**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP | |
|      Plaintiff, | |
| v. | |
| JASON CYRULNIK | |
|      Defendant. | No. 1:21-cv-1746 |
| | **JURY TRIAL DEMANDED** |

<u>**AMENDED COMPLAINT**</u>

Roche Cyrulnik Freedman LLP ("Plaintiff") brings this action against Jason Cyrulnik ("Defendant"), and alleges as follows:

<u>**Introduction**</u>

1.      This case is about a law firm refusing to tolerate the unprofessional, obstructionist, and abusive conduct of one of its partners who elevated his own interests over the interests of the firm. When efforts to resolve these problems failed, the firm's other founding partners unanimously voted to remove him for cause to safeguard firm interests, including protecting associates, staff, and the remaining partners. But, rather than accept payment for his work and focus on ensuring a smooth transition, this expelled partner refused to leave, and is attempting to shake down his former firm for millions of dollars he did not earn and to which he is not entitled. In addition, he has refused to submit his billable time records for 2021, thereby preventing the firm from collecting revenue for his time, and has failed to assist the firm in collecting over $3.3 million in unpaid invoices owed by clients he generated. Worse, on information and belief he has advised these clients not to pay the firm for these significant outstanding amounts.

2.      On December 27, 2019, Kyle Roche, Velvel Freedman, Amos Friedland, Nathan Holcomb, Edward Normand, and Defendant Jason Cyrulnik signed a Memorandum of Understanding ("MOU") to form a law firm named Roche Cyrulnik Freedman LLP ("RCF" or the "Firm"). As set forth in the MOU, RCF was to be the successor firm to Roche Freedman LLP ("RF"), a law firm formed five months earlier by Roche and Freedman. All of the above-named persons had recently left Boies Schiller Flexner LLP ("BSF"), a New York-based litigation firm, to embark on creating RF and then RCF.

3.      The purpose of the Firm was not only to create a "high-end litigation-oriented law firm," but also to form a firm that was decidedly different from the standard "big law" model. As

an initial matter, many of RF's clients operated in emerging legal areas, such as blockchain, cannabis, and other high-tech industries. But the Firm's founding partners also sought to create an environment that was more collaborative, collegial, and transparent than many traditional large law firms. In doing so, the founding partners believed it would best promote the interests of all clients, associates, staff, and partners.

4.     Defendant Jason Cyrulnik agreed with these goals, signed the MOU, and promised to "work together and cooperate in good faith and to fully participate to develop the Firm." But rather than abiding by his commitment, Cyrulnik, over an approximately one-year period, has engaged in a pattern of increasingly abusive, destructive, erratic, and obstructive behavior, materially impairing the Firm's ability to carry on its business. Examples of this conduct include, but are not limited to:

- engaging in a pattern of verbal abuse and bullying towards other partners, punctuated by screaming fits of rage directed towards those who disagreed with him;

- mocking and belittling attempts by other partners to increase the Firm's employee diversity;

- interfering with Firm staffing decisions and unilaterally obstructing associate assignments by, *inter alia*, ordering them to prioritize the clients he originated to the Firm over others, causing disruption and requiring intervention by multiple partners to ensure that all clients' interests were protected;

- creating an unsustainable work environment for associates, which led to associate complaints, including associates threatening to quit if they continued to be staffed on his matters;

- instructing a Firm employee to withhold the Firm's financial information from other equity partners of the Firm;

- refusing to take part in and discuss the management of the Firm in an attempt to exercise "veto power" over management and hiring decisions;

- breaching his commitment to work together and cooperate in good faith;

- refusing to negotiate a final partnership agreement and breaching his commitment to make effective a final partnership agreement; and

- repeatedly demanding additional compensation beyond what was contemplated by the MOU.

Multiple attempts to address these issues with Cyrulink were unsuccessful. Thus, in order to protect the interests of the Firm, the five founding partners voted affirmatively and unanimously to remove Cyrulnik from the partnership for cause, as expressly provided in the MOU.

5.     Cyrulnik refused to accept his removal for cause and demanded excessive payments as a condition for leaving. Accordingly, this lawsuit seeks a declaration that Cyrulnik was justly removed from the Firm for cause under the terms of the MOU, thereby triggering the agreement over the withdrawal provisions of the MOU for determining what Cyrulnik is owed by the Firm.

6.     Cyrunlik's wrongdoing and subsequent shake down have made this legal action necessary. The Firm refuses to be bullied by a former colleague, whose erratic conduct poses a risk to associates, staff, and partners, and is not in keeping with the Firm's values-driven culture. When sincere efforts to resolve these problems failed due to Cyrulnik's obstructive and abusive behavior, he was removed for cause. The Firm has brought this action to obtain relief from the Court, to try to ensure an orderly transition of its former partner out of the Firm, and to recover

damages caused by Cyrulnik's retaliatory refusal to submit his billable time records and his interference with the Firm's collection efforts.

## Parties

7.      RCF is a New York and Florida based litigation boutique law firm with offices in Manhattan and Miami. RCF is registered as a limited liability partnership with the state of Florida.

8.      Jason Cyrulink is a citizen of Teaneck, New Jersey.

## Jurisdiction and Venue

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because the parties are completely diverse. RCF is a citizen of Florida and New York and Cyrulnik is a citizen of New Jersey. No other RCF partners are citizens of New Jersey. Furthermore, the matter in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Jason Cyrulnik because this case arises from his transacting of business within the state of New York.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to RCF's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  The creation of Roche Freedman in August 2019.

12.     On August 1, 2019, Roche and Freedman left BSF to start a law firm called Roche Freedman LLP ("RF"). The intent was to create a cutting-edge litigation boutique that would handle high end cryptocurrency, cannabis, and commercial litigation matters. Part of the motivation in founding a firm was the opportunity to build and cultivate a team of talented lawyers

who worked in a collaborative and collegial environment to find creative solutions to complex issues.

