UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP,<br><br>    Plaintiff,<br><br>v.<br><br>JASON CYRULNIK,<br><br>    Defendant.<br><br>JASON CYRULNIK,<br><br>    Counterclaim-Plaintiff,<br><br>v.<br><br>ROCHE CYRULNIK FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN, AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND,<br><br>    Counterclaim-Defendants. | Case No. 1:21-cv-01746 (JGK) |

**COUNTERCLAIM-DEFENDANT KYLE ROCHE AND DEVIN FREEDMAN'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 4

I.    ROCHE FREEDMAN LLP'S FORMATION AND OPERATIONS PRIOR TO CYRULNIK'S ARRIVAL IN JANUARY 2020 ............................................................ 4

II.    THE FOUNDING PARTNERS EXECUTE THE MOU AND FRIEDLAND, HOLCOMB, NORMAND, AND CYRULNIK JOIN THE FIRM .................................. 5

III.    FOLLOWING MONTHS OF ESCALATING MISCONDUCT, CYRULNIK IS REMOVED FROM THE FIRM FOR CAUSE ........................................................... 8

IV.    CYRULNIK REFUSES TO LEAVE AND INSTEAD CONCOCTS A CONSPIRACY THEORY TO SHAKE THE FIRM DOWN ............................................................... 8

ARGUMENT ..................................................................................................................... 10

I.    CYRULNIK'S STATUTORY CLAIMS AGAINST ROCHE AND FREEDMAN SHOULD BE DISMISSED ................................................................................... 10

II.    CYRULNIK'S COMMON-LAW CLAIMS AGAINST ROCHE AND FREEDMAN SHOULD BE DISMISSED ................................................................................... 10

CONCLUSION .................................................................................................................. 11

## TABLE OF AUTHORITIES

**Cases**

*Condit v. Dunnex,*
 317 F. Supp. 2d 344 (S.D.N.Y. 2004) .................................................................................. 1

*Fair Hous. Justice Ctr. Inc v. Lighthouse Living LLC,*
 2021 WL 4267695 (S.D.N.Y. Sept. 20, 2021) ..................................................................... 3

**Other Authorities**

Fla. Stat. § 620.1407 ............................................................................................................... 10

Fla. Stat. § 620.8403 ............................................................................................................... 10

Fla. Stat. § 620.8701 ............................................................................................................... 10

Counterclaim-Defendants Kyle Roche and Devin Freedman respectfully submit this Memorandum of Law in support of their Motion to Dismiss Defendant Jason Cyrulnik's Counterclaims.

## INTRODUCTION

Cyrulnik claims this case is about "a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded." His allegations are false and irresponsible.

Indeed, Cyrulnik's story is based on his say-so that six of his former colleagues (all officers of the Court) (i) conspired to fabricate allegations that he engaged in misconduct, (ii) convinced Firm associates to join this conspiracy and likewise fabricate episodes of his misconduct, and (iii) used those fabricated allegations as a pretext for removing him from Roche Freedman LLP ("RF" or the "Firm"). Cyrulnik further claims his former colleagues effectuated this removal to justify withholding extremely volatile cryptoassets (the "Tokens") that a client (the "Startup") would potentially pay the Firm over a three-year period in exchange for future legal services. But Cyrulnik's allegations completely ignore the reality that when he was removed, the Startup could have terminated the engagement at any time and owed no further Token payments to the Firm. More fundamentally, his allegations ignore the plain language of the contract he seeks to enforce, the Memorandum of Understanding dated December 26, 2019 (the "MOU"), which provides for a mechanism to redistribute the Tokens based on which lawyers were performing work for the Startup.[1]

---

[1] Although Cyrulnik attached the MOU to his Counterclaims (*see* Dkt. No. 72-1), he inexplicably omitted its Exhibits B and C. The MOU, with those exhibits, is attached as Exhibit 2 to the Declaration of Sean Hecker ("Hecker Decl."). Because Cyrulnik relies on and quotes from the MOU and its exhibits (*see, e.g.*, Dkt. No. 72 at Counterclaims ¶¶ 50-52), this version may properly be considered for purposes of Counterclaim-Defendants' motions to dismiss. *See Condit v. Dunnex*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004) ("When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may also take that document into consideration in deciding the defendants' motion to dismiss." (alterations and quotations omitted)).

