**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212-763-0883
DIRECT EMAIL   shecker@kaplanhecker.com

May 20, 2022

**Via ECF**
The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:   *Roche Freedman LLP v. Jason Cyrulnik*, No. 1:21-cv-1746 (S.D.N.Y.)

Dear Judge Netburn:

We represent Plaintiff and write in response to Defendant Jason Cyrulnik's letter (Dkt. No. 123) seeking to quash subpoenas the Firm issued to its former clients. The subpoena recipients are all clients Cyrulnik brought to the Firm before he was removed for cause ("Cyrulnik Clients"). As the Court may recall, the Firm's complaint alleges Cyrulnik tortiously interfered with the Firm's contracts with these Clients and that Cyrulnik breached his fiduciary duties by so interfering. (Dkt. No. 31 ¶¶ 90-108). Specifically, the Firm alleges the Cyrulnik Clients owe the Firm over $3,300,000 in unpaid legal fees and that Cyrulnik is the cause for this failure to pay. *Id.*

As explained below, the subpoenas seek relevant information that goes to the heart of these breach of fiduciary duty and tortious interference claims. And Cyrulnik lacks standing to raise these objections anyway. His request for a conference should be denied, as should his frivolous request for sanctions.

**Factual Background**

As a threshold matter, the RF Parties note that Cyrulnik repeats—yet again (*see, e.g.*, Dkt. No. 118)—his absurd claim that he is the victim of "a deplorable scheme" to "improperly and suddenly remove him" from the Firm. Neither Cyrulnik's continued repetition of this falsehood, nor his inappropriate labeling of the RF Parties as the "Conspiring Partners," make his baseless allegations any less false. Cyrulnik's story is that six of his former colleagues (all attorneys and officers of the Court) (i) conspired to fabricate allegations that he engaged in misconduct, (ii) convinced Firm associates to join in this conspiracy and likewise fabricate episodes of his misconduct, and (iii) used those fabricated allegations as a pretext for terminating him—all so they could "steal" his share of a highly volatile cryptoasset that the Firm already had the contractual authority to reallocate. (*See* Dkt. No. 104 at 1-4.) This conspiracy theory is unbelievable and demonstrably false, as evidenced by contemporaneous records of Cyrulnik's abusive conduct that

pre-date any cryptoasset price increase.[1] The RF Parties look forward to proving as much at trial as soon as possible.

This discovery dispute concerns whether to quash subpoenas that seek information relevant to the Firm's breach of fiduciary duty and tortious interference claims against Cyrulnik.

Over his 14 months with the Firm, Cyrulnik engaged in abusive behavior where he ignored the Firm's rules and policies and sought to maximize his bottom line at the expense of the Firm, its attorneys, and its staff. (Dkt. No. 31 ¶¶ 29, 39.) The Parties' Memorandum of Understanding contemplated that each Founding Partner would receive a specified percentage of revenue generated from clients they originated. (Dkt. No. 104 at 9.) Shortly after Cyrulnik joined the Firm in January 2020, he began advocating for the Founding Partners to modify the formula in a manner favorable to him. (Dkt. No. 31 ¶¶ 32-33, 41.) When others disagreed, Cyrulnik became increasingly hostile and verbally abusive. (*Id.*) Having failed to persuade other Founding Partners to accept his proposal voluntarily, Cyrulnik began a campaign to bring the other Founding Partners to "their breaking point," such that they would accede to his demands. (*Id.* ¶¶ 38, 47.)

Cyrulnik began informing associates they would "be taken off" matters for clients originated by other Founding Partners and demanded they bill <u>exclusively</u> to clients he originated. (*Id.* ¶¶ 41, 49-51.) Cyrulnik made these demands, which were intended to increase his compensation at the expense of other Founding Partners', regardless of the associates' availability and prior commitments. (*Id.*) Cyrulnik thus put those associates in "untenable and high-stress" positions and created an "unsustainable work environment." (*Id.* ¶¶ 61-63.)

