**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL          212-763-0883
DIRECT EMAIL        shecker@kaplanhecker.com

July 12, 2022

**Via ECF**
The Honorable Sarah Netburn
United States Magistrate Judge
40 Foley Square, Room 430
New York, NY 10007

Re: *Roche Cyrulnik Freedman LLP v. Jason Cyrulnik*, No. 1:21-cv-1746 (S.D.N.Y.)

Dear Judge Netburn:

We represent Plaintiff and Counterclaim-Defendants ("RF") and write pursuant to the Court's July 5, 2022, order to address outstanding discovery issues.

Consistent with RF's desire to move this case forward expeditiously, we explain below why any discovery extension should be limited and why Cyrulnik's demand that RF review 30,000 additional documents is unduly burdensome and disproportionate. For affirmative relief, RF seeks a limited order compelling Cyrulnik to (i) provide hit reports, something he's bizarrely refused to provide, (ii) produce documents related to his tortious interference until July 2021 (as RF did), and (iii) provide complete answers to certain RFAs.

### I. Revised Schedule

The pendency of this litigation—and discovery in particular—is prejudicial to RF. In his Counterclaims, Cyrulnik seeks to dissolve the Firm, relief which, if granted, would leave his former colleagues (including associates and staff) without a place to work. (DE 72 ¶¶ 103-12.) He also seeks to depose *more than half* of the 24 attorneys at the Firm, as well as staff, clients, and important firm business partners. He has requested documents from 16 current and former Firm attorneys and staff members. (DE 149 at 1.) And he has made these requests when the Firm is just three years old and trying to attract both new clients and attorneys. It is difficult to foster relationships internally at the Firm, and with clients and business partners, against the constant threat of intrusive discovery, depositions, and subpoenas.

Because RF understood that discovery would be a major distraction for the Firm and its employees, it proposed an expedited schedule to Judge Koeltl, pursuant to which fact discovery would close on August 1, 2022, and pre-motion summary judgment letters would be due on October 10, 2022. (DE 91 at 2-4.) Cyrulnik, in contrast, proposed that the parties engage in discovery until December 2022, with pre-motion summary judgment letters due on April 24, 2023. (*Id.*) Judge Koeltl adopted RF's proposed schedule (DE 92 at 3-4). And RF has worked diligently—expending significant time, effort, and resources—to ensure its compliance with that schedule (DE 131 at 2-4; DE 149 at 1-3).

KAPLAN HECKER & FINK LLP

Cyrulnik, by contrast, failed to act with that same diligence. (DE 131 at 1-4; DE 144 at 1-3.) Indeed, he waited until 14 days before the deadline for substantial production to propose search terms so broad that they hit on over 800,000 documents. (DE 131 at 2-3.) He then waited until *after* that deadline to propose amended terms, took weeks to schedule meet and confers, took more than a month to negotiate a basic protective order, and failed to raise any issues with RF's production until this Court set a deadline for doing so. (DE 144 at 2.) Delaying discovery benefits Cyrulnik: as long as this action is pending, he can operate his own competing law firm (where he shares none of his profits with the Firm), while simultaneously asserting an interest in every additional dollar his former colleagues earn. (DE 142 at 4.) It also allows Cyrulnik to impose costs on former colleagues who dared to stand up to him.

On July 5, 2022, the Court conducted a two-hour hearing on the parties' respective discovery letters. At the end of the hearing, the Court directed the parties to meet and confer on a reasonable request to extend the discovery deadline. (Hr'g Tr. at 79:2-15.)

Cyrulnik responded to this instruction by proposing a 106-day, 3.5-month, extension of fact discovery from August 1, 2022, to November 15, 2022. This extension—which would effectively reverse Judge Koeltl's prior rejection of Cyrulnik's original proposed schedule—is inappropriate for at least three reasons.

