# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

ROCHE FREEDMAN LLP,

               Plaintiff,

v.

JASON CYRULNIK,

               Defendant.

---

JASON CYRULNIK,

               Counterclaim-Plaintiff,

v.

ROCHE FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN, AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND,

               Counterclaim-Defendants.

</td><td>

Case No.: 1:21-cv-01756 (JGK)

**ANSWER TO COUNTERCLAIM**

</td></tr>
</table>

Counterclaim-Defendants Devin Freedman, Amos Friedland, and Edward Normand (the "Individual Counterclaim-Defendants"), hereby answer the Counterclaim dated March 2, 2022, filed by Defendant and Counterclaim-Plaintiff Jason Cyrulnik, as follows:

## <u>ANSWER</u>

Each paragraph in Cyrulnik's counterclaims (*see* Dkt. No. 72) is copied below, followed by the Individual Counterclaim-Defendants' answer to each paragraph. Any allegation not expressly admitted is denied.

## INTRODUCTION

1.      This action arises from a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the Firm's clients that ████████ had suddenly appreciated exponentially to more than $250 million.  The Firm's governing agreement expressly prohibits the removal of a Founding Partner without cause, so Roche and Freedman, together with certain other partners they secretly recruited to their scheme and to whom they agreed to provide a share of Cyrulnik's assets, concocted an absurd and purely pretextual "cause" — their principal claim that Cyrulnik had raised his voice during two telephone conversations months earlier — and then, jeopardizing Cyrulnik's ability to represent his clients in active ongoing litigation, they cut his access to the Firm's client files, emails, electronic systems and bank accounts, and terminated his and his family's access to the Firm's health insurance.

**RESPONSE TO PARAGRAPH 1**: The Individual Counterclaim-Defendants admit that the parties' Memorandum of Understanding dated December 26, 2019 (the "MOU"), states that "[a] Founding Partner cannot be removed without cause" and that Cyrulnik's access to certain Firm records, bank accounts, and benefits was limited after he was removed for cause. The Individual Counterclaim-Defendants also admit that the value of a certain and highly volatile cryptocurrency token, some of which may have been paid by a client of the Firm, rose in value before crashing down in value, and has repeated this erratic rise and fall many times before and since. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 1.

2.      What makes Counterclaim-Defendants' greedy and unlawful scheme even more egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who

had spent months recruiting and convincing Cyrulnik, a highly accomplished lawyer with a long-standing, robust and growing practice, to leave his equity partnership at a prominent national law firm to transform their fledgling firm into a stable and respected litigation practice. They convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Counterclaim-Defendants are now trying to steal.

**RESPONSE TO PARAGRAPH 2**: The Individual Counterclaim-Defendants admit Cyrulnik was an equity partner at a prominent national law firm and told Counterclaim-Defendants he held a half-point of equity there. The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about whether Cyrulnik is "a highly accomplished lawyer with a long-standing, robust and growing practice." The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 2.

3.       Roche, who graduated law school in 2016, and Freedman, who graduated in 2012, had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF"). Counterclaim-Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm focusing on cryptocurrency and other specialized practice areas. Shortly thereafter, realizing that they needed an experienced lawyer with an established and successful practice and cash flow to fund the firm's operations and help procure lead counsel appointments in their class-action cases, they approached Cyrulnik about his leaving BSF to join them and co-found RCF. After fifteen years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to found a law firm with Roche and Freedman in January 2020. As the Conspiring Partners knew, in doing so, Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing lucrative

offers to join other national law firms.  As the Conspiring Partners also knew, Cyrulnik did so in reliance on the negotiated and unambiguous terms of the new Firm's governing agreement that provided him with fixed, guaranteed, and significant equity interests in the new Firm's contingency and alternative fee matters, with substantial financial upside.

**RESPONSE TO PARAGRAPH 3**: The Individual Counterclaim-Defendants admit that Roche and Freedman graduated from law school in 2016 and 2012, respectively; that they met Cyrulnik while they were associates at BSF; that they left BSF in summer 2019 to start their own law firm; and that, in December 2019, Cyrulnik executed the MOU, which refers to "the basic terms upon which the Founding Partners will enter into a definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-oriented firm to be named Roche Cyrulnik Freedman LLP." The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 3.

4.      Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases and core client base, and his practice, which Counterclaim-Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

**RESPONSE TO PARAGRAPH 4**: The Individual Counterclaim-Defendants deny the allegations in paragraph 4.

5.      Then, in late ▬▬▬ 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and ▬ ▬▬▬▬▬▬ 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

**RESPONSE TO PARAGRAPH 5**: The Individual Counterclaim-Defendants admit that the market value of its potential/contingent interest in the Tokens (defined below) increased over the referenced time period, but otherwise deny the allegations in paragraph 5.

6.       Notwithstanding months of reaffirming their admiration for Cyrulnik and his enormous contributions to the Firm's success, the Conspiring Partners seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the cryptocurrency and keep it for themselves.  To circumvent the threshold hurdle of their scheme – that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency – Roche and Freedman manufactured transparently false grounds to remove him for "cause."  Alleging that Cyrulnik raised his voice on two phone calls concerning certain questionable actions Roche and Freedman (and two other partners) had taken that threatened to endanger the Firm, the Conspiring Partners claimed that Cyrulnik suddenly somehow lost the guaranteed equity and cryptocurrency interests expressly granted to him by the parties' agreement.  They then invited handpicked partners – the other Conspiring Partners – to a secret meeting, excluding anyone they knew would not participate in their improper scheme.  At the secret meeting, the Conspiring Partners held a self-serving "vote" to "remove" him from the Firm.  They then took the position that Cyrulnik was no longer entitled to the cryptocurrency and other interests expressly granted to him by the parties' agreement – even though nothing in the agreement provides for such a forfeiture.

**RESPONSE TO PARAGRAPH 6**: The Individual Counterclaim-Defendants admit that the Founding Partners (sans Cyrulnik) unanimously voted to remove Cyrulnik for cause, but otherwise deny the allegations in paragraph 6.

7.     Counterclaim-Defendants compounded their egregious misconduct by seeking to pressure clients to stay with them rather than continue to have Cyrulnik represent them.  That scheme failed miserably: a mass exodus of those clients ensued, as they wanted Cyrulnik to lead their litigations.  At the same time, the Firm's other equity partner, Paul Fattaruso, rebuffed Counterclaim-Defendants' requests to continue working with them in the wake of the scheme they had perpetrated.

**RESPONSE TO PARAGRAPH 7**: The Individual Counterclaim-Defendants admit that certain clients Cyrulnik had originated followed him to his new firm after he was removed from the Firm for cause and that Paul Fattaruso later left the Firm to join Cyrulnik at a new venture, Cyrulnik Fattaruso LLP. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 7.

8.     Counterclaim-Defendants' unconscionable misconduct is in flagrant violation of their contractual, fiduciary, and ethical duties to Cyrulnik and their professional responsibilities to the Firm's clients.  Cyrulnik's conduct was consistently exemplary, in contrast to several Conspiring Partners (whose missteps Cyrulnik was addressing in the very discussions about which they now complain and seek to use as the purported basis for their scheme), including with respect to Roche's lax attitude toward billing practices and timekeeping and Freedman's problematic referral-fee arrangements with other firms.

**RESPONSE TO PARAGRAPH 8**: This paragraph contains legal conclusions to which no response is required. The Individual Counterclaim-Defendants deny the allegations in the second sentence of paragraph 8.

9.     Accordingly, Cyrulnik brings these claims seeking, among other things, dissolution of the Firm and distribution of its assets in accordance with Florida law and the parties'

unambiguous governing agreement, and recovery of the damages Counterclaim-Defendants' egregious conduct has caused.

**RESPONSE TO PARAGRAPH 9**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit this is what Cyrulnik's lawsuit claims to be doing, but otherwise deny the allegations in paragraph 9.

## THE PARTIES

10. Counterclaim-Plaintiff Jason Cyrulnik is a citizen of New Jersey and a cofounding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 10**: The Individual Counterclaim-Defendants admit that Cyrulnik is a citizen of New Jersey, but otherwise deny the allegations in paragraph 10.

11. Counterclaim-Defendant RCF is a Florida limited liability partnership, with offices in Miami, Florida and New York, New York.

**RESPONSE TO PARAGRAPH 11**: The Individual Counterclaim-Defendants admit the allegations in paragraph 11, with the understanding that "RCF" is a reference to the Firm, defined as Roche Freedman LLP (n/k/a Freedman Normand Friedland LLP).

12. Counterclaim-Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 12**: The Individual Counterclaim-Defendants admit the allegations in paragraph 12, with the understanding that "RCF" is a reference to the Firm.

13. Counterclaim-Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

**RESPONSE TO PARAGRAPH 13**: The Individual Counterclaim-Defendants admit that at the time of filing, Mr. Roche was a citizen of New York and a co-founding named equity partner at the Firm.

14.     Counterclaim-Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 14**: The Individual Counterclaim-Defendants admit that Mr. Friedland is an equity partner at the Firm, but otherwise deny the allegations in paragraph 14.

15.     Counterclaim-Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 15**: The Individual Counterclaim-Defendants admit that Mr. Holcomb is a citizen of New York, and that Mr. Holcomb was previously "an equity partner of RCF," with the understanding that "RCF" is a reference to the Firm.

16.     Counterclaim-Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

**RESPONSE TO PARAGRAPH 16**: The Individual Counterclaim-Defendants admit the allegations in paragraph 16, with the understanding that "RCF" is a reference to the Firm.

## JURISDICTION

17.     This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees, and costs.

**RESPONSE TO PARAGRAPH 17**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit Cyrulnik so claims, but deny the allegations in paragraph 17.

18.     Cyrulnik is filing his counterclaims in accordance with and pursuant to the Court's ruling that "[g]iven the intertwined nature of the jurisdictional question with the merits, '[t]he

Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims.'" (ECF No. 56 at 13).

