# KASOWITZ BENSON TORRES LLP

| | 1633 BROADWAY | ATLANTA |
| --- | --- | --- |
| Marc E. Kasowitz | NEW YORK, NEW YORK 10019 | HOUSTON |
| Direct Dial: (212) 506-1710 | (212) 506-1700 | LOS ANGELES |
| Direct Fax: (212) 835-5010 | FAX: (212) 506-1800 | MIAMI |
| MKasowitz@kasowitz.com | | NEWARK |
| | | SAN FRANCISCO |
| | | SILICON VALLEY |
| | | WASHINGTON DC |

April 26, 2023

**VIA ECF**
The Honorable John G. Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    <u>Roche Freedman LLP v. Cyrulnik</u>, Case No. 1:21-cv-01746 (JGK)

Dear Judge Koeltl:

      We represent Counterclaim-Plaintiff, Jason Cyrulnik, and respectfully write in response to the RF Parties'[1] April 18 pre-motion conference letter previewing their intent to file a motion for summary judgment. We briefly address the RF Parties' meritless arguments below.[2]

      1.     The RF Parties apparently intend to run the head-scratching argument that, notwithstanding their dozens of written and oral acknowledgments to the contrary (including written confirmation to a federal agency), Cyrulnik was somehow just an employee and not in fact an equity partner at the firm he co-founded and that bore his name. The theory appears to be that the parties' MOU agreement is not enforceable because the RF Parties did not draft a long-form partnership agreement before deploying their secret conspiracy in February 2021. This argument does not pass the smell test, and the fact that the RF Parties intend to seek judgment *in their favor* on it as a matter of law tells the Court everything it needs to know about how untethered the RF Parties' claims are from reality.

      There is no material issue of fact with respect to whether Cyrulnik was an equity partner (allotted the largest share of equity in writing, at 27 percent) at the firm he co-founded and led, and that the parties intended for the MOU to be a binding agreement setting forth their rights and obligations at the time. The firm operated under an MOU agreement for almost two years, and the individual Counterclaim-Defendants repeatedly acknowledged that the MOU governed their relationship during the relevant period. This was no preliminary expression of interest in forming a partnership: the parties formed, announced, and launched the firm, representing dozens of clients. And this was in no way an agreement to agree: it was a heavily negotiated agreement setting forth the material terms of the parties' valuable partnership, and the undisputed drafting and negotiation

---

[1] Notably, Counterclaim-Defendant Holcomb has not joined in the RF Parties' pre-motion letter.

[2] Counterclaim-Defendants confirmed they do not object to the filing of this letter one day after the deadline set by the Court.

history confirm that the parties ensured that the Founding Partners would have a binding agreement in place *before* they left their positions at Boies Schiller Flexner LLP (from which Cyrulnik was giving up his long-standing equity partnership). The fact that they all agreed that they would also draft and execute a long-form agreement does not magically transform their binding agreement under which they operated into an unenforceable nullity.[3]

2.  As previewed in our April 18 letter, the RF Parties have contorted themselves to fabricate supposed "cause" for their deplorable actions, but their justifications fail as a matter of law under the controlling standard. The RF Parties' stated intent to move for summary judgment in their favor on their pretextual "cause" claim has it backwards. Recognizing the absurdity of their stated grounds for removal, Counterclaim-Defendants now point to the new fanciful grounds they manufactured after the fact, but every single one of these post-facto inventions is irrelevant under the law and devoid of evidence in the record.

3.  The RF Parties' main argument, that the Court should recharacterize ***their*** removal of Cyrulnik as an act of "involuntary withdrawal" (a self-evident oxymoron) from the firm ***by Cyrulnik*** is nonsensical and meritless as a matter of law. As detailed in our April 18 letter, the Agreement – like the operative Florida partnership statute, the Florida Revised Uniform Partnership Act (FRUPA) – separately addresses partner removal and partner withdrawal (not applicable here). As we noted in our April 18 letter, the few courts confronted with similar strained arguments seeking to recharacterize a termination as a withdrawal have rejected it out of hand. *See, e.g., Love v. Fleetway Air Freight & Delivery Serv., L.L.C.*, 875 So. 2d 285, 289 (Ala. 2003) ("We first note that the most appropriate definition of "withdraw" contained in *Merriam–Webster's Collegiate Dictionary* (11th ed.2003) for this case is 'to remove oneself from participation.' Thus, unless defined otherwise in the parties' agreements, the act of withdrawal is usually considered to be a voluntary act. We find nothing in the member's agreement or in the operating agreement that persuades us to give the terms 'withdraw' and 'withdrawing member' anything other than their ordinary and usual meanings."). The RF Parties' attempt to justify their misconduct by appealing to the withdrawal provision of the parties' agreement fails as a matter of law (and common sense).

4.  The RF Parties apparently intend to again peddle their argument that the parties' written contracts prevent Cyrulnik's tort and quasi-contractual claims, notwithstanding the Court's recent decision on the motion to dismiss and the parties' discussion at the April 4 conference – and they preview their intent to make this argument in the same letter that opens with multiple paragraphs purporting that no contract governs, which is fatal to their argument.

---

[3] This argument also fails for the independent reason that each of the Counterclaim-Defendants expressly contractually obligated himself to enter a long-form agreement that included all six of them (*see* MOU § 1), but the RF Parties instead drafted and executed that agreement only after they purported to "remove" Cyrulnik, breaching their own contractual obligations.

      5.      Roche and Freedman apparently plan to argue that they can avoid Cyrulnik's conversion claim – which is based on the secret scheme they perpetrated and their unilateral attempt to "re-assign" the Tokens to themselves without the Firm or its partners' knowledge and consent – by arguing that "Roche and Freedman could not convert their own assets." Taking assets that belong to the Firm (and which they were contractually obligated to then distribute to certain partners in specified percentages, including Cyrulnik's 25% of the Tokens) by engaging in surreptitious efforts to move those assets to themselves unquestionably constitutes conversion – it is not a get-out-of-jail-free card and should be disregarded under the legal doctrine of *Ex turpi causa non oritur actio*.

      6.      Finally, enforcing the parties' clear agreement and not permitting the RF Parties to continue to withhold Cyrulnik's assets does not in any way violate the Rules of Professional Conduct, nor would that be a defense anyway.

      We thank the Court for its attention to this matter.

      Respectfully,

      /s/ Marc E. Kasowitz

      Marc E. Kasowitz

cc.: All Counsel of Record (via ECF)