## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

JASON CYRULNIK,

                Counterclaim-Plaintiff,

      v.

ROCHE FREEDMAN LLP, KYLE ROCHE, DEVIN
FREEDMAN, AMOS FRIEDLAND, NATHAN
HOLCOMB, and EDWARD NORMAND,

                Counterclaim-Defendants.

Case No. 1:21-cv-01746-JGK

JASON CYRULNIK,

                Third-Party Plaintiff,

      v.

KYLE ROCHE, DEVIN FREEDMAN, AMOS
FRIEDLAND, NATHAN HOLCOMB, and EDWARD
NORMAND,

                Third-Party Defendants.

## THIRD-PARTY DEFENDANT NATHAN HOLCOMB'S ANSWER TO
## JASON CYRULNIK'S COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Third-Party Defendant Nathan Holcomb hereby answers Jason Cyrulnik's

"Counterclaims and Third-Party Complaint" dated March 2, 2022. Holcomb responds to the

claims styled as "Counterclaims" without conceding that any claim against him is a

"Counterclaim," because Holcomb has asserted no claims against Cyrulnik. Each paragraph in

Cyrulnik's pleading is copied below, followed by Holcomb's answer to each paragraph. Any

allegation not expressly admitted is denied.

# INTRODUCTION[1]

1.       This action arises from a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the Firm's clients that ████████ had suddenly appreciated exponentially to more than $250 million. The Firm's governing agreement expressly prohibits the removal of a Founding Partner without cause, so Roche and Freedman, together with certain other partners they secretly recruited to their scheme and to whom they agreed to provide a share of Cyrulnik's assets, concocted an absurd and purely pretextual "cause" — their principal claim that Cyrulnik had raised his voice during two telephone conversations months earlier — and then, jeopardizing Cyrulnik's ability to represent his clients in active ongoing litigation, they cut his access to the Firm's client files, emails, electronic systems and bank accounts, and terminated his and his family's access to the Firm's health insurance.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Kyle Roche, Devin ("Velvel") Freedman, Jason Cyrulnik, Edward ("Ted") Normand, Amos Friedland, and Nathan Holcomb (together, the "Founding Partners") jointly founded RCF (the "Firm"); that Roche and Freedman appropriated assets that had previously been allocated to Cyrulnik and other partners; that the parties' Memorandum of Understanding dated December 26, 2019 (the "MOU") states that "[a]

---

[1] The headings in Cyrulnik's Counterclaims and Third-Party Complaint are reproduced here for ease of reference without admitting to any factual allegations implied in those headings. To the extent a response to allegations implied by the headings is required, Holcomb's responses are contained in his responses to the fuller articulations of Cyrulnik's allegations in the numbered paragraphs of the Counterclaims and Third-Party Complaint, and all allegations in the headings that are not expressly admitted are denied.

Founding Partner cannot be removed without cause"; that the Firm limited Cyrulnik's access to certain Firm records, bank accounts, and benefits after he was removed; and that the Tokens (defined below) had experienced a significant increase in value at one point and that their value subsequently fluctuated. Holcomb otherwise denies the allegations in paragraph 1.

2.      What makes Counterclaim-Defendants' greedy and unlawful scheme even more egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who had spent months recruiting and convincing Cyrulnik, a highly accomplished lawyer with a long-standing, robust and growing practice, to leave his equity partnership at a prominent national law firm to transform their fledgling firm into a stable and respected litigation practice. They convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Counterclaim-Defendants are now trying to steal.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Cyrulnik had a growing practice and an equity partnership at a prominent national law firm and that Roche and Freedman appropriated assets that had previously been allocated to Cyrulnik and other partners. Holcomb denies that he conspired with Roche and Freedman. Holcomb admits that the MOU was "the agreement governing the Firm" and refers to the MOU for its complete and accurate contents; provided, however, that Holcomb reserves the right to amend this Answer if he obtains evidence undercutting Cyrulnik's right to enforce the MOU's terms after he is given access to the discovery record in this case. Holcomb lacks knowledge or information sufficient to form a

3

belief regarding negotiations amongst Roche, Freedman, and Cyrulnik to which he was not privy

and otherwise denies the allegations in paragraph 2.

3.      Roche, who graduated law school in 2016, and Freedman, who graduated in 2012,

had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity

partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF"). Counterclaim-

Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm

focusing on cryptocurrency and other specialized practice areas. Shortly thereafter, realizing that

they needed an experienced lawyer with an established and successful practice and cash flow to

fund the firm's operations and help procure lead counsel appointments in their class-action cases,

they approached Cyrulnik about his leaving BSF to join them and co-found RCF. After fifteen

years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to

found a law firm with Roche and Freedman in January 2020. As the Conspiring Partners knew,

in doing so, Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing

lucrative offers to join other national law firms. As the Conspiring Partners also knew, Cyrulnik

did so in reliance on the negotiated and unambiguous terms of the new Firm's governing

agreement that provided him with fixed, guaranteed, and significant equity interests in the new

Firm's contingency and alternative fee matters, with substantial financial upside.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb admits that Roche and Freedman graduated from law

school in 2016 and 2012, respectively; that they met Cyrulnik when they were associates at BSF;

that they left BSF in summer 2019 to start their own law firm; that Cyrulnik signed the MOU,

which contemplated that Roche, Freedman, Cyrulnik, Normand, Friedland, and Holcomb would

found a law firm in January 2020; and that Holcomb understood Cyrulnik to have relied on the

terms of the MOU when Cyrulnik agreed to launch RCF. Holcomb states that Cyrulnik's characterization of the MOU contains legal conclusions requiring no response and refers to the MOU for its complete and accurate contents. Holcomb lacks knowledge or information sufficient to form a belief as to negotiations amongst Roche, Freedman, and Cyrulnik in which he did not participate. Holcomb otherwise denies the allegations in paragraph 3.

4.      Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases and core client base, and his practice, which Counterclaim-Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the Firm's financial performance and otherwise denies the allegations in paragraph 4.

5.      Then, in late ▆▆▆▆ 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and ▆▆▆▆▆▆▆▆▆▆▆▆ in ▆▆▆▆ 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

**RESPONSE:** Holcomb admits that the market value of the Tokens (defined below) increased over the referenced time period and otherwise denies the allegation in paragraph 5.

6.      Notwithstanding months of reaffirming their admiration for Cyrulnik and his enormous contributions to the Firm's success, the Conspiring Partners seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the cryptocurrency and keep it for themselves. To circumvent the threshold hurdle of their scheme— that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without

cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency—Roche and Freedman manufactured transparently false grounds to remove him for "cause." Alleging that Cyrulnik raised his voice on two phone calls concerning certain questionable actions Roche and Freedman (and two other partners) had taken that threatened to endanger the Firm, the Conspiring Partners claimed that Cyrulnik suddenly somehow lost the guaranteed equity and cryptocurrency interests expressly granted to him by the parties' agreement. They then invited handpicked partners—the other Conspiring Partners—to a secret meeting, excluding anyone they knew would not participate in their improper scheme. At the secret meeting, the Conspiring Partners held a self-serving "vote" to "remove" him from the Firm. They then took the position that Cyrulnik was no longer entitled to the cryptocurrency and other interests expressly granted to him by the parties' agreement – even though nothing in the agreement provides for such a forfeiture.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that he was invited to attend a meeting with Roche, Freedman, Normand, and Friedland to address Cyrulnik's conduct; that, following the meeting, he and the others voted to remove Cyrulnik from the Firm; and that after Roche, Freedman, Normand, Friedland, and Holcomb had given notice of Cyrulnik's removal, Roche wrote on behalf of the Firm to state the Firm's position with respect to Cyrulnik's entitlement to compensation. Holcomb refers to the Firm's communications with Cyrulnik for their complete and accurate contents. Holcomb lacks knowledge or information sufficient to form a belief as to whether other partners had reaffirmed their admiration for Cyrulnik and his contributions to the Firm for months. Holcomb otherwise denies the allegations in paragraph 6.

7.    Counterclaim-Defendants compounded their egregious misconduct by seeking to

6

pressure clients to stay with them rather than continue to have Cyrulnik represent them. That scheme failed miserably: a mass exodus of those clients ensued, as they wanted Cyrulnik to lead their litigations. At the same time, the Firm's other equity partner, Paul Fattaruso, rebuffed Counterclaim-Defendants' requests to continue working with them in the wake of the scheme they had perpetrated.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to whether other partners pressured clients to stay with RCF. Holcomb admits that Cyrulnik's clients went with him to a new firm that he founded together with Fattaruso. Holcomb admits that Roche requested that Fattaruso continue working at RCF but denies that he ever made such a request to Fattaruso. Holcomb otherwise denies the allegations in paragraph 7.

8.    Counterclaim-Defendants' unconscionable misconduct is in flagrant violation of their contractual, fiduciary, and ethical duties to Cyrulnik and their professional responsibilities to the Firm's clients. Cyrulnik's conduct was consistently exemplary, in contrast to several Conspiring Partners (whose missteps Cyrulnik was addressing in the very discussions about which they now complain and seek to use as the purported basis for their scheme), including with respect to Roche's lax attitude toward billing practices and timekeeping and Freedman's problematic referral-fee arrangements with other firms.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he ever violated contractual, fiduciary, or ethical duties to Cyrulnik or his professional responsibilities and states that to the extent Cyrulnik's allegations are directed at other parties, no response is required from him. Holcomb lacks knowledge or information sufficient to form a belief as to Roche's billing practices or Freedman's referral-fee arrangements. Holcomb otherwise denies the allegations in paragraph 8.

