**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE FREEDMAN LLP,<br><br>     Plaintiff,<br><br>v.<br><br>JASON CYRULNIK,<br><br>     Defendant. | Case No. 1:21-cv-01746 (JGK) |
| JASON CYRULNIK,<br><br>     Counterclaim-Plaintiff,<br><br>v.<br><br>ROCHE FREEDMAN LLP, KYLE ROCHE,<br>DEVIN FREEDMAN, AMOS FRIEDLAND,<br>NATHAN HOLCOMB, and EDWARD<br>NORMAND,<br><br>     Counterclaim-Defendants. | |

**PLAINTIFF AND COUNTERCLAIM-DEFENDANTS FREEDMAN, NORMAND,**
**FRIEDLAND, AND ROCHE'S MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................... 3

    A.    Roche and Freedman form Roche Freedman LLP and acquire Tokens. ............... 3

    B.    The parties agree in the MOU to a framework for founding a new law firm partnership ................................................................................ 4

    C.    The MOU's contingencies do not occur before Cyrulnik's removal. .................... 6

           1.    The parties never enter into the contemplated partnership agreement. ......... 6

           2.    Cyrulnik never performs work for the Startup Client. .................................. 7

           3.    The Counter-Defendants never collect on the ███████ final judgment. ....... 8

    D.    Cyrulnik is removed for cause. ............................................................... 8

ARGUMENT ....................................................................................... 9

I.    Cyrulnik's claims fail because they turn on an express condition precedent that was never satisfied. .................................................................................... 10

    A.    The MOU contained an express condition precedent that never occurred. .......... 10

    B.    Cyrulnik's failure to become an equity partner is fatal to all of his counterclaims. ...................................................................................... 13

II.    The MOU created a preliminary agreement to negotiate, for which Cyrulnik cannot recover any damages. ............................................................................. 13

    A.    The MOU is a Type II preliminary agreement. .................................... 14

           1.    The MOU's plain language shows an intent not to be bound. .................... 15

           2.    Any partial performance is insufficient to establish a Type I agreement. ... 19

           3.    The MOU does not reach agreement on all material terms. ....................... 20

           4.    Sophisticated law partnership agreements are typically reduced to a formal writing. ............................................................................... 23

    B.    Cyrulnik cannot prove cognizable damages under the MOU. ............................ 24

III.    Cyrulnik's claims fare no better even if the MOU were a Type I agreement because
        he was properly removed for cause. ................................................................. 25

        A.      Cyrulnik's termination meets the MOU's "for cause" standard. .......................... 25

                1.      Firm management was confronted with a barrage of complaints, making
                        any further working relationship untenable. ................................. 26

                2.      Cyrulnik's ethical violations constitute additional cause for his removal. ... 31

                3.      Cyrulnik's breach of the MOU constitutes further cause for his removal
                        and precludes his ability to enforce its terms. ............................. 32

                4.      Disputes about the Counter-Defendants' alleged "motives" are irrelevant. 33

        B.      The Withdrawal provision bars Cyrulnik from further recovery. ......................... 34

IV.     Cyrulnik's conversion claims fail. ................................................................... 37

V.      Cyrulnik's fiduciary duty claims fail. ............................................................... 39

VI.     Cyrulnik's civil conspiracy claims fail. ............................................................. 41

VII.    Cyrulnik's quasi-contract claims fail. ............................................................... 41

VIII.   Cyrulnik's implied covenant and accounting claims are duplicative and should be
        dismissed. ............................................................................................ 43

IX.     Cyrulnik cannot prove Counter-Defendants breached the Side Letter in regard to the
        ████ matter. ......................................................................................... 43

        CONCLUSION ........................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

*Adjustrite Sys. v. GAB Bus. Servs., Inc.*,
  145 F.3d 543 (2d Cir. 1998)............................................................................ passim

*Aldora Aluminum & Glass Prods., Inc. v. Poma Glass & Specialty Windows, Inc.*,
  2016 WL 3922938 (M.D. Fla. July 21, 2016) ............................................... 42

*Alter v. Bogoricin*,
  1997 WL 691332 (S.D.N.Y. Nov. 6, 1997) .................................................... 43

*Amica Mut. Ins. Co. v. Morowitz*,
  613 F. Supp. 2d 1358 (S.D. Fla. 2009) .......................................................... 43

*Appalachian Power Co. v. Wagman Heavy Civ., Inc.*,
  2019 WL 6188303 (W.D. Va. Nov. 20, 2019) ................................................ 10

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
  884 F.2d 69 (2d Cir. 1989)........................................................................ 16, 20

*Azure, LLC v. Figueras Seating U.S.A., Inc.*,
  2014 WL 11531792 (S.D. Fla. Apr. 22, 2014) .............................................. 43

*Baraliu v. Vinya Capital, LP*,
  765 F. Supp. 2d 289 (S.D.N.Y. 2011) ...................................................... 11, 12

*Baron v. Acosta Capital*,
  2017 WL 3084416 (S.D. Fla. July 19, 2017).............................................. 14, 40

*Barry v. James*,
  394 N.E.2d 55 (Ill. Ct. App. 1979) ............................................................... 11

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*,
  401 B.R. 598 (S.D.N.Y. 2009)................................................................... 21, 22

*Bedoyan v. Samra*,
  352 So. 3d 361 (Fla. DCA 2022) .................................................................. 43

*Berkery v. Pratt*,
  2008 WL 11409018 (S.D. Fla. Oct. 7, 2008), *R&R adopted*,
  2009 WL 10698261 (S.D. Fla. Feb. 24, 2009), *aff'd*,
  390 F. App'x 904 (11th Cir. 2010) ................................................. 14, 15, 18, 21

*Brennan v. Brennan Assocs.*,
  293 Conn. 60 (2009) ....................................................................................... 31

*Brown v. Cara,*
  420 F.3d 148 (2d Cir. 2005)............................................................................... passim

*Cambridge Cap. LLC v. Ruby Has LLC,*
  565 F. Supp. 3d 420 (S.D.N.Y. 2021) ...................................................................... 42

*CapLOC, LLC v. McCord,*
  2020 WL 1036044 (S.D.N.Y. Mar. 3, 2020) ............................................................. 24

*Capstone Asset Mgmt. Co., Ltd v. Dearborn Capital Grp. LLC,*
  2021 WL 4250087 (S.D.N.Y. Sept. 17, 2021)........................................................... 18

*Castaldi v. 39 Winfield Assocs.,*
  30 A.D.3d 458 (2d Dep't 2006) ................................................................................ 37

*Comprehensive Care Corp. v. RehabCare Corp.,*
  98 F.3d 1063 (8th Cir. 1996) .................................................................................... 11

*Creative Fin. Grp., Inc. v. Calvary Pentecostal Church, Inc.,*
  2016 WL 6582409 (N.Y. Cty. Sup. Ct. Nov. 02, 2016) ............................................ 32

*CSX Transp., Inc. v. Prof'l Transp., Inc.,*
  467 F. Supp. 2d 1333 (M.D. Fla. 2006)..................................................................... 24

*Daytree at Cortland Square, Inc. v. Walsh,*
  2022 WL 2345820 (2d Cir. June 29, 2022) ............................................................... 34

*Durso v. Baisch,*
  37 A.D.3d 646 (2d Dep't 2007) ................................................................................ 21

*Ehrlich v. Froehlich,*
  72 A.D.3d 1010 (2d Dep't 2010) .............................................................................. 39

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
  837 F. Supp. 2d 162 (S.D.N.Y. 2011) ...................................................................... 40

*Est. of Stine v. Chambanco, Inc.,*
  560 N.W.2d 424 (Neb. 1997)................................................................................... 10

*Fiorenti v. Cent. Emergency Physicians, PLLC.,*
  305 A.D.2d 453 (2d Dep't 2003) .............................................................................. 37

*Fitzpatrick v. Am. Int'l Grp., Inc.,*
  2013 WL 709048 (S.D.N.Y. Feb. 26, 2013).............................................................. 34

*Gas Natural, Inc. v. Iberdrola, S.A.,*
  33 F. Supp. 3d 373 (S.D.N.Y. 2014) ........................................................................ 42

*Gilbane Bldg. Co. v. Brisk Waterproofing Co.*,
    585 A.2d 248 (Md. Ap. 1991) ....................................................................... 11

*Giles v. Giles Land Co., LP*,
    279 P.3d 139 (Kan. Ct. App. 2012) ............................................................... 31

*Ginsberg v. Lennar Fla. Holdings, Inc.*,
    645 So. 2d 490 (Fla. DCA 1994) .................................................................. 37

*Golden v. Worldvision Enterprises, Inc.*,
    133 A.D.2d 50 (1st Dep't 1987) .................................................................... 26

*Goss v. E.S.I. Cases & Accessories, Inc.*,
    2020 WL 5817163 (S.D.N.Y. Sept. 29, 2020) ............................................... 25

*Gueye v. Evans*,
    2006 WL 3298427 (S.D.N.Y. Nov. 13, 2006) ............................................... 29

*Gutkowski v. Steinbrenner*,
    680 F. Supp. 2d 602 (S.D.N.Y. 2010) .......................................................... 21

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002) ........................................................................... 43

*Herman v. Duncan*,
    2019 WL 2137335 (S.D.N.Y. May 16, 2019) ........................................ 19, 20, 22

*ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*,
    2015 WL 5710947 (S.D.N.Y. Sept. 29, 2015), *aff'd*, 662 F. App'x 19 (2d Cir. 2016) ........... 42

*IDT Corp. v. Tyco Grp.*,
    13 N.Y.3d 209 (2009) ............................................................................ 14, 17

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993) ........................................................................... 37

*In re Nagel*,
    278 F. 105 (2d Cir. 1921) ............................................................................. 33

*In re Piazza*,
    719 F.3d 1253 (11th Cir. 2013) .................................................................... 25

*In re Tingle*,
    34 B.R. 676 (Bankr. S.D. Fla. 1983) ............................................................. 11

*In re Utnehmer*,
    499 B.R. 705 (B.A.P. 9th Cir. 2013) ............................................................. 11

*In re Utnehmer*,
  651 F. App'x 634 (9th Cir. 2016) ........................................................................ 11

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
  29 F.4th 118 (2d Cir. 2022) ............................................................................... 33

*Johnston v. Eichelberger*,
  13 Fla. 230 (1869) ............................................................................................. 11

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  52 N.Y.2d 105 (1981) ......................................................................................... 20

*Kerns, Inc. v. Wella Corp.*,
  114 F.3d 566 (6th Cir. 1997) ............................................................................. 33

*Komlossy v. Faruqi & Faruqi, LLP*,
  2017 WL 722033 (S.D.N.Y. Feb. 23, 2017), *aff'd*, 714 F. App'x 11 (2d Cir. 2017) .............. 38

*Lafarge N. Am., Inc. v. Matraco Colorado, Inc.*,
  2008 WL 2277503 (S.D. Fla. May 30, 2008) ........................................... 16, 19, 20

*Loengard v. Santa Fe Indus., Inc.*,
  70 N.Y.2d 262 (1987) ......................................................................................... 41

*Mayaguez S.A. v. Citibank, N.A.*,
  2022 WL 901627 (S.D.N.Y. Mar. 25, 2022) ...................................................... 42

*McCort v. ADCS Clinics, LLC*,
  2021 WL 8946696 (M.D. Fla. Oct. 12, 2021) .................................................... 33

*MLB Props., Inc. v. Opening Day Prods., Inc.*,
  385 F. Supp. 2d 256 (S.D.N.Y. 2005) ................................................................ 21

*Mootry v. Bethune-Cookman Univ., Inc.*,
  279 So. 3d 207 (Fla. 5th DCA 2019) ................................................................. 34

*Morrison v. Morrison*,
  247 So. 3d 604 (Fla. DCA 2018) ........................................................................ 35

*Morse v. Ted Cadillac, Inc.*,
  146 A.D.2d 756 (2d Dep't 1989) ........................................................................ 11

*Murphy v. Inst. of Int'l Educ.*,
  32 F.4th 146 (2d Cir. 2022) ............................................................................... 24

