Marc E. Kasowitz (mkasowitz@kasowitz.com)
Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)
Gavin D. Schryver (gschryver@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Defendant/Counterclaim-Plaintiff Jason Cyrulnik*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP,<br><br>Plaintiff,<br><br>v.<br><br>JASON CYRULNIK,<br><br>Defendant. | Case No. 1:21-cv-01746-JGK |
| JASON CYRULNIK,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>ROCHE CYRULNIK FREEDMAN LLP,<br>KYLE ROCHE, DEVIN FREEDMAN, AMOS<br>FRIEDLAND, NATHAN HOLCOMB, and<br>EDWARD NORMAND,<br><br>Counterclaim-Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT/COUNTERCLAIM-PLAINTIFF JASON CYRULNIK'S**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF RELEVANT FACTS ................................................................................... 4

    A.    The Parties Negotiate and Enter the MOU ................................................. 4

    B.    The Firm's Assets Rapidly and Dramatically Appreciate in Value,  and the CC Defendants Devise a Scheme to Misappropriate  Cyrulnik's Interests in The Firm and Its Valuable Assets ........................................................ 11

        1.    The Cryptocurrency Tokens ................................................. 11

        2.    The Purported Removal of Cyrulnik from the Firm ................................ 14

    C.    The Firm Files This Meritless Lawsuit ................................................ 16

ARGUMENT ....................................................................................................................... 19

I.    THE LEGAL STANDARD ON SUMMARY JUDGMENT ........................................... 19

II.    CYRULNIK DID NOT "WITHDRAW" FROM THE FIRM ......................................... 20

III.    THE MOU IS ENFORCEABLE .................................................................... 26

    A.    The Plain Language of the Parties' Agreement Allocates to Cyrulnik 27% of the Firm's Equity Without A Condition Precedent ................................. 26

    B.    The RF Parties' Efforts To Expand Their Meritless Equity Provision Argument To the Rest of the Agreement Is Baseless On Its Face ....................... 29

IV.    CYRULNIK WAS NOT REMOVED FOR "CAUSE" .................................................. 34

V.    CYRULNIK IS ENTITLED TO SUMMARY JUDGMENT ON THE FIRM'S CLAIMS ..................................................................................................... 37

VI.    CYRULNIK IS ENTITLED TO SUMMARY JUDGMENT ON ROCHE'S FRAUDULENT INDUCEMENT COUNTERCLAIM ...................................................... 38

CONCLUSION .................................................................................................................... 42

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*,
    634 F.3d 112 (2d Cir. 2011)........................................................................22

*260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*,
    137 A.D.3d 457 (1st Dep't 2016) ..........................................................21, 22

*Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*,
    2013 WL 628533 (S.D.N.Y. Feb. 15, 2013)..............................................40

*Bailey v. Fish & Neave*,
    8 N.Y.3d 523 (2007) ..................................................................................20

*Barakat v. Broward County Hous. Auth.*,
    771 So. 2d 1193 (Fla. Dist. Ct. App. 2000) ..............................................20

*Baraliu v. Vinya Capital, L.P.*,
    765 F. Supp. 2d 289 (S.D.N.Y. 2011).......................................................27

*Bed Bath & Beyond Inc. v. IBEX Const., LLC¸*
    52 A.D.3d 413 (1st Dep't 2008) ...............................................................27

*Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*,
    302 So. 2d 404 (Fla. 1974).......................................................................31

*Burns v. Barfield*,
    732 So. 2d 1202 (Fla. Dist. Ct. App. 1999) ..............................................20

*Cadwalader, Wickersham & Taft v. Beasley*,
    728 So.2d 253 (Fla. Dist. Ct. App. 1998) .................................................22

*CBS Inc. v. PrimeTime 24 Joint Venture*,
    245 F.3d 1217 (11th Cir. 2001) ................................................................22

*Comprehensive Care Corp. v. Katzman*,
    2010 WL 3190136 (M.D. Fla. July 30, 2010) ..........................................34

*DeLeonardis v. Credit Agricole Indosuez*,
    2000 WL 1718543 (S.D.N.Y. Nov. 15, 2000).........................................35

*In re Estate of Boyar*,
    592 So. 2d 341 (Fla. Dist. Ct. App. 1992) ................................................26

*In re Eugenia VI Venture Holdings, Ltd. Litig.*,
    649 F. Supp. 2d 105 (S.D.N.Y. 2008) .............................................................................. 19, 39

*Gay v. Brencorp, Inc.*,
    2012 WL 162354 (M.D. Fla. Jan. 19, 2012) ...................................................................... 27, 28

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ............................................................................................................ 20

*Gunderson v. School Dist. of Hillsborough County*,
    937 So. 2d 777 (Fla. Dist. Ct. App. 2006) ........................................................................... 26

*Hanover Realty Corp. v. Codomo*,
    95 So. 2d 420 (Fla. 1957) ..................................................................................................... 28

*Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*,
    2020 WL 614991 (S.D.N.Y. Feb. 10, 2020) ....................................................................... 40

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ............................................................................................ 19, 39

*King v. Fox*,
    2005 WL 3098933 (S.D.N.Y. Nov. 18, 2005) ..................................................................... 35

*Kipp v. Kipp*,
    844 So. 2d 691 (Fla. Dist. Ct. App. 2003) ........................................................................... 20

*Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of New York*,
    28 N.Y.2d 101 (1971) ........................................................................................................... 29

*In re Lorenzo*,
    434 B.R. 695 (Bankr. M.D. Fla. 2010) ................................................................................ 32

*Love v. Fleetway Air Freight & Delivery Serv., L.L.C.*,
    875 So. 2d 285 (Ala. 2003) .............................................................................................. 22, 23

*New York Wheel Owner LLC v. Mammoet Holding, B.V.*,
    481 F. Supp. 3d 2016 (S.D.N.Y. 2020) ............................................................................... 41

*Orellana v. Reiss Wholesale Hardware Co., Inc.*,
    2016 WL 4480720 (E.D.N.Y. June 8, 2016) ....................................................................... 35

*Pictometry Int'l Corp. v. Air Am. Flight Ctr., LLC*,
    394 F. Supp. 3d 320 (W.D.N.Y. 2019) ................................................................................ 20

*Pitcock v. Kasowitz*,
    2009 WL 3240385 (N.Y. Sup. Ct. Sept. 29, 2009) ............................................................. 23

*Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP¸*
  2010 WL 2430910 (N.Y. Sup. Ct. Feb. 22, 2010) ...................................................................23

*R/S Associates v. New York Job Development Authority,*
  98 N.Y.2d 29 (2002) ..............................................................................................................20

*Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams,*
  856 So. 2d 1 (Fla. Dist. Ct. App. 2003) .................................................................................31

*Rikhy v. AMC Comput. Corp.,*
  2003 WL 1618529 (S.D.N.Y. Mar. 28, 2003) .......................................................................35

*Robbie v. City of Miami,*
  469 So. 2d 1384 (Fla. 1985) ..................................................................................................31

*In re Sav-A-Stop Inc.,*
  124 B.R. 356 (Bankr. M.D. Fla. 1991) ..................................................................................31

*Silverman v. Worsham Bros. Co.,*
  625 F. Supp. 820 (S.D.N.Y. 1986) .........................................................................................19

*Tomasini v. Mount Sinai Med. Ctr. of Florida, Inc.,*
  315 F. Supp. 2d 1252 (S.D. Fla. 2004) ..................................................................................35

**Statutes**

Fl. Stat. § 620.8601 ......................................................................................................................23

Florida's Revised Uniform Partnership Act ...........................................................17, 19, 23, 31

FRUPA Section 620.8306 .............................................................................................................17

FRUPA § 8202(1) .........................................................................................................................31

**Other Authorities**

Federal Rules of Civil Procedure Rule 56(a) ...........................................................................1, 19

Local Civil Rule 11.1 ....................................................................................................................43

Local Rule 56.1 ...............................................................................................................................1

Defendant/Counterclaim-Plaintiff, Jason Cyrulnik, respectfully submits this memorandum of law in support of his motion for summary judgment on liability pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This case centers on an egregious scheme by CC Defendants to improperly oust Cyrulnik from the firm he-cofounded and built, with the goal of misappropriating Cyrulnik's extremely valuable assets – including in particular Cyrulnik's 25% interest in cryptocurrency tokens ("Tokens") that had ballooned in value to more than $250 million just days earlier – that had been contractually and expressly promised to him as incentive to leave his law firm practice and co-found RCF.  Discovery has revealed that CC Defendants incredibly memorialized their deplorable plan to convert Cyrulnik's Tokens for themselves (Ex. 1 (July 16, 2020 email between Kyle Roche and Edward Normand):



The plain language of the parties' agreement is dispositive of liability on virtually all of the claims in this case and leaves for determination only the issue of calculation of damages. Because Cyrulnik's claims concern amounts the Conspiring Partners expressly owe Cyrulnik under the parties' MOU *irrespective of whether the Conspiring Partners were permitted to remove Cyrulnik* (they were not), a detailed demonstration of the pretextual scheme the Conspiring Partners devised here – which discovery has exposed in spades – is not necessary for

---

[1]  Submitted herewith is Cyrulnik's Local Rule 56.1 Statement of Material Undisputed Facts ("SMUF"), the Declaration of Jason Cyrulnik (the "Cyrulnik Declaration"), and the Declaration of Paul Fattaruso.  Unless otherwise noted, all alterations, citations and internal quotation marks have been omitted from quoted text.  Citations to "Ex." herein refer to the exhibits attached to the Cyrulnik Declaration.

resolution of those claims.  Accordingly, this motion focuses solely on the facts and relevant law pertaining to resolution of those claims.

Summary judgment should be granted on each of Cyrulnik's ten counterclaims; on RCF's three claims; and on Roche's counterclaim.

*First*, it is undisputed and indisputable that Cyrulnik never elected to withdraw from the firm, which is the only circumstance in which the MOU permits the divestiture of *any* of Cyrulnik's assets at issue in this litigation.[2] And the law is clear that there is no reasonable interpretation of the MOU whereby the CC Defendants' involuntary removal can be recharacterized as a "withdrawal" by Cyrulnik that would magically divest Cyrulnik of the assets and rights he was given in the MOU.

