**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ROCHE FREEDMAN LLP,

      Plaintiff,

v.

JASON CYRULNIK,

      Defendant.

---

JASON CYRULNIK,

      Counterclaim-Plaintiff,

v.

ROCHE FREEDMAN LLP, KYLE ROCHE,
DEVIN FREEDMAN, AMOS FRIEDLAND,
NATHAN HOLCOMB, and EDWARD
NORMAND,

      Counterclaim-Defendants.

---

Case No. 1:21-cv-01746 (JGK)

**PLAINTIFF AND COUNTERCLAIM-DEFENDANTS FREEDMAN, NORMAND,
FRIEDLAND, AND ROCHE'S MEMORANDUM OF LAW
IN OPPOSITION TO CYRULNIK'S MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... i

INTRODUCTION ............................................................................................................... 1

COUNTER-STATEMENT OF FACTS ................................................................................. 3

ARGUMENT ..................................................................................................................... 6

  I.    THE MOU IS ONLY A PRELIMINARY AGREEMENT-TO-AGREE.......................... 6

      A.   The plain language of the MOU is the best evidence of the parties' intent. ............... 6

      B.   Cyrulnik cannot rely on disputed, extrinsic evidence to contradict the unambiguous
language of the MOU........................................................................................................ 9

  II.   THE MOU'S CONDITION PRECEDENT SHOULD NOT BE EXCUSED.................. 13

      A.   The MOU contains an express condition that must be satisfied as a condition for
obtaining the benefits of partnership.......................................................................... 13

      B.   Evidence shows the MOU's condition precedent was material to the parties. ......... 18

      C.   Counter-Defendants are not estopped from relying on the condition precedent....... 22

  III.  CYRULNIK'S COUNTER-INTUITIVE CONSTRUCTION OF THE MOU'S
"WITHDRAWAL" PROVISION IS WRONG ......................................................... 25

  IV.  CYRULNIK IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER THE "FOR
CAUSE" PROVISION OF THE MOU ................................................................... 30

      A.   Cyrulnik's argument fails as a matter of law. ........................................................ 30

      B.   Cyrulnik's argument fails as a matter of fact. ........................................................ 33

  V.   CYRULNIK FAILS TO SUPPORT ANY OF HIS STATUTORY, TORT, OR QUASI-
CONTRACT CLAIMS........................................................................................... 35

  VI.  CYRULNIK FAILS TO PRESENT ANY EVIDENCE TO SUPPORT A CLAIM
AGAINST FRIEDLAND ...................................................................................... 37

  VII. ROCHE'S CLAIM FOR FRAUDULENT INDUCEMENT AND COUNTER-
DEFENDANTS' RELATED AFFIRMATIVE DEFENSES SHOULD NOT BE DISMISSED
ON SUMMARY JUDGMENT .............................................................................. 38

      A.   Cyrulnik's misrepresentations concerning the Patterson offer constitute fraud........ 39

      B.   Roche has alleged damages from Cyrulnik's fraudulent misrepresentations............ 42

VIII.  PLAINTIFF'S CLAIMS FOR BREACH OF FIDUCIARY DUTY AND
INTENTIONAL INTERFERENCE SHOULD NOT BE DIMISSED ON SUMMARY
JUDGMENT ................................................................................................................. 43

CONCLUSION.......................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**..............................................................................................................................**Page(s)**

*260-261 Madison Avenue LLC v. Bower Monte & Greene PC*,
   2013 WL 5763732 (N.Y. Sup. Ct. Oct. 21, 2013),
   *aff'd* 137 A.D.3d 457 (1st Dep't 2016) ................................................................ 33, 34

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*,
   145 F.3d 543 (2d Cir. 1998) ................................................................................ 10, 25

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
   404 F.3d 566 (2d Cir. 2005) ...................................................................................... 23

*Aguirre v. Best Care Agency*, Inc.,
   961 F. Supp. 2d 427 (E.D.N.Y. 2013) ...................................................................... 46

*Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney*,
   2013 WL 628533 (S.D.N.Y. Feb. 15, 2013) ............................................................ 48

*Armstrong v. Collins*,
   2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ......................................................... 25

*Banque Franco–Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*,
   106 F.3d 22 (2d Cir.1997) ........................................................................................ 48

*Baraliu v. Vinya Cap., L.P.*,
   765 F. Supp. 2d 289 (S.D.N.Y. 2011) ...................................................................... 14

*Basquiat ex rel. Est. of Basquiat v. Sakura Int'l*,
   2005 WL 1639413 (S.D.N.Y. July 5, 2005) ............................................................ 49

*Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*,
   401 B.R. 598 (S.D.N.Y. 2009) ........................................................................... 15, 20

*Cadwalader, Wickersham & Taft v. Beasley*,
   728 So. 2d 253 (Fla. Dist. Ct. App. 1998). ............................................................. 34

*Cambridge Capital LLC v. Ruby Has LLC*,
   2023 WL 3956868, (S.D.N.Y. June 2, 2023) .......................................................... 47

*Capstone Asset Mgmt. Co., Ltd v. Dearborn Capital Grp. LLC*,
   2021 WL 4250087 (S.D.N.Y. Sept. 17, 2021) .......................................................... 9

*Chambers v. TRM Copy Centers Corp.*,
   43 F.3d 29 (2d Cir. 1994) ......................................................................................... 54

*Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*,
   88 A.D. 2d 461 (2d Dep't 1982) ............................................................................... 50

*Comprehensive Care Corp. v. Katzman*,
    2010 WL 3190136 (M.D. Fla. July 30, 2010) ............................................................ 37, 38, 40

*Cross & Cross Props., Ltd. v. Everett Allied Co.*,
    886 F.2d 497 (2d Cir. 1989)................................................................................................. 25

*Daytree at Cortland Square, Inc. v. Walsh*,
    2022 WL 2345820 (2d Cir. June 29, 2022) ....................................................................... 40

*DeLeonardis v. Credit Agricole Indosuez*,
    2000 WL 1718543 (S.D.N.Y. Nov. 15, 2000) .................................................................. 41

*Elvin Assocs. v. Franklin*,
    735 F. Supp. 1177 (S.D.N.Y. 1990) ................................................................................... 19

*Energy Transfer Partners, L.P. v. Enter. Prod. Partners, L.P.*,
    593 S.W.3d 732 (Tex. 2020)................................................................................................ 22

*Fattaruso v. Roche Freedman LLP*,
    No. 2022-005345-CA-01 (Fla. 11th Cir. Ct. June 7, 2023) ....................................... 16

*Finch v. Campbell*,
    541 S.W.3d 616 (Mo. Ct. App. 2017)................................................................................ 51

*Fitzpatrick v. Am. Int'l Grp., Inc.*,
    2013 WL 709048 (S.D.N.Y. Feb. 26, 2013)................................................................ 20, 41

*Fort Transfer Co., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*,
    2007 WL 707545 (N.D. Ill. Mar. 2, 2007)....................................................................... 32

*Gay v. Brencorp*,
    2012 WL 162354 (M.D. Fla. Jan. 19, 2012)................................................................ 22, 23

*Ginett v. Computer Task Group*,
    962 F.2d 1085 (2d Cir. 1992).............................................................................................. 18

*Goss v. E.S.I. Cases & Accessories, Inc.*,
    2020 WL 5817163 (S.D.N.Y. Sept. 29, 2020)................................................................. 36

*Hanover Realty Corp. v. Codomo*,
    95 So. 2d 420 (Fla. 1957).................................................................................................... 27

*Hyatt Corp. v. Epoch-Fla. Cap. Hotel Partners, Ltd.*,
    2008 WL 490121 (M.D. Fla. Feb. 20, 2008) .................................................................. 52

*In re Adler, Coleman Clearing Corp.*,
    263 B.R. 406 (S.D.N.Y. 2001)............................................................................................ 48

*In re Lipper Holdings, LLC,*
    1 A.D.3d 170 (1st Dep't 2003) ........................................................... 30

*In re Men's Sportswear, Inc.,*
    834 F.2d 1134, 1141 (2d Cir. 1987)................................................... 50

*Int'l Exterior Fabricators, LLC v. Decoplast, Inc.,*
    128 A.D.3d 1016 (2nd Dep't 2015) ................................................... 45

*Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.,*
    2020 WL 614991 (S.D.N.Y. Feb. 10, 2020)................................. 46, 47, 49

*Johnston v. Eichelberger,*
    13 Fla. 230 (1869) ........................................................................... 20

*Kaleidoscope Media Grp., Inc. v. Ent. Sols., Inc.,*
    2001 WL 849532 (S.D.N.Y. July 19, 2001) ...................................... 49

*King v. Fox,*
    2005 WL 3098933 (S.D.N.Y. Nov. 18, 2005) .................................... 41

*Kirch v. Liberty Media Corp.,*
    449 F.3d 388 (2d Cir. 2006)............................................................. 52

*Kleiman v. Wright,*
    2019 WL 4023392 (S.D. Fla. Aug. 27, 2019)...................................... 4

*Kooleraire Serv. & Installation Corp. v Board of Educ. of City of N.Y.,*
    28 N.Y.2d 101 (1971) ...................................................................... 27

*Kulick v. Gamma Real Estate LLC,*
    2022 WL 4467341 (S.D.N.Y. Sept. 23, 2022)................................... 31

*Lake Cty. Sch. Bd. v. Erdman,*
    2020 WL 6625464 (Fla. Div. Admin. Hrgs. Oct. 8, 2020)................... 38

*Lockey v. Kanodia,*
    2001 WL 755841 (Mass. Super. Ct. May 15, 2001)........................... 31

*Love v. Fleetway Air Freight & Delivery Serv., LLC,*
    875 So. 2d 285 (Ala. 2003) .............................................................. 34

*Mack v. United States,*
    814 F.2d 120 (2d Cir. 1987)............................................................. 11

*Martin v. Baird,*
    175 Pa. 540, 34 A. 809 (1896) ......................................................... 21

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ................................................................................................. 16

*Mootry v. Bethune-Cookman Univ., Inc.*,
279 So. 3d 207 (Fla. Dist. Ct. App. 2019) ............................................................. 41

*Morse v. Ted Cadillac, Inc.*,
146 A.D.2d 756 (2d Dep't 1989) ........................................................................... 28

*Morse/Diesel, Inc. v. Fid. & Deposit Co. of Maryland*,
768 F. Supp. 115 (S.D.N.Y. 1991) ........................................................................ 51

*Murphy v. Transportation Vehicles Inc.*,
22 Misc. 2d 966 (Kings Cty. Sup. Ct. 1959) ........................................................ 29

*Palm Beach Cty. Sch. Bd. v. Loud*,
2022 WL 1559998 (Fla. Div. Admin. Hrgs. Apr. 11, 2022) ................................ 38

*Pitcock v. Kasowitz*,
2009 WL 3240385 (N.Y. Cty. Sup. Ct. Sep. 29, 2009) ........................................ 32

*Postlewaite v. McGraw-Hill, Inc.*,
411 F.3d 63 (2d Cir. 2005) .................................................................................... 30

*Prudential Ins. Co. of Am. v. S.S. Am. Lancer*,
870 F.2d 867 (2d Cir. 1989) .................................................................................. 24

*Real Est. Webmasters Inc. v. Rodeo Realty, Inc.*,
74 Misc. 3d 1204(A) (Albany Cty. Sup. Ct. 2022) ............................................... 50

*Roca v. Lytal & Reiter*,
856 So. 2d 1 (Fla. Dist. Ct. App. 2003) ................................................................ 15

*Rogers v. United States*,
184 So. 3d 1087 (Fla. 2015) .................................................................................... 7

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery Inc.*,
751 F. App'x 39 (2d Cir. 2018) ............................................................................. 53

*Sch. Bd. of Palm Beach Cty., Florida v. Duhart*,
2021 WL 1832332 (Fla. Div. Admin. Hrgs. Mar. 29, 2021) ................................ 39

