Marc E. Kasowitz (mkasowitz@kasowitz.com)
Kevin A. Cyrulnik (kcyurlnik@kasowitz.com)
Gavin D. Schryver (gschryver@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Defendant/Counterclaim-Plaintiff Jason Cyrulnik*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP,<br><br>      Plaintiff,<br><br>   v.<br><br>JASON CYRULNIK,<br><br>      Defendant. | Case No. 1:21-cv-01746-JGK |
| JASON CYRULNIK,<br><br>      Counterclaim-Plaintiff,<br><br>   v.<br><br>ROCHE CYRULNIK FREEDMAN LLP,<br>KYLE ROCHE, DEVIN FREEDMAN, AMOS<br>FRIEDLAND, NATHAN HOLCOMB, and<br>EDWARD NORMAND,<br><br>      Counterclaim-Defendants. | |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF JASON CYRULNIK'S**
**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S AND**
**COUNTERCLAIM-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

    A.    Roche and Freedman Recruit Cyrulnik to Co-Found RCF and the Parties Enter Into the MOU ............................................................................ 4

    B.    The MOU Was Intended to be (and Was) a Binding, Enforceable Agreement ...... 5

        1.    The Founding Partners Intended the MOU to be Binding ......................... 5

        2.    The Founding Partners Operated Under the MOU for Over a Year .......... 6

    C.    The Conspiring Partners Devise a Scheme to Misappropriate Cyrulnik's Interests in The Firm and Its Valuable Assets ........................................ 8

ARGUMENT ........................................................................................ 14

II.    THE LEGAL STANDARD ON SUMMARY JUDGMENT ........................................... 14

III.    THE MOU IS AN ENFORCEABLE AGREEMENT ................................................ 15

    A.    A Written Partnership Agreement Was Not a Condition to Enforcement of MOU ................................................................................ 15

    B.    The MOU Was Not a Type II Agreement ............................................. 17

        1.    The MOU Was Binding .................................................................. 18

        2.    At a Minimum, the MOU Was a Binding Type I Agreement ................. 18

    C.    Cyrulnik Would Still Be Entitled to Equity as a Member of an Oral Partnership Even if the MOU Were Not Binding ................................ 27

IV.    CYRULNIK WAS NOT REMOVED FOR "CAUSE" ............................................. 28

    A.    The "Cause" Issue is Irrelevant to Cyrulnik's Entitlement to Compensation and Assets Under the MOU ............................................ 28

    B.    None of Defendants' Grounds Are Sufficient to Constitute Cause ..................... 28

    C.    Defendants' Grounds for Removing Cyrulnik Were Plainly Pretextual ............. 32

    D.    The Issue of "Cause" Is Replete With Questions of Fact ..................................... 36

V.    CYRULNIK'S NON-CONTRACTUAL CLAIMS SHOULD NOT BE DISMISSED ... 40

VI.    CYRULNIK IS ENTITLED TO RELIEF UNDER THE SIDE LETTER ...................... 44

CONCLUSION ........................................................................................ 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adjustrite Systems, Inc. v. GAB Business Services, Inc.*,
 145 F.3d 543 (2d Cir. 1998)..................................................................................20, 23, 25

*Alter v. Bogoricin*,
 1997 WL 691332 (S.D.N.Y. Nov. 6, 1997)..................................................................43

*Amica Mut. Ins. Co. v. Morowitz*,
 613 F. Supp.2d 1358 (S.D. Fla. 2009) ........................................................................43

*Appalachia Power Co. v. Wagman Heavy Civil, Inc.*,
 2019 WL 6188303 (W.D. Va. Nov. 20, 2019) ............................................................16

*In Matter of Application of NAP, Inc.*,
 1996 WL 221623 (S.D.N.Y. May 1, 1996) ....................................................19, 20, 23, 26

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
 884 F.2d 69 (2d Cir. 1989)....................................................................................20, 23

*Baraliu v. Vinya Capital, L.P.*,
 765 F. Supp. 2d 289 (S.D.N.Y. 2011).......................................................................16, 17

*Barry v. James*,
 394 N.E.2d 55 (Ill. Ct. App. 1979) .............................................................................16

*Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.*,
 401 B.R. 598 (S.D.N.Y. 2009)......................................................................................25

*Bedoyan v. Samra*,
 352 So.3d 361 (Fla DCA 2022) ....................................................................................44

*Brown v. Cara*,
 420 F.3d 148 (2d Cir. 2005), The RF ...........................................................18, 19, 22, 25

*Calhoun v. Walden*,
 2023 WL 2820076 (N.D. Fla. Feb. 8, 2023)................................................................26

*Capstone Asset Management Co., Ltd. v. Dearborn Capital Group LLC*,
 2021 WL 4250087 (S.D.N.Y. Sept. 17, 2021)............................................................21

*Cataldi v. 39 Winfield Associates*,
 30 A.D.3d 458 (2006) ...................................................................................................41

ii

*Comprehensive Care Corp. v. Katzman*,
　　2010 WL 3190136 (M.D. Fla. July 30, 2010) ........................................................29

*Comprehensive Care Corp. v. RehabCare Corp.*,
　　98 F.3d 1063 (8th Cir. 1996) .....................................................................16, 30

*Eclectic Synergy, LLC v. Seredin*,
　　347 So. 3d 27 (Fla. Dist. Ct. App. 2022) .............................................................39

*Ehrlich v. Froehlich*,
　　72 A.D.3d 1010 (2d Dep't 2010) ........................................................................41

*FCOF UB Sec. LLC v. MorEquity, Inc.*,
　　663 F Supp 2d 224 (S.D.N.Y. 2009).....................................................................24

*Fincher v. Depository Tr. and Clearing Corp.*,
　　604 F.3d 712 (2d Cir. 2010)..................................................................................38

*Gilbane Bldg. Co. v. Brisk Waterproofing Co., Inc.*,
　　585 A.2d 248 (Md. 1991) .......................................................................................16

*Golden v. Worldvision Enters., Inc.*,
　　133 A.D.2d 50 (1st Dep't 1987) ...........................................................................33

*Goss v. E.S.I. Cases & Accessories, Inc.*,
　　2020 WL 5817163 (S.D.N.Y. Sept. 29, 2020).....................................................29

*Gutkowski v. Steinbrenner*,
　　680 F. Supp.2d 602 (S.D.N.Y. 2010)....................................................................25

*Harris v. Provident Life and Acc. Ins. Co.*,
　　310 F.3d 73 (2d Cir. 2002)....................................................................................43

*State ex rel. Hathaway v. Smith*,
　　160 Fla 485 (1948)................................................................................................30

*Herman v. Duncan*,
　　2019 WL 2137335 (S.D.N.Y. May 16, 2019) .................................................22, 25

*IDT Corp. v. Tyco Group*,
　　13 N.Y.3d 209 (2009)............................................................................................20

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
　　29 F.4th 118 (2d Cir. 2022) ..................................................................................33

*Johns v. Intl. Bus. Machines Corp.*,
　　361 F Supp 2d 184 (S.D.N.Y. 2005)......................................................................32

*Johnston v. Eichelberger,*
    13 Fla. 230 (1869) ........................................................................................................16

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,*
    52 N.Y.2d 105 (1981) ...................................................................................................25

*Kerns, Inc. v. Wella Corp.,*
    114 F.3d 566 (6th Cir. 1997) .......................................................................................33

*King v. Fox,*
    2005 WL 3098933 (S.D.N.Y. Nov. 18, 2005) ...........................................................31

*Komlossy v. Faruqi & Faruqi, LLP,*
    2017 WL 722033 (S.D.N.Y. Feb. 23, 2017) ..............................................................41

*Lafarge North America, Inc. v. Matraco Colorado, Inc.,*
    2008 WL 2277503 (S.D. Fla. May 30, 2008) ......................................................20, 23

*Lamda Sols. Corp. v HSBC Bank USA, N.A.,*
    574 F Supp 3d 205 (S.D.N.Y. 2021) ...........................................................................43

*Marvel Characters, Inc. v. Simon,*
    310 F.3d 280 (2d Cir. 2002) .................................................................................14, 15

*McCort v. ADCS Clinics, LLC,*
    2021 WL 8946696 (M.D. Fla. Oct. 12, 2021) ............................................................34

*MCM Holdings, Inc. v. Levy,*
    2017 WL 11716614 (S.D. Fla. May 25, 2017) ...........................................................40

*Miller v. Wells Fargo Bank, N.A.,*
    994 F. Supp. 2d 542 (S.D.N.Y. 2014) .........................................................................39

*Missan v. Schoenfeld,*
    95 A.D.2d 198 (1st Dep't 1983) ..................................................................................27

*MLB Props., Inc. v. Opening Day Prods., Inc.,*
    385 F. Supp. 2d 256 (S.D.N.Y. 2005) .........................................................................25

*In re Nagel,*
    278 F. 105 (2d Cir. 1921) ............................................................................................33

*Nelly de Vuyst, USA, Inc. v. Eur. Cosmetiques, Inc.,*
    2012 WL 246673 (S.D.N.Y. Jan. 6, 2012) ................................................................41

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.,*
    315 F.3d 47 (2d Cir. 2016) ..........................................................................................15

*Orellana v. Reiss Wholesale Hardware Co., Inc.*,
   2016 WL 4480720 (E.D.N.Y. June 8, 2016) ........................................................30

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015).............................................................................39

*In re Piazza*,
   719 F.3d 1253 (11th Cir. 2013) .........................................................................29

*Prince-Vomos v. Winkler Real Estate, Inc.*,
   140 A.D.3d 1043 (2d Dept. 2016) ..............................................................33, 35

*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc.*,
   2020 WL 9214290 (S.D.N.Y. Nov. 4, 2020)........................................................20

*Rikhy v. AMC Comput. Corp.*,
   2003 WL 1618529 (S.D.N.Y. Mar. 28, 2003) ......................................................30

*S. Katzman Produce Inc. v. Yadid*,
   999 F3d 867 (2d Cir. 2021)...............................................................................38

*S.A.F., S.A. v. Ryder Int'l, Inc.*,
   2007 WL 628133 (S.D. Fla. Feb. 26, 2007) ........................................................25

*Sellinger Enterprises, Inc. v Cassuto*,
   50 A.D.3d 766 (2d Dept. 2008) ........................................................................41

*Shi v. Le*,
   2022 WL 1085420 (E.D.N.Y. Mar. 2, 2022) ......................................................41

*Sines v. Opportunities for Broome, Inc.*,
   156 A.D.2d 878 (3d Dept. 1989) ......................................................................30

*Spurlin v. Sch. Bd. of Sarasota Cty.*,
   550 So. 2d 294 (Fla. DCA 1988) .............................................................29, 30, 33

*Stanacard, LLC v. Rubard, LLC*,
   2016 WL 462508 (S.D.N.Y. Feb. 3, 2016)....................................................29, 37

*Estate of Stine v. Chambanco, Inc.*,
   560 N.W.2d 424 (Neb. 1997).............................................................................16

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
   2011 WL 13305367 (E.D.N.Y. May 13, 2011) ....................................................41

*In re Tingle*,
   34 B.R. 676 (Bankr. S.D. Fla. 1983).................................................................16

*Tomasini v. Mount Sinai Med. Ctr. of Florida, Inc.*,
315 F. Supp. 2d 1252 (S.D. Fla. 2004) .......................................................31

*In re Tremont Sec. Law, State Law, and Ins. Litig.*,
2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013).........................................15

*Tutor Perini Bldg. Corp. v. New York City Regional Ctr., LLC*,
525 F Supp 3d 482 (S.D.N.Y. 2021).........................................................40

*In re Utnehmer*,
499 B.R. 705 (B.A.P. 9th Cir 2013)..........................................................16

*V'Soske v. Barwick*,
404 F.2d 495 (2d Cir. 1968)................................................................24, 25

*Vacold LLC v. Cerami*,
545 F.3d 114 (2d Cir. 2008)...............................................................19, 22

*Viacom Intern. Inc. v. Tandem Productions, Inc.*,
368 F. Supp. 1264 (S.D.N.Y. 1974)....................................................23, 24

*Walton v. Lake-Sumter State Coll.*,
2023 WL 2938525 (Fla. DCA Apr. 14, 2023) .........................................30

*Waters v. Churchill*,
511 U.S. 661 (1994).......................................................................... 36, 37

*White Const. Co., Inc. v. Martin Marietta Materials, Inc.*,
633 F. Supp. 2d 1302 (M.D. Fla 2009) .....................................................20

## Statutes

Fla. Stat. § 620.8101(8)...................................................................................27

Fla. Stat. § 620.8404 ......................................................................................42

## Other Authorities

Fed. R. Civ. P. 56(a) .......................................................................................14

New York Rule of Professional Conduct 1.5.............................................38, 46

Defendant/Counterclaim-Plaintiff Jason Cyrulnik respectfully submits this memorandum of law in opposition to the motion for summary judgment filed by Plaintiff/Counterclaim Defendant Roche Freedman LLP n/k/a Freedman Normand Friedland LLP f/k/a Roche Cyrulnik Freedman LLP ("RCF") and Counterclaim-Defendants Kyle Roche, Devin Freedman, Edward Normand and Amos Friedland (the "Conspiring Partners" and together with RCF, the "RF Parties").[1]

## PRELIMINARY STATEMENT

The RF Parties have utterly failed to carry their burden of establishing the absence of genuine issues of material fact regarding any of Cyrulnik's claims, and their motion should be denied in its entirety.

