Marc E. Kasowitz (mkasowitz@kasowitz.com)
Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)
Gavin D. Schryver (gschryver@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.:    (212) 506-1700
Fax:    (212) 506-1800

*Attorneys for Defendant/Counterclaim-Plaintiff Jason Cyrulnik*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP, <br><br> Plaintiff, <br><br> v. <br><br> JASON CYRULNIK, <br><br> Defendant. | Case No. 1:21-cv-01746-JGK |
| JASON CYRULNIK, <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> ROCHE CYRULNIK FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN, AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND, <br><br> Counterclaim-Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT/COUNTERCLAIM-PLAINTIFF JASON CYRULNIK'S**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.   THE MOU IS ENFORCEABLE ........................................................................... 2

     A.   The MOU Was Not an Unenforceable Preliminary Agreement ............................ 2

     B.   The MOU Contains No Conditions Precedent to Its Enforcement ........................ 5

II.  CYRULNIK DID NOT WITHDRAW ................................................................... 11

III. CYRULNIK INDISPUTABLY WAS NOT REMOVED FOR CAUSE ........................ 14

IV.  CYRULNIK IS ENTITLED TO SUMMARY JUDGMENT ON HIS NON-
     CONTRACTUAL CLAIMS .................................................................................. 16

V.   FRIEDLAND IS LIABLE TO CYRULNIK ............................................................ 18

VI.  ROCHE'S FRIVOLOUS FRAUD CLAIM SHOULD BE DISMISSED ...................... 19

VII. THE RF-PARTIES FAIL TO DEMONSTRATE AN ISSUE OF FACT THAT
     CYRULNIK BREACHED FIDUCIARY DUTIES ................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amusement Indus. v. Buchanan Ingersoll & Rooney*,
  2013 WL 628533 (S.D.N.Y. Feb. 15, 2013) .......................................................................... 19

*Bank of New York Mellon Tr. v. Morgan Stanley Mortg. Cap.*,
  821 F.3d 297 (2d Cir. 2016) .............................................................................................. 8

*Bear Stearns Inv. Prods. v. Hitachi Auto. Prods (USA)*,
  401 B.R 598 (S.D.N.Y. 2009) ............................................................................................ 8

*Comprehensive Care Corp. v. Katzman*,
  2010 WL 3190136 (M.D. Fla. July 30, 2010) ............................................................... 14, 15

*Dist. Att'y of New York Cnty. v. Republic of the Philippines*,
  307 F. Supp. 3d 171 (S.D.N.Y. 2018) .............................................................................. 21

*Finch v. Campbell*,
  541 S.W.3d 616 (Mo. Ct. App. 2017) ................................................................................ 20

*Fitzpatrick v. Am. Int'l Grp.*,
  2013 WL 709048 (S.D.N.Y. Feb. 26, 2013) ........................................................................ 9

*Hallock v. Holiday Isle Resort & Marina*,
  885 So. 2d 459 (Fla. 3d DCA 2004) .................................................................................. 17

*State ex rel. Hathaway v. Smith*,
  160 Fla. 485 (1948) ........................................................................................................ 14, 15

*ILKB, LLC v. Singh*,
  2021 WL 3565719 (E.D.N.Y. Aug. 12, 2021) .................................................................... 19

*Johnston v. Eichelberger*,
  13 Fla. 230 (1869) ............................................................................................................. 9

*In re Lorenzo*,
  434 B.R.695 (Bankr. M.D. Fla. 2010) .................................................................................. 3

*Love v. Fleetway Air Freight & Delivery Serv., LLC*,
  875 So.2d 285 (Ala. 2003) ................................................................................................ 13

*Martin v. Baird*,
  175 Pa. 540 (1896) ............................................................................................................. 9

*In re Men's Sportswear*,
    834 F.2d 1134 (2d Cir. 1987)................................................................................20

*New York Wheel Owner LLC v. Mammoet Holding, B.V.*,
    481 F. Supp. 3d 2016 (S.D.N.Y. 2020)...............................................................20

*Oparah v. New York City Dep't of Educ.*,
    No. 12-CV.-8347-JGK-SN, 2015 WL 4240733 (S.D.N.Y. July 10, 2015)
    (Koeltl, J.) ..............................................................................................................3

*Pike Co. v. Universal Concrete Prod.*,
    616 F. Supp. 3d 253 (W.D.N.Y. 2022) ...................................................................6

*Pitcock v. Kasowitz*,
    2009 WL 3240385 (Sup. Ct. N.Y. C'ty. Sept. 29, 2009).......................................13

*Rafael J Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*,
    856 So. 2d 1 (Fla. 4th DCA 2003) ........................................................................10

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery*,
    751 F. App'x 39 (2d Cir. 2018) ............................................................................21

*Strategic Growth Intern. v. RemoteMDx*,
    2008 WL 4179235 (S.D.N.Y. Sept. 10, 2008).......................................................20

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008)....................................................................................3

**Statutes**

Fla. Stat. §620.8202(1)...................................................................................................10

Fla. Stat.§§620.8801(5)(a)-(c) ......................................................................................17

**Other Authorities**

13 Williston on Contracts §38:16 (4th ed.)....................................................................7

## PRELIMINARY STATEMENT

In opposition to Cyrulnik's motion, the RF-Parties take the proverbial "everything but the kitchen sink" approach. Their defenses lack support in the record and are meritless as a matter of law.

*First*, Cyrulnik has established that the MOU is a binding, enforceable agreement not subject to any conditions precedent. The plain language is clear, and even had it not been, the indisputable contemporaneous evidence overwhelmingly shows that, for more than a year after launching RCF, the parties treated the MOU as the agreement that governed every facet of the firm's operations – including the treatment of the firm's equity partners, expressly including Cyrulnik.

*Second*, it is indisputable that Cyrulnik did not "withdraw" from RCF. The MOU's withdrawal provision is thus wholly irrelevant to Cyrulnik's claims and cannot magically divest him of the assets he was promised in the MOU, including his Tokens.

