# Exhibit 3

## DECLARATION OF NATHAN A. HOLCOMB

1.     I am a former partner of Roche Cyrulnik Freedman LLP, a/k/a Roche Freedman LLP, n/k/a Freedman Normand Friedland LLP. I make this declaration based on my personal knowledge pursuant to 28 U.S.C. § 1746. This declaration and its exhibits contain sensitive business and personal information and should be treated as "Confidential" under the terms of the applicable protective order in the event that they or any portion of them are filed in connection with a court case.

2.     My understanding is and always has been that Jason Cyrulnik was an equity partner of Roche Cyrulnik Freedman LLP. I also believe that Paul Fattaruso was an equity partner. I believe that arguments to the contrary are meritless. I further believe that in early 2021, Kyle Roche and Devin "Velvel" Freedman exploited the existence of escalating tensions within the firm to orchestrate the removal of Jason Cyrulnik, secure control over the firm, and benefit themselves financially, including by taking for themselves cryptocurrency tokens that had been promised to Cyrulnik and other partners. I believe that Roche's and Freedman's stated motivations for removing Cyrulnik were disingenuous and pretextual and that they took advantage of me and other partners who were motivated by a concern over protecting the interests of the firm. Without attempting to present an exhaustive history of events that span a period of nearly four years, I explain below the main facts that underpin my beliefs and understandings.

## I.  THE FORMATION OF ROCHE CYRULNIK FREEDMAN LLP BY THE SIX FOUNDING EQUITY PARTNERS

3.     Based on my knowledge of the launch of Roche Cyrulnik Freedman LLP and its subsequent history, as well as my understanding of the Memorandum of Understanding amongst

the six Founding Partners, I believe that Cyrulnik was an equity partner of the firm. I also believe that Fattaruso was an equity partner.

4.      Roche and Freedman left the law firm of Boies Schiller Flexner LLP during the summer of 2019 after obtaining funding to found a new litigation boutique, which they dubbed Roche Freedman LLP. On Roche's last day at BSF, he had lunch with Ted Normand, Amos Friedland, and me, with whom he had worked during his time at BSF. Roche said that he and Freedman planned to build a collegial, collaborative, and entrepreneurial law firm, and that he hoped we would consider joining.

5.      Cyrulnik, who had worked together with Freedman as well as with Normand and me at BSF, was later brought into the discussions. Ultimately, six "Founding Partners"—Roche, Freedman, Cyrulnik, Normand, Friedland, and I—executed a MOU setting forth the terms upon which a new firm was to be founded. Lengthy negotiations amongst the Founding Partners preceded execution of the MOU.

6.      Early drafts of the MOU provided that its terms would not be binding or enforceable until execution of a definitive partnership agreement, but Roche removed this provision in a December 10, 2019 redline, a copy of which is attached as **Exhibit 1**:

> The Founding Partners agree to work together and co-operate in good faith and to fully participate to develop the Firm and to work towards the finalization of the Partnership Agreement.;
> a) This MOU does not create a binding agreement and will not be enforceable against any of the Founding Partners. Only the Partnership Agreement, duly executed and delivered by the Founding Partners, will be enforceable, and it will supersede the provisions of this MOU and all other agreements and understandings between the Founding Partners with respect to the subject matter of this MOU;
> b) No Founding Partner shall have any liability to any other Founding Partner in respect to any of the provisions of this MOU.

7.      I made additional clarifying edits to the same end the next day in a redline, a copy of which is attached as **Exhibit 2**:[1]

> This MOU sets out the basic terms upon which the Founding Partners ~~would be prepared to~~will enter into a ~~binding~~definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-orientated law firm to be named Roche Cyrulnik Freedman /or Roche Freedman Cyrulnik LLP (the "Firm").
>
> The terms of this MOU are not comprehensive, and additional terms, including further clarification of areas of responsibility and resources to be committed, will be incorporated into a formal Partnership Agreement (the "Partnership Agreement") to be negotiated and to be made effective on or around January 1, 2020.

8.      My purpose in making these edits was twofold: First, I wanted to ensure there was a contractual obligation to finalize a "definitive partnership agreement" promptly. Second, given how lengthy the negotiation of the MOU had already been, I wanted to ensure that in the event the partners failed to promptly finalize a more comprehensive partnership agreement, the MOU itself would serve as binding partnership agreement while the new firm launched regardless of whether a "definitive partnership agreement" was executed. I believed then and believe now that the MOU was a binding and fully enforceable agreement.  No Founding Partner ever expressed to me before Cyrulnik's removal that they did not understand the MOU to be binding.  In fact, all six Founding Partners commenced with launching a firm and engaged in a course of performance pursuant to the MOU.

9.      The MOU contemplated the creation of a new firm into which Roche Freedman LLP would be merged:

   a.   The preamble stated: "This Memorandum of Understanding ("MOU") is dated as of December 26, 2019, and establishes the intent to form a partnership between Jason Cyrulnik, Velvel Freedman, Amos Friedland, Nathan Holcomb, Edward Normand, and Kyle Roche (together, the 'Founding Partners')."

---

[1] In the exhibit, the first attachment shows only edits made by me in redline and the second attachment shows edits made both by me and Friedland in redline.

b. Section I introduced the defined term "Firm" to refer to the new firm, stating: "This MOU sets out basic terms upon which the Founding Partners will enter into a definitive partnership agreement to use their respective skills, knowledge, and assets for the purposes of building a high-end litigation-oriented law firm to be named Roche Cyrulnik Freedman LLP (the 'Firm') that is to be branded and marketed as 'RCF'."

c. Section IV stated, in relevant part: "The Founding Partners understand that Kyle Roche and Velvel Freedman formed a law firm called Roche Freedman LLP in August 2019. Roche Freedman will be merged into the Firm in January 2020."

10.    The foregoing provisions of the MOU and the fact that the MOU contemplated a merger of "Roche Freedman" into "the Firm" made it clear to me that the MOU contemplated creation of a new firm that would be distinct from (not identical to) Roche Freedman LLP. It was and is my understanding that the MOU did not contemplate that Cyrulnik, Normand, Friedland, and I would be made partners of the already-existing Roche Freedman LLP. Nor did the MOU contemplate any scenario in which Roche and Freedman would be 50/50 owners of Roche Cyrulnik Freedman LLP, the new "Firm" that the six Founding Partners had agreed to launch.

11.    As discussed below, Roche and Freedman have conflated the already-existing firm Roche Freeman LLP with the new "Firm" contemplated by the MOU. I use the lowercase word "firm" in this Declaration where the distinction between the already-existing firm Roche Freedman LLP and the "Firm" that was to be formed under the MOU is not specifically at issue.

12.    Section II of the MOU contemplated that Paul Fattaruso would be offered an

4

equity partnership in the Firm and that the Equity Committee contemplated by the MOU would effectuate the allocation of equity to him. In my December 11, 2019 redline (Exhibit 2), I had proposed that the allocation of equity to partners beyond the six Founding Partners would be done by the Equity Committee after the formation of "the Firm" because—after already-lengthy negotiations—I wanted to turn the MOU into a document that the Founding Partners could execute without further negotiation or revision so that we could proceed with launching our new "Firm":

> The Founding Partners understand that equity in Roche Freedman LLP is currently split 50/50 between Kyle Roche and Velvel Freedman. After execution of the Partnership Agreement, and effective January 2020, the equity division in the Firm will be the following:
>
> Jason Cyrulnik – 27%
> Velvel Freedman – 23%
> Amos Friedland – 10%
> Nathan Holcomb – 10 %
> Edward Normand – 10 %
> Kyle Roche – 20 %
> ~~Paul Fattaruso~~
> ~~Marc Ayala~~
>
> The allotment of equity to additional partners, anticipated to include at least Paul Fattaruso and Marc Ayala, subject to their acceptance of offers of partnership, will be made by the Equity Committee in accordance with the procedures specified below. The Founding Partners understand that at the Firm meeting at the end of 2020, the Founding Partners will sit down to review their contributions to the Firm and discuss whether any equity revisions amongst the six of them should be made.

13.    Section III of the MOU provided that Roche Cyrulnik Freedman LLP's revenue would be distributed according to a formula set forth in a "Partnership Compensation Model" attached as an exhibit. The Founding Partners regularly referred to compensation according to the model as "formula compensation."

