UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

ROCHE FREEDMAN LLP,

                         Plaintiff,              21-cv-1746 (JGK)

           - against -                           OPINION AND ORDER

JASON CYRULNIK,

                         Defendant.
————————————————————————————————
JASON CYRULNIK,

              Counterclaim-Plaintiff,

           - against -

ROCHE FREEDMAN LLP, ET AL.,

              Counterclaim-Defendants.
————————————————————————————————

JOHN G. KOELTL, DISTRICT JUDGE:

     The plaintiff, Roche Freedman LLP (the "Firm") brought this

action for a declaratory judgment, breach of fiduciary duty, and

intentional interference with contract against Jason Cyrulnik

("Cyrulnik"), a founding partner of the Firm.[1] See ECF No. 31.

_____

[1] When these motions to dismiss were briefed, this action was
captioned Roche Cyrulnik Freedman LLP v. Jason Cyrulnik. On
August 15, 2022, the Clerk of Court changed the caption to Roche
Freedman LLP v. Jason Cyrulnik. ECF No. 201. "Roche Cyrulnik
Freedman LLP" was then terminated as a party and replaced with
"Roche Freedman LLP." In the interest of clarity, this
Memorandum Opinion & Order will refer to the plaintiff by the
name listed on the caption: Roche Freedman LLP. This naming
decision is not a judicial determination that Cyrulnik is no
longer a partner in the Firm; he alleges that he is still a
partner. See ECF No. 72 ¶ 106 ("Cyrulnik remains a Founding
Partner and Co-Chairperson of [Roche Cyrulnik Freedman LLP].");

Jurisdiction is based on diversity of citizenship. See 28 U.S.C. § 1332. Cyrulnik then brought a host of statutory and common-law counterclaims against the Firm and five of its then-attorneys -- Kyle Roche, Devin Freedman, Amos Friedland, Nathan Holcomb, and Edward Normand (the "Individual Counterclaim-Defendants" and, with the Firm, the "Counterclaim-Defendants") -- arising from what Cyrulnik alleges was his wrongful removal from the Firm. See ECF No. 73 ¶¶ 103-74.[2] In a Memorandum Opinion and Order dated March 28, 2023, this Court granted in part and denied in part the Individual Counterclaim-Defendants' motions to dismiss the counterclaims. See Roche Freedman LLP v. Cyrulnik, No. 21-cv-1746, 2023 WL 2663648, at *1, *10 (S.D.N.Y. Mar. 28, 2023)("March 2023 Opinion"), ECF No. 374.[3]

Cyrulnik's surviving counterclaims include the following: (1) dissolution pursuant to Florida Statutes § 620.8801; (2) statutory buyout against the Firm pursuant to Florida Statutes § 620.8701; (3) an accounting pursuant to Florida Statute §

---

see also ECF No. 277 (November 9, 2022 letter by Cyrulnik continuing to refer to the case as Roche Cyrulnik Freedman LLP v. Cyrulnik).

[2] Nathan Holcomb has since settled with the plaintiff and been dismissed from this action. See ECF No. 447.

[3] Cyrulnik's statutory buyout claim, Count 2, was dismissed against the Individual Counterclaim-Defendants. See March Opinion, at *7. But Count 2 was not dismissed against the Firm. See id. Count 3 of the Counterclaims was dismissed against the Individual Counterclaim-Defendants to the extent Cyrulnik sought an accounting under Fla. Stat. § 620.1407. Id. at *5 n.5.

620.8403; (4) breach of contract (against the Individual
Counterclaim-Defendants); (5) breach of the covenant of good
faith and fair dealing (against the Individual Counterclaim-
Defendants); (6) breach of fiduciary duty (against the
Individual Counterclaim-Defendants); (7) conversion; (8) unjust
enrichment; (9) promissory estoppel (against the Individual
Counterclaim-Defendants); and (10) civil conspiracy (against the
Individual Counterclaim-Defendants). See March 2023 Opinion, at
*1, *10; ECF No. 72 ¶¶ 103-74.

The parties have now filed cross-motions for summary
judgment. In its motion for summary judgment, the Firm and the
four remaining partners seek summary judgment on the first claim
for a declaratory judgment that Cyrulnik was lawfully removed.
See ECF No. 416, at 3, 44. The Firm asserts that Cyrulnik was
terminated for "cause" and thereby "withdrew" from the Firm. Id.
at 9, 34. They also seek summary judgment dismissing Cyrulnik's
counterclaims. Id. at 9-10, 44.

Cyrulnik, in turn, seeks summary judgment dismissing the
three claims by the Firm, see ECF No. 432 at 25, 38, and
granting judgment on all of his counterclaims, see id. at 25,
31-32 n.11, 33. He also seeks summary judgment dismissing a
separate claim by Roche that claims fraudulent inducement in
connection with Cyrulnik's alleged representation to Roche and
Freedman that he had a competing offer from the law firm

Patterson Belknap Webb & Tyler LLP (the "Patterson Offer"). See
id. at 38-42; ECF No. 385 at 30-33. Cyrulnik also moves for
summary judgment that he is entitled to a portion of the
contingency interest in any recovery from the "Kleiman
litigation," see ECF No. 385 at 5-6, 11, which is based on an
agreement memorialized in the "Side Letter," ECF No. 510 ¶ 17;
Declaration of Jason Cyrulnik, ECF No. 434 ("Cyrulnik Decl."),
Ex. 7 (the "Side Letter"). The Side Letter represents an
agreement by Roche and Freedman to give Cyrulnik 25% of
recoveries from the Kleiman v. Wright litigation "should Roche,
Freedman, Roche Freedman LLP, or RCF be entitled to any
contingent recovery in connection with" that litigation.
Cyrulnik Decl. Ex. 7 at 3.

**I.**

The standard for granting summary judgment is well
established. "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.
L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).

"[T]he trial court's task at the summary judgment motion
stage of the litigation is carefully limited to discerning
whether there are any genuine issues of material fact to be

4

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. However, "disputed legal questions . . . present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990).[4]

When, as in this case, both parties seek summary judgment, "the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." Ramos v. N.Y.C. Dep't of Educ., 447 F. Supp. 3d 153, 155 (S.D.N.Y. 2020). And, "[b]ecause this case involves enforcement of an alleged contract, the intentions of the parties are at issue. While this is frequently a source of persistent disputes of fact, where a question of intention is determinable by written agreements, the question is one of law, appropriately decided on a motion for summary judgment." Brown v. Cara, 420 F.3d 148, 152–53 (2d Cir. 2005).

## II.

The following facts are based on the parties' Local Civil Rule 56.1 statements, counterstatements, and supporting papers, and are undisputed unless otherwise noted. The Court also

---

[4] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

assumes familiarity with the March 2023 Opinion, including its extensive description of the facts of this case. See March 2023 Opinion, at *1-4.

## A.

In 2004, Cyrulnik graduated from law school and joined the law firm Boies Schiller Flexner LLP ("BSF"). ECF No. 507 ¶ 1; ECF No. 521 ¶ 1. In summer 2019, Roche and Freedman, two more junior attorneys at BSF, left BSF to form Roche Freedman LLP, a law firm focusing on cryptocurrency and other specialized practice areas. ECF No. 515 ¶ 1; ECF No. 72 ¶ 1. They registered Roche Freedman LLP as a Florida limited liability partnership. ECF No. 515 ¶ 1. Among the Firm's early clients was a technology startup (the "Startup") that agreed to pay the Firm for its legal services with cryptocurrency known as "Tokens." ECF No. 507 ¶ 7; ECF No. 515 ¶ 96-97.

