**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ROCHE FREEDMAN LLP,

      Plaintiff,

v.

JASON CYRULNIK,

      Defendant.

---

JASON CYRULNIK,

      Counterclaim-Plaintiff,

v.

ROCHE FREEDMAN LLP, KYLE ROCHE,
DEVIN FREEDMAN, AMOS FRIEDLAND,
NATHAN HOLCOMB, and EDWARD
NORMAND,

      Counterclaim-Defendants.

Case No. 1:21-cv-01746 (JGK)

**PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO EXCLUDE ERIC JENKINS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

LEGAL STANDARD ........................................................................................................... 4

ARGUMENT ........................................................................................................................ 6

   I.    JENKINS HAS NO EXPERTISE IN VALUING LITIGATION MATTERS. ................. 6

   II.   JENKINS' VALUATIONS ARE UNRELIABLE. ........................................................... 7

       A.   Jenkins' untested and unsupported methodology is inherently unreliable. ............... 8

       B.   Jenkins' inputs at each step are unreliable. .......................................................... 10

           1.   Jenkins' estimates of probable damages are unreliable *ipse dixit*. ................. 11

           2.   Jenkins' estimates of likelihood of success are unreliable *ipse dixit*. ............ 12

           3.   Jenkins' collectability estimates are unreliable *ipse dixit*. ............................. 15

   III.  JENKINS' CONCLUSIONS ARE IMPERMISSIBLY SPECULATIVE. ...................... 16

       A.   Jenkins makes numerous faulty assumptions. ....................................................... 16

       B.   Jenkins relies on a chain of unsupported inferences. ............................................. 18

CONCLUSION .................................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
   514 F. Supp. 2d 571 (S.D.N.Y. 2007)................................................................. 14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002).............................................................. 1, 5, 7, 10

*In re Androgel Antitrust Litig. (No. II)*,
   2018 WL 2984873 (N.D. Ga. June 14, 2018) ........................................... 14

*BASF Corp. v. Nu-Vision, LLC*,
   2011 WL 13298432 (M.D. Fla. July 12, 2011) ........................................ 10

*Bocoum v. Daimler Trucks N. Am. LLC*,
   2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ........................................... 12

*Caruso v. Bon Secours Charity Health Sys. Inc.*,
   2016 WL 8711396 (S.D.N.Y. Aug. 5, 2016) ........................................... 12

*Chart v. Town of Parma*,
   2014 WL 4923166 (W.D.N.Y. Sept. 30, 2014) ....................................... 17

*City of Providence v. Bats Glob. Mkts., Inc.*,
   2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ........................................... 14

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013)..................................................... 14

*EEOC v. Bloomberg LP*,
   2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ........................................ 12

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)................................................................................. 13

*Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*,
   2010 WL 4892646 (S.D.N.Y. Dec. 2, 2010) ....................................... 2, 19

*Holland Loader Co., LLC v. FLSmidth A/S*,
   313 F. Supp. 3d 447 (S.D.N.Y. 2018).............................................. 10, 18

*In re Intuniv Antitrust Litig.*,
   2020 WL 5995326 (D. Mass. Oct. 9, 2020)...................................... 10, 13

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000)..................................................... 17

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016)................................................................ 5

*Macaluso v. Herman Miller, Inc.*,
2005 WL 563169 (S.D.N.Y. Mar. 10, 2005) (Koeltl, J.)............................... 5, 16, 17

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)* ("*Mirena I*"),
341 F. Supp. 3d 213 (S.D.N.Y. 2018)............................................................. 5, 6

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)* ("*Mirena II*"),
982 F.3d 113 (2d Cir. 2020).................................................................... 4, 5, 8, 10

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
164 F.3d 736 (2d Cir. 1998)............................................................................. 6

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
571 F. Supp. 3d 106 (S.D.N.Y. 2021)............................................................. 5

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010)............................................................ 14

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)............................................................................. 4

*Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*,
449 F. Supp. 3d 402 (S.D.N.Y. 2020) (Koeltl, J.) ...................................... 1, 7

*Potter v. United States*,
2020 WL 2836440 (S.D.N.Y. May 30, 2020) ................................................ 12

*Reserve Mech. Corp. v. Comm'r of Internal Revenue*,
34 F.4th 881 (10th Cir. 2022) ......................................................................... 8

*Riegel v. Medtronic, Inc.*,
451 F.3d 104 (2d Cir. 2006)............................................................................. 11

*Roberts v. Roberts*,
689 So. 2d 378 (Fla. Dist. Ct. App. 1997) ..................................................... 18

*Santalucia v. Sebright Transp., Inc.*,
184 F. Supp. 2d 224 (N.D.N.Y. 2002)........................................................... 9, 10

*Saucier v. State Farm Mut. Auto. Ins. Co.*,
2017 WL 1321826 (W.D. La. Apr. 6, 2017).................................................. 18

*Scentsational Techs., LLC v. Pepsi, Inc.*,
2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018)............................................... 5, 11

iii

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ............................................................. 18, 19

*SEC v. Lek Sec. Corp.*,
    370 F. Supp. 3d 384 (S.D.N.Y. 2019) ........................................ 2, 12, 13

*SEC v. Ripple Labs, Inc.*,
    2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ....................................... 15

*Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*,
    2010 WL 2382405 (S.D.N.Y. June 14, 2010) ................................... 19

*Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*,
    254 F. Supp. 2d 1239 (M.D. Fla. 2003) ............................................ 7

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
    2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ................................... 17