13.     RF enjoyed considerable success for a small firm. Given Roche's and Freedman's expertise in the growing industry of cryptocurrency and cannabis litigation, RF was retained by many high profile and innovative clients in those spaces. RF also began developing a class-action practice. On October 7, 2019, RF filed a class action on behalf of a group of cryptocurrency investors who suffered significant economic loss as a result of a historic market manipulation scheme.[1]

14.     Further, as relevant here, RF was retained by a startup company that planned to build a new platform for decentralized assets and applications ("START UP").  Instead of being paid in cash, RF negotiated with the START UP to be paid for its legal services with digital assets ("Tokens") over a 36-month period beginning on September 30, 2019.

**B.   The creation of RCF in January 2020.**

15.     In October 2019, shortly after RF filed the class-action lawsuit described above, a number of BSF attorneys approached Roche and Freedman about potentially joining RF. Over the course of the next two months, Roche and Freedman began negotiating an agreement to have Cyrulnik, Edward Normand, Amos Friedland and Nathan Holcomb join Roche Freedman LLP as founding partners of RCF.

16.     During the course of these negotiations, the prospective partners discussed and agreed to a variety of things, ranging from how the Firm would allocate profits, compensate partners, and govern itself.  Roche and Freedman also used those negotiations and agreements to

---

[1] *See e.g.* https://www.ft.com/content/eb5cf045-1ea1-3b54-80cd-e9f8c8287f08;
https://www.bloomberg.com/news/articles/2019-10-07/backers-of-crypto-coin-tether-sued-over-market-manipulation,

ensure mechanisms were in place to help police the cultural and business fit they were building at RF, *i.e.,* a group of innovative, collegial, creative, and respectful lawyers.

17.     On December 27, 2019, after significant negotiations and oral understandings and agreements had been reached, Roche, Freedman, Cyrulnik, Normand, Friedland, and Holcomb (collectively, the "Founding Partners") executed a memorandum of understanding (the "MOU") "for the purposes of building a high-end litigation law firm to be named Roche Cyrulnik Freedman LLP." The MOU memorialized portions of the agreements reached between the Founding Partners, some of which relate to this dispute.

18.     *First*, the MOU provided for a proposed division of RCF's equity to be effective after a formal partnership agreement was entered into by the Founding Partners. But a formal Partnership Agreement was never executed, as described below, due to Cyrulnik's obstruction.

19.     Likewise, in addition to the eventual provision of RCF's equity, the MOU also provided for a "Partnership Compensation Model" (Formula Compensation) for distribution of RCF's profits amongst the Firm's partners, and the assignment of certain assets that belonged to the predecessor firm of RF.  In distributing these predecessor assets, the MOU specifically stated that "Not all rights and assets of the Roche Freedman LLP will be shared according to the equity percentage of the Firm in January 2020. An exhaustive list of assets that will not be shared pro-rata will be prepared in connection with the Partnership Agreement, but the list of core assets being excluded or not divided according to the Firm's equity allocations is set forth below, along with a description of how they are excluded from the assignment."

20.     The MOU also contained a provision regarding the Tokens described above. The MOU stated that an engagement letter existed between RF and START UP that contemplated that START UP would pay for legal services to be rendered with a certain amount of Tokens. The

MOU attached that engagement letter, which allows START UP to terminate the engagement letter at any time and stop paying the Tokens. The MOU then contemplated that notwithstanding the equity and formula compensation agreed to by the partners for other matters, the Tokens that RCF would earn from START UP would be distributed according to different agreed to percentages. Further, and based on the understanding that START UP was entitled to a significant amount of legal work from RCF, the MOU provided that Roche, Freedman and Cyrulnik would be the only founding partners expected to work for START UP, and that the other Founding Partners (Normand, Friedland, and Holcomb) who were not expected to work directly for START UP would each receive a significantly smaller fraction of the Token payments as they were earned. The partners agreed that if Roche, Freedman, or Cyrulnik did not do the work for START UP, if further partner resources would be required, "[t]he Firm will revisit the above distribution" of the Tokens, as specified in the MOU.

21.     By email on July 22, 2020, pursuant to the above described MOU provisions, Roche specified a re-allocation of the Tokens based on partner resources that had thus far been committed to the START UP. Cyrulnik, who never worked on the matter, did not dispute this re-allocation in his reply email. In addition, a substantial portion of the Tokens remain unearned and will only be paid by START UP if it does not terminate the agreement with the Firm, and elects to continue paying for future legal services.

22.     Since the beginning of 2021, the Tokens appreciated substantially in value and are now worth, in total, millions of dollars (although their value remains volatile). Cyrulnik has claimed that the five equity partners affirmatively and unanimously voted to remove him to gain the highly volatile and speculative value of "his" Token allocation and then lied about the cause for his removal. This is false. In addition to Cyrulnik refusing to acknowledge his own egregious

behavior, Cyrulnik ignores that the issues leading to his removal, as demonstrated below, began months prior to any rise in the Token value and were problems of his own making. Moreover, when Roche emailed Cyrulnik on July 22, 2020 about a Token re-allocation due to the additional partner resources that were needed for the START UP, the Tokens had not even been issued, could not be bought or sold, and therefore lacked any real market value. Rather than own up to his misconduct, accept payment for his work, and withdraw from the Firm in a constructive manner, it is Cyrulink who now attempts to shake down the Firm for yet more money.

23.    *Second*, as reflected in the MOU itself, the MOU was never intended to be a comprehensive document that embodied all of the partners' negotiated terms:

> This MOU sets out the **basic terms** upon which the Founding Partners will enter into a definitive partnership agreement . . . **The terms of this MOU are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the "Partnership Agreement")** to be negotiated and to be made effective on or around January 1, 2020.