Unsurprisingly, Cyrulnik's allegations are built on little beyond the layers of rhetoric and adjectives contained in his Counterclaims. Specifically, Cyrulnik can only identify one fact to support the existence of this convoluted and allegedly "deplorable scheme" - that the price of the Tokens (which like many cryptoassets, is *extremely* volatile[2]) had increased around the same time the Firm removed him. But that lone fact doesn't help him. Indeed, although Cyrulnik claims the Firm's allegations of his misconduct are fabricated, he ignores that those allegations are captured in *contemporaneous* records that *pre-date* not only any Token price increase, but also the initial launch of the Token itself. These allegations of his misconduct *cannot* be explained away by a *subsequent* increase in the price of the Tokens. There is no, and was no, "deplorable scheme" to steal from Cyrulnik.

Instead, what Cyrulnik ultimately seeks is a windfall against the Firm and his former colleagues—Roche, Freedman, Friedland, Holcomb, and Normand (together with Cyrulnik, the "Founding Partners"). Cyrulnik had nothing to do with securing the Startup retention. Roche and Freedman signed that client up long before he joined the Firm. Cyrulnik has likewise never performed *any* legal work for the Startup, or even spoken to its principals. The Firm that Cyrulnik no longer supports, on the other hand, continues to perform millions of dollars in legal work for the Startup.

Cyrulnik, unburdened from working for the Startup or on any Firm matters, has since started his own nine-attorney law firm, Cyrulnik Fattaruso LLP, which competes with RF, and

---

[2] The Tokens lost more than half their value within days of Cyrulnik's removal. Within months they were down ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Since then, the price continues to fluctuate wildly, but has (for now) climbed above the price at Cyrulnik's removal. The Tokens remain subject to major fluctuations in price, and the Firm is still performing legal services for the Startup in return for the Tokens.

which, he boasts, has taken many of RF's clients.[3] Cyrulnik is presumably collecting substantial revenue from those clients and keeps that revenue all to himself. But that is, apparently, not enough for him.

Indeed, not satisfied to claim partnership at one law firm at a time, Cyrulnik has taken the position that he is *still* a partner at RF and entitled to all the benefits that come with that partnership despite the fact that he no longer contributes any of the work, responsibility, or contribution associated with that benefit.[4]

Moreover, based on his alleged status as an RF partner, Cyrulnik seeks to *dissolve* RF—a competitor of his new firm. The only way Cyrulnik will acknowledge he is not an RF partner (and end his crusade to dissolve the Firm), is if RF agrees to make *continuing* payments to him. Specifically, if the Firm agrees to pay him 25% of any Tokens the Startup has paid, and will ever pay, for the Firm's work. He makes this demand even though at the time of his removal (i) he had never provided any legal services to the Startup, (ii) many of the Tokens were neither earned nor paid, (iii) the Startup could have terminated its engagement with the Firm (and thus withhold unearned Tokens), (iv) the MOU he signed provides for a reallocation of the Tokens should he not work on the matter, and (v) the clear intent of the MOU (as captured by the reallocation clause mentioned above) is that Cyrulnik should only share in Tokens paid if he's a partner of the Firm, contributing to its success, and working on the Startup matter.

Neither the parties' governing agreement nor applicable law permit Cyrulnik, after being terminated for cause, to "tax" RF indefinitely by collecting a percentage of fees paid to RF by its

---

[3] *See* Hecker Decl. Ex. 5 (New York Department of State Entity Information for Cyrulnik Fattaruso LLP); *see also Fair Hous. Justice Ctr. Inc v. Lighthouse Living LLC*, 2021 WL 4267695, at *4 (S.D.N.Y. Sept. 20, 2021) (stating that "the Court may take judicial notice of the public Entity Information provided by the New York State Department of State, Division of Corporations Corporate and Business Entity Database") (alterations omitted).

[4] Cyrulnik was never an equity partner of the Firm. (*See, e.g.*, Dkt. No. 31 ¶¶ 18, 24). The Firm will raise these arguments for adjudication at an appropriate procedural posture.

3

clients. His claims are meritless. For purposes of this motion, however, Roche and Freedman seek dismissal of the claims brought by Cyrulnik against them in their individual capacities, for many of the same reasons explained in Holcomb, Normand, and Friedland's Memorandum of Law in Support of Their Motion to Dismiss. ("Holcomb Br."). In addition to joining that brief, this brief is intended to highlight the provisions and effect of the parties' MOU for the Court, and overlay those provisions and agreements onto Cyrulnik's allegations to demonstrate the implausibility of his claims.