Compounding the problem, Cyrulnik refused to timely invoice the Cyrulnik Clients for those associates' work, failing to send out approximately $4 million in bills for months. (*Id.* ¶ 42.) When asked by other Founding Partners to provide a <u>timeline</u> by when he would be able to send out these invoices, Cyrulnik refused, thus depriving the Firm of revenue earned by its attorneys. (*Id.*) This conduct continued after Cyrulnik was terminated for his wrongful behavior.

In particular, after his removal, Cyrulnik (i) refused to provide his billable time records to the Firm for 2021 and thus prevented the Firm from collecting revenue for his time over that period; (ii) failed to assist the Firm "in collecting over $3.3 million in legal fees owed by the Cyrulnik Clients," and (iii) advised the Cyrulnik Clients "to withhold payment of money owed to the Firm, thereby thwarting the Firm's collection efforts." (*Id.* ¶¶ 73-80, 90-108.) Indeed, after Cyrulnik was removed, the Cyrulnik Clients almost uniformly refused to pay their outstanding bills, which, in many cases, had accrued for months prior to Cyrulnik's removal as a result of his delinquency in sending invoices. (*Id.* ¶¶ 42, 81, 96, 105.) And when the Firm requested payment, the Cyrulnik Clients provided near-identical responses coordinated by Cyrulnik. (*Id.*) Based on these allegations, the Firm asserted claims against Cyrulnik for breach of fiduciary duty and intentional interference with the Firm's engagement agreements with the Cyrulnik Clients. (*Id.* ¶¶ 90-108.)[2]

---

[1] For example, Firm partner and former federal prosecutor Katherine Eskovitz wrote to Cyrulnik: "I will not stay and take your outbursts again. I am not a witness you are cross-examining or an opponent. I am very disappointed and upset by your conduct." (Dkt. No. 31-3.)

[2] Although Cyrulnik asserts (at 1) that these claims are "frivolous and sanctionable," he tellingly did not move to dismiss them as implausible and has filed no sanctions motion. (Cyrulnik did file a motion to dismiss the Firm's Amended Complaint on other grounds; it was denied. (*See* Dkt. No. 56.))

Faced with these claims, Cyrulnik made (false) allegations about the Firm's relationship with the Cyrulnik Clients in his counterclaims. For example, Cyrulnik claims the Firm "egregiously breached their duties to and badly mistreated" the Cyrulnik Clients by "seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik." (Dkt. No. 72 ¶ 85.) This never happened, and the Firm intends to prove it. Cyrulnik also alleges that after the Cyrulnik Clients chose to transfer their case to Cyrulnik, the "Firm scrambled to punish those clients by rapidly removing the associates who had been staffed on those cases for months." (*Id.* ¶¶ 91-93.) This is likewise false. In fact, the RF Parties provided nearly $500,000 in legal services to Cyrulnik Clients after he was removed for cause. Finally, Cyrulnik also falsely alleges that the RF Parties "sought to harm those clients by generating and demanding payment of inaccurate and improper invoices, and refusing to remit client funds that did not belong to them." (*Id.* ¶¶ 91-93.)

In light of the parties' respective allegations about the Firm's interaction with the Cyrulnik Clients and Cyrulnik's tortious interference and breaches of fiduciary duty involving those clients, the RF Parties served the Cyrulnik Clients[3] with narrowly-tailored subpoenas targeting information concerning their obligations to pay the Firm for its services (a necessary element of the Firm's tortious interference claim), their communications with the Firm (which the RF Parties contend were coordinated by Cyrulnik), and their statements about the Firm in the period following Cyrulnik's removal (when Cyrulnik alleges they were "badly mistreated" by the RF Parties).

Cyrulnik now seeks to quash those subpoenas. Further, Cyrulnik claims these highly relevant subpoenas constitute "egregious misconduct" that merits sanctions. (Dkt. No. 123 at 3.)