*First*, Cyrulnik has not—and cannot—demonstrate "good cause" for an extension of that length. To establish "good cause" necessary to modify a scheduling order, a movant typically must show that "the deadlines cannot reasonably be met despite" his or her "diligence." *Mirra v. Jordan*, 2016 WL 889636, at *1 (S.D.N.Y. Feb. 22, 2016). RF's efforts to date demonstrate Cyrulnik could have met the deadlines with proper diligence, as RF did, but failed to do so. (*See* DE 131 at 1-4; DE 144 at 1-3.)

*Second*, a 106-day extension is far longer than necessary to complete fact discovery. In seeking to modify a scheduling order, the movant should explain "why the requested time (and not some lesser time) is necessary." *Furry Puppet Studio Inc. v. Fall Out Boy*, 2020 WL 4978080, at *1 (S.D.N.Y. Feb. 24, 2020). To the extent the Court believes an extension is appropriate, all remaining fact discovery can be completed within 30 additional days, by no later than August 31, 2022, and in advance of the Jewish holiday season, which begins on September 26, 2022. Indeed, once the Court resolves the current search term dispute, RF is committed to doing whatever is necessary to promptly comply. In an effort to reach common ground, the Firm was prepared to extend the schedule by an additional 15 days, to September 15th, a proposal that Cyrulnik rejected.

*Third*, a 106-day extension would prejudice RF. *See Mirra*, 2016 WL 889636, at *1 (courts may consider prejudice to non-movant in determining whether to modify scheduling order). As explained above, Cyrulnik's lawsuit, and discovery in particular, is disruptive and harmful to both the Firm and its clients. *See Cohen v. G&M Realty LP*, 2015 WL 1182712, at *5 n.6 (E.D.N.Y. Mar. 13, 2015) (finding prejudice where extension would add "expense and further delay resolution" of matter). Cyrulnik should not be permitted to leverage delays he created to inflict further costs on RF and obtain what Judge Koeltl denied him just a few months ago: a fact discovery period stretching to the end of 2022. Consequently, RF requests any additional time be limited to a 30-day fact discovery extension, and a corresponding 15-day extension to the remaining deadlines in Judge Koeltl's order.

KAPLAN HECKER & FINK LLP

## II. Search Terms

In the days leading up to the July 5, 2022, hearing, and despite the fact that the June 6, 2022, deadline for substantial production had long passed, Cyrulnik began asking that additional search terms be run. He eventually demanded RF review documents responsive to three sets of search terms (described below) which included nearly 33,000 documents. Thousands of these documents were only responsive because they contained the word "Jason." RF refused. (DE 149 at 2.)

At the hearing, Cyrulnik argued that running these terms was necessary because, in his view, RF had not produced enough documents relating to the February 2021 meeting where he was removed for cause. (*See* Hr'g Tr. at 3:16-4:25). In response, RF argued it had already conducted a reasonable process to identify responsive documents, that Cyrulnik's requests came too late, and that (based on data RF analyzed) Cyrulnik's proposed terms were overbroad and unlikely to result in additional documents being produced. (*Id.* at 7:8-8:9, 12:1-18).[1]

Striking a balance between the work RF had done to date and Cyrulnik's desire to fashion additional terms himself, the Court directed the parties to work together to narrow the results:

> It may be, for example, that you can come up with search terms that are more specific about the grounds for termination, that are even more narrowed than the 15 months or 18 months, whatever that period is right now. *And so you may want to identify search terms that are targeted but only for a six-week period, or something like that, to really focus in on the issues*. It may be that there are no documents there, but I do think it's a fair request to continue forward with that. So I am going to ask that you do that, and I am going to request a status letter on that next Tuesday.

*Id.* at 12:19-13:8 (emphasis added); *see also id.* at 11:4-7.