**RESPONSE TO PARAGRAPH 18**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 18, and so deny those allegations.

19.     The Court has personal jurisdiction because Counterclaim-Defendant RCF has an office in this District in which the Conspiring Partners regularly practice, RCF and the Conspiring Partners regularly conduct business in this District, and RCF (at the direction of the Conspiring Partners) has availed itself of this forum by bringing suit here.

**RESPONSE TO PARAGRAPH 19**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that, at the time Cyrulnik's counterclaims were filed, the Firm had an office in this District in which Roche, Friedland, Holcomb, and Normand regularly practiced law, that the Firm and each individual defendant regularly conduct business in this District, and that the Firm commenced an action in this District against Cyrulnik. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 19.

<u>**FACTS**</u>

I.     **COUNTERCLAIM-DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FORGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

    **A.  Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF**

20.     Cyrulnik graduated Yale Law School in 2004 and joined BSF.  With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

**RESPONSE TO PARAGRAPH 20**: The Individual Counterclaim-Defendants deny the allegations in Roman numeral "I," lack information and therefore deny the allegations in subsection "A," but admit the allegations in paragraph 20.

21.     Cyrulnik rose through the ranks quickly.  He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

**RESPONSE TO PARAGRAPH 21**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 21, and therefore deny those allegations.

22.     Cyrulnik's steadfast commitment to clients generated a substantial following and client base.  He has been leading bet-the-company litigations for a growing base of core clients for many years.  He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

**RESPONSE TO PARAGRAPH 22**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 22, and therefore deny those allegations.

23.     He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly.  He mentored associates, brought in partners in to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

**RESPONSE TO PARAGRAPH 23**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 23, and therefore deny those allegations.

24.     Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters.  In 2019, Cyrulnik was recruited aggressively by several major national law firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

**RESPONSE TO PARAGRAPH 24**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in the first sentence of paragraph 24, and therefore deny those allegations. The Individual Counterclaim-Defendants deny the remaining allegations in paragraph 24.

### B.   Roche And Freedman Recruit Cyrulnik To Join RCF

25.     In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP.  Roche was a third-year associate who had extensive expertise in the cryptocurrency space.  Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel.  Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

**RESPONSE TO PARAGRAPH 25**: The Individual Counterclaim-Defendants admit Roche and Freedman left BSF in the summer of 2019 to start their own law firm. The Individual Counterclaim-Defendants admit Roche was a third-year associate with extensive experience in the cryptocurrency space. The Individual Counterclaim-Defendants admit Freedman graduated law school in 2012 and that he became BSF's youngest counsel ever in his fifth year, but deny that he "left BSF six months after being passed over for partnership and being named counsel" and deny the characterizations in subsection "B." The Individual Counterclaim-Defendants admit they intended to pursue, among other things, cryptocurrency-related matters.

26.     Cyrulnik had interacted with both Roche and Freedman at BSF.  Indeed, Freedman regularly sought advice from Cyrulnik about how to manage cases, legal strategy, and general guidance as Freedman embarked on his new venture in 2019.

**RESPONSE TO PARAGRAPH 26**: The Individual Counterclaim-Defendants admit both Roche and Freedman interacted with Cyrulnik at BSF. The Individual Counterclaim-Defendants admit that at BSF, Freedman worked on a case with Cyrulnik that Freedman originated, and that on that case, Freedman would consult with Cyrulnik on legal strategy as they worked on the matter together.  The Individual Counterclaim-Defendants deny the balance of paragraph 26.

27.     During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman.  Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate platform (in quality and size) to service his growing client base, which was his top priority.

**RESPONSE TO PARAGRAPH 27**: The Individual Counterclaim-Defendants admit Cyrulnik and Freedman discussed the possibility of Cyrulnik joining the Firm. The Individual Counterclaim-Defendants also admit that at the time, Freedman thought highly of Cyrulnik. The Individual Counterclaim-Defendants deny the balance of paragraph 27.

28.     Freedman would not take no for an answer.  He continued to press over the course of several months, ultimately bringing Roche into the conversation.  The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many clients' needs.  In exchange for his

agreement to leave BSF to co-found a firm with them, Roche and Freedman promised Cyrulnik significant stakes in what they described as their high-upside contingency work and in certain assets that they had secured.  The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue and stability that would help finance Roche and Freedman's contingency and alternative fee arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

**RESPONSE TO PARAGRAPH 28**: The Individual Counterclaim-Defendants admit that conversations between Freedman, Roche, and Cyrulnik continued at the initiation of all three parties. The Individual Counterclaim-Defendants also admit that the Firm needed a larger associate base to handle its own work, as well as the work Cyrulnik, Friedland, Normand, and Holcomb would originate. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 28.

29.    After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to cofound the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

**RESPONSE TO PARAGRAPH 29**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that Cyrulnik decided to leave BSF and join the Firm, but otherwise deny the allegations in paragraph 29.

**C.  The Parties Negotiate And Execute The MOU**

30.    On December 27, 2019, RCF's Founding Partners — named partners Cyrulnik, Roche and Freedman, together with Counterclaim-Defendants Friedland, Holcomb and Normand

(as defined in the MOU) — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

**RESPONSE TO PARAGRAPH 30**: This paragraph contains legal conclusions to which no response is required (*e.g.*, the characterization of the MOU as "binding"). With respect to the remaining allegations in this paragraph, the Individual Counterclaim-Defendants admit the parties executed the MOU on December 27, 2019, but otherwise deny the allegations.

31.     Section II of the MOU sets forth the partners' equity positions in the Firm.  In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%).  Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies for revenue earned through hourly and contingency matters.  Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

**RESPONSE TO PARAGRAPH 31**: The Individual Counterclaim-Defendants refer to the MOU for its content, admit that Cyrulnik's descriptions of Sections III and V of the MOU are generally correct, deny the ambiguous term "as modified," and otherwise deny the allegations in paragraph 31.

32.     Section IV of the MOU lists a series of "assets" (most of which were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)), excludes those assets from the Compensation Model, and instead sets forth the agreed-upon fixed allocations of those assets to the Founding Partners in different formulas and percentages that varied by asset.

**RESPONSE TO PARAGRAPH 32**: The Individual Counterclaim-Defendants refer to the MOU for its content, admit that Section IV of the MOU lists a series of "assets" that were mostly generated between August 2019 and January 2020, and otherwise deny the allegations in paragraph 32.

33.     One of the key assets allocated in the MOU was cryptocurrency (referred to as "Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the "Startup Client"), had agreed to convey to the Firm.  The MOU expressly granted each of the Founding Partners a fixed allocation of the Tokens (which was to be ████ of all Tokens issued by the Startup Client), as follows:   Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and Normand, Friedland, and Holcomb, 5% each.

**RESPONSE TO PARAGRAPH 33**: The Individual Counterclaim-Defendants refer to the MOU for its content, admit that in 2019 and before Cyrulnik was even in discussions to join the Firm, the Startup Client initially agreed to convey Tokens to the Firm under certain conditions in September 2019 and that agreement was revised in October 2019 to convey Tokens to Roche and Freedman under certain conditions.  No tokens were conveyed to the Firm, Friedland, Holcomb, or Normand, after the assignment to Roche and Freedman and prior to Cyrulnik's termination.  The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 33.

34.     Section VI of the MOU addresses the management of the Firm.  In particular, the parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

**RESPONSE TO PARAGRAPH 34**: The Individual Counterclaim-Defendants refer to the MOU for its content, and admit that Cyrulnik's description of Section VI of the MOU is generally accurate and that Cyrulnik has accurately quoted a sentence in that section.

35.     The MOU has two separate provisions governing the departure of a partner from the Firm.  The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who voluntarily elects to withdraw from the Firm within 18 months would have his or her compensation limited to the amount to which he or she would have been entitled under the Compensation Model, and would return his or her equity in the Firm to the other equity partners.

**RESPONSE TO PARAGRAPH 35**: The Individual Counterclaim-Defendants refer to the MOU for its content, admit that Section VI(C) is entitled "Withdrawal from Firm," and otherwise deny the allegations in paragraph 35.

36.     The second, Section VI(G), entitled "Partner Removal," expressly provides that a "Founding Partner cannot be removed without cause."  That section also provides that, even if cause arose for the removal of a Founding Partner, that removal would require an affirmative vote of at least two-thirds of the Firm's equity partners.  In stark contrast to the voluntary withdrawal provision, however, such an involuntary removal (for "cause") does not result in the forfeiture of any compensation, interests, or assets owed or allocated to the Founding Partner under the MOU.

**RESPONSE TO PARAGRAPH 36**: The Individual Counterclaim-Defendants refer to the MOU for its content, and admit that Section VI(G) is entitled "Partner Removal" and states that a "Founding Partner cannot be removed without cause" and that for-cause removal requires "the affirmative vote of 2/3 of the Firm's equity partners." The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 36.

37.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter," attached as Exhibit B).  Given his reputation, seniority, and equity stake in the new Firm, Cyrulnik was the natural choice for the "first-named" partner.  But Roche — consumed with securing that

recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be listed as the first named partner at RCF. The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model. Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

**RESPONSE TO PARAGRAPH 37**: The Individual Counterclaim-Defendants refer to the Side Letter for its content, admit that Cyrulnik's description of the actual terms of the Side Letter is generally accurate though incomplete, and otherwise deny the allegations in paragraph 37.

38.    In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

   a.    27% of the Firm's equity, which could not be diminished at any time without his consent;

   b.    25% of the cryptocurrency Tokens from the Startup Client;

   c.    a 25% interest in a specified contingency matter; and

   d.    an $850,000 cash payment from Roche (to be paid in specified installments).

**RESPONSE TO PARAGRAPH 38**: The Individual Counterclaim-Defendants deny the allegations in paragraph 38.

39.    In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

**RESPONSE TO PARAGRAPH 39**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in paragraph 39, and therefore deny those allegations.

## II. CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

40.    Cyrulnik's many clients all elected to follow him from BSF to RCF.  During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice.  Specifically, Cyrulnik was singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

**RESPONSE TO PARAGRAPH 40**: The Individual Counterclaim-Defendants deny the allegations in Roman numeral "II." The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about how many of Cyrulnik's clients "elected to follow him from BSF to RCF." The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 40.