9.      Accordingly, Cyrulnik brings these claims seeking, among other things, dissolution of the Firm and distribution of its assets in accordance with Florida law and the parties' unambiguous governing agreement, and recovery of the damages Counterclaim-Defendants' egregious conduct has caused.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Cyrulnik seeks the stated relief and denies that Cyrulnik is entitled to any relief from Holcomb.

## THE PARTIES

10.     Counterclaim-Plaintiff/Third-Party Plaintiff Jason Cyrulnik is a citizen of New Jersey and a co-founding named equity partner of RCF.

**RESPONSE:** Holcomb admits that Cyrulnik is a citizen of New Jersey, admits that he was a co-founding equity partner of RCF, and denies that he is an equity partner of RCF at present.

11.     Counterclaim-Defendant RCF is a Florida limited liability partnership, with offices in Miami, Florida and New York, New York.

**RESPONSE:** Admitted.

12.     Counterclaim-Defendant/Third-Party Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

**RESPONSE:** Admitted.

13.     Counterclaim-Defendant/Third-Party Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

**RESPONSE:** Holcomb admits that Roche was previously a citizen of New York and was a co-founding named equity partner of RCF, denies that Roche is still an equity partner of the

Firm, and lacks knowledge or information sufficient to form a belief as to Roche's current State of citizenship.

14.     Counterclaim-Defendant/Third-Party Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

**REPSONSE:** Holcomb admits that Friedland is an equity partner of RCF and denies that he was a citizen of Connecticut at any time relevant to this action.

15.     Counterclaim-Defendant/Third-Party Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

**RESPONSE:** Holcomb admits that he is a citizen of New York, admits that he was previously an equity partner of RCF, and denies that he remains an equity partner of RCF.

16.     Counterclaim-Defendant/Third-Party Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

**RESPONSE:** Admitted.

## JURISDICTION

17.     This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees, and costs.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent that a response is required, Holcomb admits that Cyrulnik seeks the stated relief and denies that Cyrulnik is entitled to any relief from Holcomb.

18.     Cyrulnik is filing his counterclaims in accordance with and pursuant to the Court's ruling that "[g]iven the intertwined nature of the jurisdictional question with the merits, '[t]he Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims.'" (ECF No. 56 at 13).

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Cyrulnik has filed claims styled as "counterclaims," denies that he was a party to this action prior to Cyrulnik's filing of claims against him, and refers to the referenced Court order for its complete and accurate contents.

19.     The Court has personal jurisdiction because Counterclaim-Defendant RCF has an office in this District in which the Conspiring Partners regularly practice, RCF and the Conspiring Partners regularly conduct business in this District, and RCF (at the direction of the Conspiring Partners) has availed itself of this forum by bringing suit here.

**RESPONSE:** Holcomb admits that at the time of filing he regularly practiced in the Firm's office in this District, admits that the Court has personal jurisdiction over him, admits that the Firm filed suit in this District, denies that he participated in any conspiracy, and otherwise denies the allegations in paragraph 19.

## FACTS

I.   **COUNTERCLAIM-DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FORGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

A.   **Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF**

20.     Cyrulnik graduated Yale Law School in 2004 and joined BSF. With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

**RESPONSE:** Admitted.

21.     Cyrulnik rose through the ranks quickly. He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

**RESPONSE:** Holcomb admits that Cyrulnik was promoted to partner and then to equity partner at BSF and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 21.

22.     Cyrulnik's steadfast commitment to clients generated a substantial following and client base. He has been leading bet-the-company litigations for a growing base of core clients for many years. He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

**RESPONSE:** Holcomb admits that Cyrulnik had a client base and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 22.

23.     He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly. He mentored associates, brought in partners in [*sic*] to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

**RESPONSE:** Holcomb admits that he worked regularly with Cyrulnik at BSF; that Cyrulnik worked with other partners at BSF; and that Cyrulnik was supportive of Holcomb at BSF. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 23.

24.     Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters. In 2019, Cyrulnik was recruited aggressively by several major national law firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 24.

**B.     Roche And Freedman Recruit Cyrulnik To Join RCF**

25.     In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP. Roche was a third-year associate who had extensive expertise in the cryptocurrency space. Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel. Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

**RESPONSE:** Holcomb admits that in the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP; that Roche was a third-year associate who had familiarity with the cryptocurrency space; that Freedman graduated law school in 2012 and was a counsel at BSF; and that Roche and Freedman had a stated intent to pursue, among other things, cryptocurrency-related matters. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 25.

26.     Cyrulnik had interacted with both Roche and Freedman at BSF. Indeed, Freedman regularly sought advice from Cyrulnik about how to manage cases, legal strategy, and general guidance as Freedman embarked on his new venture in 2019.

**RESPONSE:** Holcomb admits that Cyrulnik had interacted with both Roche and Freedman at BSF and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 26.

27.     During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman. Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate

platform (in quality and size) to service his growing client base, which was his top priority.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 27.

28.     Freedman would not take no for an answer. He continued to press over the course of several months, ultimately bringing Roche into the conversation. The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many clients' needs. In exchange for his agreement to leave BSF to co-found a firm with them, Roche and Freedman promised Cyrulnik significant stakes in what they described as their high-upside contingency work and in certain assets that they had secured. The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue and stability that would help finance Roche and Freedman's contingency and alternative fee arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 28.

29.     After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to cofound the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that extensive discussions and negotiations preceded execution of the MOU and that he understood Cyrulnik to have relied on the terms of the MOU when Cyrulnik agreed to cofound RCF. Holcomb refers to the terms of the MOU for

its complete and accurate contents and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 29.

### C.     <u>The Parties Negotiate And Execute The MOU</u>

30.     On December 27, 2019, RCF's Founding Partners — named partners Cyrulnik, Roche and Freedman, together with Counterclaim-Defendants Friedland, Holcomb and Normand (as defined in the MOU) — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

**RESPONSE:** Holcomb denies that he was a party to this action before Cyrulnik asserted claims against him, admits that Cyrulnik has styled claims against him as "counterclaims," and otherwise admits the allegations in paragraph 30; provided, however, that Holcomb reserves the right to amend this Answer if he obtains evidence undercutting Cyrulnik's right to enforce the MOU's terms after he is given access to the discovery record in this case.

31.     Section II of the MOU sets forth the partners' equity positions in the Firm. In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%). Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies for revenue earned through hourly and contingency matters. Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

**RESPONSE:** Holcomb admits that Cyrulnik provides a generally accurate description of Sections II, III, and V of the MOU, except that Holcomb denies that the MOU was "modified." Holcomb refers to the MOU for its complete and accurate contents. Holcomb lacks knowledge or information sufficient to form a belief as to the basis on which Cyrulnik negotiated for a 27%

equity stake in the Firm.

32.    Section IV of the MOU lists a series of "assets" (most of which were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)), excludes those assets from the Compensation Model, and instead sets forth the agreed-upon fixed allocations of those assets to the Founding Partners in different formulas and percentages that varied by asset.

**RESPONSE:** Holcomb admits that Section IV of the MOU specifies treatment of a series of assets that were excluded from the Firm's "Partnership Compensation Model," states that the allegation that most of these assets "were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)" is a vague and ambiguous legal conclusion and on that basis denies the allegation, and refers to the MOU for its complete and accurate contents.

33.    One of the key assets allocated in the MOU was cryptocurrency (referred to as "Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the "Startup Client"), had agreed to convey to the Firm. The MOU expressly granted each of the Founding Partners a fixed allocation of the Tokens (which was to be ▮▮▮ of all Tokens issued by the Startup Client), as follows: Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and Normand, Friedland, and Holcomb, 5% each.

**RESPONSE:** Holcomb admits that paragraph 33 provides a generally accurate but partial description certain terms of the MOU, which omits in particular the provision stating that "[i]n the event further partner resources are required, the Firm will revisit the above distribution of [Startup Client's] Tokens." Holcomb refers to the MOU and its exhibits for their complete and accurate contents.

34.     Section VI of the MOU addresses the management of the Firm. In particular, the parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

**RESPONSE:** Holcomb admits that Cyrulnik's description of Section VI of the MOU is generally accurate and that he has accurately quoted a sentence from that section, and refers to the MOU for its complete and accurate contents.

35.     The MOU has two separate provisions governing the departure of a partner from the Firm. The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who voluntarily elects to withdraw from the Firm within 18 months would have his or her compensation limited to the amount to which he or she would have been entitled under the Compensation Model, and would return his or her equity in the Firm to the other equity partners.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Section VI is entitled "Withdrawal from Firm" and refers to the MOU for its complete and accurate contents.

36.     The second, Section VI(G), entitled "Partner Removal," expressly provides that a "Founding Partner cannot be removed without cause." That section also provides that, even if cause arose for the removal of a Founding Partner, that removal would require an affirmative vote of at least two-thirds of the Firm's equity partners. In stark contrast to the voluntary withdrawal provision, however, such an involuntary removal (for "cause") does not result in the forfeiture of any compensation, interests, or assets owed or allocated to the Founding Partner under the MOU.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Section VI (G) is entitled "Partner Removal" and states that a "Founding Partner cannot be removed without cause" as well as that for-cause

removal requires "the affirmative vote of 2/3 of the Firm's equity partners." Holcomb refers to the MOU for its complete and accurate contents.