*Nelly de Vuyst, USA, Inc. v. Eur. Cosmetiques, Inc.*,
  2012 WL 246673 (S.D.N.Y. Jan. 6, 2012) ......................................................... 37

*Onex Food Servs., Inc. v. Grieser*,
    1996 WL 103975 (S.D.N.Y. Mar. 11, 1996) ........................................................... 32

*Orellana v. Reiss Wholesale Hardware Co., Inc.*,
    2016 WL 4480720 (E.D.N.Y. June 8, 2016), *R&R adopted*,
    2016 WL 4480962 (E.D.N.Y. Aug. 23, 2016) ........................................................ 30

*Paraka v. Univ. of Rochester*,
    136 F. Supp. 3d 481 (W.D.N.Y. 2015) .................................................................. 41

*Prince-Vamos v. Winkler Real Estate, Inc.*,
    140 A.D.3d 1043 (2d Dep't 2016) ......................................................................... 34

*Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*,
    23 A.D.3d 213 (1st Dep't 2005) ............................................................................ 41

*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc.*,
    2020 WL 9214290 (S.D.N.Y. Nov. 4, 2020), *R&R adopted*,
    2021 WL 1425355 (S.D.N.Y. Apr. 15, 2021) ................................................. 16, 23

*Rikhy v. AMC Comput. Corp.*,
    2003 WL 1618529 (S.D.N.Y. Mar. 28, 2003) ....................................................... 30

*Roth Law Firm v. Sands*,
    2010 WL 3800683 (N.Y. Cty. Sup. March 31, 2010) ........................................... 32

*RSSM CPA LLP v. Bell*,
    2017 WL 77030 (N.Y. Cty. Sup. Ct. Jan. 06, 2017) ............................................. 32

*S.A.F., S.A. v. Ryder Int'l, Inc.*,
    2007 WL 628133 (S.D. Fla. Feb. 26, 2007) .................................................... 16, 22

*Sargeant v. Maroil Trading Inc.*,
    2018 WL 3031841 (S.D. Fla. May 30, 2018) ........................................................ 41

*Selinger Enters., Inc. v. Cassuto*,
    50 A.D.3d 766 (2d Dep't 2008) ............................................................................. 38

*Sines v. Opportunities For Broome, Inc.*,
    156 A.D.2d 878 (3d Dep't 1989) ..................................................................... 26, 30

*Sivin v. Jones*,
    138 Misc. 234 (NY Cty. Sup. Ct. 1930) ................................................................ 39

*Spurlin v. Sch. Bd. of Sarasota Cty.*,
    520 So. 2d 294 (Fla. DCA 1988) .......................................................................... 25

*Stanacard, LLC v. Rubard, LLC*,
  2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) ........................................................... 25

*StarVest Partners II, LP v. Emportal, Inc.*,
  101 A.D.3d 610 (1st Dep't 2012) ....................................................................... 42

*Sugar Cane Growers Co-op of Fla., Inc. v. Pinnock*,
  735 So. 2d 530 (Fla. 4th DCA 1999) .................................................................. 36

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
  2011 WL 13305367 (E.D.N.Y. May 13, 2011) .................................................... 39

*Tradewinds Airlines, Inc. v. Soros*,
  2009 WL 1321695 (S.D.N.Y. May 12, 2009) ....................................................... 36

*Trans World Airlines, Inc. v. Beaty*,
  402 F. Supp. 652 (S.D.N.Y. 1975) ...................................................................... 25

*Transcience Corp. v. Big Time Toys, LLC*,
  50 F. Supp. 3d 441 (S.D.N.Y. 2014) ................................................................... 37

*Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*,
  43 F. Supp. 3d 236 (S.D.N.Y. 2014) ................................................................... 40

*Velez v. Mitchell*,
  211 A.D.3d 415 (1st Dep't 2022) ....................................................................... 22

*Wall v. CSX Transp., Inc.*,
  471 F.3d 410 (2d Cir. 2006) ............................................................................... 10

*Walton v. Lake-Sumter State Coll.*,
  2023 WL 2938525 (Fla. DCA Apr. 14, 2023) ...................................................... 25

*Warnick v. Warnick*,
  2003 WY 113 (2003) .......................................................................................... 31

*Welland v. Citigroup, Inc.*,
  2003 WL 22973574 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 F. App'x 321 (2d Cir. 2004)......... 26

*White Constr. Co., Inc. v. Martin Marietta Materials, Inc.*,
  633 F. Supp. 2d 1302 (M.D. Fla. 2009) .............................................................. 17

*Zirvi v. Flatley*,
  433 F. Supp. 3d 448 (S.D.N.Y.), *aff'd,* 838 F. App'x 582 (2d Cir. 2020).............................. 41

**Other Authorities**

Williston on Contracts (4th ed.) ............................................................................ 11, 34

22 N.Y.C.R.R. 1215.1 ................................................................................................ 32

Fla. Rule 4-1.5(g) ..................................................................................................... 36

Fla. Stat. §110.227 .................................................................................................... 26

Fla. Stat. §620.8403 .................................................................................................. 13

Fla. Stat. §620.8404 .............................................................................................. 40, 41

Fla. Stat. §620.8405 .................................................................................................. 13

Fla. Stat. §620.8601 .......................................................................................... 31, 33, 35

Fla. Stat. §620.8603 .................................................................................................. 35

Fla. Stat. §620.8701 ............................................................................................. 13, 35

Fla. Stat. §620.8801 .................................................................................................. 13

NY Rule 1.5 ......................................................................................................... 32, 36

**INTRODUCTION**

This case has a long backstory but remains, at base, a contract dispute.  As such, it can be resolved on summary judgment. It arises from the termination of Defendant Jason Cyrulnik's employment as an attorney affiliated with Plaintiff Roche Freedman LLP ("RF"), a law firm founded by Counter-Defendants Kyle Roche and Devin Freedman. It is undisputed that during the thirteen months Cyrulnik worked at the firm, he was paid millions of dollars for his work and the matters he generated. Cyrulnik claims he is owed more, based solely on his interpretation of two agreements between the parties: a Memorandum of Understanding ("MOU") signed by all individual parties in December 2019, and a Side Letter signed by Roche, Freedman, and Cyrulnik in January 2020. Application of the plain and unambiguous terms of these documents defeats Cyrulnik's claims.

The MOU contained an express condition precedent that had to be satisfied before any of its signatories, including Cyrulnik, could claim entitlement to any of the benefits contemplated therein: namely, a partnership agreement, governing the rights and obligations of the signatories, had to be signed. It is undisputed that such an agreement, though the subject of ongoing discussion, was never fully negotiated, let alone executed. In his counterclaims, Cyrulnik is claiming rights contingent upon satisfaction of that condition precedent, even though it never occurred. His counterclaims can be disposed of on that ground alone.

Further examination of the MOU makes it abundantly clear that the MOU does not create any specific obligations of the type Cyrulnik seeks to enforce here. By its plain terms, the MOU is an incomplete document that expressly recognizes the parties' intent to negotiate various remaining open terms. It is not a definitive or final agreement. Under the standard rubrics used to categorize preliminary non-final agreements under New York law, it is a "Type II" agreement. As

such, it binds the parties to negotiate in good faith toward a final agreement, but, absent final agreement on all terms recognized to require negotiation, no individual term is enforceable. This principle is based on the recognition that any term can change as negotiations continue. Cyrulnik's counterclaims attempt to shortcut that process by cherry-picking individual proposed terms even though other open terms remained to be negotiated and were being negotiated. Cyrulnik's counterclaims fail not only because they depend on a final partnership agreement that was never signed, but also because the MOU, which anticipated that further agreement, creates no specific binding obligations in its own right, other than the obligation to negotiate in good faith.

Put another way, Cyrulnik asks this Court to deem the parties to have entered a partnership even though the terms of that partnership were never decided or formally consummated, and even though the parties did not intend to be bound in such circumstances. Worse yet, because Cyrulnik seeks either a buyout of his purported equity share or dissolution, Cyrulnik further asks this Court to hypothesize what assets *might* have been included in this unfinished partnership so that they can be liquidated for his benefit. But the law does not allow one party to an unsuccessful negotiation to impose its preferred contractual terms after the fact to the detriment of the other parties.

With respect to the question of Cyrulnik's termination, Cyrulnik wrongly claims that it should be adjudged according to the "for cause" standard set forth in the MOU. As noted, individual terms of the MOU's preliminary framework are unenforceable. In any event, no rational fact-finder could conclude that Counter-Defendants lacked cause to remove Cyrulnik. There were numerous reports of what was perceived as his abusive and inappropriate behavior, accompanied by statements of attorneys in all ranks of the firm that they would consider leaving if Cyrulnik remained. Cyrulnik may seek to vindicate his conduct, but he cannot deny that such reports were made and that such sentiment existed at the time of his departure. Such circumstances constitute

2

cause and easily justify Cyrulnik's removal. Cyrulnik cannot genuinely claim there was no legitimate basis to remove him.

Cyrulnik's counterclaims seek damages based on purported contractual entitlements to equity, ongoing compensation, and significant assets in the form of cryptocurrency "tokens," even though he is no longer affiliated with RF and now works at his own separate firm.  RF seeks a declaratory judgment that Cyrulnik was lawfully removed.  Summary judgment should be granted against Cyrulnik, and in favor of RF and all individual Counter-Defendants.

## STATEMENT OF UNDISPUTED FACTS

Although the parties deeply contest aspects of the events underlying this action, the following is undisputed:

### A.   Roche and Freedman form Roche Freedman LLP and acquire Tokens.

In July 2019, Kyle Roche and Devin "Velvel" Freedman left Boies Schiller Flexner LLP ("BSF") and founded a partnership called Roche Freedman LLP ("RF"). *Statement of Undisputed Material Facts* (cited herein as "¶X") ¶1. They executed a partnership agreement that divided equity 50/50. *Id.*

On September 30, 2019, a technology startup ("Startup") retained RF for their expertise in cryptocurrency. ¶96. Startup initially agreed to pay RF certain future "Token Distributions" in return for ███████████████ over four years. *Id.* As detailed below (*infra* §IV,) Startup restructured the deal a few days later so that Roche and Freedman, RF's two equity partners, would personally acquire the Tokens. ¶97. Twenty-five percent of the Tokens "vested" on September 30, 2019, with the balance to vest over three years while Roche and Freedman provided services. ¶¶96, 102. Startup and RF each retained the right to terminate RF's representation at any time, which would (i) stop any remaining Tokens from vesting and (ii) terminate RF's provision of legal services. ¶96. All of this transpired well before Cyrulnik joined RF.

B.   The Parties agree in the MOU to a framework for founding a new law firm
     partnership.

Months after Roche and Freedman formed RF, they began negotiating with Friedland,

Holcomb, Normand and Cyrulnik (the "incoming lawyers"), all then working at BSF, about

working together. ¶2. The discussions led to an MOU executed on December 27, 2019. ¶9. Per the

MOU, the incoming lawyers agreed they would not join RF as equity partners, but instead would

form a new law-firm partnership where all six would be equity partners. (Ex.21 ("MOU") §I-II;

*see also* ¶6-7 (Cyrulnik, testifying he never considered "joining" RF and always intended to "co-

found" a new firm)). Indeed, Cyrulnik edited early versions of the MOU to clarify that the

incoming lawyers intended to form a new law-firm partnership.[1] ¶5.

Consistent with the understanding that a new partnership would be formed, the MOU calls

all of its signatories "Founding Partners," repeatedly distinguishes between RF (the existing firm)

and RCF (the contemplated firm), and expressly contemplates that RF would eventually be

"merged into" the new firm. (MOU §§II, IV). Importantly, the MOU provides that the new

partnership would not be formed unless and until the parties signed a "formal Partnership

Agreement."  (MOU §§I-II). It expressly states that no equity would issue to its signatories until

"after" execution of such an Agreement. (MOU §II).