*Second*, the law and the evidence make clear that the MOU was a binding, enforceable agreement, which the parties acted on for more than one year.  The notion that Section II of the MOU somehow created an unidentified condition precedent requiring the parties to execute a separate agreement in order to receive the respective equity ownership shares each was given in the MOU is farcical, as is the CC Defendants' fanciful claim that the firm they had formed and operated for fourteen months actually never came into existence. The evidence is abundantly clear that CC Defendants treated Cyrulnik (a named partner) as an equity partner both amongst themselves and to multiple third parties, including the federal government in documents that were signed under penalty of perjury.  There is simply no genuine issue of fact that Cyrulnik is entitled to an accounting and a buyout under the Florida Statutes. The CC Defendants' newly

---

[2] The lone asset that Cyrulnik would not keep absent his withdrawing from the Firm is the naming-right installment payment that Roche owes Cyrulnik under the parties' Side Letter. Roche's breach of that obligation is thus addressed separately in Section IV, concerning the issue of cause.

concocted position, that the MOU (and not just the equity component) is unenforceable in its entirety, is belied by the plain terms of the MOU and the law.  At bottom, an agreement is enforceable as long as the parties have agreed on the essential terms and intend to be bound, notwithstanding the fact that they have not finalized every aspect of their relationship or reduced it to writing in a long-form agreement.  Here, the evidence is crystal clear that the parties intended for the MOU to be binding (indeed, every CC Defendant conceded this point at their respective depositions in addition to their contemporaneous references for fourteen months to the controlling MOU) and, of course, they operated RCF pursuant to the MOU (and purported to remove Cyrulnik *under that same* MOU) for more than a year despite the absence of any formal partnership agreement.

*Third*, the evidence is clear that Cyrulnik was not removed "for cause."  Under precedential Florida law, termination "for cause" (where, as here, the agreement at issue does not define it otherwise) requires a showing of illegal activity, ethical breaches, or utter abandonment or dereliction of a job.  Setting aside the overwhelming evidence that Roche and Freedman orchestrated a pretextual termination of the worst kind, the summary judgment record is clear that *none* of the purported bases for Cyrulnik's removal even come close to the conduct that could constitute "cause" for removal.  Rather, every purported reason set forth in CC Defendants' carefully constructed removal letter boils down to differences in management style, hurt feelings, and office politics.  Accordingly, there is simply no evidence upon which a jury could reasonably conclude that the RF Parties had "cause" to remove Cyrulnik.

*Fourth*, Cyrulnik is also entitled to summary judgment dismissing RCF's claims for breach of fiduciary duty and intentional interference with contract because the record is devoid of evidence supporting RCF's bald assertion that Cyrulnik conspired with his clients to not pay

RCF, or even that Cyrulnik encouraged them not to do so – an odd claim to begin with, where the majority of the uncollected money would be remitted to Cyrulnik. Indeed, CC Defendants expressly and unequivocally admitted in a court filing that *they* "strategically" and intentionally decided not to pursue collections from those clients because they thought that it would be better for CC Defendants' case against Cyrulnik.

Finally, Cyrulnik is entitled to summary judgment dismissing Roche's recently filed fraudulent inducement claim because: (i) the record is devoid of any evidence upon which a reasonable jury could conclude that Cyrulnik acted with an intent to defraud; (ii) the evidence establishes that Roche did not rely (justifiably or otherwise) on Cyrulnik's alleged misrepresentations; (iii) Cyrulnik's alleged misrepresentations (there were none) were, at most, inactionable "puffery"; and (iv) Roche cannot establish the he suffered any damages.

## SUMMARY OF RELEVANT FACTS

### A.      The Parties Negotiate and Enter the MOU

In mid-2019, Kyle Roche and Velvel Freedman, two former junior attorneys from Boies Schiller & Flexner LLP ("BSF"), left BSF to form their own firm, which they named Roche Freedman LLP. (SMUF ¶ 3.) In late 2019, Roche and Freedman induced Cyrulnik and three other attorneys – Amos Friedland, Edward Normand and Nathan Holcomb (together with Cyrulnik, Roche and Freedman, the "Founding Partners") – to leave BSF and start a new firm, into which Roche Freedman LLP would be merged. (SMUF ¶¶ 4-6, 12.) The new firm would be known as Roche Cyrulnik Freedman LLP ("RCF" or the "Firm"). (SMUF ¶ 12.)

The Founding Partners memorialized their agreement to form the partnership in a Memorandum of Understanding (the "MOU") detailing the core terms on which the lawyers were forming the RCF partnership and on which the BSF attorneys, including Cyrulnik (a BSF

equity partner who had spent his entire career at that firm), were relying in making the decision to leave BSF.  (SMUF ¶ 12.)  The MOU included multiple key provisions, including:

- **Firm Name (Section VI.F)**

    o Any change in the Firm's name requires unanimous consent of the Named Partners (Roche, Cyrulnik, and Freedman)

- **Assignment of Specified Assets (Section IV)**

    o Because Roche and Freedman had operated as a small firm for several months before Cyrulnik and the others agreed to form RCF, the prior firm (Roche Freedman LLP) "will be merged into the Firm [RCF] in January 2020."

    o The parties listed out the core assets of Roche Freedman that would not be shared pro rata according to the partners' respective equity percentages in RCF.  All other assets would be allocated based on the equity percentages listed above (with Cyrulnik receiving 27%).

    o The enumerated assets that were not being shared according to the RCF equity percentages were to be split according to fixed allocations set forth in this section of the MOU, including:

        ▪ **Ava Labs Tokens**: "In exchange for legal services, Ava Labs has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019. A copy of the Roche Freedman LLP / Ava Labs retention agreement is attached to this MOU as Exhibit B. Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its Ava Labs Tokens according to the following breakdown:

            - Jason Cyrulnik 25%; Velvel Freedman 32%; Amos Friedland 5%; Nathan Holcomb 5%; Edward Normand 5%; Kyle Roche 28%."

        ▪ **Kleiman Contingency Case**

            - The partners agreed that Roche and Freedman's contingency interest in any recovery for their clients David Kleiman and W&K Info Defense Research LLC "shall be distributed according to a distribution agreement Kyle, Velvel, and Jason previously negotiated [the Side Letter Agreement]," which gave Cyrulnik 25% of that interest.

- **Partner Compensation/Distribution of Future Firm Revenues (Section III)**

  o The partners agreed to distribute revenue to its partners according to the Firm's Partnership Compensation model, which the parties attached as Exhibit C to the MOU.

- **Equity Ownership Allocation**

  o Jason Cyrulnik – 27%; Velvel Freedman – 24%; Amos Friedland – 10%; Nathan Holcomb – 10%; Edward Normand – 10%; Kyle Roche 19% **(Section II)**

  o Changes cannot be made without approval of the equity committee (on which Cyrulnik sat) and reductions required 90 days notice. **(Section VI.I)**

- **Firm Management Rights & Responsibilities (Section VI)**

  o The MOU established four-partner committees for various functions, including an Equity Committee (Section VI.I), a New Matter Committee (Section VI.A), an Expense Committee (Section VI.J), and a Compensation Formula Committee (Section VI.K). Cyrulnik and the two other named partners sat on each committee, along with one other founding member who was included on each of the committees.

  o **Bank Account Access (Section VI.N):** Jason Cyrulnik, Kyle Roche, and Velvel Freedman "will have full access to the Firm's bank accounts" while the remaining Founding Partners "will have access to view the Firm's bank accounts."

  o **Firm Co-Chairpersons (Section VI.M)**

    ▪ "To be eligible for chairperson, the candidate must be a partner of the Firm holding at least 8% of the Firm's equity"

    ▪ At inception, and for the first year only, Edward Normand (who held 10% of the firm's equity) and Velvel Freedman (who held 34% of the Firm's equity) were appointed firm chairpersons. In 2021, Cyrulnik (who held 27% of the Firm's equity) and Freedman were pre-appointed firm chairpersons.

- **Departure from Firm**

  o **Partner Withdrawal (Section VI.C)**

    ▪ Founding partners were permitted to withdraw from the firm.

    ▪ In the event a partner elected to withdraw from the firm, and did so within 18 months of the firm's formation, he would have to return

6

certain compensation rights, specifically "payments received that exceed what that Partner was entitled to under the Firm's formula compensation model."

o **Partner Death (Section VI.H):** The partners agreed that if a Partner passed away or became severely disabled, he or his estate would receive all unpaid amounts under the Firm's then existing formulas and the Firm would make efforts to buy out that partner's equity as calculated by an independent third party.

o **Partner Removal (Section VI.G):** "A Founding Partner cannot be removed without cause. A Founding Partner can be removed for cause only on the affirmative vote of 2/3 of the Firm's equity partners." In contrast to a partner withdrawal or death, no financial forfeitures were provided for in the event of a removal.

Attached as Exhibit B to the MOU was the Firm's Engagement Letter with Ava Labs, providing for the Firm's receipt of 0.6% of all the Tokens Ava Labs would distribute. Ava distributed 360 million Tokens, leaving the Firm with 2.16 million Tokens.  (Ex. 2.)  The Ava Labs engagement letter was ███████████████████████████████████████ █████████████████████████████████████ (Ex. 3 (Holcomb Dec.) ¶ 16); Cyrulnik Dec. 26.)

The Founding Partners – and in particular the attorneys who were leaving BSF to start this new firm – fully intended that the MOU be binding.  Indeed, an early draft of the MOU read as follows:



(Ex. 4 (Holcomb Dec. Exhibit 1).)  The original proposed language stating that ████████

███████████████████████████████████████████████████

████████████████████████████████████████ was *stricken*, evidencing the parties' clear and undisputed intent

that the MOU be binding (and not conditioned on signing a longer-form partnership agreement).