*Spurlin v. Sch. Bd. of Sarasota Cty.*,
520 So. 2d 294 (Fla. Dist. Ct. App. 1988) ............................................................ 37

*Stanacard, LLC v. Rubard, LLC*,
2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) ........................................................... 36

*State ex rel. Hathaway v. Smith*,
    160 Fla. 485 (1948) ........................................................................... 37, 38

*Teachers Ins. & Ann. Ass'n of Am. v. Tribune Co.*,
    670 F. Supp. 491 (S.D.N.Y. 1987) ......................................................... 26

*Tomasini v. Mount Sinai Medical Center of Florida*,
    315 F. Supp. 2d 1252 (S.D. Fla. 2004) .................................................. 41

*Trans World Airlines, Inc. v. Beaty*,
    402 F. Supp. 652 (S.D.N.Y. 1975) ......................................................... 36

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ............................................................................. 7

*Wansdown Properties Corp. N.V.*,
    626 B.R. 165 (Bankr. S.D.N.Y. 2021) ............................................... 23, 24

*Winston v. Mediafare Entm't Corp.*,
    777 F.3d 78 (2d Cir. 1985) ................................................................... 15

**Statutes** ............................................................................................... **Page**

Fed. R. Civ. P. 15 ......................................................................................... 12

Fed. R. Civ. P. 56 ........................................................................................... 9

Fla. Stat. §620.8601 ..................................................................................... 26

Fla. Stat. §620.8103 ..................................................................................... 37

Fla. Stat. §620.8801 ..................................................................................... 36

Fla. Stat. §620.8916 ..................................................................................... 16

RULPA §402 ................................................................................................ 28

Tex. Bus. Org. Code §152.501 ..................................................................... 28

**Other Authorities** ................................................................................. **Page**

Williston on Contracts (4th ed.) ................................................................... 29

Merriam-Webster Dictionary ........................................................................ 31

# INTRODUCTION

Counterclaimant Jason Cyrulnik seeks summary judgment arguing that the "plain language" of the parties' Memorandum of Understanding ("MOU") "is dispositive of liability on virtually all the claims in this case." (Cyrulnik Br.1). Oddly, his submission has very little to say about that plain language and rarely stays inside the four corners of the document he recognizes to be dispositive. Instead, his papers delve into a range of highly contested, extra-contractual evidence and rely on lengthy fact-intensive witness declarations to make their points. That is hardly fertile ground for summary disposition. The history of the relationship among the parties is a matter of intense factual dispute. Untethered to the plain language of the MOU, Cyrulnik's motion cannot come close to providing the type of undisputed factual record necessary to seek summary judgment under Rule 56.

When Cyrulnik supposedly turns to the "plain language" of the MOU, there is actually no plain language to be found that supports his positions. First and foremost, Cyrulnik pretends that the MOU can be read as a complete and final document with a precise delineation of fixed rights that he can enforce at will, and in which every omission is a clear and deliberate expression of the parties' intent. The MOU says the opposite: its text explains that it is not a final document, that its terms "are not comprehensive," and that "additional Terms" and "further clarification" are needed and must still "be negotiated." Cyrulnik claims that the MOU adopts an exceedingly high standard for removing a Founding Partner, one that requires a finding of "illegal activity" or "utter abandonment" of one's job. But no such language, plain or otherwise, appears in the MOU. The MOU merely states that a Founding Partner may be removed "for cause." He further claims the MOU guarantees a removed Founding Partner an ongoing compensation stream, of indefinite duration, including full equity ownership and full entitlement to other financial assets,

1

as if there had been no removal at all. The MOU says nothing of the sort. Its sole clause concerning withdrawing partners clearly states that compensation ends upon departure.

The reason Cyrulnik does not and cannot embrace the plain terms of the MOU is that they cut directly against his position. They establish that Cyrulnik never obtained an equity interest in any partnership with Counter-Defendants because no Partnership Agreement was ever executed and no equity or other ownership interest ever issued. Indeed, the MOU expressly conditions any entitlement to partnership rights or ownership upon the performance of a condition precedent, the execution of a Partnership Agreement, which never occurred. Similarly, the plain terms of the MOU also make clear that the MOU is no surrogate for such an agreement, but only a provisional agreement-to-agree: it only requires the parties to negotiate in good faith toward a definitive Partnership Agreement. Counter-Defendants explain in their own summary judgment motion how the plain language of the MOU directly bears out these points. Cyrulnik cannot overcome them. He is reduced to arguing that a written Partnership Agreement is not "material" in the eyes of potential law firm partners, an inherently absurd position, and that express condition precedents are "not favored," a proposition that runs directly contrary to the basic tenets of contract law.

Nor can Cyrulnik defeat Counter-Defendant Kyle Roche's claim for fraudulent inducement, a claim echoed in the fraudulent inducement affirmative defenses of the other Counter-Defendants. Record evidence indicates that, while exploring the possibility of joining the law firm launched by Roche and Devin Freedman, and while negotiating the MOU with that possibility in mind, Cyrulnik falsely claimed to have a competing offer worth up to $3 million from a major global firm. He had no such offer. In seeking summary judgment, he argues that his statements were mere "puffery." They were not.

Cyrulnik's perfunctory request for summary judgment on Plaintiff's breach of fiduciary duty and intentional interference claims also falls flat. There is evidence from which a jury could find that Cyrulnik deliberately and intentionally withheld his time-records and encouraged clients not to pay their bills, which more than suffices to demonstrate Cyrulnik's liability on these claims. Cyrulnik may dispute the facts, but those disputes are for a jury to decide.

Cyrulnik's entire application for summary judgment should be denied.

## COUNTER-STATEMENT OF FACTS

Cyrulnik's submission includes extensive witness declarations and numerous alleged facts, many of which have nothing to do with the arguments he makes in support of his summary judgment motion. To the extent particular factual assertions are not addressed herein, Counter-Defendants respectfully refer the Court to their opposition to Cyrulnik's 56.1 Statement, which accompanies this submission. Counter-Defendants have also previously set forth their contrasting factual position in their own motion for summary judgment. To avoid duplicative argument, this brief assumes familiarity with and incorporates by reference the factual summary and arguments set forth in Counter-Defendants' opening summary judgment brief and 56.1 Statement (Dkts.423, 424 referred to herein as "RF Br." and "RF 56.1").

Counter-Defendants dispute Cyrulnik's primary assertions of fact as relevant to his motion as follows:

**No pretextual scheme:** Contrary to Cyrulnik's assertions, Counter-Defendants deny they engaged in any scheme to improperly deprive Cyrulnik of compensation or assets. Ample evidence shows they acted in good faith and removed Cyrulnik for good reason, including based on widespread reports of his abusive and inappropriate behavior. The evidence shows they had ample cause to do so. (RF 56.1 ¶¶33-86.)

As purported evidence of an improper scheme, Cyrulnik relies primarily on an email exchange between Counter-Defendants Kyle Roche and Edward Normand in which Normand suggests that, in two years, they should "fraudulently edit and backdate" the MOU. (Cyrulnik Br.1). Roche and Normand dispute their exchange reflect anything more than a joke. Both testified that it alludes in jest to the misconduct of Craig Wright, a defendant in an unrelated litigation who engaged in backdated forgeries. (56.1 Opp. ¶¶27, 52); *see generally Kleiman v. Wright*, 2019 WL 4023392, at *11, *13-14 (S.D. Fla. Aug. 27, 2019) (referencing misconduct). No rational fact-finder will find otherwise: one cannot "fraudulently edit and backdate" a document that has already been circulated to numerous parties, including to Cyrulnik himself.

**No equity or other ownership interests had been conferred:** Cyrulnik relies on extracontractual statements and circumstances to argue that, even if no Partnership Agreement had been executed, a partnership had in fact been formed, which allegedly conferred upon him all of the partnership rights and interests contemplated by the MOU. He presents evidence that Counter-Defendants referred to Cyrulnik as an equity partner for more than a year or so after the MOU was signed. (Cyrulnik Br.9-10). Counter-Defendants deny that any new partnership had been formed, that any equity or other ownership rights had been conferred, and that the parties intended to have—or understood themselves as having—partnership rights and interests absent a signed Partnership Agreement. Ample evidence, including the text of the MOU itself, shows that the parties intended to have a signed Partnership Agreement precede any conferral of partnership rights and interests, and that they continued to work toward and negotiate the terms of such a Partnership Agreement for more than a year after the MOU was signed. (MOU §§I, II; RF 56.1 ¶¶20-32). The parties referred to each other as equity partners because they expected a definitive Partnership Agreement to be signed in the near future and understood, per the terms of the MOU,

that the Partnership Agreement, when executed, would be deemed effective retroactive to the date when the parties began working together. (RF 56.1 ¶¶10; 56.1 Opp. ¶17). Contrary to Cyrulnik's assertion that Counter-Defendants defaulted, frustrated, or failed to perform with respect to the obligation to sign and adopt a Partnership Agreement (Cyrulnik Br.28-29), ample evidence shows that it was Cyrulnik who was obstructive, refused to budge, made it exceedingly difficult to negotiate a Partnership Agreement, and refused to sign a partnership agreement until his compensation structure was agreed to. (Counter-Defendants' Counter-Statement of Facts ("CSOF") ¶35.)

**Cyrulnik lied to the MOU's signatories**: Evidence shows that Cyrulnik intentionally misled the other signatories to the MOU by materially overstating the terms of a competing offer he claimed to have received from another law firm. While negotiating the MOU, he falsely stated that the Patterson Belknap firm was prepared to pay him $3 million a year and would bring him on board as the chair of its litigation department. (CSOF ¶32.) The MOU signatories reasonably relied on this false information when negotiating the MOU. (CSOF ¶34.)

**Cyrulnik instructed clients not to pay outstanding bills**: Contrary to Cyrulnik's assertion that no evidence supports the contention that he caused firm clients not pay outstanding bills (Cyrulnik Br.37-38), ample evidence shows that, following his removal, Cyrulnik refused to cooperate in billing clients for legal services the firm provided. Among other things, he refused to provide his own time entries for the months of January and February 2021, and advised clients with outstanding bills that he had not "reviewed or approved" them, thereby encouraging them not to pay, even though the firm had made the bills fully available for his review. (CSOF ¶¶10-15, 25; Cyrulnik 56.1 ¶49.)

**Holcomb's declaration is contradicted by a wealth of evidence:** Cyrulnik recently obtained a declaration from former Counter-Defendant Nathan Holcomb, which he executed in securing his release from this case. Much of the declaration, including numerous asides and innuendos about his former co-defendants, have nothing to do with the arguments Cyrulnik now advances. Much of it consists of inadmissible speculation. It also omits material facts to paint a highly misleading picture of events. Aspects of the declaration are also contradicted by Holcomb's own prior testimony and by his own contemporaneous documents. (*E.g.* 56.1 Opp. ¶¶17, 37, 38, 52). Counter-Defendants discuss relevant portions of the declaration below. Although Counter-Defendants do not respond to every point Holcomb raises, they dispute many of his allegations and the conclusions he attempts to draw. The Court is entitled to consider them with appropriate skepticism given the context in which he agreed to provide such a declaration to his former adversary.

## ARGUMENT

### I.   THE MOU IS ONLY A PRELIMINARY AGREEMENT-TO-AGREE

To prevail on any of his claims at summary judgment, Cyrulnik must demonstrate the MOU was a fully enforceable agreement that conferred upon him the benefits he seeks. But the plain language of the MOU shows otherwise. It demonstrates it was intended only as a preliminary agreement-to-agree. (RF Br.15-19.) Instead of acknowledging and engaging with the MOU's express statements of its own limitations, Cyrulnik attempts to vary the MOU's terms, relying on a host of disputed extrinsic evidence. Cyrulnik's arguments fail as a matter of basic contract law, and as a matter of fact.

A.   The plain language of the MOU is the best evidence of the parties' intent.

Cyrulnik concedes that where—as here—the terms of an agreement are unambiguous, its language "is the best evidence of the parties' intent and [their] plain meaning controls."