The RF Parties rely largely on their incredible argument that the MOU – which the Founding Parties executed after months of negotiation, which multiple Founding Partners have expressly conceded to be "binding," and which governed the operation of a sophisticated law firm with more than a dozen employees and dozens of clients for more than a year – was nothing more than a "preliminary agreement" that obligated the parties merely to make a good-faith attempt to negotiate a formal partnership agreement. The RF Parties' outlandish position contradicts not only the plain language of the MOU itself, but also *all* the contemporaneous evidence – such as the very email through which they purported to terminate Cyrulnik "pursuant to" the MOU, based on the fact that Cyrulnik allegedly "breached the MOU" – and the RF

---

[1] Submitted herewith is Cyrulnik's Local Rule 56.1 Counter-Statement of Material Facts ("CSMF") and the Declaration of Jason Cyrulnik, dated July 11, 2023 (the "Cyrulnik Declaration"). Unless otherwise noted, all alterations, citations and internal quotation marks have been omitted from quoted text. Citations to "Ex." refer to the exhibits attached to the Cyrulnik Declaration. Citations to "SMUF" refer to Cyulnik's 56.1 Statement submitted with his motion for summary judgment (Dkt. 433).

Parties' own complaint and summary judgment motion.  As set forth below and in Cyrulnik's

own summary judgment motion, the MOU was a binding and enforceable agreement, which the

RF Parties breached when they perpetrated their scheme to steal Cyrulnik's assets.

The RF Parties' argument that they properly terminated Cyrulnik for cause under the

MOU fares no better, and fails for at least three reasons.

*First*, the RF Parties improperly ask the Court to resolve heated factual disputes in their

favor, at the summary judgment stage.  Cyrulnik vigorously disputes the (typically bare)

allegations underlying each purported basis for "cause" asserted by the RF Parties – he disputes

that he ever mistreated even a single associate; he disputes the accounts of the Conspiring

Partners who claim he raised his voice during two telephone calls; and he disputes that he

violated any ethical rule.  In moving for summary judgment, the RF Parties ask the Court to

simply adopt their version of the facts over Cyrulnik's – notwithstanding that their version is

based entirely on their own self-serving, unsupported testimony, and/or of individuals over

whom the RF Parties exert undue influence, both as their employers and through improper

witness tampering (as confirmed by one of their former partners).  It bears repeating here:  the

RF Parties have not produced (and claim not to possess) a single shred of paper relating to the

substance of the meeting at which they purported to terminate Jason Cyrulnik from the firm; they

do not possess a single shred of paper relating to (much less documenting) the allegations of

"misconduct" that form the basis for the "cause" on which they based their termination votes;

and they admittedly destroyed any documents that *did exist* relating to either of those two things.

The Court should reject the RF Parties' plea to resolve heated factual disputes in their favor.

*Second*, likely recognizing the glaring lack of existence of "cause" and that the question

is at best replete with unresolved factual disputes, the RF Parties ask the Court to set the standard

required for "cause" so low that the word would be rendered essentially meaningless.  The RF Parties assert that they were permitted to remove Cyrulnik for *any* articulable reason, that the Court is not permitted to consider the overwhelming evidence that the reasons they have advanced for their removal of Cyrulnik were pretextual, and that the Court is not permitted to consider the overwhelming evidence that Cyrulnik was removed for the purpose of misappropriating his valuable cryptocurrency Tokens.  The RF Parties are wrong.  Under binding precedent from the Florida Supreme Court, the RF Parties are required to establish that they removed Cyrulnik for illegal activity, ethical breaches, or utter abandonment or dereliction of his job; and that their decision to remove him was reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual.  Even the inapplicable New York law the RF Parties cite requires far more of a showing than they claim, or than they can make.  In sum, the RF Parties cannot establish they removed Cyrulnik for "cause," much less as a matter of law.

*Third*, as demonstrated in Cyrulnik's own motion for summary judgment, even if the RF Parties *did* have "cause" to remove Cyrulnik, that would not impact Cyrulnik's right to all of the assets he was unequivocally promised in the MOU, including his equity interest and 25% allocation of Tokens, because the MOU provides for a loss of those assets only in the event that a partner voluntarily chooses to withdraw from RCF.

Finally, the RF Parties' request that the Court dismiss Cyrulnik's non-contractual claims is truly astonishing – not for what they say, but for what they leave out.  Although one would never know it from reviewing the RF Parties' motion, **another court has recently upheld the exact same claims against the RF Parties in a related case**.  Specifically, in a litigation brought by another former RCF partner (Paul Fattaruso) against the very same RF Parties arising from

the same conduct at issue here, a court in Florida rejected the same arguments the RF Parties

make here, and permitted Fattaruso's non-contractual claims to proceed.  For the same reasons

articulated by that court, the RF Parties are not entitled to summary judgment dismissing

Cyrulnik's non-contractual claims.

## STATEMENT OF FACTS

**A.      Roche and Freedman Recruit Cyrulnik to Co-Found RCF
         and the Parties Enter the MOU**

In mid-2019, junior attorneys Kyle Roche and Velvel Freedman left Boies Schiller &

Flexner LLP ("BSF") to form Roche Freedman LLP.  (SMUF ¶3.)  In late 2019, Roche and

Freedman induced Cyrulnik (along with three other attorneys – Amos Friedland, Edward

Normand and Nathan Holcomb) (collectively, the "Founding Partners") – to leave BSF and start

a new firm, into which Roche Freedman LLP would be merged.  (SMUF ¶¶4-6, 12.)  The

Founding Partners agreed that the new firm would be known as Roche Cyrulnik Freedman LLP

("RCF" or the "Firm").  (SMUF ¶12.)

The Founding Partners memorialized their agreement to form the partnership in a heavily

negotiated contract they entitled the Memorandum of Understanding (the "MOU"), detailing the

material terms on which they were forming the RCF partnership and on which the BSF attorneys,

including Cyrulnik (a BSF equity partner who had spent his entire career at that firm), were

relying in leaving BSF.  (SMUF ¶12.)  The MOU included multiple key provisions, including:

allocation of equity (Section II); partner compensation and distribution of firm revenues (Section

III); assignment and allocation of the predecessor firm's assets (Section IV); treatment of the

firm's existing cases (Section V); firm management rights and responsibilities, including

procedures for new clients and matters, attorney hiring, partner withdrawal, firm marketing,

lodestar calculations, firm name, partner removal, partner death, firm employee benefits, firm co-

chairpersons, bank account access, and the establishment of four partner committees responsible

for various firm matters (Section VI).  (Ex. 2.)  Attached to the MOU was an Engagement Letter

with client Ava Labs ("Ava"), through which Ava agreed to give the Firm ███ of Ava's

cryptocurrency Tokens (or ████████ Tokens in total) – a key asset that was used to induce

Cyrulnik to leave BSF and co-found the new firm.  (Ex. 2; CSMF ¶127.)

**B.      The MOU Was Intended to be (and Was) a Binding, Enforceable Agreement**

**1.   The Founding Partners Intended the MOU to be Binding**

The Founding Partners fully intended that the MOU be binding.  Indeed, as described

further below, Cyrulnik and Holcomb each made (and the other Founding Partners accepted)

edits to the draft MOU expressly designed to ensure that the agreement would be "binding and

enforceable."  (CSMF ¶25.)  And the other partners confirmed that they understood the MOU to

be a binding agreement as well.  For example, on December 17, 2019 – nine days before the

parties executed the MOU – Roche emailed the other Founding Partners about the MOU, stating

that "it's time we get signatures on the document and get a ***binding agreement*** in place."

(CSMF ¶25.)

The three named partners – Cyrulnik, Roche, and Freedman – also entered into a related

contract (the "Side Letter") effective as of January 4, 2020.  (CSMF ¶17.)  The Side Letter

memorialized Roche and Freedman's agreement to give Cyrulnik ███ of recoveries from the

███████████ litigation "should Roche, Freedman, Roche Freedman LLP, or RCF be

entitled to any contingent recovery in connection with" that litigation.  (*Id.*)  The Side Letter also

provided that Roche would make $850,000 in installment payments to Cyrulnik in exchange for

putting "Roche" first in the firm's name.  (*Id.*)  With respect to *those payments only*, the partners

agreed that "[s]hould Freedman or Cyrulnik voluntarily leave the firm ***or be terminated for***

*cause* before any of the foregoing payments is scheduled to be paid, the departing partner's remaining payments hereunder will be forfeited back to Roche." (*Id.*)

### 2.   The Founding Partners Operated Under the MOU for Over a Year

The Founding Partners launched "Roche Cyrulnik Freedman LLP" in January 2020, with Cyrulnik as a founding equity partner, and proceeded to operate and manage RCF, its non-equity partners, associates, staff, clients and cases pursuant to the MOU's express terms for more than a year. Indeed, every single aspect of the Firm's services, communications and operations was governed by the MOU:

*Compensation.*  Partner compensation at RCF was calculated – and paid to Cyrulnik and the other equity partners – using the compensation formula attached to the MOU. (CSMF ¶110.) While the parties discussed potential modifications to that formula, they understood that the formula was binding unless the Compensation Formula Committee modified it pursuant to Section IV.K of the MOU. (*Id.* ¶111; Ex. 2 § IV.K.) And while the Firm set up payroll administration through ADP for its employees, Roche told Cyrulnik and the others that, "*As equity partners*, your draws will be set up as direct deposits and will not go through payroll." (CSMF ¶112.)

*Client Relationships.*  RCF held itself out to its many clients as a law firm founded and managed by the Founding Partners. For example, client invoices were issued by "Roche Cyrulnik Freedman LLP," and the firm's clients signed engagement letters on "Roche Cyrulnik Freedman" letterhead, stating that each client had "agreed to retain Roche Cyrulnik Freedman LLP." (CSMF ¶¶113-14.)

*Applications for Government Services.*  The firm also held itself out as "Roche Cyrulnik Freedman LLP" – and held Cyrulnik out as an equity partner – to the federal government. On

April 6, 2020, "Roche Cyrulnik Freedman LLP" submitted an application on behalf of the firm

to obtain government aid pursuant to the COVID-19 Paycheck Protection Program.  (CSMF

¶115; Ex. 28.)  In response to the question requiring the identification of "all owners of 20% or

more of the equity of the Applicant," the firm identified Cyrulnik as a 27% owner of RCF (and

Freedman as a 24% owner – not 50% as he now claims).  (Ex. 28.)  *Freedman* signed the

application and certified under penalty of perjury that this information "was true and accurate in

all material respects."  (*Id.* at 2.)  Later that year, when the firm sought forgiveness of the PPP

loan, the firm's accountant advised that the salaries of the entire "**equity group**" – including

Cyrulnik – needed to be excluded from the calculation.  (CSMF ¶116.)

 *Agreements with Third Parties.*  The firm also held itself out as "Roche Cyrulnik

Freedman LLP" to third parties in binding legal contracts – including the lease agreement for the

firm's New York office, which identified the tenant as "Roche Cyrulnik Freedman LLP," and

agreements with numerous service providers.  (CSMF ¶117.)

 *Firm Marketing and Formal Communications.*  On January 15, 2020, the parties

announced the launch of "Roche Cyrulnik Freedman LLP."  (CSMF ¶118.)  In emails with

RCF's press agent the day before the announcement, Roche distinguished between the "old firm"

(Roche Freedman LLP) and the "new firm" (Roche Cyrulnik Freedman LLP).  (*Id.* ¶119.)  And

the parties' firm email addresses used the domain "@rcfllp.com" and their email signatures –

including Cyrulnik's – identified each of them as a "Partner" of "Roche Cyrulnik Freedman

LLP."  (*Id.* ¶120.)