*Third*, although irrelevant to almost all of Cyrulnik's claims, the RF-Parties failed to raise any issue of material fact regarding whether Cyrulnik properly was removed for "cause." He was not. The RF-Parties rely on an inapplicable standard that would require merely a "rational, non-arbitrary" reason for his removal, rather than the controlling standard that they effectively concede they cannot meet. In any event, the RF-Parties cannot meet even their own fanciful standard, because the evidence establishes that their removal was entirely pretextual.

*Fourth*, Cyrulnik is entitled to dismissal of Counts II and III of RF's Amended Complaint because the RF-Parties – who bear the burden on these claims – have not presented a scintilla of evidence to support their allegations that Cyrulnik tortiously interfered with RCF's collection of fees from third parties (their former clients), or that Cyrulnik failed to enter time after the RF-

Parties improperly locked him out of RCF's files and systems.  If anything, the record shows the contrary is true.

*Finally*, Cyrulnik is also entitled to summary judgment dismissing Roche's belated, baseless fraud claim, since Roche fails on all three elements: he cannot identify any actionable misrepresentations, reasonable reliance, or damages.[1]

## ARGUMENT

## I.    The MOU Is Enforceable

### A.    The MOU Was Not an Unenforceable Preliminary Agreement

The RF-Parties now contend that the robust, 34-page MOU, including a detailed compensation formula and multiple exhibits, was a mere "agreement to agree" that obligated the parties *only* to negotiate a long-form partnership agreement.  To support this fiction, the RF-Parties just ignore the overwhelming contemporaneous evidence (including their own repeated contemporaneous admissions that of course the MOU was a "binding agreement"), disregard the facts and circumstances surrounding the execution of the MOU, and cast aside that the parties operated RCF for fourteen months pursuant to the MOU's terms – hoping that citing select portions of their own self-serving testimony (ignoring their own and others' contrary testimony) will distract from that dispositive record.  The RF-Parties' argument has no merit:  the evidence (Cyrulnik-Mov.26-33; Cyrulnik-Opp.15-27) is overwhelmingly clear that the MOU is a binding,

---

[1]  Capitalized terms retain the meaning assigned in Cyrulnik's opening brief (Dkt. 432). Submitted herewith is the supplemental declaration of Jason Cyrulnik, dated July 25, 2023 ("Cyrulnik-Reply-Dec."), and Cyrulnik's reply to the RF-Parties' Rule 56.1 counterstatement ("RSMF").  Citations to: (i) "Reply-Ex." refer to the exhibits attached to the Cyrulnik-Reply-Dec.; (ii) "Cyrulnik-Dec." refer to Cyrulnik's July 11, 2023 declaration submitted with his opposition to the RF-Parties' summary judgment motion; (iii) "Ex." refer to exhibits attached to the Cyrulnik-Dec.; (iv) "Cyrulnik-Mov." refer to Cyrulnik's opening brief; (v) "Cyrulnik-Opp." refer to Cyrulnik's opposition to the RF-Parties' summary judgment motion; (vi) "RF-Mov." refer to the RF-Parties' moving brief (Dkt. 423); (vii) "RF-Opp." refer to the RF-Parties' opposition brief; and (viii) "MOU" refer to Cyrulnik-Dec. Ex.2.

enforceable agreement governing the parties and their operation of RCF and, at a bare minimum, a binding, enforceable Type I agreement.

In response, the RF-Parties complain (RF-Opp.9) that Cyrulnik's motion relies on parol evidence to establish that the MOU was binding. Setting aside that the MOU's plain language establishes that it is binding and enforceable, the RF-Parties have the law wrong: where a party challenges the *validity* of a contract, as the RF-Parties do here, a court not only *can* consider parol evidence in determining whether an enforceable agreement was reached, but it *must* do so. *See Vacold LLC v. Cerami*, 545 F.3d 114, 127 (2d Cir. 2008) (courts are "both permitted and required to consider" the "drafting history" in determining whether parties intended to be bound); *Oparah v. New York City Dep't of Educ.*, No. 12-CV.-8347-JGK-SN, 2015 WL 4240733, at *6 (S.D.N.Y. July 10, 2015) (Koeltl, J.) (parties' overt acts indicated intent to be bound).[2]

As Cyrulnik has demonstrated (Cyrulnik-Mov.30-33; Cyrulnik-Opp.18-27), the parol evidence here is overwhelming and unequivocally compels just one conclusion: the Founding Partners intended and understood that the heavily negotiated MOU was a binding, enforceable agreement governing their relationship and operation of RCF for fourteen months until they purported to remove Cyrulnik in reliance on that same MOU. Among other things, (i) when drafting the MOU, two of them (Cyrulnik and Holcomb) revised the text specifically to ensure that the MOU was "binding and enforceable," which revisions the other partners accepted and executed in the revised final MOU (Cyrulnik-Opp.5, 21-22; CSMF¶25); (ii) the remaining partners also confirmed that they understood the MOU was a binding agreement, including when Roche told the other Founding Partners that "it's time we get signatures on the [MOU] and get a

---

[2]  Contrary to the RF-Parties' attempt to avoid *In re Lorenzo*, 434 B.R.695 (Bankr. M.D. Fla. 2010) (RF-Opp.8), that court based its conclusion that the parties' agreement was binding primarily on the parties' conduct evidencing an understanding that it was binding.

*binding agreement* in place" (Cyrulnik-Opp.5; CSMF¶25), and they communicated to each other

the importance of entering a binding agreement *before* announcing their departures from BSF,

waiting to give coordinated notice only *after* executing the MOU (Cyrulnik-Dec.¶17-18; Reply-

Ex.69); and (iii) the Founding Partners then managed *every* aspect of RCF's services,

communications and operations pursuant to the MOU for over a year, repeatedly citing to the

MOU's many terms as binding (Cyrulnik-Opp.5-8; CSMF¶¶110-24).

The parol evidence cited by the RF-Parties (RF-Opp.11-12), meanwhile, merely reflects

the non-controversial fact that the parties also contemplated later "reducing" the binding terms of

the "pretty comprehensive MOU" into a long-form partnership agreement.  (CSMF¶25.)  But no

one disputes that fact.  (MOU§I.)  The relevant question here is whether the MOU's terms were

binding prior to execution of that long-form agreement and, as shown, they plainly were.