14.    The Founding Partners agreed that all of the assets of Roche Freedman LLP would be assigned to Roche Cyrulnik Freedman LLP, with the exception of assets that were excluded under Section IV or divided under Section IV in a manner that would depart from the

partners' equity allocations. Among the assets addressed in Section IV were cryptocurrency

"Tokens" that were to be issued by Ava Labs, which had been a client of Roche Freedman LLP:

> **B.     Ava Labs Tokens**
>
> The Founding Partners understand that Roche Freedman LLP represents Ava Labs. Ava Labs is a startup company that plans to distribute a certain amount of Digital Assets (the "Tokens") as part of its plans of building a new platform for decentralized assets and applications. In exchange for legal services, Ava Labs has agreed to pay Roche Freedman LLP a certain amount of Tokens over a thirty-six month period beginning on September 30, 2019. A copy of the Roche Freedman LLP / Ava Labs retention agreement is attached to this MOU as Exhibit B. Notwithstanding, the Founding Partners understand that Roche Freedman LLP has agreed to distribute its Ava Labs Tokens according to the following breakdown:
>
> | | |
> |---|---|
> | Jason Cyrulnik | 25% |
> | Velvel Freedman | 32% |
> | Amos Friedland | 5% |
> | Nathan Holcomb | 5% |
> | Edward Normand | 5% |
> | Kyle Roche | 28% |
>
> The Founding Partners understand that Kyle Roche will be the Originating Attorney for Ava Labs (i.e., he will have 100% of the Origination Credit) and any further consideration paid by Ava Labs for the Firm's services will be subject to the Firm's Partnership Compensation Model.
>
> The Founding Partners further understand that notwithstanding the fact that all Founding Partners will have an interest in the Ava Labs Tokens, Kyle Roche, Velvel Freedman, and Jason Cyrulnik will be the only partners expected to bill to the Ava Labs matter. In the event that

15.     The MOU thus acknowledged that Ava Labs had agreed to pay "a certain amount of Tokens" to be issued over a thirty-six month period to Roche Freedman LLP, and provided that "Roche Freedman LLP has agreed to distribute its Ava Labs Tokens" to Cyrulnik, Freedman, Friedland, Holcomb, Normand, and Roche according to a specified breakdown (25% to Cyrulnik, 32% to Freedman, 5% to Friedland, 5% to Holcomb, 5% to Normand, and 28% to Roche).

16.     The engagement letter between Roche Freedman LLP and Ava Labs, dated September 30, 2019, was attached to the MOU as Exhibit B. This is the only agreement relating to the Tokens that I saw prior to execution of the MOU, that I relied on when executing the MOU, or that the Founding Partners collectively discussed before executing the MOU. It stated

(in the section titled "Billing Matters") that when Ava Labs made future issuances of Tokens, it would transfer to Roche Freedman LLP 0.6% of all Tokens that were issued. In exchange for these Tokens, as well as a 0.6% equity interest in Ava Labs, Roche Freedman LLP agreed to waive $1.7 million in fees for legal work.

17.     The firm has argued that the MOU's withdrawal provision contemplated circumstances involving a partner's "involuntary withdrawal," which would permit the firm to withhold from a Founding Partner his compensation set forth in the MOU. During the negotiations of the MOU, to my knowledge and recollection, there were no communications amongst the Founding Partners concerning the concept of an "involuntary withdrawal" impacting a partner's compensation or causing forfeiture of a partner's compensation. The first time I heard this concept mentioned was when the firm made the argument about "involuntary withdrawal" in the pending litigation. Around that time, I recall Normand stating that he had doubts as to whether the argument was likely to succeed, and I also believed it was uncertain.

18.     Freedman collected the Founding Partners' electronic signatures on the MOU on December 27, 2019. A copy of the MOU, with its exhibits, is attached as **Exhibit 3**.

19.     Roche and Freedman concealed from me that well before the execution of the MOU on December 27, 2019, they had secretly purported to assign Roche Freedman LLP's interests in Ava Labs Tokens to themselves personally and that Roche had represented to Ava Labs that these assignments satisfied the "Token Consideration" contemplated in the Ava Labs Engagement Letter.

20.     During early December 2019—after Roche and Freedman had executed these assignments and after Roche had represented to Ava Labs that the assignments satisfied the "Token Consideration" contemplated in the Ava Labs Engagement Letter, but before execution

7

of the MOU—Roche and Freedman circulated drafts of the MOU that contained the same representation about the Tokens quoted above in paragraphs 14–15. In particular, those drafts represented that "Ava Labs has agreed to pay Roche Freedman LLP a certain amount of Tokens" and contemplated providing that "Roche Freedman LLP has agreed to distribute its Ava Labs Tokens" to the Founding Partners according to specified percentages. Exhibit 1 is an example of such a draft. I now know that Roche and Freedman had deceptively purported to assign to themselves Tokens that they had agreed to distribute to the Founding Partners.

21.     Shortly after execution of the MOU, as I was working together with Friedland to prepare engagement letters for clients who were coming with us to our new firm, Friedland and I asked Roche whether the appropriate state paperwork related to the formation of Roche Cyrulnik Freedman LLP had been filed, such that we could proceed with executing engagement letters to which Roche Cyrulnik Freedman LLP would be party. Roche stated that this had been handled already and that Friedland and I could proceed with preparing engagement letters with Roche Cyrulnik Freedman LLP for our clients' execution.

22.     Roche concealed from me that he and Freedman had not in fact filed the paperwork that would be necessary to register the new "Firm" contemplated by the MOU. Instead, a few weeks later, on January 28, 2020, and unbeknownst to me at the time, Freedman would file a document that simply changed the name of Roche Freedman LLP to "Roche Cyrulnik Freedman LLP." A copy of this filing, obtained from the website of the Florida Secretary of State, is attached as **Exhibit 4**.

23.     Following conversations with the other Founding Partners, it was my understanding that Fattaruso had accepted an offer of a 2% equity stake and had joined the Firm as an equity partner. Prior to the launch of Roche Cyrulnik Freedman LLP in January 2020,

Normand told me that Fattaruso had initially been offered 1%, that they had settled on 2%, and that Fattaruso had seemed happy with that.

## II. DISAGREEMENTS AMONGST THE FOUNDING PARTNERS CULMINATE IN THE VOTE TO REMOVE CYRULNIK

24.     In early 2021, certain disagreements had arisen amongst the Founding Partners relating to issues including the firm's compensation formula, associate staffing, and firm governance. For my part, conflicts related to associate staffing and negotiations related to potential funding for a contingency case had culminated in a contentious call amongst Cyrulnik, me, and another partner, Katherine Eskovitz, on December 30, 2020. I believe this was the only discussion I had with Cyrulnik at the firm without other Founding Partners. At the time, I was concerned by the escalating tensions amongst the Founding Partners and hoped there was a solution that would protect the interests of the firm. I believe that Roche and Freedman exploited the existence of escalating tensions within the firm in order to orchestrate the removal of Cyrulnik so that they could secure control over the firm and benefit themselves financially, including by taking for themselves Tokens that had been promised to Cyrulnik and other partners. If I had known everything then that I know today, I would not have voted to remove Cyrulnik from the firm.

25.     At some point during early 2021, I learned for the first time from Friedland that there had been discussions between Roche and Freedman about potentially voting to remove Cyrulnik from the firm. I don't recall hearing about any such discussions before then. Knowing that the Ava Labs Tokens had significant value by this time, I told Friedland that if action were taken with respect to Cyrulnik "the issue will be the Tokens." In other words, I knew that the Tokens were of considerable value by that time and therefore would be a prime focus of any separation discussion. Friedland responded that maybe Cyrulnik would just get his Tokens and

we could all move on.

26.     I was invited to a meeting with Roche, Freedman, Normand, and Friedland on February 8, 2021, at Normand's tennis club in Bronxville, New York. The meeting was very lengthy and went well into the night.  I was later informed by Normand that Roche had been prodding him about Cyrulnik for some time; Normand compared it to a cat pawing in order to get attention.

27.     At the beginning of the February 8, 2021, meeting in Bronxville, the partners in attendance discussed their experiences with Cyrulnik and the conflicts that had arisen within the firm. Roche proposed a vote to remove Cyrulnik from the firm. He said that he would not stay at the firm if Cyrulnik remained a partner, and that if Cyrulnik stayed he would leave to become general counsel of Ava Labs and would make a lot of money if he did. I do not recall the specific figure he gave, but I recall that it was in the tens of millions of dollars. Subsequently, during the Bronxville meeting but when we were outside earshot of Freedman, Roche said that he was not actually planning to leave the firm but that he had said so in order to influence Freedman to agree to vote to remove Cyrulnik.  I believed at the time that Roche was telling me the truth, but given the information I have since learned, as set forth in this declaration, I have doubts about Roche's veracity.