Throughout summer and fall 2019, Roche Freedman LLP tried to recruit Cyrulnik, who alleged that he was being recruited by several national law firms. ECF No. 507 ¶ 5; ECF No. 521 ¶ 1, 5. In exchange for Cyrulnik's agreement to leave BSF, Roche and Freedman promised him significant stakes in what they described as their high-upside contingency work, including the Kleiman litigation, and in certain assets they had secured. ECF No. 521 ¶¶ 7, 11. After negotiations, Cyrulnik agreed to leave BSF to form the law firm Roche Cyrulnik Freedman LLP ("RCF"), a Florida

6

limited liability partnership. Id. ¶ 6. On December 27, 2019,
RCF's six founding partners -- name partners Cyrulnik, Roche,
and Freedman, together with Friedland, Holcomb, and Normand --
signed a Memorandum of Understanding to govern the partnership.
See ECF No. 510 ¶ 9; ECF No. 507 ¶ 14; see also Declaration of
Jonathan Bach, ECF No. 425 ("Bach Decl."), Ex. 21 (the "MOU"). A
seventh partner was added to RCF in January 2020 – Paul
Fattaruso – although he was not added to the MOU. See ECF No.
507 ¶ 16; Cyrulnik Decl. ¶ 20.

The MOU's "Compensation Model" set forth distribution
methodologies for revenue earned through hourly and contingency
matters. MOU § III; see ECF No. 507 ¶ 12. Beyond compensation
from these matters, the MOU also entitled Cyrulnik to 27% of the
Firm's equity, the largest share, plus 25% of a fixed allocation
of the Tokens to be issued by the Startup. MOU §§ II (Equity in
the Firm), IV(A) (Finance Agreement - Tokens).

Two provisions of the MOU governed the departure of a
Founding Partner from the Firm. Id. §§ VI(C), (G). Under the
first section, "Withdrawal from Firm," a Founding Partner who
withdrew from the Firm within 18 months of the Firm's formation
would be entitled only to compensation under the Firm's
Compensation Model and would be required to return his equity
"to the balance of the firm's equity partners pro-rata." Id. §
VI(C) (the "Withdrawal Provision"); see also ECF No. 507 ¶ 12.

The second section, "Partner Removal," provided that a "Founding Partner cannot be removed without cause" and that, even if cause arose to remove a Founding Partner, that removal would require a two-thirds vote of the Firm's equity partners. MOU § VI(G) (the "Removal Provision"); ECF No. 507 ¶ 12. In contrast to the Withdrawal Provision, the Removal Provision did not expressly provide that an involuntary removal would result in the forfeiture of any compensation, interests, or assets owed or allocated to a partner under the MOU. See MOU § VI(G).

**B.**

A week after signing the MOU, on January 4, 2020, Roche, Cyrulnik, and Freedman executed the Side Letter. ECF No. 507 ¶ 18; ECF No. 515 ¶ 17; Side Letter.[5] The Side Letter provided that Roche will pay Cyrulnik and Freedman in four installments for the privilege of being listed first in the name of RCF, although such payments would be forfeited if either recipient is "terminated for cause" before a payment is due. See Side Letter; ECF No. 507 ¶ 18. The Side Letter also provided that Cyrulnik would receive a 25% interest in the Firm's anticipated recovery in the Kleiman litigation. See Side Letter; ECF No. 507 ¶ 19.

---

[5] The top of the Side Letter reads "Memorandum of Understanding January 4, 2019," but the year appears to have been a typo. The parties do not dispute that the letter was signed in January 2020. See ECF No. 515 ¶ 17; ECF No. 507 ¶ 18.

c.

In January 2021, the Tokens issued by the Startup escalated in value. ECF No. 507 ¶ 30. At this point, Cyrulnik alleges, his partners no longer needed the revenue from his client base to fund the Firm's operations, and they schemed to remove him. See id. ¶¶ 34-39. On February 10, 2021, Roche, Freedman, Normand, Holcomb, and Friedland convened a "secret meeting," to which Cyrulnik and the Firm's seventh equity partner, Paul Fattaruso -- allegedly the only partner at the Firm who worked regularly with Cyrulnik on the Firm's core matters -- were not invited. See ECF No. 507 ¶ 35, 39; ECF No. 515 ¶ 78.

Two days later, on February 12, 2021, the Individual Counterclaim-Defendants advised Cyrulnik by email that he had been removed from RCF for "cause." ECF No. 106-3 (the "Removal Email") at 1; ECF No. 515 ¶ 93; ECF No. 507 ¶ 40. Among the charges were that Cyrulnik "breached the 2019 MOU" by "failing to work together and co-operate in good faith and to fully participate to develop the Firm," and that Cyrulnik had "engaged in a pattern of conduct that has made it not reasonably practicable to carry on the firm and its operations with [Cyrulnik's] involvement." Removal Email at 1. Cyrulnik's co-Founding Partners asserted that he verbally abused them, exercised "unilateral control over" staffing, created "unsustainable environments for associates," sought to

9

"undermine the intent of the MOU and marginalize other founding partners," and refused to "participate in firm-related discussions in good faith." Id. All five Individual Counterclaim-Defendants signed the Removal Email. Id.

Cyrulnik alleges that the other partners attempted to oust him from the firm rather than pay him for his share of the Tokens. Cyrulnik asked the Counterclaim-Defendants to commit that they would remit to him assets and compensation owed, including the Tokens. ECF No. 507 ¶ 43. Through counsel, Cyrulnik stated that he would be willing to discuss mediation if the Firm confirmed that it would remit to Cyrulnik his assets. Cyrulnik Decl. ¶ 49.

On February 27, 2021, the Firm brought this action against Cyrulnik. See ECF No. 1. The original complaint was filed in this Court on February 27, 2021, id., and on March 9, 2021, Cyrulnik responded, suing the Firm and the remaining Founding Partners in Florida state court, and alleging that he had been wrongly removed without cause and was entitled to what he was allegedly promised in the MOU. See Cyrulnik v. Roche, No. 2021-5837-CA-01 (Fla. 11th Cir. Ct. Mar. 9, 2021). The Firm amended its complaint on July 2, 2023, adding claims against Cyrulnik for breach of fiduciary duty and intentional interference with contract. ECF No. 31 ¶¶ 90-108. After unsuccessfully moving to dismiss the amended complaint, see Roche Cyrulnik Freedman LLP

10

v. Cyrulnik, 582 F. Supp. 3d 180, 184 (S.D.N.Y. 2022), on March
2, 2021, Cyrulnik then filed common-law and statutory
counterclaims under Florida's Revised Uniform Partnership Act
(the "FRUPA") against the Firm and the other Founding Partners.
See ECF No. 72. This Court granted in part and denied in part
the Individual Counterclaim-Defendants' motions to dismiss the
counterclaims. See March 2023 Opinion, at *1, 10.