*Tolentino v. City of Yonkers*,
    2017 WL 4402570 (S.D.N.Y. Oct. 2, 2017) ...................................... 12

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) ................................................................. 1

*Value Drug Co. v. Takeda Pharm., U.S.A., Inc.*,
    2023 WL 2278650 (E.D. Pa. Feb. 28, 2023) ................................... 14

*Washington v. Kellwood Co.*,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015) ............................................... 7

*Whalen v. CSX Transp., Inc.*,
    2016 WL 5723877 (S.D.N.Y. Sept. 29, 2016) .................................. 11

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007) ....................................... 5, 6

*Wills v. Amerada Hess Corp.*,
    379 F.3d 32 (2d Cir. 2004) ................................................................. 8

*Zaremba v. Gen. Motors Corp.*,
    360 F.3d 355 (2d Cir. 2004) ........................................................... 6, 8

## Other Authorities

Fed. R. Evid. 702(c) ................................................................................... 5

## INTRODUCTION

This case is a textbook illustration of why district courts are tasked with "being vigilant gatekeepers of . . . expert testimony." *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003). In support of his damages claims, Cyrulnik asked Eric Jenkins to opine on the value of four contingency litigation matters that Roche Freedman ("RF") was litigating when Cyrulnik was removed. Jenkins, however, has no experience or expertise in this area. And he was so glib about his own methodology that he testified he made it up using inputs that, in his own words, he could have come up with "*on the golf course*." Declaration of Randy Mastro dated February 27, 2024 ("Mastro Decl."), Ex. 1 (Jenkins Dep. Tr. 105:23–106:8 (emphasis added)). His opinions cannot withstand any scrutiny, much less the "rigorous examination" that Rule 702 requires. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The Court should exclude Jenkins' contingency opinions and testimony for three independent reasons.

*First*, Jenkins has *no* specialized knowledge in valuing contingency litigation matters. He has never valued a contingency litigation matter before; he has no legal training or background in the law by which he might be able to do so now; nor is he even familiar with any of the legal issues in the complex cases he purported to value. This Court should do exactly what it did in an analogous case and exclude Jenkins' opinions for lack of expertise. *See Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402, 419–20 (S.D.N.Y. 2020) (Koeltl, J.).

*Second*, and as a result, Jenkins' opinions are wholly unreliable. Rather than use an accepted methodology, Jenkins made up a new one that purported to multiply (1) each lawsuit's probable damages by (2) the likelihood of success, discounted by (3) the risk the defendant would not pay. This "methodology" is unreliable as a whole: it fails all four *Daubert* factors and cannot be reconciled with basic statistical principles. It is also unreliable "at every step," contrary to what Rule 702 permits. *Amorgianos*, 303 F.3d at 267. In fact, *no* step has any analysis: at each step,

Jenkins simply lists the information he "considered" and states his conclusion. "[Jenkins] must provide more than his *ipse dixit* to make his opinions admissible under Rule 702 and *Daubert*." *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 415 (S.D.N.Y. 2019) (Cote, J.). He failed to do that.

*Finally*, Jenkins' conclusions would not help the jury because they are inherently speculative. His conclusions indisputably rest on faulty assumptions—*e.g.*, he assumes the damages in one matter (*Tether*) were $850 million based on a news article that was actually reporting on an entirely different case involving entirely different alleged misconduct. *Infra* III.A. In addition, "experts' opinions on such calculations are excludable" when their inputs are "'wrought with unsupported and speculative assumptions.'" *Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, at *7–9 (S.D.N.Y. Dec. 2, 2010) (Holwell, J.) (citation omitted). Because Jenkins used inputs that he plucked out of thin air, it is anybody's guess whether his speculative chain of inferences is correct. Exclusion is clearly warranted.

The Court should exclude Jenkins' contingency opinions and testimony in full.

## FACTUAL BACKGROUND

Cyrulnik engaged Eric Jenkins to provide damages opinions concerning, as relevant here, the value of RF's contingency litigation matters when Cyrulnik was removed. *See* Mastro Decl., Ex. 2 ("Jenkins Report") ¶ 10. Jenkins, however, has never previously estimated the value of any contingency litigation matter. Jenkins Dep. Tr. 31:3–23 ("Q: [H]ave you ever valued a litigation? A: . . . I have not."); *id.* at 32:2–23. He admits he is "not a lawyer," has no "background in law," and is not "familiar" with any legal doctrine. *Id.* at 36:8–25.

Nevertheless, Jenkins opines that Cyrulnik is owed $7.4 million for the following four matters that RF was litigating when Cyrulnik was removed for cause. Jenkins Report ¶ 10.

- **Apothio**: *Apothio, LLC v. Kern County*, No. 1:20-cv-00522-JLT-CDB (E.D. Cal. filed Apr. 10, 2020) is a pre-discovery complex commercial case against a California county for improperly destroying cannabis crops. After the defendants' first motion to dismiss

was granted in part on April 25, 2022, the plaintiffs amended in May 2022. A fully briefed renewed motion to dismiss remains pending. No real discovery has been undertaken. The firm has collected no contingency fee on this matter.

- **Tether:** *In re Tether & Bitfinex Crypto Asset Litigation*, No. 1:19-cv-9236 (S.D.N.Y. filed Oct. 6, 2019) is a complex and novel class action alleging market manipulation and antitrust violations against a cryptocurrency entity. At the time of Cyrulnik's removal, a motion to dismiss was still pending. Although two defendants have been dismissed, the case is currently in discovery, with no class yet certified. As a result of the Cryptoleaks Videos (described in Counterclaim-Defendants' motion to exclude evidence relating to the videos), RF was removed as interim class counsel, and no longer litigates the action. The firm has collected no contingency fee on this matter.