24.    The above provision was added because each of the Founding Partners understood that the MOU did not reflect the entirety of their agreements or understandings with each other. Instead, the MOU was entered into as a placeholder memorializing some of the "basic terms" of their decision to form a partnership.  As the MOU stated, the partners contemplated a more formal and complete Partnership Agreement that would be entered into on or about January 1, 2020, after which time the Firm's equity would be formally reassigned, and all the details of assets committed, and obligations/responsibilities going forward were clarified and agreed to.

25.    *Third*, as a result of the extensive negotiations, discussions, and agreements reached over that multi-month period prior to, and contemporaneously with, the MOU's execution, each of the Founding Partners understood that RCF was intended to be a collaborative, collegial,

transparent, inclusive firm that would strive to be best in its class. This was memorialized in the MOU, which stated that:

> It is mutually agreed upon and understood by and among the Founding Partners that the Founding Partners **agree to work together and co-operate in good faith** and to fully participate to develop the Firm and to work towards the finalization of the Partnership Agreement.

26.     *Fourth*, each of the Founding Partners understood that there would be risks in joining together with multiple other individuals to form a new law firm. Accordingly, the Founding Partners wrote into the MOU an ability to remove a Founding Partner for cause upon concurrence of ⅔ of the Firm's equity partners, stating: "A Founding Partner cannot be removed without cause. A Founding Partner can be removed for cause only on the affirmative vote of ⅔ of the Firm's equity partners."

27.     The MOU provided for a specific mechanism for calculating what RCF would owe to a withdrawing partner in the event the withdrawal occurred within, as is applicable here, the first 18 months of RCF's formation:

> If any Partner withdraws from the firm within 18 months from the Firm's formation, the following shall occur: That Partner shall return to the firm any amount of payments received that exceed what that Partner was entitled to under the Firm's formula compensation model. If the Firm owes that Partner funds under the formula, that amount shall be paid to that Partner at the next quarterly distribution, but the Firm shall not owe that Partner any additional compensation going forward. That Partner's equity shall be returned to the balance of the firm's equity partners pro-rata.

28.     The intent of this provision was to make a separation that occurred within the first 18 months of the Firm's operation simple: it provides the departing partner with compensation he or she "earned" through their efforts, but not reward that partner further. In sum, it was inserted to provide a simple, practical, and speedy method of calculating a partner's compensation in the event things did not work out and there was a premature withdrawal (voluntary or involuntary).

**C. Under joining RCF, Cyrulnik engaged in a pattern of abusive and obstructive behavior to the detriment of the Firm.**

29.     After the MOU was signed and the Firm commenced operations, Cyrulnik began engaging in a pattern of abusive behavior that impeded Firm governance. And the abusive conduct escalated over time. Specifically, but not exhaustively, Cyrulnik screamed at other partners; refused to allow other partners to weigh in on Firm administrative matters; concealed financial information from other Founding Partners (and commanded the Firm's Director of Operations to do the same); caused associates to tell Firm partners they would quit the Firm if forced to continue working on his matters; single-mindedly attempted to reallocate Firm profit to himself in a manner that required intervention to prevent harm to Firm clients, associates, staff, and other partners; and attempted to assume total control over the Firm's management decisions –yelling at partners that they were "going rogue" when they did not obtain his "permission" prior to making decisions, despite partner emails and calls expressly addressing the decisions at issue.

  **i.     Cyrulnik attempts to monopolize power and becomes abusive to the other partners.**

30.     Following the MOU's execution, Cyrulnik began attempting to "consolidate authority" over the Firm in a manner that was contrary to the Founding Partners' agreements and inconsistent with the terms of the MOU.

31.     As an example, Cyrulnik began claiming absolute control over the allocation of associate time. He made this claim notwithstanding that no such power was ever given to him by the MOU, any agreement, or through any formal or informal vote or consent by any of the other partners, and notwithstanding other Founding Partners' stated opposition to his opportunistic power grab, which also benefited his bottom line.

32.     In addition, beginning in the first quarter of 2020, Cyrulnik began to raise concerns over the Firm's formula compensation system ("Formula Compensation"). Initially, those conversations were civilized. However, as the discussion concerning changes to Formula Compensation advanced, Cyrulnik became verbally abusive towards other partners who did not agree with his demand for a change to the formula, which would have shifted compensation from other partners to Cyrulnik.

33.     While Cyrulnik became belligerent on multiple calls about this issue in the first half of 2020, the first instance of severe verbal abuse took place on July 21, 2020, during a telephone call between Roche, Cyrulnik, and Freedman. During this call, Freedman told Cyrulnik that for a variety of reasons (including market conditions) he was unwilling to fully adopt the changes Cyrulnik was proposing to the Firm's Formula Compensation model. Minutes into the conversation, Cyrulnik completely lost control, erupted into an alarming rage, and screamed at both Roche and Freedman at the top of his lungs.

34.     In response, Roche hung up the phone almost immediately.

35.     Freedman tried to calm Cyrulnik down, but Cyrulnik's outburst escalated and became increasingly frightening. After about a minute, Freedman hung up too.

36.     The next morning, on July 22, 2020, Roche wrote Cyrulnik:

Jason,

I am writing this email not to chastise, but to set forth my positions in no uncertain terms. Given the apparent misunderstandings of what you thought I may or may not have been told, this exercise seemed necessary.