This case is not about some contrived "deplorable scheme." Instead, it is about a lawyer trying to free ride on the work, skill, and reputation of others, after his bad behavior got him fired for cause by a unanimous vote of his former colleagues.

**FACTUAL BACKGROUND**

I. **ROCHE FREEDMAN LLP'S FORMATION AND OPERATIONS PRIOR TO CYRULNIK'S ARRIVAL IN JANUARY 2020**

In Summer 2019, Kyle Roche and Velvel Freedman left Boies Schiller Flexner LLP ("BSF") to start their own firm, Roche Freedman LLP ("RF" or the "Firm"). (Dkt. No. 72 at Counterclaims ("CC") ¶ 25.) Roche and Freedman divided equity in their new firm 50/50 (*see* MOU § II), raised over ███████ in funding (*id.* § IV.A), and quickly built a successful practice that was earning millions more in revenue. RF also represented clients in contingency and alternative-fee matters, including a "major contingency matter" (CC ¶ 37) that Roche and Freedman originated in 2018 while at BSF, and for which Roche and Freedman ultimately obtained a "$100 million jury award" (*id.* ¶ 102).

The Firm's contingency and alternative-fee matters also included the Firm's representation of an innovative technology startup (the "Startup"), which agreed to pay the Firm for its legal services with cryptoassets (the "Tokens") that are central to Cyrulnik's Counterclaims. (*Id.* ¶¶ 50-

4

55.). Specifically, in September 2019, shortly after RF's formation, and before Cyrulnik joined RF, the Startup retained RF due to Roche and Freedman's expertise in the emerging crypto industry. (*See id.* ¶ 25; MOU § IV.B.) Pursuant to the agreement governing that engagement (the "Engagement Letter"), RF would provide ███ million in legal services to the Startup over a three-year period. (CC ¶ 51; MOU Ex. B at 2.)

In exchange, RF would receive, as a fee for its services, ███ percent of certain "Token Distributions" that the Startup "intend[ed]" to make over that period (the "Maximum Token Fee"). (MOU Ex. B at 2; *see also* MOU § IV.B.)

Under the Engagement Letter, RF's right to the Maximum Token Fee was not unalterable. The engagement could be terminated by either party "████████████████████████████" (MOU Ex. B at 5.) In that event, RF would only get ███ of the Maximum Token Fee (earned before Cyrulnik joined RF), plus an additional ████████████████████████ ████████████. (*Id.*) Accordingly, as of the date of Cyrulnik's removal, only ███ of the Maximum Token Fee had been earned and ████████ could only be earned if neither the Firm nor the Startup terminated the engagement before September 2022.

## II. THE FOUNDING PARTNERS EXECUTE THE MOU AND FRIEDLAND, HOLCOMB, NORMAND, AND CYRULNIK JOIN THE FIRM

Months after Roche and Freedman formed RF, several BSF attorneys began exploring the possibility of joining them. On December 27, 2019, then-BSF attorneys Amos Friedland, Nathan Holcomb, Edward Normand, and Cyrulnik, along with Roche and Freedman (the "Founding Partners"), executed the MOU. (CC ¶ 30.) The MOU set "out the basic terms upon which the Founding Partners will enter into a definitive partnership agreement . . . for the purposes of building a high-end litigation law firm to be named Roche Cyrulnik Freedman LLP." (MOU § I.)

5

The MOU was "not comprehensive" and was subject to "additional terms, including further clarification on areas of responsibility and resources to be committed," that were to "be incorporated into a formal Partnership Agreement" that was "to be negotiated." (*Id.*) It also made clear that "[n]ot all rights and assets of Roche Freedman LLP will be shared according to the equity percentages" expected at the new Firm. (*Id.* § IV.) The MOU identified some of the assets that were to be distributed differently, and identified the Tokens as one such asset. (*Id.* § IV.B.)