## Argument

### I.   The subpoenas seek relevant information

Cyrulnik's letter does not provide a basis for quashing the subpoenas. In nearly five pages, Cyrulnik *never* argues that the subpoenas don't seek relevant information. Nor could he. As explained above, the Firm alleges Cyrulnik breached his duties to the Firm and tortiously interfered with its agreements with the Cyrulnik Clients by "failing to assist the Firm in collecting over $3.3 million in legal fees owed by the Cyrulnik Clients," and by advising those clients "to withhold payment of money owed to the Firm." (Dkt. No. 31 ¶¶ 95-96, 104.) Moreover, Cyrulnik's Counterclaims accuse the RF Parties of, among other things, "egregiously breach[ing] their duties to and badly mistreat[ing]" the Cyrulnik Clients after Cyrulnik was removed for cause. (Dkt. No. 72 ¶ 85.) The subpoenas seek information relating to these allegations, including documents concerning "payments due to the Firm" and "Cyrulnik's Removal." (Dkt. No. 123 at 2-3.)

### II.   Cyrulnik lacks standing to challenge the subpoenas

Cyrulnik asserts (at 3-4) that the subpoenas are "a manifestly improper attempt to harass [him] and his clients" and impose an "undue burden" on the Cyrulnik Clients by seeking "information that should more properly be sought from Cyrulnik." These arguments are meritless both (i) on their face and because (ii) during the meet and confer process the Firm offered to

---

[3] The subpoenas also target some key employees of the Cyrulnik Clients as the Firm expects there to be communications on personal devices.

suspend any obligations associated with documents that Cyrulnik possesses and produces. **More importantly, however, is that Cyrulnik does not even have standing to raise these objections.**

A "party lacks standing to challenge subpoenas issued to non-parties on the grounds of relevancy or undue burden." *In re Subpoenas Served on Lloyds Banking Grp. PLC*, 2021 WL 3037388, at *2 (S.D.N.Y. July 19, 2021) (Netburn, J.) (quoting *Universitas Educ., LLC v. Nova Grp., Inc.*, 2013 WL 57892, at *5 (S.D.N.Y. Jan. 4, 2013)); *McCutcheon v. Colgate-Palmolive Co.*, 2017 WL 4776984, at *3 (S.D.N.Y. Oct. 5, 2017) (same). The same is true of a challenge based on an argument that the subpoena is "intended to harass" its target. *See A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, 2013 WL 6511934, at *2 (D. Conn. Dec. 12, 2013). Cyrulnik is accordingly foreclosed from challenging the subpoenas on the grounds raised.

His arguments to the contrary are unpersuasive. *First*, he claims (at 4 n.3) that he "possesses a personal right and interest in the documents sought by the subpoenas, including the attorney work product that necessarily is covered" by the subpoenas. Even if he did, he could not bootstrap that interest to challenge the subpoenas on any and all grounds. Instead, any challenge would need to be limited to his purported "privilege, privacy or proprietary interest in the documents sought." *Subpoenas Served on Lloyds*, 2021 WL 3037388, at *2-3 (standing limited to "confidentiality interest"). Cyrulnik is not challenging the subpoenas on work-product grounds; he is challenging them on the grounds that they "are a manifestly improper attempt" to harass him and his clients.

*Second*, Cyrulnik claims (at 4 n.3) that Rule 26 permits him to seek a protective order even if he lacks standing under Rule 45. He's wrong: "The proper standard to be applied in evaluating whether a party has standing to request a protective order on behalf of a third-party is the same as that which is applied in the context of efforts by parties to quash subpoenas directed to non-parties." *McCutcheon*, 2017 WL 4776984, at *3 (quoting *Dominion Res. Servs., Inc. v. Alstom Power, Inc.*, 2017 WL 3575892, at *3 (D. Conn. Aug. 18, 2017))). Indeed, as one court recognized, "it would be peculiar indeed if a party could circumvent the well-established standing requirements under Rule 45 simply by styling what is effectively a motion to quash as a motion for a protective order." *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2012 WL 5395249, at *2 (S.D.N.Y. Nov. 5, 2012) ("PHL nevertheless argues that even if it does not have standing under Rule 45, it does under Rule 26 for purposes of seeking a protective order. This is not a distinction recognized by this circuit." (internal citations omitted)).