Cyrulnik, however, has declined to narrow either the timeframe of his search requests or the terms themselves. **He has made no changes to his pre-hearing demands**.[2] Instead, he continues to demand RF run three sets of search terms, identified as Search 1-A (10,362 hits), Search 1-B (4,600 hits), and Search 2 (13,167 hits) – **a total of 28,129 documents.** While RF believes Cyrulnik's proposed search would have been disproportionate if timely proposed, it's especially inappropriate here given the work RF has done to date, the lateness of Cyrulnik's proposal, and the data showing that review of these ~28,000 documents will likely result in no additional documents being produced. More fundamentally, Cyrulnik's refusal to narrow his

---

[1] As explained, to meet discovery deadlines without search terms from Cyrulnik, RF instituted a robust search protocol of **52 different search strings**. D.E. 149-2. **These terms resulted in 8,895 documents** which were all reviewed. RF also used *search terms Cyrulnik authored*, and RF narrowed, to identify an additional **26,391 documents,** which were all reviewed. RF narrowed the terms (due to the lateness of their proposal and their breadth) but did not wholesale re-write them. For example, RF narrowed Cyrulnik's "within 100" search parameter to be "within 5." The results were reviewed and produced. To ensure these two searches had identified the universe of responsive documents, RF reviewed 1,000 random documents from the set that had no search hits. None were responsive. Moreover, RF reviewed nearly 4,500 documents from Cyrulnik's set of 33,000 during the course of its review. Not a single document was responsive and unprivileged, thus demonstrating the extremely limited utility of further searches. **In total, RF manually reviewed over 18,629 documents**.

[2] Due to a typo, RF's pre-hearing hit reports had, for certain search strings, included 11 months of documents Cyrulnik had not requested. Cyrulnik pointed out that error, but this correction only removed ~4,772 documents from the review set.

KAPLAN HECKER & FINK LLP

proposed terms flies in the face of the Court's directive to attempt to work collaboratively to narrow the terms.

RF proposes the following compromise: RF will run all of the requested terms for Search 1-A and 1-B, but over a narrower time period to focus on the time immediately before and after Cyrulnik's removal. Specifically, RF will run these terms for all documents dated between January 19, 2021, and February 28, 2021 (20 days before and after the February 8, 2021, meeting). That will result in RF manually reviewing an additional 4,664 documents. It thus reduces the resulting document count without sacrificing any of Cyrulnik's terms or the most relevant time-period.

Cyrulnik's Search 2, however, contains *incredibly* broad terms. For example, Cyrulnik is demanding RF review every instance of "Jason," (18,816 hits), "Cy*," (19,395 hits), "partnership," (7,920 hits), and "Start Up's name" (25,242 hits). Cyrulnik seeks these broad hits over a 30-day time-period, but without any limiter to ensure relevance. As requested by Cyrulnik, Search 2 would add 36,553 documents, which through de-duplication and application of relevancy criteria is reduced to 10,362 new documents. Given the prior work, data on responsiveness, the 4,664 documents RF would be adding, and the sheer breadth of these terms, these additional documents are unduly burdensome and not proportional to the needs of the case.

### III.    Cyrulnik refuses to provide RF with hit reports

In stark contrast with RF's repeated provision of hit reports on demand, Cyrulnik has, bizarrely, refused to provide RF with any hit counts—at all—for RF's own requested terms. Cyrulnik's rejection of such a basic litigation practice has undermined RF's ability to assess the effectiveness of its requested terms. The Court should order Cyrulnik to provide hit reports.

### IV.    Former RF client documents

Former Firm clients originated by Cyrulnik owe the Firm over $3.3 million in unpaid invoices. These clients left RF for Cyrulnik's new law firm, sent coordinated emails to RF about past due invoices and work, and have uniformly refused to pay what they owe. (DE 31 ¶¶ 95-96, 104-05.) These facts strongly suggest that Cyrulnik—the only common thread between the clients—has contributed to that refusal. Accordingly, RF brought claims against Cyrulnik for tortious interference and breach of fiduciary duty. (*Id.* ¶¶ 90-108.) Seeking relevant evidence, RF subpoenaed the clients, but the Court hit pause on those subpoenas pending Cyrulnik's production.