41.    As Freedman stated at the end-of-year partner's meeting in January 2021 (just a few weeks before orchestrating the scheme to try and steal Cyrulnik's assets), and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

**RESPONSE TO PARAGRAPH 41**: The Individual Counterclaim-Defendants deny the allegations in paragraph 41.

42.    Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions.  Cyrulnik also devoted tireless efforts to managing the Firm, including overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease.

Roche and Freedman, separately and together, and as recently as January 2021 (just a few weeks before effectuating the scheme to try and steal Cyrulnik's assets), told Cyrulnik how much they enjoyed working with him to build the Firm, that they could not have built the Firm without him, that his contributions were instrumental to the Firm's success, and that his performance and accomplishments were remarkable.  Normand told Cyrulnik in or about December 2020 (less than eight weeks before participating in the scheme to try and steal his assets) that Cyrulnik was "the leader" of the Firm.

**RESPONSE TO PARAGRAPH 42**: The Individual Counterclaim-Defendants deny the allegations in paragraph 42.

43.     While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections.  Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they maintained would bring enormous revenue to the Firm over time.  That was particularly applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

**RESPONSE TO PARAGRAPH 43**: The Individual Counterclaim-Defendants deny the allegations in paragraph 43.

**III.  THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD**

44.     The Named Partners met regularly to discuss the Firm's administration matters.  Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements.  Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success, and that they could not have accomplished what they had without Cyrulnik.  Freedman actually remarked to Cyrulnik during

an in-person meeting in the Firm's Florida office on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running the Firm (referring to Freedman's effort to enrich himself at the Firm's expense through referral arrangements and other "discounts" he would apply to the Firm's revenue but not his own take on that revenue).

**RESPONSE TO PARAGRAPH 44**: The Individual Counterclaim-Defendants deny the allegations in Roman numeral "III" and paragraph 44.

45.     With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues.  Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings and his responsibilities as counsel representing class clients; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense.  Roche and Freedman were content to downplay such problems, or to delay resolution of the matter "for another day." With respect to these issues, Cyrulnik expressed the view that it was important for the Firm to address these issues promptly and definitively to ensure that the Firm was complying with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try to ensure that the partners would do so.

**RESPONSE TO PARAGRAPH 45**: The Individual Counterclaim-Defendants admit that Roche, Freedman, Friedland, Normand, and Holcomb worked well together, but otherwise deny the allegations in paragraph 45.

IV.   **CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM'S LONG-TERM SUSTAINABILITY**

46.     As the senior member of the group meeting regularly to administer the Firm, Cyrulnik addressed serious concerns that had come to his attention regarding, among other things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation Model.

**RESPONSE TO PARAGRAPH 46**: The Individual Counterclaim-Defendants admit Cyrulnik disingenuously claimed to have serious concerns about certain issues and threw temper tantrums, was abusive, and yelled at his co-workers when he did not get his way. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 46 and Roman numeral "IV."

A.   **Cyrulnik Asks Roche To Fix His Lax Approach To Time Keeping**

47.     First, in or about April 2020, Cyrulnik was reviewing time record reports from the Firm's billing system and learned that Roche had not recorded the hours he had worked on client matters for months.  Cyrulnik reached out to Roche and asked him to remedy that serious deficiency, stressing the importance of being honest and accurate with respect to client billing. Roche apologized and told Cyrulnik that he had messed up and that he would take care of it.  Roche stated that he was hiring his mother to try and "reconstruct" his time by scrolling through his emails and guesstimating time entries.  Cyrulnik was not comfortable with Roche's approach and reminded Roche that he needed to ensure that he was keeping accurate time records.  Roche exhibited a similar immature and inappropriate attitude toward client bills.  Roche boasted to Cyrulnik about his desire to "pound the lodestar" on his class-action contingency matters, stating that he wanted to hire more associates and staff attorneys to work on his contingency matters so that he could position himself to obtain a better percentage of fee awards being split with the Firm's co-counsel in class matters.  Cyrulnik was concerned about Roche's approach and again told Roche

that he needed to take his obligations to clients and class representations seriously.  Freedman told Cyrulnik that his concerns about Roche were not unfounded, but that Freedman would keep Roche in line.  Specifically, Freedman told Cyrulnik that Roche was dishonest, explaining that Roche was the kind of person "who will lie to your face and then beg for forgiveness if he's caught" – but Freedman stressed that he uniquely knew how to "control" Roche, and that Freedman could get Roche to do "anything I want him to do."

**RESPONSE TO PARAGRAPH 47**: The Individual Counterclaim-Defendants admit Roche interviewed and discussed hiring his mother to assist with secretarial work that would include facilitation of time entries for both himself and Cyrulnik, but that he ultimately chose not to hire her. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 47 and the characterizations in subsection "A."

### B.  Cyrulnik Seeks To Correct Freedman's Efforts To Engage In Self-Dealing

48.     Second, Freedman engaged in self-dealing by manipulating the Firm's Compensation Model to enrich himself at the Firm's expense.  Specifically, Freedman struck a deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to pay Schall a 20% referral fee in connection with Freedman's desire to apply for lead counsel appointments in securities class actions.  Instead of paying that referral fee out of Freedman's origination credit, moreover, Freedman demanded the Firm absorb that referral fee.  Freedman's non-economic, "pay to play" origination strategy put the Firm in an unsustainable financial position; namely, the Firm was paying as much as 50% of all client revenue from Freedman's clients merely to "originate" the matters, and then paying the attorneys who worked on the case as much as 45% of the remaining revenue pursuant to the Compensation Model.  In other words, after paying associates and partners their shares, virtually nothing would be left to cover Firm expenses and pay partnership distributions.  Incongruously, Freedman's referral scheme was not only

objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting himself.  When partner Katherine Eskovitz sought a similar arrangement for a matter she was suggesting the Firm take on (and pay her husband a large referral fee), Freedman rejected her proposal as a "money grab," a non-starter, and wholly unacceptable.  Freedman and Roche both called Cyrulnik and told him that Eskovitz was a "liability" and "a problem" who was just trying to exploit the Firm, and proceeded to blame Cyrulnik for supporting making an offer to Eskovitz back in 2019.  Freedman's excessive focus on enriching himself at the expense of the Firm's long-term sustainability was deeply concerning, as was his response.  Freedman told Cyrulnik that Freedman's objective in life was simple: "I don't want to just be rich; I want to be super rich." Cyrulnik and Roche both discussed their concerns about Freedman's approach to compensation, but Roche assured Cyrulnik that he knew Freedman well, and that although Freedman often acted "immature" and was fixated on short-term financial upside, Roche was committed to ensuring that the concerns Cyrulnik identified would be remedied.

**RESPONSE TO PARAGRAPH 48**: The Individual Counterclaim-Defendants admit the Firm approved certain ethical co-counsel agreements, but otherwise deny the allegations in paragraph 48 and the characterizations in subsection "B."

## V.   THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM THE STARTUP CLIENT

49.    Cyrulnik's many stable clients and billable hour matters substantially funded the Firm's operations and many of the Firm's alternate fee arrangement representations of other clients.

**RESPONSE TO PARAGRAPH 49**: The Individual Counterclaim-Defendants admit that while Cyrulnik used the Firm's associates, software, property, and reputation, and while it paid his salary and benefits, some of the revenue generated from clients he originated was used to fund

firm overhead. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 49 and Roman numeral "V."

50.     For example, as discussed above, the Firm was retained by the Startup Client, which planned to distribute digital cryptocurrency assets in the form of Tokens and build a platform of decentralized assets and applications.  The purpose of the representation was to assist the Startup Client and its officers during the growth and development of their business.

**RESPONSE TO PARAGRAPH 50**: The Individual Counterclaim-Defendants admit that the Firm was retained to represent the Startup Client prior to the announcement of RCF and prior to Cyrulnik's involvement in the Firm. The Individual Counterclaim-Defendants otherwise deny the allegations of paragraph 50.

51.     Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all Tokens issued by the Startup Client in connection with all future distributions.

**RESPONSE TO PARAGRAPH 51**: The Individual Counterclaim-Defendants deny the allegations in paragraph 51.

52.     Under the engagement letter, the Firm would receive a flat percentage of all Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any Token Distribution."  Further, under the engagement letter, the Tokens functioned as a nonrefundable advance, meaning "any unused portion of the Billable Hour Advance will expire on the fourth anniversary of this agreement's execution."

**RESPONSE TO PARAGRAPH 52**: The Individual Counterclaim-Defendants admit that Cyrulnik has quoted incomplete portions of the engagement letter. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 52.

53.   Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

**RESPONSE TO PARAGRAPH 53**: The Individual Counterclaim-Defendants refer to the MOU for its content and otherwise deny the allegations in paragraph 53.

54.   At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be.  Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

**RESPONSE TO PARAGRAPH 54**: The Individual Counterclaim-Defendants admit that, at the time the engagement letter was signed, the Startup Client was in its development phase, Tokens had not been distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be. The Individual Counterclaim-Defendants deny the allegation that "Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters."

55.   In ▮▮▮▮▮▮ 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors.  The sale ascribed real value to the Tokens.  More importantly though, it validated the Startup Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

**RESPONSE TO PARAGRAPH 55**: The Individual Counterclaim-Defendants admit the allegations in paragraph 55.

VI.   **ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION**

56.     Roche understood that addressing the Firm's sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik. Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm and that Freedman was out for himself too much. To that end, Roche and Cyrulnik had worked for months to clarify the formulas used to calculate credits in the Compensation Model to try and protect against future exploitation of it, in an effort to disincentivize the practices that were problematic and in which Freedman in particular was engaged. But when Roche presented the updates to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him.

**RESPONSE TO PARAGRAPH 56**: The Individual Counterclaim-Defendants admit that at Cyrulnik's insistence, Roche discussed potential changes to the Firm's formula compensation model. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 56 and Roman numeral "VI."