37.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter," attached as Exhibit B). Given his reputation, seniority, and equity stake in the new Firm, Cyrulnik was the natural choice for the "first-named" partner. But Roche — consumed with securing that recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be listed as the first named partner at RCF. The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model. Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

**RESPONSE:** Holcomb states that the allegation that Cyrulnik was "the natural choice for the 'first-named' partner" is vague and ambiguous and on that basis denies the allegation. Holcomb refers to the referenced "Side Letter" for its complete and accurate contents and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 37.

38.     In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

        a.  27% of the Firm's equity, which could not be diminished at any time without his consent;

        b.  25% of the cryptocurrency Tokens from the Startup Client;

        c.  a 25% interest in a specified contingency matter; and an $850,000 cash

payment from Roche (to be paid in specified installments).

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 38 and refers to the MOU and the "Side Letter" for their complete and accurate contents.

39.     In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

**RESPONSE:** Holcomb admits that he understood Cyrulnik to have relied on the terms of the MOU when Cyrulnik agreed to co-found RCF. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 39.

## II.    CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

40.     Cyrulnik's many clients all elected to follow him from BSF to RCF. During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice. Specifically, Cyrulnik was singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

**RESPONSE:** Holcomb admits that some clients elected to follow Cyrulnik from BSF to RCF. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 40.

41.     As Freedman stated at the end-of-year partner's meeting in January 2021 (just a few weeks before orchestrating the scheme to try and steal Cyrulnik's assets), and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

18

**RESPONSE:** Holcomb admits that Freedman made a comment at the end-of-year partner meeting in January 2021 to the effect that Cyrulnik's business development had been impressive and that Freedman and Roche appropriated assets that had been allocated to Cyrulnik and other partners for themselves. Holcomb denies that he participated in any conspiracy or that he ever had the motivation or expectation of obtaining assets that had been previously allocated to Cyrulnik or otherwise benefiting financially from Cyrulnik's removal. Holcomb lacks knowledge or information sufficient to form a belief as to conversations amongst other partners to which he was not privy. Holcomb otherwise denies the allegations in paragraph 41.

42.     Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions. Cyrulnik also devoted tireless efforts to managing the Firm, including overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease. Roche and Freedman, separately and together, and as recently as January 2021 (just a few weeks before effectuating the scheme to try and steal Cyrulnik's assets), told Cyrulnik how much they enjoyed working with him to build the Firm, that they could not have built the Firm without him, that his contributions were instrumental to the Firm's success, and that his performance and accomplishments were remarkable. Normand told Cyrulnik in or about December 2020 (less than eight weeks before participating in the scheme to try and steal his assets) that Cyrulnik was "the leader" of the Firm.

**RESPONSE:** Holcomb admits that Freedman and Roche appropriated for themselves assets that had been previously allocated to Cyrulnik and other partners. Holcomb denies that he participated in any conspiracy or that Holcomb ever had the motivation or expectation of

obtaining assets that had been promised to Cyrulnik or otherwise benefiting financially from Cyrulnik's removal. Holcomb lacks knowledge or information sufficient to form a belief as to conversations amongst other partners to which he was not privy. Holcomb otherwise denies the allegations in paragraph 42.

43.     While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections. Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they maintained would bring enormous revenue to the Firm over time. That was particularly applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

**RESPONSE:** Holcomb admits that Roche and other partners spent time developing major contingency cases. Holcomb lacks knowledge or information sufficient to form a belief as to the Firm's finances. Holcomb otherwise denies the allegations in paragraph 43.

III.     **THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD**

44.     The Named Partners met regularly to discuss the Firm's administration matters. Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements. Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success, and that they could not have accomplished what they had without Cyrulnik. Freedman actually remarked to Cyrulnik during an in-person meeting in the Firm's Florida office on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running the Firm (referring to Freedman's effort to enrich himself at the Firm's

expense through referral arrangements and other "discounts" he would apply to the Firm's revenue but not his own take on that revenue).

RESPONSE: Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 44.

45.     With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues. Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings and his responsibilities as counsel representing class clients; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense. Roche and Freedman were content to downplay such problems, or to delay resolution of the matter "for another day." With respect to these issues, Cyrulnik expressed the view that it was important for the Firm to address these issues promptly and definitively to ensure that the Firm was complying with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try to ensure that the partners would do so.

RESPONSE: Holcomb admits that the Firm grew to a workforce of approximately 25, but lacks knowledge or information sufficient to form a belief as to whether the number of personnel accurately described as "employees" was equal to 25. Holcomb admits that some equity partners worked well together with other equity partners, denies that as a general matter the equity partnership worked well together, and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 45.

21

## IV.   CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM'S LONG-TERM SUSTAINABILITY

46.   As the senior member of the group meeting regularly to administer the Firm, Cyrulnik addressed serious concerns that had come to his attention regarding, among other things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation Model.

**RESPONSE:** Holcomb states that the reference to "the senior member of the group meeting regularly to administer the Firm" is vague and ambiguous. Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 46.

### A.   Cyrulnik Asks Roche To Fix His Lax Approach To Time Keeping

47.   First, in or about April 2020, Cyrulnik was reviewing time record reports from the Firm's billing system and learned that Roche had not recorded the hours he had worked on client matters for months. Cyrulnik reached out to Roche and asked him to remedy that serious deficiency, stressing the importance of being honest and accurate with respect to client billing. Roche apologized and told Cyrulnik that he had messed up and that he would take care of it. Roche stated that he was hiring his mother to try and "reconstruct" his time by scrolling through his emails and guesstimating time entries. Cyrulnik was not comfortable with Roche's approach and reminded Roche that he needed to ensure that he was keeping accurate time records. Roche exhibited a similar immature and inappropriate attitude toward client bills. Roche boasted to Cyrulnik about his desire to "pound the lodestar" on his class-action contingency matters, stating that he wanted to hire more associates and staff attorneys to work on his contingency matters so that he could position himself to obtain a better percentage of fee awards being split with the Firm's co-counsel in class matters. Cyrulnik was concerned about Roche's approach and again told Roche that he needed to take his obligations to clients and class representations seriously.

Freedman told Cyrulnik that his concerns about Roche were not unfounded, but that Freedman would keep Roche in line. Specifically, Freedman told Cyrulnik that Roche was dishonest, explaining that Roche was the kind of person "who will lie to your face and then beg for forgiveness if he's caught" – but Freedman stressed that he uniquely knew how to "control" Roche, and that Freedman could get Roche to do "anything I want him to do."

      **RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 47.

      **B.**    **Cyrulnik Seeks To Correct Freedman's Efforts To Engage In Self-Dealing**

      48.    Second, Freedman engaged in self-dealing by manipulating the Firm's Compensation Model to enrich himself at the Firm's expense. Specifically, Freedman struck a deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to pay Schall a 20% referral fee in connection with Freedman's desire to apply for lead counsel appointments in securities class actions. Instead of paying that referral fee out of Freedman's origination credit, moreover, Freedman demanded the Firm absorb that referral fee. Freedman's non-economic, "pay to play" origination strategy put the Firm in an unsustainable financial position; namely, the Firm was paying as much as 50% of all client revenue from Freedman's clients merely to "originate" the matters, and then paying the attorneys who worked on the case as much as 45% of the remaining revenue pursuant to the Compensation Model. In other words, after paying associates and partners their shares, virtually nothing would be left to cover Firm expenses and pay partnership distributions. Incongruously, Freedman's referral scheme was not only objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting himself. When partner Katherine Eskovitz sought a similar arrangement for a matter she was suggesting the Firm take on (and pay her husband a large referral fee), Freedman rejected her proposal as a "money grab," a non-starter, and wholly unacceptable. Freedman and

23

Roche both called Cyrulnik and told him that Eskovitz was a "liability" and "a problem" who

was just trying to exploit the Firm, and proceeded to blame Cyrulnik for supporting making an

offer to Eskovitz back in 2019. Freedman's excessive focus on enriching himself at the expense

of the Firm's long-term sustainability was deeply concerning, as was his response. Freedman

told Cyrulnik that Freedman's objective in life was simple: "I don't want to just be rich; I want to

be super rich." Cyrulnik and Roche both discussed their concerns about Freedman's approach to

compensation, but Roche assured Cyrulnik that he knew Freedman well, and that although

Freedman often acted "immature" and was fixated on short-term financial upside, Roche was

committed to ensuring that the concerns Cyrulnik identified would be remedied.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to

the allegations in paragraph 48.

## V.   THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM THE STARTUP CLIENT

49.     Cyrulnik's many stable clients and billable hour matters substantially funded the

Firm's operations and many of the Firm's alternate fee arrangement representations of other

clients.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to

the allegations in paragraph 49.

50.     For example, as discussed above, the Firm was retained by the Startup Client,

which planned to distribute digital cryptocurrency assets in the form of Tokens and build a

platform of decentralized assets and applications. The purpose of the representation was to assist

the Startup Client and its officers during the growth and development of their business.

**RESPONSE:** ███████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████, and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 50.

51.    Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all Tokens issued by the Startup Client in connection with all future distributions.

**RESPONSE:** ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████.

52.    Under the engagement letter, the Firm would receive a flat percentage of all Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any Token Distribution." Further, under the engagement letter, the Tokens functioned as a nonrefundable advance, meaning "any unused portion of the Billable Hour Advance will expire on the fourth anniversary of this agreement's execution."

**RESPONSE:** Paragraph 52 states legal conclusions requiring no response. To the extent a response is required, ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████.