Over the next 13 months, the parties discussed but were unable to agree upon the

anticipated partnership agreement. In the interim, all worked for RF, doing business as RCF LLP

pursuant to a simple name change filed in anticipation of the eventual consummation of the

---

[1] The Side Letter to the MOU, which Cyrulnik executed on January 22, 2020, also distinguishes

between RF and RCF, further demonstrating he considered the two entities separate. Ex.29

("should Roche, Freedman, Roche Freedman LLP, or RCF be entitled…").

required partnership agreement and expected merger. The MOU refers to cases Cyrulnik planned to bring with him as "Roche Freedman LLP's cases," while recognizing he would be compensated for his role in originating them. (MOU §V).

The plain language of the MOU and its exhibits make clear that although the MOU provided a provisional framework for an anticipated partnership agreement, key terms remained subject to further negotiation. For example, under the header "Purpose," the MOU states that its terms "are not comprehensive and additional terms, including further clarification and areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement," which was "to be negotiated." (MOU §I). The MOU's compensation "Proposal" states that it lays out "the general framework we plan to use going forward," but "the specific percentages contemplated in this proposal are still subject to further review." (MOU Ex.C n.1). Similarly, the MOU leaves open how to distribute various RF assets, simply stating it will be done "in connection with the Partnership Agreement." (MOU §IV).

The MOU contemplated that, following execution of the anticipated partnership agreement, certain Tokens would be allocated to the signatories, with a larger distribution to Roche, Freedman, and Cyrulnik because they were "the only partners expected to bill to the [Startup] matter." (MOU §IV.B). That allocation was not inviolate; rather, the MOU provided the new partnership could reallocate Tokens if "further partner resources are required." *Id.*

Cyrulnik's claims assume that the MOU forms a binding, self-effectuating agreement that automatically granted him partnership rights. The MOU's plain text says otherwise, specifically stating that it expressed only the signatories' "intent to form a partnership," rather than forming the partnership itself. Nonetheless, Cyrulnik relies on two provisions of the MOU as if they have binding force: *First*, Section VI.G proposes that "A Founding Partner cannot be removed without

5

cause," as determined by a 2/3 vote of RCF's equity partners. *Second*, Section VI.C proposes that "If any Partner withdraws from the firm within 18 months from [RCF's] formation," that person receives only the amount owed under the compensation formula and forfeits their equity.

After the MOU was finalized, Roche, Freedman, and Cyrulnik executed the Side Letter. It provides that Roche will pay Cyrulnik and Freedman in four installments for the privilege of being listed first in the name of the contemplated new firm (RCF), although such payments would be forfeited if either recipient is "terminated for cause" before a payment is due. Ex.29. It also allocates compensation for any contingent recovery in ███████████, one of RF's high-profile cases. *Id.*

C.      The MOU's contingencies do not occur before Cyrulnik's removal.

    *1.   The parties never enter into the contemplated partnership agreement.*

After the MOU's execution, the Founding Partners began, as promised, "to work towards the finalization of the Partnership Agreement." (MOU §I). Consistent with the spirit of cooperation and other aspirations set forth in the MOU, Roche and Freedman changed the name associated with Roche Freedman's LLP registration to "Roche Cyrulnik Freedman LLP" (but not to the general partnership itself) so they could begin earning goodwill under the anticipated new firm's name. ¶¶20-21. Because the MOU provided the "Partnership Agreement" would be "made effective" retroactive to January 1, 2020, the MOU's signatories referred to each other as equity partners. ¶10. It is undisputed, however, that notwithstanding over a year of negotiations, the MOU's signatories were unable to agree on the terms of a final partnership agreement. ¶¶31-32.

In deposition, Cyrulnik admitted the MOU envisioned the parties would prepare a "long-form" partnership agreement, which was "supposed to be executed after January 1st, 2020, but made effective as of January 1st, 2020." ¶10. It is likewise undisputed that terms which would be material to any such agreement, such as partner compensation, were never finalized for purposes

of the partnership agreement, as evidenced by Cyrulnik's continued efforts to negotiate the terms of partner compensation for months after the MOU was executed. ¶¶22-24.

The need to negotiate and finalize a partnership agreement remained an active topic of discussion among the MOU's signatories. For example, in July 2020, six months after execution of the MOU, Holcomb emailed its signatories about getting the "definitive partnership agreement" in place. ¶26. Holcomb subsequently suggested hiring an attorney specializing in partnership law to draft an agreement that would properly account for complexities, including "tax consequences" for the parties. ¶27. On August 26, 2020, Cyrulnik, continuing to press for additional compensation, acknowledged to the other signatories that "[w]e are all working through a comp model that is innovative," in addition to recognizing other open governance issues. ¶28. Later that day Friedland identified a law firm to draft the partnership agreement. ¶29. On September 16, 2020, Roche suggested proceeding with the firm Friedland identified, but then asked Friedland to hold off because Cyrulnik wanted to get a competing quote from another firm. Roche then sent an invite to discuss "moving forward on partnership agreement." *Id.* In November 2020, another attorney at RF circulated a thirty-one-page draft partnership agreement from another firm, to facilitate the execution of a partnership agreement, and encouraged the parties to try to reach a final agreement "within the first year" of their collaboration. ¶30. Nonetheless, more than a year after the MOU was signed, the parties were still trying to reach an agreement on compensation and complete a final partnership agreement. ¶31.

### 2. *Cyrulnik never performs work for the Startup Client.*

It is undisputed that although the MOU noted Cyrulnik was "expected to bill" to Startup's matters (MOU §IV.B), he never did so, while Roche, Freedman and other attorneys did, and continued to do so after Cyrulnik's removal. ¶¶106-108.

   *3. The Counter-Defendants never collect on the* ███████ *final judgment.*

Neither RF nor its attorneys have ever collected on the final, $143 million judgment in

███████ . ¶19.

  D. <u>Cyrulnik is removed for cause.</u>

It is undisputed that on February 10, 2021, Counter-Defendants unanimously voted to remove Cyrulnik for cause. ¶92. Cyrulnik may have a different view of the events leading up to that decision and how they should have been handled, but he cannot dispute that, in the months prior to the vote, Counter-Defendants received numerous complaints about Cyrulnik's conduct from both associates and partners who threatened to leave the firm rather than continue working with Cyrulnik. ¶¶46-47, 50-54, 57-59, 63-65, 69, 70-72, 77-81. The majority of the firm's New York-based associates complained that Cyrulnik behaved in ways that were perceived to be sexist, racist, and extraordinarily disrespectful of associates' time and personal lives. ¶¶46-47, 50-54, 57-59, 63-65, 69. Senior attorneys Roche, Freedman, Holcomb, and Eskovitz were alarmed by separate instances in which Cyrulnik violently screamed at them. ¶¶33-40, 73-75. Counter-Defendants reasonably concluded that if Cyrulnik remained, RF was at risk of a mass exodus. ¶¶70-72, 77-81. In short, it is undisputed that RF had a good basis to believe Cyrulnik had become a polarizing and controversial figure, and his continued affiliation with RF was perceived as threatening RF's continued viability.

In January 2021, Counter-Defendants called a meeting to deal with the crisis. ¶¶87-88. In preparing for that meeting, they discovered (i) Cyrulnik had not obtained engagement letters from many of his largest clients, ¶¶82-84; and (ii) Cyrulnik had violated the MOU's framework by filing a new case without new matter committee approval. ¶¶84-85.

On February 8, Counter-Defendants met to discuss issues surrounding Cyrulnik. ¶89. The meeting lasted hours and was adjourned so the parties could further consider their decision. ¶¶90-

91. On February 10, Counter-Defendants met again and unanimously voted to remove Cyrulnik for cause. ¶92. They informed him on February 12. ¶93.

On February 27, 2021, Plaintiff RF initiated this lawsuit, seeking only a declaratory judgment that Cyrulnik was properly removed. (Dkt.1).[2] On February 25, 2022, Cyrulnik answered and filed a litany of counterclaims against RF and the individual Counter-Defendants, including: dissolution, a buyout, and an accounting under Florida partnership law (Counts 1-3); breach of contract and breach of the implied covenant of good faith and fair dealing (Counts 4-5); breach of fiduciary duty (Count 6); conversion (Count 7); unjust enrichment (Count 8); promissory estoppel (Count 9); and civil conspiracy (Count 10). (Dkts.62, 72). But there is no claim Cyrulnik was not compensated for the work he did between execution of the MOU and his termination; his pay for those 13 months, ███████, was consistent with RF's existing compensation policies. ¶¶14-15. Cyrulnik is now pressing for more. He seeks to be paid for "equity" in a partnership that never came to be, and instead has named the 2019 entity he expressly chose ***not*** to join as the party responsible to buyout his "equity."

## ARGUMENT

Cyrulnik's various claims are all derivative of his contract claims, based on the MOU and a related Side Letter he executed with Roche and Freedman. (Dkt.72, Cyrulnik Counterclaims ("CC") ¶¶127-29). Cyrulnik does his best to convert the incomplete and preliminary framework set out in the MOU into a final partnership agreement, but his arguments and claims cannot be squared with the plain text of the MOU. All of his counterclaims fail.

---

[2] In its amended complaint, Plaintiff also alleged breach of fiduciary duty and intentional interference claims against Cyrulnik (Dkt.31); however, Plaintiff does not seek summary judgment on those claims.

Although the MOU has no choice of law provision, the Court should apply New York law. All but two signatories reside in New York and executed the MOU in New York, all were barred to practice law in New York, the "main" law office was in New York, the Counter-Defendants' meeting to discuss Cyrulnik occurred in New York, and a substantial amount of the parties' business was done in New York. ¶¶1, 11-13, 88. Finally, because there is no relevant conflict between New York and Florida law, it is appropriate to apply New York law. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006) ("As there is no conflict,…for ease of administrating the case, New York, as the forum state, would apply its law.").

## I.     Cyrulnik's claims fail because they turn on an express condition precedent that was never satisfied.

### A.     The MOU contained an express condition precedent that never occurred.

Cyrulnik's claims are all premised on the assumption that, by virtue of the MOU, he attained equity partner status and rights that entitle him to the damages he seeks. But the MOU did not create a partnership. It *anticipated* one. The entitlements it envisioned were all contingent on the execution of a partnership agreement, which never occurred.

The MOU contains a classic condition precedent. It states that the "Founding Partners," rather than obtaining rights in an existing law firm partnership (RF), will obtain rights only through the creation of a new firm. And it provides only "[a]fter execution of the Partnership Agreement, and effective January 2020, the equity division in the [new] Firm will be" issued. (MOU §II).

There can be no genuine dispute that the use of the word "after" creates a condition precedent. Courts in many jurisdictions uniformly recognize that the word "after" indicates an intent to declare and set a condition precedent. *See, e.g.*, *Appalachian Power Co. v. Wagman Heavy Civ., Inc.*, 2019 WL 6188303, at *4 (W.D. Va. Nov. 20, 2019); *Est. of Stine v. Chambanco, Inc.*, 560 N.W.2d 424, 429 (Neb. 1997); *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063,

1066 (8th Cir. 1996); *Gilbane Bldg. Co. v. Brisk Waterproofing Co.*, 585 A.2d 248, 251 (Md. Ap.

1991); *accord* 13 Williston on Contracts §38:16 (4th ed.) ("after" signals condition precedent).[3]

Similarly, there is no dispute the MOU's condition precedent was never met. No partnership

agreement was executed; no equity in any new firm issued at any point before Cyrulnik's removal;

and RF never "merged" into any new firm.

"It is a basic tenet of contract law that before liability can arise on a promise qualified by

conditions expressed or implied in fact, such conditions must be fulfilled." *Morse v. Ted Cadillac,

Inc.*, 146 A.D.2d 756 (2d Dep't 1989)). The same rule applies to partnerships: "no legal partnership

exists if a condition precedent set and agreed by the parties has not occurred." *In re Tingle*, 34 B.R.