CC Defendant Holcomb then made additional revisions to the draft MOU to further clarify that

intent that the MOU be binding:



(Ex. 5 (Holcomb Dec. Exhibit 2).)  Holcomb testified that his purpose of making those edits

was:

Ex. 3 (Holcomb Dec.) ¶ 8 (emphasis added). The other partners confirmed that they understood

the MOU to be a binding agreement. (SMUF ¶ 14.)

Throughout 2020, the group of seven equity partners were recognized and treated as owners of the firm – acting pursuant to the binding, express terms of the MOU – in countless ways, including:

- The Firm set up payroll administration through ADP for its employees. By contrast, the firm's seven equity partners (the six Founding Partners and Paul Fattaruso, who was added as an equity partner in January 2020) were given monthly draws, with no tax withholdings.  (SMUF ¶ 17.)

- On January 3, 2020, the partners held an initial firm meeting at which the equity partners voted to promote an associate's title, among other firm business.  (SMUF ¶ 17.)

- On January 13, 2020, the equity partners voted on the hiring of a non-equity partner of the firm.  (SMUF ¶ 17.)

- On January 28, 2020, Roche wrote to Cyrulnik and the other equity partners: █████████ ████ (SMUF ¶ 17.)

- On January 31, 2020, Freedman wrote to Cyrulnik and the other equity partners: ████ ██████████████████ (SMUF ¶ 17.)

- Throughout the first half of 2020, Freedman, Roche, Friedland, and Holcomb repeatedly cited the MOU as a binding agreement in addressing a proposal to revise the formula compensation calculations to address a problem that had been identified after the firm commenced operations. In July 2020, for example, Roche ████████████████ ███████████████████████████████ ███████████████ (SMUF ¶ 17.)

- On April 6, 2020, Freedman submitted applications to the U.S. government for COVID-related loan assistance and expressly represented that Cyrulnik was a 27% owner of the firm as set forth in the MOU (and that Cyrulnik and Freedman were the only owners who owned more than 20% of the firm, as set forth in the MOU).  Freedman swore to the accuracy of those representations under penalty of perjury. (SMUF ¶ 17.)

- On August 12, 2020, the Firm's Director of Operations ██████████████████ ███████████████████████████████████████ ███████████████████████████████ (SMUF ¶ 17.)

- On November 7, 2020, Freedman wrote to the Firm's Director of Operations requesting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SMUF ¶ 17.)

- On December 16, 2020, the Firm's Director of Operations wrote to Cyrulnik to explain how the firm's year-end 401k contributions would work for Cyrulnik as ▮▮▮▮▮▮▮▮ (SMUF ¶ 17.)

- The Firm's agenda for its year-end Equity Partners Meeting on December 27, 2020, lists the seven equity partners among the Firm's ▮▮▮▮▮▮▮ and Cyrulnik ran that meeting.  (SMUF ¶ 17.)

- Holcomb confirmed that he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 3 (Holcomb Dec.) ¶ 44).)

- On February 10, 2021, each of the CC Defendants executed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SMUF ¶ 17.)

- On February 12, 2021, the CC Defendants purported to remove Cyrulnik from the Partnership through an email in which they expressly cited the MOU as the agreement pursuant to which they purported to be removing Cyrulnik from the partnership.  (SMUF ¶ 17; Ex. 6 ("We are writing to inform you that, *pursuant to the December 2019 MOU*, Kyle, Vel, Ted, Amos and Nate have voted to remove you for cause from the firm's partnership.") (emphasis added).)

The three named partners – Cyrulnik, Roche, and Freedman – concurrently memorialized their two side agreements in a side letter (the "Side Letter") made effective as of January 4, 2020, which memorialized their two core side agreements.  (SMUF ¶ 18; Ex. 7.)  That agreement provided that Roche would pay Cyrulnik $850,000 for allowing Roche to list himself as the first named partner, which amount he was required to pay in four installments on an agreed-upon schedule ($204,000 on January 12, 2020, July 12, 2020, January 12, 2021, and $238,000 on July 12, 2021).  (*Id.*)  *With respect to those payments only*, the partners agreed that "Should Freedman or Cyrulnik voluntarily leave the firm *or be terminated for cause* before any of the foregoing payments is scheduled to be paid, the departing partner's remaining payments hereunder will be

10

forfeited back to Roche."  (*Id.* (emphasis added).)  Roche, Freedman and Cyrulnik separately agreed to give Cyrulnik 25% of the recovery from their *Kleiman* litigation matter: "should Roche, Freedman, Roche Freedman LLP, or RCF be entitled to any contingent recovery in connection with the *Kleiman v. Wright* litigation, Freedman, Roche, and Cyrulnik agree to split the recovery as follows . . . Cyrulnik: 25% of any recovery."  (SMUF ¶ 19.)

**B.     The Firm's Assets Rapidly and Dramatically Appreciate in Value, and the CC Defendants Devise a Scheme to Misappropriate Cyrulnik's Interests in The Firm and Its Valuable Assets**

**1.     The Cryptocurrency Tokens**

One of the key assets that Roche and Freedman had offered to Cyrulnik to entice him to leave his partnership at BSF to co-found the Firm were cryptocurrency tokens that firm client Ava Labs ("Ava") was going to be distributing to the firm (the "Tokens").  (SMUF ¶ 20.) Pursuant to the Ava engagement letter with Roche Freedman LLP – which, again, Roche and Freedman attached to the MOU as Exhibit B – Ava agreed to give 0.6% of all Tokens Ava distributed.  (SMUF ¶ 21.)  The MOU provided that Cyrulnik would receive 25% of the 0.6% of the Tokens, or 0.15% of all Tokens (translating to 540,000 Tokens), in addition to his 27% equity in the firm.  (SMUF ¶ 21.)[3]

In July 2020, Ava Labs completed "the largest ICO [initial coin offering] since 2017 . . . $40m in 3.5 hours."  (SMUF ¶ 24.) Roche did not share this information with Cyrulnik but

_____

[3] The evidence adduced during this litigation has revealed that Roche and Freedman secretly purported to reassign the firm's Tokens *to themselves*. Roche and Freedman did not share those reassignment documents with the other partners (including Cyrulnik) and instead attached to the MOU the firm's engagement letter with Ava Labs clearly stating that all 0.6% of the Token distributions were to be paid *to the firm*. This conduct was revealed in mid-2021, in connection with this litigation.

instead revealed it to Normand, with whom he had built a strong relationship and who was leading many of Roche's cryptocurrency litigations.  (*Id.*)

On July 16, 2020, two of the CC Defendants, Kyle Roche and Edward Normand, secretly discussed the implications of the highly successful Ava Labs launch. Roche had expressed to Normand that he regretted putting the Tokens in the pot of assets that he divvyed up amongst the Firm's partners when he was seeking to attract them to co-found RCF – especially giving Cyrulnik 25% of the Tokens – given his renewed and increased expectations about their value. (SMUF ¶ 25.) In the July 16, 2017 email exchange concerning Ava's $40 million ICO in 3.5 hours, Normand responded to Roche two minutes later: ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████  (*Id.*)  There was no arrangement that Roche was discussing *with Cyrulnik*, as they (and all of the Founding Partners) had agreed on the exact allocation of Tokens seven months prior in he executed MOU. (SMUF ¶ 26.) Roche told Normand ████████████████████████████████████ Just a few minutes later, Roche wrote: ████████████████████████████████████

███████████████████████████████████████████████████████████████████

███  (*Id.*) Sven minutes later Normand responded. Referring to the fact that seven months earlier, Roche and his then-partner Freedman had agreed to give Cyrulnik 25% of the high-upside cryptocurrency Tokens, Roche and Normand discussed Roche's burning desire to renege on the deal he had struck:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

(SMUF ¶ 27; Ex. 1 (July 16, 2020 email between Kyle Roche and Edward Normand).)

Just six days later, on July 22, 2020, Roche sent Cyrulnik a cryptic email concerning implementation of a resolution to an unrelated ongoing firm administration issue related to formula compensation computations. (SMUF ¶ 29.) Roche himself had previously proposed the resolution, but Roche's email for the first time included the following demand: ███████████ ████████████████████████████████████████ ████████████████████████████████████ █████████████ (*Id.*) Roche threatened in no uncertain terms: ████████████ ████████████████████████████████████████ █████████████████████ (*Id.*) A confused Cyrulnik did not accept the cryptic offer and told Roche that it was wrong and inscrutable for him to condition his support for participation in firm administrative functions on his extracting personal benefits for himself. (SMUF ¶ 30.)

Ava Labs distributed its first tranche of 540,000 Tokens in October 2020.  (SMUF ¶ 30.) Roche and Freedman received all of those Tokens but did not remit to Cyrulnik his 25% share, nor did they tell Cyrulnik about the distribution. (SMUF ¶ 30.)

At the end of January 2021, the Tokens started to rise in value astronomically, rocketing from roughly $3 per Token earlier that month to many multiples of that amount.  (SMUF ¶ 30.) By February 10, 2021, the price had reached more than $59 per Token, which meant that the Firm's stake was worth approximately $130 million.  (SMUF ¶ 30.)  The chart below reflects the appreciation in the Tokens' value:



(SMUF ¶ 30.)

### 2.    The Purported Removal of Cyrulnik from the Firm

Behind closed doors, Roche had been working on other partners to plant the seeds for a

big move to get back Cyrulnik's Tokens. Roche had been ███████████████████████

██████████████████████████████ (SMUF ¶ 34; Ex. 3 (Holcomb Dec. ¶ 26).) As

the Tokens multiplied in value in the two weeks preceding February 8, 2020, Roche reached out

to Normand, who secretly reached out to others. (SMUF ¶ 35.) They kept no records of their

meetings or communications. They excluded Fattaruso – the only partner who worked with

Cyrulnik on virtually all of his cases on a regular basis – from the secret discussions and

meetings. (SMUF ¶ 35.)

On February 8, 2021, the CC Defendants – comprised of five of the Firm's seven equity

partners at the time – secretly met at Normand's country club.  (SMUF ¶ 36.)  At no point prior

to this meeting had any of the CC Defendants informed Cyrulnik that they were meeting, or even

that they were ever considering voting to remove him.  (SMUF ¶ 37.)  Nonetheless, at the February 8 meeting, the CC Defendants expressly discussed conducting a vote to remove Cyrulnik from the firm.  (SMUF ¶ 38.)