(Cyrulnik Br.20.) As the New York Court of Appeals explained, "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). Florida law is in accord. *Rogers v. United States*, 184 So. 3d 1087, 1100 (Fla. 2015) ("extrinsic evidence is not admissible to vary the terms" of an unambiguous agreement).[1]

By its plain terms, the MOU rejects Cyrulnik's contrived attempt to suggest that it can be read as a fully binding and enforceable agreement that in itself grants Cyrulnik equity and other partnership rights. The MOU states that its terms "are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the 'Partnership Agreement') to be negotiated." (MOU §I.) Its "Purpose" section confirms this order of events: "This MOU sets out the basic terms upon which" the parties will then "enter into a definitive partnership agreement to use their…assets for the purpose of building a…law firm." *Id.*

Thus, as set forth more fully in Counter-Defendants' opening brief, the MOU does not itself obligate the parties to build a new firm together, but proposes only an incomplete and opening framework for a subsequent *agreement* to do so. The MOU expressly identifies the execution of that definitive Partnership Agreement as a condition precedent to distribution of

---

[1] The parties appear to agree there are no relevant conflicts between New York and Florida law. (Cyrulnik Br.n.5). Cyrulnik asserts the parties "agreed" at some unspecified time, in an unspecified way, that Florida law "would govern." (Cyrulnik 56.1 ¶46; Cyrulnik Dec. ¶51.) He offers no support for that assertion but his own say-so, and Counter-Defendants dispute it.  (56.1 Opp. ¶46.)

equity and other assets, directing that such distribution will take place only "*after* execution of the Partnership Agreement." (MOU §II; *see* Section II, *infra*; RF Br.10-13.) This language unambiguously demonstrates the parties' intent not to be fully bound.

It also renders *In re Lorenzo*, the primary authority on which Cyrulnik relies in arguing that the MOU is fully binding, inapposite. The agreement in *Lorenzo* "recites in plain, unambiguous language it is binding on the parties" and makes clear that "the effectiveness or enforceability of the [relevant agreement] was not contingent upon the creation of [a subsequently contemplated agreement]," and had "no conditions precedent." 434 B.R. 695, 704-05 (Bankr. M.D. Fla. 2010). The MOU contains no language of this sort and says the opposite.

Contrary to Cyrulnik's contentions, Counter-Defendants do not argue that the MOU is "void for uncertainty" or that it cannot be enforced in any respect. (Cyrulnik Br.31.) Counter-Defendants embrace the MOU as setting forth a clear and binding commitment among the parties to negotiate in good faith toward a definitive Partnership Agreement. It amounts to an agreement-to-agree, whether one applies traditional contract interpretation principles, or the Type I / Type II rubric adopted by the Second Circuit. (RF Br.13-24.) Contending that it amounts to more, Cyrulnik cites language in the MOU stating that it "sets out the *basic* terms upon which the Founding Partners will enter into a definitive partnership agreement" (MOU §I (emphasis added).) He argues this means final agreement was reached on "the most essential terms," such that there was nothing left to negotiate. (Cyrulnik Br.32.) Again, the plain text of the MOU belies this interpretation: it expressly states that there *were* "additional terms…to be negotiated" (MOU §I) and indisputably leaves open numerous material issues concerning compensation, distribution of assets, and firm management. (RF Br.21-23.) Nor does the MOU anywhere state it is a binding and final agreement as to any of its terms, nor render any term immune from further

negotiation. Instead, the term "basic" leaves room for modulation, especially when used, as here, in a document that, by its own terms, contemplates further negotiation. *See Capstone Asset Mgmt. Co., Ltd v. Dearborn Capital Grp. LLC*, 2021 WL 4250087, at *6 (S.D.N.Y. Sept. 17, 2021) (agreement that "outlined the basic terms upon which a joint venture…might be formed" did not itself form joint venture).

### B. Cyrulnik cannot rely on disputed, extrinsic evidence to contradict the unambiguous language of the MOU.

Cyrulnik does not argue the MOU is ambiguous. And he correctly acknowledges that, therefore, "parol evidence is not admissible." (Cyrulnik Br.20.) Nevertheless, he relies almost exclusively on evidence extrinsic to the MOU to make his arguments, no doubt because the plain language of the MOU does not support them. Because extra-contractual evidence is not admissible to vary the MOU's plain language, Cyrulnik cannot use it to support his arguments on summary judgment. *See* Fed. R. Civ. P. 56(c).

The extrinsic evidence Cyrulnik cites, moreover, yields numerous disputes of material fact that bar any grant of summary judgment in his favor. Consider, for example, Cyrulnik's extra-contractual claim that all parties "confirmed that they understood the MOU to be a binding agreement." (Cyrulnik Br.7-8.) This statement fails to acknowledge that the parties understood the MOU to be binding *only* insofar as it required them to negotiate further in attempting to reach a definitive Partnership Agreement. (56.1 Opp. ¶14; Ex.65, Friedland Dep. at 37:3-25 ("I believe that we were entering a binding agreement to agree to form a partnership agreement."); Ex.72, Roche Dep. at 81:20-86:17 (explaining that "there was a binding commitment to work in good faith to execute a partnership agreement"); Ex.64, Freedman Dep. at 263:9-264:12 ("[I]t was a fundamental assumption that fully drafted robust partnership agreement would be drafted to

9

replace this agreement. And we recognized this agreement was not comprehensive and needed further clarification.").)

Cyrulnik also points to one edit Holcomb made during the MOU's lengthy "drafting and negotiation history," striking a provision that referred to the MOU as non-binding, along with Holcomb's *ex post* explanation as to why he proposed the revision. (Cyrulnik Br.7, 33; Cyrulnik 56.1 ¶14.) As a preliminary matter, Holcomb's "subjective evidence of intent" generally should not be considered, especially because there is no evidence he expressed his views to anyone else at the time, much less that anyone else agreed with them. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 549 (2d Cir. 1998). Moreover, Holcomb's *ex post* view is contested. As Friedland explained at his deposition, the drafting history Cyrulnik cites merely reflects the parties' intent to give the MOU "a bindingness that we agreed to agree to form this partnership agreement in short order." (56.1 Opp. ¶14.)[2] Indeed, Holcomb's edit left in place language stating that the MOU's signatories intended to continue to "work towards the finalization of the Partnership Agreement" (Cyrulnik Br.7), as well as other language in the MOU cautioning

---

[2] Holcomb's declaration asserts that "[n]o Founding Partner ever expressed to me before Cyrulnik's removal that they did not understand the MOU to be binding." (Br. at 8 (citing Holcomb Decl. ¶8).) That statement directly contradicts Holcomb's sworn deposition testimony and should be disregarded. (56.1 Opp. ¶14; Ex.68, Holcomb Dep. 42:8-43:13 (testifying that Freedman made such statements "at various points" and that Holcomb could not "recall one way or the other whether any of those statements were prior to [Cyrulnik's] removal"); *see also Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("[A] party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

against any understanding that the MOU, by itself, was a complete and final binding agreement. There is no evidence that when Holcomb made the edit, he suggested any language stating that the parties regarded the MOU as a binding partnership agreement, nor did the signatories adopt any such language thereafter.

Beyond the cautionary language included in the text of the MOU itself, the record is replete with additional evidence that the parties—including both Cyrulnik and Holcomb— understood the MOU to be no more than a preliminary agreement reached in anticipation of further negotiations toward a definitive partnership agreement. For instance:

- Just before signing the MOU, Cyrulnik wrote to another signatory: "I think the drafting of whatever Val[sic] sent around leaves a bit to be desired, but we'll just work it out later so we can get this thing signed and everyone happy in the spirit of your message." (RF 56.1 ¶8.)

- In deposition, Cyrulnik admitted the MOU envisioned the parties would prepare a "long-form" partnership agreement, which was "supposed to be executed after January 1st, 2020, but made effective as of January 1st, 2020." (RF 56.1 ¶10.)

- Holcomb testified that the parties "did have multiple conversations about executing, well negotiating and executing a definitive partnership agreement....I had expressed many times that I thought that was important and we needed to do it." (Holcomb Tr. 309). Documents corroborate Holcomb's testimony. For instance:

  - In July 2020, Holcomb emailed the parties about the need to get a the "definitive partnership agreement" in place.

  - Holcomb subsequently suggested hiring an attorney specializing in partnership law to draft an agreement that would properly account for complexities. (RF 56.1 ¶¶27, 29.)

  - In November 2020, another attorney at RF circulated a thirty-one-page draft partnership agreement from another firm, to facilitate the execution of a partnership agreement. (RF 56.1 ¶30.)

  - Contemporaneous reports of the December 2020 call in which Cyrulnik screamed at Holcomb and another senior lawyer also reflect that Cyrulnik "screamed and mocked [Holcomb] for his concerns over…the MOU's obligation to enter into a definitive partnership agreement." (RF 56.1 ¶74.)

11

- Friedland similarly testified that that the firm was "[o]perating" with the "expectation" that they would become equity partners, but that he was "concerned that we were in a limbo" because the Partnership Agreement had not been executed. (56.1 Opp. ¶¶16).

- Normand testified the MOU "proposed distribution of...equity, contingent on our working out a partnership agreement." (56.1 Opp. ¶16).

- Freedman testified that he intentionally revised language in the MOU to ensure that equity would not be distributed immediately upon its execution because: "I didn't want there to be a distribution of equity in the firm until a lawyer who knew what the heck they were doing...had drafted a partnership agreement for us." (56.1 Opp. ¶14.)

In addition, there is substantial evidence that the parties continued to negotiate key terms of their contemplated Partnership Agreement after the MOU was executed, including the compensation formulas. For example:

- Cyrulnik admitted in deposition that, shortly after executing the MOU, he "wanted to update the formula compensation model to reflect an adjustment that needed to be made." (RF 56.1 ¶22.)

- Cyrulnik's changes to formula compensation were the subject of the July 2020 call in which Cyrulnik violently screamed at Roche and Freedman. (RF 56.1 ¶33.)

Accordingly, even if extrinsic evidence is considered, Cyrulnik cannot prevail at summary judgment given all of the evidence that contradicts his one-sided version of events.[3]

---

[3] Cyrulnik's argument that Plaintiff's invocation of the MOU in its complaint evidences a supposed intent to regard the MOU as binding (Cyrulnik Br.30-31) is fallacious in view of its specific reference to the condition precedent to Cyrulnik's receipt of equity (Dkt.1, ¶¶18, 24) and the evidence discussed above. It also ignores that parties are free to amend and conform their pleadings to the proof, especially pleadings drafted at an early stage of the proceedings. Fed. R. Civ. P. 15.

## II.    THE MOU'S CONDITION PRECEDENT SHOULD NOT BE EXCUSED

Cyrulnik's claims all turn on his ability to enforce specific terms of the MOU. The MOU set an express condition precedent that he never satisfied and that bars him from the recovery he seeks. His attempts to evade the plain language of that condition precedent fail.

### A.    The MOU contains an express condition that must be satisfied as a condition for obtaining the benefits of partnership.

As set forth in Counter-Defendants' motion for summary judgment, the MOU contains a clear and express condition precedent that makes the allocation of partnership benefits conditional upon the execution of a Partnership Agreement governing the rights and obligations of the partners. (RF Br.10-13.) There is nothing unusual about such a condition. Many law firm partnerships have written partnership agreements and require lawyers who join the partnership to sign them. The MOU's statement that an entitlement to partnership benefits arises only "[a]fter execution of the Partnership Agreement" (MOU §II) is clear on its face and not subject to contrary interpretation. Indeed, Holcomb's declaration confirms that that "the MOU contemplated creation of a new firm that would be distinct from (not identical) to Roche Freedman LLP." (Holcomb Decl. ¶¶9-10.) Per the MOU, any partnership rights would flow from that new firm only "after" the new firm's partnership agreement was negotiated, finalized, and executed. Cyrulnik's claimed rights and benefits never materialized, as he never executed any such agreement.