 *Communications Among Partners.*  As described in Cyrulnik's motion for summary

judgment (Dkt. 428, pp. 9-10), Cyrulnik and the Conspiring Partners treated each other as equity

partners in countless ways, including in emails relating to benefits ("because you are equity

partners, the firm is fronting 100% of the cost of your healthcare"; "please circulate to the equity partners"); taxes ("as an owner (K1)"); and partnership meetings ("Equity Partners Meeting"). (CSMF ¶¶121-122.)

**Firm Committees.**  Pursuant to the MOU, the Founding Partners formed partner committees responsible for new matters, equity, expenses and compensation.  (*See* Ex. 2 §§ VI.A, VI.I, VI.J, VI.K.)  The MOU defined the contours of these committees, including their composition and decision-making requirements.  (*Id.*)  Indeed, the RF Parties submitted sworn declarations from Roche, Freedman and Normand that they were members of the New Matter Committee, which of course was created by the MOU they claim never became effective.  (*See* Dkt. Nos. 418-20.)

**Termination of Partners.**  Perhaps the most damning evidence that the Conspiring Defendants operated under the MOU, and considered it a binding agreement that governed the parties' relationship, is that they *cited the MOU as the basis for removing Cyrulnik*.  The first sentence of Roche's February 12, 2021 email to Cyrulnik – sent on behalf of all the Conspiring Partners – states:  "We are writing to inform you that, *pursuant to the December 2019 MOU*, [we] have "voted to remove you for cause from the firm's partnership."  (CSMF ¶124.)  And the second sentence begins, "*You have breached the MOU*…"  (*Id.*)

## C.   The Conspiring Partners Devise a Scheme to Misappropriate Cyrulnik's Interests in The Firm and Its Valuable Assets

As described in Cyrulnik's opening motion (Dkt. 428 at 11-14), to entice Cyrulnik to leave his equity partnership at BSF, Roche and Freedman agreed to give Cyrulnik 25% of the ███████ cryptocurrency tokens Ava agreed to distribute to the firm.  (CSMF ¶127.)  But Roche and Freedman secretly conspired at the time to take the assets for themselves if they became as valuable as they hoped:  (i) Roche and Freedman signed covert "reassignment" agreements

through which they tried to reassign to themselves personally the firm's Tokens (25% of which they were giving Cyrulnik), without telling Cyrulnik or the other Founding Partners (CSMF ¶129); (ii) they did not remit to Cyrulnik any of his Tokens, which Ava transferred later that year and instead told Cyrulnik no Tokens had transferred yet and that they would let Cyrulnik know when the Tokens arrived (CSMF ¶129); and (iii) in July 2020, Roche and Normand hatched a scheme, which they would deploy if "the economics of the tokens at issue [] really heat up," to "***revise and/or fraudulently edit and back-date the MOU*** to rejigger the silly distribution of [Tokens] that we gave Cyrulnik in December 2019" (CSMF ¶129).  Six months later, toward the end of January 2021, "the economics of the tokens" indisputably "heated up," with the price of each Token increasing twentyfold, from approximately $3 to $59 by February 10, 2021, at which time the Firm's stake was worth approximately $130 million.  (CSMF ¶131.)  Roche immediately put his scheme into action – campaigning with the other Conspiring Partners to hold a meeting in which they would remove Cyrulnik and keep his Tokens for themselves.

On February 8, 2021, the Conspiring Partners secretly met to discuss Roche's proposal to remove Cyrulnik from the firm.  (CSMF ¶132.)  During the meeting, Roche and Freedman both applied pressure to the other Conspiring Partners – Roche (responsible for most of the firm's burgeoning cryptocurrency contingency practice) threatened that he would leave if the others did not vote to remove Cyrulnik (CSMF ¶133); while Freedman told the other partners that he was not prepared to vote to remove Cyrulnik unless the other partners would agree to sign an Amended MOU that would grant him veto rights over decision-making at the firm, which Roche admitted was Freedman's way to exploit the situation "as leverage for money and power" (*id.* ¶133).

On February 10, 2021, the Conspiring Partners voted to remove Cyrulnik.  (CSMF ¶134.)
The purported justification for the removal was set forth in a February 12, 2021 email (*id.* ¶135),
though the RF Parties now advance a number of new post-hoc justifications for their removal
that were not mentioned in the Removal Email or discussed during the February 2021 meetings.
All of the justifications advanced by the RF Parties – in February 2021 and in this litigation –
were baseless and pretextual.

   ***The False Allegations in the Removal Email.***  The RF Parties stated in the Removal
Email that they had removed Cyrulnik because he had raised his voice during two conversations
the prior year in an "unprofessional, unhealthy way," supposedly attempted to exercise unilateral
control over staffing and marginalized other partners' involvement in firm operations,
supposedly created an unsustainable environment for associates, "temporized," and did not
participate in firm-related discussions in good faith.  (Ex. 6.)

   Even if true – and they were not – every purported reason set forth in the Removal Email
boiled down to differences in management style, hurt feelings, or office politics.  Indeed,
multiple witnesses testified that they enjoyed working with Cyrulnik, had positive relationships
with him (at BSF and RCF), and *never* witnessed him yell or scream.  (CSMF ¶136.)  The RF
Parties' allegations that in two instances Cyrulnik purportedly raised his voice in an
"unprofessional, unhealthy way" are supported solely by the RF Parties' own self-serving
testimony, as Cyrulnik vigorously disputes their characterization of events (*id.* ¶137); ignore the
critical nature of the subject of the calls at issue (which involve misconduct by firm partners) (*id.*
¶138); and ignores the fact that one of the Conspiring Partners yelled and even cursed at
Cyrulnik during a call, but was not disciplined at all (*id.* ¶¶139-40).

***The Conspiring Partners' Newfound False Allegations of Discrimination.***  After this case commenced , the RF Parties began arguing that they had "cause" to remove Cyrulnik because he allegedly discriminated against an associate (█████████ on the basis of her gender and another associate ████████ on the basis of his race.  Each of these outrageous newfound allegations is pretextual and false, and raises factual issues that cannot be resolved on summary judgment.

*First*, Cyrulnik did not discriminate against anyone on the basis of their gender.  (CSMF ¶142.)  ██████ allegations that she felt she *may* have been treated differently due to her gender lack credibility because (i) she depends on the RF Parties for her livelihood, and was made partner after Cyrulnik's removal (CSMF ¶44); (ii) Holcomb has stated under oath that the Conspiring Partners tampered with ███████, and that ██████ herself admitted that Freedman pressured her into giving that testimony (Ex. 3 ¶49); and (iii) there is not a single document anywhere in the record that substantiates the RF Parties' claim that █████ had concerns about Cyrulnik, or that she (or anyone else) raised them with others at the firm.  (CSMF ¶44.)  Indeed, ██████ claim that she was discriminated against makes no sense, since she also testified that a white male of the exact same seniority as herself had expressed complaints that were essentially identical to hers – complaints that were not about Cyrulnik, but about the role senior associates like █████ and the male associate played on two cases Cyrulnik brought to the firm, for which she assumed Cyrulnik (and not the more junior partner to whom █████ reported directly) was responsible.  (*Id.*)

Moreover, the firm's own conduct makes clear that either █████ never made the complaints they now claim she did, or that the RF Parties never believed those complaints were credible.  For example, after the firm purportedly learned that █████ believed Cyrulnik had

discriminated against her, the firm actually directed her to spend even *more* time working on Cyrulnik's cases, in order to free up a white male attorney so he could work on one of their preferred cases.  (CSMF ¶143.)  And while the RF Parties stated that Cyrulnik had "mocked" another partner "for his concerns over diversity," that partner testified that both Roche and Freedman opposed promoting ███ to partner, preferring to promote a male attorney instead, and that he "believe[s] that Roche and Freedman's purported concern over the firm's gender balance was disingenuous and pretextual."  (Ex. 3 ¶91.)  Indeed, at all times since its founding, RCF's equity partnership has been exclusively white and male – notwithstanding its professed concerns for diversity, RCF has ***never*** promoted a female or minority attorney to its equity ranks.  (CSMF ¶148.)

Second, equally baseless are RCF's claims that Cyrulnik discriminated against an African American associate, ███████.  Cyrulnik did no such thing.  According to the RF Parties, ████ – whose credibility suffers from the same problems as ████ – claimed that there "*might*" be discrimination because Cyrulnik did not send him a "welcome" email the day ████ joined the firm, he had a general "*feeling"* that Cyrulnik was "dismissive," and he was replaced by a white associate on one of his cases.  (CSMF ¶56.)  But as a result of the Conspiring Partners' own hiring practices, the firm's only other associates at the time were white – so if ████ was replace, it necessarily would be with a white associate.  (*Id.*)  And to the extent Cyrulnik was dismissive of ████, or replaced him on a matter, he did so solely for performance reasons, as evidenced by the fact that numerous partners complained about ████ performance, and that ████ was ultimately told to leave (and did leave) the firm for performance reasons.  (*Id.*)

### The Conspiring Partners' Newfound False Allegations of "Unethical" Conduct.

Despite not mentioning it in the Removal Email, the RF Parties now assert that Cyrulnik failed to

obtain written engagement letters from certain clients, and that this violated ethical rules and constituted cause for his removal.  But at least one Conspiring Partner acknowledged that he is "not sure you need an engagement letter to represent a client," and there is literally not a shred of evidence that any of the Conspiring Partners were aware of (much less relied on) the purported lack of engagement letters as a basis to remove Cyrulnik, or that Cyrulnik was ever informed by the firm that any client file was missing anything, including a engagement letter.  (CSMF ¶¶150-51, 153.)  In any event, ethics expert Bruce Green has confirmed that the firm's alleged failure to obtain new engagement letters was not an ethical violation at all.  (*Id.* ¶149.)  And, even if a letter were missing and required, that easily could have been rectified had it been brought to Cyrulnik's attention by obtaining any required engagement letter then.  (*Id.* ¶82.)

*The Conspiring Partners' Newfound False Allegations of Cyrulnik's Failure to Obtain New Matter Committee Approval.*  As noted above, the RF Parties argue that Cyrulnik is barred from enforcing the MOU because he allegedly failed to obtain approval from the New Matter Committee before opening a single one of the dozens of new matters he opened.  Cyrulnik disputes the RF Parties' claim that they don't recall him obtaining New Matter Committee approval (CSMF ¶152) – and, as discussed below, it would not remotely constitute a "material breach" even if he did.

*The Conspiring Partners Intentionally Hid Their Purported Concerns from Cyrulnik.* As the RF Parties' own expert admitted, and the RF Parties' own policies required, a firm should provide an individual subject to complaints feedback about those complaints and an opportunity to respond (and, if the complaints are substantiated, to address the concerns that motivated the complaints).  (CSMF ¶153.)  As it applies to allegations of discrimination, the RF Parties' handbook makes clear that: "Upon receiving a complaint, the Firm will promptly conduct a fair

13

and thorough investigation into the facts and circumstances of any claim of a violation of this to ensure due process for all parties," and during that investigation, "the Firm generally will interview the complainant and the accused, conduct further interviews as necessary and review any relevant documents or other information....." (*Id.* ¶154.)  The RF Parties did not do any of this.  (Ex. 64.)  To the contrary, they intentionally did not tell Cyrulnik that ***anyone*** had complained about him (*id.* ¶155), demonstrating that those complaints never actually occurred and/or were immaterial, and that the RF Parties' reliance on them is pretextual – otherwise, why wouldn't they tell Cyrulnik about the complaints, learn what Cyrulnik's response was, and mandate that Cyrulnik correct any issues they concluded existed after the investigation was complete?  Instead, the RF Parties did the exact opposite – even after they received these alleged complaints, they made Cyrulnik believe that everything was going extremely well with the firm (and with their relationship with him), induced him to continue bringing millions of dollars of business to the firm, and only later cited the alleged complaints as grounds to remove him.  A reasonable inference – indeed, the *only* reasonable inference – is that these complaints are a pretext for their real motivation:  to steal for themselves Cyrulnik's share of Tokens, which were worth tens of millions of dollars.