Aside from the self-serving testimony of some RF-Parties themselves (who are desperate

to avoid their obligation to remit to Cyrulnik his assets owed under the MOU), the rest of the

extrinsic evidence the RF-Parties cite (RF-Opp.12) relates to Cyrulnik's effort to slightly *revise*

one formula used for calculating certain compensation under the MOU, which was utilized for

the entirety of RCF's existence.  But Cyrulnik's and the other Founding Partners' recognition

that any revision to the formula required a *renegotiation*, and *approval* by the Compensation

Formula Committee established by the MOU (*see* MOU§VI.K), does the *opposite* of what the

RF-Parties now try to argue: it *further* establishes the indisputable fact that the MOU was

binding in the first place (as does the fact that the Founding Partners followed the MOU's

formula in paying out *millions* of dollars to the partners for 2020).  (*See* Ex.38 at RF_0188454-

55 (Holcomb and Freedman agreeing that any vote to modify compensation formula must follow

"the procedures contemplated in the MOU"); Reply-Ex.68 at RF_0422624 (Friedland opposing

any retroactive revision to formula, since "*reliance issues* for this year compel sticking with the

*agreed formula*"; noting that "reliance here is ***not just about what people relied on in making the decision to join the firm, agree to the ultimate balance of provisions in the MOU***, etc.").)

The RF-Parties also cite language referencing "additional terms … to be negotiated," baldly claiming that the MOU "leaves open numerous material issues concerning compensation, distribution of assets, and firm management."  (RF-Opp.8.)  But through two rounds of briefing, the RF-Parties failed to identify any such "open issues," or why they were purportedly material. The MOU includes:

- a detailed, four-page set of formulas for calculating partner compensation that the partners negotiated for months before executing the MOU and followed to the letter when making distributions for 2020 (in addition to making draws strictly in accordance with the MOU's terms) (MOU§III);

- four pages devoted to distribution of RCF's assets, including the Tokens and proceeds of ***twenty-eight*** ongoing matters (MOU§§IV-V); and

- three pages devoted to "firm management," setting up the committees governing all material elements of RCF, and designating two chairpersons to manage it (MOU§VI).[3]

### B.    The MOU Contains No Conditions Precedent to Its Enforcement

As explained in Cyrulnik's briefs (Cyrulnik-Mov.26-33; Cyrulnik-Opp.15-17), the RF-Parties' argument that subsequent execution of a long-form partnership agreement was a condition precedent to enforcement of the MOU and creation of the firm is contrary to well-established precedent requiring an agreement to be "unmistakably clear" that a condition precedent was intended for a court to conclude that a condition precedent exists.  At best, any purported condition would be excused because it was not material to the parties' agreement; and

---

[3] Normand and Freedman confirmed that they were co-chairpersons in accordance with Section VI.M of the MOU.  (Ex.10 at 175:22-176:3; Ex.20 at 118:19-119:7.)

the failure of that purported condition to be fulfilled could not excuse the RF-Parties' breaches where their own failure to draft the long-form agreement would have excused that purported condition in any event.  (Cyrulnik-Mov.28-29.)

All of the RF-Parties' responsive arguments – *i.e.*, their claim that the formation of the partnership was conditioned on executing a long-form agreement – essentially ignore the undisputed fact that the parties heavily negotiated and executed the MOU, left their lucrative positions in reliance on the MOU, and then managed and operated RCF pursuant to the MOU for more than a year.  (CSMF¶25, 109-125.)  According to the RF-Parties, there was never any firm at all, and Cyrulnik and the other Founding Partners merely worked adjacent to each other, using associates and staff who worked for a fictional company, representing to dozens of courts in thousands of filings that they were partners in a law firm bearing Cyrulnik's name, and sharing resources – and, in Cyrulnik's case, sharing the proceeds of millions in billable work he brought into RCF – for no guaranteed compensation at all.  Their position is simply absurd.[4]

The phrase on which the RF-Parties hang their *entire* argument – "[a]fter execution of the Partnership Agreement" – does not evidence an "unmistakable" intent to create a condition precedent.  On the contrary, "the law … demands that conditions precedent be 'expressed in unmistakable language….  While New York courts have construed some triggering events as conditions precedent, they have done so ***only when the trigger is necessary to a party's ability to perform the obligation at issue***."  *Pike Co. v. Universal Concrete Prod.*, 616 F. Supp. 3d 253,

---

[4]  The absurdity does not end there.  The RF-Parties concede that the Roche-Cyrulnik-Freedman Side Letter "contains no condition precedent to enforcement."  (RF-Opp.16 n.5.)  Accordingly, under the RF-Parties' theory, Roche ***irrevocably*** agreed to pay Cyrulnik $850,000 for naming rights to a firm that ***was never created***.  Indeed, Roche was required under the Side Letter to pay Cyrulnik unless Cyrulnik were to leave or be terminated from "***the firm***"; but if RCF were never formed, Cyrulnik could never "leave" or be terminated from it, and Roche is still obligated to pay Cyrulnik the full $850,000, regardless of what happened in February 2021.  Clearly, Roche disputes that – implicitly acknowledging that the parties entered the Side Letter based on their clear understanding that they had already entered a binding and enforceable MOU forming RCF.

265 (W.D.N.Y. 2022).  Here, of course, there is no "unmistakable language," and the condition

the RF-Parties seek to now impose certainly is not remotely "necessary" for the parties "to

perform the obligation at issue."  As Cyrulnik's Opposition details (at 15-16 n.3), the non-

controlling cases cited by the RF-Parties – *none* of which are from Florida or New York – are

wholly inapposite, involving contracts with *express* condition precedents.  Indeed, even the

secondary source on which the RF-Parties rely for their argument that "the use of the word

'after' creates a condition precedent" makes clear that usage of the word "after" "is not

determinative."  13 Williston on Contracts §38:16 (4th ed.).

Notably, the language supposedly creating the condition precedent does not appear in the

MOU's preamble, nor in Section I ("Purpose"), but rather only in Section II ("Equity in the

Firm") – ("After execution of the Partnership Agreement, and effective January 2020, the equity

division in the Firm will be the following:  Jason Cyrulnik–27%").)  This placement is

dispositive that this language is certainly not a condition to enforcement of the MOU as a whole,

if even a condition to anything at all.