28.     The MOU did not permit termination of a Founding Partner without cause.  The group discussed that a unanimous vote by all of them would be sufficient to remove Cyrulnik for cause because Section VI.G of the MOU required a vote by two thirds of the equity partners to remove a Founding Partner, there were seven equity partners total (including the six Founding Partners plus Fattaruso), and the votes of five out of seven would exceed the two-thirds threshold.

29.    Early in the discussions, Freedman stated that he was "the one most against this" (referring to a vote to remove Cyrulnik) because Cyrulnik usually agreed with him and voted with him on issues related to firm management, and because he was concerned about the negative business impact of losing Cyrulnik's clients. However, Freedman expressed openness to removing Cyrulnik on the condition that the remaining Founding Partners agree to terms for an "Amended Memorandum of Understanding" or "AMOU" that were acceptable to him. Among the terms Freedman proposed were veto rights over various firm actions, including his own removal from the partnership. In reference to the prospect of his own removal, Freedman said that he did not want to "go through this again." Roche did not push for equivalent veto rights for himself, but he tried to downplay the veto rights Freedman had asked for in an effort to get us to agree, saying they were very limited and that he had not expected they would be a significant issue.

30.    Freedman and Roche proposed that the remaining Founding Partners would contribute 15,000 Tokens, the value of which had recently increased significantly, each from their allotments to fund the firm's operations if such funds were needed to avoid disruption from the loss of Cyrulnik's clients, such as a shortfall in the funds needed to pay associate and staff salaries and other operating expenses. Specifying equal contributions was advantageous to Freedman and Roche, who would have been responsible for relatively higher amounts if there had been capital contributions according to either the partners' equity percentages or their percentage allotments of Tokens.

31.    Freedman stated that it was important that Friedland, Normand, and I not benefit from the terms in the AMOU as compared to the terms of the existing MOU. My inference from this comment was that Freedman expected that Cyrulnik's removal would be easier to defend in

11

the future if partners had voted in favor of it who did not stand to gain personally. Freedman was thus able to benefit himself as a result of Cyrulnik's removal while having the cover that other partners who had no financial incentive (Normand, Friedland, and I) had voted in favor of removing Cyrulnik.

32.     Later that day, Freedman stated that if the group could not agree on terms for the AMOU, then they would all go home and it would be as if the meeting had never happened. However, at another point during the meeting when the suggestion was made that it could be better to wait before voting to remove Cyrulnik, Freedman responded that the group should proceed with removal soon, because he said that we now had "cause" to do so. I understood Freedman to be referring to the fact that conflicts over staffing culminating in the contentious conversation amongst me, Cyrulnik, and Eskovitz were still recent at that time.

33.     At one point during the meeting, I suggested that we consider speaking to Cyrulnik. Freedman immediately shut down my suggestion by responding that he and Roche had "gamed this out" for 45 minutes and that if we were to approach Cyrulnik in that way, Cyrulnik was liable to respond in a way that could be damaging to the firm. Freedman expressed the concern that if we broached the issue of Cyrulnik leaving the firm, that would risk triggering public fights over associate time that we could lose control over, which would be a risk to the firm's retention of associates and to its overall stability. It was evident to me that Freedman hoped to remove Cyrulnik from the firm, but that he was pretending to be "the one most against this" and withholding his vote as leverage in order to secure benefits for himself. I believed, however, that his threat to withhold his vote was credible. I believed that the escalating conflicts posed an existential threat to the firm if we did not accede to Freedman's demands.

34.     Freedman shared with the group a draft AMOU, which I hadn't seen or heard of

before the meeting. The provision covering the Ava Labs Tokens stated that Roche and Freedman would have the sole authority to distribute Tokens going forward, but that Normand, Friedland, and I would be entitled to "5% of the AVAX tokens the Firm expects to receive between April 2021 and November 2023." (AVAX is the name that was given to Ava Labs Tokens.) When I saw this provision, I noticed the introduction of a date range specifying when "the Firm" was to receive the allotment of Tokens from which I would receive a 5% share. This date range had not been included in the original MOU provision, which entitled me to 5% of Roche Freedman LLP's Tokens without any limitation. I immediately questioned whether this date range narrowed the reference to some subset of the Tokens contemplated as consideration in the engagement letter between Roche Freedman LLP and Ava Labs or whether it encompassed all of them. (At this time, I had not yet learned that Ava Labs had already paid Tokens in 2020.)

35.     Seeking clarification, I asked Roche whether the referenced date range included all of the Tokens or whether it limited them in some way. Roche responded that the date range included all of the Tokens.

36.     I was troubled by the fact that Freedman was using the escalating tensions at the firm as leverage to extract agreement on terms that were favorable to him. After the February 8, 2021, meeting, I discussed with Roche my concerns about the positions that Freedman had taken at that meeting. I recall in particular a telephone conversation that I had with Roche when I was in my car at the bottom of my driveway at nighttime. Roche told me that the visions Roche and I had for the firm were aligned and that he was doing his best to manage Freedman. Roche and I agreed that the firm would not need to be governed by the AMOU permanently. Roche suggested that when the firm demonstrated it could achieve business success without Cyrulnik, Freedman would likely be amenable to a more equitable system of governance. I used the analogy of

13

training wheels on a bicycle and said that the AMOU's governance provisions could serve as training wheels that could later be taken off. Roche expressed approval of this analogy. Roche asked me whether I thought he should have veto rights as well and said that he did not care one way or the other. My immediate response was that if Freedman was going to have veto rights, I would prefer that Roche have them too. At that time I had confidence in Roche's integrity and motivations that I no longer have now; I believed that there would be a balance of power more consistent with the firm's interests if both Roche and Freedman had veto rights than if Freedman alone had them. I told Roche that if both he and Freedman had veto rights, there could be a veto of a veto, and I said that both of them having veto rights could reinforce that the AMOU wasn't intended to be a permanent system of governance for the firm. Roche expressed approval of these views.

37.    On another call with Roche in between the Bronxville meeting and the removal vote, which included Normand as well, I stated that Freedman was using the issues with Cyrulnik as leverage for money and power. Roche responded simply: "Yes."

38.    The decision whether to vote in favor of removing Cyrulnik was extremely difficult for me. I remained disturbed by the approach Freedman had taken in the AMOU negotiations, but I concluded that the firm had reached a point of crisis. I understood that Freedman had made an ultimatum that he was prepared to let the conflicts within the firm result in its destruction if he did not get the benefits he wanted for himself. I believed Freedman was prepared to risk allowing the firm to be destroyed if his demands were not satisfied. Given the ultimatum Freedman had made, I concluded that it was necessary for the sake of the firm's survival for me to accept the terms of the AMOU and vote in favor of Cyrulnik's removal.  At the time, however, I was unaware of several facts, including that Roche's and Freedman's

motivations for removing Cyrulink were disingenuous and pretextual, that they had purported to assign rights to the tokens to themselves personally, and that they had already appropriated 25% of the tokens for themselves.  If I had known everything then that I know today, including these facts, I would not have voted to remove Cyrulnik from the firm. And if I had not voted to remove Cyrulnik, then there would not have been the two-thirds majority required to remove Cyrulnik from the firm, and the vote to remove him would have failed.

39.     Roche called for the final vote to remove Cyrulnik on February 10, 2021. Freedman then collected electronic signatures from Roche, Freedman, Normand, Friedland, and me. A copy of the AMOU is attached as **Exhibit 5**.

40.     The AMOU contains the provision specifying a date range for Token distributions that Roche had represented to me covered all of the Tokens rather than a subset:

> **IV.    ASSIGNMENT AND EXCLUSION OF ROCHE CYRULNIK FREEDMAN LLP ASSETS AND RIGHTS**
>
> The AMOU does not alter the 2019 MOU with respect to any of the firm's assets except in so far that the Remaining Founding Partners agree that Kyle Roche and Vel Freedman, upon their unanimous vote, shall have sole authority to distribute any AVAX tokens traceable to Roche Freedman's 2019 retention agreement with Ava Labs.
>
> That said, Kyle and Vel agree that each of the Remaining Founding Partners shall be entitled to at least 5% of the AVAX tokens the Firm expects to receive between April 2021 and November 2023. Provided, however, that 15,000 AVAX from each of the Remaining Founding Partners' tokens shall be sold, and held in an interest bearing account, to fund the firm's operations. The interest shall be paid to the Remaining Founding Partners, pro rata. These funds will only be used to pay for a shortfall in the Firm's ability to pay draws, salaries, rent, bonuses, or other operational costs.