### III.

There is a threshold question of whether the substantive
law of Florida or New York is to be applied to the
interpretation of the MOU and Cyrulnik's common-law causes of
action. It is well-settled that a federal court sitting in
diversity applies the choice of law rules of the forum state.
Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97
(1941). And, "under New York law, the first step in any case
presenting a potential choice of law issue is to determine
whether there is an actual conflict between the laws of the
jurisdictions involved; if no conflict exists, then the inquiry
ends." EMA Fin., LLC v NFusz, Inc., 444 F. Supp. 3d 530, 540
(S.D.N.Y. 2020). Because the MOU does not include a choice of
law provision, see MOU, and the parties both propose
interpretations of the MOU based on New York law, see ECF No.
416 at 10; ECF No. 475 at 18 n. 4 (Cyrulnik asserting that
Florida law applies, but agreeing that no conflict exists with

11

respect to Florida and New York law on this issue); Hearing Tr. 49-51 (Cyrulnik asserting the same), this Court will apply New York law to the claims involving the MOU. See Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989).[6]

With respect to three of Cyrulnik's remaining counterclaims, dissolution (Count I), accounting (Count III), and breach of fiduciary duty (Count VII), the parties agree that these claims are governed by the FRUPA, see ECF No. 432, at 23; ECF No. 416, at 39-41, and the Court can also accept that agreement, see Tehran-Berkeley, 888 F.2d at 242. Finally, because there is no conflict between New York and Florida law, with respect to Cyrulnik's common-law counterclaims, this Court will apply New York law. See Wall v. CSX Transp., Inc., 471 F.3d 410, 422 (2d Cir. 2006) ("As there is no conflict, for practical reasons, that is, for ease of administrating the case, New York, as the forum state, would apply its law.").

## IV.

The parties have cross-moved for summary judgment on the Firm's claim for a declaratory judgment, disputing whether the Firm breached the contract, in this case the MOU, by terminating

---

[6] The one exception noted by Cyrulnik is the definition of "cause" under Florida law. See Hearing Tr. at 50. But as discussed below, this issue does not affect the disposition of the current motion.

Cyrulnik, without "cause." See ECF Nos. 416, 432. The Firm and
the Individual Counterclaim-Defendants assert that there was a
condition precedent to the binding nature of the MOU -- namely
the execution of a limited partnership agreement and, because
that agreement was never executed, there was no binding
agreement that could have been breached. See ECF No. 416 at 10-
13. In the alternative, they allege that the MOU was only a Type
II preliminary agreement and therefore simply an agreement to
negotiate in good faith toward a binding partnership agreement
and that they, unlike Cyrulnik, continued to negotiate in good
faith. Id. at 14-23 (citing Brown, 420 F.3d at 154). Finally,
even if there was a binding partnership agreement in the MOU,
the Firm and the Individual Counterclaim-Defendants claim that
there was "cause" to terminate Cyrulnik under the terms of the
MOU. Id. at 25-33. Moreover, they claim that a termination for
cause should be considered a "withdrawal" under the terms of the
MOU and pursuant to the MOU, a "withdrawing partner" forfeits
his equity. Id. at 34-36.

### A.

As an initial matter, the "question for the court on a
motion for summary judgment with respect to a contract claim is
whether the contract is unambiguous with respect to the question
disputed by the parties." Law Debenture Tr. Co. of N.Y. v
Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). And, "the

matter of whether the contract is ambiguous is a question of law for the court." Id. "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement." Id. at 467. And, "language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." Id.

The MOU unambiguously creates a binding partnership agreement. Any argument that there was a condition precedent -- the completion of a partnership agreement -- that was never satisfied and therefore, there was no binding contract -- fails as a matter of law. The Firm argues that there was no partnership agreement because in one clause of the MOU, the MOU used the word "after." See MOU § II.[7]  But that word appears only in Section 2 relating to Equity and it refers to the execution

---

[7] The MOU provides:

> After execution of the Partnership Agreement, and effective January 2020, the equity division in the Firm will be the following:
>
>> Jason Cyrulnik – 27%
>> Velvel Freedman – 24%
>> Amos Friedland – 10%
>> Nathan Holcomb – 10%
>> Edward Normand – 10%
>> Kyle Roche – 19%

MOU § II (emphasis added).

14

of a partnership agreement that would be retroactive to January 2020. See MOU § I. The clause does not state that none of the agreements in the MOU would be binding until the partnership agreement was executed.

Furthermore, the parties intended the partnership agreement to be retroactive: Cyrulnik acknowledged in his deposition that the MOU contemplated that the "partnership agreement was supposed to be executed after January 1st, 2020 but made effective as of January 1st, 2020." ECF No. 515 ¶ 10. And Freedman explained, "we are trying to build a firm, trying to be collegial, friendly, trying to create lasting relationships. We don't want to be poking people in the eye saying you're not an equity partner, you're not an equity partner yet when we were fully expecting them to be retroactively on January 1." Cyrulnik Decl. Ex. 10 at 303:6-22. Language evidencing the retroactive effect of a contemplated formal agreement weighs in favor the parties' intent to be bound. See In re Application of NAP, Inc., No. 96-cv-640, 1996 WL 221623, at *2-4 (S.D.N.Y. May 1, 1996) ("The retroactive effective date provision supports [the respondent's] contention that the parties intended to be bound by the [Letter]"); see also I.R.V. Merch. Corp. v. Jay Ward Prods., Inc., 856 F. Supp. 168, 173 (S.D.N.Y. 1994)(finding that although a more formal agreement was contemplated, the statement

that the preliminary licensing agreement was effective as of its
date, was evidence that the parties intended to be bound).

Moreover, there are many other clauses in the MOU that
indicate it is a binding contract, not dependent on the
execution of the partnership agreement. For example, the MOU
says that it sets out "the basic terms upon which the Founding
Partners" will enter into a partnership agreement. MOU § 1.
Section III states that the Firm "will distribute revenue to its
partners according to the Firm's Partnership Compensation
Model." MOU § 3. In another section, the MOU provides that the
"Founding Partners understand that Roche Freedman LLP has agreed
to distribute its Ava Labs Tokens according to the following
breakdown." MOU § IV(B). Footnote 3 of the MOU expressly states
that the "Token Consideration the Firm received for Ava Labs
shall be distributed as set forth in Section VI." MOU § V n.3.
The provisions with respect to Withdrawal from the Firm and
Partner Removal are stated affirmatively and not conditionally.
Id. §§ VI(C); VI(G). There is, in short, no basis in the MOU to
conclude that the parties viewed it as contingent on the
execution of a formal partnership agreement.[8]

---

[8] The Firm relies on Brown v. Cara to support its contention that
the MOU did not create an enforceable contract. See ECF No. 416
at 14-24 (citing 420 F.3d 148 (2d Cir. 2005)). But Brown
involved an agreement between a development contractor and an
equipment company, that contemplated developing a property for
commercial and residential use. Brown, 420 F.3d at 151. The