- **Scurtis:** *Scurtis v. 6th Avenue Buildings Ltd.*, No. 2014-031805-CA-01 (Fla. 11th Cir. Ct. filed Dec. 17, 2014) was a complex real estate partnership dispute. After Cyrulnik left RF, the litigants settled ███████████████████████████████ ██████████

- **Kleiman:** *Kleiman v. Wright*, No. 18-cv-80176-BB (S.D. Fla. filed 2018) was a complex dispute over cryptocurrency IP and bitcoin. After the defendant backed out of a tentative settlement agreement, the case went to trial. Although RF's client eventually obtained a $150M judgment in late 2021 after Cyrulnik had left the firm, the client has collected nothing from that judgment. The firm has collected no contingency fee on this matter.

Jenkins purported to value each contingency matter by multiplying (1) the lawsuit's probable damages (according to him) by (2) the likelihood of success (according to him), discounted by (3) the risk the defendant would not pay (according to him). Jenkins Report ¶¶ 52–59. Jenkins cites no authority for such a case-specific methodology; his only cited authority is a blog post describing a different methodology based on a law firm's average "success rate," *id.* ¶ 54 & n.38—which Jenkins admits he did not use, *id.* ¶ 55.

At each step, Jenkins notes the sources he considered, then states his bottom-line conclusion, without explaining what information proved relevant or how that information translated into a specific number. *See*, *e.g.*, Jenkins Report ¶ 57 (explaining sources considered). Below is the entirety of Jenkins' relevant analysis of *Tether*:

To estimate probable damages [of $850 million], I used the Tether Complaint and other publicly available information. The Tether Complaint stated that the potential damages were 'likely to surpass $1.4 trillion.' Reports in the press came to a consensus that the damages were at least $850 million. . . .

I then assessed the probability of success of an award or settlement and its potential size, based on the same information I used to estimate damages. I also assessed the stage of the case. The defendants had filed Motions to Dismiss which the case survived prior to the Separation Date. I was not able to look to the average success rate of the Firm as part of this step. I estimated a 50% probability of success. . . . .

I then assessed the probability of collecting all of the award or settlement pursuant to its terms. I considered Tether's credit-worthiness, its overall market capitalization, the potential for self- or third-party insurance coverage, and the likelihood of compliance. I applied a 90% probability of collection to the Gross Expected Recovery to calculate the estimated Realizable Recovery to RCF of $65.7 million.

*Id.* ¶¶ 77, 80, 84.

Jenkin's cursory and unsubstantiated analysis of *Tether* is illustrative of how he analyzed all of the contingency cases that RF was handling at the time of Cyrulnik's removal. There is simply no analysis or description of how he picked these random numbers.

## **LEGAL STANDARD**

Under Rule 702, courts must act as "'gatekeep[ers]'" and undertake a "rigorous review" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)* ("*Mirena II*"), 982 F.3d 113, 122–24 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). "The proponent of the expert testimony has the burden to establish" admissibility under this Rule. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). As relevant here, there are three basic inquiries under Rule 702:

*First*, an expert must have "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). "If the witness does not possess superior knowledge, education, experience, or skill in the relevant area, the Court must exclude his or her testimony." *In re Mirena IUS*

*Levonorgestrel-Related Prods. Liab. Litig. (No. II)* ("*Mirena I*"), 341 F. Supp. 3d 213, 240–41 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020). Mere "*general*" knowledge is insufficient where the witness lacks "the industry-specific expertise necessary to make the numerous judgments" in his or her analysis. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1245 (N.D. Okla. 2007) (emphasis in original).

*Second*, the testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Courts must "undertake a rigorous examination" of an expert's methodology to ensure it is reliable as a whole and "at every step." *Amorgianos*, 303 F.3d at 267. "'[*A*]*ny* step that renders the analysis unreliable . . . *renders the expert's testimony inadmissible*.'" *Id.* (citation omitted) (emphases in original). In assessing reliability, courts consider the four *Daubert* factors, asking whether the methodology (1) "can be (and has been) tested," (2) "has been subjected to peer review and publication," (3) has "standards controlling" its "known or potential rate of error," and (4) "has gained general acceptance in the relevant scientific community." *Mirena II*, 982 F.3d at 123–24 (cleaned up).

*Finally*, Rule 702 "requires that 'expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation.'" *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 113 (S.D.N.Y. 2021) (citation omitted). Expert testimony therefore "should be excluded if it is speculative or conjectural." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644 (S.D.N.Y. 2016) (citation omitted). That includes both where the testimony is "ipse dixit," *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *6 (S.D.N.Y. Apr. 18, 2018), and where it "is based on incorrect factual assumptions," *Macaluso v. Herman Miller, Inc.*, 2005 WL 563169, at *7–8 (S.D.N.Y. Mar. 10, 2005) (Koeltl, J.).

## ARGUMENT

The Court should exclude Jenkins' opinions and testimony on contingency litigation matters for three independent reasons: (1) Jenkins admits to having no "specialized knowledge" in this area, contrary to what Rule 702 requires; (2) he uses a valuation methodology that is untested, unreviewed, and unsupported—in short, it is patently unreliable; and (3) his conclusions amount to pure speculation that is contrary to, or otherwise unsupported by, real-world facts and evidence.