First, the manner in which you screamed at both me and Vel is simply unacceptable. I get that tempers can fly in the heat of the moment, but what you did went beyond that. I have greatly enjoyed not only steering the growth of this firm with you but also growing as friends and partners. *However, if yesterday is any sort of signal to how you think you can treat*

12

> *us when we have disputes over business and money, then I do not see how*
> *we can continue to grow the partnership . . .*

(Exhibit A, emphasis added)

37.    A few days later, on July 27, 2020, Freedman independently wrote Cyrulnik:

> Jason,
>
> I have never been screamed at the way you yelled at Kyle and I on the phone
> last week. You were out of line and it can't happen again. Going forward,
> if you scream like that again, the conversation is over. If you fail to let me
> express my opinion, the conversation is over. This is a partnership where
> we listen to each other, and then make a decision. It's not a forum of one.
>
> I understand that the delay [in effecting changes to Formula Compensation]
> may have been frustrating to you, but it certainly wasn't intended to string
> you along, and the way you handled it was unacceptable. I trust nothing
> more needs to be said about that, and I'm very hopeful this was a hiccup in
> our otherwise very enjoyable relationship.
>
> On to substance. . .

(Exhibit B, emphasis added)

38.    Roche and Freedman both hoped that this was an isolated incident. Unfortunately,
as described below, Cyrulnik's behavior continued to deteriorate to the point where it was not
reasonably practicable to carry out the partnership's business with him as a partner. Multiple
associates told Firm partners they would quit if they would continue to be staffed on Cyrulnik's
matters. Partnership meetings could no longer be peacefully conducted, and thus, were halted.
Cyrulnik engaged in further verbal abuse by screaming at additional partners. Cyrulnik derided
and ridiculed important Firm issues, including efforts to increase the number of women employed.
And Cyrulnik began engaging in highly adversarial tactics with his own partners intending, as he
bragged, to "bring them to their breaking point," and waiting until his partners "were ready to leave
the firm" before he would consider making any concessions.

39.     Cyrulnik had turned what was supposed to be a collegial, respectful, collaborative, and diverse law firm into a war zone in which Cyrulnik fought to maximize his bottom line at the expense of associates, partners, diversity initiatives, and the Firm itself.

40.     As another example of Cyrulnik's attempt to exercise unilateral control in direct violation of the MOU, on December 31, 2020, Cyrulnik circulated a conflict check to the Firm. He never sought the requisite approval required by the MOU to take on this matter, but he filed the lawsuit and staffed it without the Founding Partners' knowledge or consent. Similarly, Cyrulnik onboarded numerous clients without having them execute any formal engagement letter with the Firm, much less the Firm's approved standard engagement letter which provides for numerous protections.

### ii.     Cyrulnik obstructed partnership meetings by filibustering, speaking over, and demeaning other partners.

41.     Following the July 21, 2020 call described above, Cyrulnik became increasingly hostile during partnership meetings. Cyrulnik ramped up efforts to push changes to the Firm's Formula Compensation system that would have the effect of shifting value from the other partners to him. When this proposal was met with resistance and other partners attempted to share their views, Cyrulnik interrupted and raised his voice above everyone else's, refused to listen to anyone speak, ordered other partners to stop speaking, and simply filibustered conversations. It became a common occurrence that if Cyrulnik disagreed with another partner, he became openly hostile, pejorative, and spoke over them. This conduct made it impossible to carry on Firm governance with Cyrulnik as a partner.

42.     For example, while Cyrlunik had a busy practice, he was extremely delinquent in sending invoices to clients, to the detriment of the Firm. Despite the Firm hiring numerous associates to staff matters he originated, Cyrulnik refused to review his invoices and, for months,

refused to send out invoices totaling ~$4 million of time billed to matters he had originated. At a partnership meeting in late 2020, despite being wary of confronting Cyrulnik due to his multiple violent outbursts, Freedman again asked Cyrlunik about these delinquent invoices and stressed the importance to the Firm of collecting billable time. He requested that Cyrulnik commit to a date by when Cyrulnik could provide the partners with a *timeline* by when he would be in position to send his invoices out to his clients. Cryulnik refused this most basic request and became openly hostile, telling Freedman that he would "get to it when he gets to it," thus ending the conversation.

43.     Beginning in January 2020, and throughout the year, when partners raised with Cyrulnik the need to draft the formal Partnership Agreement, as required by the MOU, he repeatedly shut these conversations down. Based on Cyrulnik's comments and actions, it is clear he intentionally refused to enter into a Partnership Agreement, in violation of the MOU, in order to leverage gaps in the incomplete document to try to seize power and a financial advantage to the detriment of the Firm.

44.     On numerous calls throughout the year, partners expressed a desire to hire more women, minorities, LGBTQ, and diverse attorneys and staff. Cyrulnik was dismissive of these proposals, and in at least one instance, openly mocked a partner's desire to hire more women.

45.     As 2020 continued, Cyrulnik also took steps to hide financial information from other partners. In December 2020, Friedland and Holcomb (a member of the Firm's Formula Compensation Committee) reached out to the Firm's Director of Operations to ask for the financial information he had compiled when calculating formula compensation payments. Cyrulnik, however, instructed the director not to provide Friedland and Holcomb with the requested financial information and, instead, to direct all questions concerning the Firm's finances to him. He then doubled down on his concealment efforts by demanding that the director simply not respond to

Friedland or Holcomb, so that they would be unaware that no response was being prepared to their queries. Concerned about inciting the ignitable Cyrulnik, the Director complied.

46.     During this period, Roche had multiple phone conferences with Cyrulnik in an attempt to resolve the formula compensation discussion. On those calls, Roche reminded Cyrulnik that the Firm's formula compensation committee controlled any changes to the formula and that even if Roche supported the change, Cyrulnik and Roche alone could not effectuate such a change. Roche informed Cyrulnik that, to maintain the peace, the other two committee members offered a compromise that embodied a change which moved the formula in the direction Cyrulnik wanted, and that other Founding Partners had agreed to support such a compromise as well. He urged Cyrlunik to accept the compromise and end the disruption his crusade had created in the partnership. Roche warned Cyrulnik he was creating a management crisis with his brinkmanship-like behavior and begged him to abandon his futile campaign.