The MOU explained that the Startup "has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019." (*Id.*) It further provided that the "Founding Partners understand that Roche Freedman LLP has agreed to distribute its [Tokens] according to" a specified "breakdown," under which Freedman, Roche, and Cyrulnik would receive 32%, 28%, and 25% respectively. (*Id.*) In contrast, Friedland, Holcomb, and Normand would only receive 5% each. (*Id.*) This distinction was based on the fact that Roche, Freedman, and Cyrulnik were "the only partners expected to bill to the [Startup] matter." (*Id.*) Indeed, the MOU provided: "In the event that further partner resources are required"—*e.g.*, Roche, Freedman, or Cyrulnik did not provide services to the Startup or Friedland, Holcomb, or Normand did provide such services—"the Firm will revisit the above distribution of the [Tokens]." (*Id.*)

This structure made good sense. Under the compensation formula contemplated by the MOU (*see* MOU § III), a Founding Partner was expected to receive ▌ of each dollar he billed to matters he originated, ▌ of each dollar he billed to matters he did not originate, and ▌ of every dollar anyone billed to a matter he originated. (*See* MOU Ex. C.) The unconventional fee arrangement between the Firm and the Startup made it difficult to apply this structure to hours billed to the Startup, so the Founding Partners settled on a default allocation based on their expectation as to who would be billing to that matter.

6

At the same time, the clause permitting the Firm to "revisit" that allocation (the "Reallocation Clause") ensured that the initial Token distribution would be adjusted if reality deviated from expectations. The clause thus protected a Founding Partner who spent *more time* than expected working on behalf of the Startup from a situation where he would receive no additional compensation (*i.e.*, no additional Tokens) for that work. Indeed, such a Founding Partner would be forgoing *formula* compensation because he would be spending time working on behalf of the Startup, as opposed to other Firm clients for which he would receive between ▇ and ▇ of each dollar billed.

On the other hand, the Reallocation Clause also prevented a Founding Partner who spent *less time* than expected working on behalf of the Startup from free-riding off of a Founding Partner that picked up his slack. Absent the Reallocation Clause, for example, Roche, Freedman, or Cyrulnik could spend all of their time billing to other Firm clients, and thus collect formula compensation on those other clients, without giving up any Tokens. They could thus increase their own compensation, at the expense of one of their colleague's compensation. This is, as explained below, exactly what Cyrulnik did.

The newly-expanded version of the Firm, called RCF, launched in January 2020. (CC ¶ 32.) By that point, Roche and Freedman had been providing services to the Startup for several months and had already earned ▇ of the Tokens. (MOU Ex. C at 5.) They continued to do so following the arrival of the other Founding Partners. (*Id.* ¶ 38; *see also* Dkt. No. 31-1 at 3.) Indeed, although the MOU contemplated that Cyrulnik would work on behalf of the Startup, he never did. (*See* Dkt. No. 31-1.) Instead, he focused exclusively on representing clients that he originated (*see* CC ¶ 4, 71), which enabled him to maximize his own personal compensation.

7

Based on Cyrulnik's failure to perform *any* work for the Startup, on July 22, 2020, Roche proposed that Tokens be reallocated from Cyrulnik to Roche and another attorney, who had both devoted extensive time to representing the Startup. (CC ¶ 58; *see* Dkt. No. 31-1.) Roche explained that the "redistribution" was contemplated by the MOU, that he expected his "workload" for the Startup to "substantially increase," and that, as a result, he was "completely at capacity" and thus had to pass "up taking on additional (paying) work because of these commitments." (Dkt. No. 31-1.) Cyrulnik, disregarding his obligations under the MOU, ignored that proposal, which he now mischaracterizes, colorfully, as an "unjust and unethical" attempt to "dupe Cyrulnik into sacrificing his right to a portion of the Tokens." (CC ¶¶ 58-59.) Of course, Roche was merely proposing that Cyrulnik honor his obligations under the parties' agreement voluntarily so as to avoid the need to call a formal vote invoking the Reallocation Clause.

### III. FOLLOWING MONTHS OF ESCALATING MISCONDUCT, CYRULNIK IS REMOVED FROM THE FIRM FOR CAUSE

Following months of Cyrulnik's escalating misconduct and abuse, the Firm's Founding Partners voted unanimously to remove him for cause. (*See* CC ¶¶ 69-72; Dkt. No. 31-4.)

### IV. CYRULNIK REFUSES TO LEAVE AND INSTEAD CONCOCTS A CONSPIRACY THEORY TO SHAKE THE FIRM DOWN

Notwithstanding his well-documented misconduct and the Founding Partners' unanimous vote to remove him, Cyrulnik refused to leave. Instead, he claimed the removal was "void *ab initio*," because it was really just "a deplorable scheme" to "illegally steal extraordinarily valuable assets by purporting to oust [him] from the firm." (CC ¶¶ 1, 86, 106.)