Underscoring the prudential concerns with allowing Cyrulnik to circumvent these rules is the fact that at the parties' meet and confer, Cyrulnik stated that if his motion to quash fails, the Cyrulnik Clients will file motions of their own, raising *the same arguments*. Cyrulnik should not be permitted to duplicate proceedings by raising arguments on behalf of others.

### III. The Subpoenas do not impose an undue burden and are not intended to harass

Even if Cyrulnik had standing to challenge the subpoenas on the grounds raised (he doesn't), his arguments for quashing them have no merit. Although Cyrulnik claims (at 3) that the subpoenas are "plainly designed to harass" him, he disregards that the Subpoenas seek *relevant information* from entities (i) at the core of the Firm's tortious interference and breach of fiduciary duty claims, and that (ii) are directly implicated in his counterclaims. This case is thus nothing like *KGK Jewelry LLC v. ESDNetwork*, cited by Cyrulnik, where the subpoenaed entities were *not* parties to the contracts with which the defendant allegedly interfered. 2014 WL 1199326, at *5-6 (S.D.N.Y. Mar. 21, 2014).

Cyrulnik's undue burden argument, premised on his view that the subpoenas "seek information that should more properly be sought from Cyrulnik himself," likewise fails. Although the subpoenas seek some information that may be in Cyrulnik's possession, they also seek information that is exclusively in the Cyrulnik Clients' possession, including documents concerning (i) "payments due to the Firm," (ii) "Cyrulnik's Removal," (iii) the Cyrulnik Clients' communications about the Firm to which the Firm is not a party and (iv) this litigation. *Cf. Jam Indus. USA, LLC v. Gibson Brands, Inc.*, 2020 WL 4003280, at *5 (S.D.N.Y. July 15, 2020) (denying motion, where request "also" sought "information internal to" non-party and thus did not "exclusively" seek information in party's possession); *Allstate Ins. Co. v. A&F Med. P.C.*, 2016 WL 7116067, at *3 (E.D.N.Y. Dec. 6, 2016) (denying motion, where defendant argued that some of the documents sought from a non-party could have been obtained from a party). Moreover, during the meet and confer process, and in an effort to minimize any alleged burden on the Cyrulnik Clients, the Firm offered to limit the subpoenas to just information that is not within Cyrulnik's possession. Instead of accepting that offer and this motion practice, Cyrulnik filed his letter complaining about the precise issue the Firm's reasonable proposal would have resolved.

Finally, in support of his undue burden argument, Cyrulnik misleadingly suggests (at 4) that he has offered to produce all information covered by the subpoenas. That is not correct. Although Cyrulnik has indicated he will produce *some* documents that would also be responsive to the subpoenas, he has also indicated that he intends to withhold others. For example, documents concerning payments due to the Firm by Cyrulnik Clients before February 10, 2021 (Request 19), and documents concerning the Cyrulnik Clients' non-billing-related communications with the Firm (Request 20). Such documents, if produced, would be responsive to the third and fifth requests in the subpoenas, which seek, respectively, documents dated between January 1, 2020, and August 2, 2021, concerning payments due to the Firm, and documents concerning the Cyrulnik Clients' communications with the Firm. (*See* Dkt. No. 123 at 2.) Cyrulnik cannot argue the subpoenas should be quashed because he will be producing all responsive documents, while simultaneously stating that he will withhold those same documents. This is especially so here, where the subpoenas seek much information that is outside of Cyrulnik's possession.

In short, there is nothing improper—and certainly nothing sanctionable—about seeking relevant information from non-parties that were allegedly induced by a party to breach their contractual obligations. Thank you for your consideration.

Respectfully,

Sean Hecker

cc: Counsel of Record (via ECF)