Cyrulnik now purports to have completed producing documents. (DE 152 at 4.) But the gaps in his productions make clear that additional production is required. Cyrulnik has produced *some* documents related to his tortious interference, *e.g.,* documents demonstrating he did coordinate his clients' communications with the Firm (something he previously denied, DE 72 ¶ 81). But he has not produced *any* documents that reflect substantive communications with these clients about what to do over RF's invoices. And we *know* these communications occurred because after his removal, these clients—**at least 13 times**— (i) explicitly asked him whether they should pay him *or* the Firm and/or (ii) requested phone calls with him about how to proceed with respect to withdrawals or billings.

Yet Cyrulnik has not produced a single document about what he told the clients to do. There are two explanations for this: Either Cyrulnik's advice is in writing but dated after March 14, 2021 (and thus outside the date range he's agreed to produce), or Cyrulnik's advice was telephonic, but almost certainly reflected in his clients' internal communications.

4

KAPLAN HECKER & FINK LLP

    To minimize the burden on those clients, RF respectfully requests the Court order Cyrulnik to produce responsive documents relating to interactions with the clients up until July 2, 2021 (the same date for which RF agreed to produce similar documents). The Firm's breach of fiduciary duty and tortious interference claims primarily arose *after* Cyrulnik's removal and were asserted for the first time in its Amended Complaint dated July 2, 2021, by which point the clients had repeatedly refused to pay. Indeed, many of the clients had not yet refused to pay before March 14, 2021, the date beyond which Cyrulnik has refused to produce. Of course, RF has already agreed to produce, and has produced, documents relating to those clients up until July 2, 2021. Cyrulnik should do the same.

    To the extent that Cyrulnik does not have any such documents (or has very few relevant documents), RF will return to the Court for narrow relief about actual subpoenas to clients.

### V. Unaddressed RFAs and Interrogatories

    ***Engagement Letter RFAs***. RF sought an admission that Cyrulnik failed to execute engagement letters with a subset of clients (DE 141, at 3). Cyrulnik objected on relevance. The objection is baseless: The Firm cited Cyrulnik's failure to obtain engagement letters in its Complaint as an example of Cyrulnik's improper conduct leading to his removal (DE 31 ¶ 40). Finally, Cyrulnik's suggestion that he doesn't know whether his own clients, for which RF performed millions of dollars in services, executed engagement letters, is not credible. Regardless, he "has an obligation to undertake a reasonable inquiry of information . . . readily obtainable" and must therefore do some basic investigation to answer the RFA. *Jacobson Warehouse Co., Inc. v. Prestige Brands, Inc.*, 2022 WL 1617711, at *7 (S.D.N.Y. May 23, 2022) (cleaned up).

    ***Screaming RFAs***. Seeking to narrow issues in dispute, RF sought an admission that Cyrulnik "yelled," "screamed," or spoke above "normal speaking level." (DE 141 at 3). Cyrulnik denied these RFAs, but adopted a definition of the phrases "normal speaking level," "scream," and "yell" that was so broad it rendered his responses meaningless. (*Id*. at 4) In responding to these RFAs, Cyrulnik should interpret those terms as commonly understood by speakers of the English language. *See Tyson v. King*, 1999 WL 493394, at *4 (S.D.N.Y. July 8, 1999) (directing party to use common definition of "received" in responding to RFAs).

### VI. Depositions

    Cyrulnik has indicated that he intends to take 21 depositions in this action, more than twice the amount permitted by the Federal Rules. To the extent that Cyrulnik seeks permission from the Court to take those depositions, many of which would be wholly unnecessary, RF respectfully requests the opportunity to respond.

    Thank you for your consideration.

                            Respectfully,

                              Sean Hecker

cc:  Counsel of Record (via ECF)