57.     In ▮▮▮▮▮▮ 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that. But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long and hard to fashion. When Cyrulnik asked Roche what happened after the call, Roche admitted to Cyrulnik that Roche was "scared" of Freedman because Freedman "sometimes acts irrationally" and is selfish. Roche told

Cyrulnik that Roche had concluded it was not "worth it" to stand up to Freedman.  Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants."  Cyrulnik told Roche that the Firm needed to be more principled and that problems need to be addressed rather than ignored.  He told both Roche and Freedman that he believed it was critical to the Firm's success that they look beyond their own individual interests to address any vulnerabilities in the formula applications for compensation to ensure that the Firm was sustaining itself and doing so fairly.

**RESPONSE TO PARAGRAPH 57**: The Individual Counterclaim-Defendants admit there was a conversation where Cyrulnik raised changes to the formula that deviated from the agreed-upon formulas, that Freedman resisted those changes, and that Cyrulnik completely lost control, erupted into an alarming rage, and screamed at both Roche and Freedman at the top of his lungs. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 57.

58.    Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates.  Roche uniquely understood how the Startup Client's ███ 2020 Token sale foreshadowed their enormous potential value, and sensed an opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens.  To that end, Roche wrote to Cyrulnik following the meeting with Freedman about fixing the Firm's formulas: "I agree with the economics of the proposed formula comp. change," but then shockingly told Cyrulnik that, in order for Roche to vote consistent with what he believed was best for the Firm, Cyrulnik needed to buy his support by agreeing to pay Roche 40% of Cyrulnik's Tokens (10% of the total Tokens): "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU."  The request came out of left field.

**RESPONSE TO PARAGRAPH 58**: The Individual Counterclaim-Defendants admit that Roche is deeply engaged in the cryptocurrency industry, that he regularly, speaks, writes, and litigates on that topic, and that Cyrulnik has quoted excerpts of an email that Roche sent to Cyrulnik on July 22. The Individual Counterclaim-Defendants refer to that email for its content (*see* Dkt. No. 31-1), and note that Cyrulnik has taken Roche's statements out of context and omitted key portions that make clear Roche was explaining to Cyrulnik that there were significant problems with Cyrulnik's proposal and that, separately, a re-allocation of Tokens was necessary under the MOU because, in contrast to his commitments under that agreement, Cyrulnik had not provided services to the Startup Client (while Roche and another attorney at the Firm, Joe Delich, had devoted a significant amount of time to providing such services). The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 58.

59.     Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands.  He flatly rejected any such change to his Token stake and explained that acting in the best interests of the Firm and making decisions designed to protect its long-term sustainability was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was unjust and unethical.  As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

**RESPONSE TO PARAGRAPH 59**: The Individual Counterclaim-Defendants deny the allegations in paragraph 59.

**VII.    THE PARTNERS COMPLETE 2020 AND PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS**

60.     Although there were a couple of important issues that had arisen over the course of the first year of the Firm's operations on which the partners had expressed different views (and with respect to which decisions proceeded by split votes), the partnership was generally very

functional and friendly.  The partners consistently touted the collegiality of the Firm in discussions with potential lateral candidates.  Throughout January 2021 (in the few weeks prior to the scheme at issue in this lawsuit), the partners continued to interact as they had in the past.  Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, 2021, and they discussed many Firm planning issues.

**RESPONSE TO PARAGRAPH 60**: The Individual Counterclaim-Defendants admit that outside of interactions with Cyrulnik, the partnership (referring to Firm attorneys who held the title "Partner") was very friendly and functional. The Individual Counterclaim-Defendants admit Freedman and Cyrulnik had lunch in January when Cyrulnik visited Miami. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 60.

61.     Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

**RESPONSE TO PARAGRAPH 61**: The Individual Counterclaim-Defendants admit Cyrulnik raised various issues he claimed to have about the Firm at that meeting.

62.     Counterclaim-Defendant Friedland reached out to Cyrulnik on January 2, 2021: "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

**RESPONSE TO PARAGRAPH 62**: The Individual Counterclaim-Defendants admit the allegation in paragraph 62.

63.     On January 22, 2021, less than three weeks before their bad-faith "removal" ploy, Freedman was arranging to ensure that the Firm's bank accounts at Chase Bank were corrected to finally ensure that Cyrulnik was listed as a registered owner – something that Freedman was

required to do when the Firm was first formed one year prior, but had delayed due to the pandemic and the requirement that the owners be present together at a Chase branch to update the accounts in person.  Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York the following week (less than two weeks before the illegal "removal" scheme) in light of a family conflict Freedman had to navigate that day.

**RESPONSE TO PARAGRAPH 63**: The Individual Counterclaim-Defendants admit Cyrulnik wanted to be added to the bank accounts, that Freedman did not add him, and instead told him to ask Roche about it in New York. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 63.

64.  ▮▮▮▮▮▮ the value of the Tokens exploded.

**RESPONSE TO PARAGRAPH 64**: The Individual Counterclaim-Defendants refer to publicly available market data for the actual price of Tokens over time but admit that the price of the highly volatile Tokens generally increased during the period referenced by Cyrulnik and fluctuated wildly thereafter.

## VIII.   COUNTERCLAIM-DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF TO TRY AND MISAPPROPRIATE HIS INTERESTS IN THE FIRM'S VALUABLE ASSETS

65.  In ▮▮▮▮▮▮ 2020, the Tokens began trading publicly for the first time.  Between ▮▮▮▮▮▮ 2020 and ▮▮▮▮▮▮ 2020, the price of the Tokens remained relatively stable.

**RESPONSE TO PARAGRAPH 65**: The Individual Counterclaim-Defendants refer to publicly available market data for the actual price of the highly volatile Tokens over time, but admit Cyrulnik's allegations in paragraph 65 are generally accurate. The Individual Counterclaim-Defendants deny the allegation in Roman numeral "VIII."

66.     In ████ 2021, however, the Tokens experienced a precipitous rise in value. Between ████ 2021 and ████ 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between ████ 2021, and ████ 2021.  The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in ██ 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the ██ days leading up to Cyrulnik's purported "removal" for cause.

**RESPONSE TO PARAGRAPH 66**: The Individual Counterclaim-Defendants refer to publicly available market data for the actual price of Tokens over time, but admit that Cyrulnik's statements regarding the price trend of Tokens during the refenced period is generally accurate, though misleading. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 66.

67.     Below is a chart of the Tokens' price between ████████ and the day of the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm:



**RESPONSE TO PARAGRAPH 67**: The Individual Counterclaim-Defendants refer to publicly available market data for the actual price of Tokens over time, but admit that Cyrulnik's chart appears to accurately reflect the price trend of Tokens during the referenced time period (with the caveat that Cyrulnik's characterization of the Founding Partners' meeting to remove him for his pervasive misconduct as "the Conspiring Partners' secret meeting to expel Cyrulnik" is grossly inaccurate and misleading).

68.     As the chart shows, as of ████████, 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than ███ per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million.  But that was not enough for Roche and Freedman, the latter of whom had previously remarked that his goal in life was to be "super rich."

**RESPONSE TO PARAGRAPH 68**: The Individual Counterclaim-Defendants deny the allegations in paragraph 68.

69.     Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters.  With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

**RESPONSE TO PARAGRAPH 69**: The Individual Counterclaim-Defendants deny the allegations in paragraph 69.

70.     Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with Friedland, Holcomb and Normand, convened a secret meeting on or about February 10, 2021, without even informing two of the Firm's seven equity partners, to concoct the pretext for his removal. Cyrulnik was not informed of the meeting, and was not given the opportunity to address whatever false allegations the Conspiring Partners had decided to use as a pretext for the "removal" – neither at the meeting nor at any other time prior to his purported (and unlawful) "removal."

**RESPONSE TO PARAGRAPH 70**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that Cyrulnik was not given notice of the meeting on February 10, 2021, and that the other Founding Partners attended that meeting, but otherwise deny the allegations in paragraph 70.

71.     Also excluded from the covert meeting was equity partner Paul Fattaruso, who was the only partner at the Firm who regularly worked with Cyrulnik on running the Firm's core matters while the other partners focused primarily on the Firm's contingency work (and small billable matters).  Fattaruso was deliberately and unjustifiably excluded so that the Conspiring Partners could falsely mischaracterize the vote to oust Cyrulnik as "unanimous," when in fact, they did not even include two of the Firm's seven equity partners (constituting almost 30% of the Firm's equity votes).

**RESPONSE TO PARAGRAPH 71**: The Individual Counterclaim-Defendants admit that Fattaruso was not given notice of the February 10, 2021, meeting, but otherwise deny the allegations in paragraph 71.

72.     The secret meeting not only breached the fiduciary duties owed by the Conspiring Partners to Cyrulnik, but directly breached the MOU.  As the Firm's co-chairperson, only Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting of those meetings."  Cyrulnik's right to initiate and conduct Firm meetings could not be altered without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik, which of course never happened.

**RESPONSE TO PARAGRAPH 72**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 72.

73.     Two days after the meeting, on February 12, 2021, the Conspiring Partners sent Cyrulnik an email informing him that he was "removed," which email was riddled with errors, misstatements, and mischaracterizations, purporting to remove Cyrulnik from the Firm for

"cause." The fictitious bases set forth in the email had not even occurred, much less constituted proper "cause" as required.

**RESPONSE TO PARAGRAPH 73**: The Individual Counterclaim-Defendants admit that the other Founding Partners sent Cyrulnik notice of his removal on February 12, 2021, but otherwise deny the allegations in paragraph 73.

## IX. COUNTERCLAIM-DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS

### A. Counterclaim-Defendants Indisputably Lacked "Cause" To Expel Cyrulnik

74.    Counterclaim-Defendants indisputably lacked anything close to "cause" — which, under applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of his job — to remove Cyrulnik.

**RESPONSE TO PARAGRAPH 74**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 74, Roman numeral "IX," and subsection "A."