53.    Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

**RESPONSE:** Paragraph 53 contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that paragraph 53 provides a generally accurate but partial description of certain terms of the MOU, which omits in particular the provision

stating that "[i]n the event further partner resources are required, the Firm will revisit the above distribution of [Startup Client's] Tokens." Holcomb refers to the MOU for its complete and accurate contents.

54.     At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be. Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

**RESPONSE:** ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Holcomb lacks knowledge or information sufficient to form a belief as to whether Cyrulnik's billable hour matters were "stable" or whether they were "needed to fund the attorney hours spent on the Startup Client matters."

55.     In ██████ 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors. The sale ascribed real value to the Tokens. More importantly though, it validated the Startup Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

**RESPONSE:** Admitted.

## VI.     ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION

56.     Roche understood that addressing the Firm's sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik. Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm and that Freedman

was out for himself too much. To that end, Roche and Cyrulnik had worked for months to clarify the formulas used to calculate credits in the Compensation Model to try and protect against future exploitation of it, in an effort to disincentivize the practices that were problematic and in which Freedman in particular was engaged. But when Roche presented the updates to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 56.

57.    In ▮▮▮▮▮ 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that. But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long and hard to fashion. When Cyrulnik asked Roche what happened after the call, Roche admitted to Cyrulnik that Roche was "scared" of Freedman because Freedman "sometimes acts irrationally" and is selfish. Roche told Cyrulnik that Roche had concluded it was not "worth it" to stand up to Freedman. Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants." Cyrulnik told Roche that the Firm needed to be more principled and that problems need to be addressed rather than ignored. He told both Roche and Freedman that he believed it was critical to the Firm's success that they look beyond their own individual interests to address any vulnerabilities in the formula applications for compensation to ensure that the Firm was sustaining itself and doing so fairly.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 57.

58.     Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates. Roche uniquely understood how the Startup Client's ▮ 2020 Token sale foreshadowed their enormous potential value, and sensed an opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens. To that end, Roche wrote to Cyrulnik following the meeting with Freedman about fixing the Firm's formulas: "I agree with the economics of the proposed formula comp. change," but then shockingly told Cyrulnik that, in order for Roche to vote consistent with what he believed was best for the Firm, Cyrulnik needed to buy his support by agreeing to pay Roche 40% of Cyrulnik's Tokens (10% of the total Tokens): "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU." The request came out of left field.

**RESPONSE:** Holcomb admits that at one time Roche was deeply engaged in the cryptocurrency industry, but lacks knowledge or information sufficient to form a belief as to Roche's current activities. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 58.

59.     Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands. He flatly rejected any such change to his Token stake and explained that acting in the best interests of the Firm and making decisions designed to protect its long-term sustainability was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was unjust and unethical. As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

**RESPONSE:** Holcomb admits that Freedman and Roche appropriated assets that had

been previously allocated to Cyrulnik and other partners for themselves; denies that Holcomb

participated in any conspiracy; denies that Holcomb took any action with the motivation or

expectation of obtaining assets that had been promised to Cyrulnik; and otherwise lacks

knowledge or information sufficient to form a belief as to the allegations in paragraph 59.

## VII.   THE PARTNERS COMPLETE 2020 AND PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS

60.     Although there were a couple of important issues that had arisen over the course

of the first year of the Firm's operations on which the partners had expressed different views

(and with respect to which decisions proceeded by split votes), the partnership was generally

very functional and friendly. The partners consistently touted the collegiality of the Firm in

discussions with potential lateral candidates. Throughout January 2021 (in the few weeks prior to

the scheme at issue in this lawsuit), the partners continued to interact as they had in the past.

Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, 2021,

and they discussed many Firm planning issues.

**RESPONSE:** Holcomb admits that there were important issues that had arisen over the

course of the first year on which the partners had expressed different views; denies knowledge or

information sufficient to form a belief as to whether such issues were typically put to a vote;

admits that some partners were friendly; and denies that the partnership as a whole was

"generally very functional and friendly." Holcomb admits that he consistently touted his and

other partners' stated aspiration to build a collegial firm in discussions with potential lateral

candidates, but lacks knowledge or information sufficient to form a belief as to conversations

other partners had to which he was not privy. Holcomb denies that throughout January 2021 the

partners continued to interact as they had in the past. Holcomb otherwise lacks knowledge or

information sufficient to form a belief as to the allegations in paragraph 60.

61.     Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 61.

62.     Counterclaim-Defendant Friedland reached out to Cyrulnik on January 2, 2021: "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 62.

63.     On January 22, 2021, less than three weeks before their bad-faith "removal" ploy, Freedman was arranging to ensure that the Firm's bank accounts at Chase Bank were corrected to finally ensure that Cyrulnik was listed as a registered owner – something that Freedman was required to do when the Firm was first formed one year prior, but had delayed due to the pandemic and the requirement that the owners be present together at a Chase branch to update the accounts in person. Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York the following week (less than two weeks before the illegal "removal" scheme) in light of a family conflict Freedman had to navigate that day.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 63.

64.     ▮▮▮▮▮, the value of the Tokens exploded.

**RESPONSE:** Holcomb admits that the price of the Tokens generally increased during

the referenced time period and fluctuated thereafter and refers to publicly available market data for the actual prices of Tokens over time.

## VIII.   COUNTERCLAIM-DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF TO TRY AND MISAPPROPRIATE HIS INTERESTS IN THE FIRM'S VALUABLE ASSETS

65.     In  2020, the Tokens began trading publicly for the first time. Between ███████ 2020 and ███████ 2020, the price of the Tokens remained relatively stable.

**RESPONSE:** Holcomb admits that Cyrulnik's characterizations in paragraph 65 are generally accurate and refers to publicly available market data for the actual prices of Tokens over time.

66.     In ███████ 2021, however, the Tokens experienced a precipitous rise in value. Between ███████ 2021 and ███████, 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between ███████, 2021, and ███████, 2021. The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in ███ 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the ███ days leading up to Cyrulnik's purported "removal" for cause.

**RESPONSE**: Holcomb admits that Cyrulnik's statements regarding the price trend of Tokens during the referenced period is generally accurate and refers to publicly available market data for the actual prices of Tokens over time. Holcomb otherwise denies the allegations in paragraph 66.

67.     Below is a chart of the Tokens' price between ███████ and the day of the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm:

[SEE CHART]

**RESPONSE:** Holcomb admits that Cyrulnik's chart appears to accurately reflect the

price trend of Tokens during the referenced time period and refers to publicly available market data for the actual prices of the Tokens over time. Holcomb denies that Cyrulnik's reference to "the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm" is accurate and refers to his responses to Cyrulnik's allegations concerning the referenced meetings, including the responses to paragraphs 6 and 70–72.

68.      As the chart shows, as of ████████, 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than ███ per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million. But that was not enough for Roche and Freedman, the latter of whom had previously remarked that his goal in life was to be "super rich."

RESPONSE: Holcomb denies the allegations in the first sentence of paragraph 68. Holcomb admits that Roche and Freedman generally desired to appropriate more Tokens for themselves and otherwise lacks knowledge or information sufficient to form a belief as to the allegations in the second sentence of paragraph 68.

69.      Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters. With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

RESPONSE: Denied.

70.      Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with Friedland, Holcomb and Normand, convened a secret meeting on or about

February 10, 2021, without even informing two of the Firm's seven equity partners, to concoct

the pretext for his removal. Cyrulnik was not informed of the meeting, and was not given the

opportunity to address whatever false allegations the Conspiring Partners had decided to use as a

pretext for the "removal" – neither at the meeting nor at any other time prior to his purported

(and unlawful) "removal."

      **RESPONSE:** The paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb denies that he breached fiduciary duties and states that to

the extent Cyrulnik's allegations are directed at other parties, no response to Cyrulnik's

allegations is required from him. Holcomb admits that Cyrulnik and Fattaruso did not receive

notice of meetings that took place on February 8 and February 10, 2021 and otherwise denies the

allegations in paragraph 70.

      71.     Also excluded from the covert meeting was equity partner Paul Fattaruso, who

was the only partner at the Firm who regularly worked with Cyrulnik on running the Firm's core

matters while the other partners focused primarily on the Firm's contingency work (and small

billable matters). Fattaruso was deliberately and unjustifiably excluded so that the Conspiring

Partners could falsely mischaracterize the vote to oust Cyrulnik as "unanimous," when in fact,

they did not even include two of the Firm's seven equity partners (constituting almost 30% of the

Firm's equity votes).

      **RESPONSE:** Holcomb admits that Fattaruso was not given notice of meetings that took

place on February 8 and February 10, 2021, admits that the vote to remove Cyrulnik for cause

did not include two of the Firm's seven equity partners, states that those partners' votes were not

necessary for the required two-thirds threshold, and otherwise denies the allegations in paragraph

71.

72.     The secret meeting not only breached the fiduciary duties owed by the Conspiring Partners to Cyrulnik, but directly breached the MOU. As the Firm's co-chairperson, only Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting of those meetings." Cyrulnik's right to initiate and conduct Firm meetings could not be altered without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik, which of course never happened.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 72.

73.     Two days after the meeting, on February 12, 2021, the Conspiring Partners sent Cyrulnik an email informing him that he was "removed," which email was riddled with errors, misstatements, and mischaracterizations, purporting to remove Cyrulnik from the Firm for "cause." The fictitious bases set forth in the email had not even occurred, much less constituted proper "cause" as required.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that he, Normand, Friedland, Freedman, and Roche sent Cyrulnik notice of his removal on February 12, 2021, and otherwise denies the allegations in paragraph 73.