676, 677 (Bankr. S.D. Fla. 1983); *Johnston v. Eichelberger*, 13 Fla. 230, 248-50 (1869) (no

partnership ever existed for failure to satisfy condition precedent); *Baraliu v. Vinya Capital, LP*,

765 F. Supp. 2d 289, 299-300 (S.D.N.Y. 2011) (same, under New York law).

It is similarly well-established that parties can agree the execution of a partnership

agreement will itself constitute a condition precedent to the formation of a partnership—just as

they did here. *See, e.g.*, *In re Utnehmer*, 499 B.R. 705 (B.A.P. 9th Cir. 2013), *rev'd on other

grounds*, 651 F. App'x 634 (9th Cir. 2016) (agreement that equity would vest "upon the execution

of a formal operating agreement" did not create a partnership because of "the rule that an

agreement to form a partnership in the future, upon fulfillment of a contingency, does not, at the

time of entry of the agreement, create a partnership"); *Barry v. James*, 394 N.E.2d 55, 56 (Ill. Ct.

App. 1979) (finding on summary judgment that correspondence anticipating payment "as soon as

a partnership agreement can be drawn and signed" created condition precedent even though

plaintiff asserted "the parties had agreed on the terms of the partnership and that the partnership

---

[3] Unless noted, all quotation marks, citations, and alterations are omitted from cited authorities.

went into operation").

In *Baraliu,* for example, an agreement provided the plaintiff "would receive a 2.5% ownership stake...upon his execution and delivery of the Limited Partnership Agreement." 765 F. Supp 2d at 300. The Court held this language "makes it clear that Baraliu's grant of ownership" would take effect "only upon his completion of [that] express condition—execution and delivery of the [limited partnership] agreement." *Id.* Because Baraliu never executed that agreement, he "did not perform a condition precedent to receipt of his 2.5% ownership grant." The Court accordingly dismissed his ownership claim on summary judgment. *Id.* at 300–01. Just as in *Baraliu*, Cyrulnik never executed the partnership agreement that was a condition precedent to the formation of a new firm partnership and distribution of equity in it, and thus he never had a right to any ownership stake.

Given the MOU's express and unambiguous language, the Court should not look to parol evidence. *See* Fed. R. Civ. P. 56(c)(2). Regardless, the undisputed record makes clear that it was *Cyrulnik* who (i) struck language in drafts of the MOU contemplating that RF would simply be "renamed" Roche Cyrulnik Freedman, (ii) struck language stating RF was a law firm "to which the Partners are now joining," and (iii) added the requirement that RF would be "merged into" the new firm. ¶5. Indeed, at his deposition, Cyrulnik repeatedly insisted he had only agreed to become the *founder* of a new firm, not to obtain partnership rights in a firm that preceded his joinder. ¶6. It is similarly undisputed that, consistent with the MOU, the parties continued to recognize the need for the partnership agreement throughout Cyrulnik's time at RF. ¶¶25-27, 29.

Cyrulnik may point to parol evidence that the LLP name was changed to include his name and that he was held out as a "partner" of the firm and referred to, at times, as an equity partner or owner. That fact is wholly consistent with the parties' intent to make the anticipated new

partnership agreement retroactively "effective" back to January 1, 2020. (MOU §§I-II). Cyrulnik admits this retroactive effect in his deposition testimony. (¶10 ("the partnership agreement was supposed to be executed after January 1st, 2020, but made effective as of January 1, 2020.")). Moreover, the use of such nomenclature cannot override the plain language of the parties' agreement, which indisputably conditioned the distribution of equity on the completion of a partnership agreement.

      B.    <u>Cyrulnik's failure to become an equity partner is fatal to all of his counterclaims.</u>

Cyrulnik's statutory claims for dissolution, buyout, and accounting all assume he had attained the rights of an equity partner, which, by failure of his satisfaction of a condition precedent, he had not. *See* Fla. Stat. §§620.8403, 620.8405(2), 8801(5), 620.8701 (discussing rights and causes of actions that accrue to "partners"). All the material MOU provisions he invokes are premised on the notion that he should be treated as an equity holder in a new partnership that, absent the contemplated partnership agreement, had yet to be formed. (MOU §§VI.C, F, G, N). In the same vein, Cyrulnik has no independent entitlement to the Tokens or RF's assets unless his anticipated equity-partner status came to fruition. Since it did not, Cyrulnik's claims for breach of fiduciary duty, conversion, and civil conspiracy also fail.

**II.    The MOU created a preliminary agreement to negotiate, for which Cyrulnik cannot recover any damages.**

Setting aside Cyrulnik's failure to satisfy a clear condition precedent, his claims for Tokens, equity, contingency fees, and other assets fail for a separate and independent reason: the MOU is just a framework for future negotiations; it does not give rise to any specific enforceable entitlements.

The MOU states its terms "are not comprehensive," that "additional terms" and "further clarification" are needed and must still "be negotiated," that its compensation proposals are "not

final" and "subject to further review," and that a full list of assets excluded from assignment to the partnership would be "prepared in connection with the Partnership Agreement." (MOU §§I, III, IV, Ex. C. n.1). It expressly states the parties need to enter into a "definitive partnership agreement," delays distribution of equity until after that agreement's execution and commits the parties to "work together" in "good faith" "towards the finalization of the Partnership Agreement." (*Id.* §§I, II).

Under traditional principles of contract interpretation, the proposed terms of such a manifestly incomplete agreement are not binding. That is because a preliminary agreement, just like any other, "is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 214 (2009). Courts routinely find, as a matter of law, there is no intent to be bound by an agreement which—like the MOU—"contemplated the negotiation of later agreements" or expressly indicates that its terms are not final. *Id.* at 213 n.2. "There is a strong presumption against finding binding obligation in agreements which," like the MOU, "include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005); *see also Baron v. Acosta Capital*, 2017 WL 3084416, at *4 (S.D. Fla. July 19, 2017) (contract unenforceable where "essential terms...remain open, subject to future negotiation"); *Berkery v. Pratt*, 2008 WL 11409018, at *3 (S.D. Fla. Oct. 7, 2008), *R&R adopted*, 2009 WL 10698261 (S.D. Fla. Feb. 24, 2009), *aff'd*, 390 F. App'x 904 (11th Cir. 2010) (it is "difficult for a party to parlay a letter of intent as the end agreement" because it "does not reflect a complete and final agreement over the object of negotiation").

A.    The MOU is a Type II preliminary agreement.

Federal courts applying New York law have crystalized these principles of contract interpretation into the rubric of "Type I" and "Type II" preliminary agreements. Type I agreements

are fully binding and preliminary in name only, while Type II agreements "do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith..." *Brown*, 420 F.3d at 154. Thus, a Type I agreement must be "complete" such that the parties have agreed on "all the issues perceived to require negotiation," whereas a Type II agreement merely "reflect[s] agreement on certain major terms, but leav[es] other terms open for further negotiation." *Id.* at 153-54.[4] As explained below, far from being "complete" or reflecting agreement on "all the issues perceived to require negotiation," the MOU expressly states its terms "are *not* comprehensive" and that "*additional terms*" would need "to be *negotiated*." (MOU § I) (emphasis added).

Four factors are relevant to determining whether a preliminary agreement is Type I or II: (1) whether the language of the agreement shows an intent to be bound; (2) whether there has been partial performance; (3) the existence of open material terms; and (4) the necessity of putting the agreement in final form as indicated by the customary form of such transactions. *See Brown*, 420 F.3d at 154-55. The plain language of the MOU demonstrates that at least three factors, including the first and most important one, cut strongly against finding the MOU is Type I. Because the parties' intention to create a Type II agreement "is determinable by written agreements, the question is one of law, appropriately decided on a motion for summary judgment." *Id.* at 153. Consequently, summary judgment is appropriate here.

### 1. The MOU's plain language shows an intent not to be bound.

"The first factor, which is frequently the most important, requires the Court to determine whether the language of the contract discloses an intention by the parties to be bound to the

---

[4] Florida law similarly recognizes a preliminary agreement "can establish parameters for continued negotiations such as the obligation of good faith bargaining." *Berkery*, 2008 WL 11409018, at *3.

ultimate objective." *Brown*, 420 F.3d at 154.[5]. No specific words or disavowals are necessary to satisfy this requirement: the mere fact that the agreement's language is "non-committal" can suffice to show an intent not to be bound to the ultimate goal. *Brown*, 420 F.3d at 154-55. And where, as here, the language of the MOU is clear that the parties did not intend to be bound, the Court "need look no further" to determine the absence of a Type I agreement. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). The first factor is easily satisfied here.

*First*, it is apparent from the face of the MOU that the parties eschewed any final commitment and expressly confirmed that the terms of their anticipated partnership would continue "to be negotiated" until the parties arrived at and executed a final definitive agreement. (MOU §1). That the MOU "explicitly contemplated the execution of a long-form" agreement "counsels against a Type I finding." *Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc.*, 2020 WL 9214290, at *5 (S.D.N.Y. Nov. 4, 2020), *R&R adopted*, 2021 WL 1425355 (S.D.N.Y. Apr. 15, 2021). Indeed, it creates a "strong presumption against" such a finding. *Brown*, 420 F.3d at 154; *see S.A.F., S.A. v. Ryder Int'l, Inc.*, 2007 WL 628133, at *2-3 (S.D. Fla. Feb. 26, 2007) (no binding agreement where language "contemplate[d] the need for additional negotiation of the terms to be incorporated" in "final form of the agreement"); *Lafarge*, 2008 WL 2277503, at *5 (same, where language made "clear that the parties contemplated future negotiations leading to a formal written contract").

---

[5] *See Lafarge N. Am., Inc. v. Matraco Colorado, Inc.*, 2008 WL 2277503, at *5 (S.D. Fla. May 30, 2008) (no enforceable agreement where letter of intent expressed an "intent not to be bound in the absence of a written formal agreement").

*Second*, the plain language of the MOU demonstrates that, in addition to anticipating a separate long-form agreement, the parties did not intend to be fully bound *until after* such a formal instrument was negotiated and executed. (MOU §II; *see supra* §I). This express contingency "strongly supports" the conclusion that the MOU is not a Type I agreement. *Adjustrite Sys. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549-50 (2d Cir. 1998) (first factor "strongly supports" non-Type I finding, where agreement "was expressly contingent, at least in part, 'upon the execution of a sales agreement contract'"); *IDT Corp.*, 13 N.Y.3d at  213 n.1 (preliminary agreement unenforceable because it "contemplated the negotiation of later agreements" which would be "a precondition to a party's performance"); *White Constr. Co., Inc. v. Martin Marietta Materials, Inc.*, 633 F. Supp. 2d 1302, 1320-22 (M.D. Fla. 2009) (agreement conditioned on, *inter alia*, execution of "more detailed 'definitive contract'" was not binding). Indeed, granting Cyrulnik equity and rights without the protections of a partnership agreement, for which the Counter-Defendants expressly negotiated, would "trap[] the parties in surprise contractual obligations they never intended," violating a "core" policy concern applicable "to preliminary agreements." *Brown*, 420 F.3d at 156-57.

*Third*, the MOU is littered with non-committal language that merely reflects the parties' expectations of what they hope will occur in the future. The MOU's first sentence expressly states it only "establishes the *intent to form* a partnership," not that it establishes a partnership on execution. (MOU §I (emphasis added).) It further provides that "the Founding Partners agree *to work together* and co-operate in good faith...*to develop* the Firm and to work toward the finalization of the Partnership Agreement." (MOU §§I, II (emphases added).) Confronted with remarkably similar language in *Brown*—where the MOU proposed "to 'outline the terms under which [the parties] will *work together to develop*" a new venture and anticipated "entrance 'into a

17

formal contract,'"—the Second Circuit affirmed a partial summary judgment order finding the MOU was not a Type I agreement. 420 F.3d at 154-44 (emphasis added). In fact, *Brown* held this similar "language was so non-committal" that "the intention of the parties to create a 'Type II' preliminary agreement is patent in the language of the MOU, presenting us with a pure issue of law." *Id.* at 156; *see also Berkery*, 2008 WL 11409018, at *3 (not fully binding, where "very purpose" of LOI "was to foster the execution of a subsequent complete agreement"). The same is true here.