Holcomb proposed that if there were actual issues that they consider raising the issues for Cyrulnik, but Freedman shut the suggestion down stating that this was the best time for them to make a move. (SMUF ¶ 37.) Freedman said that he and Roche had ████████████████

████████████████████████████████████████████████████████

██████ (SMUF ¶ 37.)

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Freedman

said they could all just go home and never mention a word to Cyrulnik about the meeting. Roche admitted that Freedman was exploiting the situation "as leverage for money and power." Fearful that the firm would fall apart without Roche, Holcomb agreed to vote in favor of the plan. (SMUF ¶ 38.) The partners essentially agreed to move forward with Roche's plan but decided to sleep on it. On February 10, 2021, the Conspiring Partners met again, this time over Zoom. (SMUF ¶ 39.)  They then purported to conduct a vote by which they removed Cyrulnik from the firm.

On February 12, 2021, the CC Defendants sent an email to Cyrulnik, stating that he had been removed from RCF.  (SMUF ¶ 40; Ex. 6 (the "Removal Email").)  In the Removal Email, the CC Defendants asserted the following grounds for his removal:

1. Two conversations (from July 2020 and December 2020) in which they claimed Cyrulnik had raised his voice in an "unprofessional, unhealthy" way;

2.  Unidentified instances of Cyrulnik's supposed "intent" to exercise unilateral control over the staffing of firm matters (largely his matters);

3. Creating a supposedly unsustainable environment for associates through unidentified actions;

4. Marginalizing other founding partners from meaningfully participating in the firm's operations in unidentified ways;

5. Temporizing and not participating in firm-related discussions in good faith.

(SMUF ¶ 40; Ex. 6.)  At no point prior to receipt of the Removal Email was Cyrulnik aware that anyone had discussed or suggested his removal from the Firm or had any of these issues even been alleged or raised to him.[4]  (SMUF ¶ 40.)

## C.    The Firm Files This Meritless Lawsuit

In the Removal Email, the CC Defendants stated that they wished to reach an "an agreement on compensation owed to you [Cyrulnik]" and then told him on a phone call later that day that they did not have a position yet on remitting his assets to him. (SMUF ¶ 43; Ex. 6.) Cyrulnik told them that if they committed to remitting his assets, including his Tokens, he would meet to discuss their proposal.

On Sunday, February 27, 2021, fearing that Cyrulnik would sue them to enforce his rights, RCF commenced this action by filing a preemptive complaint against Cyrulnik in this

---

[4] Indeed, in 14 months of interactions the *only* issue that was *ever* raised for Cyrulnik was the mutual disagreements he and the participants on the two phone calls had had about important firm policy issues.

Court, seeking a declaration that they were permitted to remove Cyrulnik notwithstanding the express provision in the MOU barring such removal, and that they could keep all of his assets. (Dkt. 1.)  On July 2, 2021, the Firm amended its complaint, adding claims for breach of fiduciary duty and intentional interference with contract arising from Cyrulnik's alleged interference with the firm's collection of fees owed from Cyrulnik's clients.  (Dkt. 31.)

On March 2, 2022, Cyrulnik filed his claims against RCF and the CC Defendants, alleging claims for dissolution (Count 1), buyout (Count 2) and an accounting (Count 3) under Florida's Revised Uniform Partnership Act ("FRUPA"), breach of contract (Count 4), breach of the implied covenant of good faith and fair dealing (Count 5), breach of fiduciary duty (Count 6), conversion (Count 7), unjust enrichment (Count 8), promissory estoppel (Count 9), and civil conspiracy (Count 10) and seeking (i) dissolution of RCF and the winding up of its affairs, (ii) alternatively, a buyout of his interest in RCF, (iii) an accounting of RCF from inception through present, (iv) compensatory damages, including the value of his equity interest in RCF and the value of the Tokens and other assets owed to him; (v) punitive damages; (vi) pre- and post-judgment interest; (vii) Cyrulnik's costs and attorneys' fees; and (viii) such other relief as is just and proper.  (Dkt. 72.)  On March 28, 2023, the Court denied the motion filed by the individual CC Defendants seeking to dismiss the claims against them on various grounds, including that FRUPA Section 620.8306 "does not bar claims against individual partners based on a partner's individual conduct or wrongdoing," and that Cyrulnik's allegations that "the Individual Counterclaim-Defendants conspired, voted, and engaged in other improper efforts to deprive him improperly of his assets" permit Cyrulnik to recover against each of them individually.  (Dkt. 372 at 23-24.)

**D.     The Aftermath of the CC Defendants' Actions**

17

Roche's, Freedman's, and Normand's deplorable plan has now been exposed in spades. One of the equity partners who was not invited to participate in the scheme, Paul Fattaruso, was so shocked to learn what his partners had just done, the lies they perpetrated about Cyrulnik and the inhuman conduct he had just witnessed, that he rejected the CC Defendants' pleas to stay at the Firm and left. (Fattaruso Dec. ¶ 8.) Even one of the CC Defendants, Nathan Holcomb, came to realize that Roche and Freedman had manipulated him and that he could no longer live with the lies and deception underlying the scheme. Holcomb left the firm in the middle of this litigation, admitting that he could not practice law with ███████████████████████ ██████████ and he proceeded to reveal the truth, further corroborating the core allegations in Cyrulnik's counterclaim.

Holcomb – *a CC Defendant in this action* – explained in detail the pretextual scheme that was perpetrated against Cyrulnik and that Cyrulnik's counterclaims seek to redress. Holcomb also revealed that Freedman was meeting with deposition witnesses within the firm in an illegal attempt to influence their testimony, and that he and another lawyer believed Freedman influenced witness testimony to support the firm's allegations against Cyrulnik.  *See* Ex. 3 (Holcomb Dec.) ¶ 49 ("During the summer of 2022, I learned that Freedman was privately meeting with witnesses within the firm in advance of their depositions in the Cyrulnik litigation. . . . I believed that Freedman was trying to influence witness' testimony and that this was improper. Another attorney at the firm approached me about this issue, expressed concern that Freedman was trying to influence that attorney's testimony to support his discrimination accusations[.]").

# ARGUMENT

## I.   THE LEGAL STANDARD ON SUMMARY JUDGMENT

"A party may move for summary judgment, identifying each claim or defense – or the

part of each claim or defense – on which summary judgment is sought," and the "court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jeffreys v.*

*City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  A fact is "material" if it "might affect the

outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could *reasonably* find for the plaintiff.  To defeat summary judgment, therefore, nonmoving

parties must do more than simply show that there is some metaphysical doubt as to the material

facts, and they may not rely on conclusory allegations or unsubstantiated speculation." *Id.* at

554.  "Establishing such facts requires going beyond the allegations of the pleadings, as the

moment has arrived to put up or shut up." *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F.

Supp. 2d 105, 116 (S.D.N.Y. 2008).

Under Florida law,[5] interpreting an unambiguous contract – including a partnership

agreement – involves a pure question of law for the court, and contracts are to be construed in

---

[5]  This Court previously determined that Florida law governs Cyrulnik's statutory counterclaims
under FRUPA (Counts 1-3). (*See* Dkt. 374 at 12, 13 n.5.) With respect to Cyrunik's common law
counterclaims (Counts 4-10), Counterclaim-Defendants concede that "there is no relevant
conflict" between the laws of Florida and New York.  However, in the event the Court
determines that a conflict of law exists between Florida and New York, pursuant to New York's
"significant relationship test, Florida law applies here.  *See Silverman v. Worsham Bros. Co.*, 625
F. Supp. 820, 826 (S.D.N.Y. 1986) ("Under New York law, the law of the state having the most
significant relationship to the matter in controversy governs contract disputes in the absence of

order to give effect to the intent of the parties.  *See Burns v. Barfield*, 732 So. 2d 1202, 1205 (Fla. Dist. Ct. App. 1999).  "[I]t is a well settled principle of contract law that where the terms of a contract are unambiguous, the parties' intent must be determined from within the four corners of the document.  In the absence of ambiguity, the language itself is the best evidence of the parties' intent and its plain meaning controls.  Contracts are to be construed in accordance with the plain meaning of the words contained therein."  *Id.*; *see also Barakat v. Broward County Hous. Auth.*, 771 So. 2d 1193, 1194-95 (Fla. Dist. Ct. App. 2000).  Where the terms of a contract are complete and unambiguous, parol evidence is not admissible, and "[t]he fact that both sides ascribe different meanings to the language does not mean the language is ambiguous so as to allow the admission of extrinsic evidence."  *Kipp v. Kipp*, 844 So. 2d 691, 694 (Fla. Dist. Ct. App. 2003).

## II.   CYRULNIK DID NOT "WITHDRAW" FROM THE FIRM

The plain language of the MOU expressly grants Cyrulnik enumerated assets (including 25% of the Tokens) that could not be taken from him unless he chose to "withdraw" from the firm.  (SMUF ¶ 12.)  Because there is no dispute that Cyrulnik did not *voluntarily* leave the firm – everyone acknowledges that the individual CC Defendants secretly met in February 2021 and purported to remove Cyrulnik against his will without informing him of even the prospect of such a removal, and directed their paralegals not to allow him to file papers in active litigations

---

an effective choice by the parties."); *Pictometry Int'l Corp. v. Air Am. Flight Ctr., LLC*, 394 F. Supp. 3d 320, 336 (W.D.N.Y. 2019) ("New York law provides that the laws of the jurisdiction that govern a foreign limited liability partnership shall determine its internal affairs.  Moreover, New York applies the internal affairs doctrine to claims for breach of fiduciary duty.").  In any event, New York follows the same general principles of contract interpretation.  *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002); *R/S Associates v. New York Job Development Authority*, 98 N.Y.2d 29 (2002); *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007).

with deadlines unless he removed his name from the firm (Cyrulnik Dec. ¶ 48) – there is likewise no genuine issue of material fact that Cyrulnik did not "withdraw" from the firm.  Accordingly, Cyrulnik is entitled to the assets he secured under the MOU (as well as his equitable share of the firm, under FRUPA's dissociation provisions), and the only task remaining for this Court is to determine the value of those assets and rights.