Counter-Defendants have already explained at length that the term "after" is a classic statement of a condition precedent. (RF Br.10-11.) Cyrulnik collects authority for the proposition that courts hesitate to *infer* condition precedents. (Cyrulnik Br.26-27.) But, given the standard use of the term "after" to indicate a condition precedent, there is no need for any inference here. (RF Br.10-11 (collecting cases).) Where parties have clearly agreed to set a condition precedent,

"literal observance is required." *Baraliu v. Vinya Cap., L.P.*, 765 F. Supp. 2d 289, 299 (S.D.N.Y. 2011).

In discussing the MOU, Cyrulnik generally ignores the phrase "[a]fter execution of the Partnership Agreement," offering no contrary interpretation of its meaning, and offering no reading of the MOU that does not impermissibly treat it as surplusage. It should be emphasized that the MOU refers to "the" Partnership Agreement, not to "a" partnership agreement, and thus Cyrulnik's arguments that the MOU can be enforced as a surrogate for the contemplated Partnership Agreement are also contradicted by the MOU's plain terms.[4]

---

[4] Cyrulnik argues in passing that: (1) no written partnership agreement is necessary; or, perhaps, (2) there was an "oral partnership agreement" between the parties. (Cyrulnik Br.31 & n.11.) For starters, Cyrulnik does not cite any evidence to show the specifics of that supposed agreement, nor can he, because no oral agreement took place. (RF 56.1 ¶¶31-32.) In any event, both arguments fly in the face of the MOU's plain language, which expresses the parties' intention to enter into a written, formally executed partnership agreement. And "if either party communicates an intention not to be bound absent a fully executed document, then 'no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.'" *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 617 (S.D.N.Y. 2009) ((quoting *Winston v. Mediafare Entm't Corp.*, 777 F.3d 78, 80 (2d Cir. 1985)). *Roca*, on which Cyrulnik relies, is not to the contrary: it, too, recognizes that "the existence of a true partnership relation depends on an agreement, whether implied or express, to operate as such." 856 So. 2d 1, 5 (Fla. Dist. Ct. App. 2003). The plain language of the MOU demonstrates there was no such

14

Taking snippets of the MOU out of context, Cyrulnik claims that certain provisions are inconsistent with the notion of a condition precedent. (Cyrulnik Br.27.) For instance, he considers in isolation the provision that states: "Roche Freedman LLP [the preexisting firm] will be merged into the [new] Firm in January 2020." (*Id.* (quoting MOU §VI).) He argues the imperative nature of this wording defies any and all conditions. (*Id.*) His argument ignores the larger context of the MOU and the clear intention of the parties as expressed in that agreement. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (One "cardinal principle of contract construction [is] that a document should be read to give effect to all its provisions and to render them consistent with each other," rather than viewing discrete phrases in isolation.).

The MOU "establish[ed] the intent to form a partnership," but it did not establish the partnership itself; then Section II indicates that equity in that new firm would not be distributed until "after" the Partnership Agreement was executed; and the MOU indicates that the "Partnership Agreement" still needed to be "negotiated" and "made effective on or around January 1, 2020." (MOU §I.) Thus, as originally contemplated by the parties, any merger would follow satisfaction of the condition precedent: once the new firm was formed via execution of the Partnership Agreement, the merger could follow. Indeed, the sentence Cyrulnik relies upon

---

agreement here. Finally, Cyrulnik's reference to a decision in the *Fattaruso* case is misleading. (Cyrulnik Br.33 n.12.) That opinion did not purport to interpret the MOU at all. Instead, it primarily held that Fattaruso, who did not sign the MOU, had adequately alleged an oral partnership agreement. Order at 1-5, *Fattaruso v. Roche Freedman LLP*, No. 2022-005345-CA-01 (Fla. 11th Cir. Ct. June 7, 2023).

depends upon the existence of the new "Firm," with a capital "F," as the anticipated vehicle for the merger. While the parties did not ultimately execute the partnership agreement in January as contemplated, that does not mean the express requirement of having an executed Partnership Agreement should be read out of existence, nor does it suggest that any merger would have taken place without one.[5] Indeed, FRUPA provides specific requirements for how to merge partnerships, *see* Fla. Stat. §620.8916, which the parties never undertook. (Cyrulnik Decl. Ex.3 ¶22.)

Similarly, Cyrulnik parses out a single sentence of the MOU relating to Tokens and claims it too defeats any notion of a condition precedent: "the Founding Partners understand that Roche Freedman LLP has agreed to distribute its [] Tokens according to the following breakdown." (Cyrulnik Br.29 (citing MOU §IV.B).) Cyrulnik argues this contemplated distribution stands apart from any condition precedent that may govern "equity" distributions among the parties. (*Id.*) According to his reading, even if the parties never executed a Partnership Agreement, and even if none obtained equity as contemplated by the MOU, he would still be entitled to 25% of the Tokens as if a new partnership had been formally consummated.

This skewed reading defies common sense. It also flies in the face of the broader context of the MOU, which makes clear that the issuance of equity is a *sine qua non* upon which other

---

[5] Cyrulnik's invocation of the Side Letter as evidence that the new Firm had been formed is unavailing. The Side Letter, executed by Cyrulnik on January 22, 2020, contains no condition precedent to enforcement and acknowledges that Roche Freedman LLP and RCF were distinct entities. Cyrulnik Ex.7 ("should Roche, Freedman, *Roche Freedman LLP, or RCF* be entitled to any contingent recovery . . .") (emphasis added).

claimed partnership rights turn, including any allocation of Tokens. Indeed, the opening paragraph of Section IV, in which the Token distribution provision is found, expressly anticipates the creation of a new firm and ties the distribution of the Tokens and other assets to the distribution of equity in that new firm. It explains that the purpose of its provisions is to identify preexisting assets that will not be shared "according to the equity percentages of the [new] Firm in January 2020." (MOU §IV.) In other words, this preamble shows that the assets discussed in Section IV will be distributed alongside that equity, and not independently or in advance.

Further confirming that the Token distribution is not a separate and severable agreement as Cyrulnik claims, the MOU provides no separate consideration for that provision. In *Ginett v. Computer Task Group*, 962 F.2d 1085, 1098 (2d Cir. 1992), the Second Circuit found that one provision in an agreement could not be treated as severable from the others where it was not supported by any independent consideration. The MOU, too, contains "no express severability clause, no obvious unit-for-unit transaction, and no way to determine the agreed-upon consideration for each part of the contract." *Id.* at 1099. Under Cyrulnik's theory, he could execute the MOU, refuse to sign any Partnership Agreement, contribute nothing to the Firm, disclaim any responsibility for the Firm's losses, and *still* receive Tokens. The law disfavors such unreasonable constructions. *See, e.g.*, *Elvin Assocs. v. Franklin*, 735 F. Supp. 1177, 1183-84 (S.D.N.Y. 1990) (unmet condition precedent precluded liability where, *inter alia*, plaintiff "cannot reasonably have believed that [counter-defendant] was committing himself unconditionally to the financial obligations [of performance]…without first obtaining adequate capitalization [the relevant condition precedent]").

Nor was the contemplated Token distribution set in stone as of the MOU's signing. On the contrary, the MOU states the distribution could be revisited, and the terms of the Token distribution itself, like all other compensation terms, remained subject to ongoing negotiation, including because Cyrulnik failed to work on Startup's matters as the MOU anticipated. (MOU §IV.B; RF 56.1 ¶¶107-08; Cyrulnik 56.1 ¶29.)

In effect, Cyrulnik attempts to exploit what he sees as gaps in the MOU, even though it expressly states it is incomplete and subject to further negotiation. But the gaps Cyrulnik identifies only confirm that the MOU should not be treated as a final instrument conveying definitive rights. (*See* RF Br.13-23.)

B.   Evidence shows the MOU's condition precedent was material to the parties.

Contrary to Cyrulnik's contentions, there is no basis to conclude the MOU's condition precedent was immaterial, or that the parties waived it. (Cyrulnik Br.26-29.)

The very fact that the parties negotiated for and memorialized this requirement in the MOU is itself strong evidence that it was important to them. As one court has explained:

> Parties that wish to be bound only upon execution of a formal document agree to negotiate in that manner because they wish to create a writing that is satisfactory to both sides in every respect. It is not for the court to determine retrospectively that at some point in the evolution of a formal document that the changes being discussed became so "minor" or "technical" that the contract was binding despite the parties' unwillingness to have it executed and delivered. For the court to do so would deprive the parties of their right to enter into only the exact contract they desired.

*Bear Stearns*, 401 B.R. at 621.

The same freedom-of-contract principles dictate that where the parties expressly negotiated for a condition, "[a] waiver of defendants' contractual rights—specifically a condition precedent—will not be inferred unless the intent to waive is clear." *Fitzpatrick v. Am. Int'l Grp., Inc.*, 2013 WL 709048, at *16 (S.D.N.Y. Feb. 26, 2013) (history omitted) (collecting cases). No

such intent is evident here. Rather than waive the requirement of a final executed Partnership Agreement, the parties—including Holcomb—made repeated efforts to negotiate and finalize one. (RF 56.1 ¶¶20-32.) Cyrulnik himself continued to press for certain financial terms. (*Id.*)

Instead, Cyrulnik argues that the fact the parties worked together for over a year and sometimes held each other out as "partners" demonstrates that a formal partnership agreement was immaterial as a matter of law. (Cyrulnik Br.28). The Florida Supreme Court long ago rejected this argument in *Johnston v. Eichelberger*, 13 Fla. 230 (1869), where parties worked together on an interim basis before a formal partnership was formed. Like Cyrulnik, the plaintiff claimed that a partnership had been formed, notwithstanding his failure to satisfy an express condition precedent. The Florida Supreme Court disagreed, in terms that bear a striking resemblance to the instant case:

> Calling the store our store, our business, &c., opening the books in the name of the contemplated firm, expressions of intention upon the part of the parties to sell out that stock and buy another, are expressions and acts which each of the parties might indulge in without a waiver of antecedent rights.…They are expressions made in view of a compliance with the agreement, and in the belief that everything would be done that should be.…Acts which may be attributed to common courtesy and to the confidence which generally exists between persons who have agreed to enter into the intimate confidential relation of partners, should not be held to be a waiver of conditions necessary to be performed before that relation is to exist under their contract.

*Id.* at 247-48. Other courts have reached similar results. *See Martin v. Baird*, 175 Pa. 540, 34 A. 809 (1896) (Synopsis) (where parties do business together and hold themselves out as partners, and allocate equity and profits as partners, all in contemplation of completing a written partnership agreement, no partnership exists where written contract not completed). That is precisely what happened here. It is undisputed that, prior to Cyrulnik's removal, the parties anticipated a Partnership Agreement would be executed and effective retroactive to January

19

2020, and they behaved accordingly. (RF 56.1 ¶10, Ex.4, Cyrulnik Dep. at 171:19–25 ("[T]he partnership agreement was supposed to be executed after January 1st, 2020 but made effective as of January 1st, 2020."); 56.1 Opp. ¶17; Ex.64, Freedman Dep. at 303:6-22 ("[W]e are trying to build a firm, trying to be collegial, friendly, trying to create lasting relationships. We don't want to be poking people in the eye saying you're not an equity partner, you're not an equity partner yet when we were fully expecting them to be retroactively on January 1.").). By working together in the interim while continuing to negotiate terms, the parties did not waive their right to a final agreement that would govern their rights and obligations, nor did they waive their right to insist that such an agreement be executed as condition for obtaining the benefits of partnership.

*Johnston* remains good law. Since that decision, federal courts in the Second Circuit and in Florida have repeatedly held that even substantial partial performance cannot override the parties' stated intentions and turn a preliminary agreement into a final one. (*See* RF Br.19-20); *accord Energy Transfer Partners, L.P. v. Enter. Prod. Partners, L.P.*, 593 S.W.3d 732, 741 (Tex. 2020) (where there is a condition precedent to partnership formation, "[e]vidence that would be probative of expression of intent [to form a partnership]—such as the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement—is not relevant.").