## **ARGUMENT**

## II.    **The Legal Standard on Summary Judgment**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of genuine issues of material fact.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).  In considering whether a genuine issue of material fact exists, the evidence must be construed in the light most favorable to the opposing party and draw all inferences in that party's favor.  *Niagara*

*Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 47, 59 (2d Cir. 2016).  Accordingly,

summary judgment is "'improper if there is any evidence in the record that could reasonably

support a jury's verdict for the non-moving party.'"  *Marvel*, 310 F.3d at 286.

## III.   The MOU Is an Enforceable Agreement

### A.   A Written Partnership Agreement Was Not a Condition to Enforcement of the MOU

As Cyrulnik demonstrated in his opening brief, (i) conditions precedent are not favored;

(ii) the MOU did not contain traditional terms used in conditions; (iii) any condition would be

excused in any event; (iv) any condition would have been frustrated by the RF Parties' own bad-

faith failure to fulfill their own contractual obligations; and (v) at a bare minimum, if entry into a

partnership agreement was a condition to *anything*, it could be to only the division of the firm's

equity – and *not* to the division of the firm's Tokens.  (Dkt. 428 at 26-29.)

Nothing in the RF Parties' moving brief (Mot. 10-13) changes this analysis.[2]  For

example, the RF Parties' assertion that the phrase "after execution of the Partnership Agreement"

in Section II of the MOU constitutes a condition precedent relies on wholly inapposite (and non-

controlling) caselaw, involving contracts with *express* condition precedents – unlike this case,

which has no such language, and in which the evidence demonstrates that the parties intended

---

[2] As an initial matter, pursuant to the internal affairs doctrine and New York's "significant relationship test," Florida law applies here.  New York applies the internal affairs doctrine to limited partnerships.  *See* N.Y. P'Ship L. § 121-901.  The internal affairs doctrine also applies to the interpretation of partnership agreements.  *See In re Tremont Sec. Law, State Law, and Ins. Litig.*, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013), *aff'd sub nom.*, *Elendow Fund, LLC v. Rye Inv. Mgt.*, 588 Fed. Appx. 27 (2d Cir. 2014) ("Because New York follows the internal affairs doctrine, and the XL Fund was organized in Delaware, Delaware law governs the interpretation of this clause [of the partnership agreement].").  Accordingly, the Court should apply Florida law here.

and understood the MOU to be binding and enforceable.  (CSMF ¶¶8,10,25.)[3]  Similarly, the

cases on which the RF Parties rely for the proposition that the failure of a condition can prevent

the formation of a partnership are also inapposite.  *See In re Tingle*, 34 B.R. 676 (Bankr. S.D.

Fla. 1983) (parties intended that return to plaintiff of purchase price for business and capital

contributions be a condition precedent to creation of partnership); *Johnston v. Eichelberger*, 13

Fla. 230, 237 (1869) (payment of 50% of price of goods was condition precedent to creating

partnership).  The same is true for the cases that the RF Parties rely on for the position that

execution of a partnership agreement can be a condition precedent:

- *In re Utnehmer*, 499 B.R. 705 (B.A.P. 9th Cir. 2013) involved a *loan agreement* with a single paragraph stating the loan was "intended to be superseded by execution of a formal operating agreement which will recharacterize [a portion of the loan] to an investor's equity interest with . . . 35% participation in profits." *Id.* at *2.  Unlike here, there was "nothing in the Loan Agreement to indicate any intent to form a partnership or LLC at the time of signing the Loan Agreement, nor at any point before the execution of the operating agreement or LLC formation." *Id.* at *6.

- In *Barry v. James*, 394 N.E.2d 55 (Ill. Ct. App. 1979), the plaintiff sent a first draft of a proposed partnership agreement, the defendant refused to enter into a partnership and demanded the return of his deposit, and the plaintiff sued. *Id.* at 56.  The court found that "the formal execution of a written partnership agreement was viewed by the parties as a condition precedent to the vesting of rights and duties so there was no binding contract." *Id.*  The case could not be more dissimilar to the case here.

- In *Baraliu v. Vinya Capital, L.P.*, 765 F. Supp. 2d 289 (S.D.N.Y. 2011), an employee claimed entitlement to a 2.5% equity stake in a partnership pursuant to an addendum to his employment agreement that required plaintiff to "execute and return" it, which he failed to do. *Id.* at 299.  The evidence showed that the plaintiff was not satisfied with the company's offer, and plaintiff's failure to return the signed agreement "appears to have been designed to allow him to avoid committing to an agreement

---

[3]  *See Gilbane Bldg. Co. v. Brisk Waterproofing Co., Inc.*, 585 A.2d 248 (Md. 1991) (contract stated "[i]t is specifically understood and agreed that the payment . . . is dependent, as a condition precedent, upon [receipt of payments] from the owner"); *Appalachia Power Co. v. Wagman Heavy Civil, Inc.*, 2019 WL 6188303, at *4 (W.D. Va. Nov. 20, 2019) (contract expressly used term "condition"); *Estate of Stine v. Chambanco, Inc.*, 560 N.W.2d 424 (Neb. 1997) (contract stated payment obligation triggered only "when it is received"); *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063 (8th Cir. 1996) (contract stated "if [a particular event occurred] then [a payment obligation would arise]").

that he evidently viewed as deficient." *Id.* Here, all the Founding Partners committed to the terms of the MOU, which governed their firm's operations for over a year.

The RF Parties also argue that their filing of papers to merely change the name of the pre-existing firm, as opposed to forming a new entity, was somehow consistent with their argument that the MOU was not intended to be binding. But the RF Parties fail to mention that Roche **concealed** the fact that he and Freedman had not formed a new entity. (CSMF ¶20.) In any event, Section IV of the MOU expressly states that "Roche Freedman LLP **will be merged into [Roche Cyrulnik Freedman LLP] in January 2020**." (Ex. 2 § IV.) Thus, regardless of any name-change paperwork, the MOU is absolutely clear that the Founding Partners agreed that they were forming a new partnership, and the old firm – whatever its name – would become a part of the new firm in January 2020.

Finally, the RF Parties' argument (Mot. 12-13) that their multiple statements acknowledging that Cyrulnik was an equity partner and owner of RCF are merely consistent with the intent to make the future partnership agreement retroactive to January 1, 2020 is nonsensical. Referring to Cyrulnik as an equity partner and owner of RCF is consistent with only one thing: the overwhelming evidence that the parties understood and intended that the MOU was binding and effective when they signed it.

### B.    The MOU Was Not a Type II Agreement

The RF Parties' argument (Mot. 13-24) that the MOU was merely a preliminary Type II agreement is meritless. To the contrary, the MOU was a binding agreement requiring the Founding Partners to operate RCF in accordance with its terms, and the undisputed evidence shows that the parties did just that. Furthermore, even if the MOU could be characterized as a

17

"preliminary agreement," it would be a binding and enforceable "Type I" agreement, not a

"Type II" agreement that merely obligated the parties to continue negotiations in good faith.[4]

### 1.   The MOU Was Binding

For all the reasons set forth in Cyrulnik's own motion, the MOU is a heavily negotiated

agreement setting forth the most essential terms of the parties' partnership relationship, and is

itself a binding agreement – not a preliminary agreement, and not an "agreement to agree," but

(as Counter-Defendant Holcomb himself testified) a "binding and enforceable" agreement.  (Dkt.

428 at 4-10, 26-33; Ex. 18 at 36:10-37:6, 41:22-42:7.)

### 2.   At a Minimum, the MOU Was a Binding Type I Agreement

Even if the MOU was not a complete, binding partnership agreement, at a bare minimum,

it is an enforceable Type I agreement that bound the parties to its terms.

Type I preliminary agreements "are 'preliminary' in name only"; "[t]he hallmark of a

Type I agreement is that the parties have agreed to all necessary elements of the contract and are,

therefore, bound to the ultimate objective despite the fact that a more formal or elaborate writing

has yet to be produced."  *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).[5]  Courts consider

four factors to determine whether an agreement is a Type I agreement:  "(1) whether there is an

---

[4]   While Florida does not use the "Type I" vs. "Type II" nomenclature, New York and Florida
law on this issue appears to be consistent.  In any event, as discussed in footnote 4, *supra*, the
Court should apply Florida law here.

[5]   The RF Parties rely heavily on *Brown* for their argument that the MOU was merely a Type II
agreement.  However, the "agreement" at issue in *Brown* was so vastly dissimilar to the MOU at
issue here that *Brown* actually strongly supports a finding that the MOU here is a Type I
agreement.  In *Brown*, the parties entered into a 2-page memorandum which merely set forth a
"general working framework" for a contemplated partnership to develop a parcel of land.  *Id.* at
151.  The memorandum in *Brown* included "almost *none* of the terms of the [project] that require
negotiation" and was "silent on critical terms of design, financing, construction, compensation,
corporate form, and ownership."  *Id.* at 155 (emphasis in original).

expressed reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to a writing." *Id.* Each of the four factors weighs heavily in favor of concluding that the MOU is a Type I agreement.

### i.    *The MOU Evidences An Intent To Be Bound*[6]

The first factor weighs heavily in favor of a Type I agreement. "This factor is frequently determined by explicit language of commitment or reservation." *Brown*, 420 F.3d at 154. The MOU plainly reflects that it includes the terms upon which the Founding Partners had agreed, that they intended to be bound by them, and that those agreed-upon terms would later be included in a subsequent long-form agreement. (*E.g.*, Ex. 2 § I ("This MOU sets out the basic terms upon which the Founding Partners will enter into a definitive partnership agreement…").) The MOU contains no language suggesting that the parties did not intend to be bound by its terms. While the RF Parties argue that the phrase "after execution of the Partnership Agreement" (in the MOU's equity provision only) indicates an intention not to be bound, courts have found binding Type I agreements utilizing language of reservation far stronger than that cited by the RF Parties. *See In Matter of Application of NAP, Inc.*, 1996 WL 221623, at *2-4 (S.D.N.Y. May 1, 1996) (finding binding Type I agreement even though it stated "[t]he parties understand that a definitive Exclusive Distributorship and License Agreement . . . shall be

---

[6]  Although the MOU is unambiguous and the Court generally should not consider extrinsic evidence, Cyrulnik's citation to parol evidence here relates only to the parties' intent to be bound by the MOU, including the MOU's "drafting history," which the Second Circuit has made clear the Court is "both permitted and required to consider." *See Vacold LLC v. Cerami*, 545 F.3d 114, 127 (2d Cir. 2008).

executed by the parties and the terms contained herein shall not be effective until the Agreement is fully executed").

Notably, the court in *NAP* cited three factors that are highly relevant to this case. *First*, the court found that the effect of the language evidencing an intent not to be bound was "weakened ... by the retroactive effect of the contemplated formal agreement" – just like the retroactive effect of the partnership agreement contemplated by the MOU – which "supports [the] contention that the parties intended to be bound." *Id.* at *4. *Second*, the language of the agreement was "outweighed by the parties' extensive performance," which (like the parties' performance here) was "strong evidence" that the parties believed themselves to be bound. *Id.* at *4-5. *Third*, the court also found it significant that the party arguing the agreement was not binding had previously relied on the terms of the agreement when the parties' dispute initially arose, having characterized the other party's conduct as "a serious breach of our letter of intent" – similar to the RF Parties' reliance on the MOU in both the February 12, 2021 termination email and their complaint in this action. *Id.* at *5.[7]

---

[7]  The agreements at issue in the RF Parties' cases are not comparable to the MOU here. *See Arcadian Phosphates. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) (agreement was subject to board approval, referenced potential failure of negotiation on outstanding terms, and anticipated that parties would enter into future "binding sales contract"); *Rembrandt 3D Holding v. Stream TV Network*, 2020 WL 9214290 (S.D.N.Y. Nov. 4, 2020) ("The parties could not have shown their objective manifestations of their intent not to be bound … more clearly"); *Lafarge North America v. Matraco Colorado*, 2008 WL 2277503 (S.D. Fla. May 30, 2008) (letter expressly stated that it "'does not, and is not intend to, impose any binding obligations on the parties'"); *Adjustrite Systems v. GAB Business Services*, 145 F.3d 543 (2d Cir. 1998) (document was "entitled a 'proposal' and it merely state[d] that [defendant] 'desires' to purchase assets and sets forth [defendant's] offer"); *IDT Corp. v. Tyco Group*, 13 N.Y.3d 209, 214 (2009) (agreement expressly conditioned performance on "the negotiation and execution of four additional agreements"); *White Const. Co. v. Martin Marietta Materials*, 633 F. Supp. 2d 1302, 1321 (M.D. Fla 2009) (letter of intent stated in bold capital letters, "THIS LETTER IS NOT INTENDED TO CREATE NOR SHOULD IT BE CONSTRUED AS CREATING ANY LEGAL OBLIGATION TO CONCLUDE THIS TRANSACTION UNDER THE TERMS OUTLINED HEREIN OR ON ANY OTHER TERMS OR CONDITIONS"); *Capstone Asset Management Co., Ltd. v.*

Notably, during the negotiations of the MOU, Cyrulnik **struck** language that would have provided what the RF Parties now claim the MOU provides – that the MOU "does not create a binding agreement and will not be enforceable against any of the Founding Partners," and that "[o]nly the Partnership Agreement, duly executed and delivered by the Founding Partners, will be enforceable."  (CSMF ¶25.)