For the same reason, even if this phrase were sufficient to establish a condition (it is not),

it plainly would be limited to that section (Section II - allocation of equity), not to the MOU as a

whole, or to the agreed-upon allocation of Tokens set forth in a completely different section of

the MOU (Section IV).[5]  The RF-Parties' argument (RF-Opp.16-17) that the allocation of

Tokens was subject to supposed condition precedent language in a *different* section of the MOU

is nonsensical.  Section IV is plain and unambiguous: (i) Roche Freedman "***will be merged*** into

[RCF] in January 2020"; (ii) the Tokens and other "core assets" of Roche Freedman "***will not be***

***shared*** according to the percentages of [RCF] in January 2020"; and (iii) Roche Freedman "***has***

---

[5]  Notably, the RF-Parties apparently have taken the same position with now-departed partner
Holcomb's equity despite the Amended MOU omitting the purported condition-precedent
language.  (Ex.3 ¶47.)

*agreed* to distribute its Ava Labs Tokens according to the following breakdown: Jason Cyrulnik - 25%." (MOU§IV.)  There are *no* conditions whatsoever to these commitments, and there is *absolutely nothing* in Section IV that conceivably ties the allocation of the Tokens to the execution of a partnership agreement[6]; on the contrary, it expressly *disclaims* any relationship between the Token allocation and the equity percentages set forth in Section II.[7]

The RF-Parties' argument (RF-Opp.18-20) that a long-form agreement was "material" falls flat.  If it were material, one would have expected the parties to have proceeded to draft the partnership agreement after executing the MOU – as the parties did in the RF-Parties' cited case, *cf. Bear Stearns Inv. Prods. v. Hitachi Auto. Prods (USA)*, 401 B.R 598, 617 (S.D.N.Y. 2009) (after oral agreement purportedly reached during a phone call, party "almost immediately sent comments…including substantive edits" to material terms).  Instead, the parties here proceeded to form and operate their law firm pursuant to the MOU for more than a year, giving only

---

[6]  The RF-Parties incorrectly assert that Cyrulnik's position is that the Token distribution is a "separate and severable agreement" for which there was no "separate" consideration (RF-Opp.17.)  Cyrulnik has made no such argument.  In any event, the case they cite strongly supports Cyrulnik.  In *Ginett v. Computer Task Group*, the court rejected an employer's attempt to avoid paying severance to an employee based on an alleged failure to fulfill a purported condition precedent (non-compete agreement), holding that the non-compete requirement was immaterial to the agreement and that the provision (much like the supposed "condition" here) was "buried in in the middle of page two, the specifics of the new non-compete were left open, and … the parties agreed to defer the drawing and execution of the non-compete agreement." 962 F.2d 1085, 1097-99 (2d. Cir. 1992).  Like here, "the non-compete provision became essential only in litigation, and not at the time the contract was signed." *Id.*  The RF-Parties cannot keep Cyrulnik's assets based on the purported nonoccurrence of a supposed (immaterial) condition in *another* section of the MOU having nothing to do with the Tokens.  *See Bank of New York Mellon Tr. v. Morgan Stanley Mortg. Cap.*, 821 F.3d 297, 306 (2d Cir. 2016) (rejecting condition-precedent treatment in separate provision that does not contain such language).

[7]  The RF-Parties' argument (RF-Opp.18) that the MOU provided for possibly "revisit[ing]" the Token distribution if "further partner resources [were] required" (MOU§IV) is a red herring.  Any such redistribution would have required the partners to negotiate and agree to a change before Cyrulnik was removed, which indisputably never happened – and either way does not even mention executing a long-form partnership agreement, let alone make it a condition precedent.

8

passing attention to the drafting of the partnership agreement at various points many months after the MOU was signed.[8]

Equally without merit is the RF-Parties' response to Cyrulnik's argument that, even if execution of a partnership agreement had been a condition, it clearly was waived. Even their own caselaw makes clear that conditions can be waived by conduct, *Fitzpatrick v. Am. Int'l Grp.*, 2013 WL 709048, at *16 (S.D.N.Y. Feb. 26, 2013) ("Conditions precedent may of course be waived, either explicitly **or implicitly by conduct**."), and that is exactly what happened here. (Cyrulnik-Mov.17-28; Cyrulnik-Opp.6-8; CSMF¶¶109-125.).[9] The RF-Parties respond with caselaw that is more than a century old and completely inapposite. *See Johnston v. Eichelberger*, 13 Fla. 230, 237 (1869) (condition for payment of goods was plainly material); *Martin v. Baird*, 175 Pa. 540 (1896) (Synopsis) (involving "proposed" partnership that likely would have been Type II agreement had case been decided in this (or even the last) century). And in *Energy Transfer Partners v. Enterprise Products Partners*, the parties entered three written agreements in which, unlike here, the parties expressly "reiterated their intent that *neither party be bound to proceed until each company's board of directors had approved the execution of a formal contract*." 593 S.W.3d 732, 734 (Tex. 2020).

And any purported condition also would be excused because it would be a "disproportionate forfeiture." (Cyrulnik-Mov.28.)[10] The RF-Parties' defend the forfeiture by

---

[8]  The RF-Parties operated under an Amended MOU after Cyrulnik's removal for *another eight months* before executing a partnership agreement. (Reply-Ex. 70.)

[9]  For the avoidance of doubt (contrary to the RF-Parties' claim), Cyrulnik is not arguing that the obligation to negotiate a final partnership agreement was waived – only that any *condition precedent* based on that provision was plainly waived by the parties' conduct.