41.     The AMOU implied that the Tokens were expected to be received by "the Firm." Roche and Freedman continued to conceal the fact that that they had purported to assign the rights to the Tokens to themselves personally. And, as discussed further below, they also concealed the fact that they had already received 25% of the Tokens from Ava Labs in 2020.

## III. ROCHE AND FREEDMAN IGNORE MY STATED CONCERNS AND ADVANCE UNFOUNDED LITIGATION POSITIONS

42.    Cyrulnik disputed the validity of his removal soon after being informed of the vote. During a conversation amongst the remaining Founding Partners about how to deal with the situation, Roche commented that he had expected that the situation would probably end up in litigation. I was upset by this because at the Bronxville meeting, we had all discussed that we would make an effort to negotiate terms for an amicable parting with Cyrulnik. I was deeply reluctant to engage in litigation, particularly in a public forum, and refused to be an individual plaintiff. Ultimately, however, I concluded that it was likely that Cyrulnik would sue first if the firm delayed filing a complaint and therefore didn't oppose the filing. The firm proceeded to initiate litigation against Cyrulnik.

43.    After the firm initiated litigation, Fattaruso resigned as a partner. I was informed that Roche made efforts to retain Fattaruso before he left. After leaving the firm, Fattaruso sent a series of emails seeking clarification of the compensation to which he was entitled, including for his equity.

44.    In conversations amongst the remaining five Founding Partners about how to respond to Fattaruso's emails, Freedman and Roche advocated asserting the position that neither Fattaruso nor Cyrulnik had received equity in the firm because they had never executed a definitive partnership agreement. I had never heard anyone suggest that Cyrulnik and Fattaruso were not equity partners until after the vote to remove Cyrulnik. I was concerned at the time that this position was meritless and inconsistent with my understanding that the Founding Partners and Fattaruso had all been equity partners since January 2020. It had been my understanding that all of the six Founding Partners had created a new partnership in January 2020 and that Fattaruso had become an equity partner shortly thereafter. It did not make sense to me that anyone could be considered an equity partner of Roche Cyrulnik Freedman LLP without Cyrulnik, who was a

named partner, being an equity partner. And it does not make sense to me now that by filing paperwork to change the name of Roche Freedman LLP to Roche Cyrulnik Freedman LLP rather than registering a new entity as the MOU contemplated, Roche and Freedman could make themselves 50/50 owners of the firm that the six Founding Partners had all launched together.

45.    I knew that there were many documents supporting and reflecting the conclusion that the Founding Partners and Fattaruso had all been equity partners since January 2020. I also knew that the firm had set up its benefits plans, including its 401(k) plan, on that assumption, and that there were multiple documents reflecting this. I further knew that the basic purpose of a 401(k) plan is to take advantage of the tax benefits available under Section 401(k) of the Internal Revenue Code and that the management of such a plan must comply with the tax laws.

46.    During a call amongst the remaining Founding Partners, when I discussed my concerns about taking the position that Fattaruso and Cyrulnik weren't equity partners, Freedman responded, "Jason isn't going to play it clean." Roche said that anyone who disagreed with the position that Fattaruso wasn't an equity partner needed to have said that earlier. (I had raised my concerns earlier.) Notwithstanding my concerns, the firm proceeded to advance the position that Cyrulnik and Fattaruso had never been equity partners. Fattaruso then brought suit against the firm and the remaining Founding Partners.

47.    Although I had strong misgivings about the position that Cyrulnik and Fattaruso had never been equity partners, I did not expect at the time that my own equity would be called into question, because the AMOU did not contain the language that Roche and Freedman claimed created a condition precedent in the MOU. Section II of MOU stated that "[a]fter execution of the Partnership Agreement, and effective January 2020, the equity division in the Firm will be the following . . . ." In defending against claims made by Cyrulnik and Fattaruso,

17

Roche and Freedman have claimed this language implies that execution of a definitive partnership agreement was a condition precedent to anyone other than Roche and Freedman becoming an equity partner, and that the necessary consequence of a collective failure by the Founding Partners to execute a definitive partnership agreement is that Roche and Freedman were 50/50 owners of Roche Cyrulnik Freedman LLP. Setting aside the flaws in this position, the language upon which Roche and Freedman base the position is absent in the AMOU, which states that "[t]he equity division in the Firm will be the following . . . ." As discussed below, however, Roche and Freedman would later leverage the same baseless claim against me as well.

48.    Notwithstanding the fact that I was a named party and equity partner of the firm, I received limited information about the ongoing litigations with Cyrulnik and Fattaruso. When attempting to review the Dropbox folder in which the firm's files related to those cases were kept, I noticed that I had been screened from access to the folder. I do not know who was responsible for restricting my access. I asked the firm's Director of Operations to grant me access in a March 24, 2022 email, and he did. A copy of this email chain is attached as **Exhibit 6**. After that, I periodically reviewed documents contained in the folder. At times I saw messages on the screen that said I did not have permission to access certain documents.

49.    During the summer of 2022, I learned that Freedman was privately meeting with witnesses within the firm in advance of their depositions in the Cyrulnik litigation. I first learned that Freedman was meeting with witnesses by reviewing the Dropbox folder for the case. I was concerned by this because I believed that it would be appropriate for outside counsel to be responsible for conversations with witnesses about the facts of the case and about preparation for their depositions. I believed that Freedman was trying to influence witness' testimony and that this was improper. Another attorney at the firm approached me about this issue, expressed

18

concern that Freedman was trying to influence that attorney's testimony to support his discrimination accusations, and was uncomfortable as well. I was so uncomfortable with what was happening that I stopped going into the office, so that I could avoid having conversations about the litigation.

50.     Before Freedman testified as a representative for the firm in the Cyrulnik litigation pursuant to Fed. R. Civ. P. 30(b)(6), he spoke with me as part of his preparations. I did not understand this conversation to be privileged because it was part of his preparation to testify as a 30(b)(6) witness, and I told Freedman that was my understanding. During the conversation, Freedman told me that the other witnesses were saying that there had been no discussion of the Tokens at the February 8, 2021, meeting, with the exception of the contributions of 15,000 Tokens from each partner to fund the firm's operations if necessary. He said that others recalled that there had been no negotiation of the AMOU at the February 8, 2021 meeting, and that the AMOU was done quickly prior to the vote to remove Cyrulnik. It was false that the AMOU was done quickly prior to the vote to remove Cyrulnik. I told Freedman I wasn't sure this was true and said I thought there had been negotiation of the AMOU at the Bronxville meeting. Freedman told me that there was a computer forensics expert who was working on finding the earlier drafts of the AMOU. During this conversation, it appeared to me that Freedman was attempting to get me to confirm information that was not true so that he could testify about that information as a 30(b)(6) representative of the firm. I have since seen that Freedman testified in his 30(b)(6) deposition that the AMOU was drafted over the span of about an hour or two after the vote was taken to remove Cyrulnik. That is false.

## IV. I LEARN THAT ROCHE AND FREEDMAN SECRETLY PURPORTED TO TRANSFER RIGHTS TO THE TOKENS TO THEMSELVES PERSONALLY AND TOOK FOR THEMSELVES A TRANCHE OF THE TOKENS DURING 2020

51.    During the summer of 2021, I learned that (a) Ava Labs had already made its first payment of Tokens that it was required to pay under the engagement letter, representing approximately 25% of the total, in 2020, but (b) Roche and Freedman had purported to transfer the rights to the Tokens to themselves personally, did not tell me that they had received the Tokens, and secretly kept the Tokens for themselves.

52.    I first learned in this litigation that Roche and Freedman had entered into an agreement that purported to transfer the rights to the Tokens to themselves personally on a call with Roche, Normand, and Friedland during the summer of 2021. I do not recall the exact date of this call but I recall that I was in a hotel room in Miami during the summer of 2021. Roche said that he had sent us the agreement transferring the rights to the Tokens to him and to Freedman. This was false. I do not recall the exact date when I first heard a reference to an initial tranche of Tokens that Roche and Freedman had received, but I recall learning specifically that Roche and Freedman had received a tranche of Tokens during 2020, which represented approximately 25% of the total, contemporaneously with the settlement conference conducted by Magistrate Judge Netburn in the Cyrulnik litigation, which took place on July 14, 2021.

53.    I now recognized that Roche had misled me on February 8, 2021, when he responded to my question about the Token provision in the AMOU and told me that the date range in that provision included all of the Tokens rather than limiting them in some way.  This fact, in combination with other facts, has led me to conclude that Roche and Freedman were attempting to secure significant benefits for themselves by removing Cyrulnik.