It is particularly misplaced for the Firm to argue that the MOU is not binding because of the existence of a condition precedent when the Firm never made such an argument in its Amended Complaint. See ECF No. 31. The Amended Complaint seeks a declaratory judgment that Cyrulnik was removed from the partnership for cause pursuant to the MOU § VI (G), see ECF No. 31 ¶ 88-89, not that a partnership was never formed. While it is true that the parties are not bound by that pleading, it is evidence of their intent and, if at the time of the Amended Complaint, they did not perceive that they were not bound because of the failure of a condition precedent, it is not plausible that they really intended such a result. Moreover, as explained below, the actions of the parties strongly argue against the existence of a condition precedent that was not fulfilled. The Firm relied on the MOU to induce Cyrulnik to join the Firm, which he did. See ECF No. 507 at ¶ 12; ECF No. 515 ¶¶ 2-9. Thereafter, the Firm specifically relied on the terms of

---

parties in that case signed a two-paged MOU in which the parties "agreed to work together." Id. The MOU in Brown set forth a "general working framework," id.; it did not include "all necessary elements of the contract," id. at 154. By contrast, the MOU signed by the Individual Counterclaim-Defendants and Cyrulnik included the necessary elements, including the equity division, distribution of firm revenue, assignment of assets, treatment of existing cases, and firm management, see MOU §§ II-VI, and reflected the parties' intention to "form a partnership between Jason Cyrulnik, Velvel Freedman, Amos Friedland, Nathan Holcomb, Edward Norman, and Kyle Roche," id.

the MOU to terminate Cyrulnik, allegedly for "cause." See ECF
No. 507 ¶ 17; ECF No. 515 ¶ 93.

The Counterclaim-Defendants contend that Cyrulnik relies on
contested extrinsic evidence to support his interpretation of
the MOU, and that "numerous disputes of material fact . . . bar
any grant of summary judgment in his favor." ECF No. 460 at 9.
For example, the Firm refers to Cyrulnik's message to another
signatory, in which he states: "I think the drafting of whatever
[signatory] sent around leaves a bit to be desired, but we'll
just work it out later so we can get this thing signed." Id. at
11. In his deposition, Cyrulnik also admitted that he envisioned
the parties would prepare a "long-form" partnership agreement,
that would be executed after January 1, 2020. ECF No. 510 ¶ 10.
But this extrinsic evidence only makes the case stronger that
the parties intended to form a binding parentship agreement when
they executed the MOU. Cyrulnik's messages and testimony
demonstrate that Cyrulnik anticipated amendments to the MOU, not
that the MOU failed to set forth a binding partnership
agreement. Indeed, Section VI of the MOU describes the process
through which the Firm may amend the terms of "these obligations
and requirements" upon the affirmative vote of all the Founding
Partners of the Firm. MOU § VI(M). That the MOU could be amended
through an agreed-upon process does not detract from the
unambiguous and binding terms of the agreement.

Moreover, the drafting history of the MOU also establishes the parties' intent to execute a binding agreement. On December 8, 2019, Cyrulnik received a draft of the MOU from Roche that contained the following language: "This MOU does not create a binding agreement and will not be enforceable against any of the Founding Partners." Cyrulnik Decl. Ex. 51 at 3. On December 9, 2019, Cyrulnik circulated a draft of the MOU with that "non-binding" language removed. See id. Ex. 48 at 4. Freedman responded on December 10, 2019 that Cyrulnik's "redlines are fine." Id. Ex. 49 at 2. The non-binding language was never reinserted back into the MOU. Thereafter, in addition to Cyrulnik's edits, on December 11, 2019, Holcomb made additional revisions to ensure that the MOU was binding.[9] See Cyrulnik Decl. Ex. 3 ¶¶ 6-7. This drafting history is probative of the parties' intent. See Vacold LLC v. Cerami, 545 F.3d 114, 127 (2d Cir. 2008) (concluding that the drafting history of an agreement supported the Court's finding of a Type I agreement, even though

---

[9]  The initial draft of the MOU stated that "[t]his MOU sets out the basic terms upon which the Founding Partners would be prepared to enter into a binding partnership agreement to use their respective skills . . . for the purpose of building a high-end litigation-oriented law firm . . . ." Cyrulnik Decl. Ex. 3 ¶ 7. In his December 11, 2019 email, Holcomb proposed the following changes: "This MOU sets out the basic terms upon which the Founding Partners **will** enter into a **definitive** partnership agreement to use their respective skills . . . for the purposes of building a high-end litigation orientated law firm." Id. (emphasis added). Holcomb's language was included in the final MOU.

that agreement contemplated the preparation and execution of a
subsequent contract).

**B.**

The Firm's alternative argument that the MOU created a
"framework for future negotiations," ECF No. 416 at 13, rather
than a binding preliminary agreement, also fails. Federal courts
applying New York law have distinguished between "Type I" and
"Type II" preliminary agreements. See Brown, 420 F.3d at 153.
The Firm contends that it is entitled to summary judgment
because the MOU was not a "Type I" binding preliminary agreement
even though a final written agreement is still contemplated, but
instead a "Type II" preliminary agreement, which is only a
binding agreement to negotiate in good faith toward the
execution of the final written agreement. See ECF No. 416 at 14-
24; see also Tchr.'s Ins. & Annuity Ass'n v. Tribune Co., 670 F.
Supp. 491, 498 (S.D.N.Y 1987) (introducing the Type I and Type
II framework to analyze whether a preliminary agreement is a
binding contract). The relevant factors in this case point
unmistakably to a Type I agreement. See Adjustrite Sys., Inc. v.
GAB Bus. Servs., Inc., 145 F.3d 543, 549 (2d. Cir. 1998)
(reviewing four factors). Significantly, as discussed above, the
Firm did not dispute that the MOU was a binding partnership
agreement in the Amended Complaint. See ECF No. 31. Rather the
Firm asked for a declaration that Cyrulnik was removed for cause

20

and that the removal was subject to the withdrawal provision in the MOU, and that Cyrulnik was not entitled to any further compensation. Id. at ¶¶ 26, 64-72. The Firm attempts to explain away the Amended Complaint by saying that it is not bound by the Amended Complaint, and that the Amended Complaint was drafted at the beginning of the case. See ECF No. 460 at 12 n.3. But the Firm and its partners should know what the parties agreed to, and the Amended Complaint is powerful evidence that the partners knew they were bound by the MOU to a partnership agreement with Cyrulnik.

As to whether this was only a Type II binding agreement to negotiate in good faith, the necessary indicia establish that this was a Type I preliminary agreement, binding by its terms and preliminary in name only. The Second Circuit Court of Appeals has identified four factors to be considered in determining whether the parties to a preliminary agreement intended to be bound by that agreement in the absence of an executed final instrument, including "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." Adjustrite Sys., Inc., 145 F.3d at 549;

see also Brown, 420 F.3d at 154 (restating the four factors).
The first factor is "frequently the most important." Brown, 420
F.3d at 154; see also Adjustrite, 145 F.3d at 549 (asserting the
same).

Applying those factors to the MOU, the parties indisputably
executed a Type I preliminary agreement. First, there is no
language that says the parties are not bound until there is a
final agreement. Rather, there are numerous indications in the
text that the parties expressed an intent to be bound. And the
only indication that the parties are not yet bound is the use in
one clause of the word "after," see Bach Decl. Ex. 21, but that
reference is weakened by the fact that the clause simply refers
to the fact that the anticipated agreement will be retroactive
to January 2020, see id. at 3.