## I.    JENKINS HAS NO EXPERTISE IN VALUING LITIGATION MATTERS.

Jenkins' testimony should be excluded because he is not an expert in valuing contingency litigation matters. In fact, he has never previously valued *any* contingency litigation matter. Jenkins Dep. Tr. 31:3–32:23. While he is an accountant, he admits he is "not a lawyer," has no "background in law," and has zero familiarity with "any doctrinal issues" that might prove dispositive in the litigation matters he purports to value. *Id.* at 36:8–25, 37:21–25. This lack of expertise directly infects Jenkins' analysis. For example, he purports (without explanation of how) to use the procedural stage of each complex matter to evaluate the likelihood that RF clients would prevail. *See* Jenkins Report ¶¶ 64, 80, 93, 106. But as he admitted at deposition, he does not know how those stages (*e.g.*, surviving a motion to dismiss) bear on the ultimate merits of a case. *See* Jenkins Dep. Tr. 76:21–78:12 ("Again, I'm not an attorney, so I – the particulars of certain standards is not my area . . . .").

Because "[Jenkins] does not possess superior knowledge, education, experience, or skill in the relevant area [of valuing litigation matters]," his opinions cannot help the jury, and "the Court *must* exclude his . . . testimony." *Mirena I*, 341 F. Supp. 3d at 240–41 (Engelmayer, J.) (emphasis added); *see Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360–61 (2d Cir. 2004) (*Daubert* analysis is "superfluous" where expert is not qualified); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (excluding testimony of unqualified expert).

It is irrelevant that Jenkins has worked on valuations in other contexts. In the specialty area of valuing *litigation* matters, his "*general*" knowledge of accounting cannot make up for his lack of "industry-specific expertise." *Williams*, 496 F. Supp. 2d at 1245; *see also*, *e.g.*, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 310–11 (S.D.N.Y. 2015) (Dolinger, J.) (excluding testimony from accountant who lacked "specialized knowledge about . . . marketing" despite taking "various marketing courses in graduate school"); *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1245 (M.D. Fla. 2003) (excluding testimony from accountant who had "never valued any insurance agencies," "does not have any background information on the long term care insurance industry," and "has done no work in the long term care industry in the last ten years").

In similar circumstances, this Court has not hesitated to exclude a proffered expert's opinion and testimony. In *Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*, a proposed damages expert did exactly what Jenkins did here, "forecast[ing] that [the plaintiff] would be able to enforce its patent . . . against the largest market players" with "an estimated 34% success rate." 449 F. Supp. 3d at 419–20 (Koeltl, J.)*.* Even though that proposed expert had far *more* experience than Jenkins in valuing litigation matters (he was also an accountant, but had specific "expertise" in "the analysis and quantification of economic damages arising from intellectual property-type cases"), this Court excluded his testimony because he was "not a lawyer, let alone a patent lawyer" and thus was "not qualified" to opine on the likelihood of success in a patent case. *Id.* So too here: Jenkins admits he is "not a lawyer" and has no legal background, so he is "not qualified" to opine on the likelihood of success—much less the value of—any contingency litigation matters. *Id.*

All of Jenkins' opinions on the contingency matters should therefore be excluded.

## II.   JENKINS' VALUATIONS ARE UNRELIABLE.

Given that Jenkins has no experience valuing contingency litigation matters, it is unsurprising that "the method by which [he] draws an opinion" fails the "rigorous examination"

this Court must apply. *Amorgianos*, 303 F.3d at 267. Indeed, Jenkins' valuations of contingency litigation matters are not "the product of reliable principles" at all, Fed. R. Evid. 702(c), because his methodology is unreliable both as a whole and at every step. A made-up methodology that can be applied "on the golf course"—as Jenkins suggested at his deposition, Jenkins Dep. Tr. 105:23–106:8—is just the sort of junk science that Rule 702 was designed to exclude.

### A.   Jenkins' untested and unsupported methodology is inherently unreliable.

Jenkins took a three-step approach to calculating the value of each contingency litigation matter: he multiplied (1) the lawsuit's probable damages by (2) the likelihood of success, discounted by (3) the risk the defendant would not pay. Jenkins Report ¶¶ 52–59. This unsupported approach is inherently unreliable; on that basis alone, Jenkins' opinions should be excluded.

*No Daubert* factor supports reliability here. Jenkins offers no evidence that his methodology (1) has been "tested," (2) has ever "been subjected to peer review," (3) is subject to "standards" to control its "rate of error," or (4) "has gained general acceptance." *Mirena II*, 982 F.3d at 123–24 (cleaned up). To the contrary, the one authority he cites for his methodology is a *blog post* describing *a different methodology* based on a law firm's average "success rate," not case-specific probabilities of success; and Jenkins concedes he lacked "sufficient information" to use that methodology. Jenkins Report ¶¶ 54–55 & n.38. Because Jenkins' methodology undisputedly "satisfie[s] *none* of the four [*Daubert*] factors," his opinions should be excluded as unreliable. *Zaremba*, 360 F.3d at 358–59 (emphasis added); *see*, *e.g.*, *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 n.9, 50 (2d Cir. 2004) (affirming exclusion of expert testimony that "failed to satisfy *any* of the *Daubert* factors for reliability").