47.     Cyrulnik refused. He insisted there was no need to compromise as the other members of the formula compensation committee were not yet "at their breaking point" and ready to leave the firm.

### iii.     Cyrulnik attempted to assert control over Firm staffing in an unsuccessful effort to favor his financial interests to the detriment of other Firm clients

48.     As stated above, Cyrulnik attempted to assert exclusive and unreasonable control over firm staffing, putting his own interests over the interests of clients for whom he was not working, associates, and his other partners. His attempts to exercise this unilateral, unauthorized control increased throughout 2020, causing disruption and requiring intervention by multiple partners to ensure that all clients' interests were protected.

49.     At numerous points throughout 2020, Cyrulnik instructed various associates that they should be spending nearly all of their time on his matters and that if other partners were asking them to do work, they should direct those partners to Cyrulnik.

50.     Cyrulnik told associates that clients being billed on an hourly basis (billable clients) were "more important" than contingency clients because billable clients were (allegedly) more profitable to the Firm. Cyrulnik also instructed associates to prioritize work for his billable clients over other billable clients at the Firm. He argued to partners, in demanding associates be pulled off of time-sensitive, significant matters to prioritize his cases, that "not all billables are created equal."   Of course, due to the Firm's Formula Compensation, Cyrulnik profited substantially from associate time spent on matters that he originated.

51.     Similarly, he repeatedly conveyed to associates who were key team members on other cases that they would "be taken off" those matters to work on his own matters.   Cyrulnik disregarded the Firm's obligations to its clients other than his own while increasing his earnings with each additional associate who worked on his matters.

52.     In December 2020, Holcomb and Katherine Eskovitz (another senior partner who joined the Firm just after the MOU was executed) were working with an associate on a time-sensitive matter to comply with a court-ordered deadline.

53.     When Cyrulnik found out this associate was spending significant time on that matter, he proclaimed that the associate needed to stop. Holcomb and Eskovitz first tried to resolve this issue with Cyrulnik through emails but that failed. Cyrulnik next insisted on a call to understand why this associate was not taken off of Eskovitz's matter.

54. On that call, Cyrunlik immediately became verbally abusive. Much like during the July 21, 2020 call with Roche and Freedman, Cyrulnik was combative, quickly lost control, and began yelling at both Eskovitz and Holcomb.

55. Cyrulnik shrieked that he was "in charge of allocating associates" and that the associate working on the court-ordered imminent deadline was "not on this case now." Eskovitz and Holcomb each pushed back on this assertion, explaining again the immediate needs of the client and the associate's unique familiarity with the documents. Based on the information Eskovitz and Holcomb conveyed to Cyrulnik, it was clear that the client would be prejudiced if that associate were to be removed from the case just days before a filing. At the same time, they offered to discuss Cyrulnik's staffing needs in an effort to come up with a solution. In response to Holcomb's stated concerns about the staffing issue, Cyrulnik screamed "that is not your place." Eskovitz then responded that Cyrulnik did not have the unilateral authority to remove an associate from an urgent matter. Cyrulnik interjected–still yelling–"I can do that." After Cyrulnik continued to lodge irate accusations and proclamations about procedure, Holcomb pointed out that such procedural disputes were related to the Firm's lack of a definitive partnership agreement and a firm handbook with policies and procedures (Cyrulnik had stalled efforts to make progress on both as he meanwhile asserted increasing unilateral authority).

56. Cyrulnik mocked Holcomb, including by yelling at him "we don't have enough women, you always go back to the same thing." Cyrulnik's enraged mockery of Holcomb's legitimate focus on the Firm's gender balance was particularly notable because the subject had not come up on the call previously and was unrelated to the topic at hand. Cyrulnik continued to yell at and attack Eskovitz and Holcomb for about thirty minutes. Cyrulnik then abruptly ended the

call, refusing to discuss his staffing needs or why he needed that associate, on a call that purported to be about his staffing needs and that associate's time.

57.     Cyrulnik's attempt to prejudice this case in favor of his matters required additional Firm time and intervention to prevent obstructing Firm obligations. After the call, Eskovitz wrote to Cyrulnik:

> Jason,
>
> Since I have not had a call like this in my career, I feel the need to memorialize it given the misstatements you have now made by email and during the call. After thirty minutes of trying to address your concerns about procedure, with you yelling and interrupting almost the entire time, you refused to discuss the actual underlying issue of staffing, misstated both our prior emails and what I said even during the call, refused to discuss what your time sensitivities and staffing of your current case is, and instead literally ordered that [senior associate] is prohibited from working on our case after today's video call, despite my urging that we resolve this in a partner call to review staffing and reviewing the emails with you and showing you he was on our team as part of the engagement terms, which you approved.
>
> You were unprofessional and rude to me, but much worse to Nate, talking over him and entirely dismissive of his very calm, rationale input. You twisted his words and mine, and you absolutely refused to listen to anything we said, demanding answers to questions and screaming over our attempts to answer you and ignoring our answers.
>
> I am shocked at your inability to discuss this issue professionally, your misstatement of both emails and what we have said, even during the call, and your assertion that you alone are in charge of staffing and can order us to stop using [senior associate] so you can use him on your case without any further discussion of your current staffing or needs. Your accusations during the call are not only blatantly wrong, but your approach is wildly inappropriate.