Cyrulnik was, however, willing to leave the Firm if it capitulated to certain absurd demands. (*Id.* ¶ 86.) Among several "non-negotiables," Cyrulnik insisted the Firm pay him 25% of *all* Tokens it *could ever* receive from the Startup, even if those Tokens were received for services rendered by the Firm *after* Cyrulnik's removal. (Dkt. No. 38-3.) When made, his demand meant

8

that (assuming neither the Firm nor the Startup terminated the engagement), the Firm would be obligated to (i) provide millions of dollars of hourly work to the Startup for nearly two years, without (ii) any assistance or support from Cyrulnik, and then (iii) pay Cyrulnik 25% of the fee paid by that client. All this while Cyrulnik operates his own firm, Cyrulnik Fattaruso LLP, and keeps all the fees from that firm.

Cyrulnik made clear that any alternative is unacceptable to him: he alleges he rejected RF's offer to provide him with 6.25% of the Tokens—25% more than what the other Founding Partners who did not provide legal services to the Startup would receive (and who, unlike Cyrulnik, remain at the Firm and working for its benefit). (CC ¶ 87.)

Since his "non-negotiables" were rejected, Cyrulnik has refused to acknowledge that he is no longer a part of the Firm. Incredibly, to this day—more than one year after his removal—Cyrulnik continues to claim that he "remains a Founding Partner and Co-Chairperson of RCF," who holds 27% of the Firm's equity, and is entitled to all that entails. (*Id.* ¶¶ 106, 115.) He has taken this position even though he's started a competing firm and even though "every single client" he originated while at RF has opted to follow him to Cyrulnik Fattaruso—an "exodus" that Cyrulnik says has caused the Firm to lose "most" of its "core clients and revenue." (*Id.* ¶¶ 7, 85, 90-93).

Seeking to further harm the firm at which he allegedly "remains" a partner, Cyrulnik requests that this Court *dissolve* RF because, among other reasons, "it is not reasonably practicable for Cyrulnik to carry on the business in partnership" with the other Founding Partners. (*Id.* ¶¶ 106, 109.) Cyrulnik thus admits he cannot work with his old colleagues, but seeks to burn the house down on his way out to dissolve his competition. Cyrulnik also asserts claims for a buyout under

9

Fla. Stat. § 620.8701 and an accounting under Fla. Stat. §§ 620.8403 and 620.1407. (*Id.* ¶¶ 113-25.) Each of these claims are asserted against the Founding Partners in their personal capacities.

In addition to his statutory claims, Cyrulnik asserts a number of common-law claims against Roche and Freedman. These claims, at bottom, are based on the same core allegation: Roche and Freedman engaged in a "deplorable scheme" to manufacture cause to remove Cyrulnik, so that they could "steal" "his" Tokens. (*Id.* ¶¶ 130-31, 142, 147, 150, 159, 163, 171.) That allegation is baseless and will be proven so at the appropriate time.

On this narrow motion, Roche and Freedman only seek dismissal on the legal grounds set forth below and articulated in their colleagues' motion to dismiss. (*See generally* Holcomb Br.)

## ARGUMENT

### I. CYRULNIK'S STATUTORY CLAIMS AGAINST ROCHE AND FREEDMAN SHOULD BE DISMISSED

Roche and Freedman join Holcomb, Normand, and Friedland's argument that Cyrulnik's dissolution, buyout, and accounting claims (Counts 1, 2, and 3) can only be asserted against the Firm. (*See* Holcomb Br. at 6-9.) For that reason, Cyrulnik's claims against Roche and Freedman should likewise be dismissed.

### II. CYRULNIK'S COMMON-LAW CLAIMS AGAINST ROCHE AND FREEDMAN SHOULD BE DISMISSED

Roche and Freedman join Holcomb, Normand, and Friedland's argument that Cyrulnik's common-law claims for breach of contract, breach of the implied covenant of good faith, breach of fiduciary duty, conversion, unjust enrichment, promissory estoppel, and civil conspiracy (Counts 4-10) should be dismissed because they concern the Firm's obligations, not any individual partner's obligations. (*See* Holcomb Br. at 14-16.) For that reason, Cyrulnik's claims against Roche and Freedman should likewise be dismissed.

## **CONCLUSION**

Roche and Freedman respectfully request, for the foregoing reasons, that the Court dismiss Cyrulnik's Counterclaims as against them personally.

Dated: New York, New York
April 26, 2022

_____
Sean Hecker
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0889
shecker@kaplanhecker.com

*Counsel for Kyle Roche and Devin Freedman*

## CERTIFICATE OF COMPLIANCE

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 3,334 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

_____
Sean Hecker