75.    Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from associate to partner to equity partner as quickly as anyone in BSF's history. All of the Firm's equity partners, including all of the Conspiring Partners, had worked for years at BSF with Cyrulnik. He had never before had any complaints lodged against him for any improper interactions with any colleague — associate, partner, or otherwise. Cyrulnik is highly respected by scores of colleagues with whom he works and has worked. Because there was no record of misconduct and, of course, no actual misconduct, the Conspiring Partners had no substance upon which to base their pretextual removal for cause. Instead, they contrived a removal email that not only was false and devoid of substance, but failed to describe any actual cause.

**RESPONSE TO PARAGRAPH 75**: The Individual Counterclaim-Defendants admit that Cyrulnik worked at BSF for fifteen years prior to joining the Firm, that Cyrulnik was an equity partner at BSF, and that some of the other Founding Partners had worked with Cyrulnik at BSF. The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about whether Cyrulnik is "highly respected by scores of colleagues" and whether Cyrulnik rose "from associate to partner to equity partner as quickly as anyone in BSF's history." The Individual Counterclaim-Defendants deny that no one at the Firm lodged a complaint about Cyrulnik prior to his for-cause removal and deny that no one at BSF lodged a complaint about Cyrulnik either. The Individual Counterclaim-Defendants likewise deny the remaining allegations in paragraph 75.

76.     For example, Counterclaim-Defendants' purported "removal" email asserts that Cyrulnik screamed, "spoke over" other partners, refused to listen, and was antagonistic at meetings.  Setting aside that "screaming" cannot and does not constitute cause, it in any event mischaracterizes two instances of disagreement about Firm decisions throughout 14 months of Cyrulnik's tenure.  For example, in July 2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on Cyrulnik and coordinated matching e-mails, alleging Cyrulnik had "screamed" at them, accompanied by a misleading account of events.  These emails were a misguided effort to pressure Cyrulnik into conceding financial rights.  When Roche and Freedman realized that Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

**RESPONSE TO PARAGRAPH 76**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-

Defendants admit that the February 12, 2021, email identified a non-exhaustive list of Cyrulnik's misconduct. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 76.

77.     The other allegations in the email are equally misguided. The email vaguely asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other founding partners." Yet, it provides no context or support for these accusations (because they are false). And the email includes a vague and nebulous accusation that Cyrulnik created "unsustainable environments for associates," which is completely false. To the contrary, Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who has spoken ill of him or working for him.

**RESPONSE TO PARAGRAPH 77**: The Individual Counterclaim-Defendants admit that the February 12, 2021, email identified Cyrulnik's attempts "to undermine the intent of the MOU and marginalize other founding partners" and creation of an "unsustainable environment[] for associates" as examples of Cyrulnik's problematic behavior. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 77.

78.     As the removal email evidences, the actions by the Conspiring Partners are about one thing only: greed. They had no problem working with Cyrulnik at BSF — actively recruiting him to leave his hard-earned position and lead the Firm — and no problem working with Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue base) until ▮ ▮ days before his removal when his assets skyrocketed in value and the Tokens suddenly appreciated to more than $60 million in value. Then, without any precipitating incident, the Conspiring Partners felt compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an opportunity for him to respond to their pretextual and baseless allegations.

**RESPONSE TO PARAGRAPH 78**: The Individual Counterclaim-Defendants admit that some of the Founding Partners had no problem working with Cyrulnik at BSF and that Cyrulnik was not given notice of the February 10, 2021, meeting, but otherwise deny the allegations in paragraph 78.

79.     Following their wrongful attempted removal of Cyrulnik, the Conspiring Partners have stopped at nothing in their quest to defame him.  In a truly cynical effort, the Conspiring Partners attempted to exploit the legal community's rightful concerns over diversity and inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit themselves — *i.e.*, five white males.  Cyrulnik has never expressed anything other than outright support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Conspiring Partners are manifestly false.

**RESPONSE TO PARAGRAPH 79**: The Individual Counterclaim-Defendants deny the allegations in paragraph 79.

80.     Accordingly, after receiving the Conspiring Partners' email on February 12, 2021, Cyrulnik expressly placed the Conspiring Partners on notice that their purported removal was "in bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

**RESPONSE TO PARAGRAPH 80**: The Individual Counterclaim-Defendants admit that Cyrulnik's counsel, Marc Kasowitz, sent a letter to the other Founding Partners on February 22, 2021, containing the quoted statements, but otherwise deny the allegations in paragraph 80.

**B.  The Conspiring Partners Breached The MOU By Denying Cyrulnik The Compensation**

**They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause**

81.     The Conspiring Partners' scheme suffered from many fatal flaws, including the threshold problem that, even where partners have grounds for removing a Founding Partner for cause (there were none here) and the proper procedures for doing so were followed (again not the case here), such a removal would not impact Cyrulnik's core compensation rights under the MOU in any event.

**RESPONSE TO PARAGRAPH 81**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 81 and subsection "B."

82.     In Section VI of the MOU ("Firm Management"), the MOU addressed two different instances where a Founding Partner would depart from the Firm.  The partner could withdraw voluntarily under Section VI(C), or under limited circumstances could be removed involuntarily for cause under Section VI(G).

**RESPONSE TO PARAGRAPH 82**: The Individual Counterclaim-Defendants deny the allegations in paragraph 82.

83.     In their complaint, the Conspiring Partners intentionally sought to conflate the provisions in a misguided attempt to treat their improper and involuntary removal as Cyrulnik deciding to "withdraw" from the Firm.  In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an involuntary removal and voluntary withdrawal separately, and the intent of the parties (including the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily agreed to change their economics).

**RESPONSE TO PARAGRAPH 83**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 83.

84.     The MOU unambiguously provides for certain ramifications in the event of voluntary withdrawal.  It unequivocally does not set forth those ramifications for involuntarily removal, and Counterclaim-Defendants' attempt to do so is baseless and improper.

**RESPONSE TO PARAGRAPH 84**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 84.

## X.   THE CONSPIRING PARTNERS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS

85.     Since perpetrating their scheme and purporting to remove Cyrulnik as a partner, the Conspiring Partners have egregiously breached their duties to and badly mistreated the Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik.  Despite the Conspiring Partners' extreme efforts to keep the Firm's clients at RCF, every single client that Cyrulnik brought to the Firm left the Firm and remained with Cyrulnik.

**RESPONSE TO PARAGRAPH 85**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 85 and Roman numeral "X," except admit that Cyrulnik's clients followed Cyrulnik to his new firm, Cyrulnik Fattaruso LLP.

### A.  The Conspiring Partners Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets

86.     After sending Cyrulnik their "removal" email, the Conspiring Partners tried to pressure him to agree to sign a confidential mediation and binding arbitration agreement to facilitate an "amicable" re-division of his assets and rights under the MOU.  After calling out the

Conspiring Partners' improper scheme, Cyrulnik told the Conspiring Partners that a necessary predicate for any discussion about splitting the Firm was their commitment to provide him all of the compensation he is owed under the MOU.

**RESPONSE TO PARAGRAPH 86**: The Individual Counterclaim-Defendants admit they sought to amicably resolve this dispute, including through mediation and/or arbitration, and that Cyrulnik made absurd demands for compensation he was not entitled to. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 86 and subsection "A."

87.    On February 19, Roche sent Cyrulnik a proposal in which he proposed that Cyrulnik give the Conspiring Partners 75% of his Tokens.   Through his counsel, Cyrulnik told the Conspiring Partners that, if they did not commit to providing Cyrulnik everything to which he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens, Cyrulnik would be forced to commence litigation.  The Conspiring Partners' counsel stated that his clients were looking to resolve the matter, and that he would speak with them and revert on Sunday morning, February 28, 2021.

**RESPONSE TO PARAGRAPH 87**: The Individual Counterclaim-Defendants admit that, on February 19, 2021, Roche proposed a resolution of the parties' dispute and that Cyrulnik rejected that proposal. The Individual Counterclaim-Defendants deny the remaining allegations in paragraph 87.

88.    Having forestalled litigation through that stall tactic, the Conspiring Partners rushed to prepare their own anticipatory pleading and rushed into court, in the hope that publicizing a false narrative would force Cyrulnik to give them what they wanted and would enable the Conspiring Partners to keep Cyrulnik's clients. Without providing any further response to Cyrulnik, the Counterclaim-Defendants filed a declaratory relief lawsuit in this Court on the night

of Saturday, February 27, 2021 (a day before the scheduled call between their counsel and Cyrulnik's counsel, pursuant to Counterclaim-Defendants' counsel's request).

**RESPONSE TO PARAGRAPH 88**: The Individual Counterclaim-Defendants deny the allegations in paragraph 88.

89.     Concurrent with their late-night filing, the Conspiring Partners suddenly cut Cyrulnik's access to client files without notice.  At the time, Cyrulnik was lead counsel on many active matters with a number of court hearings and depositions scheduled the next business day and throughout the ensuing week, and the Conspiring Partners' actions materially hindered Cyrulnik's ability to work on these matters – as the Conspiring Partners intended all along, as further leverage to force Cyrulnik to give up his rights.  Cyrulnik rejected the Conspiring Partners' extortionate actions, and demanded that his access to client files be restored so that he could continue representing and protecting the interests of his clients – clients who, at the time, remained Firm clients to whom each of the Conspiring Partners owed fiduciary duties.  Ultimately, the Conspiring Partners agreed to provide Cyrulnik access to his clients' files – although only after he was forced to scramble and waste significant time and effort to protect client interests.

**RESPONSE TO PARAGRAPH 89**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny they cut off Cyrulnik's access to client files without significant advance notice. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 89.

**B.   The Conspiring Partners Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Choosing Cyrulnik**

90.     Faced with the imminent prospect of losing most of their core clients and revenue, the Conspiring Partners sought to leverage deadlines in active matters to pressure clients to execute new engagement letters with the Firm or else be left without adequate staffing for their matters on

virtually no notice at all.  Indeed, in many cases, the Counterclaim-Defendants' letters to clients demanded responses within just a few business hours.

**RESPONSE TO PARAGRAPH 90**: The Individual Counterclaim-Defendants deny the allegations in paragraph 90 and subsection "B."