## IX.  COUNTERCLAIM-DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS

### A.  Counterclaim-Defendants Indisputably Lacked "Cause" To Expel Cyrulnik

74.     Counterclaim-Defendants indisputably lacked anything close to "cause" — which, under applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of his job — to remove Cyrulnik.

34

**REPSONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 74.

75.     Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from associate to partner to equity partner as quickly as anyone in BSF's history. All of the Firm's equity partners, including all of the Conspiring Partners, had worked for years at BSF with Cyrulnik. He had never before had any complaints lodged against him for any improper interactions with any colleague — associate, partner, or otherwise. Cyrulnik is highly respected by scores of colleagues with whom he works and has worked. Because there was no record of misconduct and, of course, no actual misconduct, the Conspiring Partners had no substance upon which to base their pretextual removal for cause. Instead, they contrived a removal email that not only was false and devoid of substance, but failed to describe any actual cause.

**RESPONSE:** Holcomb admits that Cyrulnik worked at BSF for 15 years prior to joining the Firm; that Cyrulnik was an equity partner at BSF; and that some of the other Founding Partners had worked with Cyrulnik at BSF. Holcomb lacks knowledge or information sufficient to form a belief as to whether Cyrulnik is "highly respected by scores of colleagues" or whether Cyrulnik rose "from associate to partner as quickly as anyone in BSF's history." Holcomb states that Cyrulnik's reference to "complaints lodged" against Cyrulnik is vague and ambiguous and lacks knowledge or information about this allegation. Holcomb admits that no formal complaint procedure was ever invoked against Cyrulnik at the Firm. The additional allegations in paragraph 75 contain legal conclusions requiring no response. To the extent a response is required, Holcomb denies any allegations in paragraph 75 that he has not expressly admitted.

76.     For example, Counterclaim-Defendants' purported "removal" email asserts that Cyrulnik screamed, "spoke over" other partners, refused to listen, and was antagonistic at

35

meetings. Setting aside that "screaming" cannot and does not constitute cause, it in any event mischaracterizes two instances of disagreement about Firm decisions throughout 14 months of Cyrulnik's tenure. For example, in July 2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on Cyrulnik and coordinated matching e-mails, alleging Cyrulnik had "screamed" at them, accompanied by a misleading account of events. These emails were a misguided effort to pressure Cyrulnik into conceding financial rights. When Roche and Freedman realized that Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

     **RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that paragraph 76 contains accurate partial quotations of the referenced February 12, 2021 email, refers to that email for its complete and accurate contents, and otherwise denies the allegations in paragraph 76.

     77.    The other allegations in the email are equally misguided. The email vaguely asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other founding partners." Yet, it provides no context or support for these accusations (because they are false). And the email includes a vague and nebulous accusation that Cyrulnik created "unsustainable environments for associates," which is completely false. To the contrary, Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who has spoken ill of him or working for him.

     **RESPONSE:** Holcomb admits that paragraph 77 contains accurate partial quotations of the referenced February 12, 2021 email and refers to that email for its complete and accurate contents. Holcomb lacks knowledge or information sufficient to form a belief as to Cyrulnik's

state of mind with respect to awareness of associate complaints. Holcomb otherwise denies the allegations in paragraph 77.

78.     As the removal email evidences, the actions by the Conspiring Partners are about one thing only: greed. They had no problem working with Cyrulnik at BSF — actively recruiting him to leave his hard-earned position and lead the Firm — and no problem working with Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue base) until ▮▮▮ days before his removal when his assets skyrocketed in value and the Tokens suddenly appreciated to more than $60 million in value. Then, without any precipitating incident, the Conspiring Partners felt compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an opportunity for him to respond to their pretextual and baseless allegations.

**RESPONSE:** Holcomb admits that some of the Founding Partners had no problem working with Cyrulnik at BSF and that Cyrulnik was not given notice of the meetings on February 8 and February 10, 2021. Holcomb otherwise denies the allegations in paragraph 78.

79.     Following their wrongful attempted removal of Cyrulnik, the Conspiring Partners have stopped at nothing in their quest to defame him. In a truly cynical effort, the Conspiring Partners attempted to exploit the legal community's rightful concerns over diversity and inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit themselves — i.e., five white males. Cyrulnik has never expressed anything other than outright support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Conspiring Partners are manifestly false.

**RESPONSE:** Denied.

80.     Accordingly, after receiving the Conspiring Partners' email on February 12, 2021, Cyrulnik expressly placed the Conspiring Partners on notice that their purported removal was "in

bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Cyrulnik's counsel, Marc Kasowitz, sent a letter on February 22, 2021, which contains the quoted statements, and otherwise denies the allegations in paragraph 80.

**B.      The Conspiring Partners Breached The MOU By Denying Cyrulnik The Compensation They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause**

81.      The Conspiring Partners' scheme suffered from many fatal flaws, including the threshold problem that, even where partners have grounds for removing a Founding Partner for cause (there were none here) and the proper procedures for doing so were followed (again not the case here), such a removal would not impact Cyrulnik's core compensation rights under the MOU in any event.

**RESPONSE:** Paragraph 81 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 81.

82.      In Section VI of the MOU ("Firm Management"), the MOU addressed two different instances where a Founding Partner would depart from the Firm. The partner could withdraw voluntarily under Section VI(C), or under limited circumstances could be removed involuntarily for cause under Section VI(G).

**RESPONSE:** Paragraph 82 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 82 and refers to the MOU for its complete and accurate contents.

83.      In their complaint, the Conspiring Partners intentionally sought to conflate the

provisions in a misguided attempt to treat their improper and involuntary removal as Cyrulnik deciding to "withdraw" from the Firm. In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an involuntary removal and voluntary withdrawal separately, and the intent of the parties (including the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily agreed to change their economics).

   **RESPONSE:** Paragraph 83 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he ever filed a complaint against Cyrulnik and states that the referenced Complaint was filed by the Firm. Holcomb otherwise denies the allegations in paragraph 83 and refers to the MOU for its complete and accurate contents.

   84.   The MOU unambiguously provides for certain ramifications in the event of voluntary withdrawal. It unequivocally does not set forth those ramifications for involuntarily removal, and Counterclaim-Defendants' attempt to do so is baseless and improper.

   **RESPONSE:** Paragraph 84 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 84 and refers to the MOU for its complete and accurate contents.

## X.   THE CONSPIRING PARTNERS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS

   85.   Since perpetrating their scheme and purporting to remove Cyrulnik as a partner, the Conspiring Partners have egregiously breached their duties to and badly mistreated the Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for choosing to follow Cyrulnik. Despite the Conspiring Partners' extreme efforts to keep the Firm's clients at RCF, every single client that Cyrulnik brought to the Firm left the Firm and remained with Cyrulnik.

**RESPONSE:** Paragraph 85 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached duties or mistreated the Firm's clients, and states that to the extent allegations are advanced against other parties, no response is required from him. Holcomb lacks knowledge of information sufficient to form a belief as to whether any other partners made efforts to keep Cyrulnik's clients at the Firm and admits that Cyrulnik's clients followed him to his new firm, Cyrulnik Fattaruso LLP.

A.   **The Conspiring Partners Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets**

86.   After sending Cyrulnik their "removal" email, the Conspiring Partners tried to pressure him to agree to sign a confidential mediation and binding arbitration agreement to facilitate an "amicable" re-division of his assets and rights under the MOU. After calling out the Conspiring Partners' improper scheme, Cyrulnik told the Conspiring Partners that a necessary predicate for any discussion about splitting the Firm was their commitment to provide him all of the compensation he is owed under the MOU.

**RESPONSE:** Holcomb denies that he communicated with Cyrulnik at all after Cyrulnik was given notice of his removal. Holcomb admits that Roche sent an email on behalf of the Firm proposing confidential mediation and arbitration and that Cyrulnik refused to submit any disputed issues to mediation or arbitration. Holcomb otherwise denies the allegations in paragraph 86.

87.   On February 19, Roche sent Cyrulnik a proposal in which he proposed that Cyrulnik give the Conspiring Partners 75% of his Tokens. Through his counsel, Cyrulnik told the Conspiring Partners that, if they did not commit to providing Cyrulnik everything to which he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens, Cyrulnik would be forced to commence litigation. The Conspiring Partners' counsel stated that his clients

were looking to resolve the matter, and that he would speak with them and revert on Sunday morning, February 28, 2021.

**RESPONSE:** Holcomb admits that on February 19, 2021, Roche wrote on behalf of the Firm to send Cyrulnik a settlement proposal and that in response, Cyrulnik's counsel threatened that if the Firm did not accede to Cyrulnik's demands including "unfettered access" to the Firm's bank accounts, this would "guaranty [*sic*] a resort to litigation to protect Jayson's [*sic*] unquestioned partnership rights." Holcomb refers to the referenced communications for their complete and accurate contents and otherwise denies the allegations in paragraph 87.

88.     Having forestalled litigation through that stall tactic, the Conspiring Partners rushed to prepare their own anticipatory pleading and rushed into court, in the hope that publicizing a false narrative would force Cyrulnik to give them what they wanted and would enable the Conspiring Partners to keep Cyrulnik's clients. Without providing any further response to Cyrulnik, the Counterclaim-Defendants filed a declaratory relief lawsuit in this Court on the night of Saturday, February 27, 2021 (a day before the scheduled call between their counsel and Cyrulnik's counsel, pursuant to Counterclaim-Defendants' counsel's request).