*Fourth*, the language of the MOU indicates that it was intended to serve only as a flexible starting point for a final agreement. Instead of setting forth "all material terms" in a final and comprehensive agreement, the MOU provides only the "basic terms upon which the Founding Partners will enter into a definitive partnership agreement." (MOU §I). Courts recognize that a bare framework of "basic" terms is not enough to make out a Type I agreement. *See, e.g.*, *Capstone Asset Mgmt. Co., Ltd v. Dearborn Capital Grp. LLC*, 2021 WL 4250087, at *6 (S.D.N.Y. Sept. 17, 2021) (recognizing that an agreement that simply "outlined the basic terms upon which a joint venture…might be formed" and left others incomplete, "did not create a binding contract to form a joint venture"). Indeed, while irrelevant parol evidence, Cyrulnik's contemporaneous communications make clear he fully understood the need for and anticipated further negotiation. Just before signing the MOU, he wrote to another signatory: "I think the drafting of whatever Val[sic] sent around leaves a bit to be desired, but we'll just work it out later so we can get this thing signed and everyone happy in the spirit of your message." ¶8.

*Finally*, there is no countervailing language showing that the parties intended the MOU to be a final, effective agreement. Like the other agreements deemed not to be Type I, the MOU "nowhere states that it became a binding agreement the moment it was signed," *Adjustrite*, 145

18

F.3d at 549, and it "does not include language signaling a binding contract, such as the word 'agreement.'" *Herman v. Duncan*, 2019 WL 2137335, at *7 (S.D.N.Y. May 16, 2019).

> ### 2. *Any partial performance is insufficient to establish a Type I agreement.*

It is undisputed that partial performance never occurred with respect to significant anticipated milestones, such as retaining a firm to execute a final partnership agreement or Cyrulnik's "expected" billing to Startup's matter. In that sense, this factor cuts in Counter-Defendants' favor.

To the extent Cyrulnik points to some partial performance insofar as he worked at RF while being held out as a partner of a firm doing business as RCF, any such performance is wholly consistent with the parties' understanding, reflected in the MOU, that after additional negotiations were complete, a partnership agreement would eventually be executed *retroactive* to January 2020. (MOU §II.) Cyrulnik's communications before and after the MOU's execution confirm that he always understood further negotiation was required. As noted, he recognized at the time that the MOU "leaves a bit to be desired" but said he would sign and "work it out later." ¶8. After execution, Cyrulnik repeatedly tried to negotiate formula compensation, and received numerous communications seeking to negotiate and draft the partnership agreement. ¶¶22-29; *cf. LaFarge*, 2008 WL 2277503, at *5 (that the performing party "repeatedly asked [the counterparty] to send the final contract papers" indicated "that he knew that without a completed written agreement, he could not be sure that the deal would go through"). Any partial performance occurred against that backdrop, in full recognition that it was no substitute for the formal instrument the parties envisioned.

Furthermore, any evidence of partial performance Cyrulnik may muster is insufficient to overcome the clear indicia that the MOU is a Type II agreement as a matter of law. The Second Circuit and courts in this district hold that even "significant partial performance" is not enough to

save a party from summary judgment if the other factors weigh against a Type I agreement. *Brown*, 420 F.3d at 155-56 (affirming summary judgment finding no Type I agreement, even though party's efforts "constitute[d] significant partial performance," which "resulted in significant benefits"); *see also Arcadian Phosphates*, 884 F.2d at 73 (holding summary judgement on no Type I agreement was "perfectly appropriate," "even though there was considerable partial performance"); *Herman*, 2019 WL 2137335, at *9 (granting summary judgment finding no Type I agreement even where "the parties complied with most of the [agreement's] terms for the two years of their working relationship"). For instance, in *Adjustrite*, the Second Circuit affirmed a grant of summary judgment and held that plaintiffs' "partial performance" did not, as a matter of law, preclude a determination that there was no Type I agreement, because "no reasonable factfinder could conclude" that "the parties agreed on all material elements of the transaction, intended to be fully bound when they signed the Agreement, and considered the [anticipated agreements] to be unnecessary formalities." 145 F.3d at 549-51; *accord Lafarge*, 2008 WL 2277503, at *5 (granting summary judgment under Florida law, because contract language evinced an intent not to be bound notwithstanding the parties' "commitment of substantial time and financial resources"). That is likewise true here.

### 3.  The MOU does not reach agreement on all material terms.

The numerous material terms left open in the MOU demonstrate it is not a Type I agreement. "[I]t is rightfully well settled in the common law of contracts…that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981); *see also Berkery*, 2008 WL 11409018, at *3 (no binding agreement where LOI "memorialized important contract terms," but not "*all* terms important to" the transaction).

*First*, like the prototypical Type II agreement, the MOU is "concededly incomplete." *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 624 (S.D.N.Y. 2009). It states that its terms "are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement," which was "to be negotiated." (MOU §I). That those "additional terms" required negotiation is critical because Type I agreements, unlike Type II agreements, reflect "a meeting of the minds on 'all the issues perceived to require negotiation.'" *Brown*, 420 F.3d at 153. The MOU did not.

Similarly, the MOU expressly states that several of its provisions concerning the distribution of compensation and RF's property are "not final" and "not comprehensive." (MOU §§III, IV). Exhibit C states that the compensation formula itself was just a "Proposal" and "still subject to further review." *See Adjustrite*, 145 F.3d at 549 (document "entitled a 'proposal'" was not Type I agreement). Case law and common sense demonstrate that "[t]he consideration to be paid under a contract is a material term." *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 610 (S.D.N.Y. 2010) (collecting cases); *see also MLB Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("a future agreement to agree on compensation is too indefinite for enforcement"). In a law firm partnership agreement, the compensation and partnership draws are tantamount to the salary term in an employment contract, which is indisputably material. *See Durso v. Baisch*, 37 A.D.3d 646, 647 (2d Dep't 2007).

The parties' conduct confirms that the compensation formula was vitally important. It is undisputed that the parties, including Cyrulnik, contested the formula for over a year after the MOU was signed. ¶¶22, 24, 31. Indeed, that the "parties kept negotiating" itself demonstrates that they had not reached agreement on all material terms. *Berkery*, 2008 WL 11409018, at *3; *see also*

21

*Bear Stearns*, 401 B.R. at 619 ("[N]egotiating numerous contract drafts after reaching a preliminary agreement...has been held by the Second Circuit as strong evidence that the parties intended to remain unbound pending execution of formal documentation.").

Additionally, "[o]ther material terms are referenced in the [MOU], but are left unresolved." *Herman*, 2019 WL 2137335, at *9. Specifically, the MOU flagged that "[n]ot all rights and assets of the Roche Freedman LLP will be shared according to the equity percentages of the Firm," and "[a]n exhaustive list of [RF's] assets that will not be shared pro-rata will be prepared in connection with the Partnership Agreement." (MOU §VI). But the MOU itself does not identify those unlisted assets, the degree of their exclusion, or provide any framework for resolving disagreements about them. The *Herman* court found that similar language—specifically, that "the parties must still 'list everything else [Herman] currently does that should be excluded' from the joint venture"— "weigh[ed] strongly in favor of not finding a binding agreement." 2019 WL 2137335, at *9.

*Second*, the MOU is also silent on issues that are indisputably material. For example, the MOU fails to provide any mechanism for the firm to call capital if it had suffered losses and needed resources to operate. Similarly, the MOU has no discussion of how any risk of loss will be shared— an "indispensable element" of any claim of partnership. *Velez v. Mitchell*, 211 A.D.3d 415, 415 (1st Dep't 2022); *accord S.A.F.*, 2007 WL 628133, at *2 (document that failed to address the "essential issues" "of how profits and losses would be shared" did not create an enforceable joint venture agreement under Florida law).

Additionally, the MOU says nothing about numerous important aspects of firm governance. It does not provide a default provision detailing how the firm would make decisions not covered by the various committees listed in §VI. It thus provides no guidance on how the Firm would decide a variety of important issues, such as how to secure loans and funding, lease office

space, adopt policies, or open new office locations. Holcomb sought to resolve these omissions in July 2020, when he proposed an agenda of items necessary for the firm's growth that included, *inter alia*, "processes for decision-making and allocation for responsibilities for various areas of firm management." ¶26.

*Third*, if, as Cyrulnik apparently contends, there is no provision governing how to allocate the equity and compensation rights of a partner who is terminated for cause (*see infra* §III.B), that would be yet another material term on which there was no agreement.

    4.  *Sophisticated law partnership agreements are typically reduced to a formal writing.*

The fourth factor, too, cuts decidedly in Counter-Defendants' favor. "New York courts have recognized that the complexity and duration of an alleged agreement is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable." *Brown*, 420 F.3d at 155.

On its face, the MOU contemplates the establishment of a "high-end," multi-state law firm with millions of dollars of litigation funding and a substantial book of both hourly and contingent fee cases. (MOU §§I, IV, V). This is precisely the type of agreement that is typically memorialized in a formal writing. *See Adjustrite*, 145 F.3d at 551 (holding that where transaction involved "a million-dollar acquisition," and five-year terms of employment, it "was of [a] type that ordinarily would be committed not only to a writing but to a formal contract"); *Rembrandt*, 2020 WL 9214290, at *6 (that term sheet "contemplated more than a decade of contractual relationship between the parties, the transfer of intellectual property, and a total value exceeding $1 million" weighed in favor of Type II). Indeed, it would be rare for a law firm operating at this level not to have a formal partnership agreement.

Moreover, partnership agreements on this scale are not only formalized; they are frequently

drafted by professionals who specialize in partnership law. Such agreements carry substantial tax implications for individual partners and raise concerns unique to the legal profession, such as ensuring the firm's procedures are compliant with ethical rules. Notably, the parties here all agreed it would be appropriate to retain a specialist to draft the agreement and were about to proceed with one such firm when Cyrulnik insisted on consulting a different one. ¶¶27, 29.

Because three of the four relevant factors cut strongly in Counter-Defendants' favor, the Court should find that the MOU is not a Type I Agreement as a matter of law. To the extent the MOU is enforceable despite the non-occurrence of a condition precedent, it is a Type II agreement that only required the parties to negotiate in good faith.

B.    Cyrulnik cannot prove cognizable damages under the MOU.

Because the MOU is a Type II agreement, Cyrulnik is not entitled to enforce its proposed terms regarding Tokens, equity, and other assets. *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150 (2d Cir. 2022) ("[A] party cannot demand performance under a Type II agreement"). Even assuming Counter-Defendants breached a Type II agreement (they didn't), the remedy, if any, would be limited. Courts hold that a limited form of reliance damages may be available. *See e.g.*, *CapLOC, LLC v. McCord*, 2020 WL 1036044, at *20 (S.D.N.Y. Mar. 3, 2020) (reliance damages, but no "benefit-of-the-bargain" damages, available for a Type II breach); *but see CSX Transp., Inc. v. Prof'l Transp., Inc.*, 467 F. Supp. 2d 1333, 1342 (M.D. Fla. 2006) (quoting *Dep't of Corr. V. C&W Food Serv., Inc.*, 765 So. 2d 728, 729-30 (Fla. 1st DCA 2000) (court "could not afford a remedy for the breach of a promise to negotiate, because there could be no way to determine whether the parties would have reached an agreement had they negotiated"). Summary judgment limiting Cyrulnik to reliance damages could be appropriate, except Cyrulnik has not put forward any evidence to support his entitlement to reliance damages. ¶¶14-16. Cyrulnik's lack of cognizable damages is one more reason to dismiss his claims under the MOU.

24

III.    **Cyrulnik's claims fare no better even if the MOU were a Type I agreement because he was properly removed for cause.**

   A.    Cyrulnik's termination meets the MOU's "for cause" standard.

Cyrulnik insists he was not properly removed "for cause." His focus on the "for cause" provision of the MOU is misplaced because, as set forth above, individual terms of the MOU are not enforceable. Regardless, Cyrulnik cannot genuinely dispute that there was "cause" to remove him.