Recognizing that their contract unambiguously requires them to remit to Cyrulnik virtually[6] all of the assets at issue in this litigation unless he "withdrew" from the Firm, the RF Parties have resorted in this case to a tortured interpretation of the MOU – and the English language – to argue that, when they secretly terminated him, Cyrulnik actually was engaging in an act of "involuntarily withdrawing" from the firm.  Amended Complaint (Dkt. 31 ¶ 84.)  This is nonsense.  Not surprisingly, the few courts that have had occasion to analyze an attempted recharacterization of a termination or removal as an involuntary withdrawal have rejected it out of hand, reaching the obvious conclusion that the term "withdraw" refers to a voluntary act.

For example, in *260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*, 137 A.D.3d 457 (1st Dep't 2016), the parties disputed the interpretation of the term "withdraw" in a guaranty agreement.  The court rejected the argument that a partner who had been terminated for cause had "withdrawn" from the partnership.

> **The term "withdraws,"** as employed in the parties' **unambiguous** guaranty and interpreted according to its plain meaning, **refers to a voluntary act**.  Because defendants, who are seasoned attorneys, chose not to employ terms such as "involuntarily withdraws," "withdraws for cause," "is terminated" or other similar language**, it is reasonable to conclude that they did not intend for an attorney departing the firm under such involuntary circumstances to be**

---

[6] As explained below, the Side Letter provides for two forms of consideration that Roche and Freedman promised Cyrulnik and that could only be taken back if a partner was properly removed for cause. Cyrulnik's claims also seek remittance of those two assets, with respect to which summary judgment is warranted on other grounds, as set forth in Section IV.

> **considered** the first guarantor who "retires or **withdraws**" under the guaranty.

*Id.* at 457-58.

Similarly, in *Cadwalader, Wickersham & Taft v. Beasley*, 728 So.2d 253 (Fla. Dist. Ct. App. 1998), a law firm argued that a former partner ("Beasley") at a satellite office that was being closed down was a "withdrawn partner" – and thereby entitled to recover only his paid-in capital – after the partner declined the firm's offer to relocate, sued the firm, and was then kicked out of the office and told to cease representing himself as being associated with the firm.  The court rejected the argument, ruling that "the term 'withdrawn' neither contemplated nor encompassed a partner expelled in the same manner as Beasley, especially since Beasley never provided any written notice of a voluntary withdrawal."  *Id.* at 257.

And in *Love v. Fleetway Air Freight & Delivery Serv., L.L.C.*, 875 So. 2d 285 (Ala. 2003), the court found that a member of an LLC who was terminated by the other members did not "withdraw" (and thus, like Cyrulnik, was entitled to his full compensation rights), since a "withdrawal" must be a "voluntary" act:

> We first note that the most appropriate definition of "withdraw" contained in Merriam–Webster's Collegiate Dictionary (11th ed. 2003) for this case is 'to remove oneself from participation.'  Thus, unless defined otherwise in the parties' agreements, the act of withdrawal is usually considered to be a voluntary act. We find nothing in the member's agreement or in the operating agreement that persuades us to give the terms 'withdraw' and 'withdrawing member' anything other than their ordinary and usual meanings.[7]

---

[7] That court's approach is consistent with the law across jurisdictions: "it is common practice for the courts of this [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (citing *Mazzola v. Cnty. of Suffolk,* 143 A.D.2d 734, 735, 533 N.Y.S.2d 297, 297 (2d Dep't 1988)).  Similarly under Florida law, "[i]n order to determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance."  *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001).

*Id.* at 289.[8]

Indeed, Florida's Revised Uniform Partnership Act ("FRUPA"), which this Court has already determined governs Cyrulnik's statutory causes of action (Dkt. 374 at n.5), distinguishes between voluntary "withdrawals" and involuntary removals – using the term "withdraw" in connection with the former (a voluntary decision to leave), but "expulsion" in a separate provision in connection with the latter (the decision made by others to remove). *See* Fl. Stat. § 620.8601 ("Events causing partner's dissociation") ("(1) The partnership having notice of the partner's express will to immediately withdraw as a partner or withdraw on a later date specified by the partner; … (3) The partner's expulsion pursuant to the partnership agreement…").

There is no reasonable interpretation of the MOU whereby the CC Defendants' involuntary removal of Cyrulnik was in fact an act of "withdrawal" from the Firm by Cyrulnik. Indeed, in addition to the foregoing authority, the parties' agreements themselves further demonstrate the point. Section VI(C) of the MOU, entitled "Withdrawal from the Firm" (the "Withdrawal Provision"), provides for certain financial consequences "[i]f any partner withdraws from the firm within 18 months from the Firm's formation." (Ex. 2 § VI(C).) *Separately*, Section VI(G) of the MOU, entitled "Partner Removal" (the "Removal Provision") addresses the involuntary termination of a partner, and in addition to expressly prohibiting the

---

[8]  In their Pre-Motion Letter, the RF Parties' claimed that Cyrulnik's counsel's law firm had previously argued in favor of the concept of an "involuntary withdrawal" in a litigation against a former partner.  (*See* Dkt. 401 at -2, citing *Pitcock v. Kasowitz*, 2009 WL 3240385 (N.Y. Sup. Ct. Sept. 29, 2009) and *Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP¸* 2010 WL 2430910 (N.Y. Sup. Ct. Feb. 22, 2010)).  They have it backwards: the law firm there made the exact *opposite* argument, *i.e.*, that the partner had been terminated for cause and was *not* entitled to post-termination benefits provided to withdrawing partners.  It was the *partner* that made the argument he had "involuntarily withdrawn" in order to try and obtain additional separation benefits under the partnership agreement.  And of course the court *rejected* Pitcock's argument – just like it should reject the RF Parties' argument here – and ruled that Pitcock had been terminated for cause and did not "involuntarily withdraw."  *Pitcock*, 2009 WL 3240385 at 6.

removal a Founding Partner without cause, it also does not provide for the partner's relinquishment of any of the enumerated assets he received under the MOU in the event of such removal (*id.* § VI(G)) – in stark contrast to the separate provision governing that partner's withdrawal from the Firm and his forfeiture of certain assets (*id.* § VI(C)).  That those two scenarios are set forth in two entirely different provisions of the MOU is, in and of itself, fatal to the RF Parties' baseless position, and requires summary judgment in favor of Cyrulnik on his claims.

If the parties had intended "Removal" to be a "Withdrawal," they would not have distinguished between these types of departures by addressing these different types of departures in two separate provisions.  Indeed, it is unclear why the term "Withdrawal" – whose plain English ordinary use connotates a voluntary act of taking oneself out – would have been used at all, given that there are other terms (such as "separation" or "departure") that would cover both voluntary and involuntary acts.  Furthermore, if the term "Withdrawal" was intended to reference any type of departure from the firm (voluntary or involuntary), there would have been no need for the MOU to separate out a distinct provision addressing the unquestionably "involuntary" departure resulting from the death of a partner – but the parties included a separate provision for that type of involuntary departure as well (which carries its own financial terms).  *See* MOU Section VI(H) ("Death of a Partner").

In sum, it is clear that the parties' agreement and chosen language clearly distinguishes between (i) voluntary departures ("Withdrawals" in Section VI(C)); (ii) involuntary departures in the form of a partner's death ("Death of a Partner" Section VI(H)); and (iii) involuntary departures in the form of a forced termination ("Partner Removal in Section VI(G)) – leaving no room for any colorable argument that Cyrulnik "withdrew" from the Firm.

24

To the extent the Court does not decide this issue on the plain language of the MOU and considers extrinsic evidence, another contemporaneous and related agreement between certain of the parties conclusively debunks the notion that the parties intended to use the term "withdrawal" to include an involuntary termination.  Virtually concurrent with entering into the MOU, Cyrulnik, Roche and Freedman entered into an agreement (the "Side Letter") regarding the ordering of the named partners in "Roche Cyrulnik Freedman LLP," and payments Roche agreed to make in connection therewith.  (Ex. 7.)  The Side Letter addresses what would happen with those installment payments if either Cyrulnik or Freedman departed the firm, and provides that "[s]hould Freedman or Cyrulnik *voluntarily leave the firm or be terminated for cause* before any of the foregoing payments is scheduled to be paid, the departing partner's remaining payments hereunder will be forfeited back to Roche."  (*Id.*)  Clearly, the parties recognized and understood the difference between voluntarily leaving the Firm and being involuntarily "terminated for cause" and expressly distinguished between those two acts.  Had they intended to institute monetary consequences to a partner being involuntarily terminated in the MOU, they would have done so, much like they did in the Side Letter.

As there is no genuine issue of material issue regarding whether Cyrulnik "withdrew" from RCF (he did not), summary judgment should be granted in favor of Cyrulnik and against the RF Parties on the issue of their liability to Cyrulnik in connection with Counts 4-10 of his Counterclaim, as well as summary judgment dismissing Count 1 of the RF Parties' Amended Complaint, which seeks a declaratory judgment that their seizure of Cyrulnik's assets was permissible on the grounds that Cyrulnik was terminated for cause and therefore "withdrew" from RCF.

### III.   THE MOU IS ENFORCEABLE

Likely recognizing that their arguments for seizing Cyrulnik's assets on the grounds that he "involuntarily withdrew" from the firm have no support in the MOU or the law (or common sense), the RF Parties have begun arguing that key provisions in the MOU – or even the MOU in its entirety – are somehow unenforceable nullities.  That inscrutable claim is meritless.