*Gay v. Brencorp*, the sole case on which Cyrulnik relies (at 28), is wholly distinguishable. There, the court determined the relevant language "was not a condition precedent" and further held that "the affirmative defense of failure of a condition precedent is not available against Plaintiffs" because of their status as trustees of pension and welfare funds. 2012 WL 162354, at *9 (M.D. Fla. Jan. 19, 2012).

Moreover, the concept of "disproportionate forfeiture" that Cyrulnik cherry-picks from the *Gay* opinion does not apply here. *First*, the doctrine is not available where, as here, the condition was material. *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 601 (2d Cir. 2005) (A court may excuse such a condition to avoid disproportionate forfeiture "unless its occurrence was a material part of the agreed exchange," citing Restatement (Second) of Contracts §229). Indeed, the RF Parties are aware of no case applying the disproportionate forfeiture doctrine in the context of a preliminary agreement to form a partnership. *Second*, Cyrulnik cannot dispute that he was paid millions of dollars for the work he did at RF, in accordance with the MOU's proposed compensation formula. (RF 56.1 ¶¶14-15.) Cyrulnik's claim is that he is also entitled to be paid a percentage of the value *other people* generated through their own work and clients. There is nothing "disproportionate" about refusing to provide Cyrulnik these purely contractual entitlements if he failed to comply with the contractual terms. *Cf. In re Wansdown Properties Corp. N.V.*, 626 B.R. 165, 169 (Bankr. S.D.N.Y. 2021) ("the contracted-for financial consequence of a party's own failure to do that which it promised to do is not a forfeiture") (cleaned up).

And he did fail to comply. The MOU contemplated Cyrulnik would do work for Startup. (MOU §IV.B.) He did no work for Startup. (RF 56.1 ¶¶106-08.) And for the thirteen months Cyrulnik remained at the firm, no Tokens were distributed in accordance with the MOU's contemplated distribution scheme.[6] (56.1 Opp. ¶30.) While Cyrulnik attempts to rely on a range

---

[6] Cyrulnik alleges Roche and Freedman hid a tranche of Tokens they received in ███ 2020. (Cyrulnik Br.13.) To the extent he has any evidence to support that claim, it is disputed.

of post-MOU conduct to support his other arguments, he can marshal no evidence of post-MOU

conduct, including his own, to support his claim for Tokens. "Under the circumstances, the

retention of" all Tokens owed and yet to be earned "would be a windfall and there is no

disproportionate forfeiture" if the unmet condition prevents such a result. *Wansdown*, 626 B.R. at

170-71 (quoting *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989)

for the proposition that "equity...abhors a windfall.").

       C.  Counter-Defendants are not estopped from relying on the condition precedent.

It is undisputed that although the parties continued to negotiate the terms of a Partnership

Agreement, they never executed one before Cyrulnik's removal. Cyrulnik argues that because all

parties had to sign a partnership agreement for it to be effective, any party who failed to sign

such an agreement (apparently excluding himself) effectively prevented it from coming to

fruition. (Cyrulnik Br.28.) Consequently, he claims, Counter-Defendants each technically

"prevented" the condition's satisfaction, and therefore cannot invoke it as a defense. But the

"prevention" doctrine on which Cyrulnik relies requires a showing of bad faith, an element

Cyrulnik cannot meet.

"[A] condition precedent is not automatically waived simply because the conditional

promisor blocks the condition precedent." *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886

F.2d 497, 502 (2d Cir. 1989). Rather, the party seeking to avoid enforcement of a condition

precedent must show that the condition precedent was blocked "through a breach of the duty of

good faith and fair dealing." *Id.* (quoting Restatement (Second) of Contracts §225 cmt.b). "The

---

Freedman testified that, in a September 2020 call, he and Roche discussed the 2020 distribution

with Cyrulnik and explained those Tokens would go only to Roche and Freedman as part of

Roche Freedman LLP's "2019 revenue," and Cyrulnik did not object. (56.1 Opp. ¶30.)

boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Id.* at 502; *see also Armstrong v. Collins*, 2010 WL 1141158, at *25 (S.D.N.Y. Mar. 24, 2010) ("The question is whether the party who blocks the condition precedent acted in the good faith[.]").

Cyrulnik cannot show that Counter-Defendants failed to negotiate toward a final Partnership Agreement in good faith. The mere fact that a final agreement was not agreed upon during his time at the firm is not evidence of any malevolent derogation. In the context of preliminary agreements like the MOU, "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement; if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." *Adjustrite*, 145 F.3d at 548. The law recognizes the possibility that no final agreement will be reached if, for example, the parties encounter "good faith differences in the negotiation of the open issues" or "lose interest as circumstances change." *Teachers Ins. & Ann. Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987).

There is no basis to excuse the MOU's condition precedent under these principles. The record shows that Counter-Defendants (along with Holcomb) made repeated efforts to finalize a partnership agreement with Cyrulnik over the year he remained at the firm. (RF 56.1 ¶¶20-32.) They never waived their commitment to work toward such an agreement, and they never deemed any such agreement immaterial. They simply failed to reach agreement.

Just as fundamentally, Cyrulnik offers no evidence to suggest that *he* made any genuine effort to work toward a partnership agreement, as the MOU required. On the contrary, the evidence shows Cyrulnik resisted that obligation. He made clear that he would not move forward with the Partnership Agreement until others acceded to his proposed modification of the

compensation formula. (RF 56.1 ¶23; *see also* CSOF ¶35.) When Friedland and Roche suggested retaining a law firm to draft a partnership agreement in August 2020, Cyrulnik asked them to hold off while he sought out a quote from a different law firm—but then never provided one. (CSOF ¶42.) In December 2020, Cyrulnik mocked Holcomb's "focus on executing a definitive partnership agreement." (RF 56.1 ¶74; *see also* RF Ex.38.)

Nothing in the MOU suggests Counter-Defendants were required to persevere against Cyrulnik's own obstructive conduct and obtain a partnership agreement at any cost. Nor does Cyrulnik offer any legal authority for the proposition that the prevention doctrine applies in such circumstances. The caselaw Cyrulnik cites is not on point. (Cyrulnik Br.28-29.) In *Hanover*, the court enforced a condition precedent *even though* the plaintiff alleged defendants' arbitrary conduct caused the condition's failure. 95 So. 2d 420, 423-24 (Fla. 1957). It observed that the plaintiff agreed to the condition without reservation, and the prevention doctrine could not override the parties' agreement. *Id.* And *Koolaire* is factually distinguishable: there, the defendant *admitted* it had frustrated the occurrence of the condition precedent, and simply argued that frustration was justified. 28 N.Y.2d 101, 105 (1971). Moreover, consistent with the principles discussed above, the *Koolaire* court recognized that frustration of a condition precedent may be "justified by the conduct of the other party"—it simply held that frustration was not justified on the facts before it. *Id.* at 106. Here, by contrast, the evidence demonstrates Cyrulnik himself was the obstacle.

In sum, the MOU's condition precedent pertains to all of Cyrulnik's claimed entitlements under the agreement. It is undisputed that condition was not met, and there is no basis to waive or excuse its performance. "It is a basic tenet of contract law that before liability can arise on a promise qualified by conditions expressed or implied in fact, such conditions must be fulfilled."

24

*Morse v. Ted Cadillac, Inc.*, 146 A.D.2d 756, 756 (2d Dep't 1989). Consequently, Cyrulnik's claims under the MOU fail as a matter of law.

### III.    CYRULNIK'S COUNTER-INTUITIVE CONSTRUCTION OF THE MOU'S "WITHDRAWAL" PROVISION IS WRONG

Cyrulnik asserts he is entitled to summary judgment because there is no provision in the MOU that specifically precludes an involuntarily departing Founding Partner from receiving all the financial benefits of partnership as if he had never been dismissed from the firm. (Cyrulnik Br.20-21). Cyrulnik's logic would entitle him to full pay and benefits, on an ongoing basis, while performing no work at all, and even while running a *competing* firm. That is magical thinking. As set forth in Counter-Defendants' opening brief, the MOU does not give rise to any specific enforceable obligations, other than an obligation to negotiate toward a definitive Partnership Agreement in good faith. (RF Br.13-24.) It is therefore wrong for Cyrulnik to rely on any interpretation of that document based on specific express or absent provisions as if they are imbued with dispositive force. That alone disposes of his argument based on the MOU's "withdrawal" position. Yet, even assuming *arguendo* that the MOU gives rise to specific enforceable obligations, his position has no merit.

Cyrulnik asserts that his entitlement to partnership benefits can cease *only* if he voluntarily chooses to forego them. Thus, because he was removed involuntarily and for cause, he claims the MOU entitles him to all the contemplated benefits of partnership, including a full equity share and an allocation of Tokens, regardless of whether he contributes any ongoing value to the firm or even starts a competing firm. That absurd arrangement would unjustly enrich him in a remarkable way. In addition to treating partners removed for cause more generously than those who voluntarily withdraw (RF Br.35), it would also run contrary to Florida partnership law, which provides the same remedy for a dissociated partner regardless of whether the

dissociation is voluntary or not. *See* Fla. Stat. §§620.8601 (listing "[e]vents causing partner's dissociation"), 620.8701 (listing remedies for dissociated partners without distinguishing between reasons for that dissociation). If something so extraordinary were contemplated, one would expect it to be stated somewhere in writing, as it would certainly not be assumed. *See Murphy v. Transportation Vehicles Inc.*, 22 Misc. 2d 966, 967 (Kings Cty. Sup. Ct. 1959) ("If such unusual protection had been intended, the agreement would have used precise language directed to that end."). But the MOU is silent with respect to any such arrangement, and nowhere awards a partner removed for cause in the high style that Cyrulnik dares to imagine.

Although Cyrulnik purports to make a strict textual argument, he distorts the text of the MOU. He asserts that the withdrawal provision applies only "[i]n the event a partner *elected* to withdraw from the firm…." (Cyrulnik Br.6 (emphasis added); Cyrulnik 56.1 ¶12.) The MOU does not include the elective language Cyrulnik now supplies, nor does it distinguish between "voluntary" and "involuntary" departures as his argument maintains. Viewed in the context of the MOU as a whole, the withdrawal provision is all-encompassing, including all withdrawals, both voluntary and involuntary. 11 Williston on Contracts §32:5 (4th ed.) ("A contract will be read as a whole and every part will be read with reference to the whole."); *accord Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract.").

Cyrulnik's strained interpretation vitiates the clear intent of the MOU's signatories as evidenced in the MOU's "for cause" removal clause. The MOU discusses the effect of partner departures in two provisions—Section VI.C, addressing "withdrawals," and Section VI.H, addressing death. The for-cause provision, unlike those provisions, says nothing about compensation or the effects of that removal. Instead, it merely sets forth a procedure for

removing a Founding Partner "for cause." There is no other clause delineating the financial consequences of a for-cause removal. The most reasonable way to read this omission is to infer that the parties intended such departures to be treated the same was as "voluntary" ones, under the withdrawal clause. Cyrulnik, however, mistakenly reasons that the absence of a separate clause demonstrates the parties intended that a removed person would never "relinquish[] any of the enumerated assets" contemplated under the MOU. (Cyrulnik Br.24.) This interpretation is absurd: if a voluntary departure results in loss of equity and compensation rights, but a for-cause removal did not, then no one would ever voluntarily withdraw. Instead, they would simply abandon their post, get themselves removed for cause, and keep all of their equity and compensation rights forever. But the MOU "should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003). It is implausible that the parties would go through the trouble of negotiating the right to for-cause removal if they intended for such a removal to have *no* effect, other than entrenching the subject's compensation rights.