Specifically, on December 8, 2019, Cyrulnik received a draft of the MOU from Roche that contained the following language:

> b)  This MOU does not create a binding agreement and will not be enforceable against any of the Founding Partners.  Only the Partnership Agreement, duly executed and delivered by the Founding Partners, will be enforceable, and it will supersede the provisions of this MOU and all other agreements and understandings between the Founding Partners with respect to the subject matter of this MOU;

(Ex. 51 at RF_0420198.)  On December 9, 2019, following a call with Roche and Freedman, Cyrulnik circulated a draft of the MOU with the "non-binding" language removed:

> ~~This MOU does not create a binding agreement and will not be enforceable against any of the Founding Partners.  Only the Partnership Agreement, duly executed and delivered by the Founding Partners, will be enforceable, and it will supersede the provisions of this MOU and all other agreements and understandings between the Founding Partners with respect to the subject matter of this MOU;~~
> ~~d)  No Founding Partner shall have any liability to any other Founding Partner in respect to any of the provisions of this MOU.~~

(Ex. 48 at RF_0418843.)  Less than an hour later, Freedman responded that Cyrulnik's "redlines are fine…."  (Ex. 49.)  Subsequent drafts circulated the same day also showed the removal of the "non-binding" language (Ex. 50 at RF_0420038), and it was **permanently deleted and never reinserted** back into the MOU and is not present in the final MOU.  (Ex. 2.)

---

*Dearborn Capital Group*, 2021 WL 4250087, at *6 (S.D.N.Y. Sept. 17, 2021) (purported agreement "emphasized in its first paragraphs that the document did not create a commitment by any party").

Indeed, Cyrulnik was not the only Founding Partner who made changes to the MOU to make it "maximally likely to be binding and enforceable" – on December 11, 2019, Holcomb made the following change, which he testified was designed to ensure the MOU was binding:

> This MOU sets out the basic terms upon which the Founding Partners ~~would be prepared to~~will enter into a ~~binding~~definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-orientated law firm to be named Roche Cyrulnik Freedman /or Roche Freedman Cyrulnik LLP (the "Firm").
>
> The terms of this MOU are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the "Partnership Agreement") to be negotiated and to be made effective on or around January 1, 2020.

(CSMF ¶25.)  This drafting history is highly probative of the parties' intent.  *See Vacold LLC v. Cerami*, 545 F.3d 114, 127 (2d Cir. 2008) (despite absence of strong language regarding intent to be bound, where "early drafts expressly and conspicuously stated that they were not intended to be binding, but this language is absent from the April 9 agreement," the Second Circuit found it "inescapable that the parties meant for the April 9 agreement to be . . . binding").

### ii.   *The Parties Fully Performed Under the MOU*

The second factor also weighs heavily in favor of a Type I agreement.  As described above (*supra*, pp. 5-8), it is undisputed that the parties operated the firm for more than a year pursuant to the terms of the MOU, despite the absence of a long-form partnership agreement, because everyone understood that the MOU was a binding agreement that governed the operations of the firm.  (CSMF ¶¶109-125.)[8]  The caselaw is clear that performance of the

---

[8]  Because they cannot dispute that all parties performed under the MOU and treated the MOU as a binding agreement, the RF Parties' only argument regarding this factor is that (i) an outside firm was never retained to execute a final partnership agreement, and (ii) Cyrulnik never worked on the Ava matter.  (*See* Mot. 19).  Thus, they concede that in every other way – *i.e.*, the vast majority of the matters covered by the MOU's terms – the parties performed under the MOU.  In any event, the cases they rely on that found a Type II agreement despite partial performance (Mot. 19-20), unlike here, had other factors strongly evidencing a Type II agreement, such as significant open material terms (*Brown* and *Herman v. Duncan*, 2019 WL 2137335, at *9-10

"ultimate objective" of the contract at issue – here, the formation and operation of a law firm partnership – weighs heavily in favor of a Type I agreement, as that performance "is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument." *Viacom Intern. v. Tandem Productions*, 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) (finding enforceable agreement where parties performed for a year pursuant to disputed oral agreement); *see also NAP*, 1996 WL 221623, at *4 (finding enforceable agreement where parties performed for over eight months, noting that "[p]artial performance is 'an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect'").

### iii.   The MOU Has No Open Material Terms

The third factor weighs heavily in favor of a Type I agreement.  The parties negotiated for months before executing the MOU.  As the RF Parties alleged in their Amended Complaint – before they changed their approach and argued the MOU is not binding – "[d]uring the course of these negotiations, the prospective partners discussed **and agreed to** a variety of things, ranging from how the Firm would allocate profits, compensate partners, and govern itself."  (Dkt. 31 (Am. Compl.) ¶¶16-17.  Indeed, the MOU is a nine-page, single-spaced agreement (plus exhibits) memorializing the parties' agreements with respect to both material and immaterial matters including: the allocation of equity (Section II); partner compensation and distribution of firm revenues (Section III); the assignment of the predecessor firm's assets (Section IV); the treatment of the predecessor firm's existing cases (Section V); firm management rights and responsibilities, including procedures for new clients and matters, attorney hiring, partner

---

(S.D.N.Y. May 16, 2019)), or clear language indicating an intent not to be bound (*Arcadian*, *Adjustrie* and *Lafarge*).

withdrawal, firm marketing, lodestar calculations, firm name, partner removal, partner death,

firm employee benefits, firm co-chairpersons, bank account access, and the establishment of four

partner committees responsible for new matters, equity, expenses, and partner compensation

(Section VI).  The MOU does not merely reflect the Founding Partners' high-level, general

agreements on the many topics it addresses, but rather describes their agreements in granular

detail – as one of the Conspiring Partners described it in mid-2020, the MOU was "pretty

comprehensive" and its terms merely needed to be "reduced" to the formal partnership

agreement.  (CSMF ¶25.)

     While the RF Parties argue (Mot. 21-22) that the MOU contemplated that "additional

terms, including further clarification of areas of responsibility and resources to be committed"

would be incorporated into a formal partnership agreement, that is simply incorrect, and in any

event does not detract from the fact that the MOU memorialized the core terms upon which the

Founding Partners had already reached agreement (and pursuant to which they operated the firm

for over a year).  It is not required that every possible term be agreed, so long as the parties

intended to be bound by the terms they had agreed on.  *See FCOF UB Sec. LLC v. MorEquity,*

*Inc.*, 663 F. Supp. 2d 224, 230 (S.D.N.Y. 2009) ("Parties are not obliged to negotiate every final

detail of a contract before a binding preliminary agreement exists."); *V'Soske v. Barwick*, 404

F.2d 495, 500 (2d Cir. 1968) ("all the terms contemplated by the agreement need not be fixed

with complete and perfect certainty for a contract to have legal efficacy"); *Viacom*, 368 F. Supp.

at 1269 (finding binding type I agreement even though multiple terms were left open, since

"none of those was so material as to permit a finding that the agreement was to be held in

abeyances until they were resolved," particularly in light of parties' performance).[9]

      For example, while they argue that the compensation formula set forth in Exhibit C to the

MOU was just a "proposal," that is not what the MOU says.  (Ex. 2 § III ("The Founding

Partners understand that the Firm will distribute revenue to its partners according to the Firm's

Partnership Compensation Model (attached as Exhibit C).").)  And, of course, as the RF Parties

admit (Mot. 43), RCF paid its partners (including Cyrulnik) millions of dollars in accordance

with the agreed-upon compensation terms.[10]  The fact that Cyrulnik and other Founding Partners

attempted to revise the compensation formula is irrelevant, *see V'Soske*, 404 F.2d at 500

(negotiations to amend prior agreement and add new terms "do not defeat the original agreement

of the parties"), and if anything, actually underscores that the MOU terms were binding, since

the parties acknowledged that any change to the formula would require approval of "3 of the 4

---

[9]   In contrast to the MOU, the agreements in the RF Parties' cases had substantial open material terms (among other factors weighing against a Type I agreement).  *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105 (1981) (retail lease agreement did not contain amount of rent to be paid); *Bear Stearns Inv. Products, Inc. v. Hitachi Automotive Products (USA), Inc.*, 401 B.R. 598, 620-21 (S.D.N.Y. 2009) (agreement was merely a "template"); *Brown*, 420 F.3d at 155 (agreement "leaves open terms-critical to every aspect of the [project], from design, to business structure, to ownership and management"); *Adjustrite*, 145 F.3d at 550 ("proposal" to purchase software license contained "numerous open items," including scope and duration of license); *Herman*, 2019 WL 2137335, at *2, 9-10 ("Partnership Overview" did not address "the term or duration of the joint venture; the responsibilities of [the parties]; when or how a buyout would be implemented; how losses would be shared; or how profit is calculated," and included open questions regarding partner hierarchy and allocation of expenses); *S.A.F., S.A. v. Ryder Int'l, Inc.*, 2007 WL 628133, at *2 (S.D. Fla. Feb. 26, 2007) (language "reflects an absence of any final terms concerning the rights and responsibilities of [the parties] with respect to potential clients").

[10]   This fact, among others, renders the cases cited by the RF Parties regarding compensation being a material term completely inapposite.  *See Gutkowski v. Steinbrenner*, 680 F. Supp.2d 602, 610 (S.D.N.Y. 2010) (alleged oral agreement left compensation undetermined, allegedly stating only that plaintiff "would be fairly compensated for his idea and efforts"); *MLB Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) (parties' negotiations never even got to the stage of negotiating compensation).

members of the Compensation Formula Committee," per the MOU, and repeatedly recognized that absent agreement to revise the terms, the original formula would continue to govern. (CSMF ¶111.)  Similarly, while the RF Parties argue that the MOU did not include an "exhaustive list" of the predecessor firm's assets that were not to be shared pro-rata among the Founding Partners (Mot. 22), they do not identify *any* assets that were actually left out of the lengthy list of "core assets" – including the Tokens – that the Founding Partners specifically allocated amongst themselves in the MOU.  (*See* Ex. 2 § IV.)

Finally, in the related *Fattaruso* litigation, in which they defended against claims similar to those asserted by Cyrulnik here, the RF Parties "acknowledge[d] that the 'obvious purpose'" of Florida's partnership law, FRUPA,[11] "is to create a gap-filler.'"  (*See* Ex. 56 at 3 (citing Fla. Stat. § 620.8103(1) ("to the extent the partnership agreement does not otherwise provide, this act governs relations among partners and between partners and a partnership").)  Thus, to the extent the RF Parties argue that the MOU had "gaps," the parties could always look to the FRUPA to "fill" them – further weakening their argument that terms not addressed by the MOU rendered the agreement non-binding.

### iv.   *A Final Form Agreement Is Not Necessary*

"The customary form factor is less meaningful when the agreement is in writing (and needs only be reduced to a formal agreement) than when one party is trying to enforce an oral agreement."  *NAP*, 1996 WL 221623, at *5.  Here, both Florida and New York law are clear that a formal written partnership agreement is not required to form a partnership.  *See Calhoun v. Walden*, 2023 WL 2820076, at *4 (N.D. Fla. Feb. 8, 2023) ("[T]here is no legal requirement that

---

[11]   This Court has previously held that "[t]he rights of partners in a Florida LLP are governed by [FRUPA]."  (Dkt. 374 at 13 n.5.)

a partnership agreement (or any other contract) conform to industry norms, and lack of such conformity does not refute the existence of an agreement."); *Missan v. Schoenfeld*, 95 A.D.2d 198, 208 (1st Dep't 1983) ("The law is well settled that a partnership agreement may be oral."). Indeed, FRUPA's definition of "partnership agreement" expressly encompasses "an agreement, whether written, ***oral, or implied,*** among the partners concerning the partnership."  Fla. Stat. § 620.8101(8).[12]

### C.   Cyrulnik Would Still Be Entitled to Equity as a Member of an Oral Partnership Even if the MOU Were Not Binding

The evidence adduced during discovery overwhelmingly establishes that the parties operated RCF as a partnership, and that Cyrulnik was a 27% equity holder.  (CSMF ¶¶109-125.) Indeed, in the Fattaruso Litigation, the court held that "[Fattaruso] has adequately alleged an oral partnership giving rise to equity partnership rights," notwithstanding that Fattaruso was not a Founding Partner or a signatory to the MOU, and had no written agreement concerning his membership in the firm at all.  (Ex. 56 at 5-7 ("Under Florida's Partnership Act…, unless otherwise agreed, each partner 'is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits.'") (citing Fla. Stat. §§ 620.8401(2), 8404(2)(a)).)  If this Court were to hold that the Founding Partners entered into an oral partnership rather than the partnership contemplated by the MOU, Cyrulnik would still be entitled to a buyout of his equity interest in RCF (including his share of firm assets, including the Tokens) pursuant to an oral or implied partnership.