[10]  The RF-Parties also fail to rebut that they are estopped from enforcing the purported condition precedent due to their own failure to draft the agreement. (Cyrulnik-Mov.28-29.) Indeed, *Cross & Cross Properties v. Everett Allied*, cited by the RF-Parties, makes clear that no showing of bad faith is required unless "some sort of prevention or interference [with a condition

arguing that Cyrulnik received formula compensation for his work and did not work directly on Ava matters, but the RF-Parties ignore that (i) the incentive for Cyrulnik to leave BSF and found RCF was not simply that he would be paid a portion of his work – which he would receive at BSF or anywhere else he went – but the additional compensation he was given through the Tokens and RCF's contingency recoveries; and (ii) working on the Ava matters was not a requirement for Token allotments (for Cyrulnik, or for anyone else, including the other partners who did not work on the matters yet received millions of dollars in Tokens).  (CSMF¶107 (Cyrulnik was never asked to work on Ava matters and even volunteered to do anything needed); *id.* ¶106 and Ex.9 at 87:4-15 (other Founding Partners received millions in Tokens without working on Ava matters at all).

Finally, the RF-Parties entirely fail to rebut Cyrulnik's showing that, at an absolute minimum, the parties formed an oral or implied partnership.  Indeed, FRUPA provides that "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, ***whether or not the persons intend to form a partnership***."  Fla. Stat. §620.8202(1); *see also Rafael J Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 4 (Fla. 4th DCA 2003) ("[F]ormation of a partnership does not require a showing that the parties subjectively intended to create a partnership, only that they intended to do the things that constitute a partnership.").  The evidence unequivocally shows that the parties "carr[ied] on as co-owners of a business for profit" for more than a year.  (CSMF¶¶109-125.)  While the RF-Parties argue that "Cyrulnik does not cite any evidence to show the specifics of that supposed agreement" (RF-Opp.14), that is absurd:  the MOU is a 34-page agreement, detailing virtually every aspect of their agreement regarding the management and operation of RCF.  Equally

---

precedent] is contemplated by the parties as quite proper and within the privileges of the promisor."  886 F.2d 497, 502 (2d Cir. 1989).  No such interference was contemplated here.

absurd is the RF-Parties' argument (RF-Opp.14 n.4) that the Florida court's rejection of their position and holding that partner Paul Fattaruso adequately alleged he was in an oral/implied partnership with all the Founding Partners (*including Cyrulnik*) has no application here. In the RF-Parties' world, the Founding Partners were somehow in a partnership with Fattaruso but not with each other – or Fattaruso could establish an implied partnership with the Founding Partners but Cyrulnik cannot, even though Cyrulnik (unlike Fattaruso) spent months negotiating a lengthy set of detailed written terms that governed that very partnership.

## II.    Cyrulnik Did Not Withdraw

There is no serious dispute that Cyrulnik did not "withdraw" from RCF (Cyrulnik Br. 20-25), and thus did not forfeit the assets he secured under the MOU.  The RF-Parties claim that these realities should be ignored because it is "absurd" to "treat[] partners removed for cause more generously than those who voluntarily withdraw."  (RF-Opp.25-30.)  That is wrong.  When they agreed to co-found RCF, the Founding Partners (except Roche and Freedman) were leaving positions at established, stable law firms – and in Cyrulnik's case, a long-standing equity partnership at a prominent national firm – to co-found a risky, startup firm.  The partners risking their careers to launch this venture understandably wanted to disincentivize the other partners from simply withdrawing from the startup and heading for greener pastures before the venture had fully materialized.  To reduce the likelihood of that happening, the parties agreed that any partner who voluntarily chose to leave RCF in its infancy stages (the first 18 months) would forfeit the assets promised to him as incentive to co-found RCF.  (Ex.14 at 239:22-241:20; MOU§VI.C.)

Moreover, the RF-Parties' head-scratching, urged interpretation of the MOU cannot be squared with its plain terms. The MOU's withdrawal provision (and forfeiture of assets) applies *only* for the first 18 months – after that initial period, the withdrawal provision became a nullity.

11

That fact is fatal to the RF-Parties' argument because, after 18 months, the MOU provides for ***no forfeiture*** whatsoever (upon either a voluntary withdrawal or a removal for cause), instead defaulting to FRUPA's buyout obligation.  As noted above, the ***only intent*** behind the withdrawal provision was to disincentivize a Founding Partner from voluntarily leaving RCF while it was still getting off the ground – it made perfect sense to provide for consequences where a partner elected to withdraw early but not where they were forcibly removed; only after the first 18 months would a partner electing to withdraw be treated equally to one who was removed.  For that same reason, the RF-Parties' argument that the withdrawal provision necessarily applies to "for-cause" removals because "[t]here is no other clause delineating the financial consequences of a for-cause removal" (RF-Opp.27) is fatally flawed: after 18 months, the withdrawal provision indisputably no longer applies, and there indisputably is no "clause delineating financial consequences of a for-cause removal."  In other words, even the RF-Parties concede that a partner removed for actual, genuine "cause" does not forfeit assets earned under the MOU after 18 months and instead must be bought out under FRUPA. This is fatal to their supposed disbelief that removal of a partner carries forfeiture of his assets.

The RF-Parties are also playing fast-and-loose with the English language when they argue that the "the very first synonym listed in the Merriam-Webster Dictionary for the word 'withdraw' is 'remove.'"  (RF-Opp.27.)  The RF-Parties are citing the Merriam-Webster definition of "withdraw" as a ***transitive verb***, which means a verb that has a direct object, *i.e.*, to "withdraw something" is to remove it or take it out. That is different from the term used in the MOU – "withdraw" as an "intransitive" verb, which Merriam-Webster defines as "***to remove oneself*** from participation."  (*See* https://www.merriam-webster.com/dictionary/withdraw.)  The MOU unquestionably uses the intransitive version of "withdraw" – a withdrawing Partner is not "withdrawing the Firm," they are "withdraw[ing] ***from*** the firm."  (MOU§VI.C .)