54.    On August 17, 2021, Roche sent an email stating that "[t]he Firm will distribute its AVAX tokens from the Firm's AVAX wallet":

| Subject: | AVAX Token Distribution |
|---|---|
| Date: | Tuesday, August 17, 2021 at 4:05:11 PM Eastern Daylight Time |
| From: | Kyle Roche |
| To: | Ted Normand, Amos Friedland, Velvel Freedman, Nathan Holcomb |

Attachments: image001.png

All,

The Firm will distribute its AVAX tokens from the Firm's AVAX wallet. In order for the Firm to make this distribution, each of you will need to send me an AVAX deposit address. To create an AVAX deposit address, please navigate here and follow the instructions:

https://wallet.avax.network/

55.     Freedman has since said that he and Roche jointly own an AVAX wallet and that the firm has no AVAX wallet. A copy of Roche's email referring to "the Firm's AVAX wallet" is attached as **Exhibit 7**.

56.     I spoke by phone with Roche in late August 2021. This call followed an August 20, 2021 email chain amongst me, Roche, and Sean Hecker, who at that time was our counsel in the Cyrulnik litigation. A copy of this email chain, with privileged material redacted, is attached as **Exhibit 8**.

57.     I started out by saying that there were issues that I thought we should discuss with Hecker. Roche responded that we already had a lot of non-privileged conversations about these topics and said I should just go ahead and say what I wanted to say. I told Roche that it was my understanding that Cyrulnik and Fattaruso had been equity partners. Roche said it was fine if I had a different view. I told him that I did not know what was in his head at the time, but that I had asked him during the Bronxville meeting whether the date range specification in the AMOU narrowed the reference to some subset of the Tokens, and that Roche had said it referred to all of them. I further told Roche that I could not read the MOU as saying anything other than that the partners were entitled to their specified percentages of all of the Tokens deriving from the Ava Labs engagement, without any exclusion for the first tranche that had been received in 2020.

Roche responded by saying that if that was my position, the only thing I could do about it was to sue him and Freedman. He also said that he had never expected that I would receive any of the Tokens received in 2020 and said that it would be a problem for us to be partners if I believed he would do something like I had described. I told Roche that I had no plans at that time to sue him and Freedman, but that we were in active litigation and he needed to know what my understandings and recollections are, because they are what they are and I can't change them.

58.    I also expressed to Roche that I wanted the Cyrulnik lawsuit to be over. Roche responded: "The firm is litigating this case." I told Roche I was concerned that there were claims against me personally, and Roche responded that the claims relating to the Tokens affected only him and Freedman. I told Roche that Cyrulnik had asserted damages claims seeking to hold all of the partners jointly and severally liable, which meant that if he won he could collect from whomever he wanted to. I commented that if Roche had a family he might understand how concerned I was. Roche responded by saying that he had retarded brothers who relied on his support, that he had worked for everything he has and that he had achieved a great success with Ava Labs, that Cyrulnik is a terrible person who did not contribute anything to the firm, and that he wasn't going to let Cyrulnik take the Tokens. Roche also said that I could use the Tokens I had received if I wanted to hire my own lawyer to defend myself against Cyrulnik's claims. He then said that if I was going to be a partner in the firm, I couldn't just be thinking of myself.

59.    I subsequently spoke with Hecker on August 23, 2021. A copy of a calendar invitation for that call is attached as **Exhibit 9**. Roche was invited to join the call but he told me he did not feel he needed to.

60.    In response to a question Freedman asked me during his call with me in preparation to testify as a 30(b)(6) witness, I told him about the conversation I had with Roche

22

during August 2021. I also told Freedman that during the February 8, 2021 meeting, I had noticed in the draft AMOU that there was a date restriction in the Token provision that hadn't been in the MOU, that I had asked Roche about it, and that Roche had told me the date range encompassed all of the Tokens. Freedman said that Roche had given me "bad information." He then said something about invoices for the Tokens that he said related in some way to 2019 and moved on to another topic.

## V. ROCHE AND FREEDMAN ADVANCE THE FALSE CLAIM THAT I WAS NOT AN EQUITY PARTNER FOR LEVERAGE, JUST AS THEY DID TO CYRULNIK AND FATTARUSO

61.    Meanwhile, the remaining Founding Partners had been making halting progress on a definitive partnership agreement. As negotiations proceeded, Roche and Freedman took the position that Normand, Friedland, and I were not equity partners and that we could become equity partners only if we signed a definitive partnership agreement. They said that the firm would not issue a K-1 to me unless I signed a definitive partnership agreement. I believed then and believe now that this claim was false and that Roche and Freedman were using it for leverage, just as they did against Cyrulnik and Fattaruso.

62.    I became increasingly concerned that Roche and Freedman would cause the firm either to file inaccurate documentation of my income with the IRS or to withhold such documentation entirely. I was also concerned that I would not have the information I needed to prepare my own tax return by the October 15, 2021 deadline (which applied following a six-month extension of the April 15 deadline). The February 1, 2021 deadline for issuance of a W-2 (which would have been the appropriate form if I had been a non-owner employee during 2020) or for a 1099-NEC (the form for reporting non-employee compensation) was long past. The deadline for issuance of a K-1 (which was the appropriate form if I was an equity partner during 2020) was September 15, 2021 (after application of a six-month extension). But September 15

came and went without me receiving a K-1. A copy of the IRS publication listing these deadlines, downloaded from the IRS website, is attached as **Exhibit 10**.

63.    On September 24, 2021, I asked whether Roche Freedman LLP was on track to issue K-1s. Freedman responded: "There are no k1s to issue to anyone but Kyle and I [*sic*] until and if [*sic*] a partnership agreement is signed." A copy of this email, with privileged information redacted, is attached as **Exhibit 11**:

---

**From:** Velvel Freedman <vel@rochefreedman.com>
**Date:** Friday, September 24, 2021 at 12:29 PM
**To:** Nathan Holcomb <nholcomb@rochefreedman.com>, Amos Friedland <afriedland@rochefreedman.com>, Ted Normand <tnormand@rochefreedman.com>, Kyle Roche <kyle@rochefreedman.com>, "Maulsby, Tyler" <TMaulsby@fkks.com>
**Subject:** Re: RF Partnership Agreement (privileged and confidential)

There are no k1s to issue to anyone but Kyle and I until and if a partnership agreement is signed. Where are we on the draft?

Velvel (Devin) Freedman
Partner
Roche Freedman LLP
(t) (305) 753-3675
(@) vel@rcfllp.com

---

64.    In a subsequent email on September 27, 2021, Roche said that we needed to finalize the partnership agreement "so we can get K-1s issued." A copy of this email, with privileged material redacted, is attached as **Exhibit 12**.

65.    If I did not sign the partnership agreement, then I knew Roche and Freedman would refuse to acknowledge my equity and would withhold my K-1. I also knew that Roche and Freedman controlled the wallet containing the Tokens received from Ava Labs, which I perceived as giving them additional leverage.

66.    I did not know what alternative evidence of my income Roche and Freedman would file with the IRS if I did not sign a definitive partnership agreement, but I expected that it would be untimely and likely inaccurate—given that I had now been treated as an equity partner

of the firm for almost two years, for purposes that included its employee benefits and 401(k) plans and that had federal tax consequences.

67.    For example, on January 28, 2020, I—together with Friedland, Cyrulnik, Normand, and Fattaruso—had received an email from the Firm's human resources service, ADP, that instructed me to complete a form indicating that I was a "Partner" and to represent: "I receive 100% Non-Taxable Draws or Guaranteed Payments (to be reported on Form K-1)." I complied with these instructions and submitted the form in the email chain attached as **Exhibit 13**:



68.    Going forward, I received monthly bank transfers of the full amount of the draw payments provided for in the MOU, without any tax withholding by the firm (which I understand would have been required if I had been a W-2 employee).

69.    Then, on January 31, 2020, Freedman sent an email to the firm's Director of

Operations—copying Friedland, Cyrulnik, Roche, Normand, Fattaruso, and me—in which he said "[w]hen you log into ADP, you will notice that because you are equity partners, the firm is fronting 100% of the cost of your healthcare." In a subsequent email, Freedman asked the Director of Operations to "share the benefit details and costs of each plan offered to the Equity Partners so they can make informed choices." The Director of Operations responded that he was attaching "the plan details as well as the ownership class rate sheet." A copy of this email chain is attached as **Exhibit 14**. When I completed the benefits enrollment process that same day, I received an email confirming enrollment in insurance plans intended for the firm's "Ownership." A copy is attached as **Exhibit 15**:

**Subject:** Your benefit elections have been submitted
**Date:** Friday, January 31, 2020 at 4:23:41 PM Eastern Standard Time
**From:** DoNotReply@adp.com
**To:** Nathan Holcomb

Congratulations! Your benefit elections have been submitted. A summary of your elections is as follows:

| Plan Name | Coverage | Effective Date |
|---|---|---|
| AETNTL-MC OA 1000/80%, Ownership AETNTL | Employee + Family | 2/1/2020 |
| AET-APPO DEN 1,250-Area 4A, Ownership AETDEN | Employee + Family | 2/1/2020 |
| Basic $10,000, Ownership METLDI | $10,000 | 2/1/2020 |
| LTD Basic 50% $1,000/mo-180, Ownership METLDI | 50% of earnings up to $1,000.00 per month | 2/1/2020 |

70.     I have confidence in the capabilities of the firm's Director of Operations and believe he would have set up the firm's benefits plan based on his best understanding of what was correct.