Second, there was clear evidence of partial performance.
The parties worked together as partners for over a year, see ECF
No. 72 ¶ 4, reported to the government as a partnership, see ECF
No. 507 ¶ 17, conducted public relations under the new firm
name, and entered into engagement letters under the new firm
name, see, e.g., Cyrulnik Decl. Exs. 43-44. Although partial
performance is not a dispositive factor, see, e.g., Arcadian
Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir.
1989), the Firm's year-long operations provide additional proof
that the parties intended to be bound to the terms of the MOU,

22

see Viacom Int'l Inc. v. Tandem Prods., Inc., 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974).

Third, although terms could be modified, see MOU § 1, the major terms were set, and the other terms "need not be fixed with complete and perfect certainty for a contract to have legal efficacy." V'Soske v. Barwick, 404 F.2d 495, 500 (2d Cir. 1968). The MOU memorializes the parties' agreements with respect to the allocation of equity, MOU § II, partner compensation, id. § III, the assignment of the predecessor firm's assets, id. § IV, the treatment of the predecessor firm's existing cases, id. §§ IV (B), (C)-(E), (V), firm management rights and responsibilities, id. § VI, and how to deal with partner terminations, id. VI(C), VI(G). And, while the division of losses was not specifically set out, by statute, losses would be divided in the same percentage as profits. Fla. Stat. §§ 620.8401(2), 8404(2)(a).[10]

---

[10] Murphy v. Institute of International Education is instructive on this factor. See 32 F.4th 146, 152 (2d Cir. 2022). In that case, the Second Circuit Court of Appeals held that an agreement was a Type I agreement because (1) it did not "merely commit[] the parties to work together in accordance with the terms and conditions outlined in the agreement, which would be a Type II agreement to continue negotiating[;]" and (2) there was "no evidence" the parties viewed any remaining terms as being "in need of negotiation." Id. at 152. Murphy made clear that the mere existence of open terms did not undermine the binding nature of the agreement, for "if the parties intended to be bound despite the presence of open terms, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations." Id. at 151.

And fourth, while partnerships are usually formed with formal agreements, this was a comprehensive and detailed agreement. Moreover, "the customary form factor is less meaningful when the agreement is in writing (and needs only be reduced to a formal agreement) than when one party is trying to enforce an oral agreement." In re Application of NAP, 1996 WL 221623, at *5. In this case, the MOU expressed, in writing, the parties' clear intent to be bound.

Because the MOU was a binding Type I preliminary agreement, and because its enforcement was not barred by the failure of a condition precedent, this brings us to the question on which the Firm originally sought declaratory judgment, namely whether Cyrulnik was removed from the Firm for "cause" as authorized by the MOU. This is a vigorously disputed issue of fact that cannot be decided on a motion for summary judgment. See Stanacard, LLC v. Rubard, LLC, No. 12-cv-462508, 2016 WL 462508, at *23 (S.D.N.Y. Feb. 3, 2016) (denying summary judgment due to genuine issues of material fact regarding whether an employee was terminated for "cause").

The MOU does not provide the definition of "cause" in the agreement. The most restrictive definition that is supported only by two Florida cases requires "illegal activity, ethical breaches, or utter abandonment or dereliction of a job." Comprehensive Care Corp. v. Katzman, No. 09-cv-1375, 2010 WL

24

3190136, at *6 (M.D. Fla. July 30, 2010) (citing State ex rel. Hathaway v. Smith, 35 So.2d 650 (Fla. 1948)). But Comprehensive Care draws from only one authority, Hathaway, a Florida Supreme Court case that addresses due process rights for public employees, not employment contracts negotiated by private parties. See id. at * 6 (citing Hathaway, 35 So.2d at 651-52). Apart from the limited context of Comprehensive Care and Hathaway, courts applying New York and Florida law do not differ with respect to the definition of cause, as a non-arbitrary "reason" for termination.[11] In any event, the parties ignore that even the restricted definition of cause in Comprehensive Care includes "dereliction of a job" and there are disputed issues of fact as to whether Cyrulnik committed such derelictions. See

---

[11] See e.g., Goss v. E.S.I. Cases & Accessories, Inc., No. 18-cv-2159, 2020 WL 5817163, at *3 (S.D.N.Y. Sept. 29, 2020) (finding that the employer had "reason -- that is, "cause" —- to terminate the employee based on the employment agreement); Trans World Airlines, Inc. v. Beaty, 402 F. Supp. 652, 658 (S.D.N.Y. 1975) ("[A] discharge for cause is ordinarily defined as a discharge for some reason which is not arbitrary or capricious."); Stanacard, LLC, No. 12-cv-462508, 2016 WL 462508, at *23("In the absence of any contractual definition of 'cause,' the trier of fact can simply apply the most natural meaning of the phrase: whether [the employee] was fired for an articulable and defensible reason relating to the performance of his duties at [the employer-company]."); Spurlin v. Sch. Bd. of Sarasota Cnty., 520 So. 2d 294, 296 (Fla. Dist. Ct. App. 1988) (authorizing school board to decline recommending that a contract be extended for a "lawful, rational, non-arbitrary, non-statutory reason"); see In re Piazza, 719 F.3d 1253, 1261-62 (11th Cir. 2013) (in a bankruptcy context, applying the "ordinary meaning" of "cause", and observing: "the ordinary meaning of 'cause' is adequate or sufficient reason").

e.g., Bach Decl. Exs. 2, 5, 6; Cyrulnik Decl. Ex. 6. The Firm offers evidence that Cyrulnik was abusive to the associates and to his fellow partners, to the point where they allege he was disruptive to the Firm. ECF No. 515 ¶¶ 33-69. Cyrulnik denies those allegations, see ECF No. 510 ¶¶ 33-69, and argues that the Firm personnel are interested witnesses and not to be believed, see ECF No. 475 at 38. This evidence, and Cyrulnik's responses, present issues of fact that cannot be resolved on these motions for summary judgment. Accordingly, the Firm's claim for summary judgment that Cyrulnik was lawfully removed for cause is **denied**, and Cyrulnik's cross-motion for summary judgment on this issue is also **denied.**

. . .

Furthermore, whatever the basis for Cyrulnik's removal, there is the additional question of whether that removal should be treated as a "withdrawal" with the sanction for withdrawal in the MOU. See MOU § VI(C). The Firm argues that Cyrulnik's termination should be treated as a withdrawal under the MOU and therefore Cyrulnik should leave his equity with the Firm. But Cyrulnik's removal cannot plausibly be interpreted as a "withdrawal" pursuant to the MOU. Under any reasonable interpretation of that term, the involuntary removal of a partner is not a withdrawal.