There is good reason why Jenkins' made-for-this-litigation methodology is untested and unsupported: his approach of valuing specific cases in isolation is inherently unreliable. Jenkins' methodology assumes that the *actual* payout of a specific contingency matter would resemble that

matter's statistical "expected value." But that is not remotely true. *See, e.g.*, *Reserve Mech. Corp. v. Comm'r of Internal Revenue*, 34 F.4th 881, 904–05 (10th Cir. 2022) (describing the law of large numbers). *Actual* outcomes of 50/50 cases, for example, are only rarely 50% of the claimed damages—they are usually nothing, everything, or something else in between. That is presumably why Jenkins' own cited authority proposes valuing contingency matters only on a portfolio basis, by "[m]ultiplying the number of open cases by the net average fee per case by the average success rate less the percentage overhead." Jenkins Report ¶ 54. Unlike with outcomes in individual cases, the average outcome of a large portfolio of dozens of 50/50 cases will converge to 50/50 such that the *overall value* of the portfolio can be predicted with some level of certainty. There is no evidence that Jenkins' case-specific approach, in contrast, can reliably predict anything.

Worse still, Jenkins' methodology exponentially increases the unreliability of his overall valuations. He repeatedly claims to have used his "experience" to determine probable damages and probability of success. Jenkins Dep. Tr. 80:25–81:13, 94:23–96:2, 103:13–104:21. But as Jenkins conceded at his deposition, he has *no experience* in those areas. *Id.* at 31:3–23, 32:2–23. His conclusions at each step are therefore "neither relevant nor reliable." *Santalucia v. Sebright Transp., Inc.*, 184 F. Supp. 2d 224, 225–26 (N.D.N.Y. 2002) (excluding valuations of contingency matters from attorney and insurance adjuster). And because Jenkins then multiplies together inherently unreliable figures from each step, his overall valuations are that much more unreliable.

Unsurprisingly, Jenkins' conclusions have proven to be wildly inaccurate. For example, whereas Jenkins predicted that *Scurtis* would yield a $22.5 million award, *see* Jenkins Report ¶ 91 (Table 10), in reality ███████████████████████████████████ months before he submitted his report, *see* Mastro Decl., Ex. 3 (Roche Freedman Dep. Tr. 324:19–325:3). And whereas Jenkins predicted that the recovery "*floor*" in *Kleiman* would be $225 million, *see* Jenkins

Report ¶¶ 104 (Table 11), 105 (emphasis added), in reality *Kleiman* ended with an unpaid judgment worth nearly $100 million *less* than that amount by the time Jenkins submitted his report, *see id.* ¶ 113.

Jenkins could have made his methodology more reliable by using, for example, data from comparable lawsuits or comparable firms. *Compare*, *e.g.*, *Santalucia*, 184 F. Supp. 2d at 225–26 (excluding expert who failed to "survey the statistics available . . . to compare the size of jury verdicts or settlement values"), *and In re Intuniv Antitrust Litig.*, 2020 WL 5995326, at *11–12 (D. Mass. Oct. 9, 2020) (excluding testimony on likelihood of success and distinguishing case where expert "began with the average win-rate of a plaintiff in a Hatch-Waxman case" and analyzed whether the case "was weaker than average"), *with Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018) (Woods, J.) (observing that a "company without past sales can prove lost profits by identifying a comparable company and analyzing that company's actual profit history"); *BASF Corp. v. Nu-Vision, LLC*, 2011 WL 13298432, at *2 (M.D. Fla. July 12, 2011) (similar). But he did not even try to do that. Because Jenkins opted for an untested approach that he made up and that requires experience he does not have, his inherently unreliable valuations should be excluded.

### B.   Jenkins' inputs at each step are unreliable.

An independent reason to exclude Jenkins' opinions and testimony on the contingency litigation matters is that his methodology is not "reliable at every step of the way." *Mirena II*, 982 F.3d at 123; *accord Amorgianos*, 303 F.3d at 267 (Rule 702 requires "that an expert's analysis be reliable at every step"). In fact, Jenkins' methodology is not reliable at *any* step. Whether in estimating probable damages, the probability of success, or the probability of recovery, Jenkins' "analysis" is neither reasoned nor reliable, but premised entirely on his own say-so.

### 1.    Jenkins' estimates of probable damages are unreliable *ipse dixit*.

"To estimate probable damages," Jenkins explained, he "would use case filings, case engagement letters, Co-Counsel agreements or other fee splitting agreements, litigation financing agreements, expert reports, other third-party support, internal memorandum describing the merits of the matters, client or counsel projections or forecasts, memoranda and presentations used to raise litigation funding, documentation of any settlement offers, and publicly available information." Jenkins Report ¶ 57(a). The critical problem is that he applied no discernible *methodology* for selecting and weighing these disparate sources.

To the contrary, Jenkins took four different approaches to the four contingency matters he valued. He based his probable damages estimate in *Apothio* solely on the initial complaint. *See* Jenkins Report ¶¶ 61–62 & Table 8 (estimating damages at $1 billion because "[t]he Complaint stated that the potential damages were 'at least $1 billion'"). But in *Tether*, without any explanation, he *rejected* the complaint's estimate of $1.4 trillion in favor of press reports that the damages (in an entirely different case, *see infra* III.A) "were at least $850 million." *Id.* ¶¶ 76–77 & Table 9. Jenkins took a third approach in *Scurtis*—once again without explanation—basing his damages estimate in that case on "Firm email communications regarding potential litigation funding." *Id.* ¶ 92. Finally, his damages estimate for *Kleiman* involved yet another unexplained approach "based on a settlement offer." *Id.* ¶ 105.