(Exhibit C)

58.     Rather than apologizing for his unprofessional behavior, or focusing on the immediate needs of the Firm's clients, Cyrulnik engaged in gaslighting:[2] He denied his conduct in response to Eskovitz, calling her email "false (and surprising)"; charactered his behavior as an "informal amicable effort" to resolve the issue; accused Eskovitz of an attempt to "deflect blame and attack me," admonishing her, "I would encourage you to revisit that approach"; and again scolded Eskovitz and Holcomb for purportedly not using "appropriate channels" (of his own creation).

59.     He also called Roche and Freedman to complain about Eskovitz and Holcomb and demanded Roche and Freedman step in to assist his efforts to "put them in their place." Over the next few weeks Cyrulnik, in a vindictive and transparent attempt to try and demonstrate his power, repeatedly expressed a desire to Roche and Freedman to negatively alter Holcomb's and Eskovitz's compensation and equity allocations under various pretextual grounds.

60.     Then, during the week leading up to the major deadline in Eskovitz's matter, and with full knowledge that this particular associate was fully occupied, Cyrulnik unilaterally assigned the associate to yet another matter without discussing that decision with any other partner, ignoring the impossible position in which he was placing the associate and the potential prejudice to a Firm client. Cyrulnik then instructed the associate to spend the vast majority of his time on Cyrulnik's cases despite the urgent deadline on which that associate was working.

61.     This crisis forced Roche, Freedman, and Normand to step in and (together with Eskovitz and Holcomb) essentially override Cyrulnik's unilateral commands so that the client in the Eskovitz matter was not prejudiced. While the Firm's obligations to its clients were upheld,

---

[2] The term "gaslighting" refers to a specific type of psychological manipulation whereby the manipulator tries to get someone else (or a group of people) to question their own reality, memory or perceptions.

Cyrulnik's inappropriate and selfish behavior had, once again, created a massive disturbance in the Firm's operations. His behavior had now escalated to the point of threatening the Firm's ability to service a client, had resulted in more abusive interactions with partners, and had placed an associate in an absolutely untenable and high-stress position.

> **iv.    Cyrulnik's behavior led to associates lodging complaints and expressing a desire to leave the Firm if they remained on his team.**

62.    During the time between Cyrulnik's outburst with Roche and Freedman (July 2020) and his outburst with Eskovitz and Holcomb (December 2020), associates at the Firm reached out to Roche and other partners to discuss the unsustainable work environment Cyrulnik had created. These associates pleaded to be removed from Cyrulnik's teams.

63.    Cyrulnik's erratic behavior and the issues arising from the work environment continued to compound and became so severe that on or around the time of Cyrulnik's outburst at Eskovitz and Holcomb, two senior associates told partners at the Firm that they would (reluctantly) need to leave the Firm if they were not removed from Cyrulnik's matters.

> **D.  Cyrulnik is removed for cause from RCF.**

64.    By early 2021, it became obvious that it was no longer possible for RCF to carry on Firm governance with Cyrulnik as a Firm partner.

65.    Due to the pattern of conduct described above, Roche, Freedman, Friedland, Holcomb, and Normand met in New York to discuss Cyrulnik's repeated breaches of the MOU, his failure to work together and cooperate in good faith to fully participate in the development of RCF, his erratic behavior, and his single-minded interest in elevating his bottom line over the interests of the Firm. They concluded that Cyrulnik's behavior made it impossible for the Firm to continue to conduct its business productively, live up to its values, keep associate attorneys at the Firm, or even proceed constructively with basic Firm governance.

66.     Due to Cyrulnik's conduct, Roche, Freedman, Friedland, Holcomb, and Normand (whose votes constituted more than two-thirds of the equity partners) affirmatively and unanimously voted to remove Cyrulnik for cause on February 10, 2021, pursuant to the 2019 MOU, to protect the interests of clients, associates, staff, and the remaining partners of the Firm.

67.     On February 12, 2021, Roche (in consultation with the remaining Founding Partners) wrote Cyrulnik informing him of the Firm's decision to remove him for cause. *See* Exhibit D. In that email, Roche set forth a non-exclusive summary of the bases for Cyrunlik's removal. In addition, Roche wrote to Cyrulnik that the Firm's partners "intend to work with you on a transition plan to ensure that (i) your future endeavors are a success, and that (ii) the firm's clients are not prejudiced by your removal."

68.     Later that day, Roche, Freedman, and Normand spoke with Cyrulnik. On that call, Cyrulnik demanded the Firm retract the letter and claimed there were no grounds to remove him for cause. He also stated that given that none of the other partners wanted him at the Firm, he did not want to be there either. He said he would be open to working out a peaceful departure if the Firm committed to give him (1) everything "owed" to him under the 2019 MOU and (2) everything "owed" to him pursuant to a side letter agreement between the Named Partners.  But since then, Cyrulnik has demanded amounts far beyond what is owed to him under the MOU.

69.     Cyrulnik has since claimed the Firm's removal of him for cause is pretextual. Ignoring months of his own erratic behavior and abuse, ignoring the warning emails sent over the course of the last six months, ignoring the complete breakdown in the relationship between Cyrulnik and the rest of the partners that has occurred over this time, and ignoring that associates were refusing to work on his matters, Cyrulnik claims that the Tokens (a highly volatile asset) exponentially rose in value during the weeks leading up to his actual removal (they have since lost

more than three quarters of that value). He claims the Founding Partners removed him to recapture that highly volatile, substantially unearned, and uncertain asset.

70.     Cyrulnik has simultaneously refused to accept that he is no longer a partner at the Firm. In fact, his counsel, Marc Kasowitz (of Kasowitz Benson Torres, where Cyrulnik's brother is a partner), has stated that "Mr. Cyrulnik has no intention in the present circumstances of 'transition[ing] out of the firm,' nor have your clients validly exercised any authority to accomplish that."