91.     When the clients informed the Firm that they wanted Cyrulnik to lead their matters but expected an appropriate and non-prejudicial transition of their active matters, the Firm scrambled to punish those clients by rapidly removing the associates who had been staffed on those cases for months – with imminent deadlines fast approaching and against the request and recommendation of the other Firm partner who had been running the cases with Cyrulnik (and who remained at the Firm at the time).

**RESPONSE TO PARAGRAPH 91**: The Individual Counterclaim-Defendants deny the allegations in paragraph 91.

92.     The Counterclaim-Defendants also enlisted newly hired partner, Eric Rosen, to send harassing letters to clients, in which Rosen threatened to file notices of withdrawal in less than two days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to continue handling your matter."  Cyrulnik continued to field daily phone calls for weeks from clients who were receiving Rosen's emails threatening to prejudice their cases by filing withdrawal notices in their active cases.

**RESPONSE TO PARAGRAPH 92**: The Individual Counterclaim-Defendants lack knowledge and information sufficient to form a belief about whether Cyrulnik fielded "daily phone calls for weeks from clients" regarding communications from Rosen, and otherwise deny the allegations in paragraph 92.

93.     Even after the Conspiring Partners resigned themselves to the fact that Cyrulnik's clients had no interest in being represented by RCF unless Cyrulnik was leading their cases, they sought to harm those clients by generating and demanding payment of inaccurate and improper invoices, and refusing to remit client funds that did not belong to them.   Specifically, the Conspiring Partners drafted invoices for those clients without the input or oversight of any of the partners who oversaw the matter, and demanded that Cyrulnik sign off on them without review. When Cyrulnik told the Conspiring Partners that client invoicing needed to be done carefully and properly and that he needed access to Firm timekeeping and recording systems to perform his customary review of pre-bills before they were sent out to clients, the Conspiring Partners refused.

**RESPONSE TO PARAGRAPH 93**: The Individual Counterclaim-Defendants deny the allegations in paragraph 93.

94.     Cyrulnik's counsel called out Counterclaim-Defendants' attempt to mistreat clients:

> Any effort to send bills to clients without the lead partner overseeing those matters reviewing them is obviously improper. Client bills need to be reviewed before they are sent out, as clients reasonably expect to happen. The fact that these clients declined to have your clients represent them going forward does not change that. If you want to treat clients properly and fairly, we have offered a process for doing so. If your clients desire to punish clients for declining to be represented by the kinds of people you represent, we strongly oppose such efforts and will obviously not facilitate them. We have proposed a mechanism for dealing with invoicing; if you refuse to approach that effort in a manner consistent with your clients' duties to their former clients and to mine, we will address that in court.

**RESPONSE TO PARAGRAPH 94**: The Individual Counterclaim-Defendants have reviewed their records and deny having received any communication from Cyrulnik's counsel containing the block-quoted text.

95.     Confronted with this reality, Counterclaim-Defendants then partially backtracked, demanding that Cyrulnik send "corrections" to the invoices based on guesswork and memory alone, without access to the firm timekeeping systems, calendars and records or to the lawyers whose time was being listed on the bills, and that he do so within two business days.  The Conspiring Partners also demanded that Cyrulnik send them entries for the time he worked on all matters in January and February so that they could include those entries on the improper invoices, which would enable them to give clients the false impression that Cyrulnik had signed off on the invoices and the work being billed.  Although it was against Cyrulnik's own financial interests, he declined to participate in the Conspiring Partners' effort to bill clients without customary and proper review of the invoices to ensure accuracy and that clients were being treated fairly and honestly.

**RESPONSE TO PARAGRAPH 95**: The Individual Counterclaim-Defendants admit that they offered Cyrulnik the opportunity to review proposed client bills and that Cyrulnik never provided any comments on those proposed bills. The Individual Counterclaim-Defendants admit that the Firm demanded that, consistent with his obligations, Cyrulnik provide it with records of the time that he spent working on behalf of Firm clients in January and February 2021, and that Cyrulnik refused to do so. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 95.

96.     To this day, despite multiple requests and demands, the Conspiring Partners continue to block Cyrulnik's access to the billing systems needed to send out proper invoices, causing substantial harm to Cyrulnik.

**RESPONSE TO PARAGRAPH 96**: The Individual Counterclaim-Defendants deny the allegations in paragraph 96.

97.     Astonishingly, in its Amended Complaint, RCF somehow tries to turn these facts on their head, alleging that Cyrulnik breached his duties to the Firm by not participating in its plan to send out invoices without customary and requisite review, to bill clients for unauthorized work, and to create the false impression for clients that the invoices had been properly reviewed and approved – when it is the Conspiring Partners who have unilaterally and improperly blocked Cyrulnik's access to the records necessary to ensure that the Conspiring Partners do not send out false or fraudulent invoices.  The Conspiring Partners then feign ignorance in their Amended Complaint as to why the many clients they so badly mistreated – and whose cases the Conspiring Partners endangered through their bad-faith, retaliatory conduct – apparently did not pay the invoices that RCF sent.

**RESPONSE TO PARAGRAPH 97**: The Individual Counterclaim-Defendants admit that the Firm has asserted claims against Cyrulnik based on his failure to provide his time records for January and February 2021, and for tortiously interfering with the Firm's rights, but otherwise deny the allegations in paragraph 97.

### C.   The Conspiring Partners Cause the Firm To Disseminate False Tax Forms In An Effort To Further Their Scheme.

98.     Recognizing that their scheme had been exposed, the Conspiring Partners scrambled to devise a backup plan for stealing Cyrulnik's assets in mid-2021.

**RESPONSE TO PARAGRAPH 98**: The Individual Counterclaim-Defendants deny the allegations in paragraph 98 and subsection "C."

99.     Specifically, they secretly directed the Firm's accountant to withhold Cyrulnik's Form K-1 – the tax form utilized by partners in lieu of a Form W-2 – and then issued him a falsified W-2 form, claiming that Cyrulnik – the Firm's largest equity holder at 27% – would suddenly and retroactively being recharacterized as an employee of the Firm.

**RESPONSE TO PARAGRAPH 99**: The Individual Counterclaim-Defendants admit that the Firm issued Cyrulnik a W-2 form, and otherwise deny the allegations in paragraph 99.

100.     Upset that Fattaruso declined to support their scheme, the Conspiring Partners then denied Fattaruso's status as an equity partner and falsified his tax forms, seeking to punish him for being honest and refusing to endorse their unethical and illegal behavior.

**RESPONSE TO PARAGRAPH 100**: The Individual Counterclaim-Defendants admit that Fattaruso (Cyrulnik's current junior partner at his new firm, Cyrulnik Fattaruso LLP) was not an equity partner at the Firm, and otherwise deny the allegations in paragraph 100.

101.     The Conspiring Partners then reallocated to themselves Cyrulnik's allocated expenses in connection with starting the Firm and its operations, and on information and belief, filed false tax returns with the federal and local authorities claiming deductions to which they were not entitled and mischaracterizing income received by individual partners.

**RESPONSE TO PARAGRAPH 101**: The Individual Counterclaim-Defendants deny the allegations in paragraph 101.

102.     The Conspiring Partners then used Cyrulnik's funds to keep the Firm afloat in the face of the mass exodus of clients and refused to remit large amounts of compensation owed to Cyrulnik for months.  Then, in April 2021, Counterclaim-Defendants finally, and belatedly, sent a portion of the amounts owed but improperly withheld the rest of Cyrulnik's assets (and continue to do so to this day).  In violation of the express provisions of the MOU and the controlling Florida statutes governing the partnership, the Conspiring Partners sought to obscure their misconduct by withholding from Cyrulnik basic information about the Firm's accounts and revenues in which he held substantial interests, never paying him the rest of his formula compensation or any of the equity distributions owed to him, and misappropriating the other assets given to him under the

MOU, including his Tokens and his 25% interest ████████████████████████ in a $100 million jury award, with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision).

**RESPONSE TO PARAGRAPH 102**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that the Firm provided a multimillion-dollar payment to Cyrulnik in April 2021 and obtained a $100-million jury verdict on behalf of a Firm client (in yet another case in which Cyrulnik never participated). The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 102.

## COUNT 1
### (Dissolution pursuant to Florida Statutes § 620.8801)

103.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 102 herein.

**RESPONSE TO PARAGRAPH 103**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

104.    Cyrulnik seeks judicial dissolution of RCF pursuant to Florida Statutes §§ 620.8405 and 620.8801.

**RESPONSE TO PARAGRAPH 104**: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Individual Counterclaim-Defendants admit that is what Cyrulnik seeks.

105.    RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

**RESPONSE TO PARAGRAPH 105**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-

Defendants admit that the Firm is a limited liability partnership as defined by the Florida Revised Uniform Partnership Act, and otherwise deny the allegations in paragraph 105.

106.    Counterclaim-Defendants breached the MOU by purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so.  The purported "cause" cited by Counterclaim-Defendants is plainly insufficient as a matter of law, indisputably pretextual, in bad faith and based on lies and mischaracterizations of the events.  Accordingly, the Conspiring Partners lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU and is ultra vires and void *ab initio*.  Accordingly, Cyrulnik remains a Founding Partner and Co-Chairperson of RCF.

**RESPONSE TO PARAGRAPH 106**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 106.

107.    Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

**RESPONSE TO PARAGRAPH 107**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 107.

108.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, the economic purpose of the partnership has been unreasonably frustrated by the actions of the Conspiring Partners, and likely will continue to be unreasonably frustrated, within the meaning of Florida Statutes § 620.8801(5)(a).

**RESPONSE TO PARAGRAPH 108**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 108.

109.     By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Conspiring Partners, within the meaning of Florida Statutes § 620.8801(5)(b).

**RESPONSE TO PARAGRAPH 109**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 109.

110.     By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practical to carry on the activities of the limited liability partnership in conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

**RESPONSE TO PARAGRAPH 110**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 110.

111.     Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE TO PARAGRAPH 111**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 111.

112.     By reason thereof, Cyrulnik respectfully requests that this Court enter a judgment dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability

partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just and proper.