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he was a party to this action before Cyrulnik filed claims against him, admits that the Firm filed a Complaint against Cyrulnik, refers to that Complaint for its complete and accurate contents, and other denies the allegations in paragraph 88.

89.     Concurrent with their late-night filing, the Conspiring Partners suddenly cut Cyrulnik's access to client files without notice. At the time, Cyrulnik was lead counsel on many active matters with a number of court hearings and depositions scheduled the next business day

41

and throughout the ensuing week, and the Conspiring Partners' actions materially hindered

Cyrulnik's ability to work on these matters – as the Conspiring Partners intended all along, as

further leverage to force Cyrulnik to give up his rights. Cyrulnik rejected the Conspiring

Partners' extortionate actions, and demanded that his access to client files be restored so that he

could continue representing and protecting the interests of his clients – clients who, at the time,

remained Firm clients to whom each of the Conspiring Partners owed fiduciary duties.

Ultimately, the Conspiring Partners agreed to provide Cyrulnik access to his clients' files –

although only after he was forced to scramble and waste significant time and effort to protect

client interests.

> **RESPONSE:** Denied.

> **B.**   **The Conspiring Partners Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Choosing Cyrulnik**

90.     Faced with the imminent prospect of losing most of their core clients and revenue,

the Conspiring Partners sought to leverage deadlines in active matters to pressure clients to

execute new engagement letters with the Firm or else be left without adequate staffing for their

matters on virtually no notice at all. Indeed, in many cases, the Counterclaim-Defendants' letters

to clients demanded responses within just a few business hours.

> **RESPONSE:** Denied.

91.     When the clients informed the Firm that they wanted Cyrulnik to lead their

matters but expected an appropriate and non-prejudicial transition of their active matters, the

Firm scrambled to punish those clients by rapidly removing the associates who had been staffed

on those cases for months – with imminent deadlines fast approaching and against the request

and recommendation of the other Firm partner who had been running the cases with Cyrulnik

(and who remained at the Firm at the time).

**RESPONSE:** Denied.

92.     The Counterclaim-Defendants also enlisted newly hired partner, Eric Rosen, to send harassing letters to clients, in which Rosen threatened to file notices of withdrawal in less than two days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to continue handling your matter." Cyrulnik continued to field daily phone calls for weeks from clients who were receiving Rosen's emails threatening to prejudice their cases by filing withdrawal notices in their active cases.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to whether Cyrulnik "field[ed] daily phone calls for weeks" and otherwise denies the allegations in paragraph 92.

93.     Even after the Conspiring Partners resigned themselves to the fact that Cyrulnik's clients had no interest in being represented by RCF unless Cyrulnik was leading their cases, they sought to harm those clients by generating and demanding payment of inaccurate and improper invoices, and refusing to remit client funds that did not belong to them. Specifically, the Conspiring Partners drafted invoices for those clients without the input or oversight of any of the partners who oversaw the matter, and demanded that Cyrulnik sign off on them without review. When Cyrulnik told the Conspiring Partners that client invoicing needed to be done carefully and properly and that he needed access to Firm timekeeping and recording systems to perform his customary review of pre-bills before they were sent out to clients, the Conspiring Partners refused.

**RESPONSE:** Denied.

94.     Cyrulnik's counsel called out Counterclaim-Defendants' attempt to mistreat clients:

Any effort to send bills to clients without the lead partner overseeing those matters reviewing them is obviously improper. Client bills need to be reviewed before they are sent out, as clients reasonably expect to happen. The fact that these clients declined to have your clients represent them going forward does not change that. If you want to treat clients properly and fairly, we have offered a process for doing so. If your clients desire to punish clients for declining to be represented by the kinds of people you represent, we strongly oppose such efforts and will obviously not facilitate them. We have proposed a mechanism for dealing with invoicing; if you refuse to approach that effort in a manner consistent with your clients' duties to their former clients and to mine, we will address that in court.

**RESPONSE:** Denied.

95.     Confronted with this reality, Counterclaim-Defendants then partially backtracked, demanding that Cyrulnik send "corrections" to the invoices based on guesswork and memory alone, without access to the firm timekeeping systems, calendars and records or to the lawyers whose time was being listed on the bills, and that he do so within two business days. The Conspiring Partners also demanded that Cyrulnik send them entries for the time he worked on all matters in January and February so that they could include those entries on the improper invoices, which would enable them to give clients the false impression that Cyrulnik had signed off on the invoices and the work being billed. Although it was against Cyrulnik's own financial interests, he declined to participate in the Conspiring Partners' effort to bill clients without customary and proper review of the invoices to ensure accuracy and that clients were being treated fairly and honestly.

**RESPONSE:** Holcomb admits that Cyrulnik was offered the opportunity to review proposed client bills and that Cyrulnik never provided comments on those proposed bills. Holcomb admits that the Firm demanded that Cyrulnik provide it with records of the time Cyrulnik had spent working on behalf of Firm clients in January and February 2021 and that Cyrulnik refused to do so. Holcomb otherwise denies the allegations in paragraph 95.

96.     To this day, despite multiple requests and demands, the Conspiring Partners continue to block Cyrulnik's access to the billing systems needed to send out proper invoices, causing substantial harm to Cyrulnik.

**RESPONSE:** Denied.

97.     Astonishingly, in its Amended Complaint, RCF somehow tries to turn these facts on their head, alleging that Cyrulnik breached his duties to the Firm by not participating in its plan to send out invoices without customary and requisite review, to bill clients for unauthorized work, and to create the false impression for clients that the invoices had been properly reviewed and approved – when it is the Conspiring Partners who have unilaterally and improperly blocked Cyrulnik's access to the records necessary to ensure that the Conspiring Partners do not send out false or fraudulent invoices. The Conspiring Partners then feign ignorance in their Amended Complaint as to why the many clients they so badly mistreated – and whose cases the Conspiring Partners endangered through their bad-faith, retaliatory conduct – apparently did not pay the invoices that RCF sent.

**RESPONSE:** Holcomb admits that the Firm asserted claims against Cyrulnik, refers to the Firm's Amended Complaint for its complete and accurate contents, and otherwise denies the allegations in paragraph 97.

**C.**     **The Conspiring Partners Cause the Firm To Disseminate False Tax Forms In An Effort To Further Their Scheme.**

98.     Recognizing that their scheme had been exposed, the Conspiring Partners scrambled to devise a backup plan for stealing Cyrulnik's assets in mid-2021.

**RESPONSE:** Holcomb denies that he participated in any "scheme," that any "scheme" of his was "exposed," or that he devised any "backup plan." To the extent paragraph 98 advances allegations against other parties, no response from Holcomb is required.

99.     Specifically, they secretly directed the Firm's accountant to withhold Cyrulnik's Form K-1 – the tax form utilized by partners in lieu of a Form W-2 – and then issued him a falsified W-2 form, claiming that Cyrulnik – the Firm's largest equity holder at 27% – would suddenly and retroactively being recharacterized as an employee of the Firm.

**RESPONSE:** Paragraph 99 contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Cyrulnik held 27% of the Firm's equity prior to his removal and that this was the largest equity stake. Holcomb denies that he directed the Firm's accountant to withhold a K-1 from Cyrulnik or that he ever claimed that Cyrulnik should be recharacterized as an employee of the Firm. Holcomb lacks knowledge or information sufficient to form a belief as to tax forms that the Firm issued to Cyrulnik. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb.

100.    Upset that Fattaruso declined to support their scheme, the Conspiring Partners then denied Fattaruso's status as an equity partner and falsified his tax forms, seeking to punish him for being honest and refusing to endorse their unethical and illegal behavior.

**RESPONSE:** Paragraph 100 contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that Fattaruso was an equity partner. Holcomb denies that he directed the Firm's accountant to withhold a K-1 or that he ever denied that Fattaruso was an equity partner. Holcomb lacks knowledge or information sufficient to form a belief as to tax forms that the Firm issued to Fattaruso. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb.

101.    The Conspiring Partners then reallocated to themselves Cyrulnik's allocated expenses in connection with starting the Firm and its operations, and on information and belief, filed false tax returns with the federal and local authorities claiming deductions to which they

were not entitled and mischaracterizing income received by individual partners.

     **RESPONSE:** Paragraph 101 contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he participated in any re-allocation of expenses or preparation of tax returns. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb. Holcomb otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 101.

     102.    The Conspiring Partners then used Cyrulnik's funds to keep the Firm afloat in the face of the mass exodus of clients and refused to remit large amounts of compensation owed to Cyrulnik for months. Then, in April 2021, Counterclaim-Defendants finally, and belatedly, sent a portion of the amounts owed but improperly withheld the rest of Cyrulnik's assets (and continue to do so to this day). In violation of the express provisions of the MOU and the controlling Florida statutes governing the partnership, the Conspiring Partners sought to obscure their misconduct by withholding from Cyrulnik basic information about the Firm's accounts and revenues in which he held substantial interests, never paying him the rest of his formula compensation or any of the equity distributions owed to him, and misappropriating the other assets given to him under the MOU, including his Tokens and his 25% interest ███ ████████████████████ that resulted in a $100 million jury award, with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision).