Absent a definition of "cause" in the MOU, the Court "can simply apply the most natural meaning of the phrase: whether [Cyrulnik] was fired for an articulable and defensible reason relating to the performance of his duties at [RF]." *Stanacard, LLC v. Rubard, LLC*, 2016 WL 462508, at *23 (S.D.N.Y. Feb. 3, 2016); *In re Piazza*, 719 F.3d 1253, 1261-62 (11th Cir. 2013) (in bankruptcy context, observing: "the ordinary meaning of 'cause' is adequate or sufficient reason. Indeed, this understanding of 'cause' comports not only with dictionary definitions but also with judicial understandings of that term."); *Goss v. E.S.I. Cases & Accessories, Inc.*, 2020 WL 5817163, at *3 (S.D.N.Y. Sept. 29, 2020) (equating "cause" with a "reason" to terminate employee). That is, "cause" is "some reason which is not arbitrary or capricious." *Trans World Airlines, Inc. v. Beaty*, 402 F. Supp. 652, 658 (S.D.N.Y. 1975).

Florida law recognizes the same general standard. Despite limited caselaw interpreting the meaning of "for cause" removal in private contracts, authorities defining that term in the context of public employees recognize that "cause" generally requires only some "lawful, rational, non-arbitrary" reason for removal. *Spurlin v. Sch. Bd. of Sarasota Cty.*, 520 So. 2d 294, 296 (Fla. DCA 1988); *see also Walton v. Lake-Sumter State Coll.*, 2023 WL 2938525, at *2 (Fla. DCA Apr. 14, 2023) ("In Florida, the general notion of 'good cause'—a close cousin of 'cause'—is that its lack of a definition gives educational institutions a degree of leeway to determine what is a sufficient

basis for termination."); Fla. Stat. §110.227 (defining "cause" broadly to include, *inter alia*, "poor performance, negligence, inefficiency or inability to perform assigned duties").

On summary judgment, "courts apply a very narrow scope of review to an employer's decision to terminate an employee 'for cause' under an agreement where that term is not defined, reviewing the employer's decision only to determine if it was arbitrary and capricious." *Welland v. Citigroup, Inc.*, 2003 WL 22973574, at *13 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 F. App'x 321 (2d Cir. 2004). The employer's decision will be sustained as long as "[t]he record supports" the employer's "allegations of misconduct." *Sines v. Opportunities For Broome, Inc.*, 156 A.D.2d 878, 880 (3d Dep't 1989). Deference is especially appropriate where, as here, "the job performance of high-level managers is concerned" because "running of an enterprise demands a high degree of trust and cooperation among top personnel." *Golden v. Worldvision Enterprises, Inc.*, 133 A.D.2d 50, 51 (1st Dep't 1987). Applying this deferential standard to the undisputed facts demonstrates there was ample cause to remove Cyrulnik.

1. *Firm management was confronted with a barrage of complaints, making any further working relationship untenable.*

Here, it is undisputed that Counter-Defendants received numerous reports that Cyrulnik engaged in abusive conduct, and that both junior and senior attorneys stated they would leave the firm if Cyrulnik remained. The Court need not consider whether each report was justified, or whether other employers might have handled the situation differently. Cause exists where a co-worker has become such a controversial and polarizing figure that, regardless of who is right or wrong, his continued employment threatens workplace equanimity and the enterprise going forward. Cyrulnik cannot deny that his behavior was the subject of numerous complaints, or that he had emerged as a problematic figure at RF. Counter-Defendants thus had cause to remove him.

As Roche stated in his February 12, 2021 email to Cyrulnik explaining why he had been

removed: "You have…engaged in a pattern of conduct that has made it not reasonably practicable to carry on the firm…with your involvement." ¶93. This conduct included: "repeated instances of unprofessional, unhealthy, and extended verbal abuse to other partners," "creating unsustainable environments for associates," and numerous efforts to exercise "unilateral control" over aspects of the firm, both to monopolize firm resources and "to undermine the intent of the MOU." *Id.* The record indisputably supports that Roche was reporting what he and others RF partners were personally witnessing and hearing about Cyrulnik at the time.

Discovery in this case confirms numerous instances in which RF's associates reported serious concerns about Cyrulnik to the firm's management throughout 2020. At least two associates independently described working with Cyrulnik as "unsustainable." ¶¶43, 46, 49-52. Another raised alarms about Cyrulnik's absentee management style, which, in his view, constituted "case mismanagement and client mismanagement," in addition to imposing substantial and unnecessary burdens on associates and firm staff. ¶68. Associates perceived that Cyrulnik (i) created a "toxic workplace environment"; (ii) was "sexist" toward a female associate; (iii) made "inappropriate remarks," including a "crass" joke about his wife "being in the mood" which made two associates "feel uncomfortable" and which one believed "conveyed a lack of respect" for women; (iv) discriminated against the firm's only Black associate, who felt like Cyrulnik "replaced" him with a white male associate; (v) engaged in behavior that left a female associate and a Black associate feeling like they were not "being respected," "valued," or "treated as a respected member of the team," made them feel "dismissed," and caused them to become "very quiet," "just listen[] in" and "stop asking questions." ¶¶43-45, 56-57, 61-64, 67. It is further undisputed that the firm's highly qualified associates, upon reporting their concerns to

27

management, frequently conveyed that they would leave the firm rather than continue working with Cyrulnik. ¶¶46, 50, 52-54, 57, 69, 70, 72.

For instance, it is undisputed that associate ███████ repeatedly told Counter-Defendants—including while "in tears"—that "she believed she was being discriminated against by Mr. Cyrulnik on the basis of her gender"; that she was "deeply miserable," that "it was not a sustainable way to work," and that "she was going to leave." ¶¶43-47.

It is undisputed that other associates perceived and reported the same conduct. Associate ███████ testified Cyrulnik "treated ███████] terribly," including "differently because she was a woman," that Cyrulnik made disparaging "comments about diversity," and "off-color jokes," which all led him to conclude Cyrulnik "is a sexist." ¶¶61-64. ███████ reported this to Roche and Freedman in "heated conversations," while relating that Cyrulnik's behavior made him feel "uncomfortable." ¶¶63-64. Associate ███████ testified at deposition that Cyrulnik gave ███████ opinions "shorter [sh]rift," she "got treated a lot worse than [he] did," with less "respect." He discussed this with other associates. ¶67.

It is undisputed tha ███████, a Black associate, complained to Roche that he "believed he was being discriminated against on the basis of race by Cyrulnik," and that he felt "very dismissed" by Cyrulnik. ¶¶56-57. It is undisputed Roche relayed these complaints to Freedman. ¶58.

It is likewise undisputed that Cyrulnik's approach to assigning subordinate work caused severe discontent which was also reported up. Associate ███████ complained to Counter-Defendants that he was "very unhappy" and "really miserable" working with Cyrulnik, and that he would leave the firm "if he had to continue work for Cyrulnik." ¶¶50, 52. ███████ told Counter-

Defendants that it was not just him, that "associates at the firm were unhappy working for" Cyrulnik, and that the firm was "at risk of losing associates." ¶54.

It is undisputed that, by early 2021, Counter-Defendants understood at least four of the firm's eight associates in New York to have indicated, in sum and substance, "I don't want to stay if [Cyrulnik] is going to be at the firm." ¶¶70-72.

It is also undisputed that by early 2021, Cyrulnik had also "alienated" senior attorneys. ¶77. Across two separate incidents, separated by clear written warnings, firm partners perceived and reported that Cyrulnik interacted with them in an exceptionally "violent" way. ¶¶33-36, 73-76; *see Gueye v. Evans*, 2006 WL 3298427, at *5 (S.D.N.Y. Nov. 13, 2006) (employee's "aggressive and inappropriate behavior during his two separate altercations with colleagues" warranted termination).

First, Cyrulnik shouted at Roche and Freedman in July 2020. Freedman texted Roche just after the outburst, saying: "[Cyrulnik] went crazy." ¶¶33-34. Roche reported to Normand and Friedland that he was "deeply unsettled about [the incident]." ¶36. Roche and Freedman then made clear to Cyrulnik his conduct was unacceptable. Freedman warned Cyrulnik he was "out of line and it can't happen again." ¶40. Roche stated: "[T]he manner in which you screamed at both me and Vel is simply unacceptable…[I]f yesterday is any sort of signal to how you think you can treat us when we have disputes over business and money,…then I do not see how we can continue to grow the partnership." ¶37.

Just a few months later, and amidst the chorus of associate complaints, Holcomb and Eskovitz reported a second incident in which Cyrulnik lost his temper and screamed at them. ¶¶73-74. Eskovitz, a former BSF partner and federal prosecutor, emailed Cyrulnik she was "shocked" by his "wildly inappropriate" behavior, and that she had never "had a call like this in my career."

¶¶75-76. She wrote she would rather "leave the firm" than "stay and take [his] outbursts again." (*Id*.). Holcomb reported that Cyrulnik's "screaming" included statements "mocking" Holcomb's "focus on executing a definitive partnership agreement" and improving diversity at the firm. ¶74.

It is undisputed that, by early 2021, Holcomb and Eskovitz expressed an intention to leave the firm rather than continue to work with Cyrulnik. ¶78. Normand privately concluded that he would leave if Cyrulnik stayed, because he "would have been surrounded by such abject unhappiness." ¶80. Compounding the issues Counter-Defendants faced, it is undisputed that Cyrulnik refused to timely bill his clients for millions of dollars in services, even when others repeatedly asked him to do so, causing financial issues. ¶86.

In short, Cyrulnik's continued presence had become a problem, one that indisputably raised concern at all levels of the firm. Firm management reasonably believed that, unless he was removed, there was a significant risk that continued dissatisfaction and resulting attrition would severely disrupt or even end the firm.

Law firms require a baseline of trust and cooperation to function. In any workplace, it is well-understood that an individual's "inability to get along with supervisors and co-workers" is a "legitimate" basis for discharge. *Rikhy v. AMC Comput. Corp.*, 2003 WL 1618529, at *4 (S.D.N.Y. Mar. 28, 2003) (collecting cases); *see also Orellana v. Reiss Wholesale Hardware Co., Inc.*, 2016 WL 4480720, at *7 (E.D.N.Y. June 8, 2016), *R&R adopted*, 2016 WL 4480962 (E.D.N.Y. Aug. 23, 2016) (same); *Sines*, 156 A.D.2d at 880  (termination for cause was "especially" appropriate "in light of the documentary evidence on the record establishing petitioner's apparent inability to get along with his own supervisor or the workers for whom he was responsible").

Florida partnership law permits a partnership to seek judicial expulsion of a person who, like Cyrulnik, "engaged in conduct relating to the partnership business which makes it not

reasonably practicable to carry on the business in partnership with the partner." Fla. Stat. §620.8601(5)(c). Courts construe other states' analogous statutory provisions to permit expulsion where there is "an irreparable deterioration of a relationship between partners," such as where "one partner" can no longer "work with the other partners because of acrimony and mistrust that has developed." *Brennan v. Brennan Assocs.*, 293 Conn. 60, 78-83 & n.14 (2009) (collecting cases); *see also Giles v. Giles Land Co., LP*, 279 P.3d 139, 144 (Kan. Ct. App. 2012) (expulsion appropriate "[i]n light of the animosity that Kelly harbors toward his partners and his distrust of them (which distrust is mutual)"); *Warnick v. Warnick*, 2003 WY 113, ¶ 22 (2003) (standard met where "reconciliation among the partners was not a realistic possibility"). In short, against this backdrop, the firm perceived Cyrulnik to be a serious threat to the ongoing viability of its business. Regardless of whether another organization might have made a different choice, the firm's judgment that there was cause to remove Cyrulnik merits deference.

### 2.   *Cyrulnik's ethical violations constitute additional cause for his removal.*

Cyrulnik admits that termination for cause is justified where, as here, there have been instances of "ethical breaches." (CC ¶74). Cyrulnik violated the New York Rules of Professional Conduct by failing to obtain written engagement agreements from nearly all of his clients, including clients who now owe RF millions of dollars for legal services performed. ¶¶82-83. The facts are not in dispute. Cyrulnik admits that he is "not aware of new engagement letters" for fourteen clients ¶82. He testified that he does not remember if there were written engagement agreements for these clients. *Id.* He failed to produce any. ¶83. And RF has found none for these clients. *Id.* As RF's proffered expert David Keyko has opined, Cyrulnik's failure to secure written engagement letters with his clients violates both NY Rule 1.5(b) and 22 NYCRR Part 1215.1. *See* Ex.61.