#### A.   The Plain Language of the Parties' Agreement Allocates to Cyrulnik 27% of the Firm's Equity Without A Condition Precedent

Initially (both in the original complaint and the operative Amended Complaint, filed more than four months later), the RF Parties took the position in this litigation that execution of a long-form partnership agreement was a condition precedent to enforceability only of Section II of the MOU, which provided Cyrulnik a 27% share of the equity of the Firm he had co-founded and overseen for fourteen months.  *See* Amended Complaint (Dkt. 31 ¶¶ 18, 23-24) (alleging that "the MOU provided for a proposed division of RCF's *equity* to be effective after a formal partnership agreement was entered into by the Founding Partners," which provision stated that "After execution of the Partnership Agreement, and effective January 2020, the *equity* division in the Firm will be the following . . ."); *see also* Dkt. 1 ¶¶ 18, 23-24).  The argument is remarkable, including because the parties worked together for more than a year with countless representations to each other (and the federal government) that they were owners of the firm they had just launched, and *no one ever* raised this fanciful claim until this litigation.  (SMUF ¶ 17.) But it also fails as a matter of law.

For starters, "[a]s a general rule, conditions precedent are not favored, and courts will not construe provisions to be such, unless required to do so by plain, unambiguous language or by necessary implication."  *In re Estate of Boyar*, 592 So. 2d 341, 343 (Fla. Dist. Ct. App. 1992); *Gunderson v. School Dist. of Hillsborough County*, 937 So. 2d 777, 779 (Fla. Dist. Ct. App.

2006) ("Provisions of a contract will only be considered conditions precedent or subsequent where the express wording of the disputed provision conditions formation of a contract and or performance of the contract on the completion of the conditions."); *see also Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289, 299 (S.D.N.Y. 2011) (contract must be "unmistakably clear that a condition precedent was intended"); *Bed Bath & Beyond Inc. v. IBEX Const., LLC*, 52 A.D.3d 413 (1st Dep't 2008) (letter of intent was binding agreement where plain language manifested parties' intent to be bound by its terms; use of the language "subject to" and reference to the execution of a formal agreement "do not amount to an express reservation of the right not to be bound or a condition precedent to the formation of a binding contract").

While there is no specific required language to create a condition precedent, "such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose." *Gay v. Brencorp, Inc.*, 2012 WL 162354, at *8 (M.D. Fla. Jan. 19, 2012).  Here, the MOU contains *none* of those terms – or, for that matter, any language stating that a final partnership agreement was a condition precedent for the equity allocation set forth in Section II (or for the MOU as a whole to be a binding contract).  To the contrary, the MOU reflects the parties' present agreement regarding the equity allocation in the new partnership the parties were creating (and that they launched the following week), which prior agreed-upon allocation would be memorialized in the partnership agreement once it was finalized.

For example, Section IV unequivocally states that "Roche Freedman LLP **will be merged** into the Firm [defined in Section I as "Roche Cyrulnik Freedman LLP"] **in January 2020**."  (Ex. 2 § VI (emphasis added); *see also id.* § VI.B ("[T]he Founding Partners understand that Roche Freedman LLP ***has agreed*** to distribute its [] Tokens according to the following breakdown . . .").)  None of this language even hints that the parties had any intention that the

27

terms set forth in the MOU were not final and binding, and it in no way makes "unmistakably clear" that the formation of a binding contract was contingent upon the finalization of a formal partnership agreement.

Moreover, even if finalization of a partnership agreement were a condition precedent, that wouldn't give the RF Parties the right to evade their obligations under the MOU in any event, for two reasons.  *First*, satisfaction of that condition should be excused because it was not material to the parties' agreement, as evidenced by the fact that the parties operated their law firm for more than a year under the terms of the MOU, despite the absence of a final partnership agreement, and in fact the CC Defendants did not execute a long-form partnership agreement for almost *two years*.  (SMUF ¶ 17.)  *See Gay*, 2012 WL 162354, at *8-9 (non-occurrence of condition may be excused if it would cause "disproportionate forfeiture," "unless its occurrence was a material part of the agreed exchange; excusing alleged condition precedent as "simply a formality" where the parties performed under their agreement despite its non-occurrence). *Second*, even if the RF parties were correct that a long-form partnership agreement were required, under their own argument each of the CC Defendants was contractually obligated to negotiate and sign such a long-form agreement in good faith.  The RF Parties' failure to fulfill their own contractual obligation (which necessarily prevented Cyrulnik's performance since each of them would have needed to sign any such agreement) cannot possibly excuse their remaining material obligations under the parties' binding contract, like allocating equity in accordance with the parties' negotiated percentages.  The law does not permit a party to renege on an obligation thereby preventing another party from performing and then claim that the non-occurrence of that event excuses the rest of their obligations and permits them to take for themselves a windfall of tens of millions of dollars.  *See, e.g.*, *Hanover Realty Corp. v. Codomo*, 95 So. 2d 420, 423 (Fla.

1957) ("[O]ne who prevents or makes impossible the performance or happening of a condition

precedent upon which his liability by the terms of a contract is made to depend cannot avail

himself of its nonperformance."); *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of

New York*, 28 N.Y.2d 101, 106 (1971) ("A party to a contract cannot rely on the failure of

another to perform a condition precedent where he has frustrated or prevented the occurrence of

the condition.").

    **B.**    **The RF Parties' Efforts To Expand Their Meritless Equity Provision
Argument To the Rest of the Agreement Is Baseless On Its Face**

Even if the Court were to conclude – contrary to the plain terms of the MOU and

established law – that the phrase "[a]fter execution of the Partnership Agreement" in Section II

of the MOU contained a condition precedent, that condition would necessarily relate *only* to the

*division of equity* in Section II where that language appears, not the MOU as a whole. The

condition would have no impact on Cyrulnik's entitlement to his 25% allocation of the Tokens

provided in Section IV.B of the MOU, which unequivocally provides that "the Founding

Partners understand that Roche Freedman LLP **has agreed** to distribute its [ ] Tokens according

to the following breakdown:  Jason Cyrulnik 25% . . . ."  (Ex. 2 (MOU) § II (emphasis added).)

Likely in recognition that their condition precedent argument is meritless and, even if

successful, would not permit them to retain Cyrulnik's Tokens, the RF Parties now appear to

have advanced an even bolder and more audacious argument – absent from their Amended

Complaint, and contradictory to the claims they have asserted therein – that the *entire* MOU is

merely an unenforceable "agreement to agree."  *See* CC Defendants' SJ Pre-Motion Letter (Dkt.

395) at 2.  In other words, because a long-form "partnership agreement" had not been executed

before the time they perpetrated their removal scheme, the parties' operative agreement for

fourteen months – the MOU under which they all ran a law firm with more than twenty lawyers,

dozens of clients, and tens of millions of dollars being generated, is somehow an unenforceable nullity; the RCF partnership was never formed; and Cyrulnik was merely an *employee* of the old 2-lawyer Roche Freedman LLP firm.

This argument is as absurd as it sounds, particularly insofar as it resoundingly contradicts the RF Parties' own prior statements and positions in this very case, and of course 14 months of contemporaneous conduct before they were incentivized by greed to turn reality on its head to try and steal Cyrulnik's assets. Even their February 12, 2021 email purporting to remove Cyrulnik from the firm expressly states that the RF Parties had "voted to remove [Cyrulnik] for cause *from the firm's partnership*" and was signed by Roche as a "Partner" of "*Roche Cyrulnik Freedman LLP,*" citing the removal procedure *in the MOU*. (Ex. 6.) Worse, the complaint and amended complaint they filed in this matter expressly seek relief *under the very same MOU they now claim was never binding*. (Compl. ¶ 75 ("Defendant was removed for cause, *per the Memorandum of Understanding...*").)[9] Indeed, the very first sentence of the Amended Complaint refers to Cyrulnik as a "partner" of RCF. (Am. Compl. ¶ 1.) And the RF Parties have repeatedly represented to the federal government, banking institutions, insurance carriers, including under penalty of perjury, as well as in dozens of letters and firm records, that Cyrulnik is a 27% owner of RCF. (*Supra*, pp. 9-10; SMUF ¶ 17.) The firm did not withhold taxes from Cyrulnik (or any of the other firm owners) – which of course they would have been required to do if Cyrulnik were not an owner – instead issuing draw after draw and telling Cyrulnik and the

---

[9]  *See also*, *e.g.*, Am. Compl. ¶ 16-17 ("During the course of these negotiations, the prospective partners discussed and **agreed to** a variety of things, ranging from how the Firm would allocate profits, compensate partners, and govern itself. ... On December 27, 2019, after significant negotiations and **oral understandings and agreements had been reached**, Roche, Freedman, Cyrulnik, Normand, Friedland, and Holcomb (collectively, the 'Founding Partners') executed a memorandum of understanding (the 'MOU'). ... **The MOU memorialized portions of the agreements reached** between the Founding Partners...") (emphasis added).

other equity partners that they were owners of the firm and being treated accordingly.  (SMUF ¶ 17.)  This continued month after month after month, including in December 2020 when Cyrulnik led the Firm's equity partner meeting and presented its year-end financials.  (*Id.* ¶ 17.)[10]

The RF Parties' argument fails under the law as well.  It is well established that "[e]ven though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them" and "contract[s] should not be held void for uncertainty unless there is no other way out." *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974); *see also Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) ("[P]arties to a contract do not have to deal with every contingency in order to have an enforceable contract."); *In re Sav-A-Stop Inc.*, 124 B.R. 356, 359 (Bankr. M.D. Fla. 1991) ("[T]he fact that an agreement may provide that a further more specific agreement will be entered into later does not affect the enforceability of the original agreement" and "not all details of such a future agreement need be set forth in order to make the agreement to agree enforceable").  And of course the law is clear that a written partnership agreement is not necessary to form a partnership under Florida law in the first place.  *See* FRUPA § 8202(1); *Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 5 (Fla. Dist. Ct. App. 2003).[11]

---

[10]  Indeed, Roche himself concedes that he made multiple payments to Cyrulnik and Freedman required by the Side Letter (discussed *supra*) in connection with the naming rights of Roche Cyrulnik Freedman LLP, belying any argument that the parties did not in fact form RCF. (SMUF ¶ 10; Ex. 9 (Roche. Dep. Tr.) at 59:12-60:5. )