Cyrulnik nevertheless insists that his implausible interpretation is mandated by the language of the MOU, because the word "withdraw" can only refer to a voluntary act. (Cyrulnik Br.21). But the very first synonym listed in the Merriam-Webster Dictionary for the word "withdraw" is "remove"—the same word that the Founding Partners used in Section VI.G of the MOU. *See* Definition of "withdraw," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/withdraw. Consistent with that understanding, courts, legislators, and contracting parties have long understood that "withdrawal" may refer to either voluntary or involuntary acts. *See, e.g.*, RULPA §402 (defining "events of withdrawal" to include an instance where "the general partner is removed"); Tex. Bus. Org. Code §152.501 (defining "event of

withdrawal" to include "the partner's expulsion as provided by the partnership agreement");
*Lockey v. Kanodia*, 2001 WL 755841, at *7 (Mass. Super. Ct. May 15, 2001) (partnership
agreement defined "withdrawal" as "the ceasing to be a General Partner for any reason
whatsoever, whether voluntary or involuntary"); *Kulick v. Gamma Real Estate LLC*, 2022 WL
4467341, at *3 (S.D.N.Y. Sept. 23, 2022) (partnership agreement defined "involuntary
withdrawal" to include "termination"); *cf. Fort Transfer Co., Inc. v. Cent. States, Se. & Sw.
Areas Pension Fund*, 2007 WL 707545, at *3 (N.D. Ill. Mar. 2, 2007) ("Expulsion may not be a
voluntary withdrawal from a pension fund, but it is a withdrawal nonetheless."). Even Holcomb
agrees that "the word withdrawal can refer to involuntary withdrawals." (CSOF ¶38)[7]

Against this body of precedent, Cyrulnik cites a few cases holding that, in some
circumstances, the term "withdraw" implies a concept of voluntariness. None of Cyrulnik's cited
authority (at 21-23) can overcome the contrary precedent or render unreasonable an
interpretation of the MOU's sole withdrawal clause as encompassing both voluntary and
involuntary withdrawals. His reliance on *260-261 Madison* is misplaced. There, a guaranty
provision permitted the first guarantor who "withdraws" to be released from unpaid rent
obligations. The trial court held—and the Appellate Division agreed—that in light of the

---

[7] In *Pitcock v. Kasowitz*, 2009 WL 3240385 (N.Y. Cty. Sup. Ct. Sep. 29, 2009), a partnership
agreement issued by Cyrulnik's own counsel also apparently endorsed the concept of
"involuntary withdrawal." As described by the court, the Kasowitz partnership agreement
distinguished between those who "involuntarily withdraw in the absence of cause" and those
removed for cause, and the court determined that the plaintiff was in the latter camp. *Id.* Cyrulnik
misstates the import of that ruling. (Cyrulnik Br.23 n.8.)

guaranty's purpose, which conferred a benefit on the withdrawing person, it made sense to interpret "withdraw" to refer only to a voluntary act as opposed to a for-cause termination. *260-261 Madison Avenue LLC v. Bower Monte & Greene PC*, 2013 WL 5763732 (N.Y. Sup. Ct. Oct. 21, 2013), *aff'd*, 137 A.D.3d 457 (1st Dep't 2016). In short, rather than positing that there is only one way to read the meaning of the word "withdraw," the court looked at the surrounding factual context and at the overall intent of the governing contract to determine what was reasonable under the circumstances. Moreover, as the Appellate Division observed, the contract in question, unlike the MOU here, "specifically identif[ied]" that certain "limited involuntary circumstances" (*e.g.,* death or disability) qualified as withdrawals; the court held the fact that they did not include termination as one such category implied it was not a withdrawal under this agreement— in other words, it included a textual anchor for limiting the scope of the withdrawal provision in a way the MOU does not. 137 A.D.3d 457, 458 (1st Dep't 2016). *Cadwalader, Wickersham & Taft v. Beasley*, upon which Cyrulnik also relies, had a materially different agreement. There, the court observed the relevant agreement required a "withdrawing" partner to provide advance "written notice." That meant withdrawing" could not operatively include someone who was involuntarily removed, because that person could not be expected to provide any advance notice. 728 So. 2d 253, 256-57 (Fla. Dist. Ct. App. 1998). Confirming this interpretation, the partnership "conceded at trial that it did not treat [the partner] as a 'withdrawn partner' after his departure." *Id.* In contrast to both *260-261 Madison* and *Cadwalader*, the MOU does not, by its terms, limit the meaning of "withdrawal" in any way or include any required notice provisions; nor have Counter-Defendants ever conceded that Cyrulnik did not "withdraw" within the meaning of Section VI.G.

Cyrulnik's other authority, an Alabama state-court decision that is not controlling here, is similarly inapposite. There, the court concluded that a terminated LLC member had not "withdrawn" because "nothing in the member's agreement or in the operating agreement" indicated that the court should interpret the word "withdraw" to include involuntary acts. *Love v. Fleetway Air Freight & Delivery Serv., LLC*, 875 So. 2d 285, 289-90 (Ala. 2003). Here, as explained above, interpreting "withdraw" to exclude for-cause removals is inconsistent with the MOU's other terms and the obvious intent of its signatories.

Cyrulnik's additional arguments are meritless. He claims, for example, that if "withdrawal" included involuntary acts, it would have been unnecessary for the parties to include a provision governing compensation for the estate of a deceased Founding Partner, because Section VI.C would already cover that scenario. (Cyrulnik Br.24.) But the clear purpose of Section VI.H is to provide *additional* compensation to the estate of a deceased Founding Partner beyond what Section VI.C would otherwise provide. Cyrulnik's reliance on the language of the Side Letter (at 25) is similarly unavailing, because that agreement does not refer to "withdrawal" at all. It provides for the consequences should its signatories "voluntarily leave the Firm or be terminated for cause." (RF Ex.29.) That uncontroversial distinction sheds no light on whether the MOU's "withdrawal" provision was intended to encompass both outcomes.

IV.    **CYRULNIK IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER THE "FOR CAUSE" PROVISION OF THE MOU**

Cyrulnik contends the undisputed factual record shows he did not engage in any conduct that could constitute "cause" for his removal. (Cyrulnik Br.34, 36.) This position is contradicted by massive amounts of evidence of his abusive and inappropriate behavior. His argument also fails as a matter of law.

A.    Cyrulnik's argument fails as a matter of law.

30

Cyrulnik's argument turns on the enforceability of the "for cause" provision of the MOU. As set forth in Counter-Defendants' opening brief, the MOU did not create any specific enforceable obligations, other than an obligation to negotiate toward a Partnership Agreement in good faith. (RF Br.13-24.) Counter-Defendants thus had no obligation to abide by a "for cause" standard and could treat the question of Cyrulnik's removal as any employer would treat the removal of any employee. Regardless, ample evidence supports Counter-Defendants' conclusion that there was cause to remove him.

Cyrulnik also wrongly assumes the MOU's "for cause" language imposes an exceptionally high bar. The lofty standard Cyrulnik seeks to graft onto the MOU's "for cause" provision—as requiring conduct that rises to the level of "ethical breaches," "illegal activity" or "utter abandonment" of one's job (Cyrulnik Br.34)—is nowhere articulated in the MOU. Rather, the MOU does not define "cause" at all.

As Counter-Defendants explained at length in their opening brief, authorities applying New York and Florida Law in numerous contexts have recognized that "cause" means only some rational, non-arbitrary reason for termination. (RF Br.25-26 (citing, *inter alia*, *Goss v. E.S.I. Cases & Accessories, Inc.*, 2020 WL 5817163, at *2 (S.D.N.Y. Sept. 29, 2020) (employment agreement); *Trans World Airlines, Inc. v. Beaty*, 402 F. Supp. 652, 654 (S.D.N.Y. 1975) (labor dispute resolution agreements); *Stanacard, LLC v. Rubard, LLC*, 2016 WL 462508, at *23 (S.D.N.Y. Feb. 3, 2016) (restrictive covenants); *Spurlin v. Sch. Bd. of Sarasota Cty.*, 520 So. 2d 294, 296 (Fla. Dist. Ct. App. 1988) (statute governing public employees)).

Against the weight of these authorities, Cyrulnik relies on a single, unpublished Florida district court case, *Comprehensive Care Corp. v. Katzman*, 2010 WL 3190136, at *6 (M.D. Fla. July 30, 2010), which refers to cause as requiring "illegal activity, ethical breaches, or utter

abandonment or dereliction of a job." (Cyrulnik Br.34). He offers no evidence that the parties were aware of this standard when the drafted the MOU, much less that they intended to rely on it. In any event, his reliance on *Comprehensive Care* is misplaced.

In defining cause as requiring "illegal activity, ethical breaches, or utter abandonment or dereliction of a job," 2010 WL 3190136, at *6, *Comprehensive Care* misstates Florida law. The opinion draws that standard from only one authority, *State ex rel. Hathaway v. Smith*, 160 Fla. 485 (1948), a rarely cited Florida Supreme Court case. But *Hathaway* does not provide support for the standard *Comprehensive Care* claims. It merely observes that in "statutes and constitutions," the term "for cause" "imputes removal or termination for misconduct, some violation of the law or delict of duty on the part of the officer or employee affected." *Id.* at 488. *Hathaway*'s discussion is limited to public employees who have due process rights (as opposed to contract rights) by virtue of their public roles, a far cry from employment contracts negotiated by private parties. *Id.* at 488-89. And *Hathaway* holds only that age-based retirement does not constitute "for cause" termination. Even in dicta, it does not purport to adopt the heightened standard that *Comprehensive Care* attributes to it. *Id.*

This explains why *Comprehensive Care* is a complete outlier. Cyrulnik identifies no other Florida or New York court that adopts a comparable definition of "cause." Moreover, Counter-Defendants have yet to identify any other court that has relied on *Hathaway* to provide the definition of "cause" in private agreements. Indeed, no other court appears to have ever referred to *Hathaway's* discussion of cause at all, not even once in the seventy-five years since it was decided—which belies the notion that *Hathaway* set any binding standard. Counter-Defendants have also been unable to identify any court that has followed *Comprehensive Care*'s holding on cause in the thirteen years since that case came down. And although *Hathaway* is

32

sometimes cited by administrative bodies in rulings concerning public employees, those rulings

routinely interpret *Hathaway* to stand for the proposition that "just cause" should be defined in

exactly the way Counter-Defendants define "cause" above: as "a reason which is rationally and

logically related to an employee's conduct in the performance of the employee's job duties."

*Lake Cty. Sch. Bd. v. Erdman*, 2020 WL 6625464, at *8 (Fla. Div. Admin. Hrgs. Oct. 8, 2020);

*see also Palm Beach Cty. Sch. Bd. v. Loud*, 2022 WL 1559998, at *6 (Fla. Div. Admin. Hrgs.

Apr. 11, 2022) (Just cause is "a reason which is rationally and logically related to an employee's

conduct in the performance of the employee's job duties and which is concerned with

inefficiency, delinquency, poor leadership, lack of role modeling, or misconduct,"); *Sch. Bd. of*

*Palm Beach Cty., Florida v. Duhart*, 2021 WL 1832332, at *3 (Fla. Div. Admin. Hrgs. Mar. 29,

2021) (same).

Cyrulnik's definition of cause has a very questionable legal basis. It should not be the

standard applied in this case.