---

[12]  While the RF Parties argue (Mot. 23) that "the establishment of a 'high-end,' multi-state law firm" is "precisely the type of agreement that is typically memorialized in a formal writing," they cite no authority that actually supports this contention in the law firm setting.

IV.     **Cyrulnik Was Not Removed for "Cause"**

A.     **The "Cause" Issue is Irrelevant to Cyrulnik's Entitlement to Compensation and Assets Under the MOU**

As an initial matter, whether the RF Parties had cause to remove Cyrulnik is irrelevant to all claims in this litigation except Cyrulnik's claims against Roche for breach of Section 1 ("Payments") of the Side Letter.  That is because the MOU (unlike Section 1 of the Side Letter) does not provide for the forfeiture of a partner's assets or compensation owed in the instance of a partner's removal.  (*See* Ex. 2 § VI.G ("A Founding Partner cannot be removed without cause.").)  Forfeiture only occurs when a partner elects to "withdraw" from the firm.  (Ex. 2 § VI.C.)  As established in Cyrulnik's summary judgment motion, there is no serious dispute that Cyrulnik did not "withdraw" from the firm (he was removed without notice and against his will), and Cyrulnik is entitled to the assets and equity he secured under the MOU, regardless of whether the RF Parties had "cause" to remove him.  (*See* Dkt. 428 at 20-25.)[13]

B.     **None of Defendants' Grounds Are Sufficient to Constitute Cause**

In any event, none of the purported grounds that the RF Parties have identified for removing Cyrulnik actually constitute "cause."

*First*, the RF Parties' argument (Mot. 25-26) that establishing "cause" merely requires them to present "an articulable and defensible reason relating to [Cyrulnik's] duties at RF" is entirely misguided and unsupported.  Under Florida law, "[a]s understood by the Florida

---

[13]  The RF Parties argue that it would be "absurd" that a partner terminated for cause would receive greater compensation than a partner who voluntarily left the firm.  (Mot. 35.)  But this simply ignores the objective of the withdrawal provision, which was to discourage partners from leaving the new firm for other opportunities, thereby leaving the other partners who had left their own partnerships to form RCF "high and dry"; it was not designed to discourage partners from engaging in acts that the remaining partners might decide constituted "cause," much less incentivize the remaining partners to find way to find "cause" in order to misappropriate another partner's assets.

Supreme Court and other courts, 'misconduct' or 'termination for cause' refers to ***illegal activity, ethical breaches, or utter abandonment or dereliction of a job***." *Comprehensive Care Corp. v. Katzman*, 2010 WL 3190136, at *6 (M.D. Fla. July 30, 2010) (citing *State ex rel. Hathaway v. Smith*, 160 Fla 485 (1948)).  In *Katzman*, a former vice president sued his employer for violation of his employment contract following his purported termination for cause.  The employment agreement permitted the corporation to terminate the plaintiff for "misconduct in office," which the court noted is also referred to as "Termination for Cause."  *Id.* at *6.  While the agreement did not define "misconduct in office," just as the MOU here does not define "for cause," the court recognized that "the term 'termination for cause' has a well-settled meaning" and applied the Florida Supreme Court's definition noted above.  *Id.*

Indeed, ***none*** of the cases the RF Parties cite for their standard of "cause" involved the removal of a law firm partner (or any partner, for that matter), or any remotely relevant employment relationship.  *See Stanacard, LLC v. Rubard, LLC*, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) (whether at-will employee was terminated for cause, such that his covenant not to compete would be enforceable); *In re Piazza*, 719 F.3d 1253 (11th Cir. 2013) (whether Chapter 7 debtor's prepetition bad faith conduct constitutes "cause" for involuntary dismissal of bankruptcy petition under Bankruptcy Code); *Goss v. E.S.I. Cases & Accessories, Inc.*, 2020 WL 5817163 (S.D.N.Y. Sept. 29, 2020) (whether employee engaging in outside business in direct violation of employment agreement constituted "cause" for termination, where employment agreement defined "cause" to include "any violation of any of the covenants of the employment agreement"); *Spurlin v. Sch. Bd. of Sarasota Cty.*, 550 So. 2d 294, 296 (Fla. DCA 1988) (interpretation of "good cause" in statute in connection with school board's authority to reject

superintendent's employment recommendation)[14]; *Walton v. Lake-Sumter State Coll.*, 2023 WL 2938525 (Fla. DCA Apr. 14, 2023) (whether college's decision to terminate anthropology department constituted "cause" to terminate tenured anthropology professor's employment); *Sines v. Opportunities for Broome*, 156 A.D.2d 878, 880 (3d Dept. 1989) (construction foreman terminated for cause for admittedly sleeping on the job, among other misconduct for which there was "evidence to more than substantiate the specific incidents of misconduct for which he was terminated").

The RF Parties' argument (Mot. 30) that an "inability to get along with supervisors and co-workers is a legitimate basis for removal" is similarly baseless. For starters, the cases they cite are employment discrimination cases involving ***at-will employees***. *See Rikhy v. AMC Comput. Corp.*, 2003 WL 1618529 (S.D.N.Y. Mar. 28, 2003) (sales associate alleging race, national origin, ethnicity, religion and/or age discrimination and retaliation); *Orellana v. Reiss Wholesale Hardware Co.*, 2016 WL 4480720 (E.D.N.Y. June 8, 2016) (warehouse employee alleging racial discrimination and retaliation). Cyrulnik was neither an employee nor a party to an "at-will" relationship with RCF – he had a contract (the MOU), which the RF Parties breached.

*Second*, the RF Parties incorrectly argue (Mot. 34) that "nothing would prevent [them] from relying on grounds discovered after Cyrulnik's removal to justify his 'for cause' termination." To the contrary, the caselaw is clear that *post-hoc* justifications are not permitted, and the propriety of their decision to terminate Cyrulnik for "cause" is analyzed based on the

---

[14]   In *Spurlin*, the court noted that "cause" for terminating a school district employee with an employment contract requires "immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of any crime involving moral turpitude." 520 So.2d at 295-296. This is very similar to the standard set by the Florida Supreme Court in *Hathaway* and applied in *Comprehensive Care*, as discussed above.

information that was available to the RF Parties at the time they made their decision to remove

Cyrulnik. *Welland v. Citigroup, Inc.*, on which the RF Parties rely, expressly states that "the

decision of an employer to terminate an employee for cause … is reviewed on the *basis of*

*information that was available to the decision-maker when the decision was made*." 2003 WL

22973574, at *11 (S.D.N.Y. Dec. 17, 2003), *aff'd*, 116 Fed. Appx. 321 (2d Cir. 2004). Likewise,

in *DeLeonardis v. Credit Agricole Indosuez*, addressing whether defendants had cause to

terminate the plaintiff pursuant to various partnership agreements, the court noted that "what

matters is what senior management … ***relied on*** in making their decision to terminate the

plaintiff." 2000 WL 1718543, at *12 (S.D.N.Y. 2000); *see also King v. Fox*, 2005 WL 3098933,

at *5 (S.D.N.Y. Nov. 18, 2005) ("'[A]fter-acquired evidence' is not relevant to the issue of

whether the [client's] discharge [of his attorney] was for cause . . . [T]he inquiry simply asks

whether the client was justified in terminating the attorney-client relationship. Factors identified

only after the relationship has been severed cannot have placed a role in causing the

breakdown."); *Tomasini v. Mount Sinai Med. Ctr. of Florida, Inc.*, 315 F. Supp. 2d 1252, 1257-

58 (S.D. Fla. 2004) (declining to permit employer to rely on after-acquired evidence of

employee's misconduct in defense of discharged employee's breach of contract claim).

Accordingly, under the controlling definition of "cause," there is simply no evidence

upon which a jury could reasonably conclude that the RF Parties had "cause" to remove

Cyrulnik. The allegations set forth in the Removal Email (which are hotly disputed) do not come

close to rising to "illegal activity, ethical breaches, or utter abandonment or dereliction of a job."

Instead, every purported reason set forth in the Removal Email boils down, at most, to

differences in management style, hurt feelings, or office politics. If such conduct could

constitute "cause" to remove a partner from a law firm, then there would never *not* be cause – the

requirement that cause be shown would be superfluous, and a partner subject to a for-cause requirement could be fired for any reason whatsoever – no different than an employee at will.

## C.   Defendants' Grounds for Removing Cyrulnik Were Plainly Pretextual

The RF Parties contend that "it would be error to deny summary judgment based on disputes over Counter-Defendants' secret motivations and alleged true reasons for exercising the contractual right to removal for cause." (Mot. 33.) They are wrong. In *DeLeonardis*, the court noted:

> The proper inquiry for the jury, in other words, is not, "Did the employee in fact commit the act leading to dismissal?" It is, "Was the factual basis on which the employer concluded a dischargeable act had been committed ***reached honestly, after an appropriate investigation*** and for reasons that are ***not arbitrary or pretextual?***"

2000 WL 1718543, at *12; *see also Welland*, 2003 WL 22973574 at *7 (citing *DeLeonardis* and granting defendant employer's motion only because "[t]he record establishes that defendants did indeed conduct an appropriate investigation into plaintiff's activities and that the decision to terminate him was reasonable in light of the facts collected and the Company's internal policies").

In *Johns v. Intl. Bus. Machines Corp.*, 361 F. Supp. 2d 184, 189-90 (S.D.N.Y. 2005), a highly paid senior executive at an IBM subsidiary was purportedly terminated for cause after he allegedly violated corporate policy. *See id.* at 186. As a result of his termination "for cause," IBM cancelled plaintiff's stock options worth an estimated $471,000. *Id.* at 185-86. On defendant's summary judgment motion, the plaintiff argued that he was not properly discharged for cause, that the reasons given for his termination were pretextual, and that the cancellation of his stock options was therefore a breach of the stock option agreements. *See id.* at 186. The Court noted that the question is "whether the decision to discharge the employee was reached

honestly and after an appropriate investigation" and that the "inquiry should be focused on the information that was available to and relied on by defendants prior to the termination." *Id.* at 190 (quoting *Welland*, 2003 WL 22973574, at *7).  The court also pointed out that applying this standard "reflects the abhorrence of Equity for a forfeiture," which would result if the company could use a pretextual justification to take the employee's stock. *Id.* at 190.  Ultimately, even though IBM had conducted an investigation led by an internal Corporate Audit Investigator, which culminated in an investigative report, the court was "unable to say that there are no disputed issues of material fact bearing on whether the decision to forfeit the vested options was made honestly and in good faith" and that "[i]f, as appears likely, the investigation was both hasty and flawed . . ., a trial jury may bind that it was not conducted in good faith." *Id.* at 189-90.  The court denied the defendant's summary judgment motion, and noted that the plaintiff "should have the opportunity" to establish "that the decision to forfeit all his vested options was not reached honestly and in good faith." *Id.*

Indeed, even cases cited by the RF Parties make clear that evidence of pretext is relevant to the Court's analysis. *See Golden v. Worldvision Enters., Inc.*, 133 A.D.2d 50, 52 (1st Dep't 1987) ("There is no indication of any convincing motive for a pretextual firing in this case, nor can it be said . . . that plaintiff . . . was dismissed from his executive position in bad faith."); *Spurlin*, 520 So.2d at 296 (noting that "a school board may not lawfully seize upon a pretextually sound but actually invidious reason").[15]

---

[15]   The other cases cited by the RF Parties on this issue are inapposite. *See JN Contemporary Art v. Phillips Auctioneers*, 29 F.4th 118 (2d Cir. 2022) (involving art auction house's proper invocation of force majeure clause in consignment agreement due to COVID-19 pandemic); *Kerns, Inc. v. Wella Corp.*, 114 F.3d 566 (6th Cir. 1997) (beauty product manufacturer's termination of distributor contract); *In re Nagel*, 278 F. 105 (2d Cir. 1921) (involving employer's discharge of employee who admitted to breaching his employment agreement by starting a rival business); *Prince-Vomos v. Winkler Real Estate*, 140 A.D.3d 1043 (2d Dept. 2016) (real estate

Here, the evidence adduced overwhelmingly shows that the purported factual bases upon which the RF Parties seek to justify their removal of Cyrulnik were pretextual and not reached after an appropriate investigation.