In furtherance of their flawed interpretation of the MOU, the RF-Parties rely on inapposite cases and statutes where the defined term "withdraw" was expressly ***defined*** to include involuntary departures, in stark contrast to the MOU, which has separate provisions for "removal" (§IV.G) and "withdrawal" (§IV.C), does not define "withdrawal," and uses the intransitive version of "withdraw."[11]

The RF-Parties' attempt to distinguish the compelling authority rejecting their fanciful argument falls flat.  The agreement in *260-261 Madison Avenue LLC v Bower Monte & Greene PC* used "withdraw" as an intransitive verb ("when a guarantor 'retires or ***withdraws from***'") just like the MOU here, and the court ***squarely rejected*** the defendants' attempt to include involuntary termination.  2013 WL 5763732, at *4 (Sup. Ct. N.Y. C'ty. Oct. 21, 2013).  The same is true in *Love v. Fleetway Air Freight & Delivery Serv., LLC*, 875 So.2d 285, 287 (Ala. 2003) ("unless defined otherwise in the parties' agreements, the act of withdrawal is usually considered to be a voluntary act" where membership agreement used intransitive verb "withdraw").  And *Cadwalader, Wickersham & Taft v. Beasley* also strongly supports Cyrulnik's motion here.  728 So. 2d 253, 256 (Fla. 4th D.C.A. 1998).  The Florida court there ***rejected*** the firm's attempt to characterize a partner as having withdrawn where Cadwalader had announced the closure of his office – even though (i) he already planned to leave the firm, (ii) had approached colleagues about accompanying him to a different firm, and (iii) declined an offer from Cadwalader to work in a different office. *Even on these facts*, with a defined term that contemplated any means of departure, the court recognized that Beasley had been forced out of the firm, and that he would suffer forfeiture if deemed to be a "withdrawn partner," and the court

---

[11]   The RF-Parties misrepresent that *Pitcock v. Kasowitz*, 2009 WL 3240385 (Sup. Ct. N.Y. C'ty. Sept. 29, 2009) "apparently" endorsed the concept of involuntary withdrawal.  Again the opposite is true: the court there *rejected* the expelled partner's argument that he "involuntarily withdrew" when he was terminated.

held that "the term 'withdrawn' neither contemplated nor encompassed a partner expelled in the same manner as [the partner]." *Id.* at 257. Such a holding applies *a fortiori* here – where Cyrulnik had no intention to leave the firm, and the MOU imposed consequences only a partner who withdrew, *not* one who was terminated (and did not define the term withdrawn partner to include one who was terminated).

## III.    Cyrulnik Indisputably Was Not Removed for Cause

To remove Cyrulnik for "cause," the RF-Parties have to establish that Cyrulnik engaged in "***illegal activity, ethical breaches, or utter abandonment or dereliction of a job.***"[12] *Comprehensive Care Corp. v. Katzman*, 2010 WL 3190136, at *6 (M.D. Fla. July 30, 2010) (citing *State ex rel. Hathaway v. Smith*, 160 Fla. 485 (1948)); *see* Cyrulnik-Mov.34-36. Applying this Florida Supreme Court standard,[13] there is simply no evidence from which a jury could reasonably conclude that the RF-Parties had "cause" to remove Cyrulnik – and the RF-Parties' opposition brief underscores that they cannot come close to making such a showing.

The RF-Parties' contention that they are required merely to present "some rational, non-arbitrary reason for termination" is wholly unsupported. As discussed in Cyrulnik's opposition

---

[12]   While the RF-Parties baldly claim (RF-Opp.32) that Cyrulnik offers no evidence that the parties were aware of or intended this standard of "cause" to apply, that is not true. When the parties were negotiating the MOU, Freedman told Cyrulnik that the reason the MOU required both cause *and* a two-thirds vote to remove a Founding Partner was because Freedman wanted to ensure that he could not be removed from RCF unless he committed a crime. (Cyrulnik-Dec.¶71.) In any event, the standard for cause is a legal question.

[13]   The RF-Parties incorrectly argue (RF-Opp.32) that the standard set by the Florida Supreme Court in *Hathaway* applies only to public employees. While the *Hathaway* court recognized that the phrases "[r]emoval for cause or terminations for cause" are frequently used in connection with removal of public employees, the court in no way held that the "well settled connotation" of those phrases was *limited* to public employees. 160 Fla. at 487-88. There was thus nothing improper about the *Katzman* court applying the "well-settled meaning" of "termination for cause" in the private sector, just as the Court should here.

(Cyrulnik-Opp.28-30), *none* of the cases the RF-Parties cite for their "cause" standard involved the removal of a law firm partner (or any partner), and none have any relevance here.[14]

The RF-Parties are also mistaken in appealing to post-hoc justifications for Cyrulnik's "for-cause" removal. Precedent is clear that, when the propriety of an employer's termination decision is challenged as having been made in bad faith and for pretextual reasons, as here, *post-hoc* justifications are ***not permitted***; the question is whether the decision was "reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual," and the propriety of the decision is analyzed based on the information that was available at the time the decision was made. (*See* Cyrulnik-Mov.35-36; Cyrulnik-Opp.30-33.)

As discussed in Cyrulnik's opposition, the evidence conclusively establishes that the RF-Parties' decision to remove Cyrulnik was not reached honestly and in good faith: they failed to conduct any investigation of any complaints they now allege, their decision was demonstrably pretextual, and the real reason for removing Cyrulnik was because Roche and Freedman regretted giving Cyrulnik 25% of the now enormously valuable Tokens, and they wanted to further consolidate control over the firm. (Cyrulnik-Opp.32-36.) Indeed, Holcomb would not have voted in favor if truthful information had been shared with him. Ex.3 ¶24, 38. Accordingly, even if the standard for "cause" was as meaningless as the RF-Parties contend (it decidedly is not), and even if the post-hoc justifications they offered could have constituted cause for his removal (it demonstrably does not), the RF-Parties' bad faith precludes a finding that their removal was proper.

---

[14] Contrary to the RF-Parties' representation, *Spurlin also* noted that "cause" requires "immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkenness, or conviction of any crime involving moral turpitude" – very similar to the standard the Florida Supreme Court pronounced in *Hathaway* and applied in *Comprehensive Care. See* 520 So.2d at 295-296.