71.     On October 28, 2020, I indicated on my enrollment form for the firm's 401(k) plan that I was enrolling as a "partner." A copy of this form is attached as **Exhibit 16**. The firm accepted my enrollment as a "partner." On November 6, 2020, the firm's Director of Operations

sent an email to the firm's "Ownership Group" (including Roche, Cyrulnik, Freedman,

Normand, Friedland, Fattaruso, and me) clarifying that the "Ownership Group" could not enroll

in certain benefits that were available only to employees, and not to "Self Employed Owners."

This followed conversations in which I had assisted the Director of Operations in working with

ADP to correct the fact that ADP had mistakenly offered those benefits to the firm's equity

partners through its benefits enrollment portal. Neither Roche nor Freedman responded to say

that they did not understand Cyrulnik, Normand, Friedland, Fattaruso, and me to be members of

the "Ownership Group." A copy of this email is attached as **Exhibit 17**.

      72.     On March 23, 2021, I emailed the firm's Director of Operations (copying

Normand, Friedland, Roche, and Freedman) and inquired about making 401(k) contributions for

the 2020 tax year for "the owners' group"; my understanding was and is that by this time, the

ability to make contributions for 2020 was limited to equity partners, because employees are

required to make contributions for a given tax year by December 31 of that year. The Director of

Operations responded that "census numbers" for the 401(k) plan needed to be redone because

previously they had assumed that Fattaruso would be contributing, whereas now the only

members of the "ownership group" who would be contributing would be me, Friedland, and

Normand:

> **From:** William Tracy <wtracy@rcfllp.com>
> **Date:** Tuesday, March 23, 2021 at 11:34 AM
> **To:** Nathan Holcomb <nholcomb@rcfllp.com>
> **Cc:** Ted Normand <tnormand@rcfllp.com>, Amos Friedland <afriedland@rcfllp.com>, Kyle Roche <kyle@rcfllp.com>, Velvel Freedman <vel@rcfllp.com>
> **Subject:** Re: 2020 401(k) contributions
>
> Hi Nate –
>
> The census numbers were being run with the assumption that Paul was contributing. I've asked the Voya group to redo the calculations in light of his departure. We're now assuming the only members of the ownership group that will be making contributions are you, Amos, and Ted.
>
> Hopefully I'll have the numbers by early next week.
>
> Bill

73.     Neither Roche nor Freedman responded to say that they did not understand Normand, Friedland, and me to be equity partners. A copy of this email chain is attached as **Exhibit 18**.

74.     On March 30, 2021, the firm's Director of Operations wrote to Roche, Freedman, Normand, Friedland, and me that he was "still working through the IRS testing with Voya Financial to determine what the 2020 contribution limits are for members of the ownership group who are interested in making a contribution." Again, neither Roche nor Freedman wrote to say that they did not understand Normand, Friedland, and me to be members of the "ownership group." A copy of this email chain is attached as **Exhibit 19**.

75.     On April 19, 2021, the firm's Director of Operations advised me, in an email chain attached as **Exhibit 20**, that I could make a 401(k) contribution for 2020 by mailing a check made out to Roche Freedman LLP to Freedman (with the understanding that Roche Freedman LLP would then contribute that amount to the 401(k) plan). I did so, writing on the memo line of the check "2020 401(k) contribution." As noted above in paragraph 71, my understanding was and is that by this time, the ability to make contributions for 2020 was limited to equity partners, because employees are required to make contributions for a given tax year by

28

December 31 of that year. Freedman endorsed the check on behalf of the firm, and the firm made a contribution to my 401(k) plan for the 2020 tax year in the same amount. A copy of the canceled check obtained through my bank's website is attached as **Exhibit 21**:



76.     When I finally received a K-1 on October 8, 2021—just seven days before my return was due—I immediately noticed that it was erroneous because it did not reflect my 401(k) contribution. The firm's accountant, who was also Roche's and Freedman's personal accountant, responded that he "was not provided any information regarding accruing partner contributions" before correcting the K-1. A copy of this email chain is attached as **Exhibit 22**.

77.     The final partnership agreement (the "Partnership Agreement") included terms that were more favorable to Roche and Freedman even than the AMOU. For example:

    a.  The Partnership Agreement provided (in Section 3.3) that Roche and Freedman would have the right to "any Tokens earned from staking." This allowed them to profit significantly from the custody they had unilaterally and covertly asserted over the Tokens. The Ava Labs Tokens had the feature that they could be "staked" for up to 21 days. While Tokens were

29

"staked" they could not be transferred. At the end of the staking period, the holder would receive rewards in the form of more Tokens, at a rate that I understand was effectively equal to approximately 10% per annum in kind. Although Tokens that were "locked" could not be transferred, they could still be "staked." Roche and Freedman were thus able to reward themselves for transferring custody of the Tokens owed to other partners by earning valuable staking rewards on those Tokens (including during a period when the value of the Tokens, together with the broader cryptocurrency market, was at its peak).

  b. The Partnership Agreement provided for equity-based voting on various aspects of firm governance. Friedland informed me that he had discussed the issue of equity-based voting (which the Amended Memorandum of Understanding had not provided for) with Freedman, and that Freedman had responded that unless the partnership agreement provided for equity-based voting, he would refuse to sign.

78. I concluded that the risk of finding myself unable to file an accurate and timely personal tax return was unacceptable and that I had no choice but to sign the proposed Partnership Agreement in order to receive a K-1 and file my tax return by the October 15 deadline. Freedman collected the signatures of the remaining Founding Partners on October 5, 2021. A copy of the executed Partnership Agreement is attached as **Exhibit 23**.

## VI. ROCHE AND FREEDMAN'S CONDUCT FOLLOWING CYRLUNIK'S REMOVAL LEADS ME TO CONCLUDE THAT THEIR PUPORTED MOTIVATIONS FOR REMOVING CYRULNIK WERE DISINGENUOUS AND PRETEXTUAL

79. Roche and Freedman's conduct following Cyrulnik's removal has led me to

30

conclude that their claimed motivations for removing Cyrulnik were disingenuous and pretextual. I now believe that they manipulated the circumstances that were presented by the conflicts that had developed within the firm in order to secure votes to remove Cyrulnik from me, Friedland, and Normand. I also now believe that Roche and Freedman took advantage of me and the other partners in order to secure for themselves control of the firm and financial benefits, including especially the Ava Labs Tokens that had been promised to Cyrulnik in the MOU.

### A. I Now Believe That Roche and Freedman's Purported Concerns Over Transparency Were Disingenuous and Pretextual.

80.    The firm's Complaint against Cyrulnik alleges that "the Firm's founding partners . . . sought to create an environment that was more collaborative, collegial, and transparent than many traditional large law firms." And it cites, as one of the grounds for Cyrulnik's removal, "instructing a Firm employee to withhold the Firm's financial information from other equity partners of the Firm." I understand this to be a reference to an occasion when Friedland and I asked the firm's Director of Operations for information about formula compensation calculations, which we were not provided at that time. (I do not recall directly and explicitly requesting financial information from Cyrulnik during his tenure at the firm.) After Cyrulnik's removal, however, Roche and Freedman kept financial and other information about the firm's operations to themselves despite my explicit requests for the information, which has led me to conclude that their purported concerns for transparency were pretextual.

81.    I made repeated requests to review the firm's financial information after Cyrulnik's removal, with little success. On April 22, 2021, I contacted Roche Freedman LLP's accountant Seth Salver (who, I understood, as a general matter reported to Freedman) and asked when my 2020 K-1 would be available. This was well before Roche and Freedman began to press the position that I was not an equity partner and would not become one unless I signed a

partnership agreement with terms that were favorable to them. Salver copied Freedman on his evasive response, a copy of which is attached as **Exhibit 24**:



82.     As discussed above in paragraphs 60–77, Roche and Freedman would withhold my 2020 K-1 until October 2021, using it as leverage to force me to sign the Partnership Agreement.