There is no language in the MOU that would suggest that
Cyrulnik's removal is a withdrawal. Cyrulnik did not "withdraw;"
he was ousted. The Firm points to a definition in the Merriam-
Webster Dictionary, see ECF No. 460 at 27,[12] but Cyrulnik points
out that this is the definition for "withdrawal" used as a
transitive verb, such as withdrawal of a knife, not an
intransitive verb such as "he withdrew," see ECF No. 482 at 12.
The Firm contends that this result would treat a partner removed
for cause better than a partner who withdrew. See ECF No. 416 at
35. That is unclear. It is clear that the parties sought to
sanction a partner who voluntarily withdrew from the Firm in the
first 18 months because the remaining partners relied on him. It
is unclear under the MOU what the sanction is for a partner who
is discharged for cause. In any event, there is no serious
dispute that Cyrulnik did not leave voluntarily from the Firm.
See ECF No. 507 ¶ 40; ECF No. 515 ¶ 92-93 ("On February 10, the
Founding Partners unanimously voted to remove Cyrulnik for
cause"). In short, the cross-motions for summary judgment with
respect to the Firm's first claim for a declaratory judgment are
**denied** because there are issues of fact as to whether Cyrulnik

---

[12] The Firm contends: "[t]he very first synonym listed in the
Merriam-Webster Dictionary for the word 'withdraw' is "remove"—
the same word that the Founding Partners used in Section VI.G of
the MOU." ECF No. 460 at 27.

was terminated for cause and, if so, what the consequences of
that termination are.

**V.**

The parties have also cross-moved for summary judgment with
respect to Cyrulnik's counterclaims. Cyrulnik argues that he has
established as a matter of law that he is entitled to summary
judgment on each of his remaining counterclaims. The Firm and
the Individual Counterclaim-Defendants cross-move for the
dismissal of Cyrulnik's remaining counterclaims.

The parties agree that the FRUPA governs Cyrulnik's
dissolution, buyout, accounting, and breach of fiduciary duty
counterclaims. The remaining counterclaims are governed by New
York law. See Wall, 471 F.3d at 422 ("As there is no conflict .
. . New York, as the forum state, would apply its law."). For
the following reasons, summary judgment is **denied** with respect
to Cyrulnik's counterclaims seeking dissolution (Count 1),
buyout against the Firm (Count 2), accounting (Count 3), breach
of the MOU and Side Letter (Count 4), and breach of fiduciary
duty (Count 6). The resolution of these counterclaims would
require resolving genuine issues of material fact. Cyrulnik's
counterclaims alleging breach of the implied covenant of good
faith and fair dealing (Count 5), conversion (Count 7), unjust
enrichment (Count 8), promissory estoppel (Count 9), and civil

conspiracy (Count 10) are **dismissed** because they are duplicative of Cyrulnik's breach of contract claim.

**A.**

Count 1 of Cyrulnik's counterclaims seeks dissolution under Florida Statutes § 620.8801. See ECF No. 72 ¶¶ 103-12. To demonstrate that dissolution is warranted, Cyrulnik would have to prove either that "[t]he economic purpose of the partnership is likely to be unreasonably frustrated" or that it is "not reasonably practicable" to carry on the Firm without him. Fla. Stat. § 620.8801(5); see Fernandez v. Yates, 145 So. 3d 141, 145 (Fla. Dist. Ct. App. 2014). As explained in Fernandez: "[T]he drastic action of dissolving a corporation will not be justified unless its affairs have reached the sorry state where the purposes for which it was organized are no longer possible of attainment." 145 So. 3d at 145. The question of whether such a "drastic action" is warranted here requires a factual resolution of whether the Firm can survive without Cyrulnik's participation. Compare ECF No. 482 at 17 (Cyrulnik alleging that it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Firm), with ECF No. 460 at 36 (the Firm contending that the Firm "has been a successful, thriving business over the two years since Cyrulnik's departure."). Because "many of the material facts [the parties] rel[y] upon remain in dispute," neither party is entitled to

summary judgment on this counterclaim. Kremer v. Lysich, No. 19-
cv-887, 2021 WL 6128212, at *4 (M.D. Fla. Oct. 26, 2021), report
and recommendation adopted, No. 19-cv-887, 2022 WL 18358956
(M.D. Fla. Feb. 18, 2022)(denying summary judgment on the
plaintiff's claim for an equitable buyout, and comparing that
standard to "the drastic action of dissolving a corporation.").

**B.**

In Count 2, Cyrulnik seeks an alternative resolution of
buyout under Florida Statutes § 620.8701 "should judicial
dissolution be found inappropriate or inequitable." ECF No. 72 ¶
117. Florida Statutes § 620.8701 provides that "the partnership
shall cause the dissociated partner's interest in the
partnership to be purchased for a buyout price," "if a partner
is dissociated from a partnership without resulting in a
dissolution and winding up of the partnership business under §
620.8801." Fla. Stat. § 620.8801(1).

Cyrulnik moves for summary judgment on Count 2, see ECF No.
432 at 7, and asserts that "there is simply no genuine issue of
fact that [he] is entitled to an accounting and a buyout under
the Florida statutes." Id. Cyrulnik contends that the FRUPA
entitles him to the "proper value of his interest in [the
Firm]." Id. at 36-37 n.11. But there is no dispute that Cyrulnik
was removed from the Firm. Whether that removal was justified
under the MOU, and if so, what the proper consequences of that

30

removal are, constitute issues of fact that cannot be resolved on this motion for summary judgment. Accordingly, summary judgment on Count 2 is **denied.**

## C.

In Count 3, Cyrulnik alleges that he was denied access to the Firm's books and records, and he seeks an accounting of the assets, profits, and losses of the Firm. See ECF No. 72 ¶¶ 120-25. The FRUPA requires "[e]ach partner and the partnership" to provide information to co-partners, including, "[w]ithout demand, any information concerning the partnership's business and affairs reasonably required" for the exercise of the requesting partner's rights and duties, and, "[u]pon demand, any other information concerning the partnership's business and affairs," unless such a demand would be unreasonable or improper. Fla. Stat. § 620.8403(3). And, Florida Statutes § 620.8405 allows an individual partner to enforce the partner's Section 620.8403 rights "against the partnership or another partner." Id. § 620.8405(2)(b)1. In opposition, the Firm claims an accounting is unnecessary because Cyrulnik has already obtained extensive discovery into the firm's finances. See ECF No. 460 at 36. But whether Cyrulnik has access to discovery does not bear on whether Cyrulnik may prevail on his claim for relief. It is impossible to determine from the summary judgment record whether additional records exist that Cyrulnik needs that

he has not received. In addition, the statute makes clear that a partner may maintain both a breach of contract claim and an accounting claim. See Fla. Stat. § 620.8405(2); see also Larmoyeux v. Montgomery, 963 So. 2d 813, 819-20 (Fla. Dist. Ct. App. 2007) (explaining that the current version of the partnership statute "eliminat[es] the requirement that partners first sue for an accounting before bringing other claims."). Summary judgment cannot be granted on Count 3 and is **denied.**

### D.

In Count 4, Cyrulnik alleges breach of the MOU and the Side Letter for removing him as a partner from the Firm without "cause," ECF No. 72 ¶¶ 126-37, and breach of the Side Letter for failing to pay Cyrulnik the requisite installments of the Kleiman litigation allotments, id. ¶ 132. For the reasons discussed above, the question of whether the Individual Counterclaim-Defendants had "cause" to remove Cyrulnik as a partner is a factual question that must be resolved at trial. Should the finder of fact conclude that no cause existed, Cyrulnik may be entitled to damages for breach of the MOU.