Four contingency matters; four different ways to estimate probable damages, all without any rhyme or reason as to *why* Jenkins opted for one approach over another in any given case. That is not even a methodology, much less the sort of reliable methodology mandated by *Daubert*.  To be admissible, an "expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Because Jenkins plainly failed to do that, his estimates of

probable damages amount to inadmissible "ipse dixit." *Scentsational*, 2018 WL 1889763, at *6 (Forrest, J.); *see also*, *e.g.*, *Whalen v. CSX Transp., Inc.*, 2016 WL 5723877, at *23 (S.D.N.Y. Sept. 29, 2016) (Pitman, J.) (excluding testimony, where expert did not "state how the materials on which she relies support her explanation and conclusion," leaving the court "with an opinion which is nothing more than an ipse dixit"); *Lek Sec. Corp.*, 370 F. Supp. 3d at 415 (Cote, J.) ("Grigoletto does not explain the basis for his conclusion that Avalon's stock trades were consistent with a practice of testing liquidity. Grigoletto must provide more than his *ipse dixit* to make his opinions admissible under Rule 702 and *Daubert*.").

Accordingly, Jenkins' say-so as to the probable damages in each contingency matter "must be excluded under *Daubert* and Rule 702." *Potter v. United States*, 2020 WL 2836440, at *7 (S.D.N.Y. May 30, 2020); *see also*, *e.g.*, *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *11–12 (S.D.N.Y. Mar. 28, 2022) (excluding testimony as *ipse dixit*); *Tolentino v. City of Yonkers*, 2017 WL 4402570, at *3–4 (S.D.N.Y. Oct. 2, 2017) (same); *Caruso v. Bon Secours Charity Health Sys. Inc.*, 2016 WL 8711396, at *6 (S.D.N.Y. Aug. 5, 2016) (same); *EEOC v. Bloomberg LP*, 2010 WL 3466370, at *15 (S.D.N.Y. Aug. 31, 2010) (same).

### 2.     Jenkins' estimates of likelihood of success are unreliable *ipse dixit*.

Jenkins' estimates of the likelihood of success in each contingency matter are likewise unreliable. For those estimates, too, Jenkins simply provides a laundry list of information he purportedly considered without explaining how he analyzed these sources or how he came up with the specific probabilities he did. *See* Jenkins Report ¶ 57(b). His testimony that he may have been "*on the golf course*" when he decided that the plaintiff in *Apothio* had a 20% chance of prevailing only proves the point. Jenkins Dep. Tr. 105:23–106:8 (emphasis added). His methodology, if you can even call it that, was so arbitrary that he could have chosen a random number while playing golf.

Take two illustrative examples, which show that Jenkins simply stated his bottom-line conclusions without making any attempt to connect those conclusions to the information on which they were purportedly based.  This was the entirety of Jenkins' analysis for *Scurtis*:

> I then assessed the probability of success of an award or settlement and its potential size, based on the information available to estimate damages. I also assessed the stage of the case. It is my understanding that defendants had filed Motions to Dismiss which the case survived. The case docket was unavailable to me at the time of this report.[1] I was not able to look to the average success rate of the Firm as part of this step. I estimated a 50% probability of success in the Scurtis case.

Jenkins Report ¶ 93. Similarly, in *Tether*, Jenkins' initial report "estimated a 50% probability of success" without any explanation. *Id.* ¶ 80. But when Jenkins later learned that the case had not yet survived a motion to dismiss as of the relevant valuation date, he reduced his estimate to 30%. *See* Jenkins Dep. Tr. 115:25–118:13. He offered no explanation for why deducting 20%—as opposed to any other percentage—was appropriate. The reduced estimate, like his original estimate, was just his *ipse dixit*.

Courts routinely exclude such opinions as unreliable. In *Intuniv*, the expert similarly opined on the likelihood of success in a patent lawsuit, explaining that his opinion was based on "his previous work experience and expertise" as a "professor of law at Georgetown" and "instructor at the U.S. Patent and Trademark Office Patent Academy." 2020 WL 5995326, at *11. Even though that expert proffered some explanation for his conclusion (unlike Jenkins here), and had some expertise (unlike Jenkins here), the court excluded the opinion because (like Jenkins) the expert had no "*methodology* for how he arrived at [his predicted] figure." *Id.* At *12 (emphasis added); *see*, *e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opinions "connected to existing data

---

[1] This statement is incorrect. The *Scurtis* docket is public and available online. *See* https://www2.miamidadeclerk.gov/ocs/search.aspx?AspxAutoDetectCookieSupport=1  (Local Case Number: 2014-031805-CA-01). Jenkins simply did not bother to look it up.

only by the *ipse dixit* of the expert" are inadmissible); *Whalen*, 2016 WL 5723877, at *23 (excluding unexplained conclusion as "ipse dixit"); *Lek Sec. Corp.*, 370 F. Supp. 3d at 415 (same); *Bocoum*, 2022 WL 902465, at *11–12 (same).

As other courts have explained in excluding similar expert testimony, Jenkins' failure to explain *what* information he deemed relevant from his sources and "*how* these [sources] interact or how much weight each [source] is assigned in his calculus" renders his analysis unreliable. *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013) (emphasis added); *see also*, *e.g.*, *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575–76 (S.D.N.Y. 2007) (excluding testimony on lost profits, where expert did "not explain how he translated" specified factors "into dollar figures"); *Value Drug Co. v. Takeda Pharm., U.S.A., Inc.*, 2023 WL 2278650, at *3–5 (E.D. Pa. Feb. 28, 2023) (excluding testimony that party "had an overall 85% or greater likelihood of prevailing" in certain litigation because courts "cannot allow an opinion on a numerical likelihood of success absent methodology to enter the jury's consideration").