71.     Indeed, while he was removed for cause on February 12, 2021, the Firm did not immediately terminate Cyrulnik's Firm email account to ensure there would be no prejudice to the matters he was handling while he transitioned to a new email account. But instead of moving his emails over, he continued to use the Firm's email account to send purported conflict checks about potential *new* matters he wanted the Firm to undertake. Legitimate questions about whether passing on this new representation would prejudice a current Firm client in a matter the Firm is handling were simply met with Kasowitz threatening to litigate, and to "hold each of you accountable for any harm to [Cyrulnik] or the firm's clients resulting from your egregious actions."

72.     On February 26, 2021, Kasowitz threatened that if the Firm did not give Cyrulnik "immediate unfettered access" to the firm bank accounts and the automatic right to bring in new matters without inquiry, it would "guaranty" litigation "to protect Jayson's [sic] unquestioned partnership rights."

**E.  Cyrulnik refuses to submit his billable time records.**

73.     As is the case at many law firms, the Firm's attorneys are responsible for providing the Firm with records of their billable time, so that the Firm can accurately bill its clients. Indeed, the Firm cannot bill clients unless its attorneys provide the necessary billable time records.

74.     To that end, the Firm requires, as a matter of practice, that its attorneys submit their time records in a timely manner.

75.     On March 24, 2021, after Cyrulnik had been removed for cause, the Firm, through its counsel, notified Cyrulnik's attorney that Cyrulnik had not submitted his billable time records for any services that he rendered as a Firm partner for Firm clients in 2021. The Firm's counsel demanded that Cyrulnik provide such records and explained that, if Cyrulnik refused, the Firm "intend[ed] to hold him responsible for the resulting harms."

76.     In response, on March 26, Cyrulnik's attorney stated that Cyrulnik would not be providing the records unless numerous conditions were met. Cyrulnik demanded that he "have the full opportunity to review and edit bills before they are sent and that fees from those clients be held in escrow."

77.     Notwithstanding that Cyrulnik had a fiduciary and ethical duty to provide his billable time records without any strings attached, the Firm agreed on April 1, 2021 to allow Cyrulnik to review and provide comments on invoices for the months of January and February 2021, before those invoices were sent to clients. That day, the Firm sent Cyrulnik a copy of the invoices.

78.     But despite demanding an opportunity to review and comment on those invoices, Cyrulnik never provided any comments. Moreover, to this day, Cyrulnik has still not provided his billable time records.

79.     Cyrulnik had (and has) no legitimate basis for withholding his billable time records. Instead, his refusal was (and is) merely retaliatory and designed to harm and inconvenience the Firm. And it has harmed the Firm. Due to the time that's passed, the Firm was left with no choice

but to invoice these clients for the months of January and February without Cyrulnik's time records.

80.     In short, because Cyrulnik has refused to provide his billable time records, the Firm has been unable to bill its clients for services rendered by Cyrulnik as a Firm partner in 2021— *i.e.*, services rendered by Cyrulnik between January 1, 2021, and February 12, 2021, the day that Cyrulnik was removed for cause from RCF's partnership.

**F.  Clients Cyrulnik originated at the Firm have uniformly not paid their invoices since being notified of his departure.**

81.     After Cyrulnik was removed from the Firm, the clients he originated (the "Cyrulnik Clients") were notified of his departure. Cyrulnik was clearly coordinating their responses to those notifications, as many of the Cyrulnik Clients provided identical responses, and, upon information and belief, Cyrulnik was the only common link between them.

82.     Collectively, these clients owe the Firm over $3.3 million dollars in unpaid invoices, for services performed by the Firm through March 2021. These amounts date back to work performed throughout 2020, as Cyrulnik habitually failed to timely invoice his clients or obtain timely payments from them. Nonetheless, and despite the fact that (i) millions of dollars in fees are outstanding, (ii) the Firm has sent multiple invoices to these clients, and (iii) the Firm has included statements about past due amounts to these clients, with the exception of a single $5,000 payment made immediately after Cyrulnik's removal and two small payments made by a client in bankruptcy, no Cyrulnik Client has paid any amount to the Firm since Cyrulnik's removal.

**Count I**
**(Declaratory Judgment)**

83.     Plaintiff hereby repeats and realleges all of the foregoing allegations as if fully set forth herein.

84.     Defendant's behavior, while he was a partner at RCF, justified the equity partners' determination to remove Defendant from the partnership for cause and effect his involuntary withdrawal pursuant to the terms of the MOU.

85.     Defendant was removed for cause, per the Memorandum of Understanding, by an affirmative vote of ⅔ of the Firm's equity partners.

86.     As a result of Defendant's removal from the RCF partnership for cause, any distributions to Defendant by RCF are to be governed by the withdrawal provisions set forth in Paragraph VI(C) of the MOU.

87.     However, as evidence by the fact that Defendant has claimed and continued to claim that he was an equity partner of RCF or, in the alternative, that he is entitled to far more than he would be entitled to under the withdrawal provisions of the MOU, Defendant disputes that he was removed from the partnership for cause and he also disputes that he is entitled only to the compensation included under the withdrawal provisions of the MOU.

88.     As a result, a material and genuine controversy exists between the parties as to whether Defendant was removed from the RCF partnership for cause and, as a result, there is also a material and genuine controversy as to the compensation Defendant is entitled to as a result of his removal.  Accordingly, there is a bona fide, actual, present and practical need to resolve this controversy.

89.     By reason of the foregoing, Plaintiff seeks and is entitled to a declaratory judgment by the Court declaring:

(a)  Defendant has been validly removed from the Firm for cause per the MOU;

(b)  Defendant is only entitled to the compensation delineated in Paragraph VI(C) of the MOU, governing withdrawal; and,

(c)  as a further result of, *inter alia*, Defendant's breach of the MOU and his removal for cause, Defendant is not entitled to any further compensation or interests as contemplated in the MOU, or if he is, what is he entitled to.