**RESPONSE TO PARAGRAPH 112**: This paragraph contains legal conclusions to which no response is required.

## COUNT 2
### (Buyout under Florida Statutes § 620.8701 in the Alternative)

113.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 112 herein.

**RESPONSE TO PARAGRAPH 113**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

114.    RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

**RESPONSE TO PARAGRAPH 114**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that the Firm is a limited liability partnership as defined by the Florida Revised Uniform Partnership Act, and otherwise deny the allegations in paragraph 114. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

115.    Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-Chairperson of RCF.

**RESPONSE TO PARAGRAPH 115**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that Cyrulnik was a "Founding Partner" as that term is used in the MOU, and otherwise deny the allegations in paragraph 115. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

116.    Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

**RESPONSE TO PARAGRAPH 116**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 116. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

117.    Should judicial dissolution be found inappropriate or inequitable, in the alternative, the Conspiring Partners' actions to expel Cyrulnik from RCF entitle him to a buyout pursuant to Florida Statutes § 620.8701.

**RESPONSE TO PARAGRAPH 117**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 117. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

118.    Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE TO PARAGRAPH 118**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 118. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

119.    By reason thereof, in the alternative to dissolution, Cyrulnik respectfully requests that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and proper.

**RESPONSE TO PARAGRAPH 119**: This paragraph contains legal conclusions to which no response is required. In addition, as to the Individual Counterclaim-Defendants, the Court has dismissed this claim. (Dkt. No. 374 at 19.)

<u>**COUNT 3**</u>
**(Accounting Pursuant to Florida Statutes §§ 620.8403 and 620.1407)**

120.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 119 herein.

**RESPONSE TO PARAGRAPH 120**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

121.    The Conspiring Partners have taken control of RCF, have unlawfully excluded Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused to allow Cyrulnik any say in the operation of RCF, and have otherwise abused their status as partners of the Firm.

**RESPONSE TO PARAGRAPH 121**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that, after Cyrulnik's removal, the Firm has not provided Cyrulnik with unfettered access to its books and records, or allowed him "any say" in the Firm's management. The Individual Counterclaim-Defendants deny the remaining allegations in paragraph 121.

122.    An accounting of the assets, profits, and losses of RCF is necessary and appropriate at this time.

**RESPONSE TO PARAGRAPH 122**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 122.

123.    Florida Statutes § 620.8403 requires a limited liability partnership to provide its current (and former) partners access to the Firm's records that are required to be kept by all limited liability partnerships.  Florida Statutes § 620.1407 affords a current (and former) partner the right to inspect and copy and "records maintained by the limited liability partnership regarding the limited partnership's activities and financial condition."

**RESPONSE TO PARAGRAPH 123**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 123, and note that Cyrulnik has misquoted Fla. Stat. § 620.1407 by erroneously adding the word "liability."

124.    Cyrulnik has been denied access to RCF's books and records notwithstanding numerous requests for access to the Firm's financial records and accounts.

**RESPONSE TO PARAGRAPH 124**: The Individual Counterclaim-Defendants admit that the Firm has not provided Cyrulnik with unfettered access to its books and records as he is not entitled to them.

125.    By reason thereof, Cyrulnik demands judgment in his favor, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present; find and determine the amount due to Cyrulnik from RCF;

and enter a judgment or decree in favor of Cyrulnik for his compensatory damages, prejudgment interest, cost, and such further relief as this Court deems just and proper.

**RESPONSE TO PARAGRAPH 125**: This paragraph contains legal conclusions to which no response is required.

**COUNT 4**
**(Breach of Contract)**
**(Against the Conspiring Partners)**

126.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 125 herein.

**RESPONSE TO PARAGRAPH 126**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

127.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE TO PARAGRAPH 127**: This paragraph contains legal conclusions to which no response is required.

128.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE TO PARAGRAPH 128**: This paragraph contains legal conclusions to which no response is required.

129.    Cyrulnik has fully performed and is ready, willing, and able to continue to perform his obligations under the MOU and the Side Letter.

**RESPONSE TO PARAGRAPH 129**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 129.

130.    The Conspiring Partners breached the MOU by, among other things, purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so.  The "cause" cited by Counterclaim-Defendants was indisputably pretextual, in bad faith, based on Counterclaim-Defendants' lies and mischaracterizations of the events, and in any case did not rise to the level of "cause" under the law.  Accordingly, the Conspiring Partners did not have the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU.

**RESPONSE TO PARAGRAPH 130**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 130.

131.    Even if the Conspiring Partners had "cause" to expel Cyrulnik from the Firm, the Conspiring Partners further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU, including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity.  Although the MOU limits the ability of a partner who has withdrawn from the Firm to retain his equity, it does not provide any such limitation on a partner who was removed. Accordingly, by citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Conspiring Partners have breached their obligations under the MOU.

**RESPONSE TO PARAGRAPH 131**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 131.

132.     Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

**RESPONSE TO PARAGRAPH 132**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 132.

133.     The Conspiring Partners unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

**RESPONSE TO PARAGRAPH 133**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that the Firm changed its name, website, and letterhead to "Roche Freedman LLP" following Cyrulnik's removal and that Cyrulnik did not authorize these changes. The Individual Counterclaim-Defendants note Cyrulnik has taken the position that it would be a violation of ethics rules for the Firm to continue to operate with the name "Roche Cyrulnik Freedman LLP" in light of Cyrulnik's removal. (*See* Dkt. No. 40 at 16.) The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 133.

134.     Conspiring Partners Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

**RESPONSE TO PARAGRAPH 134**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-

Defendants deny they breached any obligations under the MOU, but admit Cyrulnik's access was removed after he was removed from the Firm.

135.    The Conspiring Partners also breached the MOU by not performing multiple obligations set forth therein and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE TO PARAGRAPH 135**: This paragraph contains ambiguous legal conclusions to which no response is required or possible. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 135.

136.    The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE TO PARAGRAPH 136**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 136.

137.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 137**: This paragraph contains legal conclusions to which no response is required.

**COUNT 5**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against the Conspiring Partners)**

138.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 137 herein.

**RESPONSE TO PARAGRAPH 138**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

139.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE TO PARAGRAPH 139**: This paragraph contains legal conclusions to which no response is required.

140.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE TO PARAGRAPH 140**: This paragraph contains legal conclusions to which no response is required.

141.    Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

**RESPONSE TO PARAGRAPH 141**: This paragraph contains legal conclusions to which no response is required.

142.    The Conspiring Partners breached this implied covenant by, among other things, taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity,

and by denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 142**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 142.

143.    The Conspiring Partners also breached the covenant of good faith and fair dealing by not performing multiple obligations set forth therein in the MOU and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE TO PARAGRAPH 143**: This paragraph contains ambiguous legal conclusions to which no response is possible or required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 143.

144.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 144**: This paragraph contains legal conclusions to which no response is required.

<u>**COUNT 6**</u>
**(Breach of Fiduciary Duty)**
**(Against the Conspiring Partners)**

145.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 144 herein.

**RESPONSE TO PARAGRAPH 145**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

146.     As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik. These duties include the duties of care and loyalty.

**RESPONSE TO PARAGRAPH 146**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 146.

147.     The Conspiring Partners breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 147**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 147.

148.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the

Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 148**: This paragraph contains legal conclusions to which no response is required.

**COUNT 7**
**(Conversion)**

149.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 148 herein.

**RESPONSE TO PARAGRAPH 149**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

150.    Counterclaim-Defendants knowingly and intentionally converted Cyrulnik's specific and identifiable membership interest in RCF and his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

**RESPONSE TO PARAGRAPH 150**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 150.

151.    Counterclaim-Defendants, without authority, deprived Cyrulnik of such membership interest and substantial equity interest for their own use.

**RESPONSE TO PARAGRAPH 151**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 151.

152.    Counterclaim-Defendants' deprivation of Cyrulnik's partnership and equity interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

**RESPONSE TO PARAGRAPH 152**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 152.

153.    Counterclaim-Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests.  Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

**RESPONSE TO PARAGRAPH 153**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit Cyrulnik hasn't been provided equity in the Firm, nor is he an equity partner of the Firm.

154.    As a direct and proximate result of Counterclaim-Defendants' conversion, Cyrulnik has suffered damages.

**RESPONSE TO PARAGRAPH 154**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 154.

155.    By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 155**: This paragraph contains legal conclusions to which no response is required.

<u>**COUNT 8**</u>
**(Unjust Enrichment)**

156.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 155 herein.

**RESPONSE TO PARAGRAPH 156**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

157.     Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Conspiring Partners.

**RESPONSE TO PARAGRAPH 157**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that Cyrulnik originated clients to the Firm, devoted time and attention to Firm matters, and conferred benefits on the Firm, but otherwise deny the allegations in paragraph 157 and state that any benefits conferred by Cyrulnik were outweighed by the harm caused by his conduct, and that he received compensation for these efforts.

158.     Counterclaim-Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik.  Indeed, Counterclaim-Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

**RESPONSE TO PARAGRAPH 158**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants admit that the Firm knowingly and voluntarily accepted services and retained benefits from Cyrulnik, but state Cyrulnik was paid millions of dollars, in return for those benefits. The Individual Counterclaim-Defendants otherwise deny the allegations in paragraph 158 and state that any benefits conferred by Cyrulnik were outweighed by the harm caused by his conduct.

159.     The circumstances are such that it would be inequitable for Counterclaim-Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

**RESPONSE TO PARAGRAPH 159**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 159.

160.     Cyrulnik is entitled to damages as a result of Counterclaim-Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Counterclaim-Defendants from Cyrulnik.

**RESPONSE TO PARAGRAPH 160**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 160.

161.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 161**: This paragraph contains legal conclusions to which no response is required.

## <u>COUNT 9</u>
**(Promissory Estoppel)**
**(Against the Conspiring Partners)**

162.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 161 herein.