     **RESPONSE:** Paragraph 102 contain legal conclusions requiring no response. To the extent a response is required, Holcomb admits that the Firm obtained a $100 million judgment, but states that he has no personal interest in fees related to that judgment and that he lacks knowledge or information sufficient to form a belief as to any expectation of fees for the Firm related to that judgment. Holcomb denies that he ever withheld information to which Cyrulnik

was entitled. Holcomb lacks knowledge or information sufficient to form a belief concerning the

Firm's finances. To the extent Cyrulnik advances allegations against other parties, no response is

required from Holcomb. Holcomb otherwise lacks knowledge or information sufficient to form a

belief as to the allegations in paragraph 102.

### COUNT 1
**(Dissolution pursuant to Florida Statutes § 620.8801)**

103.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs

1 through 102 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

104.    Cyrulnik seeks judicial dissolution of RCF pursuant to Florida Statutes

§§ 620.8405 and 620.8801.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb admits that Cyrulnik seeks the stated remedy.

105.    RCF is a limited liability partnership, as defined by the Florida Revised Uniform

Partnership Act, and as governed by the MOU.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb admits that the Firm is a limited liability partnership as

defined by the Florida Revised Uniform Partnership Act and states that he is unable to respond to

Cyrulnik's allegation stated with the phrase "and as governed by the MOU" because it is vague

and ambiguous.

106.    Counterclaim-Defendants breached the MOU by purporting to remove Cyrulnik

as a partner of RCF, notwithstanding that they lacked cause to do so. The purported "cause" cited

by Counterclaim-Defendants is plainly insufficient as a matter of law, indisputably pretextual, in

bad faith and based on lies and mischaracterizations of the events. Accordingly, the Conspiring

48

Partners lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU and is ultra vires and void ab initio. Accordingly, Cyrulnik remains a Founding Partner and Co-Chairperson of RCF.

**RESPONSE:** This paragraph states a legal conclusion requiring no response. To the extent a response is required, Holcomb denies that he breached the MOU. To the extent Cyrulnik advances allegations against other parties, no response from Holcomb is required.

107.    Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

**RESPONSE:** This paragraph states a legal conclusion requiring no response. To the extent a response is required, Holcomb denies that Cyrulnik is entitled to any such remedy from him. To the extent Cyrulnik advances allegations against other parties, no response from Holcomb is required.

108.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, the economic purpose of the partnership has been unreasonably frustrated by the actions of the Conspiring Partners, and likely will continue to be unreasonably frustrated, within the meaning of Florida Statutes § 620.8801(5)(a).

**RESPONSE:** This paragraph states a legal conclusion directed at other parties and requiring no response from Holcomb.

109.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Conspiring

49

Partners, within the meaning of Florida Statutes § 620.8801(5)(b).

**RESPONSE:** This paragraph states a legal conclusion directed at other parties and requiring no response from Holcomb.

110.    By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practical to carry on the activities of the limited liability partnership in conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

**RESPONSE:** This paragraph states a legal conclusion directed at other parties and requiring no response from Holcomb.

111.    Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE:** This paragraph states a legal conclusion requiring no response. To the extent a response is required, Holcomb denies that he has any obligation to pay Cyrulnik's attorneys' fees. To the extent Cyrulnik's allegation is directed at other parties, it requires no response from Holcomb.

112.    By reason thereof, Cyrulnik respectfully requests that this Court enter a judgment dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just and proper.

**RESPONSE:** This paragraph states a legal conclusion requiring no response.

## COUNT 2
### (Buyout under Florida Statutes § 620.8701 in the Alternative)

113.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 112 herein.

**RESPONSE:** No response is required to paragraph 113 because the Court has dismissed Count 2 as against Holcomb (Dkt. #374 at 19).

114.    RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

**RESPONSE:** No response is required to paragraph 114 because the Court has dismissed Count 2 as against Holcomb.

115.    Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-Chairperson of RCF.

**RESPONSE:** No response is required to paragraph 115 because the Court has dismissed Count 2 as against Holcomb.

116.    Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

**RESPONSE:** No response is required to paragraph 116 because the Court has dismissed Count 2 as against Holcomb.

117.    Should judicial dissolution be found inappropriate or inequitable, in the alternative, the Conspiring Partners' actions to expel Cyrulnik from RCF entitle him to a buyout pursuant to Florida Statutes § 620.8701.

**RESPONSE:** No response is required to paragraph 117 because the Court has dismissed Count 2 as against Holcomb.

118.    Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

**RESPONSE:** No response is required to paragraph 118 because the Court has dismissed Count 2 as against Holcomb.

119.     By reason thereof, in the alternative to dissolution, Cyrulnik respectfully requests that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and proper.

**RESPONSE:** No response is required to paragraph 119 because the Court has dismissed Count 2 as against Holcomb.

<u>**COUNT 3**</u>
**(Accounting Pursuant to Florida Statutes §§ 620.8403 and 620.1407)**

120.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 119 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

121.     The Conspiring Partners have taken control of RCF, have unlawfully excluded Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused to allow Cyrulnik any say in the operation of RCF, and have otherwise abused their status as partners of the Firm.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that, after Cyrulnik's removal, the Firm did not allow him any "say" in the Firms management. Holcomb lacks knowledge or information sufficient to form a belief as to Cyrulnik's access to books and records following his removal, including because Holcomb lacks access to the discovery record in this case. Holcomb denies

that he has in any way abused his status as a partner of the Firm. To the extent Cyrulnik advances allegations against other parties, no response from Holcomb is required.

122.    An accounting of the assets, profits, and losses of RCF is necessary and appropriate at this time.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb states that he is no longer a partner of the Firm and denies that Cyrulnik is entitled to obtain any accounting from him. To the extent Cyrulnik advances allegations against other parties, no response from Holcomb is required.

123.    Florida Statutes § 620.8403 requires a limited liability partnership to provide its current (and former) partners access to the Firm's records that are required to be kept by all limited liability partnerships. Florida Statutes § 620.1407 affords a current (and former) partner the right to inspect and copy and "records maintained by the limited liability partnership regarding the limited partnership's activities and financial condition."

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 123 and notes that Cyrulnik has misquoted Fla. Stat. § 620.1407 by erroneously adding the word "liability."

124.    Cyrulnik has been denied access to RCF's books and records notwithstanding numerous requests for access to the Firm's financial records and accounts.

**RESPONSE:** Holcomb lacks knowledge or information sufficient to form a belief as to what books and records Cyrulnik has received. Holcomb denies that he has or has ever had access to the Firm's books and records such that he could provide such access to Cyrulnik. To the extent Cyrulnik advances allegations against other parties, no response from Holcomb is required.

125.    By reason thereof, Cyrulnik demands judgment in his favor, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present; find and determine the amount due to Cyrulnik from RCF; and enter a judgment or decree in favor of Cyrulnik for his compensatory damages, prejudgment interest, cost, and such further relief as this Court deems just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

### COUNT 4
**(Breach of Contract)**
**(Third-Party Claim Against the Conspiring Partners)**

126.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 125 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

127.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits the allegations in paragraph 127, but reserves the right to amend this Answer if he obtains evidence undercutting Cyrulnik's right to enforce the MOU's terms after he is given access to the discovery record in this case.

128.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 128.

129.    Cyrulnik has fully performed and is ready, willing, and able to continue to

perform his obligations under the MOU and the Side Letter.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies the allegations in paragraph 129.

130.    The Conspiring Partners breached the MOU by, among other things, purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The "cause" cited by Counterclaim-Defendants was indisputably pretextual, in bad faith, based on Counterclaim-Defendants' lies and mischaracterizations of the events, and in any case did not rise to the level of "cause" under the law. Accordingly, the Conspiring Partners did not have the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached the MOU. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

131.    Even if the Conspiring Partners had "cause" to expel Cyrulnik from the Firm, the Conspiring Partners further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU, including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity. Although the MOU limits the ability of a partner who has withdrawn from the Firm to retain his equity, it does not provide any such limitation on a partner who was removed. Accordingly, by citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Conspiring Partners have breached their obligations under the MOU.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached the MOU. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

132.   Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Cyrulnik's allegations are directed at Roche and no response is required from Holcomb.

133.   The Conspiring Partners unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb admits that the Firm changed its name, website, and letterhead to "Roche Freedman LLP" following Cyrulnik's removal and that Cyrulnik did not authorize these changes. Holcomb notes that Cyrulnik has taken the position that it would be a violation of ethics rules for the Firm to continue to operate with the name "Roche Cyrulnik Freedman LLP" in light of Cyrulnik's removal. (*See* Dkt. #40 at 16.) Holcomb otherwise denies the allegations in paragraph 133.

134.   Conspiring Partners Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

**RESPONSE:** This paragraph contains legal conclusions and asserts allegations against other parties requiring no response from Holcomb.

135.     The Conspiring Partners also breached the MOU by not performing multiple obligations set forth therein and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached the MOU. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

136.     The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached the MOU. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

137.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

**COUNT 5**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Third-Party Claim Against the Conspiring Partners)**

138.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 137 herein.

57

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

139.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he participated in any conspiracy. Holcomb otherwise admits the allegations in paragraph 139, but reserves the right to amend this Answer if he obtains evidence undercutting Cyrulnik's right to enforce the MOU's terms after he is given access to the discovery record in this case.

140.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 140.