Instead, Cyrulnik claims RF's representation of these clients was covered by prior

engagement letters executed with BSF. That contention is frivolous. Each law firm that undertakes an engagement with a client must set forth its terms in writing; one firm's engagement letter will not suffice for firm's representation of that client. *See* NY Rule 1.5 & cmt.2 ("In a new client-lawyer relationship…an understanding as to fees and expenses must be promptly established."); *see also Roth Law Firm v. Sands*, 2010 WL 3800683 (N.Y. Cty. Sup. March 31, 2010). Cyrulnik suggests he complied with his obligations because his clients approved a transfer of their files from BSF. But Cyrulnik's transfer request merely provided authorization to transfer documents; it did not specify the financial terms on which the transferee law firm is providing services, which is required by 22 N.Y.C.R.R. 1215.1 and NY Rule 1.5(b). Only an engagement agreement can do that, and Cyrulnik plainly defaulted in that regard. His ethical breach is further cause for termination.

### 3. Cyrulnik's breach of the MOU constitutes further cause for his removal and precludes his ability to enforce its terms.

The MOU expressly required that any new billable hour matter be approved by the "new matter committee." (MOU §VI.A). It is undisputed Cyrulnik breached this requirement by opening a new matter without seeking committee approval. ¶¶84-85. Accordingly, to the extent Cyrulnik invokes the MOU as a governing document, his own breach of that agreement precludes him from "seek[ing] to enforce other provisions of [the MOU] to his…own benefit." *Onex Food Servs., Inc. v. Grieser*, 1996 WL 103975, at *5 (S.D.N.Y. Mar. 11, 1996); *see also RSSM CPA LLP v. Bell*, 2017 WL 77030, at *17 (N.Y. Cty. Sup. Ct. Jan. 06, 2017) (a party "cannot recover for breach of contract unless he performed his contractual obligations"); *Creative Fin. Grp., Inc. v. Calvary Pentecostal Church, Inc.*, 2016 WL 6582409, at *10 (N.Y. Cty. Sup. Ct. Nov. 02, 2016) (same, applying Florida law). Moreover, if the MOU is construed as a partnership agreement, as Cyrulnik argues, his breach of its express provisions constitutes further cause for his removal. Indeed,

Florida partnership law permits expulsion of a partner who "willfully…committed a material breach of the partnership agreement." Fla. Stat. §620.8601(5)(b).

### 4.  Disputes about the Counter-Defendants' alleged "motives" are irrelevant.

Cyrulnik contends the proffered causes for his removal are pretextual and that Counter-Defendants fashioned them after the fact to disguise their alleged plot to deprive him of Tokens. While Cyrulnik is wrong, the Court need not resolve who is right to grant summary judgment. As explained below, the relevant question of law is simply whether the conduct Counter-Defendants now cite satisfies the "for cause" standard for removal. Thus, even if Counter-Defendants had an ulterior motive to terminate Cyrulnik (they did not) and even if the conduct they now cite was discovered after the fact (it was not), it would be error to deny summary judgment based on disputes over Counter-Defendants' secret motivations and alleged true reasons for exercising the contractual right to removal for cause.

This is because the Second Circuit has confirmed that where a party has valid grounds for removal, its "motives for doing so are irrelevant." *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 126 (2d Cir. 2022). Indeed, under New York law, "if a party has a contractual right to take an action, the court may not inquire into that party's motive for exercising that right." *Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 570 (6th Cir. 1997) (applying New York law). Thus, courts have long held that "[t]he motives which actuate the employer in discharging his employee are wholly immaterial, if a legal ground exists for the discharge." *In re Nagel*, 278 F. 105, 109 (2d Cir. 1921); *McCort v. ADCS Clinics, LLC*, 2021 WL 8946696, at *3 (M.D. Fla. Oct. 12, 2021) (holding "evidence of pretext" cannot be considered when "cause for termination existed under the terms of the contract"). Accordingly, the fact that an employer "may have had a financial motive for terminating" an employee for cause, does "not mean that it did not validly terminate [the employee's] employment for cause on another ground." *Prince-Vamos v.*

*Winkler Real Estate, Inc.*, 140 A.D.3d 1043, 1045 (2d Dep't 2016).

Moreover, nothing would prevent Counter-Defendants from relying on grounds discovered after Cyrulnik's removal to justify his "for cause" termination. *Daytree at Cortland Square, Inc. v. Walsh*, 2022 WL 2345820, at *3 (2d Cir. June 29, 2022) ("[w]hen a party terminates a contract with an express 'for cause' termination provision, evidence discovered after the alleged breach can be used…to justify its termination"); *see also Fitzpatrick v. Am. Int'l Grp., Inc.*, 2013 WL 709048, at *26 (S.D.N.Y. Feb. 26, 2013) ("an employer may seek to justify its termination of an employee for cause based on information obtained after the termination") (history omitted); *cf. Mootry v. Bethune-Cookman Univ., Inc.*, 279 So. 3d 207, 210 n.1 (Fla. 5th DCA 2019) ("[A]n employer may use after-acquired evidence of employee misconduct in defense of a breach of contract case if the employer can demonstrate that it would have fired the employee had it known of the misconduct.").

B.     The Withdrawal provision bars Cyrulnik from further recovery.

The MOU provides that a partner who "withdraws from the firm within 18 months from the Firm's formation" must return their equity and is not entitled to "any additional compensation" outside of earned formula compensation (which Cyrulnik has already been paid). Assuming Cyrulnik was entitled to equity by virtue of the MOU's execution, that language certainly applies to Cyrulnik, who involuntarily withdrew in February 2021, within eighteen months of the MOU's execution. (CC ¶73.)

Cyrulnik contends (at ¶¶82-84) that the Withdrawal Provision applies only to *voluntary* withdrawals, not the involuntary withdrawal at issue here. That argument fails for several reasons.

*First*, the provision, on its face, applies to any withdrawal, voluntary or not. There is no indication the parties intended to treat involuntary withdrawals differently for the purposes of allocating a departing attorney's equity and compensation. Accordingly, there is no basis for this Court to add such a limitation to the MOU's plain terms. *See* 11 Williston §31:6 ("A court may

34

not…engraft on a contract a limitation or restriction that is inconsistent with the expressed or apparent object of the parties.").

*Second*, Cyrulnik's proposed interpretation is inconsistent with the statutes governing Florida limited liability partnerships. Florida partnership law eschews any distinction between the rights of partners who are dissociated from a partnership voluntarily or involuntarily. *See, e.g.*, Fla. Stat. §620.8601 (events causing dissociation include voluntary and involuntary events, such as "[t]he partner's expulsion pursuant to the partnership agreement"), §620.8603 (setting forth the effects of a partner's dissociation, without distinguishing among causes of dissociation), §620.8701 (setting forth buyout rights upon dissociation, without distinguishing among causes of dissociation). Indeed, Cyrulnik's proposed interpretation defies common sense. If "withdrawal" only refers to voluntary withdrawals, the result would be that partners terminated for misconduct would have greater rights, including the right to compensation for equity, than partners who leave on their own accord. Bad actors could thus improve their prospects by engaging in misconduct to induce their removal for cause. Such an interpretation is, of course, absurd. *Morrison v. Morrison*, 247 So. 3d 604, 608 (Fla. DCA 2018) ("an interpretation that leads to an absurd result…should be avoided").

Worse yet, Cyrulnik's position appears to be that involuntarily withdrawing partners are entitled to keep their equity and continue earning compensation even after a for-cause removal. Thus, Cyrulnik claims he remains a "a 27% equity holder and the Co-Chairperson" of Plaintiff, even though he has since launched his own competing firm. (*Compare* ¶94, *with* CC ¶115). But contrary to Cyrulnik's interpretation, the MOU nowhere permits a departing partner to retain ownership and control indefinitely, and it would be a very odd thing for any law firm to do so. Such a counter-intuitive result should not lightly be read into a contract absent express terms.

*Third*, Cyrulnik's interpretation of the Withdrawal Provision must be rejected because it requires the Court to construe the MOU as an unethical fee-sharing agreement. Both New York and Florida prohibit attorneys at different firms from sharing fees unless (1) the division is proportionate to services performed or joint responsibility is assumed; (2) the client agrees in writing after full disclosure; and (3) the fee is not excessive. (NY Rule 1.5(g); Fla. Rule 4-1.5(g)). But the MOU does not contemplate that departing attorneys would provide continuing services or retain joint responsibility for the firm's matters, nor did any clients agree to such an arrangement. ¶¶18, 105. And without those provisions, Cyrulnik's proposed interpretation of the MOU would render it an unethical fee sharing agreement. Faced with two possible interpretations of an agreement, courts routinely reject one that would "violate ethical rules." *Tradewinds Airlines, Inc. v. Soros*, 2009 WL 1321695, at *9 (S.D.N.Y. May 12, 2009); *accord Sugar Cane Growers Co-op of Fla., Inc. v. Pinnock*, 735 So. 2d 530, 537-38 (Fla. 4th DCA 1999) (rejecting interpretation that would render agreement illegal).

*Fourth*, other provisions of the MOU demonstrate Cyrulnik's interpretation of the Withdrawal Provision—under which Cyrulnik would be entitled to a fixed 25% share of Tokens after his removal—is contrary to the parties' intentions. Pursuant to Section IV.B of the MOU, Cyrulnik was "expected to bill to the [Startup] matter," and if that expectation was not met, "the Firm" could "revisit" the proposed allocation of Tokens. Clearly, if Cyrulnik is not at the firm, he is not "bill[ing] to the [Startup] matter." Under those circumstances, the MOU entitled the firm to alter the Token allocation. But if Cyrulnik's interpretation is accepted, Counter-Defendants could nevertheless be *forced* to provide Cyrulnik with those Tokens and would thus lose the benefit of the flexibility in the reallocation clause they negotiated. Clearly, that is not what was intended.

## IV.     Cyrulnik's conversion claims fail.

"It is…settled under New York law that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain." *In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir. 1993). But Cyrulnik asserts a conversion claim solely with respect to rights he supposedly obtained by contract, namely the anticipated allotment of Tokens and other compensation set forth in the MOU. (CC ¶150). His conversion claim is merely a surrogate for his contract claims and should therefore be dismissed as duplicative. *See Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014) ("[C]onversion claims "are routinely dismissed on Rule 12(b)(6) motions where duplicative of breach of contract claims.").

Moreover, because his claimed entitlement derives wholly from a contract, and not from any property he personally held or had a pre-existing right to, he cannot satisfy conversion's most basic element: that he actually had "an immediate superior right of possession" to the allegedly converted property. *Fiorenti v. Cent. Emergency Physicians, PLLC.*, 305 A.D.2d 453, 454 (2d Dep't 2003); *see also Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 499 (Fla. DCA 1994) (conversion requires a "present possessory right"). The property that Cyrulnik claims was converted was never his to begin with. The MOU he relies upon deferred any distribution of Tokens and equity until after a final partnership agreement was signed, and Cyrulnik indisputably never signed one.

Even if the Court were to treat the MOU as an effective Type I agreement, Cyrulnik would still lack sufficient possessory rights to pursue a claim for conversion. On the contrary, it is well-established that "[a] right to the benefits under a contract is not the type of intangible property interest" that gives rise to conversion claims. *Nelly de Vuyst, USA, Inc. v. Eur. Cosmetiques, Inc.*, 2012 WL 246673, at *8 (S.D.N.Y. Jan. 6, 2012) (collecting cases); *see also Castaldi v. 39 Winfield Assocs.*, 30 A.D.3d 458, 458-59 (2d Dep't 2006) ("contractual right to payment" not sufficient for

conversion); *Selinger Enters., Inc. v. Cassuto*, 50 A.D.3d 766, 768 (2d Dep't 2008) ("The mere right to payment cannot be the basis for…conversion.").