[11]  Indeed, even if the Court were to find that the MOU is not a binding contract (it is), Cyrulnik would still have been a partner in RCF pursuant to an oral partnership agreement, rendering the MOU's "Removal Provision" on which the RF Parties' purported to base their actions inapplicable.  In that scenario, pursuant to FRUPA, Cyrulnik would be entitled to summary judgment granting either (i) dissolution of RCF under § 620.8801(5) and the winding up of RCF's activities and settling of RCF's accounts in accordance with § 620.8801-8807 (Count 1 of

In re Lorenzo, 434 B.R. 695 (Bankr. M.D. Fla. 2010), is instructive. There, the parties entered into an agreement regarding their new business relationship (the "Nominee Agreement") which, like here, included a provision indicating that the parties intended to enter into a formal operating agreement to govern the management and operation of their real estate company. *Id.* at 704. Just as the RF Parties have argued here, the plaintiff there argued that the parties intended for the future operating agreement to govern their relationship, and that the Nominee Agreement was therefore not intended to be binding. *See id.* The court noted that plaintiff's argument was undercut by the fact that the plaintiff's complaint was partially premised on the Nominee Agreement, just as the RF Parties' complaint is here. *See id.* The court held that the Nominee Agreement was a valid, enforceable contract, finding that effectiveness of the agreement was *not* contingent on the anticipated formal operating agreement, and that the plain, unambiguous language of the agreement, as well as the parties' actions, established that they intended the agreement to be binding. *See id.* at 705.

Here, as in *Lorenzo*, the MOU is not merely a non-binding "agreement to agree," unenforceable absent the finalization and execution of a long-form "partnership agreement." The MOU was a heavily negotiated agreement setting forth the most essential terms of the parties' partnership relationship, which the parties agreed would subsequently be incorporated into a long-form partnership agreement. (*See* Ex. 2 § I ("This MOU sets out the basic terms upon which the Founding Partners will enter into a definitive partnership agreement").) The undisputed drafting and negotiation history confirms that the parties intended and ensured that the Founding Partners had a binding agreement in place *before* they left their long-standing

Cyrulnik's Counterclaim), or (ii) a buyout pursuant to § 620.8701 providing Cyrulnik with the proper value of his interest in RCF (Count 2 of Cyrulnik's Counterclaim).

positions at BSF.  (SMUF ¶ 14.)  Their refusal to announce their departure from BSF until the

MOU was negotiated, finalized, and signed would of course make no sense if they were signing

an unenforceable agreement to agree.  Indeed, during their negotiations over the MOU, an early

draft contained a clause stating that the MOU was not binding, but the parties expressly agreed to

strike that provision – for this very reason, *i.e.*, to ensure that the MOU itself was a binding,

enforceable agreement setting forth the Founding Partners' rights – and the final executed MOU

reflects that change.  (SMUF ¶ 14 Ex. 2.)

There is therefore no question that the parties understood and intended the MOU to be a

binding agreement setting forth the essential terms of their partnership.  Indeed, the parties in

fact formed, announced and launched the partnership in accordance with the MOU, and the

partnership operated under the MOU for more than a year.  (SMUF ¶ 17.)  The fact that the

Founding Partners agreed that they would *also subsequently* draft and execute a long-form

agreement does not perversely transform their binding agreement – under which they operated a

law firm with seven equity (and multiple non-equity) partners, numerous employees, and

multiple clients for more than a year – into an unenforceable nullity.  Accordingly, there is no

genuine issue of material fact regarding whether the MOU is an enforceable agreement between

the parties, and the RF Parties cannot avoid summary judgment on Counts 4-10 of Cyrulnik's

Counterclaim (and dismissal of Count 1 of their own Amended Complaint) on these grounds.[12]

---

[12]  Notably, just this week, a Florida court denied these same CC Defendants' motion to dismiss
claims brought against them by another former RCF partner, Paul Fattaruso, who was not even a
signatory to the MOU.  Rejecting many of the same arguments the RF Parties have advanced
here, the court found that a partnership can be formed without any agreement, and that the RF
Parties' efforts to pretend that their partner was really an employee were unavailing.

## IV.    CYRULNIK WAS NOT REMOVED FOR "CAUSE"

There is no genuine issue of material fact regarding whether Cyrulnik was properly

terminated from the firm "for cause" under Florida law:  he was not.  Before Cyrulnik agreed to

relinquish his long-standing equity partnership at BSF and co-found RCF, he and the other

founding partners negotiated certain basic and definitive rights, including that as a "Founding

Partner" he could not be removed from the firm without "cause."  (Ex. 2 (MOU) § VI(G) ("A

Founding Partner cannot be removed without cause.").)

Cyrulnik worked tirelessly to co-found and launch the Firm, where he and the other

Founding Partners worked for over a year.  Without notice of any meeting, or of any discussion

about removing anyone from the partnership for any reason, on February 12, 2021, Roche sent

an email to Cyrulnik stating that, "pursuant to the December 2019 MOU, [some of the Firm's

equity partners had] voted to remove you from the firm's partnership."  (SMUF ¶ 17; Ex. 6.)

The Removal Letter vaguely asserted that Cyrulnik had "breached the 2019 MOU by, *inter* alia,

failing to work together and co-operate in good faith and to fully participate to develop the Firm"

and that Cyrulnik had "also engaged in a pattern of conduct that has made it not reasonably

practicable to carry on the firm and its operations with your involvement."  (*Id*.)

Under Florida law, "[a]s understood by the Florida Supreme Court and other courts,

'misconduct' or 'termination for cause' refers to ***illegal activity, ethical breaches, or utter***

***abandonment or dereliction of a job***."  *Comprehensive Care Corp. v. Katzman*, 2010 WL

3190136, at *6 (M.D. Fla. July 30, 2010) (citing *State ex rel. Hathaway v. Smith*, 160 Fla 485

(1948)).  In *Katzman*, the plaintiff, a former vice president of the plaintiff corporation, sued the

corporation for violation of his employment contract following his purported termination for

cause.  The employment agreement permitted the corporation to terminate the plaintiff for

"misconduct in office," which the court noted is also referred to as "Termination for Cause."  *Id.*

34

at *6. While the agreement did not define "misconduct in office," just as the MOU here does not define "for cause," the court recognized that "the term 'termination for cause' has a well-settled meaning" and applied the Florida Supreme Court's definition noted above. *Id.*[13]

Whether the CC Defendants' claimed grounds for their action constitutes "cause" is analyzed based on the information that was available to the RF Parties at the time they made their decision to remove Cyrulnik, *i.e.*, the propriety of their decision to remove Cyrulnik is reviewed based on the grounds upon which they based their decision. *See DeLeonardis v. Credit Agricole Indosuez*, 2000 WL 1718543, at *12 (S.D.N.Y. Nov. 15, 2000) (noting that with respect to question of whether plaintiff was terminated for cause, "what matters is . . . what senior management reasonably believed and relied on in making their decision to terminate the plaintiff"); *King v. Fox*, 2005 WL 3098933, at  5 (S.D.N.Y. Nov. 18, 2005) ("'[A]fter-acquired evidence' is not relevant to the issue of whether the [client's] discharge [of his attorney] was for cause . . . [T]he inquiry simply asks whether the client was justified in terminating the attorney-client relationship. Factors identified only after the relationship has been severed cannot have placed a role in causing the breakdown."); *see also Tomasini v. Mount Sinai Med. Ctr. of Florida, Inc.*, 315 F. Supp. 2d 1252, 1257-58 (S.D. Fla. 2004) (declining to permit employer to rely on after-acquired evidence of employee's misconduct in defense of discharged employee's breach of contract claim). Accordingly, the RF Parties cannot rely on after-acquired information

---

[13]   The RF Parties' argument in their Pre-Motion Letter (at 2-3) that an "inability to get along with supervisors and co-workers is a legitimate basis for removal" is entirely misguided. The cases they rely on for this proposition are employment discrimination cases involving at-will employees. *See Rikhy v. AMC Comput. Corp.*, 2003 WL 1618529 (S.D.N.Y. Mar. 28, 2003) (sales associate alleging race, national origin, ethnicity, religion and/or age discrimination and retaliation); *Orellana v. Reiss Wholesale Hardware Co., Inc.*, 2016 WL 4480720 (E.D.N.Y. June 8, 2016) (warehouse employee alleging racial discrimination and retaliation). These cases are inapposite and irrelevant to whether the RF Parties had "cause" to remove Cyrulnik pursuant to the MOU.

in a desperate attempt to provide *post-hoc* justifications for their improper removal of Cyrulnik in breach of the MOU.

Accordingly, there is simply no evidence upon which a jury could reasonably conclude that the RF Parties had "cause" to remove Cyrulnik.  Even if all of the allegations of misconduct set forth in the Removal Email were supported by evidence (not remotely the case here, as Cyrulnik will demonstrate in opposition to the motion he expects to be filed by the RF Parties), those allegations do not come close to rising to the level required under clear Florida precedent requiring a showing of any of the three categories of cause.  Cyrulnik was not engaged in any illegal activity, nor was there any allegation to the contrary.  (Ex. 6.)  Cyrulnik did not engage in ethical breaches, and again no allegation to the contrary in the Removal Email.  (Ex. 6.) Cyrulnik did the opposite of "utter abandonment or dereliction of a job," and there was no allegation to the contrary in the Removal Email.  (Ex. 6.)

Indeed, none of the ostensible bases for Cyrulnik's removal even remotely relate to any category of behavior qualifying as "cause" for removal under Florida law.  Rather, every purported reason set forth in the Removal Email boils down to differences in management style, hurt feelings, and office politics.  If such conduct could constitute "cause" to remove a partner from a law firm, then there would never *not* be cause – the requirement that cause be shown would be superfluous, and a partner subject to a for-cause requirement could be fired for any reason whatsoever – no different than an employee at will.

As there is no genuine issue of material fact regarding whether Cyrulnik was removed for cause (he was not), summary judgment should be granted in favor of Cyrulnik on Counts 1 and 4-10 of his Counterclaim and Count I of the RF Parties' Amended Complaint.