B.   Cyrulnik's argument fails as a matter of fact.

As set forth in their opening brief, the factual record shows that Counter-Defendants had

ample cause to justify Cyrulnik's removal. There were widespread reports of his abusive,

unprofessional, and discriminatory conduct; he had become a polarizing and controversial figure

at the firm; his presence would cause the departure of numerous other attorneys at all levels of

the firm; and his continued involvement threatened the viability of the firm. (RF Br.26-31.) Even

Holcomb, a former Counter-Defendant now purporting to act as Cyrulnik's star witness, testified

under oath that, at the time of the removal vote, he was "firmly of the view that there was cause

to remove [Cyrulnik]." (56.1 Opp. ¶37.) Among other things, he testified: Cyrulnik is not "an

ethical person;" Cyrulnik made "factual misrepresentations" to his partners; Cyrulnik

"scream[ed] at people and treat[ed] them in a way that nobody should ever treat anyone;"

33

Cyrulnik's conduct was "leading to the associates expressing unhappiness;" Cyrulnik "had alienated every single other one of the founding partners;" Cyrulnik posed "a threat to our ability to operate as a business;" Cyrulnik "had asserted authority to unilaterally make decisions that he had no authority to make unilaterally;" Cyrulnik had created "a situation in which the firm was in crises and in which its ability to operate as a business was at great risk;" Cyrulnik's actions "brought" the firm "to the point that we could not practically operate as a business with Jason as a partner;" "the issue with Jason needed to be addressed;" "by the end of the day on February 8th," he was "firmly of the view that there was cause to remove Jason;" he "agreed with" the statements made in the removal email; and he "was never upset that we made the decision to remove Jason under the circumstances that we were presented with." (*Id.*) Although Holcomb is now engaged in revisionist history, even his recent declaration concedes that Cyrulnik's conduct led to "escalating tensions within the firm" and that these conflicts "posed an existential threat to the firm." (Holcomb Dec. ¶¶2, 24, 33, 38). That is more than enough to constitute cause.

Indeed, even if *Comprehensive Care's* questionable standard were applied, Counter-Defendants had ample basis to meet it:

- Cyrulnik's undisputed failure to obtain engagement letters for numerous clients violates ethics rules, including New York's state court rules and Rules of Professional Conduct. (RF Br.31-32; Ex.61 (Keyko Report).)

- Discrimination on the basis of a protected characteristic, like race or gender, is both illegal and unethical. *See* 42 U.S.C. §2000e *et seq.*; New York Rule of Professional Conduct 8.4(g) & (h); (Ex.61 (Keyko Report)). Multiple associates complained that Cyrulnik engaged in such conduct.

- Numerous associates complained that Cyrulnik had a negligent and abusive management style that placed extreme and unnecessary burdens on junior attorneys and staff and prejudiced client interests; indeed, both junior and senior attorneys complained that Cyrulnik's conduct was driving them to seriously consider leaving the firm altogether. Such conduct would seem to be a serious dereliction of Cyrulnik's job responsibilities as a senior lawyer who held himself out as a leader of the firm.

34

Cyrulnik's remaining argument, that Counter-Defendants cannot rely on after-acquired evidence, is both irrelevant and wrong. Preliminarily, Counter-Defendants do not need to rely on after-acquired evidence because they received numerous associate complaints and discovered Cyrulnik's missing engagement letters *before* Cyrulnik's removal. As noted, even Holcomb agreed that by February 8, there was cause.

In addition, the Second Circuit recognizes that parties *can* use after-acquired evidence to justify a for-cause termination. (RF Br.34 (citing, *inter alia*, *Daytree at Cortland Square, Inc. v. Walsh*, 2022 WL 2345820, at *3 (2d Cir. June 29, 2022); *Fitzpatrick*, 2013 WL 709048, at *26). The cases on which Cyrulnik relies are inapposite. (Cyrulnik Br.35-36). *DeLeonardis v. Credit Agricole Indosuez*, 2000 WL 1718543 (S.D.N.Y. Nov. 15, 2000), does not address after-acquired evidence at all. It concerns the admissibility of contemporaneous evidence about senior management's beliefs. *Id.* at *12. *King v. Fox*, 2005 WL 3098933, (S.D.N.Y. Nov. 18, 2005), concerns a malpractice allegation in an attorney fee dispute, not a contract case. *Id.* at *5. And in *Tomasini v. Mount Sinai Medical Center of Florida*, 315 F. Supp. 2d 1252 (S.D. Fla. 2004), the court observed that the availability of an after-acquired evidence defense in a wrongful discharge case was, at that time, undecided under Florida law. *Id.* at 1257-58. But Florida now permits it. *See Mootry v. Bethune-Cookman Univ., Inc.*, 279 So. 3d 207, 210 n.1 (Fla. Dist. Ct. App. 2019).

In the end, Cyrulnik cannot advance an uncontested factual position on cause suitable for summary judgment. Counter Defendants have presented ample evidence from which a reasonable jury could find there was cause to remove Cyrulnik under any applicable standard.

## V.   CYRULNIK FAILS TO SUPPORT ANY OF HIS STATUTORY, TORT, OR QUASI-CONTRACT CLAIMS

In addition to his contract claims, Cyrulnik moves for summary judgment on "each" of his other counterclaims, (Cyrulnik Br.2), which include claims for dissolution, buyout, and an

accounting under FRUPA (CC Counts 1-3), and breach of fiduciary duty, conversion, unjust enrichment, promissory estoppel, and civil conspiracy (CC Counts 6-10). But Cyrulnik's motion does not include a single sentence even describing the elements of these diverse causes of action, much less explaining why this Court should conclude he has satisfied them as a matter of law. Cyrulnik apparently assumes that if he prevails on his contract claim, he should prevail on all the others. That is wrong.

Cyrulnik's statutory claims diverge from his contractual claims in several respects. Although both sets of claims turn, in part, on whether Cyrulnik has any management or economic rights in Plaintiff (he does not), the statutory claims require more. *First*, Cyrulnik claims he is entitled to Plaintiff's dissolution—an extreme remedy that would needlessly harm the firm's twenty-plus employees and its clients. But to show that dissolution was warranted, Cyrulnik would have to prove either that "[t]he economic purpose of the partnership is likely to be unreasonably frustrated" or that it is "not reasonably practicable" to carry on the business without him. Fla. Stat. §620.8801(5); *see also* CC ¶¶108-110. Cyrulnik cannot meet that burden: Plaintiff has been a successful, thriving business over the two years since Cyrulnik's departure. (CSOF ¶41.) *Second*, Cyrulnik's alternative claim for a buyout assumes the FRUPA's default rules apply. But if, as Cyrulnik suggests, the MOU is effectively a partnership agreement, then its plain language makes clear that the parties did not intend to confer buyout rights on partners who withdrew (whether voluntarily or not) within eighteen months. (*See* Section III, *supra*; *see also* Fla. Stat. §620.8103(1) (partnership agreement may vary FRUPA's default rules, including its buyout provision)). *Third*, his accounting claim is moot because he has already obtained extensive discovery into the firm's finances. (RF Br.43.)

Cyrulnik's efforts to prevail on his tort and quasi-contract claims based solely on the MOU are similarly deficient. It is well-established that contract claims do not give rise to tort claims, and that a written agreement, even an expressly preliminary one like the MOU, bars quasi-contract claims. (*See* RF Br.37-43 (discussing that principle as applied to each of Cyrulnik's tort and quasi-contract claims)). Cyrulnik identifies no independent basis for these claims outside of the MOU; consequently, far from demonstrating any entitlement to summary judgment in *his* favor, Cyrulnik's motion only confirms these claims must be dismissed.

## VI.   CYRULNIK FAILS TO PRESENT ANY EVIDENCE TO SUPPORT A CLAIM AGAINST FRIEDLAND

Cyrulnik purports to seek summary judgment against Counter-Defendant Amos Friedland. His briefs are conspicuously silent with respect to any evidence against him. Cyrulnik apparently concedes as much, insofar as his 56.1 statement attributes a "deplorable plan" to Freedman, Roche, and Normand—but not Friedland. (Cyrulnik 56.1 ¶52.) Cyrulnik relies heavily on the Holcomb declaration. That declaration says nothing about any purported wrongdoing by Friedland and even confirms that Friedland "had no financial incentive" to vote in favor of Cyrulnik's removal. (Cyrulnik Ex.3 ¶31.) Indeed, even Cyrulnik's star witness asserts that when he raised the topic of Cyrulnik's removal with Friedland and his concern that Tokens could become a cause of dispute, "Friedland responded that maybe Cyrulnik would just get his Tokens and we could all move on"—a statement wholly at odds with the purported scheme Cyrulnik describes. (*Id.* ¶25). In any event, it is undisputed that Friedland, like Normand, had no control over the Tokens Cyrulnik now seeks. (CSOF ¶39). Far from demonstrating any entitlement to summary judgment against Friedland, Cyrulnik's papers confirm that even under his contested factual allegations, Friedland does not belong in this case.

**VII.    ROCHE'S CLAIM FOR FRAUDULENT INDUCEMENT AND
COUNTER-DEFENDANTS' RELATED AFFIRMATIVE DEFENSES
SHOULD NOT BE DISMISSED ON SUMMARY JUDGMENT**

Cyrulnik seeks summary dismissal of Roche's claim for fraudulent inducement. That

claim, like Counter-Defendants' fraudulent inducement affirmative defenses (which Cyrulnik

must overcome to obtain summary judgment), has a solid factual basis. ((Dkt.385) Roche CC

¶¶8-10; (Dkt.383), Counter-Defendants' Ans., 18th Defense.) The claims arise from Cyrulnik's

misrepresentations regarding a competing offer he allegedly received from the Patterson Belknap

firm while he was negotiating with Counter-Defendants about potentially joining together.

Specifically, during negotiations concerning the MOU, including terms relating to his

compensation, Cyrulnik represented to Roche that he had received an offer for "upwards of

$3,000,000" from Patterson Belknap, pursuant to which he "was going to be one of the leaders in

their litigation department." (CSOF ¶32.) He made substantially similar representations to

Freedman and to Normand, who relayed the details concerning the Patterson Offer to Friedland,

all while the parties were negotiating the MOU. (*Id.*) Documents disclosed in discovery have

exposed that Cyrulnik's representations were materially false: Cyrulnik had received only a "soft

offer" from Patterson, he was told that he would make approximately ███████, and

Patterson never told him he would have any "particular role at the firm." (CSOF ¶33.) Roche,

Freedman, Normand, and Friedland relied upon Cyrulnik's false representations, particularly in

considering what role and level of financial compensation might interest him. (CSOF ¶34.)

Indeed, Roche testified that Cyrulnik's representation shaped Roche's "entire approach to that

negotiation [of the MOU]." (CSOF ¶34.)

These facts amount to more than mere "puffery." They describe an actionable fraud.

They are detailed and specific and more than satisfy the necessary particularity requirements.

"The elements of a cause of action sounding in fraud are a material misrepresentation of an

existing fact, made with knowledge of the falsity, an intent to induce reliance thereon, justifiable reliance upon the misrepresentation, and damages" *Int'l Exterior Fabricators, LLC v. Decoplast, Inc.*, 128 A.D.3d 1016, 1018 (2nd Dep't 2015). A reasonable jury could easily infer that Cyrulnik's specific, factual, and false statements, were made to influence the terms of the MOU and Side Letter and to induce others to provide him with additional compensation. There is no basis for dismissal on summary judgment.

A.   Cyrulnik's misrepresentations concerning the Patterson offer constitute fraud.

Cyrulnik has yet to file an answer responding to any of the specific allegations about the Patterson Offer. Instead, he attempts to evade the issue by raising several threshold arguments: he claims (1) there is no evidence he acted with an intent to defraud; (2) Roche did not justifiably rely on Cyrulnik's alleged false statements; and (3) the statements "were mere puffery." (Cyrulnik Br.38-41). Each argument fails.

*First*, evidence exists from which a reasonable jury could conclude that Cyrulnik acted with an intent to defraud. He knew the real terms of his Patterson offer and chose to misrepresent them. A jury could reasonably conclude he did not do so by accident. He is a skilled attorney who negotiates for a living and knows that law firms consider competing offers when recruiting new attorneys. Moreover, whether a defendant had "[i]ntent to defraud is ordinarily a question of fact which cannot be resolved on a motion for summary judgment." *Aguirre v. Best Care Agency*, Inc., 961 F. Supp. 2d 427, 451 (E.D.N.Y. 2013). "Courts in this District have cautioned that summary judgment should be considered skeptically in cases alleging fraud because the issues typically turn on the parties' credibility as to their state of mind." *Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*, 2020 WL 614991, at *6 (S.D.N.Y. Feb. 10, 2020) (cleaned up). At the summary judgment stage, "[a] plaintiff may establish scienter by either showing that

defendants had both motive and opportunity to commit fraud' or by showing 'evidence of conscious misbehavior or recklessness." *Aguirre*, 961 F. Supp. 2d at 451.