*First*, at no point prior to receipt of the Removal Email was Cyrulnik *ever* made aware that anyone had discussed or suggested his removal from the Firm – or that anyone had any issues with the way he managed his cases or interacted with other attorneys at the Firm.  (CSMF ¶155.)  Indeed, in 14 months of interactions the *only* issue that was *ever* raised for Cyrulnik was the **mutual** disagreement he and certain other partners had on two phone calls about important firm policy issues.  (*Id.* ¶156.)  As noted above, best practices and RCF's own policies and procedures required that Cyrulnik be given notice of any alleged complaints against him – both so he could provide his response and so he could address or change anything that needed to be addressed or changed in light of a complaint.  (*Id.* ¶¶153-54.)  The fact that none of the RF Parties ever raised any of the purported complaints with Cyrulnik not only undermines the likelihood that they actually occurred, but indicates that the RF Parties did not actually care about the alleged behavior that was being challenged in the alleged complaints – they were focused on removing Cyrulnik for their personal benefit, and were simply looking for a pretextual justification for doing so.[16]

---

agent terminated for committing acts involving "moral turpitude, fraud, dishonesty and falsification" failed to raise triable issue of fact regarding whether employer validly terminated her for cause); *McCort v. ADCS Clinics*, 2021 WL 8946696, at *3 (M.D. Fla. Oct. 12, 2021) (at-will employee did not contest that cause existed and "d[id] not argue that [defendant] made its determination of cause in bad faith," which was a "potential argument" plaintiff could have made).

[16]  Further supporting the notion that the RF Parties' justification for removing Cyrulnik was purely pretextual is their reaction to allegations of similar conduct by others – for example, the firm did not terminate (or even admonish) partners when they cursed at Cyrulnik on a call (Friedland), cursed at each other (Freedman and Normand). failed to manage a case and was "difficult" to work with and was found to have falsified hours ▮▮▮▮▮), and admittedly lied

*Second*, the *real* reason why the RF Parties voted to remove Cyrulnik is abundantly obvious – and, at a minimum, is an issue of fact – and can be demonstrated by a single graph:



It is no coincidence that the RF Parties voted to remove Cyrulnik on the same day that the Tokens reached their then-all-time high of $59 per Token – meaning that the Firm's Tokens (of which Cyrulnik was entitled to 25% pursuant to the MOU) were now worth **over a hundred million dollars**.  (CSMF ¶131.)  Indeed, non-party Christian Ager-Hanssen, with whom Roche met in person multiple times, stated that Roche confided in him that he removed Cyrulnik in order to take back Cyrulnik's Tokens:

> [Roche] singled out two "annoying" partners, one of whom he
> identified as a named founding partner, and commented that it had
> been necessary to find ways to "kick out" the named partner from
> the firm because he 'didn't deserve' the tokens.

and disclosed privileged information during a videotaped call, and disparaged jurors and absent class members, leading to the firm's disqualification in numerous matters (Roche).  (CSMF ¶¶ 119, 139-40.)

Ex. 62.

*Third*, additional evidence shows the pretextual nature of Cyrulnik's removal, including that (i) the first basis that cited by the RF Parties in the Removal Email was a call that took place on July 21, 2020 – nearly ***seven months earlier***, and just five days after Roche and Normand secretly discussed their scheme to "revise and/or fraudulently edit and back-date the MOU to rejigger the silly distribution of shares [in the Tokens] that we gave Cyrulnik in December 2019" (Ex. 1); (ii) both Roche and Freedman found it necessary to "paper the record" in the days after that call by sending separate, formal emails to Cyrulnik claiming that he had "screamed" at them (Exs. 57, 58); (iii) the RF Parties claim not to possess (and admittedly destroyed) documents relating to the substance of the February 8, 2021 meeting and the allegations that form the basis for their claimed "cause" (CSMF ¶ 34); and (iv) Holcomb has sworn under oath that, during the February 8, 2020 meeting, Freedman told the group that if they were unable to reach an agreement on an amended MOU giving Freedman "veto rights over various firm actions," "then they would all go home and it would be as if the meeting had never happened."  (Ex. 3 ¶¶ 31-32.)

### D.    The Issue of "Cause" Is Replete With Questions of Fact

At a bare minimum, the question of whether the RF Parties had "cause" to remove Cyrulnik presents a genuine issue of fact that cannot be resolved at the summary judgment stage.

In *DeLeonardis v. Credit Agricole Indosuez*, which involved a plaintiff claiming that he was improperly removed for "cause" in breach of the governing partnership agreements, the court noted that "[t]he Supreme Court's decision in *Waters v. Churchill*, 511 U.S. 661 (1994) . . . is instructive in this regard[:]  'If the employer thinks the alleged offense is so egregious that it is proper to discipline the accused employee even though the evidence is ambiguous, the employer must consider that a jury might decide the other way.'"  2000 WL 1718543, at *13 (S.D.N.Y.

2000).  Due to the fact-intensive inquiry presented, the court denied summary judgment on the

dismissal for "cause" issue, noting that "the 'cause' issue is precisely the kind of determination

that a jury should make as the trier of fact."  *Id.*; *see also Stanacard*, 2016 WL 462508, at *23

(denying summary judgment due to genuine issues of material fact regarding whether employee

was terminated for "cause").  Here, there are substantial material issues of fact regarding whether

Cyrulnik was properly removed for "cause."

  *First*, the facts leading up to Cyrulnik's removal are heavily disputed.  While the RF

Parties claim that they "received numerous reports that Cyrulnik engaged in abusive conduct"

(Mot. 26), the sole basis for that claim is the self-serving testimony provided by the RF Parties,

as well as associates who are beholden to the RF Parties for their continued employment and

may have been subject to witness tampering – accounts that, by themselves, cannot possibly

satisfy the RF Parties' burden of establishing the absence of any genuine issues of material fact

regarding whether they had "cause" to remove Cyrulnik.  There is literally not a shred of written

evidence of a *single* complaint about Cyrulnik's conduct by a *single* associate:  the first and only

places that allegations of complaints by associates appear are in the RF Parties' pleadings

themselves.  (CSMF ¶34, 43-72, 78-81.)  And even if the Court accepted the purported

complaints as true, they largely are comprised of speculation by associates concerning the

motivations behind actions and decisions they merely assumed Cyrulnik made.  (CSMF ¶¶43-

72.)

  And while the RF Parties point to contrived and self-serving emails sent by Roche and

Freedman on July 22, 2020 and July 27, 2020 (Mot. 29), in which they claim that Cyrulnik

"screamed" at them during a heated call on July 21, 2020 concerning material issues of firm

governance, those emails are unreliable, inadmissible hearsay, and woefully insufficient to meet

the RF Parties' burden on summary judgment.  That is particularly true since the evidence

unequivocally shows that the scheme to steal Cyrulnik's Tokens was already underway at that

point – six days earlier, Roche and Normand had already discussed the need to "revise and/or

fraudulently edit and back-date the MOU to rejigger the silly distribution of [Tokens] that we

gave Cyrulnik in December 2019."  (CSMF ¶130.)  And those emails are also irrelevant because

Roche and Freedman continued to work with Cyrulnik for another six months following the

July 2020 phone call (CSMF ¶141) – the phone call could not possibly constitute cause to

remove Cyrulnik in February 2021.

Critically, Cyrulnik disputes (and multiple witnesses dispute) the allegations made

against him – both that he yelled or screamed at other partners, and that he mistreated or

discriminated against the Firm's associates.  (Cyrulnik Dec. ¶¶73-75.)  Given that Cyrulnik

denies the factual narrative alleged by the RF Parties, and that the RF Parties' narrative is

supported only by inadmissible hearsay and self-serving deposition testimony (and not a *single*

admissible document), the RF Parties' motion must be denied – the credibility of the witnesses in

this case, and the competing accounts they provide, raise quintessential issues of fact that cannot

be resolved by this Court on summary judgment.  *See S. Katzman Produce v. Yadid*, 999 F.3d

867, 877 (2d Cir. 2021) ("the court may not make credibility determinations or weigh the

evidence" on summary judgment because those are "jury functions, not those of a judge");

*Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("as a general

rule, a district court may not discredit a witness's deposition testimony on a motion for summary

judgment").

*Second*, the RF Parties' argument (Mot. 31) that they had cause to remove Cyrulnik as a

result of his alleged violation of Rule 1.5(b) of the New York Rules of Professional Conduct due

to Cyrulnik's failure to obtain written engagement agreements from some clients is meritless, and raises additional issues of fact.  As Cyrulnik's expert will testify at trial, Cyrulnik complied with all relevant requirements concerning written engagement agreements.  (CSMF ¶149.) Furthermore, any failure to obtain new engagement agreements was a shared failure by RCF and its lawyers with management responsibility.  (*Id.* ¶82.)  And, to the extent he did not, any such failure easily could have been remedied if the matter were only brought to Cyrulnik's attention – Cyrulnik could have simply obtained new engagement letters that applied retroactively.  (*Id.* ¶82.)  Yet the RF Parties never once mentioned this easily rectifiable issue with Cyrulnik, and did not even mention it in the Removal Email.  (*Id.* ¶¶82, 150, 155; Ex. 6.)

*Third*, Cyrulnik disputes the RF Parties' claim that he filed a new case without approval from the New Matter Committee, purportedly in breach of the MOU.  (CSMF ¶152.)  Moreover, the RF Parties' argument that this would permit them to deprive Cyrulnik of all the assets and equity to which he is entitled is nonsensical, and completely wrong on the law.  It is well established that "a party can enforce a contract as long as he has not committed a *material* breach."  *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552 (S.D.N.Y. 2014).  Plainly, a single instance of commencing a matter without committee approval, even if true, would not be so material so as to justify the RF Parties' attempt to avoid *all* of their obligations; but either way, materiality is an issue of fact.  *Eclectic Synergy, LLC v. Seredin*, 347 So. 3d 27, 29 (Fla. Dist. Ct. App. 2022); *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015).

Finally, for all the reasons noted above (*supra*, pp. 33-36), the jury on a trial record must decide whether the RF Parties' removal of Cyrulnik was pretextual.  Indeed, Holcomb – an individual who participated in the disputed vote on February 10, 2021 – has now submitted a sworn statement that Roche and Freedman's purported reasons for removing Cyrulnik were

"disingenuous and pretextual" and that he would never have voted to remove Cyrulnik if he knew then what he learned later. (Ex. 3 ¶¶2, 24, 38 91-102.) That statement by itself creates an issue of fact requiring trial.