At bottom, every purported reason set forth in the Removal Email boils down (at most) to differences in management style, hurt feelings, or office politics, which simply do not rise to the level of "cause" for removal.  And even looking beyond the purported bases cited in the Removal Email, the RF-Parties still fail to establish that they had cause to remove Cyrulnik. *First*, their claim that Cyrulnik somehow failed to obtain engagement letters the firm never logged as (or informed him were) missing is heavily disputed, and would not violate an ethical rule in any event.  (Cyrulnik-Opp.12-13, 38, 39.)  *Second*, their false claim that Cyrulnik engaged in gender or racial discrimination is frivolous: it is supported only by self-serving (and improperly influenced) speculation – from individuals who rely on the Counterclaim-Defendants for their livelihood – that an associate "felt" Cyrulnik *might* harbor discriminatory intent when, for example, he did not send that associate a welcome email when he joined the firm or did not involve a different associate in partner-level decisions on a case; and it is contradicted by the absence of a single piece of paper supporting their claim, their lack of *any* investigation into purported allegations of discrimination, and the admission by a former co-defendant that these after-the-fact discrimination claims were purely pretextual.  (*See id.* at 38.)  *Third*, their claim that Cyrulnik was guilty of "dereliction" of his job responsibilities is nonsense: it is baseless rhetoric counterclaim-defendants use to describe the same unsupported and self-serving complaints from select associates who purportedly did not like the "management style" on certain of Cyrulnik's cases and what they called "unnecessary burdens" shouldered in having to occasionally work late hours.

## IV.    Cyrulnik Is Entitled to Summary Judgment on His Non-Contractual Claims

*Dissolution (Count 1).*  The RF-Parties misconstrue the Florida dissolution statute in arguing that dissolution is not appropriate because **they** believe **they** are able to carry on the business without Cyrulnik.  It is the other way around:  where the RF-Parties' removal of

Cyrulnik was improper and pretextual, the removal is void *ab initio*.  Accordingly, due to their deplorable conduct, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the RF-Parties.  *See* Fla. Stat.§§620.8801(5)(a)-(c).

**Buyout (Count 2).**  In a one-sentence, throw-away argument, the RF-Parties contend that Cyrulnik is not entitled to a buyout under the indisputable FRUPA buyout provisions for a dissociated partner because the MOU's withdrawal provision (§VI.C) magically applies to removed partners (it does not) and somehow trumps FRUPA by stripping that partner of the assets he admittedly is entitled to under FRUPA.  That is farcical, and in any event, as discussed above, Cyrulnik did not "withdraw" (and also was not properly removed).

**Accounting (Count 3).**  The RF-Parties' argument that Cyrulnik's accounting claim is moot because he has obtained limited discovery into some of RCF's finances ignores the controlling law: FRUPA expressly provides that a partner may maintain an accounting claim along with other claims for legal or equitable relief.  (Cyrulnik-Opp.44.)

**Fiduciary Duty (Count 6).**  The Conspiring Partners owed Cyrulnik, their partner, "the duty of the finest and highest loyalty."  *Hallock v. Holiday Isle Resort & Marina*, 885 So. 2d 459, 462 (Fla. 3d DCA 2004).  Cyrulnik has also established that the RF-Parties breached that duty by prioritizing their interests over his, causing Cyrulnik substantial damages.

**Conversion (Count 7).**  As established, the MOU was an enforceable agreement that entitles Cyrulnik to 25% of the Tokens.  (See *infra* at 2-11; Cyrulnik-Mov.26-33; Cyrulnik-Opp.15-27, 40-41; MOU§IV.B.)  The RF-Parties refused to remit to Cyrulnik any of his Tokens.  (Cyrulnik-Dec. ¶81.)  Roche, Freedman, Normand and Friedland all received Tokens, 25% of which belong to Cyrulnik, and have all improperly exercised dominion and control over Cyrulnik's Tokens.  (Ex.9 at 87:4-15.)

***Unjust Enrichment (Count 8).***  Cyrulnik conferred significant benefits on the RF-Parties through his client generation and management of RCF, which the RF-Parties relied on and accepted while RCF was being built.  (Cyrulnik-Dec. ¶¶11, 56.)  The RF-Parties have improperly refused to provide Cyrulnik with the agreed-upon value of his services, and kept Cyrulnik's Tokens and assets for themselves.  (Ex.6.)

***Promissory Estoppel (Count 9).***  In order to induce Cyrulnik to leave his lucrative equity partnership position at BSF, forgo opportunities at other firms, and build RCF for more than a year, the RF-Parties promised to give Cyrulnik, among other things, 25% of the Tokens and a 27% equity interest in RCF (MOU§§II-V), and Cyrulnik was further promised $850,000 and 25% of any future recovery in the ███ contingency matter (Ex.7).  The RF-Parties broke those promises when they pretextually removed him from RCF and refused to remit the assets they promised him.

***Civil Conspiracy (Count 10).***  The RF-Parties effectuated an unlawful scheme to pretextually remove Cyrulnik and steal the many assets and rights he was promised under the MOU.  Each of the Conspiring Partners committed overt acts in furtherance of that scheme, including by improperly voting to remove Cyrulnik.  (Ex.6.)  Cyrulnik has suffered significant damages as a result of the conspiracy, including but not limited to his 25% of the Tokens, his 27% equity stake in RCF, and many other assets he was deprived of.  (MOU§§II-V),

## V.    Friedland Is Liable to Cyrulnik

In asserting that Cyrulnik cannot state a claim against Friedland – the same argument that this Court already rejected on Friedland's motion to dismiss (Dkt. 374, 22-24) – the RF-Parties ignore the fact that Friedland personally partook in the RF-Parties' scheme in secretly meeting and voting to remove Cyrulnik without notice.  (Ex.6.)  It is undisputed that without Friedland's

vote, the vote to remove Cyrulnik would have failed.  Furthermore, after Cyrulnik was removed, Friedland received and kept Tokens that should have gone to Cyrulnik.  (Ex.9 at 87:4-15.)

## VI.    Roche's Frivolous Fraud Claim Should Be Dismissed

*First*, Roche cannot establish that Cyrulnik made any false representations.  Because, like any law firm partner, Cyrulnik's overall compensation is highly dependent on his *future* originations (which can and do fluctuate significantly), Cyrulnik's purported $3 million projection (which Roche's co-defendants have entirely different recollections of) cannot have been a *knowingly* false statement, and therefore cannot give rise to a fraud claim.  *See ILKB, LLC v. Singh*, 2021 WL 3565719, at *7 (E.D.N.Y. Aug. 12, 2021) (estimates of future profits are not actionable statements of fact).  Furthermore, even if Cyrulnik's projections regarding his business origination were lofty (they were in fact *low*), that is precisely the sort of representation courts routinely deem to be inactionable "puffery" in any event.  (*See* Cyrulnik-Mov.40-41.)