83.     The following year, I contacted Salver on March 11, 2022, and asked whether I could expect to receive a copy of my 2021 K-1 in time to calculate estimated taxes due on April 18, 2022. I also asked for the P&L. Salver responded: "Yes, we will have a draft of the LLP return ready next week." A copy of this email chain is attached as **Exhibit 25**.

84.     When I followed up on April 1, 2022, Salver responded that he could "send a draft federal K-1 without any Crypto activity . . . would that be helpful?" Given the large value of the Ava Labs Tokens, excluding "crypto activity" from the K-1 would make it useless. A copy of this email chain is attached as **Exhibit 26**. Salver subsequently provided what purported to be a draft 2021 K-1 on April 11, 2022. A copy of this email is attached as **Exhibit 27**.

85.     On April 27, 2022, I asked Salver to advise whether he could provide P&Ls. Salver responded evasively. A copy of this email chain is attached as **Exhibit 28**:



From: Seth Salver seth@salver.com
Subject: RE: Records of 2021 AVAX Transfers
Date: April 27, 2022 at 11:25 AM
To: Nathan Holcomb nholcomb@rochefreedman.com, Ted Normand tnormand@rochefreedman.com
Cc: Kyle Roche kyle@rochefreedman.com, Velvel Freedland vel@rochefreedman.com, Amos Friedland afriedland@rochefreedman.com

[EXTERNAL SENDER]

The final P&L will not be ready until I meet with Vel and do a detailed review.
It is my understanding that the P&L that the bank is requesting from you, need only be signed by you, not the Firm's CPA. Can you double check?

86.     On May 16, 2022, I contacted Salver to ask when final K-1s would be issued. Salver again responded evasively and said he would need approval from Roche and Freedman before sharing more information with me. A copy of this email chain is attached as **Exhibit 29**:



RE: Records of 2021 AVAX Transfers

SS  Seth Salver <seth@salver.com>                                    Tuesday, May 17, 2022 at 10:50 PM
    To: Nathan Holcomb; Cc: Kyle Roche; Velvel Freedman; Amos Friedland; Ted Normand

[EXTERNAL SENDER]

Hello Nate,

The K-1s were sent as an unreviewed preliminary draft to assist with the April 18th tax deadline. Subsequent to their release I have been made aware of several factors that affect their accuracy. I do not feel comfortable updating K-1s that do not reflect the full picture. I will need to go over the financials with Vel & Kyle before I can release the final draft.

Best,
Seth E. Salver, CPA

salver+salver
CERTIFIED PUBLIC ACCOUNTANTS

87.     On July 22, 2022, I informed Salver that a bank with which I had a credit application pending had requested the last two years' K-1s and partnership returns in addition to the 2022 year-to-date P&L and balance sheet. Salver said he hoped to provide the 2021 return and K-1 after Freedman approved. But he declined to send a P&L and balance sheet. A copy of this email chain is attached as **Exhibit 30**.

88.     I was also kept in the dark about the firm's operations and strategic planning. I had to resort to reading the legal press for information about a significant project Roche was pursuing in conjunction with Ava Labs. My understanding was that the idea behind the project

33

was to "tokenize" litigation finance. Crypto-asset tokens representing interests in the outcome of a litigation would be issued to retail investors in an "Initial Litigation Offering," or "ILO," to raise funds for the plaintiffs and their attorneys to pursue the case. The tokens could then be traded on the blockchain, creating a secondary market. In the event of a recovery in the case, the holders of the tokens would be entitled to a commensurate portion.

89.      I first learned about this idea in January 2020, shortly after becoming a partner of Roche Cyrulnik Freedman LLP. Upon hearing about the idea, I immediately had concerns. After communicating these concerns to my partners, I received only very limited information about progress on the idea.

90.      I later learned about developments in Roche's plans for the firm's involvement in an "ILO" venture by reading the legal press. On February 14, 2022, an article appeared on the *ABA Journal* website with the title "A litigation finance stock market? This law firm plans to launch one." Quoting an on-the-record interview with Roche, the article said positive responses to an initial small ILO by a Roche Freedman LLP firm client had "inspired his firm to move forward with plans to develop a forum to host multiple initial litigation offerings" and that "[t]he platform, named Ryval, is expected to launch later this year and serve as a 'stock market of litigation financing.'" Quoting academic and industry experts who raised the same concerns that I had about the idea, the article reported that Roche "says he is working with his team to develop ways to provide additional data for cases moving forward." After that, I never received any more information about the purported efforts of Roche's "team" beyond what I read in the press.

**B.  I Now Believe That Roche and Freedman's Purported Concern Over the Gender Balance of the Firm Was Disingenuous and Pretextual.**

91.      In a February 12, 2021 email informing Cyrulnik of the removal vote, Roche cited among the grounds for removal that Cyrulnik had "mocked Nate for his concerns over diversity."

A copy of this email is attached as **Exhibit 31**. But during a partnership meeting on January 19, 2022, when one female attorney (Jordana Haviv) and one male attorney (Constantine Economides) were both up for partner, Roche and Freedman initially expressed opposition to making Haviv partner at that time. They said Haviv was not ready to be a partner and that they favored making only Economides partner at that time. Friedland commented on how the optics of electing only a male partner and no female partner would be poor. (At this time the firm had no female partners at all.) Roche responded that we had started the firm with six men, and that if you joined he assumed you were "on board with that." Freedman then commented that he didn't believe you needed women "to bring in business." A copy of a calendar invitation for this meeting is attached as **Exhibit 32**. I now believe that Roche and Freedman's purported concern over the firm's gender balance was disingenuous and pretextual. I did not personally base my vote to remove Cyrulnik on a conclusion or belief that he had engaged in gender discrimination, nor did I personally observe Cyrulnik engage in gender discrimination.

C. **I Now Believe That Roche and Freedman's Purported Concern Over Executing a Partnership Agreement Was Disingenuous and Pretextual.**

92.      Roche's February 12, 2021 email to Cyrulnik cited among the grounds for removal that Cyrulnik had "mocked Nate for his concerns over . . . the MOU's obligation to enter into a definitive partnership agreement." I now believe that Roche and Freedman's purported concern over this obligation was pretextual. As discussed above in paragraphs 60–77, Freedman refused to sign any agreement unless it included equity-based voting, which the AMOU had not contemplated, and both Roche and Freedman took the unfounded position that I could not receive a K-1 unless I signed a definitive partnership agreement with terms that were favorable to them.  During 2020, neither Roche nor Freedman had expressed urgency about finalizing a partnership agreement. During the February 8, 2021 meeting, Normand made an

35

observation to the effect that if not negotiating a definitive partnership was cause for removal, then Holcomb was the only partner who shouldn't be removed.

### D. I Now Believe That Roche and Freedman's Purported Concern Over Marginalization of Other Founding Partners Was Disingenuous and Pretextual.

93.     Roche's email cited among the grounds for removal that Cyrulnik had taken repeated actions to "marginalize other founding partners from meaningfully participating in the firm's operations" and had made a "sustained attempt to exercise unilateral control." I now believe that Roche and Freedman's purported concern over marginalizing other partners and exercising unilateral control was pretextual. During 2020, I believed that Roche, Cyrulnik, and Freedman had centralized power over the firm for themselves. When I voted to remove Cyrulnik, I believed, and Roche gave me assurances (as described in paragraph 36), that there was some chance that my vote would result in more equitable governance over the firm in the future. As discussed above in paragraphs 79–89, however, Roche and Freedman proceeded to exercise largely unilateral control over the firm and denied me the basic rights of a partner, such as the ability to review the firm's financial information. Among the consequential actions they took unilaterally, and without even informing me, was proceeding with a project to "tokenize" litigation funding and efforts to raise $100 million from an outside investor for the project.

### E. I Now Believe That Roche and Freedman's Purported Concern Over Adversarial Tactics Was Disingenuous and Pretextual.

94.     Roche's email cited among the grounds for removal that Cyrulnik had "consistently leverage[ed] adversarial tactics, like temporizing, to the detriment of the firm." I now believe that Roche and Freedman's purported concern over such adversarial tactics was pretextual. As discussed above, Roche and Freedman engaged in adversarial tactics, including stalling finalization of a definitive partnership agreement until they could leverage the unfounded

position that I was not yet an equity partner by threatening to withhold my K-1 unless I agreed to their terms (¶¶ 60–77) and deflecting my requests for the firm's financial information (¶¶ 79–86). Roche and Freedman also deflected repeated inquiries on my part regarding the tax treatment of the Tokens.