With respect to the Side Letter, there is no dispute that Cyrulnik is entitled to payment from the Kleiman litigation if the Firm receives such payment, see Side Letter, but the Individual Counterclaim-Defendants contend that distribution of these payments has not yet occurred, see ECF No. 527 at 23. The

Side Letter entitles Cyrulnik to 25% of any recovery in connection with the <u>Kleiman</u> litigation, and Cyrulnik demands judgment against the Individual Counterclaim-Defendants, awarding Cyrulnik his compensatory damages in an amount to be determined at trial. ECF No. 72 ¶ 137. Accordingly, the question of whether there has been a distribution, and whether there is a potential for a future distribution, and therefore whether Cyrulnik can claim his recovery, present questions of material fact that preclude summary judgment. <u>See</u> <u>Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene</u>, 746 F.3d 538, 544 (2d Cir. 2014) ("On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."). Summary judgment on Count 4 is therefore **denied.**

**E.**

In Count 5, Cyrulnik contends that "implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing." ECF No. 72 ¶ 141, and that the Individual Counterclaim-Defendants breached this covenant by depriving Cyrulnik of the benefits to which he was entitled under the MOU and the Side Letter, <u>id.</u> ¶ 142. He seeks summary judgment, awarding damages. <u>See</u> ECF No. 475 at 43-44; ECF No. 72 ¶ 144. The Individual Counterclaim-Defendants argue

that these claims must be dismissed because they are duplicative of Cyrulnik's breach of contract claim. See ECF No. 416 at 43.

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002); see also Alter v. Bogoricin, No. 97-cv-0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) ("[E]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative.").

Therefore, because Cyrulnik's claim for breach of the implied covenant of good faith and fair dealing asserts the same facts as his breach of contract claim, see ECF No. 72 ¶¶ 138 (adopting the allegations from the breach of contract counterclaim), 139-44 (alleging breach of the implied covenant of good faith and fair dealing), the motion for summary judgment dismissing the claim for breach of the covenant of good faith and fair dealing is **granted**.

## F.

In Count 6, Cyrulnik alleges that the Individual Counterclaim-Defendants breached their fiduciary duties to Cyrulnik by, among other things, conspiring to remove Cyrulnik

34

as a Firm partner, obstructing Cyrulnik's management rights, depriving Cyrulnik of his financial rights, including Cyrulnik's 25% interest in the Tokens, purporting to remove Cyrulnik as a Firm partner without legal grounds to do so, interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients, and denying Cyrulnik access to files, documents, Firm bank accounts, and other information. See ECF No. 72 ¶ 147.

The Individual Counterclaim-Defendants contend that this claim does not stand apart from Cyrulnik's contractual claims. See ECF No. 416 at 40. Cyrulnik and the Individual Counterclaim-Defendants entered into a partnership agreement, governed by the FRUPA, when they executed the MOU on December 26, 2019. See MOU § 1; see also ECF No. 72 ¶ 146 (Cyrulnik alleging: "As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik. These duties include the duties of care and loyalty.").

The FRUPA creates a separate cause of action for the breach of duties owed in a partnership agreement. Section 620.8404 of the FRUPA provides for "[g]eneral standards of partner's conduct," and states that "[t]he only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care, as set forth in subsections (2)

35

and (3)," Fla. Stat. § 620.8404(1), which includes the
obligation to refrain from engaging in "grossly negligent or
reckless conduct, intentional misconduct, or a knowing violation
of law." Id. § 620.8404(3). The question of whether the
Individual Counterclaim-Defendants engaged in such impermissible
conduct is a question of fact that cannot be resolved on a
motion for summary judgment. The cross-motions for summary
judgment on Count 6 are therefore **denied.**

### G.

    In Counts 7, 8, and 9, Cyrulnik alleges conversion, unjust
enrichment, and promissory estoppel. See ECF No. 72 ¶¶ 149-68.
These claims are duplicative of Cyrulnik's breach of contract
claim and should be dismissed.

    In alleging conversion, Cyrulnik "repeat[ed] and
reallege[d] each and every allegation contained in paragraphs 1
through 148 herein." ECF No. 72 ¶ 149. Cyrulnik then asserted:
"Counterclaim-Defendants knowingly and intentionally converted
Cyrulnik's specific and identifiable membership interest in RCF
and his substantial equity interests in RCF and RCF's assets,
including but not limited to Cyrulnik's 25% interest in the
Tokens, which belong solely to Cyrulnik[.]" Id. ¶ 150.

    Cyrulnik's conversion claim relies on the claim that
Cyrulnik did not obtain what he should have obtained under the
contract – the Tokens. But this allegation depends on Cyrulnik's

36

breach of contract claim surviving, and hence it is derivative
of the breach of contract claim. "It is . . . settled under New
York law that a tort claim will not arise where plaintiff is
essentially seeking enforcement of the bargain." In re
Chateaugay Corp., 10 F.3d 944, 958 (2d Cir. 1993). Thus,
"because [the Firm's] possession of [Cyrulnik's property] here
would have been lawful if not for the alleged breach of
contract, the conversion claim cannot be sustained." Transcience
Corp. v. Big Time Toys, LLC, 50 F. Supp. 3d 441, 456 (S.D.N.Y.
2014).[13]

    The same is true for Cyrulnik's claim of unjust enrichment
and promissory estoppel. See ECF No. 72 ¶¶ 156-61 (alleging
unjust enrichment), ¶¶ 162-68 (alleging promissory estoppel).
These claims are quasi-contract claims that cannot exist if
there is a contract that determines the parties' rights.
Mayagüez S.A. v. Citibank, N.A., No. 16-cv-6788,2022 WL 901627,

---

[13] While this proceeding was pending, Paul Fattaruso, a former
RCF partner, brought an action asserting statutory and common-
law claims against the Firm. See Cyrulnik Decl. Ex. 56. The
Florida Court denied the Firm's motion to dismiss Fattaruso's
claim alleging conversion based on the argument that there was
no identifiable property. See id. at 9. The Court did not
dismiss an argument that the claim was duplicative of a breach
of contract claim and, in any event, the Court's decision was
made on a motion to dismiss where alternative pleadings can be
sustained. See DiChristopher v. Bd. of Cnty. Comm'rs, 908 So. 2d
492, 495 (Fla. Dist. Ct. App. 2005), decision clarified on
denial of reh'g (Aug. 12, 2005) ("A plaintiff may set out the
facts of the occurrence or transaction and demand judgment in
his favor on several bases, even mutually exclusive ones.").

at *37 (S.D.N.Y. Mar. 25, 2022) ("As with promissory estoppel, claims for unjust enrichment may not be maintained where a contract exists between the parties covering the same subject matter."). Therefore, because these claims are duplicative, summary judgment is **granted**, dismissing these claims.[14]

### H.

In Count 10, alleging conspiracy, Cyrulnik again repeated and realleged "each and every allegation" contained in his previous allegations. See ECF No. 72 ¶ 169. Cyrulnik asserted that the Individual Counterclaim-Defendants conspired to remove Cyrulnik as a Firm partner, prevented Cyrulnik from exercising his management rights, engaged in self-dealing, deprived Cyrulnik of his financial rights, illegally removed Cyrulnik as a Firm partner, interfered with Cyrulnik's ability to practice law, and denied Cyrulnik access to documents necessary for Cyrulnik to protect the legal interests of his clients. Id. ¶ 171. But neither New York nor Florida recognizes an independent tort of civil conspiracy. See Zirvi v. Flatley, 433 F. Supp. 3d

---

[14] There is no conflict with Florida law. See Azure, LLC v. Figueras Seating U.S.A., Inc., No. 12-cv-23670, 2014 WL 11531792, at *3 (S.D. Fla. Apr. 22, 2014) ("Under Florida law, equitable claims such as promissory estoppel and unjust enrichment are barred where there exists a contract governing the subject matter."). The fact that the judge presiding over Fattaruso's proceeding allowed the claims to continue at the motion to dismiss stage, see ECF No. 477-56 at 8, is not dispositive. Moreover, Fattaruso was not a party to the MOU.