Notably, Jenkins *could have* tried to rely on objective data such as Westlaw Analytics data on the percentage of cases in a particular category (*e.g.*, antitrust class actions not yet past a motion to dismiss) that resolved in the plaintiffs' favor. *See In re Androgel Antitrust Litig. (No. II)*, 2018 WL 2984873, at *6–7 (N.D. Ga. June 14, 2018) (allowing expert opinion on likelihood of success based on average win-rate of plaintiffs in similar cases and analysis of whether case was weaker than average). But rather than do that, Jenkins improperly asks the Court to "take his word for it" that he has reliably estimated the likelihood of success in complex lawsuits for which he has no background and no accepted methodology. *See City of Providence v. Bats Glob. Mkts., Inc.*, 2022 WL 902402, at *10 (S.D.N.Y. Mar. 28, 2022) (Furman, J.) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (quoting Fed. R. Evid. 702 advisory

14

committee notes)); *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 481 n.211 (S.D.N.Y. 2010) (Scheindlin, J.) ("An expert's bare assertion that he has performed the necessary analysis is insufficient to show that his analysis is reliable.").

For this reason, too, Jenkins' contingency opinions should be excluded.

### 3.    Jenkins' collectability estimates are unreliable *ipse dixit*.

The third step in Jenkins' analysis—estimating a probability that the plaintiff could collect damages from the defendant—is just as unreliable as the first two steps.

As with his estimates of damages and probability of success, Jenkins fails to explain how or why he reached the specific collectability estimates in his report. He simply lists a variety of speculative factors (*e.g.*, "likelihood of compliance"), then states his *ipse dixit* conclusion. *See* Jenkins Report ¶ 68 ("I then assessed the probability of collecting all of the award or settlement pursuant to its terms. I considered Kern County's credit-worthiness, the size of its budget, the potential for self- or third-party insurance coverage, and the likelihood of compliance. I applied a 90% probability of collection . . . ."); *id.* ¶ 109 ("I then assessed the probability of collecting all of the award or settlement pursuant to its terms. I considered Dr. Wright's assets, net worth, and the likelihood of his compliance. I applied a 95% probability of collection to the Gross Expected Recovery . . . ."); *see also id.* ¶¶ 84, 97 (similar).

Moreover, Jenkins fails to show that his collectability analysis satisfies any *Daubert* factor. *See* Jenkins Dep. Tr. 112:14–113:21. While he relies on his purported experience "evaluating repayment ability," *id.* at 110:20–111:13, an expert "relying solely or primarily on experience" still must "explain *how* that experience leads to the conclusion reached," *SEC v. Ripple Labs, Inc.*, 2023 WL 5670711, at *5 (S.D.N.Y. Mar. 6, 2023) (emphasis added). Jenkins fails to explain how his experience enabled him to reliably predict the likelihood that defendants—some of whom are based in foreign countries or have only limited publicly available information—could or would

pay multimillion-dollar judgments. Nor does he explain how his experience assessing repayment *ability* enabled him to predict how often judgment debtors who could pay ultimately *would* do so.

Once again, this step in Jenkins' analysis rests on impermissible *ipse dixit*. His opinions on the contingency matters are unreliable and should be excluded accordingly.

## III.   JENKINS' CONCLUSIONS ARE IMPERMISSIBLY SPECULATIVE.

In addition to choosing an unreliable methodology that rests on his own say-so, Jenkins proffers unsupported and speculative opinions that would not help the jury. Several of his conclusions are speculative because they are "based on incorrect factual assumptions." *Macaluso*, 2005 WL 563169, at *8. And his methodology as a whole layers unsupported inference on top of unsupported inference, thereby rendering his conclusions inherently speculative. For both reasons, his opinions and testimony on the contingent litigation matters should be excluded.

### A.   Jenkins makes numerous faulty assumptions.

Many of Jenkins' assumptions are demonstrably false. For example, in estimating $250 million in probable damages in *Kleiman* based on a rejected settlement offer, Jenkins wrongly assumes plaintiffs declined the offer "because the expectation was that the anticipated award would be significantly greater." Jenkins Report ¶ 105. The public docket makes clear that, in fact, the plaintiffs *accepted* the settlement offer, but the defendant backed out because he *could not fund it*. *See* Expedited Mot. To Depose at 1–2, *Kleiman v. Wright*, No. 9:18-cv-80176 (S.D. Fla. Nov. 1, 2019), Dkt. No. 290 ("Plaintiffs were informed Craig could no longer finance the settlement and was 'breaking' the non-binding settlement agreement."). Jenkins' failure to check the docket and represent in his report what the facts of the case truly are underscores that the assumptions in his report are not tethered to reality.

For the same reason, Jenkins' assumption that the *Kleiman* plaintiffs had a 95% chance of collecting $225 million, *see* Jenkins Report ¶ 109, is baseless. Indeed, it was further contradicted

by the facts that the defendant (i) claims to have no assets (and no access to the bitcoin referenced in the sole article cited by Jenkins), (ii) is notorious for disregarding his legal obligations, and (iii) lives in a foreign country. *See* Order at 9–11, 16–26, *Kleiman v. Wright*, No. 9:18-cv-80176 (S.D. Fla. Aug. 27, 2019), Dkt. No. 277; Fact Information Sheet, *Kleiman v. Wright*, No. 9:18-cv-80176 (S.D. Fla. Apr. 20, 2023), Dkt. No. 966-1. The reality is that, whereas Jenkins assumed plaintiffs could recover $225 million nineteen times out of twenty, the *Kleiman* plaintiffs have been unable to recover *anything* dating back to late 2021, *see* Ex. 3 at 325:19–327:6.