### Count II
### (Breach of Fiduciary Duty)

90.     Plaintiff hereby repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

91.     Courts have long recognized that a law firm partner breaches his or her fiduciary duty by failing to record, or to facilitate the firm's collection of fees for, billable hours for work performed while a partner at the firm.

92.     During the period from January 1, 2021, through February 12, 2021, Cyrulnik owed fiduciary duties to Plaintiff.

93.     Following his removal for cause from the Firm on February 12, Cyrulnik continued to owe fiduciary duties to Plaintiff in connection with matters arising, and events occurring, while he was still a Firm partner.

94.     Cyrulnik breached his fiduciary duties, including the duty of loyalty, by refusing to provide his billable time records to the Firm for services that he rendered as a Firm partner for Firm clients during the period from January 1, 2021, through February 12, 2021.

95.     In addition, Cyrulnik breached those duties by failing to assist the Firm in collecting over $3.3 million in legal fees owed by the Cyrulnik Clients, for whom Firm attorneys provided legal services in 2020 and 2021.

27

96.     Worse, on information and belief, Cyrulnik has advised those clients, who opted to retain Cyrulnik as their attorney when Cyrulnik was removed for cause, and whom had coordinated responses to Firm communications, to withhold payment of money owed to the Firm, thereby thwarting the Firm's collection efforts.

97.     Cyrulnik's refusal to provide his billable time records to the Firm has proximately caused Plaintiff to suffer damages, including by preventing Plaintiff from billing its clients for services rendered by Cyrulnik as a Firm partner in 2021, and by preventing Plaintiff from receiving revenue for such services.

98.     In addition, Cyrulnik's failure to facilitate the collection of fees owed by the Cyrulnik Clients, as well as Cyrulnik's affirmative efforts to prevent such fees from being paid, has proximately caused Plaintiff to suffer damages, including by preventing Plaintiff from recovering over $3.3 million owed by the Cyrulnik Clients.

99.     Moreover, Cyrulnik's refusal to provide his billable time records, failure to facilitate the collection of fees from the Cyrulnik Clients, and affirmative efforts to prevent such fees from being paid were willful and malicious. Plaintiff is thus entitled to punitive damages.

### Count III
### (Intentional Interference with Contract)

100.    Plaintiff hereby repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

101.    While a partner at the Firm, Cyrulnik originated the Cyrulnik Clients. The Firm had binding and enforceable contracts with the Cyrulnik Clients in the form of engagement letters or oral agreements.

102.    Pursuant to those contracts, the Cyrulnik Clients were contractually obligated to pay the Firm for legal services that the Firm rendered for the Cyrulnik Clients.

103.     Cyrulnik, as the originating attorney on those matters, had knowledge of those binding and enforceable contracts, including the Cyrulnik Clients' obligations pursuant to those contracts to pay for legal services rendered by the Firm for the Cyrulnik Clients.

104.     Cyrulnik intentionally procured the breach of those contracts in two ways. *First*, in breach of his fiduciary duties, Cyrulnik has failed to facilitate the Firm's collection of money owed by the Cyrulnik Clients. *Second*, on information and belief, Cyrulnik has advised the Cyrulnik Clients, who have retained Cyrulnik as their attorney, to withhold payment of money owed to the Firm. Cyrulnik has thus encouraged and induced the Cyrulnik Clients to breach their contractual obligations to the Firm.

105.     This information and belief is based, in part, on the Cyrulnik Clients' coordination of responses to the Firm's communications since Cyrulnik's removal, the fact that no Cyrulnik Client has paid the firm since Cyrulnik's removal (beside a *de minims* payment made immediately after his removal and another made by a client in bankruptcy proceedings), and Cyrulnik's demand that the Firm hold all amounts paid by these clients in escrow, the Firm's refusal to do so, and then the Cyrulnik Clients' uniform failure to pay anything.

106.     Cyrulnik's interference with Plaintiff's contracts with the Cyrulnik Clients was unjustified. Indeed, his conduct was willful and malicious, and designed to retaliate against the Firm for removing him from the Firm for cause.

107.     Cyrulnik's interference with Plaintiff's contracts with the Cyrulnik Clients proximately caused the Cyrulnik Clients to breach their obligations to pay the Firm for legal services that it provided. Absent Cyrulnik's interference, the Cyrulnik Clients would have paid the fees, as obligated under the relevant contracts. Plaintiff has thus suffered damages as a result of Cyrulnik's conduct.

108.    As explained above, Cyrulnik's conduct was willful and malicious. Accordingly, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

    (a) Enter a judgment declaring that Defendant was validly removed for cause;

    (b) Enter a judgment declaring Defendant is entitled to just the Formula Compensation amount delineated by Paragraph VI(C) of the MOU, governing withdrawal, and no more;

    (c) Enter a judgment awarding costs and disbursements of this action;

    (d) Award compensatory damages to Plaintiff in an amount to be determined at trial, as well as punitive damages;

    (e) Award prejudgment and postjudgment interest at the maximum possible rate;

    (f) Award such other and further relief as the Court deems just and proper.

Plaintiff demands a trial by jury.

DATED: July 2, 2021            Respectfully Submitted,

**KAPLAN HECKER & FINK LLP**

*/s/ Sean Hecker*
Sean Hecker
350 Fifth Avenue, Suite 7110
New York, NY 10118
Telephone: (212) 763-0883
Email: shecker@kaplanhecker.com

**ROCHE FREEDMAN LLP**

*/s/ Eric Rosen*
Eric Rosen
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Email: erosen@rcfllp.com