**RESPONSE TO PARAGRAPH 162**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

163.    The Conspiring Partners made a clear and unambiguous promise to pay Cyrulnik certain amounts and to remit to him interests in many assets – including but not limited to 25% ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ of all Tokens issued by the Startup Client (which value has exceeded $400 million) and 27% of RCF's profits including from its contingency interests in various litigations – and to impart to him certain control rights, along with several other assets the parties listed. They did so to induce Cyrulnik to give up his long-standing equity partnership and other lucrative opportunities and leverage his reputation, experience, and substantial practice to cofound RCF.

**RESPONSE TO PARAGRAPH 163**: The Individual Counterclaim-Defendants refer Cyrulnik to the MOU for its content and otherwise deny the allegations in this paragraph.

164.    Conspiring Partners Roche and Freedman made a clear and unambiguous promise to pay Cyrulnik the amounts set forth in the Side Letter, including 25% of their interest in ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ $100 million jury award with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision), and an $850,000 cash payment to induce Cyrulnik to allow Roche to list his name before Cyrulnik's and proceed with co-founding the Firm as RCF.

**RESPONSE TO PARAGRAPH 164**: The Individual Counterclaim-Defendants refer Cyrulnik to the Side Letter for its content and otherwise deny the allegations in this paragraph.

165.    Cyrulnik reasonably and foreseeably relied on the foregoing promises the Conspiring Partners made by, among other things, leaving his lucrative practice at BSF, foregoing the opportunity to work at various other law firms, and spending the next year servicing clients at RCF.

**RESPONSE TO PARAGRAPH 165**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 165.

166.    The Conspiring Partners caused unconscionable injury to Cyrulnik by breaking those promises, misappropriating the foregoing assets for their own benefit, and refusing to remit his assets or honor the guaranteed rights he had been promised.

**RESPONSE TO PARAGRAPH 166**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 166.

167.    The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE TO PARAGRAPH 167**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 167.

168.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 168**: This paragraph contains legal conclusions to which no response is required.

## COUNT 10
### (Civil Conspiracy)
### (Against the Conspiring Partners)

169.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 168 herein.

**RESPONSE TO PARAGRAPH 169**: The Individual Counterclaim-Defendants incorporate their responses to the corresponding paragraphs.

170.     The Conspiring Partners are parties to a civil conspiracy.

**RESPONSE TO PARAGRAPH 170**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 170.

171.     The Conspiring Partners conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE TO PARAGRAPH 171**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 171.

172.     Each of the Conspiring Partners committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

**RESPONSE TO PARAGRAPH 172**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 172.

173.    As a direct and proximate result of the Conspiring Partners' civil conspiracy, Cyrulnik has suffered damages.

**RESPONSE TO PARAGRAPH 173**: This paragraph contains legal conclusions to which no response is required. To the extent that a response is required, the Individual Counterclaim-Defendants deny the allegations in paragraph 173.

174.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, and awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE TO PARAGRAPH 174**: This paragraph contains legal conclusions to which no response is required.

<u>**AFFIRMATIVE DEFENSES**</u>

By alleging the defenses set forth below, the Individual Counterclaim-Defendants do not agree or concede that they bear the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part. Nor do the Individual Counterclaim-Defendants concede that such defenses are "affirmative defenses" under applicable law that must be pleaded to be preserved. To the extent inconsistent, such defenses are pled in the alternative.

<u>FIRST DEFENSE</u>

Cyrulnik's claims are barred, in whole or in part, because he has failed to state a claim upon which relief may be granted. Cyrulnik's non-contract claims are fatally infirm because of the

contract's existence and provisions, including because of the independent tort doctrine.

SECOND DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he lacks standing to assert any claim that requires him to be or have been a partner at the Firm. This includes, but is not necessarily limited to, Counts 1, 2, and 3.

THIRD DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the doctrines of promissory, judicial, and equitable estoppel.

FOURTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, under the doctrines of waiver, laches, and unclean hands.

First, to the extent that Cyrulnik had any right to Tokens payable for services provided prior to him joining the Firm (he doesn't have such a right), Cyrulnik waived his right to those Tokens by knowingly, and without objection, not claiming them.

Second, Cyrulnik waived any right to object to the ethical co-counsel arrangement discussed in his Counterclaims, because he expressly approved it. His claims based on that arrangement are likewise barred by the doctrine of laches.

Third, Cyrulnik's claims are barred by the doctrine of unclean hands because, as explained in the Firm's Amended Complaint, he engaged in abusive and improper conduct during the time that he worked at the Firm, which necessitated his removal. His ability to enforce the MOU and Side Letter are likewise barred by unclean hands as pled in Affirmative Defense No. 18, which explains that Cyrulnik fraudulently misrepresented facts to induce Counterclaim Defendants into those agreements.

70

## FIFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the doctrines of consent, acquiescence, and ratification. As stated above, Cyrulnik knowingly failed to claim Tokens earned prior to his joining the Firm and approved of the Firm's ethical co-counsel arrangements.

## SIXTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by his failure to satisfy conditions precedent, including his failure to execute the Partnership Agreement as required by the MOU and his termination for cause.

## SEVENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the faithless fiduciary or faithless servant doctrine, because Cyrulnik breached fiduciary duties to the Firm prior to and after his for-cause removal.

## EIGHTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the fact that he was not a "partner" in the Firm under applicable law, and therefore was not owed fiduciary duties and was not entitled to any of the rights reserved for partners under the law.

## NINTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by Cyrulnik's fraudulent conduct, including but not limited to, his failure to obtain engagement letters for his clients while representing to the Firm he had them and misrepresenting to the firm that he had MFN clauses in his engagement letters.

## TENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because, as explained in the Firm's

Amended Complaint, he materially and first breached the parties' agreements, such that any alleged non-performance by the Individual Counterclaim-Defendants under those agreements is excused.

ELEVENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the Firm was precluded by applicable ethical rules from using the trade name Roche Cyrulnik Freedman LLP during the relevant time period.

TWELFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because as applied to the facts of the case, it would be illegal for the Firm to continue using the trade name Roche Cyrulnik Freedman LLP during the relevant time period.

THIRTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because there are no proximately caused injuries or damages.

FOURTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because as explained in the Firm's Amended Complaint, his own acts and/or omissions caused or contributed to his alleged losses.

FIFTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by his failure to mitigate and the avoidable consequences doctrine.

SIXTEENTH DEFENSE

To the extent that Cyrulnik suffered any damages (which the Individual Counterclaim-Defendants deny), any such damages must be reduced as a result of Cyrulnik's failure to take

reasonable steps to mitigate damages. Cyrulnik did not seek to, for example, acquire Tokens on the open market after he was allegedly deprived of Tokens.

SEVENTEENTH DEFENSE

To the extent that Cyrulnik is entitled to any damages (he is not), any such damages must be offset by the amount that Cyrulnik owes the Firm (i) in connection with the claims that the Firm has asserted against Cyrulnik in its Amended Complaint, (ii) all amounts earned at his new firm which constitute mitigation and, to the extent he is found to be a partner of the Firm, amounts that should have been paid to the firm (including because, if he were a partner, he would have breached his fiduciary duties and proximately caused damages to the Individual Counterclaim-Defendants by starting and operating a competing law firm, Cyrulnik Fattaruso, which received compensation from former Firm clients), and (iii) otherwise.

EIGHTEENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he fraudulently induced the Individual Counterclaim-Defendants into entering the MOU and Side Letter by, during the negotiation of those documents, misrepresenting the material facts of the compensation and opportunity he was offered in 2019 by the law firm Patterson Belknap Webb & Tyler LLP. Specifically, Cyrulnik stated to Freedman that he had an offer from Patterson where they would (i) pay him $3 million per year, (ii) where he would come on board as chair of their litigation department, and where (iii) he would be groomed to become chairman of the firm within 3-5 years. Cyrulnik told Normand, that Patterson was offering him (i) "mid twos" in compensation and (ii) would be bringing him in as the chair of their litigation department. As was reasonably foreseeable, Normand repeated these misrepresentations to Friedland shortly after Cyrulnik made these misrepresentations to Normand. As demonstrated in the discovery in this case, Cyrulnik was lying.

Cyrulnik knew his statements were false and intended for the Individual Counterclaim-Defendants to rely on those false statements, they reasonably did so in entering into the MOU and Side Letter. But for these misrepresentations, the Individual Counterclaim-Defendants would not have entered into the MOU and Freedman would not have entered into the Side Letter.

### NINETEENTH DEFENSE

In the alternative, Cyrulnik's claims are barred, in whole or in part, due to the doctrine of recission.

### TWENTIETH DEFENSE

Cyrulnik's claims for an accounting are moot because Cyrulnik has obtained the requested financial records through discovery.

### TWENTY-FIRST DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he anticipatorily breached the MOU by unequivocally refusing to sign a partnership agreement unless changes he unilaterally demanded were made to the Firm's formula compensation models.

### TWENTY-SECOND DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the doctrine of forfeiture. The MOU required execution of a partnership agreement; Cyrulnik never executed such an agreement, purposefully stalled, and refused to sign absent satisfaction of his unreasonable demands. This term was material to the MOU, and the Individual Counterclaim-Defendants relied on it. Consequently, Cyrulnik has forfeited his rights under the MOU.

### TWENTY-THIRD DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the doctrine of election of remedies.

### RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES AND RIGHTS

The Individual Counterclaim-Defendants give notice that they intend to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserve their right to amend this Answer to assert any such defenses.

Dated: April 11, 2023                    Respectfully submitted,

                                         /s/ Jonathan P. Bach
                                         Jonathan P. Bach
                                         Alice Buttrick
                                         SHAPIRO ARATO BACH LLP
                                         1140 Avenue of the Americas, 17th Floor
                                         New York, NY 10036
                                         Tel: (212) 257-4897
                                         Fax: (212) 202-6417
                                         jbach@shapiroarato.com
                                         abuttrick@shapiroarato.com

                                         *Counsel for Plaintiff / Counterclaim-
                                         Defendant Roche Freedman LLP,
                                         Counterclaim-Defendants Devin Freedman,
                                         Amos Friedland, and Edward Normand*