141.    Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

142.    The Conspiring Partners breached this implied covenant by, among other things, taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity, and by denying Cyrulnik access to files, documents, Firm bank accounts, and other

information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached either the MOU or the implied covenant of good faith and fair dealing. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

143.    The Conspiring Partners also breached the covenant of good faith and fair dealing by not performing multiple obligations set forth therein in the MOU and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached either the MOU or the implied covenant of good faith and fair dealing. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

144.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

## COUNT 6
**(Breach of Fiduciary Duty)**
**(Third-Party Claim Against the Conspiring Partners)**

145.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 144 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

146.    As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik. These duties include the duties of care and loyalty.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

147.    The Conspiring Partners breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he breached any duty. To the extent Cyrulnik's allegations are directed at other parties, no response is required from him.

148.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

<u>**COUNT 7**</u>
**(Conversion)**

149.   Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 148 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

150.   Counterclaim-Defendants knowingly and intentionally converted Cyrulnik's specific and identifiable membership interest in RCF and his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he converted any property of Cyrulnik's. To the extent Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

151.   Counterclaim-Defendants, without authority, deprived Cyrulnik of such membership interest and substantial equity interest for their own use.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he converted any property of Cyrulnik's. To the extent Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

152.   Counterclaim-Defendants' deprivation of Cyrulnik's partnership and equity interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he converted any property of Cyrulnik's. To the extent Cyrulnik's allegations are directed against other parties, no response is required from

Holcomb.

153.     Counterclaim-Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests. Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he refused any demand of Cyrulnik's. To the extent Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

154.     As a direct and proximate result of Counterclaim-Defendants' conversion, Cyrulnik has suffered damages.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he caused any damages to Cyrulnik. To the extent Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

155.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

### COUNT 8
**(Unjust Enrichment)**

156.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 155 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

157.    Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Conspiring Partners.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent that a response is required, Holcomb admits that Cyrulnik originated clients of the Firm, that he devoted time and attention to Firm matters, and that he conferred benefits on the Firm, but otherwise denies the allegations in paragraph 157. Holcomb further denies that Cyrulnik ever conferred benefits on Holcomb personally and denies that he ever received any benefit indirectly. Holcomb never received compensation based on his equity stake in the Firm.

158.    Counterclaim-Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik. Indeed, Counterclaim-Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent that a response is required, Holcomb admits that the Firm knowingly and voluntarily accepted services and retained benefits from Cyrulnik, but otherwise denies the allegations in paragraph 158. Holcomb further denies that Cyrulnik ever conferred benefits on Holcomb personally and denies that he ever received any benefit indirectly. Holcomb never received compensation based on his equity stake in the Firm.

159.    The circumstances are such that it would be inequitable for Counterclaim-Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

**RESPONSE:** This paragraph states legal conclusions requiring no response. To the

extent a response is required, Holcomb denies that equity requires any payment from him to Cyrulnik. To the extent that Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

160.     Cyrulnik is entitled to damages as a result of Counterclaim-Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Counterclaim-Defendants from Cyrulnik.

**RESPONSE:** This paragraph states legal conclusions requiring no response. To the extent a response is required, Holcomb denies that equity requires any payment from him to Cyrulnik. To the extent that Cyrulnik's allegations are directed against other parties, no response is required from Holcomb.

161.     By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

**COUNT 9**
**(Promissory Estoppel)**
**(Third-Party Claim Against the Conspiring Partners)**

162.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 161 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

163.     The Conspiring Partners made a clear and unambiguous promise to pay Cyrulnik certain amounts and to remit to him interests in many assets – including but not limited to 25%

███████████████████ of all Tokens issued by the Startup Client (which value has exceeded

$400 million) and 27% of RCF's profits including from its contingency interests in various

litigations – and to impart to him certain control rights, along with several other assets the parties

listed. They did so to induce Cyrulnik to give up his long-standing equity partnership and other

lucrative opportunities and leverage his reputation, experience, and substantial practice to

cofound RCF.

　　　　**RESPONSE:** Holcomb refers to the MOU for its complete and accurate content and

otherwise denies the allegations in paragraph 163 to the extent they are directed against

Holcomb. To the extent paragraph 163 advances allegations against other parties, no response is

required from him.

　　　　164.　　Conspiring Partners Roche and Freedman made a clear and unambiguous promise

to pay Cyrulnik the amounts set forth in the Side Letter, including 25% of their interest in ██

████████████████████████ a $100 million jury award with which Freedman

publicly claimed he was "thrilled" (shortly before filing an appeal of the decision), and an

$850,000 cash payment to induce Cyrulnik to allow Roche to list his name before Cyrulnik's and

proceed with co-founding the Firm as RCF.

　　　　**RESPONSE:** Paragraph 164 contains legal conclusions and advances allegations against

other parties requiring no response from Holcomb.

　　　　165.　　Cyrulnik reasonably and foreseeably relied on the foregoing promises the

Conspiring Partners made by, among other things, leaving his lucrative practice at BSF,

foregoing the opportunity to work at various other law firms, and spending the next year

servicing clients at RCF.

　　　　**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb admits that it was his understanding that Cyrulnik relied

on the terms of the MOU in agreeing to launch RCF, and otherwise denies the allegations in

paragraph 165 to the extent they are directed at him. To the extent paragraph 165 advances

allegations against other parties, no response is required from Holcomb.

166.    The Conspiring Partners caused unconscionable injury to Cyrulnik by breaking

those promises, misappropriating the foregoing assets for their own benefit, and refusing to remit

his assets or honor the guaranteed rights he had been promised.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb denies that he caused injury to Cyrulnik or

misappropriated assets for his own benefit. To the extent Cyrulnik advances allegations against

other parties, no response is required from Holcomb.

167.    The Conspiring Partners' conduct, as described above, is outrageous, intentional,

malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the

extent a response is required, Holcomb denies participating in any conspiracy and denies that his

conduct was "outrageous, intentional, malicious, willful, and in blatant or reckless disregard of

Cyrulnik's rights" or that it is otherwise actionable. To the extent Cyrulnik advances allegations

against other parties, no response is required from Holcomb.

168.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners,

jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be

determined at trial, including the value of his equity interest in the Firm (inclusive of his equity

interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such

other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

**COUNT 10**
**(Civil Conspiracy)**
**(Third-Party Claim Against the Conspiring Partners)**

169.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 168 herein.

**RESPONSE:** Holcomb incorporates his responses to the corresponding paragraphs.

170.    The Conspiring Partners are parties to a civil conspiracy.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he is or was a party to a civil conspiracy. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb.

171.    The Conspiring Partners conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he conspired to commit unlawful acts by unlawful means. To the extent Cyrulnik advances allegations against other parties, no response is

67

required from Holcomb.

172.    Each of the Conspiring Partners committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he is or was a party to a civil conspiracy. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb.

173.    As a direct and proximate result of the Conspiring Partners' civil conspiracy, Cyrulnik has suffered damages.

**RESPONSE:** This paragraph contains legal conclusions requiring no response. To the extent a response is required, Holcomb denies that he is or was a party to a civil conspiracy and further denies that he caused Cyrulnik any damages. To the extent Cyrulnik advances allegations against other parties, no response is required from Holcomb.

174.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, and awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**RESPONSE:** This paragraph contains legal conclusions requiring no response.

## AFFIRMATIVE DEFENSES

By alleging the defenses set forth below, Holcomb does not agree or concede that he bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or

in part. Nor does Holcomb concede that such defenses are "affirmative defenses" under applicable law that must be pleaded to be preserved. To the extent inconsistent, such defenses are pled in the alternative.

## FIRST DEFENSE

Cyrulnik's claims are barred, in whole or in part, because he has failed to state a claim upon which relief may be granted.

## SECOND DEFENSE

Cyrulnik's claims are barred, in whole or in part, by the doctrines of promissory, judicial, and equitable estoppel.

## THIRD DEFENSE

Cyrulnik's claims are barred to the extent discovery demonstrates that he has unclean hands.

## FOURTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, to the extent discovery demonstrates that he was a faithless fiduciary or faithless servant doctrine.

## FIFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, to the extent discovery demonstrates that he engaged in fraudulent conduct.

## SIXTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the Firm was precluded by applicable ethical rules from using the trade name Roche Cyrulnik Freedman LLP during the relevant time period.

SEVENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because as applied to the facts of the case, it would be illegal for the Firm to continue using the trade name Roche Cyrulnik Freedman LLP during the relevant time period.

EIGHTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because Holcomb's actions were not the proximate cause of any injuries or damages.

NINTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, to the extent discovery demonstrates that his own acts and/or omissions caused or contributed to his alleged losses.

TENTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, by his failure to mitigate and the avoidable consequences doctrine.

ELEVENTH DEFENSE

To the extent that Cyrulnik is entitled to any damages (he is not), any such damages must be offset by any amount that Cyrulnik owes the Firm.

TWELFTH DEFENSE

Cyrulnik's claims are barred, in whole or in part, because the doctrine of election of remedies.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES AND RIGHTS

Holcomb gives notice that he intends to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserves his right to amend this Answer. In particular, Holcomb states that he has not had access to large parts of the record of this case, including the document productions, many of the deposition transcripts, or

70

the expert reports. Holcomb made repeated efforts of a period of several months to request the record from the Firm and from his prior counsel of record. Holcomb reserves the right to amend his Answer and Affirmative Defenses after he and his current counsel have received the full record of the case and had a reasonable opportunity to review it.

Dated: May 1, 2023                          QUINN EMANUEL URQUHART & SULLIVAN, LLP
       New York, New York

                                             /s/ Luke Nikas
                                            _____

                                            Luke Nikas
                                            51 Madison Avenue, 22nd Floor
                                            New York, New York 10010
                                            (212) 849-000
                                            lukenikas@quinnemanuel.com