*Komlossy v. Faruqi & Faruqi, LLP*, 2017 WL 722033 (S.D.N.Y. Feb. 23, 2017), *aff'd*, 714 F. App'x 11 (2d Cir. 2017), is particularly instructive. There, a lawyer claimed her firm had "converted" her right to receive a fee. *Id.* at *9. The court dismissed, finding that she failed to allege a sufficient possessory right: "At best, Plaintiff alleges that she possessed a contractual right to the future fee commission. But this is insufficient." *Id.* at *10 (collecting additional cases). Cyrulnik's own pleading similarly admits that, rather than having concrete possessory rights, the MOU constituted only a "promise to pay" him Tokens and firm assets in the future. (CC ¶163). As the cases cited above demonstrate, that is not enough to maintain a conversion claim.

Indeed, Cyrulnik's conversion claim is even more attenuated than that in *Komlossy* because the provision of the MOU on which he relies is indeterminate. Far from granting him any immediately-vested right to a certain number of Tokens or even setting forth a payment schedule, it expressly provides that its proposed allotment of Tokens may be "revisit[ed]." (MOU §IV.B). And the anticipated earning of future Tokens was itself subject to termination either by Startup or by Roche and Freedman at any time. ¶¶96, 102.

Still further undermining Cyrulnik's claim, the undisputed facts show that Roche and Freedman have always enjoyed a possessory right far superior to Cyrulnik's. In September 2019, well before Cyrulnik had any relationship with the firm, Startup agreed to provide Roche Freedman LLP with Tokens and equity in exchange for legal services. ¶96. Shortly thereafter, at Startup's request, Roche and Freedman—who together owned 100% of RF—agreed to restructure the deal such that they purchased the Tokens personally. ¶97. Roche and Freedman each personally entered into "Restricted Token Purchase Agreements" with Startup; purchased the Tokens using their own

personal funds; executed promissory notes, for which they would be personally liable; and reported these transactions to the IRS as personal income. ¶¶98-99. Documentation of those transactions was kept on a Dropbox to which all RF attorneys, including Cyrulnik, had access. ¶100. Roche and Freedman cannot be held liable for "converting" their own assets.

*Finally*, Cyrulnik's Token-based conversion claims are especially deficient against Counter-Defendants RF, Normand, and Friedland, as none ever exercised "dominion or control" over the relevant Tokens, as required for a viable conversion claim. *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, 2011 WL 13305367, at *4-5 (E.D.N.Y. May 13, 2011); *Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1011 (2d Dep't 2010) (same).

## V.   Cyrulnik's fiduciary duty claims fail.

The claim Cyrulnik has styled as a "breach of fiduciary duty" is yet another impermissible duplication of his contract claim. The purported "breaches" he identifies have nothing to do with any fiduciary duty recognized under Florida partnership law; rather, they all derive from the framework of the MOU. (CC ¶147). Because Cyrulnik cannot show that any fiduciary breach gives rise to the relief he seeks, summary judgment is appropriate. Moreover, Cyrulnik's failure to adhere to any applicable fiduciary duties himself shows that he lacks clean hands and thus precludes him from asserting this claim.

To begin with, Cyrulnik's claim is entirely premised on the notion that a partnership had been formed among the parties, thus giving rise to the type of fiduciary duties owed by partners. As discussed above, that never occurred, as no partnership agreement was executed. *See* §I *supra*; *Sivin v. Jones*, 138 Misc. 234, 235 (NY Cty. Sup. Ct. 1930) ("Until the formation of the partnership…, the individuals of which it was to be composed were only parties to a contract to form a partnership and did not assume toward each other the fiduciary obligations which characterize the relations of partners.").

Nor can Cyrulnik rely on the MOU, without more, as the source of any claimed fiduciary duty. The law does not permit Cyrulnik to impose a higher duty of care by renaming his deficient contractual claims as fiduciary claims. *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011) ("a plaintiff must set forth allegations that, apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone" to make out a fiduciary duty claim). Instead, fiduciary claims that, as here, merely duplicate a contract claim are routinely dismissed. *Id.* (collecting cases); *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (duplicative claim based on the "same facts" and seeking the "same damages" "must be dismissed, even if plaintiffs have sufficiently alleged a fiduciary relationship"); *Baron*, 2017 WL 3084416, at *5 ("Under Florida law, a cause of action for breach of fiduciary duty will not lie where the claim of breach is dependent upon the existence of a contractual relationship").

Even if the Court were to recognize some partnership duties attached here (they did not), the type of fiduciary duties owed by partners to each other is limited to duties of loyalty and care. Fla. Stat. §620.8404(1). Neither such duty obligates Counter-Defendants to retain Cyrulnik as a partner when there is cause to remove him, or to ensure he can "manage" the firm, access its bank accounts and files, or represent its clients after he has been expelled. (*Compare* Fla. Stat. §§620.8404(2), (3), *with* CC ¶147). And whereas Cyrulnik's primary claim for breach of fiduciary duty is Counter-Defendants' purported financial motive to kick him out, the FRUPA expressly states that "[a] partner does not violate [their fiduciary duties] merely because the partner's conduct furthers the partner's own interest." Fla. Stat. §620.8404(5). Consequently, even if Cyrulnik could prove that Counter-Defendants violated some extra-contractual duty to him, that would not entitle him to an "equity interest" in the firm—the primary relief he seeks. (CC ¶148).

Finally, if, as Cyrulnik maintains, he remains an equity partner in RF, he has flagrantly violated his own fiduciary duties to the firm. Most obviously, FRUPA's duty of loyalty requires partners "to refrain from competing with the partnership." Fla. Stat. §620.8404(2)(c). Cyrulnik has undisputedly been operating a competing law firm since March 2021. ¶94. Cyrulnik's unclean hands thus preclude him from asserting his equitable claim here. *See Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 267 (1987) (holding that a fiduciary duty claim seeking either restoration of shareholder rights or the fair value of those shares "is equitable in nature").

**VI.    Cyrulnik's civil conspiracy claims fail.**

New York and Florida don't recognize an independent tort of civil conspiracy. Thus, that claim must be dismissed. *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 467 (S.D.N.Y.) (Koeltl, J.), *aff'd,* 838 F. App'x 582 (2d Cir. 2020); *Sargeant v. Maroil Trading Inc*., 2018 WL 3031841, at *15 (S.D. Fla. May 30, 2018) (under Florida law, conspiracy requires some "completed predicate offense")*.*

There is no evidence that any Counter-Defendant did anything remotely tortious, nor is there any evidence that they agreed to engage in such conduct. Cyrulnik's claims to the contrary—at best—simply "pile inference on inference," and at summary judgment, that is not enough. *Paraka v. Univ. of Rochester*, 136 F. Supp. 3d 481, 486 (W.D.N.Y. 2015).

**VII.   Cyrulnik's quasi-contract claims fail.**

Cyrulnik's unjust enrichment and promissory estoppel claims should be dismissed because they are barred by the parties' written contracts.

The MOU was a formal agreement to negotiate in good faith toward a final partnership agreement. It is well-settled that representations made in the context of negotiations towards a final agreement do not give rise to quasi-contract claims. *See Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*, 23 A.D.3d 213, 213-14 (1st Dep't 2005) ("intent not to be bound unless there was

a…definitive agreement" precluded promissory estoppel claim). In *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, 2015 WL 5710947 (S.D.N.Y. Sept. 29, 2015), *aff'd*, 662 F. App'x 19 (2d Cir. 2016), for instance, the court held the plaintiff adequately alleged a Type II agreement; however, it held the ongoing efforts to negotiate toward a final agreement were "insufficient to create an actual promise" sufficient to support a promissory estoppel claim and dismissed unjust enrichment claims as barred by the Type II agreement. *Id.* at *9; *see also Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 458-61 (S.D.N.Y. 2021) (no promise, reasonable reliance, or expectation of compensation as required for promissory estoppel and unjust enrichment claims, in light of Type II agreement); *Gas Natural, Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 385-86 (S.D.N.Y. 2014) ("binding obligation to negotiate in good faith" barred promissory estoppel claim).

Moreover, Cyrulnik cannot use equitable claims to circumvent the MOU's unmet condition precedent. On the contrary, because the MOU "explicitly requires execution of a further written agreement...it is unreasonable as a matter of law" for Cyrulnik to "rely upon the other party's promises to proceed with the transaction in the absence of that further agreement." *StarVest Partners II, LP v. Emportal, Inc.*, 101 A.D.3d 610, 613 (1st Dep't 2012); *see also Aldora Aluminum & Glass Prods., Inc. v. Poma Glass & Specialty Windows, Inc.*, 2016 WL 3922938, at *5 (M.D. Fla. July 21, 2016) ("reliance on a promise with an express condition precedent that never occurred would have been unreasonable").

Cyrulnik would fare no better if the MOU were determined to be an operative, Type I agreement. In that case, Cyrulnik's quasi-contract claims would be wholly duplicative of his breach of contract claim and thus could "not be maintained." *Mayaguez S.A. v. Citibank, N.A.*, 2022 WL 901627, at *37 (S.D.N.Y. Mar. 25, 2022); *Azure, LLC v. Figueras Seating U.S.A., Inc.*,

2014 WL 11531792, at *3 (S.D. Fla. Apr. 22, 2014). (*Compare* CC ¶¶131, 137, *with* CC ¶¶ 159, 161, 163-64).

Finally, it is undisputed that Cyrulnik received ample compensation for the legal work he performed before his removal, in accordance with compensation formula proposals set forth in the MOU. ¶¶14-15. He thus cannot claim that others were unjustly enriched by his work or that he was promised compensation for that work that he did not receive.

## VIII.   Cyrulnik's implied covenant and accounting claims are duplicative and should be dismissed.

Cyrulnik's claim for breach of the implied covenant of good faith and fair dealing fails because it is duplicative of his breach of contract claim. (*Compare* CC ¶142, *with* ¶¶130-31, 134). "New York...does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *Amica Mut. Ins. Co. v. Morowitz*, 613 F. Supp. 2d 1358, 1362 (S.D. Fla. 2009) (same, under Florida law); *see also Alter v. Bogoricin*, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and a breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative.").

Similarly, assuming *arguendo* Cyrulnik has standing to bring an accounting claim under FRUPA, that claim "cannot coexist with a breach of contract claim covering the same subject matter," not least because the civil discovery process renders that claim "unnecessary." *Bedoyan v. Samra*, 352 So. 3d 361, 366 n.5 (Fla. DCA 2022).

## IX.   Cyrulnik cannot prove Counter-Defendants breached the Side Letter in regard to the ▮▮▮▮▮ matter.

Cyrulnik improperly lumps all Counter-Defendants together when alleging breach of the Side Letter. (*See, e.g.*, CC ¶¶131, 142). By its plain terms, the Side Letter imposes no obligation

on Counter-Defendants Friedland and Normand. ¶17. It is undisputed that neither they, nor RF, nor its attorneys have ever collected any portion of the final $143 million judgment in the ███ litigation. ¶19. In any event, as discussed *supra* §III.B, it would be unreasonable to interpret the Side Letter to award Cyrulnik a fee in a matter in which he rendered no services, especially without client consent.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment dismissing Cyrulnik's counterclaims and granting Plaintiff RF's Declaratory Judgment claim.

Dated: June 9, 2023
      New York, NY                 Respectfully submitted,

          /s/ Jonathan P. Bach
         Jonathan P. Bach
         Alice Buttrick
         SHAPIRO ARATO BACH LLP
         1140 Avenue of the Americas, 17th Floor
         New York, NY 10036
         Tel: (212) 257-4897
         Fax: (212) 202-6417
         jbach@shapiroarato.com
         abuttrick@shapiroarato.com

         *Attorneys for Plaintiff Roche Freedman LLP and Counter-Defendants Devin Freedman, Edward Normand, and Amos Friedland*

         /s/ Matthew Leto
         Matthew Leto
         LETO LAW FIRM
         201 S. Biscayne Blvd.
         Suite 2700
         Miami, Florida 33131
         Tel: (305) 341-3155
         Fax: (305) 397-1168

mleto@letolawfirm.com

*Attorneys for Counter-Defendant Kyle
Roche*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,907 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D and the Court's May 24, 2023 Order permitting the parties to submit opening briefs of up to 15,000 words (Dkt.414).

Dated: June 9, 2023                          /s/ Jonathan P. Bach
                                          Jonathan P. Bach