## V.    CYRULNIK IS ENTITLED TO SUMMARY JUDGMENT ON THE FIRM'S CLAIMS

In their Amended Complaint, in addition to asserting a claim for declaratory relief, which seeks the opposite relief that Cyrulnik seeks (*i.e.*, that Cyrulnik is not entitled to any compensation relating to his removal (Count 1), and which fails for the same reasons Cyrulnik is entitled to summary judgment on *his* claims for relief – RCF asserts two baseless claims alleging that Cyrulnik somehow interfered with RCF's ability to collect fees owed to the firm (Counts II and III). Specifically, in Count II, RCF claims that Cyrulnik breached his fiduciary duty by failing to provide his billable time records to the firm, failing to assist the firm in collecting fees owed to the firm, and advising his clients to withhold payment from the firm (Dkt. 31 ¶¶ 90-99); while in Count III, RCF asserts that the same conduct gives rise to a claim for intentional interference with contract (*id.* at ¶¶ 100-108). Both of these claims are without merit because the record is devoid of any evidence to support them: RCF has not and cannot point to a single document or a single word of deposition testimony that supports their assertion that Cyrulnik conspired with his clients to not pay the firm, or even that Cyrulnik encouraged them not to do so.

Indeed, RCF's claims are utterly baseless: Cyrulnik did not do any of the things he is alleged to have done, and RCF has no evidence he did. The undisputed record shows that Cyrulnik ***never once*** advised a ***single client*** not to pay their invoices, that in the aftermath of the RF Parties' scheme, some clients paid invoices the RF Parties issued and others did not, including because of the RF Parties' mistreatment of those clients in the wake of their decision to have Cyrulnik continue to lead their cases.

RCF's claims are not only devoid of factual support, they are logically absurd on their face. Under the firm's formula compensation system (attached as an exhibit to the MOU), Cyrulnik would receive the lion's share of fees paid to RCF by his clients – at least 30%, plus

another 45% of any fees related to hours he personally billed.  (Ex. 2 at 31.)  By encouraging his clients not to pay RCF, Cyrulnik would in effect be encouraging his clients not to pay *Cyrulnik* – which makes no sense on its face.  Indeed, the fact that Cyrulnik would be entitled to the majority of any fees collected from these clients is likely why RCF has not commenced any collection actions against the clients RCF claims have not paid their bills.  (SMUF ¶ 50.)  In fact, in a sworn discovery response in the Florida action commenced by another former RCF partner, Paul Fattaruso, the RF Parties *admitted* that they "strategically" and intentionally decided not to pursue collections from those clients because they thought that it would be better for the RF Parties' case against Cyrulnik (and because most of the money would be remitted to Cyrulnik).  (Ex. 8 at 7.)  This fact alone is fatal to Counts II and III.

In sum, because they cannot rely on "mere speculation or conjecture as to the true nature of the facts," *Rodriguez*, 291 F. Supp. 3d at 407, the RF Parties are not able to show that any genuine issue of material fact exists for the trier of fact to decide, as they must in order to survive a motion for summary judgment, and Cyrulnik is entitled to summary judgment dismissing Counts II and III (as well as Count I) of the Amended Complaint.

**VI.   CYRULNIK IS ENTITLED TO SUMMARY JUDGMENT ON ROCHE'S FRAUDULENT INDUCEMENT COUNTERCLAIM**

More than two years after the commencement of this action, counterclaim-defendant Roche asserted a baseless fraudulent inducement counterclaim against Cyrulnik.  (*See* Dkt. 385.)

Roche alleges that, during negotiations over the founding of RCF, Cyrulnik misrepresented the terms under which he was considering accepting an offer to join the partnership of Patterson Belknap Webb & Tyler LLP (the "Patterson Offer").  (Dkt. 385 ¶ 6.) Roche further alleges that, given the risk he would be taking by passing on the Patterson Offer, Cyrulnik demanded to be compensated if he agreed to co-found RCF and Roche remained the

first named partner.  (*Id.* ¶ 8.)  Purportedly in reliance on the Patterson Offer, Roche paid

Cyrulnik $850,000 to join the firm and to allow Roche to remain the first named partner, and

paid Freedman $650,000 to move from second to third name partner.  (*Id.* ¶¶ 9-10.)  Roche

claims that he was damaged because Cyrulnik's representations regarding the terms of the

Patterson Offer were allegedly false, and those representations were allegedly the only reason he

agreed to pay $1,500,000 to Cyrulnik and Freedman.  (*Id.* ¶ 16.)

The Court should grant summary judgment in Cyrulnik's favor dismissing Roche's

counterclaim for four reasons.

*First*, Cyrulnik is entitled to summary judgment because the record is devoid of any

evidence upon which a reasonable jury could conclude that Cyrulnik acted with an intent to

defraud.  There is absolutely no evidence in the record which could lead a reasonable jury to rule

in Roche's favor.  All that Roche has in support on this issue are his unsubstantiated allegations

that "Cyrulnik intended for Roche to rely upon his misrepresentations concerning the Patterson

Offer in order to negotiate lucrative financial terms during the negotiation (Dkt. 385 ¶ 9), and

that "Cyrulnik made these misrepresentations with the intention that Roche and Freedman rely

on it" (*id.* ¶ 14).  Because all that Roche can show is conjecture and unsupported allegations, he

cannot survive summary judgment.  *See Jeffreys*, 426 F.3d at 554; *In re Eugenia VI Venture

Holdings, Ltd. Litig.*, 649 F. Supp. at 116.

*Second*, even if Roche were able to establish the existence of genuine issues of fact

regarding Cyrulnik's intent to deceive, the evidence establishes that Roche did not rely

(justifiably or otherwise) on Cyrulnik's alleged misrepresentations in agreeing to make the

payments at issue.  "[I]t is insufficient for a fraud plaintiff to show merely that some chain of

events beginning with a false statement by defendants led to his injury. Rather, a plaintiff must

show that its reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it." *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at \*12 (S.D.N.Y. Feb. 15, 2013).  Roche cannot make this showing because, as the evidence shows, Roche's decision to make the payments at issue had nothing to do with Cyrulnik's alleged misrepresentations at all.  Rather, Roche agreed to make those payments because, █████████ ████████████████████████████████████████████████████████████████ ████████████████.  (SMUF ¶ 10; Ex. 10 (Freedman Dep. Tr.) at 284:22-285:8.) Furthermore, even if the evidence did show that Roche relied on the alleged misrepresentations, there is no genuine issue of material fact regarding whether that reliance would have been reasonable, as there is no evidence that Roche made any sort of "inquiry and investigation . . . to ferret out the reliability or truth about the material facts." *Amusement Indus., Inc.*, 2013 WL 628533, at \*12.  Indeed, Roche does not even allege any such inquiry.  Accordingly, there is no basis upon which a jury could find that Roche reasonably relied on any alleged misrepresentations by Cyrulnik.

*Third*, none of Cyrulnik's alleged misrepresentations were actionable statements.  At most, the statements alleged by Roche were mere "puffery, which is inherently ill-suited to claims of fraud." *Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*, 2020 WL 614991, at \*7-8 (S.D.N.Y. Feb. 10, 2020), citing *Union Car Advert. Co. v. Collier*, 263 N.Y. 386, 398 (1934) ("Exaggeration, puffing, boasting appear to be the very breath of salesmanship.  We never expect detraction, always overemphasis. [Defendant] was a little bit too boastful, but he was bragging about his own business, which, if not commendable, is at least not unusual.").  The statements allegedly made by Cyrulnik during the course of the parties' negotiations – boasting

about the value he would bring to the firm and the salary he could obtain elsewhere – are the classic case of puffery during negotiations and plainly not actionable misrepresentations upon which a fraudulent inducement claim can be premised; if they were, it would subject virtually every person in the country negotiating a job offer to a fraud claim.

*Fourth*, Roche cannot establish that he suffered any damages as a result of the alleged fraud.  Under New York law, only "out of pocket" damages are recoverable on a fraudulent inducement claim.  *See New York Wheel Owner LLC v. Mammoet Holding, B.V.*, 481 F. Supp. 3d 2016, 235 (S.D.N.Y. 2020).  "'Out of pocket' damages are calculated in three steps.  First, the plaintiff must show the actual value of the consideration it received.  Second, the plaintiff must prove that the defendant's fraudulent inducement directly caused the plaintiff to agree to deliver consideration that was greater than the value of the received consideration.  Finally, the difference between the value of the received consideration and the delivered consideration constitutes 'out of pocket' damages."  *Id.* at 235-36.

Here, Roche alleges that he paid $1.5 million to entice Cyrulnik to join the firm and for Roche to remain the first named partner in their new firm, *i.e.*, the consideration paid.  The record is devoid of any evidence regarding the value of the consideration Roche received, *i.e.*, the value of Cyrulnik joining the firm or the value of Roche being the first named partner of RCF.  Accordingly, because Roche cannot prove by clear and convincing evidence that he received less than $1.5 million in value in exchange for the $1.5 million he paid (let alone Roche's inability to prove that Cyrulnik's alleged fraudulent inducement caused him to overpay), there is no evidence upon which a reasonable jury could find that Roche suffered any recoverable damages.

For the foregoing reasons, Cyrulnik is entitled to summary judgment on Roche's counterclaim for fraudulent inducement.

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in favor of Cyrulnik on liability; set this matter for a trial or inquest on the appropriate relief to be awarded to Cyrulnik; dismiss RCF's claims in their entirety; and dismiss Roche's counterclaim in its entirety.

Dated: June 9, 2023
     New York, New York          Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: */s/ Marc E. Kasowitz*
    Marc E. Kasowitz (mkasowitz@kasowitz.com)
    Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)
    Gavin D. Schryver (gschryver@kasowitz.com)
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:   (212) 506-1800

*Attorneys for Defendant/Counterclaim-Plaintiff Jason Cyrulnik*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,344 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

*/s/ Marc E. Kasowitz*
Marc E. Kasowitz