Cyrulnik had a *motive* to make the false representations because he saw the Side Letter and the MOU negotiations as pathways to enrich himself. Cyrulnik had the *opportunity* to commit the fraud because no Counterclaim-Defendant independently knew about Cyrulnik's parallel negotiations with Patterson, nor could they inquire into that confidential process. A jury could easily infer from these facts that Cyrulnik engaged in a "scheme or plot to defraud" each Counter-Defendant. *Integrated Constr.* 2020 WL 614991, at *6.

*Second*, Cyrulnik's claim that the evidence does not support Roche's reasonable reliance (at 40) is wrong, and raises factual issues that cannot be resolved on summary judgment. "Because justifiable reliance involves many factors to consider and balance, no single one of which is dispositive, it is often a question of fact for the jury rather than a question of law for the court." *Cambridge Capital LLC v. Ruby Has LLC*, 2023 WL 3956868, at *43 (S.D.N.Y. June 2, 2023) (cleaned up). The factual record here is more than sufficient to make out reasonable reliance. Roche testified that he relied on Cyrulnik's statements: his "entire approach to the [Side Letter and MOU] negotiation was based on the representation that Jason had an offer from Patterson where he could make upwards of $3,000,000 [, a]nd that he was going to be one of the leaders in their litigation department." (CSOF ¶32.) He further testified that, based on the false information Cyrulnik conveyed, he believed "Cyrulnik is going to command a lot to be able to come over to the firm." (CSOF ¶34) Like Roche, Normand, Freedman, and Friedland each relied on Cyrulnik's misrepresentations during the negotiations of the MOU and Side Letter. (CSOF ¶34.)

40

Cyrulnik argues the reliance of Roche and others was not reasonable because they never kicked the tires to get to the bottom of whether he was telling the truth. (Cyrulnik Br.40.) Putting aside that Counter-Defendants had no reasonable recourse to Patterson, a defrauded party is under no obligation to prove that it investigated before being swindled. "Reasonable reliance does not require 'due diligence,' but [rather] the plaintiff must show 'minimal diligence' or care that 'negat[es] its own recklessness.'" *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney*, 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013) (quoting *Banque Franco–Hellenique de Commerce Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir.1997)). "While reliance must be justifiable, mere negligent failure to investigate adequately is insufficient to bar a claim of fraud." *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 489 (S.D.N.Y. 2001).

Cyrulnik offers no evidence to suggest that Counter-Defendants were somehow negligent or reckless in failing to discern his fraud. Cyrulnik was an attorney, with ethical obligations, and a trusted former colleague. He was not a stranger off the street whose reputation for honesty was unknown and thus warranted investigation. His statements were not unbelievable on their face, nor did they present any red flags or indicia of dishonesty. It was reasonable for Counter-Defendants to believe them.

*Third*, Cyrulnik's false representations cannot be excused as "mere puffery." "Courts have found statements to be puffery as a matter of law when the statements do not provide any concrete representations." *Basquiat ex rel. Est. of Basquiat v. Sakura Int'l*, 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005). Cyrulnik made plain statements of fact, including statements quantifying the amount of his anticipated salary and career path. Such statements are either true or false, and thus are not puffery. In addition, under New York law, even puffery is actionable when a "defendant made false statements knowing they were false." *Id.*

41

Cyrulnik's reliance on *Integrated Constr. Enterprises, Inc. v. GN Erectors, Inc.*, 2020 WL 614991(S.D.N.Y. Feb. 10, 2020), is misplaced. There, a plaintiff failed to show that "generalized encomiums" concerning the defendant's "financial soundness, manpower, and supplier relations were false at all, let alone knowing misrepresentations of material present fact." *Id.* at *8. Here, there is no dispute that Cyrulnik's concrete, factual statements concerning the terms of his Patterson "offer" were false.

B.  Roche has alleged damages from Cyrulnik's fraudulent misrepresentations.

"The general standard for recovery of damages for fraud is the 'out-of-pocket' rule." *Kaleidoscope Media Grp., Inc. v. Ent. Sols., Inc.*, 2001 WL 849532, at *4 (S.D.N.Y. July 19, 2001) (citing *Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461 (2d Dep't 1982)). "Under this rule, the defrauded party is entitled solely to recovery of the sum necessary for restoration to the position occupied before the commission of the fraud." *Id.* "Thus the typical damages for fraud are similar to reliance damages for breach of contract." *Id.* And "[i]t is well settled that if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest." *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1141 (2d Cir. 1987).

Roche's fraudulent inducement claim seeks the money he paid under the Side Letter as a result of "his reliance upon Cyrulnik's false representations concerning the Patterson Offer." (Dkt.385, Roche CC ¶¶8-10.) Such damages are recoverable to restore Roche to the position he was in prior to Cyrulnik's fraud.

Although Roche did not plead recission in his counterclaim (it is pled only as an affirmative defense), the claim for the amounts paid under the Side Letter would plainly be

42

recoverable under a theory of recission. *Real Est. Webmasters Inc. v. Rodeo Realty, Inc.*, 74

Misc. 3d 1204(A) (Albany Cty. Sup. Ct. 2022) ("Clearly, Rodeo's claim for the return of monies

paid under the Service Agreement is restitutionary in nature and incidental to the equitable

remedy of rescission sought under its remaining affirmative defense."). To the extent the Court

believes the relief sought is better suited under a theory of recission, Roche should be permitted

to amend his claim to seek that relief in the alternative. *See Morse/Diesel, Inc. v. Fid. & Deposit*

*Co. of Maryland*, 768 F. Supp. 115, 117 (S.D.N.Y. 1991) (granting leave to replead rescission

claim based on fraudulent inducement despite previous dismissal of fraud claim for failure to

plead damages).

### VIII.   PLAINTIFF'S CLAIMS FOR BREACH OF FIDUCIARY DUTY AND INTENTIONAL INTERFERENCE SHOULD NOT BE DIMISSED ON SUMMARY JUDGMENT

Plaintiff RF asserts causes of action for breach of fiduciary duty and for intentional

interference based on Cyrulnik's conduct in refusing to provide his time records and in

encouraging his clients not to pay invoices. (Dkt.31, Counts 2-3.) Cyrulnik does not dispute that

if Plaintiff's allegations are true, his conduct would give rise to liability under those causes of

action. Lawyers breach their fiduciary duties if they fail to record their time or impede their

firm's collection of fees. *See Finch v. Campbell*, 541 S.W.3d 616, 624-25 (Mo. Ct. App. 2017)

("Each lawyer has a duty to the firm to represent firm clients diligently, competently, and

zealously," and that duty was breached by lawyer who "failed to timely bill his clients").

Similarly, Cyrulnik cannot deny he knew his clients had agreements to pay Plaintiff for work

done by lawyers under its auspices, and that if he induced them *not* to make such payments, the

resulting breach would damage Plaintiff. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-

02 (2d Cir. 2006) (elements of intentional interference); *Hyatt Corp. v. Epoch-Fla. Cap. Hotel*

*Partners, Ltd.*, 2008 WL 490121, at *3 n.2 (M.D. Fla. Feb. 20, 2008) (same). Instead, Cyrulnik

argues Plaintiff has no evidence to support its allegations. (Cyrulnik Br.37). He is wrong. At a minimum, genuine factual disputes preclude summary judgment.

Before Cyrulnik's removal, his clients were asking for invoices to facilitate payments owed to the firm. (CSOF ¶¶4-9.) After his removal, the firm discovered Cyrulnik had failed to enter his time for January and February 2021. (CSOF ¶¶10-14.) In mid-March, the firm requested Cyrulnik provide his time. (*Id.*) Cyrulnik refused, unless given an opportunity to review draft invoices. (*Id.*) The firm provided Cyrulnik with draft invoices on April 1. (*Id.*) But Cyrulnik never commented on the invoices, and he failed to provide his own time entries for those months. (Bach Decl. Ex.15, RFA Nos. 18, 20, 21 & 23.)

During this same period, the firm asked Cyrulnik's clients whether they intended to remain with the firm. (CSOF ¶19.) Cyrulnik drafted uniform responses for these clients, which they sent to the firm. (*Id.*) Each client ultimately decided to follow Cyrulnik to Cyrulnik Fattaruso LLP. (Dkt. 96 ¶85.)

When RF requested payment for outstanding invoices, there is evidence that at least nine clients asked Cyrulnik how to handle the invoices, whether the invoices were accurate, and/or whether they should pay. (Cyrulnik Decl. ¶53; CSOF ¶¶16-30.) The same communications also reference numerous phone calls between Cyrulnik and the clients to discuss these issues, frequently held at Cyrulnik's own suggestion. *Id*. Cyrulnik admits in his declaration (at ¶53) that he told those clients that he had not "reviewed or approved" the invoices—even though he was given an opportunity to do so. Following those discussions, the clients uniformly failed to pay. (Cyrulnik 56.1 ¶49.) On May 3, 2021, more than a month after the firm provided draft invoices to Cyrulnik for his review, one client wrote that he was refusing to pay an invoice in full because "Jason doesn't recall seeing this." (CSOF ¶25.)

44

Based on this evidence, a reasonable jury could find that Cyrulnik deliberately and unreasonably refused to provide his time-records or sign off on firm invoices, causing the firm to lose fees. Tellingly, Cyrulnik does not dispute he never signed off on the invoices, or explain why. Instead, he attempts to pass the buck by claiming that Counter-Defendants "admitted" to "strategically" failing to collect. His has no evidence for this contested proposition beyond a hypothetical example used for rhetorical effect in an unrelated litigation. (Cyrulnik Ex.8 at 7.)

A reasonable jury considering this evidence could conclude Cyrulnik intentionally caused clients, who previously intended to pay and were proactive about paying their invoices, not to pay. The facts in *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery Inc.*, 751 F. App'x 39 (2d Cir. 2018), are instructive. There, as here, there was evidence of regular phone calls "on dates relevant to the alleged interference." *Id.* at 41-42. The Second Circuit held that even though the substance of the calls was disputed, "the pattern admits an inference that the calls concerned" certain "specific efforts" to procure a breach. *Id.* at 42. In other words, a "jury could infer [the] substance of phone calls from timing and pattern." *Id.* Here, too, a jury could infer Cyrulnik's intentional interference from the timing of his repeated communications with these clients and their subsequent uniform refusal to pay.

Because there is ample evidence from which a jury could find in Plaintiff's favor on both claims, "summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Cyrulnik may dispute whether and why he discouraged clients from paying the firm, but those disputes are for a jury to decide.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Cyrulnik's motion in full.

Dated: July 11, 2023
      New York, NY                  Respectfully submitted,

    /s/ Jonathan P. Bach

Jonathan P. Bach
Alice Buttrick
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (212) 257-4897
Fax: (212) 202-6417
jbach@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Plaintiff Roche Freedman LLP and Counter-Defendants Devin Freedman, Edward Normand, and Amos Friedland*

    /s/ Matthew Leto

Matthew Leto
LETO LAW FIRM
201 S. Biscayne Blvd.
Suite 2700
Miami, Florida 33131
Tel: (305) 341-3155
Fax: (305) 397-1168
mleto@letolawfirm.com

*Attorneys for Counter-Defendant Kyle Roche*

46

**CERTIFICATE OF COMPLIANCE**

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 14,093 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D and the Court's May 24, 2023 Order permitting the parties to submit opposition briefs of up to 15,000 words (Dkt.414).

 _/s/ Jonathan P. Bach _____
Jonathan P. Bach