## V.     Cyrulnik's Non-Contractual Claims Should Not Be Dismissed

The RF Parties also seek dismissal of Cyrulnik's non-contractual claims. But the RF Parties omit the fact that another court recently upheld ***the exact same claims against them*** in a related case brought by Paul Fattaruso, another former RCF partner. (*See* Ex. 56.) The RF Parties' arguments here fare no better than they did in Florida.[17]

*Conversion.* None of the RF Parties' arguments for dismissal of Cyrulnik's conversion claim have merit. *First*, Cyrulnik's conversion claim is not duplicative of his breach of contract claim, since his conversion claim pertains to the RF Parties' wrongful obtaining possession of and exercising control over Cyrulnik's assets. (*See* Dkt. 73 ¶¶150-51 (alleging that Conspiring Partners deprived Cyrulnik of his membership and equity interests in RCF, including Tokens, "for their own use").) *See MCM Holdings, Inc. v. Levy*, 2017 WL 11716614, at *4 (S.D. Fla. May 25, 2017) (contract and conversion claims not duplicative where contract claim alleged breach arising from failure to purchase plaintiff's ownership interest as required by contract, and conversion claim alleged "wrongful obtaining possession of and exercising control over [plaintiff's] ownership interest"); *Tutor Perini Bldg. Corp. v. New York City Regional Ctr., LLC*, 525 F Supp 3d 482, 515 (S.D.N.Y. 2021) ("[W]here a complaint alleges that defendants not only failed to deposit funds in the proper account as required by a contract, but also that defendants took the separate, additional step of arranging for the Funds to be directed into their possession,

---

[17]   The RF Parties' arguments for dismissal are purely legal in nature, and should have been raised (if at all) in the RF Parties' motion to dismiss these claims (which this Court rejected). (Dtk. 374.)

the claims are not duplicative.").  *Second*, the Florida court already rejected RF Parties'

argument that Cyrulnik's claim to the Tokens is merely a right to benefits under a contract that

does not give rise to conversion.  (*See* Ex. 56 at 9 (refusing to dismiss conversion claim because

"the cryptocurrency tokens at issue are specific and identifiable property" and "[n]or does

Fattaruso's claimed equity ownership interest constitute a contractual debt"); *see also Shi v. Le*,

2022 WL 1085420, at *7 (E.D.N.Y. Mar. 2, 2022) ("Cryptocurrency is considered personal

property and courts have found that it may be the subject of a conversion suit.").[18]  *Third*, the RF

Parties' argument (Mot. 38-39) that Roche and Freedman have a "superior" right to the Tokens

such that they "cannot be liable for 'converting' their own assets" is frivolous, since it is based

on Roche's and Freedman's fraudulent conduct.  (CSMF ¶97, 129.)  *Finally*, Cyrulnik's claim is

properly asserted against RCF, Normand and Friedland because the Tokens were firm property,

and as a result of their improper removal of Cyrulnik, Normand and Friedland each received a

portion of the Tokens that belong to Cyrulnik.  (Ex. 9 at 87:4-15; Ex. 2 § IV.B.))  Thus, as

Normand and Friedland have each exercised "dominion and control" over certain of the disputed

Tokens, Cyrulnik's conversion claim properly lies against them.[19]

---

[18]   The cases relied on by the RF Parties are inapposite, as none of them involved a contractual
right to specific identifiable property like the Tokens here.  *See Nelly de Vuyst, USA, Inc. v. Eur.
Cosmetiques, Inc.*, 2012 WL 246673, at *8 (S.D.N.Y. Jan. 6, 2012) (conversion of "marketing
rights"); *Cataldi v. 39 Winfield Associates*, 30 A.D.3d 458 (2006) (conversion of contractual
right to payment for renovation work); *Sellinger Enterprises, Inc. v Cassuto*, 50 A.D.3d 766 (2d
Dept. 2008) (conversion of right to payment of commission payment); *Komlossy v. Faruqi &
Faruqi, LLP*, 2017 WL 722033 (S.D.N.Y. Feb. 23, 2017) (conversion of commission).

[19]   The cases relied on by the RF Parties are inapposite.  *See T.D. Bank, N.A. v. JP Morgan
Chase Bank, N.A.*, 2011 WL 13305367, at *5 (E.D.N.Y. May 13, 2011) (defendant merely
claimed to have ownership over disputed funds, but never actually controlled or possessed the
funds); *Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1011 (2d Dep't 2010) (defendants never exercised
dominion or control over funds at issue).

***Fiduciary Duty Claims.***  The Florida court recently upheld Fattaruso's breach of fiduciary duty claim against the RF Parties alleging, among other things, that they "fail[ed] to account to Fattaruso for benefits that the firm derived from partnership business," including the Tokens.  (Ex. 56 at 8-9.)  This Court should do the same, and reject the RF Parties' arguments that (i) the claim is duplicative, since it is not (*see id.* at 9); (ii) they owed no fiduciary duties absent a partnership agreement, since at a minimum, the parties formed an implied or oral partnership (*id.* at 5),[20] and FRUPA imposes fiduciary duties on partners (*see* Fla. Stat. § 620.8404); (iii) they did not breach their fiduciary duties because they were motivated by their own financial interests, since co-partners owe "the duty of the finest and highest loyalty" (Ex. 56 at 8)[21]; and (iv) Cyrulnik has "unclean hands" since he formed a "competing" law firm in March 2021, since he did so only ***after*** they ousted him from RCF and cut off his access to firm email and files (CSMF ¶83).

***Civil Conspiracy.***  The Florida court upheld Fattaruso's civil conspiracy claim because Fattaruso – like Cyrulnik – alleged that the RF Parties "plotted to exclude [him] from partnership assets and keep those assets for themselves."  (Ex. 56 at 9-12 (citing *Blatt v. Green, Rose, Kahn & Piotrkowski*, 456 So. 2d 194, 951 (Fla. 3d DCA 1984) (reversing dismissal of civil conspiracy claim where defendants "in bad faith, ignored the agreement and improperly had all the assets distributed to themselves")).)  This Court should do the same, and reject the RF Parties'

---

[20]   The RF Parties also ignore the fact that RF has asserted a breach of fiduciary duty claim against Cyrulnik expressly alleging that Cyrulnik owed fiduciary duties while he was a partner at RCF.  (Dkt. 31 ¶¶ 90-99.)

[21]  Fla. Stat. § 620.8404(5), which merely states that conduct us not automatically a breach of fiduciary duty "***merely because*** the partner's conduct furthers the partner's own interest," does not permit the RF Parties to undertake a despicable scheme to manufacture "cause" to remove their partner, steal millions of dollars from him, and interfere with his ability to represent his clients, simply because they had a financial motivation to do so.

argument that civil conspiracy is not an independent tort, because the RF Parties committed

separate tortious acts in furtherance of their scheme, including their breaches of fiduciary duty,

discussed above.

> ***Quasi-Contract.***  The RF Parties' arguments for dismissal of Cyrulnik's quasi-contract

claim are meritless – the RF Parties actively dispute that the MOU was valid and enforceable,

purportedly because it was subject to a condition precedent, which itself is sufficient for this

claim to survive.  *Lamda Sols. Corp. v HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 214-15

(S.D.N.Y. 2021) (plaintiff may plead quasi-contract claims "when the defendant does not

concede the enforceability of [the] contract").  The RF Parties' argument that Cyrulnik cannot

allege the RF Parties "were unjustly enriched by his work or that the was promised compensation

for that work that he did not receive" because Cyrulnik supposedly "received ample

compensation for the legal work he performed before his removal, in accordance with the

compensation formula proposals set forth in the MOU" (Mot. 43), is absurd.  The RF Parties do

not get to unilaterally decide what constitutes "ample compensation" for Cyrulnik's work – that

question is for the jury.  More importantly, the RF Parties forget that the Tokens were given to

Cyrulnik as an inducement not just for him to perform work while at the firm, but for him to

leave his existing (and lucrative) equity partnership at BSF and found RCF in the first place.

> ***Implied Covenant.***  Cyrulnik's claim for breach of the implied covenant is not

duplicative of his breach of contract claim.  The cases cited by the RF Parties make clear that

such claims may be dismissed as duplicative when they are predicated on "the same facts"

(*Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)), when the conduct

underlying both claims are "repetitive" (*Amica Mut. Ins. Co. v. Morowitz*, 613 F. Supp. 2d 1358,

1362 (S.D. Fla. 2009)), or where the damages sought are "identical" (*Alter v. Bogoricin*, 1997

WL 691332, at *8 (S.D.N.Y. Nov. 6, 1997)).  That is not the case here.  Cyrulnik alleges, among

other misconduct, that the "RF Parties denied Cyrulnik access to files, documents...and other

information necessary for Cyrulnik to adequately represent and protect the legal interests of his

clients."  (Dkt. 73 ¶141.)  No such allegation is made in connection with the breach of contract

claim.  And, of course, Cyrulnik seeks damages specifically arising from these differing

allegations of misconduct.

      ***Accounting.***  The RF Parties also are wrong in arguing that Cyrulnik cannot maintain

both his breach of contract and accounting claims.  As an initial matter, the Florida court recently

permitted Fattaruso to proceed with his claims for breach of contract and an accounting.  (Ex. 56

at 5, 8.)  Furthermore, the case cited by the RF Parties, *Bedoyan v. Samra*, 352 So.3d 361, 363

(Fla DCA 2022), involved an equitable accounting claim, not an accounting claim brought under

FRUPA, which is clear that a partner may maintain both a breach of contract and accounting

claim, *see* Fla. Stat. § 620.8405(2) ("A partner may maintain an action against the partnership or

another partner for legal or equitable relief, ***with or without an accounting as to partnership***

***business***, to: (a) Enforce such partner's rights under the partnership agreement....").

## VI.    Cyrulnik Is Entitled to Relief Under the Side Letter

      The RF Parties argue that Cyrulnik is not entitled to 25% of any recovery in the ▉▉▉▉

litigation (i) from anyone other than Roche and Freedman because only Roche and Freedman are

parties to the Side Letter; and (ii) from *any* of the RF Parties because (a) none of them have

collected anything in connection with the ▉▉▉▉ litigation, and (b) it would be "unreasonable"

to interpret the Side Letter to award a portion of the ▉▉▉▉ fee to Cyrulnik without client

consent.  (Mot. 43-44.)  Each of these arguments fail.

First, *each* of the RF Parties are indisputably liable to Cyrulnik for his share of the

███████ fee, given both the language of the Side Letter itself that Cyrulnik is entitled to 25% of

any recovery "should Roche, Freedman, **Roche Freedman LLP, or RCF** be entitled to any

contingent recovery in connection with the ████████████ litigation…." (Ex. 7), and the

language in the MOU that makes clear that "[a]ny proceeds the Firm recovers from this

contingency shall be distributed according to a distribution agreement Kyle [Roche], Velvel

[Freedman] and Jason [Cyrulnik] previously negotiated." (Ex. 2 § IV.C.)

Second, while Cyrulnik disputes the claim that no collection has been obtained in

connection with the ██████ litigation (Cyrulnik Dec. ¶55), even if that were true, it would not

mean that Cyrulnik is entitled to no relief, including in the form of a declaration and/or order of

specific performance.[22]

Finally, the RF Parties' argument that it would be "unreasonable" for the Court to

"interpret" the Side Letter pursuant to its plain and ambiguous terms is premised on their

mistaken position that such an "interpretation" would render the Side Letter an "unethical fee

sharing agreement." (Mot. 36.)  However, just as Cyrulnik's expert witness opined in his expert

report that the MOU's allocation of Tokens is entirely proper and does not run afoul of any

applicable ethical rules, the same is true with respect to the Side Letter:  (i) at the time Roche,

Freedman and Cyrulnik entered into the Side Letter, any recovery from the █████ litigation

was an account receivable, and "nothing in the rules forbids a law firm from agreeing to make

future payments to someone out of the firm's current assets, future income, or accounts

---

[22] To the extent evidence adduced at trial demonstrates that no or minimal collection has been obtained in connection with the █████ litigation, the Court can and should conform the evidence to the pleadings and order any appropriate relief, particularly given that Cyrulnik had no way of knowing the collection status at the time of his pleading.

receivable, even if all are derived from fees for legal services" (Ex. 59 ¶19); and (ii) New York

Rule of Professional Conduct 1.5(g) would not apply because the Side Letter "function[s] like

any other separation agreement that allows a departing partner an agreed-on share in the law

firm's current assets, future income or future fees in repayment of his equity interest or in

recognition of his past contributions to the firm" (*id.* ¶21).[23]  Accordingly, there is nothing

improper about the agreement in the Side Letter regarding the allocation of any recovery in the

██████ litigation, and there is certainly no basis for the Court to grant summary judgment

dismissing Cyrulnik's claim for breach of the Side Letter.

## **CONCLUSION**

The Court should deny the RF Parties' motion.

Dated:  July 11, 2023
         New York, New York                    Respectfully submitted,

                                               KASOWITZ BENSON TORRES LLP

                                               By: */s/ Marc E. Kasowitz*
                                               Marc E. Kasowitz (mkasowitz@kasowitz.com)
                                               Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)
                                               Gavin D. Schryver (gschryver@kasowitz.com)
                                               1633 Broadway
                                               New York, New York 10019
                                               Tel.:    (212) 506-1700
                                               Fax:     (212) 506-1800

                                               *Attorneys for Defendant/Counterclaim-Plaintiff*
                                               *Jason Cyrulnik*

---

[23]   The RF Parties' argument that the MOU is an unethical fee-sharing agreement (Mot. 36) also
fails for these reasons.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 14,955 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

Dated: July 11, 2023
       New York, New York

                                            */s/ Marc E. Kasowitz*
                                            Marc E. Kasowitz