*Second*, Roche cannot establish reasonable reliance.  Even the RF-Parties' cases require that a plaintiff "show minimal diligence or care that negates its own recklessness."  *Amusement Indus. v. Buchanan Ingersoll & Rooney*, 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013).  There is not a shred of evidence that Roche performed ***any*** diligence – Roche admittedly did no investigation at all.  (RF-Opp.41).  In any event, the evidence shows that Roche did not reasonably rely on any alleged statements about Patterson, but agreed to pay Cyrulnik $850,000 because, if he did not find a way to get Cyrulnik to join RCF, the other Founding Partners were going to walk away from the new firm entirely.  (*See* Cyrulnik-Mov.40; SMUF ¶10; Ex.10 at 284:22-285:8.)  In fact, Roche paid Freedman $400,000 so that Roche could be listed as the first "named partner."  That the RF-Parties completely ignore – and do not even attempt to address – these fatal facts is telling.

*Third*, Roche cannot establish damages.  The RF-Parties ignore *New York Wheel Owner LLC v. Mammoet Holding, B.V.*, 481 F. Supp. 3d 2016, 235 (S.D.N.Y. 2020), which addresses how "out of pocket damages" are calculated, and makes clear that Roche is unable to prove any damages because he cannot prove that he received less value than he paid.  (*See* Cyrulnik-Mov.41.)  Roche paid to be first named partner and to get Cyrulnik to agree to co-found RCF. Roche received exactly what he paid for.[15]

## VII.    The RF-Parties Fail to Demonstrate an Issue of Fact that Cyrulnik Breached Fiduciary Duties

Putting aside the RF-Parties' non-binding and irrelevant authority,[16] their assertion that Cyrulnik failed to provide time records ignores the undisputed fact that Cyrulnik ***offered*** to provide time records if the RF-Parties provided him access to the firm's systems and a copy of invoices for review before they would be sent to clients. But he was ***unable*** to provide time records because the RF-Parties locked him out of RCF's systems and records and refused to agree to a reasonable process for reviewing those invoices.  (*See* Ex.14 at 234:1-8; 363:18-24; *see also* Bach Ex.15 (Dkt. 425-13) at RFA No. 18-21.)  As it turns out, the RF-Parties stole client money and impermissibly applied payments for one matter to other matters. That Cyrulnik was

---

[15]  Roche's contention that he is permitted to seek restitution of the payments owed to Cyrulnik (RF-Opp.42) is nonsensical.  In his lone cited case, *In re Men's Sportswear*, 834 F.2d 1134, 1136 (2d Cir. 1987), the defendant failed to advertise plaintiff's products as required, and there was thus no consideration.  The Side Letter here required no such consideration; the only consideration it contemplated – Roche's name going first – was completed.  In fact, the Side Letter expressly contemplated that Cyrulnik and Freedman would be paid payments that came due even if they elected to withdraw from the firm immediately thereafter. (Ex.7.) Separately, Roche's improper request to amend his counterclaim to seek rescission should be denied as procedurally improper, and on the merits.  Roche's name appeared first on the firm's every document and communication for over a year; accordingly, there is no way to the parties can be "returned to the status quo ante," and rescission is inappropriate."  *Strategic Growth Intern. v. RemoteMDx*, 2008 WL 4179235, at *6 (S.D.N.Y. Sept. 10, 2008).

[16]  *See Finch v. Campbell*, 541 S.W.3d 616, 625 (Mo. Ct. App. 2017) (partner failed to timely bill his clients to depress his income in connection with divorce proceeding).

not willing to participate in their misconduct is not grounds for a legal claim. (Cyrulnik-Reply-Dec.¶4.)

       As a threshold matter, Cyrulnik did not and could not control how third-parties handled payment requests. The RF-Parties also offer *no* evidence that Cyrulnik ever even advised clients not to pay RCF's invoices, and no reasonable basis for inferring that he did. The RF-Parties ignore that some former clients did pay; others likely didn't because the RF-Parties ***mistreated*** them and sent improper invoices (*see* Cyrulnik-Dec.¶¶52-53,63) – and because the RF-Parties "strategically" avoided seeking payment, in order to maintain this claim against Cyrulnik.[17] And perhaps most importantly, the RF-Parties also ignore that it was in Cyrulnik's self-interest for these clients to pay bills, since *he* would receive the vast majority of the money paid. (Cyrulnik-Mov.37-38; MOU at Exhibit B.) *See Dist. Att'y of New York Cnty. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 188 (S.D.N.Y. 2018) (on summary judgment motion, "the court should not accord the non-moving party the benefit of unreasonable inferences, or inferences at war with undisputed facts").[18]

---

[17]  The Court should reject the RF-Parties' disingenuous attempt to disavow their sworn representation to the Florida court. (Ex.8 at 7.)

[18]  This fact (among others, including that Cyrulnik had every reason to be in constant contact with his clients in connection with ongoing matters) renders the RF-Parties' citation to *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery*, 751 F. App'x 39 (2d Cir. 2018), inapposite, since there was no indication in that case that the defendants had a strong incentive *not* to interfere, unlike here.

Dated:  July 25, 2023
       New York, New York                  Respectfully submitted,

                                          KASOWITZ BENSON TORRES LLP

                                          By: */s/ Marc E. Kasowitz*_____
                                          Marc E. Kasowitz (mkasowitz@kasowitz.com)
                                          Kevin A. Cyrulnik (kcyrulnik@kasowitz.com)
                                          Gavin D. Schryver (gschryver@kasowitz.com)
                                          1633 Broadway
                                          New York, New York 10019
                                          Tel.:    (212) 506-1700
                                          Fax:    (212) 506-1800

                                          *Attorneys for Defendant/Counterclaim-Plaintiff*
                                          *Jason Cyrulnik*

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,994 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

Dated:  July 25, 2023
       New York, New York

                                   */s/ Marc E. Kasowitz*
                                   Marc E. Kasowitz