### F. I Now Believe That Roche and Freedman's Purported Concern Over Attempts to Exercise "Veto Power" Were Disingenuous and Pretextual.

95.     The firm's Complaint against Cyrulnik alleged that one of the grounds for Cyrulnik's removal was "refusing to take part in and discuss the management of the Firm in an attempt to exercise 'veto power' over management and hiring decisions." As discussed above in paragraphs 28–37, Freedman had refused to vote for Cyrulnik's removal unless he received veto powers in the AMOU.

96.     I was skeptical at the time of the vote to remove Cyrulnik and the filing of the firm's Complaint against Cyrulnik that Freedman had any genuine belief that attempts to exercise veto powers were improper, because that position was plainly inconsistent with Freedman's insistence on veto rights for himself.

97.     However, at the time of the vote to remove Cyrulnik, I had confidence in Roche's integrity and motivations that I no longer have. I have seen that in Roche's deposition, he testified that veto rights for him and Freedman were implemented based on discussions with counsel and were not discussed outside of conversations with counsel. That is false. As discussed above in paragraphs 28 and 35, not only did we have lengthy discussions of veto rights at the February 8, 2021 meeting after Freedman conditioned his vote to remove Cyrulnik's on securing veto rights for himself, Roche and I had additional discussions about veto rights in between that meeting and the February 10, 2021 removal vote.

### G. I Believe That Roche and Freedman's New Allegations of Racism Against Cyrulnik Are Disingenuous and Pretextual.

98.     I learned during the summer of 2022 that Freedman—who had seized responsibility for managing the Cyrulnik litigation—had decided to develop the position that Cyrulnik had discriminated against a black associate, Kelvin Goode, because Cyrulnik had been reluctant to staff Goode to his cases. I first learned this by reviewing the Dropbox folder in which the firm's files related to the Cyrulnik litigation were stored. I never heard of any allegations of racism on Cyrulnik's part before the summer of 2022, well into the litigation. To my knowledge, this issue was never discussed amongst the Founding Partners before the vote to remove Cyrulnik. I have no basis to conclude and do not believe that Cyrulnik is racist.

99.     During a call amongst the equity partners in early 2022, Roche said Goode had done poor work on an arbitration, that he hadn't put any thought into his work, and that he needed to be told that he would not make partner at the firm and should explore options elsewhere. Normand and I were assigned responsibility for conducting Goode's performance review and conveying this message to him. This assignment is reflected in an April 6, 2022 email chain, a copy of which is attached as **Exhibit 33**. The firm's Director of Operation circulated written performance reviews, including Goode's, as attachments to an April 14, 2022 email. A copy of this email with Goode's review summary (but with other associate review summaries omitted) is attached as **Exhibit 34**. Communications related to the scheduling of the review are contained in an email chain attached as **Exhibit 35**. The performance review was pushed back when Normand had a scheduling conflict. It was after that that I learned of Freedman's efforts to claim that Cyrulnik was racist because he allegedly had not wanted to work with Goode; this issue had never been discussed with me. I was unwilling to conduct Goode's performance review under these circumstances—*i.e.* when Roche and Freedman were accusing Cyrulnik of being a racist for not wanting to work with Goode, yet simultaneously instructing me to give a negative

38

performance review of Goode and counsel him out of the firm. I told Normand so during a conversation that I scheduled with him in a June 16, 2022, email. A copy is attached as **Exhibit 36**.

100.    I had a more favorable view of Goode's performance than the view Roche ultimately expressed prior to pushing for him to be counseled out of the firm. I believed that Goode had both strengths and weaknesses and that he had made progress during his time at the firm, but that he had not distinguished himself such that he was ready to be promoted to partner. But setting aside the actual merits of Goode's performance, it is plainly inconsistent and hypocritical for Roche and Freedman to allege racism against Cyrulnik for allegedly not wanting to work with Goode while at the same time instructing that Goode be counseled out of the firm for what they deemed poor performance.

**H. I Now Believe That Roche and Freedman Were Motivated in Significant Part by Their Desire to Secure Power and Financial Benefits, Including in Particular the Ava Labs Tokens.**

101.    Roche and Freedman have said that their motivations for seeking to remove Cyrulnik had nothing to do with taking his Tokens. However, their behavior has led me to conclude that they took advantage of the conflicts that had developed among the partners in early 2021 and that they were in fact motivated to take the Tokens allocated to Cyrulnik in the MOU. As discussed above in paragraphs 33–34 and 50–52, Roche and Freedman used the negotiation of the AMOU as an opportunity to defraud me out of 25% of the Tokens I was owed. And as discussed above in paragraph 57, Roche betrayed his keen interest in Cyrulnik's Tokens when he said to me that he had worked for everything he has, that he had achieved great success with Ava Labs, that Cyrulnik was a terrible person who did not contribute anything to the firm, and that Roche wasn't going to let Cyrulnik take the Tokens.

102.    The fact that Roche and Freedman have taken plainly hypocritical positions as

purported justification for their own support for removing Cyrulnik reinforces my view that they have made disingenuous claims about their own motivations as cover for actions on their part that were in fact motivated by their own desires for power and financial benefits, including especially the Tokens.

## VII.     I LEAVE THE FIRM AFTER CONCLUDING I CAN NO LONGER BE PARTNERS WITH ROCHE AND FREEDMAN

103.     On Monday, August 29, 2022, I learned that a few days earlier, on Friday, August 26, a website called Cryptoleaks had published a story about Roche with links to a series of videos of him: https://cryptoleaks.info/case-no-3.

104.     I would later learn that the videos were taken during meetings in which Roche was serving as Ava Labs' representative in efforts to raise $100 million in funding for an ILO project known as "Ryval" from Christen Ager-Hanssen, a Norwegian businessman reputed to be a billionaire. After I was alerted to the videos, I promptly went online to view them.

105.     I was shocked and appalled by what I saw, and I was not personally comfortable with the firm's response after the Cryptoleaks videos exposed Roche's disregard for ethical obligations. I concluded that I had to leave the firm because I could not remain partners with Roche and Freedman. I gave notice of my departure on September 18, 2022.

106.     In a departure email to Roche and Freedman, I made an offer of settlement with respect to my compensation upon separation from the firm. Roche responded in an email the next day stating that any such discussion "must wait until after your testimony is taken in the Cyrulnik litigation to avoid any appearance of impropriety." A copy of this email chain is attached as **Exhibit 37**. My deposition in the Cyrulnik litigation took place on September 29, 2022, and October 18, 2022 was my last day at the firm. I have not been paid any compensation at all since I left the firm; nor did I receive any Tokens during the six months prior to my departure from the

firm.

107.     The number of Tokens I received, and the dates I received them, are as follows: 13,500 on August 17, 2021; 10,625 on November 13, 2021; 2,437.5 on February 15, 2022; and 2,437.5 on May 12, 2022. This represents only a small fraction of the 5% that I was promised in the MOU. Attached as **Exhibit 38** is a composite of screenshots of transaction records for my AVAX wallet. These transactions include rewards that I received after I "staked" Tokens that I had received. The fact that Roche and Freedman have misappropriated Tokens promised to me gives me additional reason to conclude that they were intent on taking Cyrulnik's Tokens when they engineered his removal.

108.     Following my departure from the firm, I have sought to obtain copies of the complete files related to pending litigations with Cyrulnik and Fattaruso. I am a named defendant in both litigations and it is my understanding that a party represented in a litigation by an attorney is entitled to that attorney's file related to the litigation. ████████████████████

███████████████████████████████████████████████████████████

████ I am not aware of Kaplan Hecker being involved in the collection or production of documents in the case with the exception of the collection from the "Signal" messaging application; it is my understanding that attorneys within the firm had primary responsibility for collecting and producing documents as well as maintaining case files, including files related to representation of me personally. I then requested the file from Tyler Maulsby of Frankfurt Kurnit Klein & Selz PC, who represents the firm and who was negotiating with me on the firm's behalf regarding the terms of my separation from the firm. A copy of this November 22, 2022, email chain is attached as **Exhibit 39**.

109.    I repeated my request for the files in the Cyrulnik and Fattaruso litigations in a December 10, 2022, email. A copy is attached as **Exhibit 40**. I never received a response. To this day, there are many portions of these files that I have never seen, including deposition transcripts, expert reports, and the document database for the Cyrulnik litigation. The fact that Freedman and the firm have suppressed case files to which I am clearly entitled as a party to the Cyrulnik and Fattaruso litigations makes me suspect that Roche and Freedman have even more to hide than I already know.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: May 4, 2023

Nathan A. Holcomb