448, 467 (S.D.N.Y. 2020) ("The plaintiffs cannot state a claim
based on civil conspiracy because there is no independent tort
of civil conspiracy under New York law."); Raimi v. Furlong, 702
So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997) ("[A]n actionable
conspiracy requires an actionable underlying tort or wrong.").[15]
Accordingly, Cyrulnik's civil conspiracy claim is **dismissed.**

## VI.

Cyrulnik seeks summary judgment, dismissing the Firm's
second and third claims -- breach of fiduciary duty (Count 2)
and intentional interference with contract (Count 3). See ECF
No. 432 at 37-38; see also ECF No. 31 ¶¶ 90-108 (Count 2 and
Count 3). Both claims present issues of material fact that
cannot be resolved on a motion for summary judgment. See
S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery Inc., 751

---

[15] In Alhassid v. Bank of America, N.A., a District Court Judge
in the Southern District of Florida identified a federal court
decision dismissing a civil conspiracy claim, but suggesting
that had a breach of contract claim survived, it could be a
basis for a civil conspiracy claim. 60 F. Supp. 3d 1302, 1317
(S.D. Fla. 2014) (citing Rebman v. Follett Higher Educ. Grp.,
Inc., 575 F. Supp. 2d 1272, 1280 (M.D. Fla. 2008). This decision
does not suggest that a conflict exists between Florida law and
New York law. This is true because "courts across the country
interpreting civil conspiracy actions identical or nearly
identical to those in Florida . . . have held that a breach of
contract may not serve as basis for a civil conspiracy claim. .
. . [T]o construe a mere breach of contract claim as a wrong or
unlawful act in substantiating a civil conspiracy claim would be
inconsistent with the fundamental division between contract and
tort actions." Id. at 1317-18 (collecting cases). Because
Cyrulnik failed to allege independent, tortious conduct, see ECF
No. 72 ¶ 169, his civil conspiracy claim must be dismissed.

F. App'x 39, 41 (2d Cir. 2018) (finding summary judgment
inappropriate when the record contains "circumstantial evidence
that could allow a jury to find" that the defendants had
intentionally induced a breach of contract).

The Firm alleges that Cyrulnik breached his fiduciary
duties to the partnership by refusing to provide his time
records and by discouraging his clients from paying their
invoices. See ECF No. 31 ¶¶ 91-99. The Firm further alleges that
Cyrulnik intentionally interfered with the Firm's contracts, in
the form of engagement letters or oral agreements. See id. ¶¶
101-08. Cyrulnik argues that the "record is devoid of evidence
to support" Counts 2 and 3. ECF No. 432 at 3. But the Firm
presents some facts to support its allegations. Specifically,
the Firm alleges that after Cyrulnik's removal, the Firm
discovered that Cyrulnik had failed to enter his time for
January and February 2021, see ECF No. 521, CSOF ¶¶ 4-9, and
that Cyrulnik refused to provide his time entries upon the
Firm's request, id. ¶¶ 10-14. The Firm also alleges that during
this same time period, the Firm asked Cyrulnik's clients whether
they intended to remain with the firm, id. ¶ 19, that Cyrulnik
drafted uniform responses for each client, and that each client
ultimately decided to follow Cyrulnik to a new firm, see ECF No.
96 ¶ 85. Finally, the Firm alleges that when the Firm asked
Cyrulnik's clients to pay outstanding invoices, at least nine

clients asked Cyrulnik how to handle the invoices, and ultimately these clients failed to pay. See ECF No. 460 at 44.

Accordingly, the Firm's claims of intentional interference with contract and breach of fiduciary duty both present genuine issues of material fact: If the Firm's evidence is credited, a rational jury could find that Cyrulnik breached his fiduciary duty to the partnership and intentionally interfered with the contracts between his clients and the Firm.

## VII.

Roche has brought a separate claim alleging that Cyrulnik fraudulently induced Roche to enter into the MOU and Side Letter, in which Roche paid Cyrulnik to allow Roche to be listed as the first name partner. See ECF No. 385 ¶¶ 5-16; ECF No. 460 at 38-39, 40. Roche complains that he was fraudulently induced to enter into the Side Letter and to finalize the MOU based on Cyrulnik's false representation that Cyrulnik had an offer from Patterson Belknap to join that firm for $3 million. Id. ¶¶ 6-9. Cyrulnik moves to dismiss that claim on the grounds that it was mere "puffery," see ECF No. 432 at 40, and that there could not have been material reliance on that alleged offer.

"A party has made out a claim of fraudulent inducement if it has pled (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [the

41

plaintiffs]; and (iv) resulting damages." Ipcon Collections LLC
v. Costco Wholesale Corp., 698 F.3d 58, 62 (2d Cir. 2012)
(applying New York law). Roche alleges that Cyrulnik
misrepresented the terms of the Patterson Offer, ECF No. 385 ¶
6, and in reliance on that Offer, Roche paid Cyrulnik $850,000
to join the firm and to allow Roche to remain the first name
partner. Id. ¶¶ 9-10. Roche further alleges that Cyrulnik
"intended for Roche to rely upon his misrepresentations"
concerning the offer, id. ¶ 9, and that Roche was damaged by
that reliance, id. ¶ 16. Cyrulnik responds that his statements
regarding the Patterson Offer were mere "puffery," see ECF No.
432 at 40, and that he is entitled to summary judgment on
Roche's counterclaim, see id. at 38. But facts abound upon which
a reasonable jury could infer that Cyrulnik's statements were
material and were intentionally made to influence the terms of
the Side Letter and to encourage Roche to finalize the MOU. See
ECF No. 385 ¶¶ 5-16. Therefore, the argument to dismiss that
claim is **denied.**

**CONCLUSION**

The Court has considered all of the parties' arguments. To
the extent not specifically addressed above, those arguments are
either moot or without merit. For the reasons explained above,
summary judgment is **denied** on all claims for which it is sought,
except Cyrulnik's counterclaims for conversion, unjust

42

enrichment, promissory estoppel, and civil conspiracy are **dismissed**. The Clerk is directed to close ECF No. 415 and ECF No. 427.

The parties are directed to submit a Joint Pretrial Order, including any motions in limine, together with Proposed Voir Dire Requests and Requests to Charge within 30 days of the date of this Opinion. Responses and objections are due fourteen days thereafter.

**SO ORDERED.**

Dated:    New York, New York
          November 24, 2023

                                    John G. Koeltl
                         United States District Judge