Similarly, Jenkins assumed $850 million in probable damages in *Tether* based on "[r]eports in the press." Jenkins Report ¶ 77. But those reports concerned a wholly unrelated case involving fraud claims brought by New York's Attorney General against Bitfinex for "cover[ing] up $850 million in (alleged) losses." Mastro Decl., Ex. 4. *Tether*, in contrast, concerned alleged antitrust violations and specifically excluded Bitfinex users from the class definition. *See* Am. Compl. ¶¶ 376, 378, *In re Tether & Bitfinex Crypto Asset Litig.*, No. 1:19-cv-09236 (S.D.N.Y. June 5, 2020), Dkt. No. 114. Jenkins' $850 million figure is thus made out of the ether.

Jenkins' analysis, in short, is riddled with "incorrect factual assumptions that render all of his subsequent conclusions purely speculative." *Macaluso*, 2005 WL 563169, at *8. These opinions and testimony should be excluded accordingly. *See, e.g., Chart v. Town of Parma*, 2014 WL 4923166, at *16–17 (W.D.N.Y. Sept. 30, 2014) (excluding expert testimony that was "not based on upon any facts" because experts "'cannot ignore the real world'") (citation omitted); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284 (S.D.N.Y. 2000) (excluding testimony based on "unsupported assumptions"); *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *3–5 (S.D.N.Y. Dec. 14, 2001) (same).

**B.      Jenkins relies on a chain of unsupported inferences.**

Jenkins' contingency opinions also should be excluded because they are nothing more than guesses. Indeed, his methodology is a house of cards built upon his own speculation.

It is black-letter law that "'damages may not be merely speculative, possible or imaginary,'" but instead "must be . . . 'based upon known reliable factors without undue speculation.'" *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citation omitted). Satisfying that burden "'is even more difficult'" where, as here, the "'case involves a new business . . . because the plaintiff's proof regarding damages in these cases face a heightened scrutiny by the courts.'" *Holland Loader Co.*, 313 F. Supp. 3d at 481 (Woods, J.) (quoting *Inficon, Inc. v. Verionix, Inc.*, 182 F. Supp. 3d 32, 37 (S.D.N.Y. 2016)); *accord Schonfeld*, 218 F.3d at 172 ("evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate").

As Jenkins' own cited authority explains, pending contingency litigation matters "defy an accurate value." Mastro Decl., Ex. 5. For that reason, courts generally deem valuations of such litigation matters highly speculative—especially in the context of a new law firm—unless they are based on sufficiently concrete inputs such as data from comparable cases or comparable firms. *See, e.g.*, *Holland Loader Co.*, 313 F. Supp. 3d at 481–82 (holding that valuation of new firm's lost profits was "speculative" because, "[w]ithout any historical data to support the [firm's internal] projections . . . , the Court simply cannot find that those figures provide a sufficiently certain and reliable baseline"); *Saucier v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 1321826, at *6 (W.D. La. Apr. 6, 2017) (holding that expert's valuation of "contingency fee professional service practice" "relie[d] too heavily on possibility and speculation" because it did not use concrete inputs such as "case volumes, duration of how long the cases take, and settlement amounts," as used in "the industry's accepted methodology"); *Roberts v. Roberts*, 689 So. 2d 378,

381 (Fla. Dist. Ct. App. 1997) (citing cases and agreeing that "the value of [pending contingency fee cases] is highly speculative" unless "the cases have progressed to a point that a recovery is probable").

Jenkins, however, did not choose an accepted methodology that rests on concrete inputs. As a non-attorney with no experience valuing contingency litigation, he instead made up a methodology that replaces concrete inputs with guesswork and speculation. It is anybody's guess whether the plaintiffs in each lawsuit *actually* could have won, much less recovered, the damages Jenkins posits. Because his conclusions rest "upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors," they should be excluded. *Schonfeld*, 218 F.3d at 172–73 (citation omitted); *see Ho Myung Moolsan*, 2010 WL 4892646, at *7–9 ("experts' opinions on [lost profits] are excludable when 'wrought with unsupported and speculative assumptions'" about their inputs) (citation omitted); *Summit Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n*, 2010 WL 2382405, at *3 (S.D.N.Y. June 14, 2010) (Sand, J.) ("Courts have repeatedly found that where the existence of lost profits rests on a multitude of assumptions, the plaintiff has failed to establish [damages].").

## **CONCLUSION**

For the foregoing reasons, the Court should exclude Jenkins' proposed testimony regarding the valuation of contingency matters, and any calculations that flow from those opinions.

Dated: February 27, 2024  
      New York, NY

Respectfully submitted,

*/s/ Randy M. Mastro*  
Randy M. Mastro  
Lauren K. Myers  
King & Spalding LLP  
1185 Avenue of the Americas, 34th Floor  
New York, NY 10036  
Tel.: (212) 827-4019  
Email: RMastro@kslaw.com  
         LMyers@kslaw.com

*Counsel for Plaintiff and Counterclaim-Defendant Roche Freedman LLP, and Counterclaim-Defendants Kyle Roche, Devin Freedman, Amos Friedland, and Edward Normand*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,457 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

*/s/ Randy M. Mastro*
Randy M. Mastro
